IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| THE TOHONO O'ODHAM NATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06-CV-02236-JR |
| | ) | Judge James Robertson |
| DIRK KEMPTHORNE, ROSS O. | ) | **(Electronically filed on April 29, 2008)** |
| SWIMMER and HENRY M. | ) | |
| PAULSON, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR ENTRY OF TRUST RECORD PRESERVATION ORDER

## I.    INTRODUCTION

The Tohono O'odham Nation (the "Nation") hereby moves for entry of the attached Trust Record Preservation Order ("Preservation Order").

Trust documents in Trustee-Delegates' possession and control are the essential lifeblood of the trust. They are critical to proof of the Nation's claims for breach of trust and its demand for equitable relief including a full and complete accounting of all of its trust assets. Without these irreplaceable records, it may well be impossible to determine the universe of the trust and the transactions relevant to the accounting the Nation seeks or to provide other equitable relief the Nation has requested. Moreover, quite apart from Trustee-Delegates' legal obligation to preserve information and documents relevant to the pending litigation, Trustee-Delegates also have a duty to preserve records related to the administration of the trust and to provide all information regarding the management and administration of the Nation's trust assets upon request; consequently, the failure of Trustee-Delegates to maintain properly and safeguard these records is plainly a breach of its fiduciary duty owed to the Nation.

1

Other courts that have considered whether to enter a preservation order have at times required that the order be necessary to the preservation of evidence in the case and that it not impose an undue burden on the party opposing preservation. Both requirements are met here. First, the necessity of the Preservation Order could not be more apparent. The record indicates that Trustee-Delegates have repeatedly destroyed trust records in contravention of their fiduciary duties and the government's own administrative directives, and in violation of orders of this Court and the United States Court of Federal Claims ("CFC") requiring preservation of such records. Indeed, while the government's remand motion was pending in this Court, it notified the Court of Federal Claims of the destruction of 15 more boxes of documents (but did not notify this Court). And the destruction and loss of trust documents continues – just two weeks ago, nine additional boxes of trust records were reportedly discovered to have been badly damaged by water and mold while in Trustee-Delegates' possession. Entry of this Preservation Order is therefore necessary to the preservation of evidence in this case.

Furthermore, entry of the Order will not impose an undue burden on Trustee-Delegates. The Order merely requires Trustee-Delegates to identify and preserve documents relevant to the accounts and assets they hold in trust for the Nation, records they have long had a duty to protect and records they have a long and sordid history of failing to safeguard. The Order does not require that Trustee-Delegates produce these records at this time – inspection is reserved for discovery. The Nation also does not seek through this motion to require Trustee-Delegates to provide an index of all of the Nation's trust records. At this time, only when the trust records are moved, which raises a particular risk of destruction or loss, must the Defendants provide written notice of the move as well as copies of move plans to include, among other things, box inventories and descriptions of the records being moved.

US2000 10779604.1

The Nation is joined in this motion by the following Tribes:

- Ak-Chin Indian Community (Civ. Action No. 06-CV-2245(JR))
- Cheyenne River Sioux Tribe (Civ. Action No. 06-CV-1897(JR))
- Chippewa Cree of Rocky Boy (Civ. Action No. 02-CV-0276(JR))
- Confederated Tribes of Goshute Reservation (Civ. Action No. 06-CV-1902(JR))
- Crow Creek Sioux Tribe (Civ. Action No. 04-CV-0900(JR))
- Eastern Shawnee Tribe of Oklahoma (Civ. Action No. 06-CV-2162(JR))
- Iowa Tribe of Kansas and Nebraska (Civ. Action No. 06-CV-1899(JR))
- Lower Brule Sioux Tribe (Civ. Action No. 05-CV-2495(JR))
- Muscogee (Creek) Nation of Oklahoma (Civ. Action No. 06-CV-2161(JR))
- Nez Perce Tribe, Mescalero Apache Tribe, Tule River Indian Tribe, Hualapai Tribe, Yakama Nation, Klamath Tribes, Yurok Tribe, Cheyenne-Arapaho Tribe, Pawnee Nation of Oklahoma, Sac and Fox Nation, Tlingit & Haida Indian Tribes of Alaska, and the Santee Sioux Tribe of Nebraska (Civ. Action No. 06-CV-2239(JR))
- Northwestern Band of Shoshone (Civ. Action No. 06-CV-2163(JR))
- Oglala Sioux Tribe (Civ. Action No. 04-CV-1126(JR))
- Omaha Tribe of Nebraska (Civ. Action No. 04-CV-0901(JR))
- Passamaquoddy Tribe of Maine (Civ. Action No. 06-CV-2240(JR))
- Prairie Band of Potawatomi Nation (Civ. Action No. 05-CV-2496(JR))
- Red Cliff Band of Lake Superior Chippewa (Civ. Action No. 06-CV-2164(JR))
- Rosebud Sioux Tribe (Civ. Action No. 05-CV-2492(JR))
- Salt River Pima Maricopa Indian Community (Civ. Action No. 06-CV-2241(JR))
- Stillaguamish Tribe of Indians (Civ. Action No. 06-CV-1898(JR))
- Winnebago Tribe of Nebraska (Civ. Action No. 05-CV-2493(JR))
- Wyandot Tribe of Kansas (Civ. Action No. 05-CV-2491(JR))
- Yankton Sioux Tribe (Civ. Action No. 03-CV-1603(JR))

Plaintiff Tribes seeking this motion have acted in concert because a single document protection protocol for all cases before this Court will save judicial resources. Adopting a single preservation order to be entered in all of these Tribes' trust cases before this Court would not only mitigate the risk of further loss of irreplaceable trust records in these matters, but would also further reduce the already-light burden imposed upon Trustee-Delegates with respect to compliance and enforcement of the Order's terms.

## II.    **BACKGROUND**

Trustee-Delegates, as trustees for the Nation's funds, land, and other assets, are obligated to make and preserve in their possession records that are critical to providing the Nation with a

US2000 10779604.1

full and complete equitable accounting of its assets. These duties are imposed by the statutes that create the trust as further elucidated by general principles of trust law. *See, e.g.*, *Cobell v. Norton (Cobell VI)*, 240 F.3d 1081, 1093 (D.C. Cir. 2001) ("As trustee delegates these officials ha[ve] a clear obligation to maintain trust records and furnish such records to beneficiaries upon request."); *Pueblo of San Ildenfonso v. United States*, 35 Fed. Cl. 777, 788 (1996) (a trustee's duty "to keep and render clear and accurate accounts" is "well settled"); RESTATEMENT (SECOND) OF TRUSTS § 172 (1959) ("Duty to Keep and Render Accounts: The trustee is under a duty to the beneficiary to keep and render clear and accurate accounts with respect to the administration of the trust."); *id.* § 173 ("Duty to Furnish Information: The trustee is under a duty to the beneficiary to give him upon his request at reasonable times complete and accurate information as to the nature and amount of the trust property . . . .").

In addition, various statutes and regulations impose more specific obligations to preserve these records. For example, proceeds generated from the use and disposition of the Nation's tribal lands and other tribal resources have been historically paid to the United States as trustee, and the Department of the Interior ("Interior") maintains all documentation related to collections and invoicing. *See, e.g.*, 25 C.F.R. § 162.108 (summarizing Interior's duties for handling payments for Indian leases); 25 C.F.R. § 211.40 (incorporating 30 C.F.R. ch. II for payments related to Indian minerals); 30 C.F.R. pt. 218 (governing collection of minerals royalties, rents, bonuses and other federal leases). In addition to their responsibility for maintaining documentation of the Nation's trust assets, the Departments of the Treasury and the Interior are required to invest the Nation's trust funds and to account for the daily and annual balance of all funds held in trust for Indian tribes. *See, e.g.*, 25 U.S.C. §§ 161a, 162a & 4001-4061. Interior is also obligated annually to audit such trust funds and provide quarterly statements identifying the

US2000 10779604.1

source, type, and status of the funds, including the beginning balances, gains and losses, receipts and disbursements, and ending balances. *Id.* § 4011(b)-(c).

Much of this documentation is in the exclusive possession and control of Trustee-Delegates and provides the **_only_** source of information about the Nation's trust assets. Therefore, it is crucial that Trustee-Delegates – as all trustees must – maintain and preserve trust records in order to ensure that the Nation may obtain the accounting it seeks and so that the Court may order further appropriate equitable relief, including a restatement and correction of trust account balances to reflect the results of the accounting or production of the very trust records themselves. Plaintiff Tribes do not seek special treatment. It is axiomatic that a trustee must preserve the trust records of its beneficiary.

As described further below, in spite of multiple court orders and the government's insistence that it has in place its own administrative directives that are sufficient to prevent the destruction of documents, there are still numerous examples of the government's mishandling of Indian trust records in the *Cobell* litigation and other cases in the CFC, where many Tribal trust claims for money damages are pending. Despite this, the government continues to take the position in court filings that it has in place adequate procedures to prevent the destruction of Indian trust records.

As a direct consequence of Trustee-Delegates' repeated failure to preserve important Indian trust documents, the Nation moves the Court to enter the proposed Preservation Order. The Preservation Order would simply require Trustee-Delegates (a) to preserve all documents, data, and tangible things in their possession, custody, or control that embody, refer to, or relate to the accounts or assets held in trust by Defendants or their agents for the Nation; (b) to require each of their employees, agents, or contractors who has custody of the Nation's trust records to

5

execute an acknowledgement stating that the person has been provided with a copy of the Preservation Order, has reviewed it, and has agreed to be bound by its terms and to notify Defendants' counsel immediately of any violations of the Order; (c) to maintain a copy of those acknowledgments; (d) to notify the Court immediately of any destruction or loss of such records, (e) in the case of such destruction or loss, to produce a list of those involved with the violation of the Order and a copy of the signed acknowledgements for those individuals, and (f) whenever Trustee-Delegates, their employees, agents or contractors anticipate moving trust records, to provide notice, a copy of a move plan or plans, and inventories and descriptions of the records being moved. The Nation does not seek by entry of this Order to require the government to index or inventory all trust records or to produce and permit inspection of those records. The Preservation Order would merely require Trustee-Delegates to comply with their obligations to this Court to preserve relevant trust documents for the pending litigation, and their obligations under trust law to preserve trust records, and would provide a mechanism to ensure that Trustee-Delegates have done so.

## III.    ARGUMENT

### A.    The Court's Authority to Preserve Trust Records.

Preservation orders like the one sought here are not uncommon. Although the issuance of a preservation order is not automatic, courts have increasingly entered such orders, especially where, as here, there is a history of document destruction or the case is complex and involves many documents at risk of destruction. *See, e.g.*, *Treppel v. Biovail Corp.*, 233 F.R.D. 363, 370 (S.D.N.Y. 2006) ("[S]uch orders 'are increasingly routine in cases involving electronic evidence, such as e-mails and other forms of electronic communication'" (quoting *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 136 (2004)); *Capricorn Power Co., Inc. v. Siemens Westinghouse*

6

*Power Corp.*, 220 F.R.D. 429, 431 (W.D. Pa. 2004) ("[O]rders directing parties to preserve materials or documents are common in circumstances in which evidence is subject to being destroyed or lost in routine and sometimes not-so-routine deletion or destruction of information in various mediums"); *HJB, Inc. v. Am. Home Products Corp.*, 1994 WL 31005, at *1 (N.D. Ill. Feb. 1, 1994) ("[Preservation orders] are common in complex litigations"); *see also El-Banna v. Bush*, 2005 WL 1903561 (D.D.C. July 18, 2005) (court recognized its inherent authority to enter preservation order to protect documents and evidence in habeas case); *Pueblo of Laguna*, 60 Fed. Cl. 133, 137 & n.7 (2004) (citing examples); *Manual for Complex Litigation*, § 11.442 ("Preservation") (4th ed. 2004) (discussing need for preservation orders in complex cases).

## 1.    The Court Has Authority to Preserve and Protect Evidence.

This Court may order the preservation of the Nation's trust records pursuant to its authority to preserve and protect evidence as well as its equitable authority to enforce Defendants' trust obligations.[1]  The Court's authority to preserve and protect evidence arises from the Federal Rules of Civil Procedure as well as certain powers that are inherent in the authority of a court.  First, the Court has authority to order the preservation of the Nation's trust records pursuant to its case management authority under Rule 16.  That rule grants the Court broad powers to "take appropriate action" with respect to the "control[] and scheduling of discovery," the need for "adopting special procedures for managing potentially difficult or protracted actions" and any such matters that may facilitate "in other ways the just, speedy and inexpensive disposition of the action."  *See* Fed. R. Civ. P. 16(c)(2)(F), (L), and (P).  Various courts have invoked these provisions in issuing preservation orders.  *See, e.g.*, *Pueblo of Laguna*, 60 Fed. Cl. at 137; *In re St. Jude Med., Inc.*, 2001 WL 1640056 (D. Minn. Aug. 21, 2001); *In re*

---

[1] Courts have entered preservation orders in other trust cases in this District.  *See, e.g.*, *Cobell v. Kempthorne*, No. 1:96CV01285 (Aug. 12, 1999) ("Order Regarding Interior Department IIM Records Retention") (attached as Ex. 1). [Dkt. No. 370]

US2000 10779604.1

*Del-Val Fin. Corp. Sec. Litig.*, 1991 WL 29140 (S.D.N.Y. Feb. 28, 1991); *In re Wirebound Boxes Antitrust Litig.*, 128 F.R.D. 250 (D. Minn. 1989). Of course, pursuant to Rule 26(c), the Court could simply order that the records be produced in response to the Nation's production requests. "That, of course, would be the surest way to preserve the documents in question – it also would be the most burdensome." *See Pueblo of Laguna*, 60 Fed. Cl. at 137 n.7. Therefore, not only do the Rules authorize the Court to enter the Preservation Order pursuant to its ability to manage discovery in this case, but doing so is a less onerous means for the Court to ensure a just and accurate outcome.

In addition to the authority granted in Rule 16, the power to preserve evidence that is relevant to the subject of the litigation is also one in a category of implied powers that "necessarily result to our Courts of justice from the nature of their institution." *Pueblo of Laguna*, 60 Fed. Cl. at 137 (quoting *U.S. v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812)); *Chambers v. NASCO*, 501 U.S. 32, 43 (1991) (same); *see also United States ex rel. Smith v. Boeing Co.*, 2005 WL 2105972, at *2 (D. Kan. Aug. 31, 2005); *Capricorn Power Co., Inc. v. Siemens Westinghouse Power Corp.*, 220 F.R.D. at 431. These implied powers are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Link v. Wabash R.R. Co.*, 370 U.S. 626, 630-31 (1962); *see also Shepherd v. Am. Broadcasting Companies, Inc.*, 62 F.3d 1469, 1474 (D.C. Cir. 1995) ("When rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gaps").

The authority to preserve evidence is critical to this Court's ability to govern and preserve the integrity of its proceedings. When evidence is not preserved, the consequences can be

irreversible and devastating to the judicial process.  *See, e.g.*, *Zublake v. UBS Warburg LLC*, 220 F.R.D. 212, 214 (S.D.N.Y. 2003) ("'Documents create a paper reality we call proof.  The absence of such documentary proof may stymie the search for the truth'") (citation omitted)); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 169 F.R.D. 598, 616 (D.N.J. 1997) ("Document destruction inevitably hinders the administration of justice").  As one court observed,

> Aside perhaps from perjury, no act serves to threaten the integrity of the judicial process more than the spoliation of evidence. …[W]hen critical documents go missing, judges and litigants alike descend into a world of *ad hocery* and half measures – and our civil justice system suffers.

*United Med. Supply Co., Inc. v. United States*, 77 Fed. Cl. 257, 259-60 (2007) (*United Med. Supply II*).

The inability to preserve evidence in turn undermines a court's ability to exercise all of its other powers.  *See Pueblo of Laguna*, 60 Fed. Cl. at 137 ("Maintaining the integrity of these functions, *a fortiori*, requires this court to be empowered to prevent abuses of its process, subsumed within is the ability to preserve relevant evidence – a power 'necessary to the exercise of all others.'" (citation omitted); *see also Shepherd*, 62 F.3d at 1474 (inherent powers "cannot be dispensed with in a court, because they are necessary to the exercise of all others" (quoting *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812)).  Destruction of evidence obviously increases "the risk of an erroneous decision on the merits of the underlying cause of action and can increase the costs of litigation as parties attempt to reconstruct the destroyed evidence or to develop other evidence that may be less persuasive, less accessible or both." *Trigon Ins. Co. v. United States*, 204 F.R.D. 277, 285 (E.D. Va. 2001).  Therefore, the power to preserve evidence, which is essential to the effective administration of justice, is inherent to this Court's judicial

authority.  These rules apply with particular vigor in the context of a trust because the documents are the property of the beneficiary.

> **2.    The Court May Also Order Preservation of Trust Records Pursuant to its Equitable Authority to Enforce the Trust.**

Quite apart from the Court's authority to preserve trust records under the Rules, this Court also has inherent equitable authority to order preservation of the Nation's trust records in compliance with Trustee-Delegates' fiduciary obligation to furnish critical information about the trust.  *See, e.g.*, *Village of Brookfield v. Pentis*, 101 F.2d 516, 520-21 (7th Cir. 1939) ("Courts of equity have original inherent jurisdiction to decree and enforce trusts").   It is beyond peradventure that the beneficiary of a trust is entitled to receive "information necessary to protect his rights under the trust."  *Clifford v. United States*, 136 F.3d 144, 152 (D.C. Cir. 1998); *see also Cobell VI*, 240 F.3d at 1093 ("As trustee delegates these officials ha[ve] a clear obligation to maintain trust records and furnish such records to beneficiaries upon request");  RESTATEMENT (SECOND) OF TRUSTS, comment c, § 173 (1959) ("[T]he beneficiary is always entitled to such information as is necessary to enable him to enforce his rights under the trust or to **prevent** or redress a breach of trust." (emphasis added)).  Moreover, this Circuit has recognized that it is this Court's obligation to protect the interest of the beneficiary from breaches of trust.  *See, e.g.*, *Crawford v. La Boucherie Bernard Ltd.*, 815 F.2d 117, 120 (D.C. Cir. 1987), *cert. denied*, 484 U.S. 943 (1987) ("Trust law contemplates the use of broad and flexible equitable remedies as means for dealing with breaches of fiduciary duty, and it imposes the obligation upon the courts to use the remedy that is most advantageous to the participants and that will most closely effectuate the purposes of the trust" (citation omitted)).  Accordingly, this Court's equitable authority to enforce trust obligations requiring preservation of these records provides a separate and independent ground for its authority to enter the Preservation Order proposed in this case.

US2000 10779604.1

### 3.    A Preservation Order May Be Entered When It Is Necessary and Not Unreasonably Burdensome.

A party seeking a preservation order need only "demonstrate that it is necessary and not unduly burdensome." *Pueblo of Laguna*, 60 Fed. Cl. at 138; *see also Treppel v. Biovail Corp.*, 233 F.R.D. at 370-71 (S.D.N.Y. 2006) (adopting a version of the test articulated in *Pueblo of Laguna*); *Williams v. Mass. Mut. Life Ins. Co.*, 226 F.R.D. 144, 147 (D. Mass. 2005) (adopting the *Pueblo of Laguna* test); *United Medical Supply Co., Inc. v. United States*, 73 Fed. Cl. 35, 36 (2006) (*United Med. Supply I*) (same); *Walker v. Cash Flow Consultants, Inc.*, 200 F.R.D. 613, 617 (N.D. Ill. 2001).[2]  "To meet the first prong of this test, the proponent ordinarily must show that absent a court order, there is a significant risk that relevant evidence will be lost or destroyed[.]"  *Pueblo of Laguna*, 60 Fed. Cl. at 138; *Treppel*, 233 F.R.D. at 371.  This burden is "often met by demonstrating that the opposing party has lost or destroyed evidence in the past or has inadequate retention procedures in place."  *Pueblo of Laguna*, 60 Fed. Cl. at 138; *see also Capricorn Power v. Siemens Westinghouse Power Corp.*, 220 F.R.D. at 437 ("Had there been evidence of attempted damage or destruction of the report of the data compilations used to produce it, the Court's level of concern for the protection of the integrity and existence of the evidence would have been different"); *Treppel*, 233 F.R.D. at 371 (same).

---

[2] The ordinary test for an injunction – such as "likelihood of success on the merits" – is not necessary and courts have recognized that applying the standard for an injunction in the context of a request for a preservation order "creates anomalies."  *Treppel*, 233 F.R.D. at 370 ("Applying such a standard requires the court to "evaluate the merits of the litigation even before evidence has been gathered, let alone produced to the opposing party or submitted to the court."); *see also El-Banna v. Bush*, 2005 WL 1903561, at *1 n.3 (D.D.C. July 18, 2005) (observing the notion that traditional injunction requirements must be met before a document preservation order is issued is "in tension" with the fact that "the Federal Rules of Civil Procedure impose preservation obligations on civil litigants in every civil action filed automatically and without court review"); *Pueblo of Laguna*, 60 Fed. Cl. at 138 n.8 ("[There is] no reason . . . to consider whether plaintiff is likely to be successful on the merits of its case in deciding whether to protect records from destruction … [S]uch an approach would be decidedly to put the cart before the horse"); *id.* ("[A] document preservation order is no more an injunction than an order requiring a party to identify witnesses or to produce documents in discovery"); *id.* ("[T]he more recent of these decisions ignore significant changes made to the Federal Rules of Civil Procedure since the 1960s, further establishing the case management powers of judges"); *Capricorn*, 220 F.R.D. at 433 ("proof of a probability of success in litigation is not an appropriate consideration in the determination whether to order preservation of documents").

US2000 10779604.1

To satisfy the second prong, the "proponent must show that the particular steps to be adopted will be effective, but not overbroad." *Pueblo of Laguna*, 60 Fed. Cl. at 138. As explained below, the Preservation Order proposed here satisfies both elements of this test.

**B.      The Preservation Order Is Necessary.**

The entry of a preservation order is necessary in this case for three reasons: (1) despite the government's own administrative preservation directives, it has repeatedly lost or destroyed irreplaceable Indian trust records in other cases similar to this one; (2) the consequences of loss or destruction are particularly grave because the government, as trustee, is in exclusive control of documents that belong to the Nation and that are critical to the accounting and other equitable relief the Nation seeks in this case; and (3) the Preservation Order will require the government to ensure the Court is notified immediately of any loss or destruction of documents so that the Court may determine at once whether Trustee-Delegates have complied with the Preservation Order and, if necessary, impose further protections to guard against the loss of additional trust records.

**1.      The Preservation Order is Necessary Because Trustee-Delegates Have Grossly Failed to Preserve Indian Trust Records in the Past.**

The proponent's burden of establishing that a Preservation Order is necessary is most often "met by demonstrating that the opposing party has lost or destroyed evidence in the past or has inadequate retention procedures in place." *Pueblo of Laguna*, 60 Fed. Cl. at 138. As detailed below, the many examples of Trustee-Delegates' mishandling of Indian trust records amply demonstrate that they have "lost or destroyed evidence in the past." *Id.* Moreover, despite Trustee-Delegates' now-familiar insistence that they have implemented administrative retention procedures adequate to protect Indian beneficiaries' trust records, their efforts have still failed to prevent new occurrences of such loss or destruction.

12

This Court and the Court of Federal Claims have repeatedly acknowledged the dismal state of preservation of trust records at the Departments of the Interior and the Treasury by entering trust preservation orders similar to the one the Nation seeks here.  Indeed, this Court in the *Cobell* litigation, and the CFC in more than a half dozen Tribal trust cases, have entered preservation orders in Indian trust cases precisely because of this pattern of destruction and loss. *See, e.g.*, *Cobell v. Kempthorne*, No. 1:96CV01285 (D.D.C. Aug. 12, 1999) ("Order Regarding Interior Department IIM Records Retention") (Ex. 1) [Dkt. No. 370]; *Quechan Tribe of the Fort Yuma Indian Reservation v. United States*, No. 06-888L (Fed. Cl. Oct. 25, 2007) ("Protective Order") (attached as Ex. 2); *Kaw Nation of Okla. v. United States*, No. 06-934L (Fed. Cl. Oct. 24, 2007) ("Document Preservation Order") (attached as Ex. 3); *Round Valley Indian Tribes v. United States*, No. 06-900L (Fed. Cl. Oct. 1, 2007) ("Protective Order") (attached as Ex. 4); *Navajo Nation f.k.a Navajo Tribe of Indians v. United States*, No. 06-945L (Fed. Cl. Sept. 10, 2007) ("Order") (attached as Ex. 5); *Swinomish Indian Tribal Community v. United States*, No. 06-899L (Fed. Cl. Aug. 24, 2007) ("Order") (attached as Ex. 6); *Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 141-143 (2004); *Jicarilla Apache Nation v. United States*, No. 02-25L (Fed. Cl. Mar. 19, 2004) ("Order") (attached as Ex. 7).

> ### a.  Trustee-Delegates' "decades of neglect" in the protection and preservation of Indian trust records.

As this Court well knows, Trustee-Delegates have a woeful track record when it comes to protecting and preserving Indian trust records, records they are specifically charged with safeguarding as trustees.  As this Court recently noted, there literally have been "decades of neglect."  *See Cobell v. Kempthorne (Cobell XX)*, 532 F.Supp.2d 37, 46 (D.D.C. 2008).  As a result, "Interior has an abysmal record of failing to prioritize the maintenance and preservation of trust documents."  *Id.*; *see also Cobell VI*, 240 F.3d at 1093 (describing "egregious" nature of

<center>13</center>

destruction of documents and failure to notify the court of their destruction).  While in other cases only the most recent examples of document destruction would be relevant to whether a preservation order is necessary, here the long history of wanton disregard and inattention to trust record preservation at the Departments of the Interior and the Treasury, combined with yet additional examples of document destruction in recent years, demonstrates the systemic nature of the problem and the grave need for the Court to ensure that trust records are preserved pending completion of this litigation.

The pattern of poor document management at Interior and Treasury is documented in numerous government reports, of which only a few illustrative examples are discussed here.  For instance, in 1990, in a formal evaluation of the records management program of the Bureau of Indian Affairs ("BIA") in 1990, the National Archives and Records Administration ("NARA") confirmed that the BIA was "deficient in all areas of its records management program."  Office of Records Administration, National Archives and Records Administration, *Evaluation of the Records Management Program of the Department of the Interior, Bureau of Indian Affairs*, at iii (Aug. 1990) (attached as Ex. 8).  Despite attempts to assist the BIA in improving its process, there had been "virtually no improvement."  *Id.*  Major deficiencies persisted, including, among many others, an inadequate response to serious problems identified in earlier evaluations and "large volumes of inactive records (many of which are permanently valuable or are potentially permanent) maintained in agency space, some under adverse environmental conditions."  *Id.* at iv.

Under a threat from NARA to pursue Congressional intervention, the BIA requested the assistance of the Federal Systems Integration and Management Center (FEDSIM) to determine the extent of the records management problem.  The report was troubling and laid bare for the

first time the breadth of the document preservation problem at Interior. FEDSIM reported "environmental conditions in which records are stored" ranging "from passable to deplorable." Federal Systems Integration and Management Center, *Records Management Study for the Bureau of Indian Affairs,* at iv (Jan. 1993) (attached as Ex. 9). The report noted that "[f]ire protection is rare, temperature control is rare, humidity control is totally absent, the risk of water and pest damage is often very high, protection against vandalism is marginal, storage containers are rarely of the proper type, and storage shelving is usually inadequate or entirely absent." *Id.* More specifically, the report recorded that most warehouses did not have sprinkler systems, records were stored in close proximity to bags of shredded material posing a high fire risk, records showed "clear evidence of earlier water damage" or were at great risk of water damage from undetected leaky roofs, and records were stored directly on the floor where a heavy rainstorm could easily flow under doorways and damage boxed records. *Id.* at 14-15. In other storage areas, FEDSIM observed that "rodents and insect pests" found no impediment to entering and occupying storage areas and that records were stored in "whatever containers are handy, including a wide variety of cardboard boxes, old filed cabinets, and so on." *Id.* at 15.

Even after the commencement of the *Cobell* litigation and the entry of a document preservation order in that case, which put Trustee-Delegates on notice of the critical need to preserve trust records, *see Cobell v. Kempthorne*, No. 1:96CV01285 (D.D.C. Aug. 12, 1999) ("Order Regarding Interior Department IIM Records Retention") (Ex. 1) [Dkt. No. 370], Trustee-Delegates still failed to take steps to protect trust records against destruction and loss. The Special Master appointed by the court to oversee the Interior Department's retention and protection from destruction of individual Indian trust records issued reports regarding site visits to area and agency offices that documented, in shocking detail and pictures, the dismal state of

15

Indian trust records maintained by Interior.  *See, e.g.*, *Cobell v. Babbitt*, No. 1:96CV01285 (D.D.C. Oct. 29, 1999) ("Report of the Special Master Regarding Visits to Area and Agency Offices of Oct. 29, 1999") [Dkt. No. 385] (without exhibits) (attached as Ex. 10); *Cobell v. Babbitt*, No. 1:96CV01285 (D.D.C. Nov. 19, 1999) ("Third Report of the Special Master Regarding Site Visits to Area Agencies and Offices of Nov. 12, 1999") [Dkt. No. 389] (attached as Ex. 11).  The Special Master found irreplaceable trust documents "strewn in exposed wood sheds," stored in non-fireproof rooms "susceptible to fire or other disaster," in filing cabinets that would not lock, stored in such a way that activation of the building's sprinkler system would destroy the documents, and stored in other "deplorable conditions" that made "disaster . . . inevitable."  October 1999 Report of the Special Master at 3-5.  At other locations, the Special Master found or learned of documents stored in a "wooden structure which is neither fireproof or temperature controlled," "sitting in a puddle of water near sacks of fertilizer," and kept in a "cold storage" unit that consisted of "a wooden and corrugated metal shed" where documents were "maintained in deplorable condition amidst gasoline canisters, tires, machinery, and other debris."  *See* November 1999 Report of the Special Master at 2-4.  At one location, the Special Master noted "callous disregard . . . beyond that of insufficient resources" concerning the care and maintenance of trust records as well as a "duplicitous denial of the existence [of] any off-site storage facility and a transparent attempt to prevent [him] from photographing the area."  *Id.* at 4.  The Special Master's Reports included many dozens of pictures documenting the deplorable conditions in which the Special Master found Indian trust records that Trustee-Delegates were supposed to be holding in trust.  A couple merely illustrative examples are included below:

16

Fort Berthold Agency                              Fort Totten Agency

   

*See* Exhibits to November 1999 Report of the Special Master.

What is more, when certain trust records were actually destroyed, Trustee-Delegates withheld reports about this destruction until months after the fact. In May 1999, the Department of Justice notified the Special Master appointed by the Court of the destruction of 162 boxes of potentially relevant Treasury Department files. *See Cobell v. Babbitt*, No. 1:96CV01285, 1 (D.D.C. Dec. 6, 1999) ("Recommendation and Report of the Special Master Regarding the Delayed Disclosure of the Destruction of Uncurrent Check Records Maintained by the Department of the Treasury of Dec. 3, 1999") [Dkt. No. 397] (attached as Ex. 12) . The government also revealed that a box of documents was "apparently mislaid" when transferred to the Bureau of Public Debt three years earlier in 1996. *Id.* Even more troubling than the destruction of the trust documents, moreover, was that the government did not bring the destruction to the Court's attention until months after its attorneys became aware of the destruction. *See id.* at 82 (noting "disturbing trend to withhold information from the Court" and a "chronic need [sic] patently poor decisions instead of promptly acting to remedy them").

17

This history of negligence, indeed indifference, to preservation of trust records is now well-chronicled in this Court's *Cobell* decisions. *See Cobell XX*, 532 F.Supp.2d at 46 ("Interior has an abysmal record of failing to prioritize the maintenance and preservation of trust documents"); *Cobell v. Norton*, 224 F.R.D. 1, 4 (D.D.C. 2004) (emphasis added) ("[S]ince his appointment, the Master has filed *dozens* of reports documenting a myriad of disturbing (and undisputed) findings with respect to the lack of care with which trust information was being safeguarded"); *Cobell VI*, 240 F.3d at 1093 (noting "egregious" nature of destruction of documents and government's failure to report that destruction to the court in a timely manner); *Cobell v. Norton (Cobell V)*, 91 F. Supp. 2d 1, 60 (D.D.C. 1999) (acknowledging Special Master's Report regarding destruction and late notification to court regarding 162 boxes of potentially relevant Treasury Department files).

> **b.    Trustee-Delegates' failure to preserve IIM trust records in *Cobell* has prompted the Court of Federal Claims to enter orders to ensure the preservation of tribal trust records.**

Relying upon, *inter alia*, the United States' failed efforts to preserve important IIM trust records in *Cobell*, the Court of Federal Claims began in 2004 to enter preservation orders to protect the trust records of Tribes bringing claims for money damages for mismanagement of their trust assets. *See Pueblo of Laguna*, 60 Fed. Cl. at 141-143; *Jicarilla Apache Nation v. United States*, No. 02-25L (Fed. Cl. Mar. 19, 2004) ("Order") (Ex. 7). In allowing the plaintiffs' motions for entry of record preservation orders in *Pueblo of Laguna* and *Jicarilla Apache* in 2004, the CFC relied heavily upon the widespread destruction of documents in *Cobell*, noting --

> many instances of the destruction of documents, including electronic records, containing or possibly containing, Indian-related information; the unsatisfactory oversight of administrative procedures; the inability of management to respond effectively when made aware of violations, the general disrepair of many facilities in which Indian records have been stored; the insufficient implementation of

18

> regulations regarding Indian-record retention and the lack of suitable systems and methods for ensuring preservation; the lack of security for computers containing Indian data; and numerous examples of improper attempts to transfer Indian records.

*Pueblo of Laguna*, 60 Fed. Cl. at 138. The Court of Federal Claims also recognized that many of the trust record retention problems "continued notwithstanding efforts by the Department of Interior and other government agencies to make meaningful administrative changes." *Id.* at 139. Based on this record, the Court of Federal Claims concluded that "the failures evidenced in *Cobell* appear to be so pervasive and systematic as to provide ample support for the issuance of a document preservation order in this case." *Id.*

As the parties and the court in *Pueblo of Laguna* "readily admit[ted]," the "record retention orders issued by [this Court in the *Cobell* litigation] do not, as yet cover" the records of Indian Tribes. *Id.* at 138. A "different set of records is at issue." *Id.* Therefore, although the same failures plague all Indian trust records, whether held in trust for individuals or for Tribes, a preservation order is necessary in this Court, as it was in *Pueblo of Laguna*, to ensure the protection and preservation of the Nation's records. As noted above, the CFC has now entered preservation orders in a number of other Tribal trust cases because of the government's ongoing inability to preserve Indian trust records.

> **c. Notwithstanding preservation orders entered in this Court and the Court of Federal Claims, Trustee-Delegates' deficient record retention regime has failed to protect Indian trust records from destruction and loss.**

The preservation orders entered in this Court and in the CFC still have not been able to halt Trustee-Delegates' failure to preserve essential Indian trust records. Indeed, the examples of document destruction and loss have continued apace. For example, in September 2004, this Court found that in February 2004, "boxes containing individual Indian trust records sustained

19

water damage from a leaking roof, and several hundred boxes of records [were] contaminated with mold." *Cobell*, 224 F.R.D. at 6. The Office of Trust Records ("OTR") reported a leak in the roof of a warehouse where an estimated 100 pallets of documents were stored, including one pallet that sat "right under a leak from the roof," and reported that one of the inside walls looked "like a mini water fall." *Id.* Trustee-Delegates themselves eventually confirmed that 350 boxes of records were moldy, that certain boxes containing mouse droppings remained uncleaned, and that another 50 water-damaged boxes were moved to "a warehouse that stores agricultural products." *Id.* Attempts to remediate the damage were unsuccessful. *Id.*

By May 2005, Interior reported that 140 of the boxes contained records "where portions of the record are illegible or unclear." DOI Status Report to the Court Number Twenty-One at 30 (May 2, 2005) ("21st Interior Report") (attached as Ex. 13). In June 2005, Interior reported that 285 boxes had been sent to the NARA for remediation. DOI Status Report to the Court Number Twenty-Two at 35 (Aug. 1, 2005) ("22nd Interior Report") (attached as Ex. 14). By December 2005, the total affected boxes had increased to 289, of which "21 boxes require humidification and flattening treatment; 39 boxes are badly damaged…; [and] 16 boxes are exceptionally damaged . . . ." DOI Status Report to the Court Number Twenty-Four at 22 (Feb. 1, 2006) ("24th Interior Report") (attached as Ex. 15). Finally, between June 2006 and March 2007, Interior reported that at least six boxes were damaged beyond repair, including one box that "has about 25% of its contents covered with a tar-like substance; one entire box that had mold and the files are stuck together; . . . one box of . . . printouts . . . that have holes in the printout caused by insects; [and] [t]hree boxes [that] have extensive water damage." DOI Status Report to the Court Number Twenty-Six at 23 (July 27, 2006) ("26th Interior Report") (attached as Ex. 16); *see also* DOI Status Report to the Court Number Twenty-Nine at 16 (May 1, 2007)

US2000 10779604.1

("29th Interior Report") (attached as Ex. 17) (implying that the remaining contaminated boxes had been repaired but conspicuously failing to confirm that the project was completed). Although Interior has made attempts to remediate and minimize the loss of trust documents, the fact remains that a period of nearly three years passed as these particular trust records deteriorated under its care.

Like the above-described incidents at the OTR, Treasury has also inadequately protected tribal trust records in its possession, custody, and control. For example, in June 2006, a set of microfilm copies of negotiated Treasury checks were water-damaged when the basement of the Financial Management Service ("FMS") Office in Maryland flooded as a result of significant rainfall. Twenty-Seventh Quarterly Report on Actions Taken by the Department of the Treasury to Retain IIM-Related Documents Necessary for an Accounting at 1 (Sept. 1, 2006) ("27th Treasury Report") (attached as Ex. 18). According to Treasury, the "water exposure … affected the quality of the check images on at least portions of  . . . the water-exposed microfilm cartridges." *Id.* In March 2007, Treasury sent 1/6th of the water-exposed cartridges to a contractor for remediation based on assumptions that "only approximately 2,000 (roughly one-sixth) of the water-exposed cartridges contain copies of checks for which original checks may not be available." Twenty-Ninth Quarterly Report on Actions Taken by the Department of the Treasury to Retain IIM-Related Documents Necessary for an Accounting at 1 (Mar. 1, 2007) ("29th Treasury Report") (attached as Ex. 19).

Likewise, in July 2006, 124 boxes of FMS records were impaired as the result of a water main break on July 2, 2006 near the Washington National Records Center ("WNRC"). According to Treasury these boxes contained "types of records that could include [trust]-related records (*e.g.*, Treasury checks and check claims documents)." 27th Treasury Report, *supra*, at 2.

(Ex. 18). It took an entire year to remediate fully the trust-related records that were damaged at the WNRC. *See* Thirtieth Quarterly Report on Actions Taken by the Department of the Treasury to Retain IIM-Related Documents Necessary for an Accounting 1 (June 1, 2007) ("30th Treasury Report") (attached as Ex. 20).

In December 2006, Treasury reported that 37 boxes of potential trust records were not located in an inventory of the Federal Reserve Bank of St. Louis. Twenty-Eighth Quarterly Report on Actions Taken by the Department of the Treasury to Retain IIM-Related Documents Necessary for an Accounting at 1 (Dec. 1, 2006) ("28th Treasury Report") (attached as Ex. 21). According to Treasury, some of the boxes "contain only 'tracing' information used in sorting and processing Treasury checks, which … could be recreated from the endorsement stamps on the checks themselves, assuming the endorsements are legible." *Id.* In addition, some of the boxes contained "information used in balancing Treasury checks and adjusting out-of-balance Treasury checks," which "may not be available from other sources." *Id.* To date, Treasury has not reported finding any of this lost information. *See* 29th Treasury Report, *supra*; 30th Treasury Report, *supra*.

Some instances of Indian trust record destruction were intentional. In September 2005, for example, a NARA employee in seven separate incidents disposed of numerous permanent federal records of Interior and other agencies. Letter from Jason R. Baron, Director of Litigation, Office of General Counsel, NARA, to Dennis Gingold at 1 (Sept. 28, 2005), attached to Notice of Filing of Sept. 2005 Status Report by DOI OTR, *Cobell v. Norton*, No. 1:96CV 01285 (D.D.C. Oct. 17, 2005) (attached as Ex. 22) [Dkt. No. 3191]. While many of these records were later found in trash baskets, a dumpster, and a trash compactor, including numerous files for the Chippewa Tribe, the Flathead Agency, and the Billings area office, *id.* at 2-3, about

22

25 identified Consolidated Chippewa files remained unrecovered as of December 2005.  *See* Letter from Jason R. Baron, Director of Litigation, Office of General Counsel, NARA, to Dennis Gingold, Esq. at 2 (Sept. 28, 2005), attached to Notice of Filing of Nov. 2005 Status Report by DOI OTR, *Cobell v. Norton*, No. 1:96CV 01285 (D.D.C. Dec. 15, 2005) (attached as Ex. 23).

The evidence of a system bereft of even rudimentary internal controls, despite the "policies" supposedly issued but obviously not followed, continues across the Department at all relevant times.  In February 2006, OTR was notified of allegations of destruction of trust records at the BIA Fort Defiance Agency, within the Navajo Nation.  DOI Status Report to the Court Number Twenty-Five at 22 (May 1, 2006) ("25th Interior Report") (attached as Ex. 24).  A subsequent investigation "concluded that approximately one cubic foot of documents, comprised of original incomplete sand and gravel permits (which were considered to be records) and non-record duplicate copies of archaeological clearances and reports were shredded by Agency staff." *Id.*  As a follow-up to this record destruction, "OTR provided records management briefings specifically targeted to the managers of BIA programs in the BIA Navajo Region . . . to reinforce the record keeping responsibilities of managers."  *Id.* at 22-23.  Although OTR took steps after the documents were destroyed to prevent future mishaps in that office, this is consistent with a pattern of "after-the-fact" efforts that are only made once documents have actually been destroyed.

Trustee-Delegates have also failed to protect important Indian trust records stored in electronic format, exposing them to the risk of loss or corruption.  For example, in November 2005, Interior reported long-standing, substantial, and widespread email backup problems.  *See* DOI Status Report to the Court Number Twenty-Three at 8-9 (Nov. 1, 2005) ("23rd Interior Report") (attached as Ex. 25).  As a result of those problems, various agencies sent hundreds of

23

backup tapes to a contractor to recover missing data from February through September 2005.  *Id.*

In May 2006, Interior reported that out of 280 BIA backup tapes sent to a contractor for data

recovery, 268 tapes were blank and 12 tapes had only partial data.  25th Interior Report at 6 (Ed.

24).  By December 2006, Interior had awarded a contract for forensic analysis of the 268 blank

backup tapes.  DOI Status Report to the Court Number Twenty-Eight at 46 (Feb. 1, 2007) ("28th

Interior Report") (attached as Ex. 25).

> **d.      Trust records have also been destroyed at the hands of Trustee-Delegates' contractors as recently as 2007.**

A recent example (and one of the most glaring) of Trustee-Delegates' inadequate record

retention demonstrates the government's continued failure to prevent destruction of Indian trust

records.  It also demonstrates the critical point that a Preservation Order is necessary not only to

protect trust records in Trustee-Delegates' possession, but also those in the care of government

contractors.  In March and April 2004, pursuant to its decision in *Pueblo of Laguna*, 60 Fed. Cl.

133, the CFC entered document preservation orders in *Pueblo of Laguna v. United States* and

*Jicarilla Apache Nation v. United States*, respectively.   On July 9, 2007, in compliance with

provisions in those preservation orders requiring government counsel to notify the CFC

immediately upon becoming aware of any destruction or loss of documents, the United States

notified the CFC that its contractors had destroyed 15 boxes of government records containing

tribal trust information.  *See Pueblo of Laguna v. United States*, No. 02-24L (Fed. Cl. July 9,

2007) and *Jicarilla Apache Nation v. United States*, No. 02-25L (Fed. Cl. July 9, 2007) (attached

as Exs. 27 & 28) ("Defendant United States hereby submits a report . . . , which describes the

recent, inadvertent destruction of 15 boxes of government records by a records storage contractor

to a Treasury contractor").

With its filing, the government submitted a copy of a report from the Office of the Chief Counsel, Financial Management Service, United States Department of the Treasury ("Treasury"). *See* Govt.'s Ex. 1 in Exs. 27 & 28. In that report, Treasury explained that it has a financial agency agreement with the Bank of America under which the Bank processes certain financial transactions, including deposits and debits for the Department of the Interior and the BIA. *Id.* The Bank in turn sub-contracts with a records storage company to store the associated records. *Id.* Although the sub-contractor destroyed the 15 boxes of government records in April 2007, the Bank did not notify Treasury of the destruction until June, and Treasury did not notify the Department of Justice until July, three months after the documents were originally destroyed. *Id.* Inexcusably, in the intervening months, the government continued to take the position in filings before the CFC that it had in place adequate procedures to prevent the destruction of Indian records and opposed the entry of document preservation orders in other Tribal trust cases. *See, e.g.*, *Navajo Nation, f.k.a. Navajo Tribe of Indians v. United States*, No. 06-945L (Fed. Cl. June 21, 2007) ("Defendant's Opposition to Plaintiff's Motion for Entry of Record Retention Order") (attached as Ex. 29); *Winnebago Tribe of Neb. v. United States*, No. 06-CV-00913L (Fed. Cl. Apr. 30, 2007) (Parties' Joint Status Report Pursuant to Court Order Dated March 8, 2007) (attached as Ex. 30).

The United States now claims that it will be possible to recreate the data destroyed by using data stored in its CA$HLINK II system. *See Pueblo of Laguna v. United States*, No. 02-24L (Fed. Cl. Sept. 24, 2007) ("Defendant's Notice of Filing of Update Concerning Inadvertent Document Destruction") (attached as Ex. 31). It is not clear, however, that all information is still available as hard copies almost always contain more information. And more importantly for present purposes, yet again, only after-the-fact and upon the actual destruction of documents,

25

have Trustee-Delegates, or their contractors "implemented certain security measures so as to ensure a similar incident does not occur in the future" – at least that is what they allege. *Id.* at 2 A Preservation Order is necessary to ensure that Trustee-Delegates' and their contractors act proactively and do not wait until it is too late as they have done time and time again.

<div align="center">

e.    **Vital trust records in the possession of Trustee-Delegates continue to be damaged and destroyed.**

</div>

The failure to prevent the destruction of critical Indian trust records continues to this day. Just two weeks ago, the United States disclosed that in the course of a "privileges review" conducted by Department of Justice counsel in conjunction with tribal trust litigation pending in the CFC, nine boxes of trust records were found on April 3, 2008 to contain "documents with mold and/or water damage." *See* "Defendant's Notification of Discovery of Document Damage," *Navajo Nation*, No. 06-945L (Fed. Cl. April 15, 2008) at 1 (attached as Ex. 32).

This matter was disclosed to the CFC on April 15, 2008 in accordance with a preservation order the CFC had entered in *Navajo Nation* – over the government's vigorous objection – seven months earlier. In making the required notification, defendant's counsel did not elaborate upon the nature or contents of the damaged trust documents – other than to acknowledge that they were "records potentially relevant to the case." *Id.* No explanation was offered as to how such trust records had been permitted to be so damaged. Nor was any mention made as to whether the government planned to inspect an undisclosed number of other boxes of trust records maintained at the same location (BIA's Regional Office in Window Rock, AZ) where the nine boxes containing the "mold and/or water damage[d]" documents had been stored.

Regrettably, this latest incident serves to further underscore the need for a Preservation Order in this litigation. The sad truth is that Trustee-Delegates are continuing to fail to take even the most rudimentary measures to protect vital trust records against the risk of damage and loss.

<div align="center">26</div>

"Defendant's Notification of Discovery of Document Damage" filed with the CFC in *Navajo Nation* on April 15, 2008 makes this crystal clear.[3]  There is thus a compelling need to enter the form of Preservation Order requested by the Nation.

> **f.    Renewed promises to implement policies to protect against destruction of Tribal trust records should not be credited.**

The United States argued in *Pueblo of Laguna*, and will likely argue again here, that the proposed Preservation Order is unnecessary because the documents "will not be destroyed under existing agency directives."  60 Fed. Cl. at 140.  Yet, as demonstrated by the events of the past two weeks in *Navajo Nation*, Trustee-Delegates' similar assertions in the past have not stopped Indian trust records from being destroyed.  This places in grave doubt Trustee-Delegates' renewed assertions that the threat of destruction has now been eliminated and that they will successfully preserve all records critical to the Nation's claims in the future.[4]

At the very least, given the very recent destruction of 15 boxes of documents by Treasury's sub-contractor, it is clear that the policies currently in place are inadequate to guard against the destruction of trust records entrusted to third-party contractors.  The Department of

---

[3] The CFC took immediate action upon being notified on April 15 that the nine boxes of trust records had been damaged. The following day, the court ordered the government to submit a "status report" by April 30, 2008 explaining in greater detail the nature of the damage, the approximate date and circumstances under which it had occurred, and any steps the government had taken or would be taking to prevent further damage in the future. *See Navajo Nation*, No. 06-945L (Fed. Cl. Apr. 16, 2008) ("Order") (attached as Ex. 33).  Rather than compile and provide the requested information by April 30 as the CFC ordered, however, the government promptly moved for an extension of time.  The CFC has now granted the government's request, extending the deadline to May 8, 2008, but has indicated in so doing that no further extension of time will be allowed.  *Id.*, No. 06-945L (Fed. Cl. Apr. 21, 2008) ("Minute Order").

[4] It is not hyperbole to suggest that the pattern of destruction of Indian trust records at Interior is systemic, and that the adoption of policies to prevent such destruction are plainly insufficient to guarantee their execution.  In September 2006, Interior's Inspector General provided broad context for the Department's ongoing record retention deficiencies in formal testimony to the House of Representatives.  Testimony of Hon. Earl E. Devaney, Inspector General for DOI, before Subcommittee on Energy and Resources, U.S. House of Representatives (Sept. 13, 2006) (attached as Ex. 34).  Most pointedly, Interior's Inspector General testified that the culture at Interior inherited by Secretary Kempthorne "sustains managerial irresponsibility and a lack of accountability" because "[s]imply stated, short of a crime, anything goes at the highest levels of the Department of the Interior."  *Id.* at 5.  Examples include "intricate deviations from statutory, regulatory and policy requirements to reach a predetermined end," "massive project collapses," and "failure to hold the leadership of the Department accountable[, which] sets the stage for the remainder of the workforce."  *Id.* at 5, 7.

27

the Interior in a recent memorandum directing all employees to place a "Litigation Hold" on documents that may be relevant to this and other tribal trust cases, stated it is "imperative that a copy of this Litigation Hold reaches every employee who may possess relevant information in your bureau or office," and included contractors within its definition of "employees." Memorandum from Lawrence J. Jensen, Deputy Solicitor, to Various Offices and Bureaus of the Department of the Interior at 1(Mar. 12, 2007) (attached as Ex. 35). The directive is quite self-evidently deficient. It did not, for example, provide any specific procedures for ensuring that third-parties are in fact informed. Nor are there any specific instructions on how to carry out the directive's instructions. Nor is there any penalty assessed for violators. Nor is there any reporting to this Court. It is no wonder that destruction continues unabated.

By contrast, paragraph 2(b) of the Preservation Order would require that each of the United States' contractors be advised of the terms of the Preservation Order, be provided with a copy of the Preservation Order, and sign a statement acknowledging receipt of the Preservation Order and agreeing to be bound by its terms. This Court can enforce its order far better than the Department has shown a penchant for doing. Further, departmental directives disseminated by email, posted on company intranet webpages, or distributed periodically by memorandum are insufficient because they may never be viewed and can be ignored. The Preservation Order proposed here is necessary to guarantee that each custodian of the Nation's records held in trust by the United States, and its contractors, is aware of the critical nature of the documents and is bound to preserve them.

Finally, even were Trustee-Delegates to adopt by administrative directive exactly the same provisions contained in the proposed Preservation Order, including the requirement that contractors and sub-contractors acknowledge their duties to preserve critical Indian trust records,

28

the entry of a Preservation Order would still be necessary to provide the appropriate incentive to ensure the plan is carried out.  As the CFC noted in *Pueblo of Laguna*, if "nothing else such a preservation order will reemphasize that defendant needs to take extraordinary precautions . . . to prevent either the purposeful or inadvertent destruction or loss of records."  60 Fed. Cl. at 139. A Preservation Order will serve "as fair warning that sanctions may be imposed should defendant instead fail adequately to protect records relevant to this action."  *Id.*  In other words, "the looming specter of sanctions – which the case law suggests may be severe, to and including the entry of a default judgment – provides the incentive, albeit in a negative way, needed to effectuate this preservation plan."  *Id.* at 141.

> ### 2. The Preservation Order is Necessary Because Trustee-Delegates Have Exclusive Custody and Control of Many of the Documents Critical to the Equitable Relief the Nation Seeks.

In this case, which seeks an accounting of an Indian Tribe's assets and production of documents, the entry of the proposed Preservation Order is particularly essential due to the context in which it arises.  Specifically, because of the trust relationship between Trustee-Delegates and the Nation, the government is uniquely in control of documents that are essential to carry out its fiduciary duties including the accounting obligation the Nation seeks.  For example, without the documents the Nation seeks to preserve, it may well be impossible to determine the universe of the trust or the transactions relevant to an accounting.   The Nation also seeks disclosure of trust records that belong to the Nation but that Trustee-Delegates have long failed to produce.  It is self-evident that destruction of these records would frustrate the Nation's claims.

As the Nation's trustees, Trustee-Delegates are obligated to make and preserve in their possession documentation that is critical to the Nation's claims.  *See Cobell VI*, 240 F.3d at 1093

(as trustee-delegates, government officials have "a clear obligation to maintain trust records and furnish such records to beneficiaries upon request"). Therefore, unlike a simple contract or other commercial dispute, both sides do not have similar access to the documents essential to prove the plaintiff's claims. Furthermore, unlike a traditional suit for money damages, the very remedies the Nation seeks here are dependent upon the existence of accurate records. For example, an accurate accounting will be impossible without accurate trust records and Trustee-Delegates cannot disclose trust records pursuant to their disclosure obligations if they have been destroyed.

If documents that are in Trustee-Delegates' possession and control are lost or destroyed, the Nation has no way to replace those documents – the damage would be severe and irreparable. Nor can the Nation take steps before the fact, apart from a court order, to ensure that documents critical to its claims are preserved. Preservation of these records is entirely outside the Nation's control. The preservation order will provide the Nation with more than Trustee-Delegates' good faith representations that it will take all necessary steps to preserve documents it has heretofore often failed to preserve.

### 3. The Preservation Order is Necessary to Ensure Immediate Notification to this Court of any Further Destruction or Loss of Relevant Trust Documents.

The Preservation Order is also necessary because, pursuant to paragraph (2)(c), it will require Trustee-Delegates to notify the Court as soon as documents are destroyed or lost. In the past, not only has the government destroyed important Indian trust records, it has also failed immediately to notify the courts of such destruction. For example, in *Cobell*, after Treasury destroyed 162 boxes of trust records, the government waited months before notifying the court of their destruction. *See, e.g.*, *Cobell VI*, 240 F.3d at 1093 (describing "egregious" nature of destruction of documents and the "failure of government officials 'to apprise the court or the

30

plaintiffs of the defendants' … self-inflicted'" inability to comply with the court's production orders (quoting *Cobell v. Babbitt (Cobell II)*, 37 F. Supp. 2d 6, 31 (D.D.C. 1999)). More recently, in 2004, the Court rebuked the government for failing to report in multiple quarterly reports some of the instances of document destruction described above, namely "the possibility of water damage to untold number of records from a leaking roof, 350 boxes with mold, and the 'recently uncovered' boxes with mouse droppings" detailed in a government letter. *See Cobell*, 224 F.R.D. at 6. The court observed that "disturbingly, . . . defendants have yet again failed to notify the Court when trust records are in jeopardy or actually damaged." *Id.* Indeed, it noted that "Interior's failure to report these happenings appears deliberate." *Id.*

There have been other delays in notice to the courts when documents are destroyed. In the case of the recent destruction of 15 boxes of trust records by Treasury's records storage sub-contractor, the contractor bank did not notify Treasury of the destruction for two months and a third month passed before Treasury notified its attorneys at the Department of Justice. (*See* Exs. 26, 27). Although counsel notified the Court of Federal Claims immediately upon learning of the document destruction as required by the document preservations orders in place in *Pueblo of Laguna* and *Jicarilla Apache*, the delay of three months before counsel was notified of the loss only highlights the need for a court order requiring immediate notification of the Court.

As demonstrated by past example, the notification provision in the Preservation Order is necessary to require counsel to notify the Court immediately upon the discovery of any discovery or loss of important trust records. Further, the notification provision also requires, in the event of such destruction or loss, that Trustee-Delegates provide to the Court (i) a list of all those involved with the violation of the order who handled the Nation's trust records, and (ii) a copy of the signed acknowledgements for those individuals. This will enable the Court to determine

US2000 10779604.1

immediately whether Trustee-Delegates have complied with the terms of the Preservation Order and, if necessary, to impose further protections to guard against the further loss of important trust records.

### C.    The Preservation Order Will Not Unduly Burden Trustee-Delegates.

The Nation's proposed Preservation Order also satisfies the requirement that such an order not be "unduly burdensome" because "the particular steps to be adopted will be effective, but not overbroad." *Pueblo of Laguna*, 60 Fed. Cl. at 138.  Like orders entered in other Tribal trust cases, the Preservation Order directs Trustee-Delegates to "preserve all the documents, data, or tangible things in question" and to report immediately any destruction or loss of records, then relies upon "the looming specter of sanctions" to provide "the incentive . . . needed to effectuate this preservation plan." *Id.* at 141.  The plan is not unduly burdensome because it "relies upon the expectation that defendant . . . is best situated to review the government's record retention processes and ensure their continued effectiveness" and leaves the door open, if "the government's conduct falls short of this expectation," for the court "to intercede and take such steps as are necessary to ensure the integrity of its processes." *Id.*  In fact, the proposed Preservation Order is substantially less burdensome than orders entered in other Tribal trust cases because it does not require Trustee- Delegates to make inactive records available to Plaintiff for inspection prior to the service of a formal discovery request for those records.  *See id.* at 141-42.  Nor does the Nation seek through entry of the Preservation Order to compel the government to index all documents, data and tangible things covered by the order.  *See id.* at 141-42.  The Preservation Order only requires that when Trustee- Delegates anticipate moving trust records, they must provide at least 20 days advance notice of the movement as well as a copy of a move plan or plans, including an implementation schedule, box inventories and

US2000 10779604.1

descriptions of the records being moved, the method of transportation, the chain of custody, and the signature of the official responsible for the move.  *See* Preservation Order ¶ 4.  This is a comparatively minor burden given the special risk of loss or confusion of records that inevitably attends any attempt to relocate documents.  Furthermore, if Trustee-Delegates contend, as they have in similar cases, that they are already taking precautions to protect trust records when they are moved, then the straight-forward requirements included here should not be a significant burden.

The only provision not included in preservation orders previously entered in other trust cases is the requirement that for each employee or agent of the United States, its departments, agencies, offices, divisions, or contractors who has custody of the Nation's trust records, that person must be advised of the terms of the Preservation Order, be provided with a copy of the Preservation Order, and be required to sign an acknowledgment to be maintained by Defendants' attorney of record.  *See* Preservation Order ¶ 2(b).  Such a requirement is significantly less burdensome than inspection and indexation requirements that could be imposed and the provision will require a small amount of effort from Trustee-Delegates with respect to each custodian of trust records in order to comply with its terms rather than time and expense with respect to every document or box of trust records.

Trustee-Delegates have imposed a similar form of "acknowledgement" requirement on plaintiff's representatives seeking to be permitted access to documents produced in trust litigation containing assertedly confidential information.  In protective orders entered in the CFC, access to such materials has been conditioned upon the tribe's counsel, consultants or members signing an acknowledgement reflecting that they have read the protective order and agree to abide by its terms.  *See, e.g.*, *Ak-Chin Indian Community v. U.S.*, Case No. 06-932L, Doc. No.

33

19, at ¶5 (Fed. Cl. July 19, 2007) (attached as Ex. 36); *Makah Indian Tribe of the Makah Indian Reservation v. U.S.*, Case No. 06-889L, Doc. No. 21, at ¶8 (Fed. Cl. Dec. 12, 2007) (requiring execution of affidavit of confidentiality before receiving access to confidential materials) (attached as Ex. 37); *Quechan Tribe of the Fort Yuma Indian Reservation v. U.S.*, Case No. 06-888L, Doc. No. 26 at ¶7 (Fed. Cl. Mar. 25, 2008) (same) (attached as Ex. 38). The recognized purpose of such a requirement is to assure that those persons entrusted with confidential information are adequately informed as to the safeguards for handling and preserving such materials -- an objective that is no less critical here.

Moreover, the need for such an additional safeguard extending to every custodian of the Nation's trust records, including third-party contractors, is elucidated by the recent destruction of documents by third-party contractors. The importance of ensuring that all custodians are aware of the Court's Preservation Order and their responsibility to comply with it certainly justifies any additional burden imposed upon Trustee-Delegates.

In sum, especially when considered in light of the experience gained from nearly a decade of implementation of the preservation orders in this Court and the CFC, the Preservation Order proposed here will be effective at preserving relevant evidence for this case and facilitating efficient identification and production of that evidence without being overly broad or imposing any undue burden upon Trustee-Delegates. Furthermore, the burden may be reduced even further to the extent there is a single protocol that can be adopted for many or all of the Tribal trust cases pending before this Court.

## IV.  **CONCLUSION**

US2000 10779604.1

For the foregoing reasons, Plaintiff, the Tohono O'odham Nation, respectfully requests that the Court approve and enter the submitted Trust Record Preservation Order in this case as well as in the cases brought by the other Tribes listed above that have joined in this Motion.

Respectfully submitted, this 29th day of April, 2008.

/s/ Keith Harper
KEITH HARPER
D.C. Bar No. 451956
E-mail: kharper@kilpatrickstockton.com
G. WILLIAM AUSTIN
D.C. Bar No. 478417
E-mail: baustin@kilpatrickstockton.com
CATHERINE F. MUNSON
Georgia Bar No. ___, Admitted *Pro Hac Vice*
Email: cmunson@kilpatrickstockton.com
KILPATRICK STOCKTON LLP
607 14th Street, N.W.
Washington, D.C. 20005
Phone: (202) 508-5800

*Attorneys for Plaintiff*
The Tohono O'odham Nation

US2000 10779604.1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELOISE PEPION COBELL, et al.,                )
                                             )       No. 1:96CV01285 RCL
            Plaintiffs,                       )
                                             )
    v.                                        )       **FILED**
                                             )
BRUCE BABBITT, Secretary of the Interior,     )       AUG 1 2 1999
    et al.,                                    )
                                             )       NANCY MAYER WHITTINGTON, CLERK
            Defendants                        )            U.S. DISTRICT COURT
_____  )

## ORDER REGARDING INTERIOR DEPARTMENT
## IIM RECORDS RETENTION

Motion having been made, and based upon the recommendation of the Special Master,

and the entire record herein,

It is hereby ORDERED, that the Interior Department shall distribute, in final form, the

attached two memoranda (Exhibit A) regarding retention of all documents and data relating to

Individual Indian Money trust funds and Individual Indian trust assets as identified in

Attachment A to the second memorandum ("IIM Records") as follows:

(1) It shall distribute the appropriate memorandum to each employee with

custody of IIM Records in each of the Department's offices, bureaus or similar sub-

department organizations;

(2) It shall distribute this Order and a letter in substantially the same form as the

second memorandum to the representative of each contractor that (a) performs services

for the  Department and (b) has custody of IIM Records;

(3) It shall distribute this Order and a letter in substantially the same form as the



second memorandum to the appropriate officials at the National Archives and Records

Administration and the General Accounting Office.

It is FURTHER ORDERED, that Alan L. Balaran, Special Master ("Special Master"), is

hereby authorized to oversee the Interior Department's retention and protection from destruction

of IIM Records through, among other things, on-site visits to any location where IIM Records

are maintained. In the event that the Special Master determines that IIM Records are not being

protected from destruction or threatened destruction, he may recommend to the Department that

it take reasonable steps to protect IIM Records found to be in jeopardy of destruction. He may

also recommend to the Court such remedial action as he deems appropriate pursuant to Rule 53,

Federal Rules of Civil Procedure.

It is FURTHER ORDERED, that the Department of the Interior shall notify the official

representative of all Tribes and tribal organizations who have contracts or compacts for

management of trust "programs," see 25 U.S.C. §§ 450f(a)(1), 458cc(b), that, during the

pendency of this case, no IIM Records identified in Attachment A of the Department of the

Interior's second memorandum may be destroyed, and that the failure to retain such records

could result in further action by the Court.

It is FURTHER ORDERED, that the Special Master is authorized, upon reasonable

advance request, to examine the IIM Records in the custody of Tribes or tribal organizations. In

the event such request is denied, or access is unreasonably delayed or conditioned, the Special

Master may recommend to the Court that it issue an order that the Tribe or tribal organization

make the IIM Records available for inspection.

-2-

It is FURTHER ORDERED, that nothing in the foregoing is intended to prevent the disposal of non-IIM Records authorized by a final records schedule approved by the Archivist of the United States or materials which are not "records" as defined in 44 U.S.C. § 3301. In addition, this Order shall not be interpreted to prevent the movement of IIM Records to different storage facilities, including Federal Records Centers and the National Archives.

Dated: **8-11-99**

*Royce C. Lamberth*
UNITED STATES DISTRICT JUDGE

**FILED**

AUG 1 2 1999

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

EXHIBIT   A

# DEPARTMENT OF THE INTERIOR MEMORANDA TO EMPLOYEES AND ATTACHMENTS

Final Draft

## Memorandum

**To:**  Assistant Secretary, Policy, Management and Budget
Assistant Secretary, Indian Affairs
Assistant Secretary, Land and Minerals Management
Office of the Solicitor
Deputy Commissioner, Bureau of Indian Affairs
Acting Special Trustee
Director, Minerals Management Service
Director, Bureau of Land Management
Director, Office of Hearings and Appeals

**From:**  Chief of Staff, Department of the Interior

**Subject:**  Retention of Documents and Data Relating to Individual Indian Money (IIM) Accounts

On June 2, 1999, I issued a directive concerning the retention of documents relating to IIM accounts. Following up with this directive, attached please find a supplemental notice to be disseminated to all Department employees who have possession, custody or control over specific documents that relate to IIM accounts. The Department is required to send this notice pursuant to an Ordered issued on July ___, 1999, and is intended to remind employees, once again, of the continuing responsibility and obligation concerning the retention of federal trust IIM records, and the specific regulations they are obligated to follow. Please send the attached memorandum to all of your office and area directors, managers and supervisors with instructions to provide this information to all affected Department employees.

Again, I appreciate your continued cooperation and assistance in this initiative to ensure the retention of IIM account records.

If you have any specific questions concerning this issue or other such records management initiatives, please contact Ken Rossman, Director, Office of Trust Litigation Support and Records, Office of the Special Trustee, at (505) 346-2787.

Final Draft

**Subject:** Memorandum Re: Retention of Documents and Data Relating to Individual Indian Money (IIM) Accounts Identified in Attachment A

**From:** Chief of Staff, Department of the Interior

On June 2, 1999, I sent a memorandum reminding employees of their obligations regarding the retention of documents and data relating to the Department's duties to manage Indian trust funds and IIM accounts. Pursuant to an Order issued on July ___, 1999, by the Court in the pending class action lawsuit Cobell et al. v. Babbitt et al., Civ. No. 1:96CV01285 (D. D.C.), the Department is required to send this memorandum to further advise Department personnel of the specific responsibilities to retain documents, records and data necessary to complete an accounting to individual Indian trust beneficiaries. A copy of this Order is attached hereto.

Attached to the June 2, 1999, memorandum as Attachment A, was a list of the documents which are subject to this record retention directive. I am attaching an additional copy for your information.[1] As I indicated earlier, it is important that you review this list carefully and identify those documents which you may have. Preservation of these documents is to continue until new written instructions are issued by this Department.

Please be advised that Section 384 of the Departmental Manual (DM) sets forth the Department's policies and procedures regarding the proper maintenance of records. The DM requires that records be protected against loss, unauthorized destruction or modification, and illegal removal. 384 DM 3.4 further provides specifically that

All official records, regardless of their form, belong to the Department rather than the officer who has custody of them and are to remain in the custody of the Department until there is official authorization for disposal.

---

[1] The attached list of documents is identical to Attachment A accompanying my June 2, 1999, memorandum; however, for purposes of this document retention directive, the notes relating only to the document search for the five-named plaintiffs and their predecessors in interest at page 6 have been removed.

Moreover, preservation of records identified in Attachment A is a responsibility that can oc enforced by the Court presiding over the <u>Cobell</u> litigation. As the Order of July ___, 1999, directs, the Special Master appointed by the Court, Alan Balaran, is authorized to oversee and independently verify our compliance with our document retention responsibilities. Mr. Balaran may exercise his responsibilities by visiting any location where IIM records are maintained and inspecting the IIM records at that location. These inspections may occur with no advance notice. Please provide full cooperation should Mr. Balaran visit your office.

The Department's ability to move trust records to different storage locations under proper authority (e.g., Federal Records Centers or the national Archives) is in no way affected by the litigation or orders of the Court. Nor is the disposal of non-trust records or non-records affected. However, transfer or removal of BIA and OST IIM trust documents from their current location must be approved and coordinated through Ken Rossman, Director, Office of Trust Litigation Support and Records, Office of the Special Trustee, at (505) 346-2787.

Again, I appreciate your continued cooperation and assistance with this record retention initiative.

| Classification & Document Type | Bureau or Agency | | | | |
|---|---|---|---|---|---|
| | OST | BIA | MMS | BLM | OHA |
| asic Financial Documents | | | | | |
| lotment Program | | | | | |
| . Allocation/Other Authorization | | | | | |
| dvice of Allotment | ✓ | | | | |
| dvice of Check Issue Discrepancy | ✓ | | | | |
| dvice of Collections | ✓ | | | | |
| ffidavit in Support of Claims | ✓ | ✓ | | | |
| pplication and Account for Advance of Funds | ✓ | | | | |
| pplication for Allotment or Change in Allotment | | ✓ | | | |
| pportionment and Allotment Schedules Transmittal | ✓ | | | | |
| pportionment and Reapportionment Schedule | ✓ | | | | |
| uthorization | ✓ | | | | |
| IA/IIM Accounts Purchase Order or Other Purchase Orders | ✓ | | | | |
| ill for Collections/Collection Voucher | ✓ | ✓ | | | |
| ancelled Check | ✓ | ✓ | | | |
| heck Carbon | ✓ | ✓ | | | |
| heck Register | ✓ | | | | |
| laim Form | ✓ | | | | |
| laims Against US/Proceed for Government Check | ✓ | ✓ | | | |
| laims Disposition Notice | ✓ | ✓ | | | |
| aily Advice of Status Card | ✓ | | | | |
| aily Disbursement Report IISSDA | ✓ | | | | |
| ebit Voucher | ✓ | ✓ | | | |
| eposit Ticket/Certificate of Deposit | ✓ | | | | |
| eld Receipt | ✓ | | | | |
| nancial Accounting System Code Sheet | ✓ | ✓ | ✓ | | |
| uaranteed Remittance | ✓ | ✓ | | | |
| A / DA Change Orders | ✓ | | | | |
| IA Time Authorization | ✓ | | | | |
| IA Permanent or Voucher/Automatic Authorization | ✓ | | | | |
| IA Programmed Authorization | ✓ | | | | |
| A Data Change Notice | ✓ | | | | |
| A Jacket File | ✓ | | | | |
| dividual Indian Account Ledger | ✓ | ✓ | | | |
| dividual Indian Accounts Application (IIAA) | ✓ | | | | |
| tra-Bureau Transfers | ✓ | ✓ | | | |
| S 1099 Interest Statement | ✓ | ✓ | | | |
| umal Voucher | ✓ | | | | |
| tter of Advice | ✓ | ✓ | ✓ | | |
| it Sheet | ✓ | | | | |
| ulti-use Standard Requisitioning/ISD | ✓ | | | | |
| egotiated Check Copies | ✓ | | | | |
| ther Transfers and Corrections | ✓ | ✓ | | | |
| iblic Voucher for Purchases and Services & Memorandum | ✓ | ✓ | | | |
| iblic Voucher for Refunds & Memorandum | ✓ | ✓ | | | |
| irchase & Lease Deposits | ✓ | ✓ | | | |
| :ceipt for Cash-Subvoucher | | ✓ | | | |
| :ceipt Log | ✓ | | | | |
| :conciliation Statement of Funded Checking Account Maintained | ✓ | | | | |
| :demption Authorizations and Schedule of Withdrawals and Credits | ✓ | | | | |
| :imbursement Voucher | ✓ | ✓ | | | |
| :quest for Individual's Social Security Number | ✓ | | | | |
| :quest for Issuance of Replacement Check. | ✓ | | | | |

| Classification & Document Type | OST | BIA | MMS | BLM | OHA |
|---|---|---|---|---|---|
| quest for Removal of Stop Payment | ✓ | | | | |
| g... r Stop Payment | ✓ | | | | |
| hi... of Canceled or Undelivered Checks | ✓ | ✓ | ✓ | ✓ | ✓ |
| hedule of Collections | ✓ | ✓ | | | |
| hedule of Disbursements from an Agency Depository | ✓ | ✓ | | | |
| hedule of Unavailable/Undelivered Check Cancellations and Credits | ✓ | | | | |
| atement, Voucher & Schedule of Withdrawals & Credits | ✓ | | | | |
| easury Check Agency Recertification Follow-up | ✓ | ✓ | | | |
| easury Check Claims Document | ✓ | | | | |
| available Check Cancellation | ✓ | | | | |
| ucher and Schedule of Payments | ✓ | | | | |
| er As Identified | ✓ | ✓ | ✓ | | |
| | ✓ | | | | |

## sic Supportive Documents to Financial Documents

| Classification & Document Type | OST | BIA | MMS | BLM | OHA |
|---|---|---|---|---|---|
| idavits of Completion | | | | | |
| Addendums/Modifications | | ✓ | | ✓ | |
| otment or Estate Cards | | ✓ | ✓ | ✓ | |
| otment Schedules | | ✓ | | | |
| peals | | ✓ | | ✓ | |
| ification | | | ✓ | ✓ | ✓ |
| INV Reports | | ✓ | | ✓ | ✓ |
| rtificates & Decrees (e.g., death, birth, marriage, divorce, adoption, etc.) | | ✓ | | | |
| aining Sheets | | ✓ | | | |
| ims | | ✓ | | | ✓ |
| ta Sheet (OHA-7) | ✓ | ✓ | | | ✓ |
| eds | | ✓ | | | ✓ |
| cument Search Reports | | ✓ | | | |
| p... Plans | | ✓ | | | |
| iv... Trust Interest Reports | | ✓ | | ✓ | |
| ividual Well Report | | ✓ | | | |
| erest Calculations, Distributions & Related Documents | | | | ✓ | |
| entories of Trust and Restricted Property | ✓ | ✓ | | | |
| dges Notes | | ✓ | | | |
| nd History Reports | | ✓ | | | ✓ |
| nd Index Reports | | ✓ | | | ✓ |
| nd Sales | | ✓ | | ✓ | |
| ase, Contracts or Agreements (Entire File) | | ✓ | | | |
| ter Calibration Data | | ✓ | ✓ | ✓ | |
| ne Plan & Amendments | | | | ✓ | |
| rtgages | | | | ✓ | |
| tice of Hearing | | ✓ | | | |
| tice to All Persons Having an Interest | ✓ | ✓ | | | ✓ |
| der Determining Heirs or Order Approving Will | ✓ | ✓ | | | ✓ |
| ner Land Resources Information System Reports | ✓ | ✓ | | | ✓ |
| ther Document Reports | | ✓ | | | |
| mits (Surface, Mineral, etc.) | | ✓ | | | |
| t/Tract Books | ✓ | ✓ | ✓ | ✓ | |
| adings and Briefs Filed | | ✓ | | ✓ | |
| bates (Order Determining Heirs) | | ✓ | | | ✓ |
| nge Unit or Lease Income Report | ✓ | ✓ | | | ✓ |
| cords Unpatented Mining Claims | ✓ | ✓ | | | |
| port of Timber Cut | | | | ✓ | |
| turn Receipt Mail | | ✓ | | | ✓ |

| Classification & Document Type | OST | BIA | MMS | BLM | OHA |
|---|---|---|---|---|---|
| Rights-of-Way | | | | | |
| ...rchase Documents | | ✓ | | | |
| ...urity Diagram | | ✓ | | | |
| Special Interest reports | | | | | |
| Special or Interim Orders | | | | ✓ | |
| Statement of Completion of Timber Contract | | ✓ | | | |
| Sundry Notices | | ✓ | | | ✓ |
| Timber Sale Contracts | | ✓ | | | |
| Title Status Reports | | ✓ | ✓ | ✓ | |
| Tract History Reports | | ✓ | | | |
| Transcript of the Proceedings | | ✓ | | | |
| Trust Patents | | ✓ | | | |
| Wills | | ✓ | | | |
| Other As Identified | | ✓ | | ✓ | ✓ |
| | | ✓ | | | ✓ |
| Production Supportive Documents | ✓ | ✓ | ✓ | ✓ | ✓ |
| Accounting Advice | | | | | |
| ADP Collection Adjustment Report (9-1431) | | ✓ | | | |
| ADP Lease Master Coding (Form 9-1425) | | ✓ | | | |
| ADP, Oil and Gas Unit, Communization and Collection Master Coding (9-1426) | | ✓ | | | |
| Application to Establish Royalty Values (USGS Form 9-1926) | | ✓ | | | |
| Appraisals & Other Value Estimates | | ✓ | | | |
| Appropriations | | | | | |
| Assessments | | ✓ | | ✓ | |
| Assignment | | ✓ | | | |
| Audit Reports | | ✓ | | | |
| ...ds | | ✓ | ✓ | | |
| ...Wire Transfer Payment Copies | | ✓ | ✓ | | |
| ...Data Sheet (USGS Form 9-1854 or 1854) | | ✓ | | | |
| Collection Letters and requests | | | ✓ | | |
| Complaints | | | ✓ | | |
| Compliance, Inspection & Enforcement Documents | | | ✓ | | |
| Condemnations | | ✓ | ✓ | | |
| Copies of Audit Reports Associated with Demand Letters | | ✓ | | | |
| Copies of Check Registers or Equivalent | | | | | |
| Copies of Fax Data Transmittals/Notifications | | | ✓ | | |
| Copies of Indian Distribution Reports | | | ✓ | | |
| Copies of Pertinent Bills | ✓ | ✓ | ✓ | | |
| Copies Payment Processing Worksheets | | | ✓ | | |
| Correspondence | | | ✓ | | |
| ...ly Collection Journal (of Payments) | | | ✓ | | |
| Images | ✓ | ✓ | ✓ | ✓ | ✓ |
| ...ect Pay Authorization and Documentation | | | ✓ | | |
| Distribution Calculations & Reports | ✓ | ✓ | ✓ | ✓ | |
| ...vision Orders | | ✓ | ✓ | | |
| Enforcement Requests | | | ✓ | | |
| ...st Production Memorandums | | | | | |
| ...torical Lease Data/Audit Sheet | | ✓ | ✓ | | |
| ...te or Non-Payment Assessments | | | ✓ | | |
| ...ase Account Check List, Changes and Corrections Worksheet | ✓ | ✓ | | | |
| ...ase Record Card/Sheet | | | ✓ | | |
| ...ssee/Operator Requesting the Refund | | | ✓ | | |
| ...g of Rentals on nonproducing Indian Leases | | | ✓ | | |

| Classification & Document Type | OST | BIA | MMS | BLM | OHA |
|---|---|---|---|---|---|
| 4 Monthly Report of Sales and Royalty Remittance | | | | | |
| Report of Collections To BLM | | | | | |
| otices of Advertisement | | | ✓ | | |
| otices to Lessees (NTL's) | | | ✓ | | |
| rders or Decrees | | ✓ | | | |
| ackage Report Check-in Sheet (Form 9-329) | ✓ | ✓ | ✓ | ✓ | ✓ |
| ayment Advice (USGS Form 9-614A) | | | ✓ | | |
| enalties and Assessments | | | ✓ | | |
| oduction Support (e.g., summary level reports to ticket detail) | | | ✓ | | |
| oduction Verification Reports | | ✓ | ✓ | ✓ | |
| uarterly Production Reports and Maps | | ✓ | ✓ | ✓ | |
| efunds From Allottees | | | ✓ | | |
| eport of Sales (USGS Form 9-361) | | | ✓ | | |
| evenue Remittance Code Sheet | | | ✓ | | |
| lls | | | ✓ | | |
| oyalty Production Report (USGS Form 9-329) | | ✓ | | | |
| n Tickets - In Agency Possesion | | | ✓ | | |
| les Contracts | | | ✓ | ✓ | |
| atement of Account (USGS Form 9-1428) | | | ✓ | | |
| atement of Account From Lessees/Operators (USGS Form 9-1424) | | | ✓ | | |
| ipervised Account & Hold Documentation | | | ✓ | | |
| ansmittal Letters to BIA/OST Forwarding Checks | ✓ | ✓ | | | |
| espasses | ✓ | ✓ | | | |
| it and Communization Agreements | ✓ | ✓ | ✓ | | |
| ucher & Schedule of Payments | | ✓ | | ✓ | |
| her As Identified | | | ✓ | | |
| | ✓ | ✓ | | ✓ | ✓ |

## s. _anagement

| Classification & Document Type | OST | BIA | MMS | BLM | OHA |
|---|---|---|---|---|---|
| Logs and Other Geological Data | | | | | |
| vironment Requirements | | | | | |
| ploration Data | | | | ✓ | |
| torical Index Information | | ✓ | | ✓ | |
| neral Survey Plats | | | | ✓ | |
| ning Claim Files | | | | ✓ | |
| PA Document | | | | ✓ | |
| n-Income Producing Land (Appraisals, Right-of-way, Advertisement, etc.) | | ✓ | | ✓ | |
| iginal Survey Plats | | ✓ | | | |
| rvey Field Notes | | ✓ | | | |
| rvey Group Files | | ✓ | | ✓ | |
| rvey Plats | | ✓ | | ✓ | |
| rvey Request File | | | | ✓ | |
| rveys | | ✓ | | ✓ | |
| chnical Reports (e.g., Drainage Determinations, Geological & Examinations) | | ✓ | | ✓ | |
| ist Patents | | ✓ | | ✓ | |
| her As Identified | | ✓ | | ✓ | |
| | ✓ | ✓ | ✓ | ✓ | ✓ |

## bal System Reports

| Classification & Document Type | OST | BIA | MMS | BLM | OHA |
|---|---|---|---|---|---|
| Day or Older Report | | | | | |
| 7 Interface Reports (TFAS) | | ✓ | | | |
| count listing by Area | | ✓ | | | |
| nual Land Reports | ✓ | ✓ | | | |
| Daily Reconciliation Reports (ADR-IRMS/TFMS) | | ✓ | | | |
| | | ✓ | | | |

| Classification & Document Type | OST | BIA | MMS | BLM | OHA |
|---|---|---|---|---|---|
| ...ed Treasury Reconciliations (Treasury/OMNI/TFMS) | ✓ | | | | |
| ...atch Proof List | ✓ | | | | |
| ...heck Payment & Reconciliation Report | ✓ | ✓ | | | |
| ...heck Register | ✓ | | | | |
| ...ompressed General Ledger | ✓ | ✓ | | | |
| ...ontrol Account Reconciliation | ✓ | | | | |
| ...allies (99 report) | ✓ | | | | |
| ...aily Mini ledger (TFAS) | ✓ | | | | |
| ...isbursements and Adjustments - ISSDA | ✓ | | | | |
| ...nd of Day Report (TFAS) | ✓ | | | | |
| ...ile Maintenance Memo | ✓ | | | | |
| ...eneral Ledger Detail List | ✓ | | | | |
| ...listorical List of Transactions (IRMS-IIM) | ✓ | | | | |
| ...iold Account List | ✓ | ✓ | | | |
| ...M Account Payout Report (TFAS) | ✓ | | | | |
| ...M ACH file-day/night (TFAS) | ✓ | | | | |
| ...M Ledger Cards & Reports | ✓ | | | | |
| ...M Pooled Fund Report (TFAS) | ✓ | | | | |
| ...nterest Posted (TFAS) | ✓ | | | | |
| ...nterface Pre-Edits | ✓ | | | | |
| ...nvestment Pool Confirmations and Documentation of Investment Transactions | ✓ | | | | |
| ...nvestment Reports Related to IIM Pool (BOLT System) | ✓ | | | | |
| ...nvestment Subsidiary Ledger Reconciliations | ✓ | | | | |
| ...nvestment Subsidiary Ledger Reports (MoneyMax, etc.) | ✓ | | | | |
| RMS / IIM Verification List | ✓ | | | | |
| ...RDRS Distribution Transaction Listing | ✓ | ✓ | | | |
| ...RDRS Error Recycle Control Report | ✓ | ✓ | | | |
| RMS / RDRS Error Recycle Exception Report | ✓ | ✓ | | | |
| RMS / RDRS Interest Report | ✓ | ✓ | | | |
| RMS / RDRS MMS Transaction Control Report | ✓ | ✓ | | | |
| RMS / RDRS Pre-Check Register | ✓ | ✓ | | | |
| RMS Distribution Batch Pre-Edit | ✓ | ✓ | | | |
| RMS Range - Error Report | ✓ | ✓ | | | |
| RMS Range - Lease / Own Match, Distribution / Reconciliation | ✓ | ✓ | | | |
| RMS Range - Own-IIM Match Verification | ✓ | ✓ | | | |
| RMS Range - Permittee Listing | ✓ | ✓ | | | |
| RMS Range - Post / Non-Post | ✓ | ✓ | | | |
| RMS Range - Range Listing | ✓ | ✓ | | | |
| IRMS Range - Summary Accounts | ✓ | ✓ | | | |
| IRMS to Finance System ADR Reports | ✓ | ✓ | | | |
| Lease Posted (TFAS) | ✓ | ✓ | | | |
| Master File List/Transaction File List | ✓ | ✓ | | | |
| Missing Social Security Numbers | ✓ | | | | |
| Monthly Journal of Transactions | ✓ | | | | |
| Oil & Gas Posted (TFAS) | ✓ | | | | |
| OPAC, Payment Over Cancellations or Reclamation Credits | ✓ | ✓ | | | |
| Per Capita Posted (TFAS) | ✓ | | | | |
| Range Posted (TFAS) | ✓ | ✓ | | | |
| RFM Audit report (TFAS) | ✓ | ✓ | | | |
| Statement of Account & Mailed Sealed Copy (IRMS-IIM) | ✓ | ✓ | | | |
| Statement of Accountability | ✓ | | | | |
| St...ment of Differences | ✓ | | | | |
| ...ent of Financial Condition | | ✓ | | | |

| Classification & Document Type | Bureau or Agency | | | | |
|---|---|---|---|---|---|
| | OST | BIA | MMS | BLM | OHA |
| Statement of Funds In Account | ✓ | | | | |
| Statement of Transactions (SF1219) | ✓ | | | | |
| Statement of Transactions (SF224) | ✓ | | ✓ | | |
| Statement of Transactions According to Appropriations, Funds and Receipt Accts | ✓ | | | | |
| Total Average Daily Balance Report by Area & Update | ✓ | | | | |
| Transaction Registers | ✓ | | | | |
| Undisbursed Appropriation Account Ledger | ✓ | | | | |
| Undisbursed Appropriation Account Trial Balance | ✓ | | | | |
| US Treasury Check (Magnetic Tape & Treasury Transmittals) | ✓ | | | | |
| Other IRMS Reports Not Listed | ✓ | ✓ | | | |
| Other OMNI/TFMS/Finance System Reports Not Listed | ✓ | ✓ | | | |
| Other TFAS Reports Not Listed | ✓ | ✓ | | | |
| Other Treasury Reports Not Listed | ✓ | | | | |
| Other As Identified | ✓ | ✓ | ✓ | ✓ | ✓ |

# In the United States Court of Federal Claims

No. 06-888L

Filed October 25, 2007

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| | \* |
| QUECHAN TRIBE OF | \* |
| THE FORT YUMA | \* |
| INDIAN RESERVATION, | \* |
| | \* |
| Plaintiff, | \* |
| | \* |
| v. | \* |
| | \* |
| THE UNITED STATES, | \* |
| | \* |
| Defendant. | \* |
| | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PROTECTIVE ORDER

Pursuant to Rule of the Court of Federal Claims 26(c) ("RCFC"), as well as the Court's inherent power to regulate its proceedings and maintain the integrity of its functions, the Court hereby issues the following Order:

### 1. Obligation to Preserve Certain Documents, Data, and Tangible Things

During the pendency of this litigation (including informal settlement discussions, ADR, and/or any appeals herein), the parties, as well as their agencies, their employees, and their agents, will take reasonable steps to preserve those documents, data, or tangible things that are in their possession, custody, or control, and that contain information that is relevant to, or may reasonably lead to the discovery of information that is relevant to, the subject matter of the pending litigation (including claims and defenses), as that subject matter is set forth in the Complaint and any amendments thereof and the Answer to such complaint and any amendments thereof. This Order does not impose an obligation on the parties to retain duplicate copies of the documents, data, or tangible things that are subject to the Order. Additionally, nothing in this Order Supplants the discovery obligations under the RCFC.

### 2. Mechanism for Ensuring Compliance With This Order

Defendant, in consultation with Plaintiff, shall establish a mechanism for ensuring on-going compliance with this Order, such as periodic reminders of record retention obligations to be sent to

appropriate document repositories by a date to be determined by the Court and then every six months thereafter for the pendency of this case. Defendant shall file a report setting forth its compliance mechanism, within 60 days of the date of this Order. The compliance mechanism shall include the parties' specification of the subject matters at issue in this litigation and the documents, data, or tangible things that the parties reasonably anticipate to be subject to discovery in this case and to this Order. Counsel shall notify the Court and opposing counsel, as soon as is reasonably possible, if, at any time, they become aware of a violation of Paragraph 1 of this Order (i.e., the destruction or loss of certain documents, data, and/or tangible things).

### 3. Definitions

For purposes of this Order, the following terms are to defined as follows:

(a) "Documents, data, and tangible things" shall be interpreted to consist of writings; records; files; contracts; leases; correspondence; reports; memoranda; calendars; diaries; minutes; electronic mail (e-mail) ; telephone message records or logs; computer and network activity logs; hard drives; backup data; removable computer storage media, such as tapes, disks, and cards; printouts; document image files; databases; spreadsheets; software; books; ledgers; journals; orders; invoices; bills; vouchers; checks; statements; worksheets; summaries; compilations; computations; charts; diagrams; graphic presentations; drawings; films; digital or chemical process photographs; video; phonographic or digital recordings, or transcripts thereof; and circulated drafts. The term also shall include information that serves to identify, locate, or link documents, data, and tangible things, such as file inventories and indices.

(b) "Preserve" shall be interpreted to accomplish the goal of maintaining the integrity of all documents, data, and tangible things reasonably anticipated to be subject to discovery in this case as related to the subject matters defined by the Parties under paragraph 2 above. "Preserve" includes the parties taking reasonable steps to prevent the partial or full destruction, alteration, deletion, shredding, incineration, wiping, theft, or mutation of documents, data, and tangible things, and any negligent or intentional handling that would make material incomplete or inaccessible.

### 4. Movement(s) or Transfer(s) of Certain Documents, Data, and Tangible Things

In the event that Defendant anticipates moving or transferring trust documents relating to Plaintiff from the Colorado River Agency, the Fort Yuma Agency, and Phoenix (Western) Regional Office of the Bureau of Indian Affairs (BIA) to the American Indian Records Repository (AIRR), Defendant shall provide Plaintiff with notice of such document movement at least 20 days in advance of the movement. Such written advance notice shall include a copy of any move plans and box inventories produced pursuant to regulations and procedures governing movement of trust documents.

### 5. Dispute Resolution

If a party desires clarification of any issue(s) related to the parties' obligations pursuant to, or compliance with, this Order, or believes that the opposing party has violated any term of this Order, the party shall notify the opposing party in writing and state the issue(s) requiring clarification or the grounds upon which the party has formed such belief. As soon as practicable after receiving such written notification, the parties shall meet and confer in an attempt to clarify the issue(s) in a mutually agreeable manner or resolve the dispute. If the parties cannot clarify the issue(s) in a mutually agreeable manner or do not resolve the dispute, within a period of 20 days either party may file a motion with the Court seeking a ruling regarding the parties' obligations under, and compliance with, this Order.

### 6. Further Instructions, Clarification, or Modification of This Order

Each party may apply to the Court, at any time, for further instructions, clarification, or modification of this Order, regarding, inter alia, their obligations to preserve specific categories of documents, data, and tangible things covered by the Order. The parties are encouraged to confer among themselves and to make a joint proposal or submission to the Court, wherever appropriate or possible.

The court, however, reserves the right, after reviewing the record and other information submitted by the parties, to modify this Protective Order in the event such information is not confidential, privileged, proprietary, or would adversely affect national defense and/or national security upon public disclosure.

**IT IS SO ORDERED.**

s/Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

3

# In The United States Court of Federal Claims

No. 06-934L

(Filed: October 24, 2007)

_____

THE KAW NATION OF OKLAHOMA,

              Plaintiff,

   v.

THE UNITED STATES,

              Defendant.

_____

## DOCUMENT PRESERVATION ORDER
_____

       This matter comes before the court after a joint status conference held on September 11, 2007, at which the parties were directed to attempt to negotiate a mutually agreeable Document Preservation Order. The parties were largely unsuccessful in this regard.

       Nonetheless, the court finds that good cause exists for approval and entry of a Document Preservation Order pursuant to RCFC 26(c) as well as the court's inherent power to regulate its proceedings and maintain the integrity of its functions. _See Pueblo of Laguna v. United States_, 60 Fed. Cl. 133, 135-37 (2004). As such, the court hereby **ORDERS** as follows:

1.    **General Obligation to Preserve.** During the pendency of this litigation or until further order of the court, defendant and its departments, agencies, employees, agents, and contractors must take reasonable steps to preserve every document, datum, or tangible thing in its possession, custody, or control containing information that is relevant to, or is reasonably calculated to lead to the discovery of admissible evidence relevant to, the subject matter involved in the pending litigation (Relevant Records). Plaintiff is reminded that it has a similar duty to preserve evidence relevant to this case.

2.    **Document Inspection and Production.**

      (a)    Defendant shall move Relevant Records that, as of the date of this order, are inactive as defined by the Department of Interior (Interior) Manual Part 303, Chapter 6, wherever located, to the Gallup BIA Warehouse in Gamerco, New Mexico, or such other location as may be agreed upon by the parties, at which location such records shall be made available to plaintiff for purposes of

inspection. At least 10 calendar days before movement of the records from their present locations to Gamerco (or as otherwise agreed), defendant will provide plaintiff with an intermediate move plan or plans, which shall include: an implementation schedule; a description or inventory of the records being moved; the method of transportation; the chain of custody; and the signature of the official responsible for the move. The move process may be monitored by plaintiff or its representative.

(b)    After reviewing the above referenced inactive Relevant Records for privileged material, if necessary, defendant shall make those records available for plaintiff's inspection, in accordance with the following schedule:

    (i)    Within 35 days after entry of this order, defendant shall provide to plaintiff any and all existing indices and inventories that include the inactive records referenced in paragraph 2(a), said documents to be provided in the most usable form readily available. Defendant shall provide to plaintiff additional or supplemental indices or inventories of inactive Relevant Records within 21 days after the creation or discovery of such indices or inventories.

    (ii)    Within 35 days after receiving such indices or inventories from defendant or within some other time as agreed to by the parties, plaintiff shall designate boxes or records listed in the provided indices or inventories that plaintiff wishes to review for Relevant Records.

    (iii)    Within 63 days after the date on which plaintiff designates the boxes it wishes to inspect, defendant will begin to make available, on a rolling basis, the boxes from such office(s) for plaintiff's inspection at the BIA warehouse in Gamerco.

    (iv)    Plaintiff generally shall have 63 days within which to inspect a designated record upon receiving notification from defendant that the designated record has become available for inspection, during which time plaintiff may identify records for production. This inspection period may be extended by agreement of the parties or by the court for good cause shown. At the time of such inspection, defendant shall permit plaintiff to identify or document the condition of records identified by plaintiff for production, including, without limitation, through the use of audio recorders, digital cameras, or document scanning, provided that no such recordings made by plaintiff shall constitute production of records. Plaintiff's documentation shall be subject to the Protective Order entered separately by this court this day.

(c)    After plaintiff has inspected and identified records for production pursuant to paragraph 2(b) above, defendant may move those records to the American Indian

Records Repository (AIRR) in Lenexa, Kansas, in accordance with defendant's procedures and protocols for the movement of Indian trust records contained in the Indian Affairs Records Management Manual. After such move(s), defendant shall scan the records identified by plaintiff; code the scanned images at the document level, including data fields as agreed to by the parties; and provide such images and coding to plaintiff within such schedule as agreed to by the parties. For documents originating in media other than paper, defendant shall provide the document in a reasonably usable form, including any form reasonably requested by plaintiff, and also shall provide plaintiff with an opportunity to test or sample such documents upon reasonable request. Defendant shall expedite and prioritize the scanning, coding, and production to plaintiff of identified records.

(d)     In accordance with defendant's procedures and protocols for the movement of Indian trust records contained in the Indian Affairs Records Management Manual, defendant may move any boxes that have been either: not designated for inspection within the time period provided for, or agreed to, under paragraph 2(b)(ii); or designated but not reviewed by plaintiff within the applicable period provided for under paragraph 2(b)(iv). Nothing herein prevents plaintiff from also seeking to inspect such records in whatever location they may be found in the future.

(e)     Within such schedule as agreed to by the parties, defendant shall input into Interior's Box Inventory Search System (BISS) data identifying the boxes, files, and documents containing all Relevant Records located as of the date of this order at the AIRR; provide plaintiff access to the BISS database at the Albuquerque office of plaintiff's counsel and the AIRR; and make those records available for plaintiff's inspection at the AIRR. At the time of such inspection, defendant shall permit plaintiff to identify or document the condition of records identified by plaintiff for production, including, without limitation, through the use of audio recorders or digital cameras, provided that no such recordings made by plaintiff shall constitute production of records. Defendant also shall provide to plaintiff all manuals, training materials, and similar documents created by or for Interior which describe the BISS database and its manner of operation and access. Defendant shall provide to plaintiff additional or supplemental indices or inventories for the AIRR that include Relevant Records promptly after the creation of such indices or inventories.

(f)     The parties shall meet and confer to discuss schedules and procedures to be used for defendant to make available to plaintiff, for purposes of inspecting active or inactive Relevant Records (determined as of the date of this order), as follows:

(i)     Defendant, after conducting any necessary review of the records for privileged material, shall make the respective record collections available to plaintiff for purposes of inspection and designation. Unless otherwise agreed by the parties, defendant shall provide existing indices or

inventories for such records as soon as practicable and make such records available for plaintiff's inspection within 63 days of plaintiff's designation of them,

(ii)    Plaintiff shall inspect the records upon receiving notification from defendant that the records have become available for inspection. If plaintiff identifies records for production, defendant shall make arrangements for scanned and coded images, or other data in a reasonably usable form, to be delivered to plaintiff as soon as practicable.

(iii)   Unless otherwise agreed by the parties, moves of Relevant Records that are inactive as of the date of this order shall be subject to the intermediate move plan requirement of paragraph 2(a) above.

(g)    The parties shall attempt to reach agreement on all matters related to document inspection and shall coordinate inspection of Relevant Records in a manner that will minimize the disruption of ongoing governmental activities.

3.    **Indexation and Inventorying.**

(a)    Within 126 days after entry of this order, the parties shall identify all their respective repositories besides the AIRR and those facilities addressed in paragraph 2(a) above that are reasonably anticipated to be subject to discovery in this case and determine whether indices or inventories exist for each location. The parties also shall have ongoing duties to identify evidence relevant to this case in their respective possession, custody, or control.

(b)    Within the same time period or as the parties may agree, the parties shall provide to each other existing indices and inventories for such repositories in the most useful form readily available, except for indices and inventories previously provided pursuant to paragraph 2 above.

(c)    If a party is unable to provide the other with indices or inventories of its repositories containing evidence relevant to this case, then the parties shall meet and confer as soon as practicable about the appropriateness of using a collection-by-collection approach, including on-site reviews, to address the sufficiency of existing indices or inventories and to discuss whether additional indexation of specific record collections is necessary and the scope, timing, and method of any additional indexation or elaboration of inventories at each location based on the particular facts relating to each repository and record characteristics. The parties shall provide additional or supplemental indices or inventories that include evidence relevant to this case within 21 days after the creation or discovery of such indices or inventories.

-4-

(d)     The parties shall cooperate in good faith to attempt to reach agreement on all issues regarding the indexation and inventorying of documents, data, and tangible things.  These issues include, but are not necessarily limited to:

   (i)     the extent of the indexation and inventorying obligation, identifying the types of material to be indexed and inventoried, the subject matter, time frame, the authors and addressees, and key words to be used in identifying such materials;

   (ii)    the identification of persons responsible for carrying out the indexation or inventorying;

   (iii)   whether indexation or inventorying will require suspending or modifying any routine processes or procedures, with special attention to document-management programs and the recycling of computer data storage media;

   (iv)    the timing of the indexation or inventorying process in relation to the movement of records, and inspection thereof, envisioned in paragraph 2, above;

   (v)     the methods to index or inventory any volatile but potentially discoverable material, such as voicemail, active data in databases, or electronic messages;

   (vi)    the anticipated costs of indexation and inventorying and ways to reduce or share these costs; and

   (vii)   policies and procedures to review and modify the indexation and inventorying obligation as this case proceeds, eliminating or adding particular categories of documents, data, and tangible things.

4.   **Compliance.**  The parties shall establish policies, procedures, and controls for monitoring compliance with this order and, on or before 63 days after entry of this order, file a status report with the court describing those policies, procedures, and controls.  The parties' counsel shall immediately notify this court if, at any time, they become aware of a violation of this order (*e.g.*, the destruction or loss of documents).

5.   **Definitions.**  For purposes of this order:

   (a)     "Documents, data, and tangible things" is to be interpreted broadly to include, without limitation, writings; records; files; contracts; leases; correspondence; reports; memoranda; calendars; diaries; minutes; electronic messages; voicemail; E-mail; telephone message records or logs; computer and network activity logs; hard drives; backup data; removable computer storage media such as tapes, disks, and cards; printouts; document image files; Web pages; databases; spreadsheets;

software; books; ledgers; journals; orders; invoices; bills; vouchers; checks; statements; worksheets; summaries; compilations; computations; charts; diagrams; graphic presentations; drawings; films; digital or chemical process photographs; video; phonographic tape or digital recordings, or transcripts thereof; drafts; jottings; and notes. The term also includes information that serves to identify, locate, or link documents, data, and tangible things, including, without limitation, file inventories; indices; and metadata.

(b)     "Preservation" is to be interpreted broadly to accomplish the goal of maintaining the integrity of all documents, data, and tangible things reasonably anticipated to be subject to discovery under RCFC 26, 45, and 56(e) in this action. Preservation includes taking reasonable steps to prevent the partial or full destruction, alteration, testing, deletion, shredding, incineration, wiping, relocation, migration, theft, mutation, negligent handling, or intentional mishandling of any documents, data, or tangible things, if such action would make that material incomplete or inaccessible.

6.     **Further Instructions; Modification.**

(a)     If after counsel confer, unresolved issues remain concerning matters arising under this order or other material aspects of preservation, inspection and production, or indexation and inventorying, the parties shall file with the court a statement of the unresolved issues together with each party's proposal for their resolution.

(b)     Either party also may apply to the court for further instructions regarding, *inter alia*:

(i)     defendant's obligation to preserve specific categories of documents, data, or tangible things;

(ii)     any aspect of the inspection or indexation tasks not herein clearly defined; and

(iii)     allocating copying costs and maintaining the confidentiality of information contained in various records.

(c)     Recognizing that the parties may perceive better ways of accomplishing the purposes of this order, the court notes that joint motions to modify any of the procedures listed herein will likely be received favorably.

7.     **Sanctions.** Failure to comply with this order may lead to the imposition of sanctions. See *Pueblo of Laguna*, 60 Fed. Cl. at 135-37; *United Medical Supply Co., Inc. v. United States*, 77 Fed. Cl. 257 (2007).

-6-

8.  **Dissemination.**  This order shall be distributed by defendant and plaintiff to all relevant agencies, departments, offices, divisions, contractors, and individuals.

**IT IS SO ORDERED.**

s/ Francis M. Allegra_____
Francis M. Allegra
Judge

# In the United States Court of Federal Claims

No. 06-900L

Filed October 1, 2007

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|                                    |   |
|------------------------------------|---|
| ROUND VALLEY INDIAN TRIBES,        | * |
|                                    | * |
|     Plaintiff,                     | * |
|                                    | * |
| v.                                 | * |
|                                    | * |
| THE UNITED STATES,                 | * |
|                                    | * |
|     Defendant.                     | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PROTECTIVE ORDER

Pursuant to Rule 26(c) of the Rules of the Court of Federal Claims (RCFC), as well as the Court's inherent power to regulate its proceedings and maintain the integrity of its functions, the Court hereby issues the following Order:

### 1. Obligation to Preserve Certain Documents, Data, and Tangible Things

During the pendency of this litigation (including informal settlement discussions, ADR, and/or any appeals herein), the parties, as well as their agencies, their employees, and their agents, shall take reasonable steps to preserve those documents, data, or tangible things that are in their possession, custody, or control, and that contain information that is relevant to, or may reasonably lead to the discovery of information that is relevant to, the subject matter of the pending litigation (including claims and defenses), as that subject matter is set forth in the Complaint and any amendments thereof and the Answer to such complaint and any amendments thereof. This Order does not impose an obligation on the parties to retain duplicate copies of the documents, data, or tangible things that are subject to the Order. Additionally, nothing in this Order Supplants the discovery obligations under the RCFC.

### 2. Mechanism for Ensuring Compliance With This Order

Defendant, in consultation with Plaintiff, shall establish a mechanism for ensuring on-going compliance with this Order, such as periodic reminders of record retention obligations to be sent to appropriate document repositories by a date to be determined by the Court and then every six months thereafter for the pendency of this case. Defendant shall file a report setting forth its compliance mechanism, within 60 days of the date of this Order. The compliance mechanism shall include the

parties' specification of the subject matters at issue in this litigation and the documents, data, or tangible things that the parties reasonably anticipate to be subject to discovery in this case and to this Order. Counsel shall notify the Court and opposing counsel, as soon as is reasonably possible, if, at any time, they become aware of a violation of Paragraph 1 of this Order (i.e., the destruction or loss of certain documents, data, and/or tangible things).

### 3. Definitions

For purposes of this Order, the following terms are to defined as follows:

(a) "Documents, data, and tangible things" shall be interpreted to consist of writings; records; files; contracts; leases; correspondence; reports; memoranda; calendars; diaries; minutes; electronic mail (e-mail) ; telephone message records or logs; computer and network activity logs; hard drives; backup data; removable computer storage media, such as tapes, disks, and cards; printouts; document image files; databases; spreadsheets; software; books; ledgers; journals; orders; invoices; bills; vouchers; checks; statements; worksheets; summaries; compilations; computations; charts; diagrams; graphic presentations; drawings; films; digital or chemical process photographs; video; phonographic or digital recordings, or transcripts thereof; and circulated drafts. The term also shall include information that serves to identify, locate, or link documents, data, and tangible things, such as file inventories and indices.

(b) "Preserve" shall be interpreted to accomplish the goal of maintaining the integrity of all documents, data, and tangible things reasonably anticipated to be subject to discovery in this case as related to the subject matters defined by the Parties under paragraph 2 above. "Preserve" includes the parties taking reasonable steps to prevent the partial or full destruction, alteration, deletion, shredding, incineration, wiping, theft, or mutation of documents, data, and tangible things, and any negligent or intentional handling that would make material incomplete or inaccessible.

### 4. Movement(s) or Transfer(s) of Certain Documents, Data, and Tangible Things

In the event that Defendant anticipates moving or transferring trust documents relating to Plaintiff from the Central California Agency and Pacific Regional Office of the Bureau of Indian Affairs (BIA) to the American Indian Records Repository (AIRR), Defendant shall provide Plaintiff with notice of such document movement at least 20 days in advance of the movement. Such written advance notice shall include a copy of any move plans and box inventories produced pursuant to regulations and procedures governing movement of trust documents.

### 5. Dispute Resolution

If a party desires clarification of any issue(s) related to the parties' obligations pursuant to, or compliance with, this Order, or believes that the opposing party has violated any term of this Order, the party shall notify the opposing party in writing and state the issue(s) requiring clarification or the grounds upon which the party has formed such belief. As soon as practicable after receiving such written notification, the parties shall meet and confer in an attempt to clarify the issue(s) in a

mutually agreeable manner or resolve the dispute. If the parties cannot clarify the issue(s) in a mutually agreeable manner or do not resolve the dispute, within a period of 20 days either party may file a motion with the Court seeking a ruling regarding the parties' obligations under, and compliance with, this Order.

### 6. Further Instructions, Clarification, or Modification of This Order

Each party may apply to the Court, at any time, for further instructions, clarification, or modification of this Order, regarding, inter alia, their obligations to preserve specific categories of documents, data, and tangible things covered by the Order. The parties are encouraged to confer among themselves and to make a joint proposal or submission to the Court, wherever appropriate or possible.

**IT IS SO ORDERED.**

s/Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

3

# In The United States Court of Federal Claims

No. 06-945L

(Filed: September 10, 2007)

_____

NAVAJO NATION
f.k.a. NAVAJO TRIBE OF INDIANS,

                Plaintiff,

    v.

THE UNITED STATES,

                Defendant.

_____

## ORDER

_____

This matter comes before the court on plaintiff's Motion for Entry of Record Retention Order. Pursuant to RCFC 26(c) as well as the court's inherent power to regulate its proceedings and maintain the integrity of its functions, *see Pueblo of Laguna v. United States*, 60 Fed. Cl. 133, 135-137 (2004), the court hereby **ORDERS** as follows:

1.    **General Obligation to Preserve.** During the pendency of this litigation or until further order of the court, defendant and its departments, agencies, employees, agents, and contractors must take reasonable steps to preserve every document, datum, or tangible thing in its possession, custody, or control containing information that is relevant to, or is reasonably calculated to lead to the discovery of admissible evidence relevant to, the subject matter involved in the pending litigation ("Relevant Records"). Plaintiff is reminded that it also has a similar duty to preserve evidence relevant to this case.

2.    **Document Inspection and Production.**

     (a)    Defendant shall move Relevant Records that, as of the date of this order, are inactive as defined by the Department of Interior ("Interior") Manual Part 303, Chapter 6, and located at the Bureau of Indian Affairs ("BIA") Navajo Regional ("Gallup") Office, the BIA Navajo Regional Realty Office, and the BIA Fort Defiance Agency, and any predecessor offices therefor to the Gallup BIA Warehouse in Gamerco, New Mexico, at which location such records shall be made available to plaintiff for purposes of inspection. At least 10 calendar days

before movement of the records from their present locations to Gamerco, defendant will provide plaintiff with an intermediate move plan or plans, which shall include: an implementation schedule; a description or inventory of the records being moved; the method of transportation; the chain of custody; and the signature of the official responsible for the move. The move process may be monitored by plaintiff or its representative.

(b)     After reviewing the above inactive Relevant Records for privileged material, if necessary, defendant shall make those records available for plaintiff's inspection, in accordance with the following schedule:

    (i)     Within 35 days after entry of this order, defendant shall provide to plaintiff any and all existing indices and inventories that include inactive Relevant Records or boxes thereof located at the above offices in the most useable form readily available. Defendant shall provide to plaintiff additional or supplemental indices or inventories of inactive Relevant Records within 21 days after the creation or discovery of such indices or inventories.

    (ii)     Within 35 days after receiving such indices or inventories from defendant or within some other time as agreed to by the parties, plaintiff shall designate boxes or records listed in the provided indices or inventories that plaintiff wishes to review for Relevant Records.

    (iii)     Within 63 days after the date on which plaintiff designates which boxes of one or more of the above offices it wishes to inspect, defendant will begin to make available, on a rolling basis, the boxes from such office(s) for plaintiff's inspection at the BIA warehouse in Gamerco.

    (iv)     Plaintiff generally shall have 63 days within which to inspect a designated record upon receiving notification from defendant that the designated record has become available for inspection, during which process plaintiff may identify records for production. This inspection period may be extended by agreement of the parties or by the court for good cause shown. At the time of such inspection, defendant shall permit plaintiff to identify or document the condition of records identified by plaintiff for production, including without limitation through the use of audio recorders, digital cameras, or document scanning, provided that no such recordings made by plaintiff shall constitute production of records. Plaintiff's documentation shall be subject to the Protective Order entered by this court on May 11, 2007.

(c)     After plaintiff has inspected and identified records for production pursuant to paragraph 2(b) above, defendant may move those records to the American Indian Records Repository ("AIRR") in Lenexa, Kansas, in accordance with defendant's

procedures and protocols for the movement of Indian trust records contained in the Indian Affairs Records Management Manual. After such move(s), defendant shall scan the records identified by plaintiff; code the scanned images at the document level, including data fields as agreed to by the parties; and provide such images and coding to plaintiff within such schedule as agreed to by the parties. For documents originating in media other than paper, defendant shall provide the document in a reasonably usable form, including any form reasonably requested by plaintiff, and also shall provide an opportunity to plaintiff to test or sample such documents upon reasonable request. Defendant shall expedite and prioritize the scanning, coding, and production to plaintiff of identified records.

(d)     In accordance with defendant's procedures and protocols for the movement of Indian trust records contained in the Indian Affairs Records Management Manual, defendant may move any boxes that have been either: not designated for inspection within the time period provided for in or agreed to under paragraph 2(b)(ii); or designated but not reviewed by plaintiff within the applicable period provided for under paragraph 2(b)(iv). Nothing herein prevents plaintiff from also seeking to inspect records from the above offices in whatever location they may be found in the future.

(e)     Within such schedule as agreed to by the parties, defendant shall input into Interior's Box Inventory Search System ("BISS") data identifying the boxes, files, and documents containing all Relevant Records located as of the date of this order at the AIRR; provide plaintiff access to such BISS database at the Albuquerque office of plaintiff's counsel and the AIRR; and make those records available for plaintiff's inspection at the AIRR. At the time of such inspection, defendant shall permit plaintiff to identify or document the condition of records identified by plaintiff for production, including, without limitation, through the use of audio recorders or digital cameras, provided that no such recordings made by plaintiff shall constitute production of records. Defendant also shall provide to plaintiff all manuals, training materials, and similar documents created by or for Interior which describe the BISS database and its manner of operation and access. Defendant shall provide to plaintiff additional or supplemental indices or inventories for the AIRR that include Relevant Records promptly after the creation of such indices or inventories.

(f)     The parties shall meet and confer to discuss schedules and procedures to be used for defendant to make available to plaintiff, for purposes of inspecting active or inactive Relevant Records (determined as of the date of this order) of all of defendant's departments, agencies, offices, employees, agents, and contractors at offices other than those identified in paragraph 2(a) above, as follows:

        (i)     The parties shall expedite and prioritize inspection of Relevant Records that, as of the date of this order, are inactive and located at: (1) the offices

of the BIA Chinle Agency, the BIA Western Navajo ("Tuba City") Agency, the BIA Eastern Navajo ("Crownpoint") Agency, and the BIA Shiprock Agency, whether inspected at those offices, the BIA Gamerco warehouse, or other mutually agreed locations; (2) the Office of Trust Records ("OTR"), the Office of the Special Trustee ("OST"), and the BIA Land Titles and Records Office ("LTRO"), all located in Albuquerque, New Mexico; or (3) offices of the Department of the Treasury.

(ii)   Defendant, after reviewing the records for privileged material, if necessary, shall make the respective record collections available to plaintiff for purposes of inspection and designation. Unless otherwise agreed by the parties, defendant shall provide existing indices or inventories for such records as soon as practicable and make such records available for plaintiff's inspection within 63 days of plaintiff's designation of them.

(iii)   Plaintiff shall inspect the records upon receiving notification from defendant that the records have become available for inspection. If plaintiff identifies records for production, defendant shall make arrangements for scanned and coded images, or other data in a reasonably usable form, to be delivered to plaintiff as soon as practicable.

(iv)   Unless otherwise agreed by the parties, moves of Relevant Records that are inactive as of the date of this order from the BIA Navajo Agencies identified in paragraph 2(f)(i) above, the OTR, the OST, and the LTRO to locations other than the AIRR shall be subject to the intermediate move plan requirement of section 2(a) above.

(g)   The parties shall attempt to reach agreement on all matters related to document inspection and shall coordinate inspection of Relevant Records in a manner that will minimize the disruption of ongoing governmental activities.

3.   **Indexation and Inventorying.**

(a)   Within 126 days after entry of this order, the parties shall identify all of their respective repositories besides the AIRR and those addressed in section 2(a) above that are reasonably anticipated to be subject to discovery in this case and determine whether indices or inventories exist for each location. The parties also shall have ongoing duties to identify evidence relevant to this case in their respective possession, custody, or control.

(b)   Within the same time period or as the parties may agree, the parties shall provide to each other existing indices and inventories for such repositories in the most

useful form readily available, except for indices and inventories previously provided pursuant to paragraph 2 of this Order.

(c)    If a party is unable to provide the other with indices or inventories of its repositories containing evidence relevant to this case, then the parties shall meet and confer as soon as practicable about the possibility of using, as may be appropriate, a collection-by-collection approach, including on-site reviews, to address the sufficiency of existing indices or inventories and to discuss whether additional indexation of specific record collections is necessary and the scope, timing, and method of any additional indexation or elaboration of inventories at each location based on the particular facts relating to each repository and record characteristics. The parties shall provide additional or supplemental indices or inventories that include evidence relevant to this case within 21 days after the creation or discovery of such indices or inventories.

(d)    The parties shall cooperate in good faith to attempt to reach agreement on all issues regarding the indexation and inventorying of documents, data, and tangible things. These issues include, but are not necessarily limited to:

(i)    the extent of the indexation and inventorying obligation, identifying the types of material to be indexed and inventoried, the subject matter, time frame, the authors and addressees, and key words to be used in identifying such materials;

(ii)    the identification of persons responsible for carrying out the indexation or inventorying;

(iii)    whether indexation or inventorying will require suspending or modifying any routine processes or procedures, with special attention to document-management programs and the recycling of computer data storage media;

(iv)    the timing of the indexation or inventorying process in relation to the movement of records, and inspection thereof, envisioned in paragraph 2, above;

(v)    the methods to index or inventory any volatile but potentially discoverable material, such as voicemail, active data in databases, or electronic messages;

(vi)    the anticipated costs of indexation and inventorying and ways to reduce or share these costs; and

     (vii)    policies and procedures to review and modify the indexation and inventorying obligation as this case proceeds, eliminating or adding particular categories of documents, data, and tangible things.

    (e)    If, after conferring to develop an indexation plan, counsel do not reach agreement on the subjects listed under paragraph 3(d) of this order or on other material aspects of indexation, the parties shall file expeditiously with the court a statement of the unresolved issues together with each party's proposal for their resolution of the issues.

4.    **Compliance.**  The parties shall establish policies, procedures, and controls for monitoring compliance with this order and, on or before 63 days after entry of this order, file a status report with the court describing those policies, procedures, and controls.  The parties' counsel shall immediately notify this court if, at any time, they become aware of a violation of this order (*e.g.*, the destruction or loss of documents).

5.    **Definitions.**   For purposes of this order:

    (a)    "Documents, data, and tangible things" is to be interpreted broadly to include, without limitation, writings; records; files; contracts; leases; correspondence; reports; memoranda; calendars; diaries; minutes; electronic messages; voicemail; E-mail; telephone message records or logs; computer and network activity logs; hard drives; backup data; removable computer storage media such as tapes, disks, and cards; printouts; document image files; Web pages; databases; spreadsheets; software; books; ledgers; journals; orders; invoices; bills; vouchers; checks; statements; worksheets; summaries; compilations; computations; charts; diagrams; graphic presentations; drawings; films; digital or chemical process photographs; video; phonographic tape or digital recordings, or transcripts thereof; drafts; jottings; and notes.  The term also includes information that serves to identify, locate, or link documents, data, and tangible things, including, without limitation, file inventories; indices; and metadata.

    (b)    "Preservation" is to be interpreted broadly to accomplish the goal of maintaining the integrity of all documents, data, and tangible things reasonably anticipated to be subject to discovery under RCFC 26, 45, and 56(e) in this action.  Preservation includes taking reasonable steps to prevent the partial or full destruction, alteration, testing, deletion, shredding, incineration, wiping, relocation, migration, theft, mutation, negligent handling, or intentional mishandling of any documents, data, or tangible things, if such action would make that material incomplete or inaccessible.

6. **Further Instructions; Modification.**

    (a)    If, after counsel confer, unresolved issues remain but require resolution concerning matters arising under this order or other material aspects of preservation, inspection and production, or indexation and inventorying, the parties shall file with the court a statement of the unresolved issues together with each party's proposal for their resolution.

    (b)    Either party also may apply to the court for further instructions regarding, *inter alia*:

        (i)    defendant's obligation to preserve specific categories of documents, data, or tangible things;

        (ii)    any aspect of the inspection or indexation tasks not herein clearly defined; and

        (iii)    allocating copying costs and maintaining the confidentiality of information contained in various records.

    (c)    Recognizing that the parties may perceive better ways of accomplishing the purposes of this order, the court notes that joint motions to modify any of the procedures listed herein will likely be received favorably.

7. **Sanctions.** Failure to comply with this order may lead to the imposition of sanctions. *See Pueblo of Laguna*, 60 Fed. Cl. at 135-137; *United Medical Supply Co., Inc. v. United States*, 77 Fed. Cl. 257 (2007).

8. **Dissemination.** This order shall be distributed by defendant and plaintiff to all relevant agencies, departments, offices, divisions, contractors, and individuals.

**IT IS SO ORDERED.**

                                  s/ Francis M. Allegra
                                  Francis M. Allegra
                                  Judge

# In The United States Court of Federal Claims

No. 06-899L

(Filed:  August 24, 2007)

_____

SWINOMISH INDIAN TRIBAL
COMMUNITY,

                        Plaintiff,

     v.

THE UNITED STATES,

                        Defendant.

_____

**ORDER**

_____

On July 31, 2007, the court ordered the parties in this case to file a proposed document preservation order.  On August 8, 2007, the parties filed a joint stipulation regarding preservation of documents, data, and tangible things.  Pursuant to RCFC 26(c) as well as the court's inherent power to regulate its proceedings and maintain the integrity of its functions, *see Pueblo of Laguna v. United States*, 60 Fed.Cl. 133, 135-137 (2004), the court adopts the parties' stipulation with minor changes, and hereby **ORDERS** as follows:

1.    **General Obligation to Preserve**.  During the pendency of this litigation or until further order of the court, defendant, its agencies, and its employees must take reasonable steps to preserve every document, data or tangible thing in its possession, custody or control, containing information that is relevant to, or may reasonably lead to the discovery of information relevant to, the subject matter involved in the pending litigation ("Swinomish documents").  Plaintiff is reminded that it also has the same duty to preserve evidence relevant to this case.

2.    **Definitions**.  For purposes of this order:

    (a)    "Documents, data, and tangible things" is to be interpreted broadly to include, without limitation, writings; records; files; contracts; leases; correspondence; reports; memoranda; calendars; diaries; minutes; electronic messages; voicemail; E-mail; telephone message records or logs; computer and network activity logs; hard drives; backup data; removable computer storage media such as

tapes, disks, and cards; printouts; document image files; Web pages; databases; spreadsheets; software; books; ledgers; journals; orders; invoices; bills; vouchers; checks; statements; worksheets; summaries; compilations; computations; charts; diagrams; graphic presentations; drawings; films; digital or chemical process photographs; video; phonographic tape or digital recordings, or transcripts thereof; drafts; jottings; and notes. The term also includes information that serves to identify, locate, or link documents, data, and tangible things, including, without limitation, file inventories; indices; and metadata.

(b)  "Preserve" is to be interpreted broadly to include, without limitation, taking reasonable steps to prevent the partial or full destruction, alteration, testing, deletion, shredding, incineration, wiping, migration, theft, or mutation of documents, data, and tangible things, and any negligent or intentional handling that would make material incomplete or inaccessible. The term also includes taking reasonable steps to prevent the relocation of documents, data, and tangible things if such relocation would result in the documents, data, or tangible things no longer being in the possession, custody, or control of the party from whom the documents, data, and tangible things are relocated.

3.  **Movement of Documents, Data, and Tangible Things**.

(a)  On August 6, 2007, defendant represented to plaintiff that it does not anticipate moving or transferring Swinomish documents from the Department of the Interior within the immediate future. Defendant shall provide plaintiff with written notice at least thirty (30) days prior to moving or transferring Swinomish documents from the Puget Sound Agency of the BIA to the American Indian Records Repository (AIRR).

(b)  Defendant has represented that it is determining the location of Swinomish documents held in other Department of the Interior facilities. Within thirty (30) days after the completion of that investigation, defendant shall meet and confer with plaintiff concerning its findings with respect to any collections of Swinomish documents that are found in other Interior facilities, and shall provide plaintiff any existing finding aids or indices of such collections, so as to allow plaintiff to determine whether it wishes to review the records at the facilities. Such review, if any, will be according to the rules and procedures of the facilities in which the records are located. During the aforementioned meeting, the parties shall also discuss how plaintiff will be notified should

-2-

any of the collections of Swinomish documents be considered for movement or transfer to the AIRR.

(c)    Should, at any point, the parties' consultations reveal a need to modify this order, the parties' shall file an appropriate motion seeking that modification.

4.    **Compliance**. Defendant, in consultation with plaintiff, shall establish a mechanism for monitoring compliance with this order, providing, *inter alia*, for periodic reminders of record retention obligations to be sent to Swinomish document repositories, BIA Puget Sound Agency, Northwest Regional Office and the Office of Trust Records. On or before September 17, 2007, defendant shall file a status report with the court describing this compliance mechanism. Counsel shall immediately notify opposing counsel if, at any time, they become aware of a violation of paragraph 1 of this order (*e.g.*, the destruction or loss of documents, data, and/or tangible things).

5.    **Dispute Resolution.** If a party desires clarification of any issue(s) related to the parties' obligations pursuant to, or compliance with, this order, or believes that the opposing party has violated any term of this order, the party shall notify the opposing party in writing and state the issue(s) requiring clarification or the grounds upon which the party has formed such belief. As soon as practicable after receiving such written notification, the parties shall meet and confer in an attempt to clarify the issue(s) in a mutually agreeable manner or resolve the dispute. If the parties cannot clarify the issue(s) in a mutually agreeable manner or do not resolve the dispute within a period of 20 days of the aforementioned written notice, either party may file a motion with the court seeking a ruling regarding the parties' obligations under, and compliance with, this order.

6.    **Sanctions**. Failure to comply with this order may lead to the imposition of sanctions. *See Pueblo*, 60 Fed.Cl. at 135-137; *United Medical Supply Co., Inc. v. United States*, 77 Fed.Cl. 257 (2007).

7.    **Dissemination**. This order shall be distributed by defendant to all relevant agencies, departments, offices, divisions, and individuals.

**IT IS ORDERED.**

s/ Francis M. Allegra
Francis M. Allegra
Judge

-3-

ORIGINAL

# In the United States Court of Federal Claims

No. 02-25L

(Filed: March 19, 2004)

_____

FILED

MAR 1 9 2004

U.S. COURT OF
FEDERAL CLAIMS

JICARILLA APACHE NATION, formerly
JICARILLA APACHE TRIBE,

        Plaintiff,

v.

THE UNITED STATES,

        Defendant.

_____

## ORDER

_____

For the reasons discussed in the order issued today in *Pueblo of Laguna v. United States*, No. 02-24L, and pursuant to RCFC 16(c) and 26(c), as well as this court's inherent power to regulate its proceedings and maintain the integrity of its functions, **IT IS ORDERED**:

1.     **General Obligation to Preserve**. During the pendency of this litigation or until further order of the court, defendant, its agencies, and its employees must take reasonable steps to preserve every document, data or tangible thing in its possession, custody or control, containing information that is relevant to, or may reasonably lead to the discovery of information relevant to, the subject matter involved in the pending litigation. Plaintiff is reminded that it also has a similar duty to preserve evidence relevant to this case.

2.     **Document Inspection**.

    (a)     The Department of the Interior ("DOI") shall move inactive Jicarilla Apache Nation records from the BIA Southwest Regional Office to the Office of Trust Records ("OTR"), in Albuquerque, New Mexico, at which location said inactive records shall be made available to plaintiff for purposes of inspection. At least 10 calender days prior to movement of the inactive records, DOI will provide plaintiff with a move plan, which plan shall include: an implementation schedule; a description or inventory of the records being moved; the method of transportation; the chain of

custody; and the signature of the official responsible for the move.
Compliance with the move plan may be monitored by plaintiff or its
representative.

(b)     After reviewing the inactive records at OTR and the Jicarilla Agency for
privileged material, DOI shall make those records available for plaintiff's
inspection, in accordance with the following schedule:

   (i)     On or before April 2, 2004, DOI shall provide plaintiff with any
and all existing indices of inactive records or record boxes located
at the OTR, the Southwest Regional Office, or the Jicarilla
Agency.

   (ii)    On or before May 3, 2004; plaintiff shall designate the boxes or
records listed in the provided indices that plaintiff wishes to review
for Jicarilla Apache Nation trust records.

   (iii)   Within 49 days from the date on which plaintiff designates which
boxes at OTR it wishes to inspect, DOI will begin to make
available, on a rolling basis, the boxes at OTR for plaintiff's
inspection.

   (iv)    Within 63 days from the date on which plaintiff designates which
boxes at the Jicarilla Agency it wishes to inspect, DOI will begin to
make available, on a rolling basis, the boxes at the Jicarilla
Agency for plaintiff's inspection.

(c)     Plaintiff generally shall have 63 days within which to inspect a designated
record upon receiving notification from DOI that the designated record has
become available for inspection, during which process plaintiff may
identify relevant documents for production. This inspection period may be
extended by the court for good cause shown. Defendant shall provide to
plaintiff copies or electronic images of the documents identified by
plaintiff pursuant to this provision within such time as is agreed to by the
parties; barring such agreement, the parties shall each file with the court
their proposed schedule for the production of such copies or images, with
an explanation in support thereof.

(d)     At such time as the inactive records identified by plaintiff have been
copied or imaged by defendant, DOI may move those records from OTR
and the Jicarilla Agency in accordance with its normal procedures and
protocols for the movement of Indian trust records. In addition, DOI may
move any boxes designated by plaintiff from OTR or the Jicarilla Agency

that plaintiff has not reviewed within three months from the date on which DOI made those boxes available for plaintiff's inspection. DOI may, at any time, move boxes that have not been designated for inspection, according to normal procedures and protocols for the movement of Indian trust records. Nothing herein prevents plaintiff from also seeking to inspect relevant records from OTR, the BIA Southwest Regional Office, or the Jicarilla Agency in whatever location they may be found in the future.

3.    **Indexation.**

(a)    The parties shall meet and confer, as soon as practicable, and no later than April 19, 2004, to develop a plan for indexing documents, data and tangible things reasonably anticipated to be subject to discovery in this case. The resulting plan shall be submitted to this court as a proposed order under RCFC 16(e).

(b)    The parties should attempt to reach agreement on all issues regarding the indexation of documents, data, and tangible things. These issues include, but are not necessarily limited to:

(i)    the extent of the indexation obligation, identifying the types of material to be indexed, the subject matter, time frame, the authors and addressees, and key words to be used in identifying such materials;

(ii)    the identification of persons responsible for carrying out the indexation;

(iii)    whether indexation will require suspending or modifying any routine processes or procedures, with special attention to document-management programs and the recycling of computer data storage media;

(iv)    the timing of the indexation process in relation to the movement of records, and inspection thereof, envisioned in paragraph 2, above;

(v)    the methods to index any volatile but potentially discoverable material, such as voicemail, active data in databases, or electronic messages;

(vi)    the anticipated costs of indexation and ways to reduce or share these costs; and

(vii)    a mechanism to review and modify the indexation obligation as this case proceeds, eliminating or adding particular categories of documents, data, and tangible things.

(c)    If, after conferring to develop an indexation plan, counsel do not reach agreement on the subjects listed under paragraph 3(b) of this order or on

other material aspects of indexation, the parties shall file with the court, within seven days of the conference, a statement of the unresolved issues together with each party's proposal for their resolution of the issues

4.    **Compliance.** Defendant shall establish a mechanism for monitoring compliance with this order and, on or before April 19, 2004, file a status report with the court describing that mechanism. Defendant's counsel shall immediately notify this court if, at any time, they become aware of a violation of this order (*e.g.,* the destruction or loss of documents).

5.    **Definitions.** For purposes of this order:

(a)    "Documents, data, and tangible things" is to be interpreted broadly to include writings; records; files; correspondence; reports; memoranda; calendars; diaries; minutes; electronic messages; voicemail; E-mail; telephone message records or logs; computer and network activity logs; hard drives; backup data; removable computer storage media such as tapes, disks, and cards; printouts; document image files; Web pages; databases; spreadsheets; software; books; ledgers; journals; orders; invoices; bills; vouchers; checks; statements; worksheets; summaries; compilations; computations; charts; diagrams; graphic presentations; drawings; films; charts; digital or chemical process photographs; video; phonographic tape; or digital recordings or transcripts thereof; drafts; jottings; and notes. Information that serves to identify, locate, or link such material, such as file inventories, file folders, indices, and metadata, is also included in this definition.

(b)    "Preservation" is to be interpreted broadly to accomplish the goal of maintaining the integrity of all documents, data, and tangible things reasonably anticipated to be subject to discovery under RCFC 26, 45, and 56(e) in this action. Preservation includes taking reasonable steps to prevent the partial or full destruction, alteration, testing, deletion, shredding, incineration, wiping, relocation, migration, theft, or mutation of such material, as well as negligent or intentional handling that would make material incomplete or inaccessible.

6.    **Further Instructions; Modification.** Either party may apply to the court for further instructions regarding, *inter alia*: (a) defendant's obligation to preserve specific categories of documents, data, or tangible things; (b) any aspect of the inspection or indexation tasks not herein clearly defined; and (c) allocating copying costs and maintaining the confidentiality of information contained in various records. Recognizing that the parties may perceive better ways of

accomplishing the purposes of this order, the court notes that joint motions to modify any of the procedures listed herein will likely be received favorably.

7. **Sanctions**.  Failure to comply with this order may lead to the imposition of sanctions, as described in greater detail in the *Pueblo of Laguna* order, cited above.

8. **Dissemination**.  This order shall be distributed by defendant to all relevant agencies, departments, offices, divisions, and individuals.

Francis M. Allegra
Judge

-5-



NARA

# Evaluation of the Records Management Program of the Department of the Interior Bureau of Indian Affairs August 1990

Office of Records Administration
National Archives and Records Administration
Washington, DC

ARP97000981

EVALUATION OF THE

RECORDS MANAGEMENT PROGRAM

OF THE

U.S. DEPARTMENT OF THE INTERIOR

BUREAU OF INDIAN AFFAIRS

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION
OFFICE OF RECORDS ADMINISTRATION
AUGUST 1990

ARP97000982

## TABLE OF CONTENTS

Executive Summary.........................................iii

Introduction..............................................vi

SECTION 1 - SUMMARY OF 1980 NARA INSPECTION...............1

SECTION 2 - OVERALL PROGRAM MANAGEMENT....................3

     A - Definition of Program Objectives..................4
     B - Records Management Staffing.......................5
     C - Training.........................................7
     D - Internal Evaluations.............................8
     E - Management Support...............................9

SECTION 3 - RECORDS CREATION AND MAINTENANCE.............11

     A - Recordkeeping Requirements......................12

          1 - Land Titles and Records Offices............13
          2 - Files Maintenance Procedures...............16
          3 - Tribal Recordkeeping......................17
          4 - Vital Records.............................18

     B - Electronic Records Creation and Maintenance......19

SECTION 4 - RECORDS DISPOSITION..........................22

     A - Records Disposition Procedures..................23

          1 - Storage Facilities........................25
          2 - Transfer of Records
              to Federal Records Centers...............26

     B - Retained Records................................27

APPENDICES

     A.  Summary of Recommendations....................A-1

     B.  Summaries of Field Office Programs............B-1

     C.  Retained Records Data Sheets..................C-1

     D.  1980 NARA Inspection Report...................D-1

     E.  Offices Visited...............................E-1

ARP97000983

## EXECUTIVE SUMMARY

Each Federal agency is required to establish and maintain an active continuing program to control the creation, maintenance and use, and disposition of its records (44 U.S.C. 3102). Staff members of the National Archives and Records Administration (NARA) conducted an evaluation of the records management program and practices of the Bureau of Indian Affairs from November 1988 to February 1989. The evaluation focused on the Bureau's overall management of its records management program, records creation and maintenance, records disposition, and retained records.

NARA's 1989 evaluation revealed that BIA is deficient in all areas of its records management program. NARA has evaluated BIA's records management program on several occasions and uncovered numerous program deficiencies. It has also attempted to assist BIA in improving its program. Despite these actions, there has been virtually no improvement since NARA's 1980 inspection of BIA, and in some respects the situation is worse. The 1980 inspection report is attached at Appendix D for reference.

Major deficiencies of BIA's records management program include:

-- Inadequate response or no response to serious problems identified by previous NARA evaluations.

-- Continued mistreatment of permanent records maintained by Land Titles and Records Offices.

-- Insufficient records management staff at the headquarters level and an inconsistent assignment of records management staff and their associated duties throughout headquarters and field operations.

-- Lack of a cohesive network of professionals to administer the records management program.

-- Inadequate management involvement in implementing the Bureau's (and the Department's) regulations relating to records management.

-- Failure to carry out the provisions of the Indian Self Determination Act (PL 93-638) by not providing systems and resources for tribal organizations to properly manage Federal records.

iii

ARP97000984

- -- Inadequate records management training.

- -- Inconsistent application of filing methods and approved disposition instructions.

- -- Lack of a program of internal records management evaluations.

- -- Poor communications among records management staff members, records custodians, and program offices.

- -- Large volumes of inactive records (many of which are permanently valuable or are potentially permanent) maintained in agency space, some under adverse environmental conditions.

The BIA Files Operations and Records Disposition Handbook (15 BIAM Supplement No. 3), in addition to several Departmental directives, provide Bureau personnel with guidance and instructions necessary to implement a records management program that is consistent with Federal regulations. A number of BIA staff members have concluded that the handbook does not accomplish its intended goal. Consequently, a new Bureau handbook, 16 BIAM, has been developed and is under review by NARA.

NARA applauds the initiative demonstrated by the Bureau to improve its basic guidance document. However, since the Bureau has made no appreciable effort to implement relevant and adequate Departmental directives and has undertaken only limited records management activities during the past several years, NARA can only conclude that the development of 16 BIAM is not the solution to far-reaching and deep-seated problems. The core of BIA's records management problems is not inadequate directives; rather, it is a failure on the part of staff members to implement those directives and of the agency as a whole to take seriously the legislative mandate to maintain and preserve adequate documentation of its activities.

As 15 BIAM is the approved Bureau directive on records management, it forms part of the basis upon which the Bureau was evaluated. Any anticipated benefits that may be derived from the implementation of 16 BIAM were not considered during the course of the evaluation nor in the development of this report. In responding to the observations and recommendations of this report, the Bureau may desire to identify areas in which needed corrective measures can be accomplished by the implementation of 16 BIAM.

iv

ARP97000985

The NARA evaluation team interviewed many BIA staff members who were genuinely concerned with the disastrous state of BIA's records management program. Unfortunately, they do not have the training, organizational structure, or most important, the management support to make needed improvements. Regardless of what systems and procedures are implemented, they are doomed to failure without active management support and participation. Furthermore, BIA cannot rely on NARA or outside contractors to correct its records management program deficiencies. It must take action itself, beginning with genuine management commitment and acquisition of the in-house expertise needed to comply with records management laws and regulations.

v

## INTRODUCTION

The Bureau of Indian Affairs (BIA) is an agency of the Department of the Interior under the supervision of the Assistant Secretary-Indian Affairs. It was created in the War Department in 1824 and was transferred to Interior in 1849. The Bureau's primary objective is to encourage and train Indian and Alaskan native people to manage their own affairs under a trust relationship with the Federal Government.

BIA consists of a headquarters, with staff in Washington, DC, and other jurisdictions throughout the country; area offices, which are middle management offices with regional coverage; agencies, sub-agencies, and field stations, which are tribal level organizations; and irrigation project offices.

## PURPOSE AND ORIGIN OF THE REPORT

Each Federal agency is required to establish and maintain an active program to control the creation, maintenance and use, and disposition of its records (44 U.S.C. 3102). The National Archives and Records Administration (NARA) is authorized to evaluate the records management practices of Federal agencies (44 U.S.C. 2906) for the purpose of rendering recommendations for the improvement of records management practices and programs. On September 13, 1988, the Archivist of the United States informed the Secretary of the Interior of NARA's intent to evaluate the records management program and practices of the Bureau of Indian Affairs. After preliminary meetings with staff members of the Division of Management Support, the on-site evaluation began on November 8, 1988, and was concluded in February 1989.

## SCOPE OF THE EVALUATION

Staff members of NARA's Office of Records Administration, Office of Federal Records Centers, and Office of the National Archives participated in the evaluation. They were assisted by BIA staff members of the Central Office Division of Management Support and various staff members at BIA field locations. The NARA team visited offices at BIA Central Office and offices at separate field activities. A listing of the offices visited is attached at Appendix E.

vi

**EVALUATION FOLLOWUP**

BIA shall submit to NARA a plan of action to implement the recommendations of this report within 90 days of its date of transmittal.  The plan should include specific action BIA plans to take on each recommendation and the proposed month and year for completion of each planned action.  Progress reports are to be submitted each 6 months thereafter until the plan is fully implemented or NARA notifies BIA that progress reports are no longer needed.

**FORMAT OF THE REPORT**

The report begins with a brief summary of the conclusions and recommendations of NARA's 1980 inspection.  The overall evaluation of BIA's records management program as of 1989 is divided into three sections.  Sections 2 through 4 each begin with a review of pertinent laws and regulations.  The statutory citations are followed by an analysis of Bureau activities, including general observations regarding the implementation of policy and procedure by program offices. The analysis portion of each of these sections is followed by recommendations for improvement.  Appendix B provides a summary of the evaluation team's observations and conclusions regarding records management activities at the field offices visited during the evaluation.  This section provides abundant supporting evidence for the conclusions summarized in Sections 2 through 4.

vii

lands are kept by BIA field offices or by the tribes
themselves.) The eventual goal is for TRB to transfer all of
its land records to NARA and focus on title research
activities. This research is performed for BIA field offices
or tribes and may entail a fair amount of research in
documents related to land titles activities. A large
percentage of this research relates to damage claims filed by
Indians. The results of TRB research (which often extends to
the holdings of the National Archives) are compiled in case
files, which, in conjunction with the land records noted
above, constitute significant permanent records maintained by
this office.

According to TRB staff members, the agency records schedule
in use during the 1960's was much better than the current
version in identifying TRB records and providing effective
dispositions. The current schedule was seen as excessively
general and not tied to office functions. When asked if TRB
had a chance to contribute to or comment on the revised BIA
schedule now at NARA for review, the evaluation team was told
that the office had never seen the pending schedule. TRB
appeared to have had very little contact with the agency
records management program in general.

The Division of Trust Fund Management is a Central Office
function located in Albuquerque, NM. Records created by this
Division had never been transferred to the FRC. Total
holdings were estimated at approximately 1,200 cubic feet.
There was no staff member involvement in the development of
descriptions or disposition schedules. All records created
by the Division were stored either in their office area or
off-site. Currently, none were expected to be transferred to
an FRC because they are needed for audit purposes.

The National Technical Support Center (NTSC), in Albuquerque,
NM, is the central data computer center for the Bureau. It
provided guidance and technical assistance in the areas of
software maintenance, applications design and documentation,
applications programming, user support, and ADP training.
NTSC was also responsible for coordinating operations of
Information Management Centers, which are its subordinate
centers collocated at selected area offices. NTSC viewed
itself as a service bureau for other BIA divisions and
generated only housekeeping records. NTSC contended that
client offices alone were responsible for maintenance and
disposition of the data in the ADP systems; therefore, it
maintained and disposed of records (tapes) as the users
dictated. NARA's most recent evaluation indicates that BIA
disposition instructions did not accurately reflect actual
records holdings or program office needs and that program
offices did not consistently apply the instructions of
approved disposition schedules. That being the case, NARA is

24

# APPENDIX A

## SUMMARY OF RECOMMENDATIONS

### OVERALL PROGRAM MAINTENANCE

2-1   Staff the full-time position of Records Management Officer at area offices and the positions of Records Liaison Officer and Records Coordinator throughout the Bureau, as required by 15 BIAM 1.4D, to provide essential control over Bureau records. Ensure that each of these staff members receives appropriate training.

2-2   Develop and offer a continuing series of records management training courses for all staff members with records-related duties. Different levels of training courses should be developed dependent on the required knowledge of the various audiences.

2-3   Improve communications at all levels of the records management hierarchy to ensure that each entity is fully aware of Bureau policies and practices that affect records.

2-4   Develop and implement a program of internal evaluations, as required by 380 DM 2.5B and 15 BIAM 1.4C(5), to gauge the effectiveness of the Bureau's records management program and to identify and correct deficiencies before they cause serious problems. The program should be cyclic, targeting each program office once during the evaluation period, and should make provisions for followup reviews.

2-5   Develop and implement a program of regular Records Management staff visits in order to provide guidance and assistance to Central Office program offices, area offices, and agencies.

2-6   Develop briefings for program office heads to inform them of their responsibilities with regard to the proper management of Federal records. Make it clear that their active support is necessary to implement a successful program and that the application of the records management policies, procedures, and regulations of the Bureau, the Department, and the Federal Government is mandatory.

ARP97000990

## RECORDS CREATION AND MAINTENANCE

3-1   Implement the fundamental aspects of the existing files system by establishing file plans, procedures, and file stations for all program areas. Inform all employees that Bureau records must be maintained in accordance with the instructions of 15 BIAM.

3-2   In conjunction with NARA, implement previously developed plans to preserve and protect Land Titles and Records Office (LTRO) records. Amend 15 BIAM to include instructions for the use of special filing equipment, especially for cartographic records. Discontinue immediately the practice of folding records to fit into existing filing equipment.

3-3   Continue to coordinate with NARA the microfilming and return of LTRO records that were borrowed from NARA in 1960. If possible, arrange for NARA to film the records to prevent further damage and to ensure the archival quality of the images. Establish LTRO microfilming procedures in accordance with the instructions of 36 CFR 1230.

3-4   Maintain the original arrangement of documents that are processed at LTRO's so they can be returned and properly interfiled into NARA's BIA Central Classified File.

3-5   Improve control over tribal recordkeeping practices. Establish guidelines, procedures, and support systems (with the assistance of NARA) for the proper care and maintenance of Federal records maintained at tribal organizations' sites.

3-6   Amend 15 BIAM to include specific instructions for the care and handling of electronic records in accordance with published standards of NARA. Include sessions on the care and handling of electronic records in records management training programs.

3-7   Evaluate ADP facilities to ensure compliance with NARA regulations on care and handling as part of the internal evaluation process (see recommendation 2-4).

## RECORDS DISPOSITION

4-1   Inform all Bureau staff members that only 15 BIAM or the General Records Schedules contain authorized disposition instructions for Bureau records and that the timely application of those instructions is mandatory. In addition, inform them that disposing of Bureau records in any manner inconsistent with authorized disposition

A-2

instructions or not specifically described by the
instructions is both unauthorized and illegal.

4-2  Revise 15 BIAM to include disposition instructions for
all series of records created, maintained, and received
by the Bureau, especially nontextual records such as
electronic and microform records.

4-3  Examine program office requirements to ensure that
approved disposition instructions are consistent with
those requirements.

4-4  Ensure that file plans are consistent with actual
program office holdings and with disposition schedules.

4-5  Review all disposition schedules annually, and update as
necessary, to ensure that they meet the program and
statutory requirements of the Bureau.

4-6  Involve appropriate program officials in the development
and modification of records disposition schedules.

4-7  Amend 15 BIAM to include specific disposition
instructions for computer tapes created and maintained
by the NTSC.

4-8  Upgrade records staging or storage areas to meet minimum
environmental and safety standards, as prescribed by 36
CFR 1228.222.

4-9  Work with the staff of NARA's FRC's to ensure the
transfer of all records to FRC's as scheduled.

4-10  As part of the action plan to implement the
recommendations of this evaluation, develop a timetable
for the transfer of permanently valuable records to the
National Archives, particularly those identified in
Appendix C, Retained Records Data Sheets.

A-3

## SECTION 1

### SUMMARY OF 1980 NARA INSPECTION

The records management program of the Bureau of Indian Affairs was inspected by the National Archives and Records Administration in 1980. The following inadequacies were identified:

— Failure to implement a records maintenance and disposition program in accordance with 15 BIAM Supplement 3, Files Operations and Records Disposition Handbook.

— Failure to implement Departmental requirements for establishing a vital records program.

— No control over the maintenance and disposition of records.

— Failure to properly care for Land Titles and Records Office records, which resulted in substantial deterioration of and damage to the records.

— Failure to address the special requirements for creation, maintenance, and disposition of electronic, audiovisual, and cartographic records.

In order for the Bureau to correct these deficiencies, NARA recommended that BIA:

— Establish a task force to implement the maintenance and disposition program outlined in 15 BIAM.

— Destroy eligible records and offer to NARA immediately all eligible permanent records and records over 30 years old.

— Film and return to NARA the Land Titles and Records Office records borrowed in 1960, which would allow BIA to retain the information it needed while protecting the original records from further deterioration.

— Revise 15 BIAM to include specific Bureau responsibilities for the care, maintenance, and disposition of electronic records.

1

ARP97000993

-- Establish a vital records program for the protection of Bureau emergency operating and rights-and-interest records.

This reports documents BIA's failure to implement NARA's 1980 recommendations. It also shows that by failing to implement previous NARA recommendations, BIA's records management program has not improved since NARA's inspection in 1980, and in many respects has worsened.

2

ARP97000994

# FEDSIM

Records Management Study

91116INS-02

January, 1993

Prepared by:
**Office of Technical Assistance**
**Federal Systems Integration and Management Center**
**Federal Software Management Support Center**

Prepared for:

**Bureau of Indian Affairs**
Department of the Interior
Washington, DC 20245



Federal Systems Integration
and Management Center
5203 Leesburg Pike  Suite 400
Falls Church. VA 22041

ARP97001436

# FEDSIM

### Foreword

The Office of Technical Assistance, Federal Systems Integration and Management Center, Federal Software Management Support Center, would like to thank the following individuals who conducted this study and prepared this report:

    Mr. Jeff Tucker, Senior Program Manager
    Ms. Hope Mentore, Project Manager

*Ann S. Liddle*

ANN S. LIDDLE
Director
Federal Software Management Support Center

- i -

# FEDSIM

# FEDSIM

## Executive Summary

The records management program of the Bureau of Indian Affairs (BIA) has undergone three formal evaluations by the National Archives and Records Administration (NARA, in 1969, 1980 and 1990). Each evaluation revealed serious deficiencies in the records program which, to date, have not been corrected. These problems compound themselves on a yearly basis as the BIA, like any organization, continues to generate new records that must be managed. The BIA's general failure to implement NARA's recommendations for corrective action has forced NARA to consider pursuing a course of action requiring Congressional intervention.

The BIA requested the assistance of the Federal Systems Integration and Management Center (FEDSIM) to determine the extent of the records management problem and to estimate the costs (both tangible and intangible) of maintaining the status quo, and to provide an estimate of the cost of correcting the deficiencies identified by NARA.

FEDSIM made site visits and conducted data-gathering at 6 Area Offices (AOs), 12 Agency Offices, and 12 schools. At each site, FEDSIM made estimates of the volume of records by facility and by program area, and made general observations regarding space utilization, environmental conditions, and the level of office automation available.

From the information gathered, FEDSIM reached the following conclusions:

- BIA facilities are retaining over 250,000 cubic feet of records.

- Of the total volume of retained records, over 150,000 cubic feet represent a backlog of records that will require examination, some disposal (probably 30% of the backlog), indexing, and shipment to a Federal Records Center (FRC).

- Of the total volume of retained records, over 100,000 cubic feet represent material to which BIA personnel require some routine access.

- Funds expended to lease space for records storage is small enough to be considered insignificant.

- Utilization of office space is generally within accepted norms.

- Vault space is often used inefficiently; vaults are frequently overcrowded, and contain material that should not be retained on-site.

- Access to records stored in office areas is not too difficult; access to records in vaults is awkward; access to records in warehouses and other storage areas is either difficult or impossible, and, in some instances, presents a danger of personal injury to BIA personnel.

- The widespread use of original documents for day-to-day reference places these records at extreme risk.

SII                                    - iii -                              FEDSIM

# FEDSIM

- Warehousing of unidentified records places these records at risk of inadvertent disposal.

- The environmental conditions in which records are stored range from passable to deplorable. Fire protection is rare, temperature control is rare, humidity control is totally absent, the risk of water and pest damage is often very high, protection against vandalism is marginal, storage containers are rarely of the proper type, and storage shelving is usually inadequate or entirely absent.

- Responsibility for records management is almost always a collateral, low-priority duty. Administrative personnel responsible for record material are often unaware of the statutory and regulatory requirements, particularly in law enforcement, education, and programs conducted under Public Law 93-638.

- Most BIA offices possess little if any modern automated data processing (ADP) equipment; where modern equipment is available, little networking has been accomplished. If these offices are to implement any sort of automated solution to their records management difficulties, they will require substantial quantities of new ADP hardware and software.

FEDSIM recommends that the BIA take the following actions to correct its records management problems. Each recommendation is accompanied by its estimated cost.

- The BIA should hire one full-time records officer for each AO, designate an alternate records officer, and provide training to records officers at all AOs, Agency Offices, and schools. Estimated cost: $636,000.

- The BIA should eliminate its current backlog of stored records (those that are not required for routine reference) by hiring and training temporary personnel, examining the records, indexing those that are to be retained, and shipping them to FRCs. Estimated cost: $6,147,275.

- The BIA should examine its active records to ensure that they are correctly identified and scheduled, and to determine which can be discarded and which should be shipped to FRCs immediately. Estimated cost: $2,077,977.

- The BIA should microfilm some active records (those that are needed on a fairly routine basis, but for which a fairly simple indexing scheme would be adequate) and ship the originals to FRCs. Estimated cost: $100,570.

- The BIA should undertake a major document imaging effort involving the development of a comprehensive indexing scheme, acquisition of imaging systems, scanning of large numbers of existing documents, shipment of the originals to FRCs, and making provisions for scanning future documents. Estimated cost: $13,736,300.

- The BIA should provide modern office automation equipment to all personnel

- iv -

FEDSI

ARP97001439

# FEDSIM

at AOs, Agency Offices, and schools, consisting of personal computers, printers, and local area networks. Estimated cost: $85,684,000.

- The BIA should carefully reexamine the retention schedules for all types of documents to ensure that material is not being retained for unreasonably long periods and to ensure that the schedules make provision for the entire range of records produced and collected by the agency.

A large proportion of the total cost is found in the expenses of bringing modern office automation to all BIA offices. The benefits of this modernization will extend far beyond the records management arena, so the cost of undertaking the effort should be viewed in that light. Conversely, FEDSIM believes that the records management problems of the BIA cannot be solved without this modernization; it would be possible to clear up much of the backlog of retained records without implementing office automation, but the problems the BIA is now experiencing would simply reappear several years down the road.

SII                                         - v -                                      FEDSIM

# FEDSIM

## Table of Contents

1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.1  Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.2  Problem Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
    1.3  Study Objectives . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

2. Study Environment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    2.1  Bureau Structure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    2.2  Area Offices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    2.3  Agency Offices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    2.4  Schools . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

3. Assumptions and Constraints . . . . . . . . . . . . . . . . . . . . . . . . . 5
    3.1  Assumptions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    3.2  Constraints . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
    3.3  Caveat . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

4. Methodology . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    4.1  Data Gathering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    4.2  Extrapolated Record Volume Estimates . . . . . . . . . . . . . . 7
    4.3  Defining Solutions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
    4.4  Cost Estimates . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

5. Analysis and Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    5.1  Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    5.2  Volumes of Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
    5.3  Space Costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    5.4  Overcrowding and Access Problems . . . . . . . . . . . . . . . . 11
    5.5  Records at Risk . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
        5.5.1  Use of Originals . . . . . . . . . . . . . . . . . . . . . . . . . 13
        5.5.2  Warehousing of Unidentified Records . . . . . . . . . 14
        5.5.3  Environmental Conditions . . . . . . . . . . . . . . . . . 14
    5.6  Responsibility for Records . . . . . . . . . . . . . . . . . . . . . . . 16
    5.7  Office Automation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

6. Conclusions and Recommendations . . . . . . . . . . . . . . . . . . . . 17
    6.1  Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
    6.2  Recommendations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
        6.2.1  Records Officers . . . . . . . . . . . . . . . . . . . . . . . . 18
        6.2.2  Eliminating the Records Backlog . . . . . . . . . . . . 19
        6.2.3  Protecting Active Records . . . . . . . . . . . . . . . . . 20
            6.2.3.1  Examination and Identification . . . . . . . . 21
            6.2.3.2  Microfilming . . . . . . . . . . . . . . . . . . . . . 21
            6.2.3.3  Document Imaging . . . . . . . . . . . . . . . . 22
        6.2.4  Office Automation Requirements . . . . . . . . . . . . 23

FEDSIM

# FEDSIM

**6.2.5** Schedule Revisions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
**6.2.6** Management Oversight . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
**6.2.7** Total Cost . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Appendix A  Sites Visited . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Appendix B  Record Categories Identified . . . . . . . . . . . . . . . . . . . . . . . . 31

Appendix C  Record Inventory by Facility . . . . . . . . . . . . . . . . . . . . . . . . 35

Appendix D  Record Inventory by Record Category . . . . . . . . . . . . . . . . . . 59

Appendix E  BIA-Wide Extrapolations . . . . . . . . . . . . . . . . . . . . . . . . . . 87

Appendix F  Summary of Estimated Costs . . . . . . . . . . . . . . . . . . . . . . . . 93

Photographs that accompany the text of the report are contained in a separate binder.

FEDSI

# 1. Introduction

## 1.1 Background

Among other responsibilities, the Bureau of Indian Affairs (BIA), Office of Management and Administration, is mandated by Congress to manage a records program in accordance with 44 U.S.C. 3102. The Division is responsible for policy and procedural development, coordination, oversight, and control of the bureau-wide Records Management Program which includes: (1) records management; (2) records maintenance; (3) records disposition; and, (4) the vital records program to ensure that records are stored, retrieved, and disposed of in accordance with applicable legislation and General Services Administration (GSA) and National Archives and Records Administration (NARA) directives.

According to NARA, Indian records are the most utilized government system of records by the public. The BIA depends upon records for virtually all aspects of its mission. In addition, many historical documents such as Indian treaties, land allocations, mineral rights, and realty leases, form the basis of many legal actions and, therefore, must be readily available if the BIA is to be able to support its position in those actions.

## 1.2 Problem Statement

The BIA has undergone three formal evaluations by NARA (1969, 1980 and 1990). Each evaluation revealed serious deficiencies in the records program which, to date, have not been corrected. These problems compound themselves on a yearly basis as the BIA, like any organization, continues to generate new records that must be managed. The BIA's general failure to implement NARA's recommendations for corrective action has forced NARA to consider pursuing a course of action requiring Congressional intervention. As a result, the BIA has prepared an initial Corrective Action Plan which was submitted to NARA.

## 1.3 Study Objectives

In order to estimate the costs of effectively and efficiently implementing the proposed Corrective Action Plan, further analysis was necessary. The BIA subsequently requested the assistance of FEDSIM to determine the extent of the records management problem and to estimate the costs (both tangible and intangible) of maintaining the status quo, and to provide an estimate of the cost of correcting the deficiencies identified by NARA.

The conclusions and recommendations presented in this study will be used by the BIA to provide budgetary data to the Office of Management and Budget (OMB) on the projected cost savings and/or increases that will result from implementing the recommendations contained in this study. In addition, the information will be used to prepare a report to Congress on the BIA Records Management Program.

## 2. Study Environment

### 2.1 Bureau Structure

The BIA operates from central offices located in Washington, DC, and Albuquerque, NM. The Central Office oversees 12 Regional Area Offices and approximately 90 Agency Offices. Area Offices (AOs) have limited oversight authority over Agency Offices but provide fundamental program guidance and services. BIA schools, of which there are 184, operate under the auspices of the Office of Indian Education Program (OIEP) and provide day and boarding education services from elementary school through junior college.

Each of the above entities implements and manages a records management program using different methods. Although records categories may be similar for AOs and Agency Offices, their characteristics (e.g., the use of originals or copies) may be different depending upon the nature of the program and where the records are being maintained.

In some instances Indian programs such as Social Services and Education operate under the Indian Self Determination Act (Public Law 93-638). These programs, commonly referred to as "638" programs, operate under contract, initiated and implemented by Tribal organizations; the programs maintain a high degree of autonomy. The methods by which OIEP and 638 programs operate with relation to their records management programs vary. Although they are required to comply with 44 U.S.C. 3102, noncompliance is commonplace. The BIA is now in the process of determining the method by which these programs will be required to comply with BIA and NARA standards for records management.

### 2.2 Area Offices

In general, each AO maintains a large volume of redundant data from the Agency Offices in the region for which it is responsible. Although some permanent record material, such as program policies and procedures, exists within these offices, many of the records are copies, and need to be retained only temporarily. In addition, a large volume of non-record material, such as handbooks and reference materials, are being boxed and stored at the AOs.

### 2.3 Agency Offices

Agency Offices, because they represent the point at which the majority of BIA services are delivered to the BIA's clients, maintain a large volume of original record material. Since their programs deal directly with the Indian people and land, many of the records they maintain are considered to be irreplaceable and perpetual.

### 2.4 Schools

The majority of records maintained by BIA schools are permanent record material such as transcripts and student case files. These original documents, often going back to the time the school was founded, are usually stored at the school facility. In general, these permanent records follow a student through the school system. As a result, the majority of the material is stored at the high schools; elementary and middle schools usually retain records only for

3

students who left the system before reaching the high school level. In some instances, historical photographs and film are being maintained at the facility in order to preserve history at a local level.

4

### 3. Assumptions and Constraints

#### 3.1 Assumptions

For the purposes of this analysis, FEDSIM made the following assumptions:

- The sites selected by the BIA represent a valid statistical sampling of AOs, Agency Offices, and schools.

- During site surveys no aspect of the records management program was concealed from the survey team.

- Three Central Office functions (Trust Funds Management, Safety Management, and Facilities Management), located in Central Office West (COW), Albuquerque, NM, are assumed to be the rough functional equivalent of an Agency Office.

FEDSIM is confident of the validity of these assumptions. With regard to the first assumption, while the BIA determined the number and location of sites to be visited, the sample size was quite large, and the survey team remarked upon the similarity of conditions within each group of sites. For example, the conditions found at each Agency Office closely resembled those at all the other Agency Offices visited.

With regard to the second assumption, the survey team did not have any reason to suspect that records management problems were being concealed; to the contrary, the BIA personnel encountered at each site were generally very forthcoming about conditions at the site.

The third assumption, regarding the COW functions, was based upon the personal observations of the FEDSIM employee who visited the site, and was concurred in by BIA personnel.

In developing its cost estimates, FEDSIM made a number of additional, specific assumptions. These are discussed at the relevant points in the remainder of this report.

#### 3.2 Constraints

First, site visits were not lengthy enough to permit a detailed examination of stored records. Therefore, with the assistance of site personnel, volumes and characteristics (i.e., archivable, non-record, unknown, etc.) of stored records were estimated.

Second, while it is apparent that environmentally suitable conditions for records storage do not exist at most BIA sites, FEDSIM does not possess expertise in construction or renovation costs, and cannot, therefore, provide any cost estimates for making the necessary improvements. FEDSIM believes that, at a minimum, sprinkler systems should be installed in all Agency Offices and schools (AOs are generally equipped with adequate fire protection), but FEDSIM has no basis for estimating the associated expense.

Finally, FEDSIM has no knowledge of the time-frame in which the Bureau wishes to resolve

5

ARP97001446

all of its records management problems. Therefore, cost estimates presented in this study are projected for a period of one year. Virtually all of the estimated costs, however, are linear in nature; if, for example, FEDSIM has estimated that a certain task can be accomplished by twenty people in one year, it is safe to assume that ten people could do the same work in two years. Therefore, the cost of each of the actions recommended may be distributed over a period of several years once an implementation plan has been developed.

## 3.3 Caveat

Beyond the assumptions and constraints discussed above, one caveat is in order: cost estimates provided in this study are intended to serve only as input to the BIA's decision-making process. They are not intended to be used for a detailed requirements or cost/benefit analysis. It will not be possible to determine the costs of some of the tasks with acceptable precision until some of the earlier tasks have been completed or are at least well under way.

6

## 4. Methodology

### 4.1 Data Gathering

FEDSIM made site visits and conducted data-gathering at 6 AOs, 12 Agency Offices (11 Agency Offices plus the COW offices discussed above), and 12 schools. These sites were pre-selected by BIA and are listed in Appendix A. The sites visited represent 50% of all AOs, 12% of all Agency Offices, and 6% of all schools.

At each site FEDSIM estimated volumes of records in office, storage, and warehouse space. Where possible estimates on the volume of records by type (i.e., Finance, Social Services, Natural Resources) were made. Appendix B presents a list of the record categories identified by FEDSIM to produce site-by-site volume tallies. There were many instances in which records stored in warehouse space are in such disarray that classification into a particular category was not possible. Those records were therefore assigned an "unknown" type.

Estimates were made of the percentage of records stored in office and warehouse space that are permanent records, originals, copies, temporary records, and non-record material. When available, FEDSIM obtained records inventories from designated records officers in order to validate our findings. Record categories (types) and disposition were determined using NARA's General Record Schedules (GRS) and BIA Records Management Manuals 15 and 16.

Data on the square footage of office and warehouse space and number of personnel were also obtained. General observations were made regarding office utilization, i.e., whether office space was overcrowded or under-utilized, compared to the norm for Federal offices. Where records are stored in leased space, lease rates were obtained to determine the direct cost of record storage.

Observations on the environmental conditions of records stored in office and warehouse space was documented. Environmental assessment (as specified in 36 CFR 1228.222) included the general condition of the facility: whether proper temperature controls and fire/water protection were in effect and whether adequate storage containers were in use.

General observations on the level of office automation available at each site were made to determine whether BIA's records management problems could be immediately rectified through document imaging and utilization of a networked data repository.

Finally, photographs were taken at most of the sites in order to supplement written data-gathering and to document some of the more extreme environmental hazards and storage conditions present at some sites. Photographs selected to be included as part of this report are numbered and provided in a separate binder.

### 4.2 Extrapolated Record Volume Estimates

In order to estimate the extent of the records management problems throughout the BIA, it

7

ARP97001448

was necessary to extrapolate from the data gathered at each site. First, averages were taken to determine the record volumes at a "typical" AO, Agency Office, and school. Second, those average volumes were multiplied by the total number of AOs, Agency Offices, and schools, respectively, to estimate the total volume of records at all BIA facilities.

### 4.3 Defining Solutions

Having determined the extent of the BIA's records management problems, FEDSIM developed a set of solutions designed to alleviate those problems. Some of the necessary actions are dictated by statute and regulation (i.e., those dealing with the proper disposition of records); in those cases, our task was reduced to describing how best to implement the required actions.

Beyond simply identifying the actions required by statute or regulation, FEDSIM also attempted to define the steps that will be necessary to prevent a recurrence of the problems FEDSIM identified. While the first goal of any BIA action plan must be to clear the backlog of improperly stored and identified records, mechanisms must be put in place to ensure that, ten years from now, the BIA doesn't find itself facing the same type of backlog again.

### 4.4 Cost Estimates

Once a set of feasible solutions to the BIA's records management problems had been identified, FEDSIM estimated the costs associated with each of the recommended actions. FEDSIM made use of many sources of information to develop these estimates: the experience of BIA personnel in taking inventories of records; typical shipping costs experienced by the BIA within the past year; NARA training catalogs; and, FEDSIM experience on other projects regarding the costs of microfilming and imaging records, implementing local area networks (LANs), and so on.

This proved to be the most difficult aspect of the study, because of the number of unknown factors. For each element of the total cost, FEDSIM has indicated whether or not our estimate represents a "worst-case" scenario, and what unknown factors might reduce or increase the estimated cost.

8

ARP97001449

## 5.  Analysis and Findings

### 5.1  Introduction

FEDSIM's site surveys revealed that all of the AOs and Agency Offices are keeping large volumes of records, both in office space and in warehouse or other storage facilities. The schools routinely maintain all of the records for their students, past and present, but the volumes of records are relatively small.

In most cases, many of the records maintained in office space are utilized for regular reference; access to warehoused records is only rarely required for day-to-day operations. FEDSIM also observed that many of the routinely referenced documents, particularly those relating to land titles, real estate, and enrollment, are original documents; backup copies are generally not available. These original documents are almost invariably classified as permanent record material. Many are of sufficient age that they clearly possess historical value; it is not unusual to discover handwritten documents from the mid-19th to early 20th century being referred to routinely. The oldest records, because of repeated handling, are in deplorable condition: crumbling, yellowed, taped together, and so on.

In addition, an extremely large volume of records that are stored have been frozen by the General Accounting Office (GAO). They are all temporary records and include documents relating to contracts, finance, property and procurement, trust funds, and the Individual Indian Monies (IIM) program. Because of the nature of these programs, they accumulate large volumes of material in relatively short periods of time. The only stipulation under freeze procedures is that the records may not be destroyed; most records officers are unaware that these records may stored at a Federal Records Center (FRC) until the freeze is lifted.

At the vast majority of sites visited, records management was only a collateral duty for the designated records officer. Frequently, records officers seemed to possess little knowledge of records management or of the laws and regulations under which it must be carried out. This lack of awareness was especially prevalent in schools and law enforcement offices at the Agency Office level.

### 5.2  Volumes of Records

Appendix C contains a site-by-site inventory, by storage facility, for the AOs, Agency Offices, and schools visited by FEDSIM. For each site, the tables indicate the facilities in which significant volumes of records are stored, the estimated volume of records stored in each facility, the volume of records of unknown origin stored in the facility (i.e., those that could not be readily be identified with a particular program area), the square footage of the facility (except for schools, for which the square footage is not of any informational value, because such figures include classroom space), and the lease cost for the facility (for facilities that are not Government-owned). The tables also contain information on the number of personnel assigned to the AO or Agency Office, the percentage of the total volume of records that are kept within office workspace, and comments about conditions encountered at the site that FEDSIM believes are noteworthy.

9

ARP97001450

Appendix D contains a similar site-by-site inventory, but it is organized by record category rather than by facility. For each site, the tables indicate the volume of records for each of the record categories maintained at that site, an estimate of the percentage of the records that are classified as permanent records, and the estimated volume of permanent records. Records not classified as permanent are either temporary (with varying retention periods) or are non-record material.

Appendix E contains FEDSIM's extrapolations from the sites surveyed to the entire BIA. First, the total volume of records, the volume of unknown records, and the volume of permanent records for a typical AO are computed by taking averages from the AOs included in FEDSIM's survey. Those averages are then multiplied by the total number of AOs to arrive at BIA-wide totals for the AOs. This process is then repeated for the Agency Offices and schools. Finally, the totals for the AOs, Agency Offices, and schools are added to produce grand totals for the BIA.

FEDSIM estimates that BIA offices nationwide (not including the Central Office in Washington, DC) are currently holding 264,262 cubic feet of records. Of this total, FEDSIM estimates that 24,704 cubic feet of records are of an unknown type, i.e., not readily identifiable with a particular program area. It is estimated that, of the total, 157,078 cubic feet of records are classified as permanent records.

Based upon FEDSIM's field observations, it is estimated that 60% of the records, or 156,157 cubic feet, constitute a "backlog" of records. These are records that are not routinely used by BIA personnel in their day-to-day operations. They are usually stored in warehouses, garages, and storerooms, though in some locations, much of this material is present in office space. This backlog represents material that requires examination before proper disposition of it can be made. Of this backlog of records, FEDSIM estimates that 30%, or 46,847 cubic feet, consists of short-term temporary or non-record material that could be discarded; the remainder, 109,310 cubic feet, will require indexing and shipment to an FRC.

The non-backlog records, amounting to 105,705 cubic feet, are those that to which BIA personnel must have ready access. This is not to say, however, that these records can simply be left in place. In many instances, irreplaceable original documents are at risk through repeated handling and through storage in locations without adequate fire protection. The volumes of records that should not continue to be stored on-site is discussed in Section 6, Conclusions and Recommendations.

## 5.3 Space Costs

One of FEDSIM's objectives in conducting its site surveys was to determine whether significant space costs are being incurred by the BIA for the unnecessary storage of records. FEDSIM found that, at the vast majority of sites visited, that records storage is confined to space that is not leased; therefore, records storage generally does not produce any direct space costs.

Only two of the six AOs surveyed occupy leased space; at a yearly cost of slightly over $1 million, but storage space does not directly account for any of that cost. At the 11 Agency

10



Offices and COW sites surveyed, approximately $343,000 is being spent on leased space. However, less than $5,000 of that total can be attributed directly to the cost for records storage. Extrapolating to all Agency Offices, FEDSIM estimates that no more than $40,000 is being spent on leased space to store records unnecessarily. Finally, none of the schools surveyed incurs space costs for records storage.

### 5.4 Overcrowding and Access Problems

Another of FEDSIM's objectives was to determine whether office space is being efficiently used at the sites surveyed. At almost every site, FEDSIM observed that the amount of space available to each worker fell within the range that is considered normal and acceptable for Government offices, between 80 and 130 square feet per person.

General Services Administration Federal Property Management Regulation D-76 states that storage space should typically not exceed 22% of the primary office area. FEDSIM did not encounter any site on its survey visits that appeared to exceed this recommended maximum.

Clearly, if unnecessary records storage in office space were eliminated, more employees could be housed in the same space. Absent a BIA plan to increase the number of personnel at these sites, however, this proves not to be a significant consideration.

FEDSIM did, however, observe one overcrowding problem at many of the Agency Offices surveyed. Most Agency Offices have one or two large, walk-in vaults for storage of their most valuable or sensitive documents. These vaults are, almost without exception, severely overcrowded.

The vault at the Ft. Berthold Agency Office (photo numbers 1 and 2) is fairly typical; material is piled to ceiling height and is often stored loose on top of filing cabinets. One of the vaults at the Cheyenne River Agency Office (photo numbers 3 and 4), used primarily to store financial records, is similarly overcrowded; many records are stacked directly on the floor, making access problematic.

While these two examples are typical, vault space is, in some instances, better utilized. The vaults at the Ft. Peck Agency Office (photo number 5), for example, are neat and orderly, though even in this case space is at a premium. Vault space overcrowding is generally not a problem at AOs. At the Phoenix AO, for example, the vault (photo number 6) is quite roomy, and access to records is relatively unimpeded.

Reducing the volume of records stored in these types of vaults will improve the efficiency of their utilization. Some of the material need not be stored in a vault, and some of it can be imaged and sent to an FRC.

More significant than the overcrowding issue, *per se*, is that of access to records. Over-crowding of records in vaults makes access to this material very difficult. One of the vaults at the Pima Agency Office (photo number 7), for example, is very small and is filled to the limit. Records, while they are stored on sturdy shelving, are stacked several feet above the height one could reach without a ladder; retrieving records from this vault would likely be

11

ARP97001452

difficult and time-consuming.

Access to records in warehouse and other storage space is almost impossible in most cases. Mislabeled boxes, unlabelled boxes, records in rusty file cabinets, records piled loose on top of boxes, and boxes deteriorated from water, rodent, and/or insect damage are commonplace.

The circumstances observed in a shop building and a garage at the Pima Agency Office (photo numbers 8, 9, and 10) and in a storage room at the Phoenix AO (photo number 11) are not at all uncommon. Under these conditions, a search for a particular piece of information could (and often does) consume large numbers of staff hours.

Such a search could also prove hazardous to the individual attempting to carry it out. Stored records are often contained in boxes that have been stacked to a dangerous height or which are placed on high shelves or platforms, accessible only by ladder. In addition, a number of the storage facilities themselves are inherently dangerous, and include condemned buildings, derelict trailers, and the like.

At the Standing Rock Agency Office, records stored in a garage area occupy a high platform, barely reachable with a stepladder (photo number 12). In a shop area at the same location, records on a high shelf (photo number 13) present a clear danger to anyone attempting to retrieve any of the boxes. Records stored in a warehouse at the Ft. Berthold Agency Office are on sturdy shelves and are relatively well-labeled; the sheer height to which they are stacked, however, makes access a hazardous undertaking (photo number 14). At the Standing Rock Agency Office, a dilapidated trailer is used for storage of some records (photo numbers 15 and 16); the floor of the trailer has several large holes, one of which is immediately inside the door, an ankle-breaking trap for the unwary.

In the most extreme case FEDSIM encountered, court documents at the Standing Rock Agency Office are stored in the foundation of a law enforcement building (photo number 17). There is no access route aside from climbing through a trap door in the floor, onto a shaky stepladder. Compounding the danger is the fact that the space has no lighting. To retrieve documents, it would be necessary to carry a flashlight; once the correct box was located, it would require considerable time and effort to gain access to the box, given the cramped space in which one would have to work. Because the boxes are stacked too high, the stacks are leaning precariously; a collapsing stack could easily pin someone against the opposite foundation wall, causing severe injury.

Poor access to records hampers BIA personnel as they carry out their duties, and also makes historical research extremely difficult. The inability to find documents also has the potential for subjecting the BIA and its clients to significant financial loss in the event of a lawsuit involving land, leasing, mineral rights, oil and gas rights, and so on. The BIA's inability to substantiate its position in such a case could produce potential costly liability for the agency.

The Trust Funds Management office in Albuquerque, NM, has an enormous volume of records stored in several warehouses and in office space (photo numbers 18, 19, and 20); the sheer volume of records, coupled with the cramped conditions under which they are stored, make it extremely difficult to locate and retrieve particular pieces of information.

12

ARP97001453

Some BIA personnel are of the opinion that, if these records were sent to an FRC, they would no longer have easy access to them. Given the conditions observed in the field, FEDSIM believes that access to the records will, on the contrary, be vastly improved if they are stored at an FRC; FRCs can typically retrieve records within one week, and it can be accomplished without compromising anyone's personal safety.

## 5.5 Records at Risk

In the course of conducting its surveys, FEDSIM found that many of the records currently held by BIA offices face a substantial risk of destruction, from a variety of causes.

### 5.5.1 Use of Originals

Every Agency Office surveyed retains and actively uses original records, many of historical importance. Specific records identified at extreme risk of being destroyed by excessive handling include:

- land allotment records (including many maps);
- tribal enrollment records;
- census records;
- heirship files;
- IIM case files; and,
- education transcript files.

In many cases FEDSIM found documents dating back to the mid- and late-19th century, often crumbling, taped together, and dog-eared. It is not uncommon to find 50 to 60 cubic feet of records over 50 years old at an Agency Office. A vault at the Cheyenne River Agency Office, for example, contains original allotment records and plats dating back to the 1880s, many in terminal condition (photo number 21). Similarly, a vault at the Pima Agency Office contains census and allotment records from the early 1900s, piled on top of filing cabinets (photo number 22).

Most AOs do not possess similar volumes of historical records, though the Portland AO, for example, has one storage cabinet containing large numbers of tract books, many over 50 years old (photo number 23). The Navajo AO at Gallup, NM, has many unprotected original maps and plats (photo number 24).

Haskell Indian Junior College possesses a large volume of material that is of particular interest. The history of this school is extensive; old photographs and school annuals are scattered throughout the campus. Sadly, many are mutilated, with pages and photographs missing.

13

ARP97001454

If routine handling of original documents throughout the BIA is not halted, they will be destroyed; irreplaceable pieces of a people's heritage and history will be lost.

### 5.5.2 Warehousing of Unidentified Records

Another practice that places records at risk is the warehousing of unidentified records. FEDSIM found that almost 10% of all the records retained by the BIA are of unknown origin, stored in unlabeled boxes and lacking indexes of any description. A warehouse at the Pima Agency Office, for example, contains hundreds of cubic feet of records that are not identified (photo number 25). The same warehouse even contains some records stored in plastic trash bags (photo number 26). The risk faced by these documents arises from their very anonymity; they could easily be discarded or destroyed, yet the BIA would be unaware of the nature of the loss it had experienced.

### 5.5.3 Environmental Conditions

The greatest threat to records at the BIA can be attributed to the poor environmental conditions under which most records are stored.

The environmental conditions in office space and vaults at most sites are generally adequate for the storage of temporary records, but none of the sites visited possessed space environmentally suitable for the storage of irreplaceable original documents. Few Agency Offices, for example, have sprinkler systems, fire retardant file cabinets, or adequate climate controls. Schools generally fare better since the majority of permanent records are stored in vaults and fire retardant safes. Most AOs, because they occupy office space in major cities, are well-protected against fire and have adequate heating and cooling, but AOs do not generally possess large volumes of permanent records.

The conditions FEDSIM encountered in warehouses and other non-office storage areas, however, are another matter entirely. In a few instances, some warehouse space was equipped with sprinkler systems (at the Pima and Papago Agency Offices, for example), but these were the exception rather than the rule. Many of the buildings used to store records are of wood-frame construction, compounding the danger. The Navajo AO at Gallup, NM, for example, uses a former U.S. Department of Agriculture commodities warehouse for storing large volumes of records (photo number 27); the building has virtually no environmental protection.

In the past, several sites have lost substantial numbers of records to fire (the Papago Agency Office, for example); FEDSIM believes that, in most of the warehouses and storage areas surveyed, even a small fire would quickly spread, and consume substantial volumes of record material (in addition to destroying the building the material is stored in, it should be pointed out). The Ft. Defiance Agency Office, for example, stores many records in a basement store room in close proximity to bags of shredded material awaiting disposal (photo number 28); a small fire in this environment would quickly become a very large fire.

Almost none of the records currently in storage are protected from extremes in temperature and humidity; most storage areas are unheated and are not air-conditioned, and none has

14

ARP97001455

humidity control of any sort.

Because many storage buildings are in very poor condition and are visited by BIA personnel only infrequently, the records stored in them are also at great risk of water damage; a leaky roof could go undetected and unrepaired for long periods. In other cases, water on the ground following a heavy rainstorm could easily flow under doorways and damage boxed records that are placed directly on the floor. Records stored at the Seba-Dalkai Boarding School, for example, are at risk from above and below (photo numbers 29, 30, and 31); this particular storage building is in very poor repair, having an entrance that is below grade, substantial amounts of debris on the floor, and a heavily-damaged roof.

A garage at the Ft. Peck Agency Office (photo numbers 32 and 33) was typical of the storage facilities found at many of the sites visited. The building is of wood frame construction, is in less than ideal condition, and sits low to the ground. Many of the records stored in the garage have been placed directly on the concrete slab on which the garage is built; they have little protection from water damage. At the Pima Agency Office, boxes of records are stored in an enclosed back porch (photo number 34); several of the boxes show clear evidence of earlier water damage. A warehouse at the Navajo AO in Gallup, NM, contains many boxes of records that, while now stored on palettes, show evidence of prior water damage (photo number 35).

Pests also threaten many stored records. Though at least one Agency Office (Ft. Berthold) routinely fumigates its primary warehouse, most do not; rodents and insect pests find no impediment to entering and occupying these storage areas. Many of the storage buildings surveyed by FEDSIM showed signs of past or present pest infestation. While at the Navajo AO in Gallup, NM, FEDSIM personnel encountered a live rat in one of the warehouses.

Most of the buildings used by BIA offices for records storage lack sufficient security against vandalism. While FEDSIM was visiting the Standing Rock Agency Office, BIA police had just been called to an old boiler plant that the Agency Office uses for storage of records and other material (photo numbers 36 and 37); vandals had broken into the building, and had caused considerable damage.

In many cases, records must share storage space with equipment, placing them at great risk of damage or destruction, particularly when flammable materials are present. At the Ft. Peck Agency Office, for example, many records are stored in the fire house, surrounded by various types of fire-fighting equipment (photo number 38). In a shop building at the Standing Rock Agency Office, some records are hemmed in by snowmobiles (photo number 39).

Finally, FEDSIM found that records are commonly stored in inappropriate containers and are improperly shelved. Ideally, records should be stored in the boxes approved for use for shipment of records to an FRC. Instead, the BIA's records are generally stored in whatever containers are handy, including a wide variety of cardboard boxes, old file cabinets, and so on. In some cases, records are stored without any containers at all; they are simply piled on top of other boxes, loose.

15

ARP97001456

The basement of the social services building at the Turtle Mountain Agency Office (photo numbers 40 and 41) and a warehouse at the Pima Agency Office (photo numbers 42 and 43) demonstrate the use of inappropriate record storage containers, a practice not unlike that found by FEDSIM at most of the sites visited. At the Navajo AO in Window Rock, AZ, for example, many original realty and leasing records are stored in haphazard fashion in a warehouse (photo numbers 44, 45, and 46).

Proper shelving proved to be a rarity. In general, boxes are stacked on top of one another, often to a height that results in the crushing of the lower boxes. In the worst cases, boxes are not even stacked, but are simply piled up in a random fashion. A garage at the Pima Agency Office contained one of the more extreme examples of this practice (photo number 47). The primary warehouse at the Ft. Berthold Agency Office, on the other hand, is lined with exceptionally sturdy shelving (photo number 48); boxes are rarely stacked directly on top of one another.

## 5.6 Responsibility for Records

Only one site visited by FEDSIM had a dedicated records officer; at every other site, even the AOs, responsibility for records management is a collateral duty. FEDSIM found that a large percentage of administrative personnel charged with records maintenance and disposition for their particular functions had little knowledge of records management procedures and regulations. This was especially true in the law enforcement and education areas, and in programs in which services are provided under Public Law 93-638.

Even in cases in which the individual designated as the records officer is knowledgeable about the requirements of that position, his or her other, primary duties often prevent that individual from carrying out the records management function in a satisfactory manner. Because records management is a collateral duty, it is generally given very low priority.

## 5.7 Office Automation

While conducting its site surveys, FEDSIM made general observations about the level of office automation available at each site, in order to determine whether substantial resources will be required to implement solutions to the BIA's records management problems that involve the use of imaged records.

Most Agency Offices and schools either have no automated data processing (ADP) equipment or have only obsolete ADP, little of which would be adequate to retrieve, display, and print record images from an optical disk repository. AOs are generally better equipped, but in most cases no local area network (LAN) has been implemented, an essential precondition to the use of a central, automated, record repository.

16

## 6. Conclusions and Recommendations

### 6.1 Conclusions

The primary conclusion to be drawn from FEDSIM's findings is that the BIA's records management program, in its current state, is not sufficiently effective. This conclusion is supported by FEDSIM's specific findings:

- BIA facilities are retaining over 250,000 cubic feet of records.

- Of the total volume of retained records, over 150,000 cubic feet represent a backlog of records that will require examination, some disposal (probably 30% of the backlog), indexing, and shipment to an FRC.

- Of the total volume of retained records, over 100,000 cubic feet represent material to which BIA personnel require some routine access.

- Funds expended to lease space for records storage is small enough to be considered insignificant.

- Utilization of office space is generally within accepted norms.

- Vault space is often used inefficiently; vaults are frequently overcrowded, and contain material that should not be retained on-site.

- Access to records stored in office areas is not too difficult; access to records in vaults is awkward; access to records in warehouses and other storage areas is either difficult or impossible, and, in some instances, presents a danger of personal injury to BIA personnel.

- The widespread use of original documents for day-to-day reference places these records at extreme risk.

- Warehousing of unidentified records places these records at risk of inadvertent disposal.

- The environmental conditions in which records are stored range from passable to deplorable. Fire protection is rare, temperature control is rare, humidity control is totally absent, the risk of water and pest damage is often very high, protection against vandalism is marginal, storage containers are rarely of the proper type, and storage shelving is usually inadequate or entirely absent.

- Responsibility for records management is almost always a collateral, low-priority duty. Administrative personnel responsible for record material are often unaware of the statutory and regulatory requirements, particularly in law enforcement, education, and 638 programs.

17

ARP97001458

- Most BIA offices possess little if any modern ADP equipment; where modern equipment is available, little networking has been accomplished. If these offices are to implement any sort of automated solution to their records management difficulties, they will require substantial quantities of new ADP hardware and software.

## 6.2 Recommendations

Why should the BIA devote additional resources to tackling its records management problems? The reasons are varied and compelling. First, the BIA is required, by statute, to maintain an effective records management program. This fact alone is sufficient to justify undertaking most of the recommended actions described below. Beyond this, however, is the fact that the records maintained by the BIA are needed for a broad array of activities. Some are necessary to search land titles, to reconcile trust funds, to verify education, and so on. The inability to locate the relevant documents could subject the BIA and its clients to substantial liabilities, both financial and otherwise. Finally, the records maintained by the BIA form the core resource for documenting the history and culture of the Indian people; if this information is lost, there are no alternative sources.

Therefore, FEDSIM recommends that a series of corrective measures be implemented as soon as possible. With each recommendation, FEDSIM has attempted to estimate the cost of pursuing that course of action.

## 6.2.1 Records Officers

Unlike most other Federal agencies, the BIA produces large volumes of permanent and long-term temporary records, the loss of which can have serious implications for the BIA and its clients if they are not properly safeguarded and controlled. Therefore, at a minimum, it is recommended that each of the 12 AOs hire one full-time records officer and designate one alternate. Because the BIA's records management needs are greater than one would normally encounter in a Federal agency (due to the nature of the BIA's activities), a full-time records officer should not be assigned any other substantial duties. It is assumed that the requirement for alternate records officers can be satisfied using existing personnel with some additional training.

AO record officers will be responsible for developing, implementing, controlling, and overseeing the records programs for the AO and Agency Offices in their geographic areas. This will encompass periodic site visits to Agency Offices and schools to ensure compliance with BIA and NARA regulations. Initial training in NARA records management laws and regulations as well as subsequent BIA training to encompass the Bureau's broad range of program activities (e.g., trust funds management, realty, forestry, education, etc.) would be required.

BIA has indicated a need for records officers at the GS-12 level in order to ensure that they possess the knowledge, skills, and abilities required for the position. The cost for 12 records officers at a fully burdened salary rate of $46,500 per year is projected to be $558,000 per year.

18

ARP97001459

At a minimum, records officers should receive at least three weeks of training, covering following subjects:

- Introduction to Records Management
- Records Disposition
- Records Scheduling
- Managing Electronic Records
- Managing Audio/Visual Records
- Microfilming
- Automating Records Management
- Promoting Records Management
- Evaluating Records Management Programs

The broad categories listed above are not all-inclusive, but will provide the minimum range of expertise that will be required. Using NARA's Directory of Records Administration Training Program fee schedule, FEDSIM estimates that an average of three weeks will be necessary to complete minimum training, at an average cost of $2,500 per person. Estimated costs for training for 12 record officers is $30,000.

Although the majority of Agency Offices and schools have a records officer designated, most are uninformed and/or not knowledgeable about their responsibilities and the tasks that are required. Therefore, periodic training should be performed for each records officer to ensure regulatory compliance and to provide them with complete and up-to-date information.

NARA offers group rates for Federal agencies in File Improvement and Records Disposition at a cost of $2,000 per group for the initial course and $1,000 for update courses. It is recommended that each records officer and alternate at Agency Offices and schools be required to complete the primary course. A group session could be held for all of the records officers and alternates from the Agency Offices serviced by a single AO (an average of 14 individuals), and another session for the records officers and alternates from the schools within the AO's area (an average of 30 individuals). The cost of these group sessions (24 sessions in all), will be $48,000.

The total cost in the first year for additional permanent personnel and training is projected at approximately $636,000. This cost may be understated, as it does not include the expenses associated with off-site training, travel, per diem costs for instructors, and the like.

## 6.2.2 Eliminating the Records Backlog

FEDSIM estimates that there is a backlog of approximately 156,157 cubic feet of records stored in warehouses and other types of storage facilities throughout the BIA and another 109,310 cubic feet of more active records in office space. This backlog includes records that are not needed for routine reference, records subject to a GAO-ordered freeze, and non-records material. In order to establish a baseline for sound records management principles and procedures, it will be necessary to clear this backlog.

It is recommended that the backlog of records be eliminated as quickly as possible, prefera-

19

ARP97001460

bly over a period of one year. FEDSIM believes that many valuable records will be lost and/or no longer be usable due to environmental damage if this effort is extended over a longer period of time.

In order to accomplish this massive undertaking, FEDSIM recommends that the BIA acquire temporary personnel, administrative or clerical in nature, to assist program specialists in identifying the records, categorizing them to determine their permanent or temporary value, disposing of non-record material, performing data entry to index records, and preparing records for shipment to an FRC or to the Archives. Program specialists at each site will provide overall supervision of the effort; the temporary personnel will perform the bulk of the labor.

To estimate the effort required to accomplish this task, FEDSIM gathered information from records officers at several sites regarding their experiences in taking inventories of records and preparing them for shipment to an FRC. Based on this information, FEDSIM estimates that an individual can fully process two cubic feet of records in a workday; the majority of the time will be devoted to the task of indexing the records. Therefore, to eliminate the records backlog over a period of one year (using a figure of 240 workdays per year), 325 temporary personnel will be required.

For temporary personnel, a grade level of GS-5 is recommended since some records management knowledge will be required. At a salary of $18,000 per year, the total cost for temporary personnel will be $585,000.

It is also recommended that these personnel attend the NARA File Improvement and Disposition Course discussed above. Twelve sessions could be conducted (one for the temporary personnel assigned to each AO), at a total cost of $24,000.

Once the task of indexing and re-boxing records has been accomplished, permanent and temporary records not needed for routine reference should be shipped to an FRC or the Archives. FEDSIM estimates that at least 30% of the backlog of records can be discarded, leaving 109,310 cubic feet of records to be shipped to an FRC.

Estimates on shipping costs were obtained from Agency Offices where possible. The costs do, of course, vary between geographic locations, but the average cost of shipping is $2.50 per cubic foot. Therefore, the total cost of shipping the 109,310 cubic feet of backlog material will be approximately $273,275. This estimate represents a worst-case scenario; FEDSIM's estimate that 30% of the backlog material can be discarded is a minimum. If more of that material can be discarded, the shipping costs will be correspondingly lower.

### 6.2.3 Protecting Active Records

FEDSIM estimates that, throughout the BIA, there are 105,705 cubic feet of records that are active, i.e., required for periodic reference. A large proportion of these records have relatively short (i.e., five years or less) retention times, but many are original, permanent records that require better protection than they now enjoy.

20

ARP97001461

### 6.2.3.1  Examination and Identification

As a first step, an examination of the active records must be undertaken to ensure that they are properly identified, labeled, and scheduled.  In addition, an effort should be made to identify which of the permanent records are deteriorating from repeated handling.  This examination will identify some records that can be discarded immediately, and will also identify some that are not needed for routine reference and can be shipped to an FRC.

Because of the magnitude of this effort, BIA personnel cannot realistically be expected to perform these tasks unaided.  FEDSIM believes that the same strategy recommended for eliminating the backlog of inactive records (in Section 6.2.2) should be adopted for the active records.

FEDSIM found that active records were generally more accessible and in better condition than the backlog of inactive records; therefore, it is estimated that an individual can fully process four, rather than two, cubic feet of records per day.  To accomplish the complete review of 109,310 cubic feet of records over the period of one year, an additional 114 temporary personnel will be required, at a total cost of $2,052,000.  The temporary personnel can participate in the same training as those hired to tackle the backlog of records, at no additional cost to the Bureau.

FEDSIM estimates that 10% of the active records, or 10,931 cubic feet, will be identified as candidates for immediate shipment to an FRC, at a cost of $25,977.

### 6.2.3.2  Microfilming

BIA offices maintain a wide array of record types such as maps, card files, and ledger books.  Many of these records are original documents, requiring protection, but BIA personnel require access to them on a regular basis.  FEDSIM believes that, because of the physical characteristics of these records, the most reasonable approach is to microfilm them, and ship the originals to an FRC.  FEDSIM estimates that 2% of the active records, or 2,114 cubic feet, are candidates for microfilming, representing roughly 1,800,000 pages of material.  This estimate is, of necessity, only approximate, because the material varies considerably in size, shape, and thickness.

Microfilming services can be obtained through an FRC or commercial contract.  The average cost of microfilming services is approximately $50.00 per 1,000 images.  Therefore, the cost of microfilming will be roughly $90,000, an estimate that FEDSIM believes is an absolute minimum.  Because many of these documents will require special handling because of age, damage, or unusual physical characteristics (oversized, bound, etc.), the cost for microfilming could easily be several times that amount.

In addition, shipping costs will be incurred, both to ship the documents to the facility at which microfilming will take place, and to ship them to an FRC.  The shipping cost will be roughly $10,570.

21

ARP97001462

### 6.2.3.3  Document Imaging

Of the 105,705 cubic feet of active records retained at BIA offices, approximately 20%, or 21,141 cubic feet, are original, permanent records that must be readily accessible. Included in this category are realty, leasing, and IIM records. FEDSIM estimates that this material represents 21,141,000 pages of documents. Microfilming such records, while an option, is not the optimal solution, because microfilm does not provide an index sufficient for rapid retrieval.

FEDSIM recommends that these documents be transferred to an optical disk storage system. The task of imaging the existing documents should be left to a commercial firm, since the size of this project is too large for the existing staff to accomplish. However, once the existing records have been imaged, records officers will need to develop a plan for imaging new documents. This will require the development and design of standard indexing schemes which will be used to access and share data across AOs, Agency Offices, and schools.

To develop an indexing scheme, FEDSIM recommends that the BIA obtain the services of a consultant who specializes in such efforts. FEDSIM estimates that the cost to develop a suitable indexing scheme will be $150,000.

For the purposes of this study, FEDSIM assumes that the BIA will procure all necessary imaging hardware, which the developer of the imaging system will use to create the application and deliver the complete system. This will allow for immediate use by the Bureau to scan new records once the existing records have been taken care of.

To estimate the cost for an imaging system, FEDSIM obtained data collected from studies done for other Federal agencies over the last two years. Companies which provide imaging storage and retrieval services and hardware include Bell and Howell, Eastman Kodak, Document Technologies, Laser Data, and File Net. All of these companies provide minimum (average cost of $76,500), medium (average cost of $558,000) and maximum (average cost of $2,100,000) base configurations. These categories are based on the number of scanners, printers, CPUs, and storage media.

Because of the high cost of these systems, FEDSIM recommends that each AO acquire one medium-sized imaging system. Agency Offices and schools will ship documents to the AOs for scanning, and will be provided with equipment to retrieve and print images from the optical disks produced by the system. The cost for 12 imaging systems is estimated to be $6,696,000. The cost for disk readers at each Agency Office and school will be $548,000. Additional ADP equipment will be required at Agency Offices and schools to make proper use of the disk readers; this is discussed in Section 6.2.4.

The cost of scanning documents averages $0.25 per page. Thus, to scan the existing records, a cost of $5,285,250 can be expected. In addition, the records will have to be shipped to the scanning location, and then to an FRC, at a total cost of $1,057,050.

22

ARP97001463

### 6.2.4 Office Automation Requirements

Imaging documents will be useless unless the AOs, Agency Offices, and schools are provided with equipment with which to access the images. FEDSIM observed that most Agency Offices and schools are lacking in this area; many use electronic typewriters or obsolete ADP equipment. AOs are generally better equipped, but no LANs are in place in most locations. Where LANs have been implemented, they are only used in specific program offices and in many instances are not yet fully operational.

To make proper use of a database of scanned documents, FEDSIM recommends that each AO, Agency Office, and school be provided with at least one optical disk reader (included in Section 6.2.3.3, above), one personal computer (PC) per employee, one printer for each ten employees, and a LAN connecting all employees at the site.

The average number of employees (FTEs) is 170 at each AO, 30 at each Agency Office, and roughly 10 at each school (administrative staff only). Therefore, the total number of employees to be accommodated is 27,640. FEDSIM assumes that a minimum workstation configuration will consist of an IBM or compatible PC with a 386 processor, a 40 megabyte hard drive, and 4 megabytes of random access memory (RAM). Based on GSA schedule prices of approximately $1,000 per workstation, bundled with operating system software, the total estimated cost of hardware will be $27,640,000. This cost does not include the cost of office automation software such as word processing, spreadsheet, graphics, or a database management system. The cost of associated laser printers is estimated to be $2,764,000.

For LANs, estimates are based on data collected from Federal agencies while assisting them in acquiring LAN systems. FEDSIM has found that the average cost per node on a non-specialized, non-secure, contractor-installed LAN is in the range of $2,000 to $3,000. This figure includes the purchase and installation of the cable plant, file servers, network operating system (NOS) software, electronic mail (E-mail) software, network interface cards, communications servers, and print servers. It does not include the cost of training, documentation, or LAN application software packages.

Even using the minimum figure of $2,000 per node, FEDSIM estimates that the cost of installing LANs at all AOs, Agency Offices, and schools will be approximately $55,280,000.

The total cost of bringing state-of-the-art automation to all BIA sites is estimated to be $85,684,000. It should be noted, however, that this expenditure, beyond helping to alleviate the severe records management problems being experienced by the BIA, will yield a number of other benefits, including better communications, more efficient use of staff resources, more accurate information, and so on. The need for modern ADP hardware and software at BIA sites is an issue that goes far beyond the records management difficulties addressed in this report.

### 6.2.5 Schedule Revisions

FEDSIM believes, based upon information obtained by BIA field personnel, that the existing records disposition schedules should be carefully reexamined. FEDSIM encountered

23

ARP97001464

numerous instances of "over-classification." For example, some records carry a "permanent" classification when, in fact, a 20- or even 5-year retention would be more than adequate; others classified for 20-year retention could safely be discarded after 5 years.

One extreme example involves police radio logs, which are considered to be permanent records. For legal reasons, these cannot be destroyed quickly, but it is doubtful that they will be needed after 20 years have passed. In a single police station, radio logs can easily account for an additional cubic foot of records every week. Reducing such unnecessary retention times would certainly help alleviate some of the BIA's records management burden.

In addition, FEDSIM found that some BIA personnel have difficulty managing their records properly because the disposition schedules do not make any provision for the types of records they routinely deal with; they are, therefore, uncertain about what they should do with the records. The Ft. Berthold Agency Office, for example, has a number of records relating to the movement of tribe members necessitated by the construction of the Garrison Dam in 1952; these records do not seem to fit into any of the record categories listed in the current schedule.

## 6.2.6 Management Oversight

If the massive effort outlined in this report is to have any hope of succeeding, it must be given a high level of management attention and support. If will not be sufficient simply to issue directives to the AOs, Agency Offices, and schools and expect satisfactory results. Frequent visits by those responsible for BIA's records management program will do much to demonstrate to BIA personnel that the agency is serious about clearing up the problems that have accumulated over the past 30 years or more.

FEDSIM believes that an attempt to oversee this effort from the BIA headquarters in Washington, DC, will be extremely difficult; most BIA facilities are west of the Mississippi River, and are located in the Mountain and Pacific Time Zones. Keeping the lines of communication open will require a certain degree of geographic and temporal proximity.

In addition, there is a perception among BIA field personnel that headquarters management officials do not fully appreciate their circumstances (the BIA is certainly not alone among Federal agencies in this regard). Bringing management closer to the operating units will do much to dispel this perception.

## 6.2.7 Total Cost

Appendix F contains a summary of FEDSIM's cost estimate for curing the BIA's records management problems within the next year. The total cost is, indeed, very high; careful consideration should be given to planning an effort that will take several years instead of one, simply to reduce the financial burden to a more realistic level.

It should be emphasized once again that many of these costs are based upon very rough estimates; to achieve a greater degree of precision, it would have been necessary for FEDSIM to spend considerably more time at each of the sites visited, to engage in a more

24

detailed examination of the retained records at those sites.

A large proportion of the total cost is found in the expenses of bringing modern office automation to all BIA offices. The benefits of this modernization will extend far beyond the records management arena, so the cost of undertaking the effort should be viewed in that light. Conversely, FEDSIM believes that the records management problems of the BIA cannot be solved without this modernization; it would be possible to clear up much of the backlog of retained records without implementing office automation, but the problems the BIA is now experiencing would simply reappear several years down the road.

25

Bureau of Indian Affairs
Sites Visited

**Area Offices**
Albuquerque Area Office - Albuquerque, NM
Minneapolis Area Office - Minneapolis, MN
Navajo Area Office - Gallup, NM, and Window Rock, AZ
Phoenix Area Office - Phoenix, AZ
Portland Area Office - Portland, OR
Sacramento Area Office - Sacramento, CA

**Agency Offices**
Central California - Sacramento, CA
Cheyenne River - Eagle Butte, SD
Fort Berthold - New Town, ND
Fort Defiance - Fort Defiance, AZ
Fort Peck - Poplar, MT
Palm Springs Field Office - Palm Springs, CA
Papago - Sells, AZ
Pima - Sacaton, AZ
Southern Pueblos - Albuquerque, NM
Standing Rock - Fort Yates ND
Turtle Mountain - Belcourt, ND

**Schools**
Casa Blanca Elementary School - Bapchule, AZ
Chemawa Indian High School (Boarding) - Salem, OR
Fort Wingate High School (Boarding) - Wingate, NM
Haskell Indian Junior College - Lawrence, KS
Hopi Day School - Oraibi, AZ
Many Farms High School (Boarding) - Many Farms, AZ
Marana Police Academy - Marana, AZ
Seba Dalkai Elementary School (Boarding) - Winslow, AZ
Sherman Indian High School (Boarding) - Riverside, CA
Southern Indian Polytechnic Institute (SIPI) - Albuquerque, NM
Tohono O'Odham High School - Sells, AZ
Turtle Mountain High School - Belcourt, ND

**Central Office West Activities**
Facilities Management - Albuquerque, NM
Safety Management - Albuquerque, NM
Trust Funds Management - Albuquerque, NM

29

ARP97001467

Bureau of Indian Affairs
Retained Records
By Facility

| Central Office West Albuquerque, NM | | | | |
|---|---|---|---|---|
| Record Storage Facility | Volume (cu. ft.) | Unknown Records | Square Footage | Lease Cost |
| Safety Management | 65 | 0 | 3,172 | $38,857 |
| Trust Funds Management | 60 | 0 | 12,385 | $184,800 |
| Storeroom 1 (TFM) | 2,309 | 0 | 1,500 | 0 |
| Storeroom 2 (TFM) | 37 | 0 | 1,094 | 0 |
| Storeroom 3 (TFM) | 1,298 | 0 | 250 | 0 |
| Storeroom 4 (TFM) | 650 | 0 | 500 | 0 |
| Storeroom 5 (TFM) | 1,500 | 0 | 120 | 0 |
| Facilities Management | 115 | 0 | 7,500 | 0 |
| Storeroom (FM) | 28 | 0 | 72 | 0 |
| Warehouse 1 (FM) | 164 | 0 | 1,000 | 0 |
| Warehouse 2 (FM) | 1,350 | 0 | 1,500 | 0 |
| TOTALS | 7,576 | 0 | 29,093 | $223,657 |

Number of Personnel (FTE):          105

Percentage of Records Maintained
in Assigned Workspace:              3%

42

Bureau of Indian Affairs
Retained Records
By Record Category

| Central Office West Albuquerque, NM | | | |
|---|---|---|---|
| Record Category | Volume (cu. ft.) | Percent Permanent | Volume Permanent |
| Safety Management | 65 | 5 | 3.3 |
| Facilities Management | 1,657 | 20 | 331.4 |
| Trust Funds Management | 5,854 | 95 | 5,561.3 |
| TOTALS | 7,576 | 78% | 5,896.0 |

68

ARP97001469

Summary of Estimated Costs

| | |
|---|---|
| **Records Officers** <br> (salaries and training) | $636,000 |
| **Eliminating the Records Backlog** <br> (temporary personnel, training, indexing, and shipping) | $6,147,275 |
| **Examining Active Records** <br> (identification, scheduling, and shipping) | $2,077,977 |
| **Microfilming Active Records** <br> (microfilming and shipping) | $100,570 |
| **Imaging Active Records** <br> (indexing scheme, scanning systems, readers, <br> scanning existing documents, and shipping) | $13,736,300 |
| **Office Automation** <br> (personal computers, printers, and LANs) | $85,684,000 |
| **TOTAL ESTIMATED COST** | $108,382,122 |

Note:

These costs have been projected for a period of one year. If this effort extends beyond the first year, these costs must be adjusted to reflect discount rates and inflation factors.

95

ARP97001470

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELOISE PEPION COBELL, et al.,                )
                                             )
              Plaintiffs,                    )
                                             )
       v.                                    )      Civil Action No. 1:96CV01285 (RCL)
                                             )
BRUCE BABBITT, Secretary of the              )
       Interior, et al.,                     )
                                             )
              Defendants.                    )

---

## REPORT OF THE SPECIAL MASTER
## REGARDING SITE VISITS TO AREA AND AGENCY OFFICES

On August 12, 1999, the Court ordered the Department of Interior to distribute memoranda to each of its employees charged with custody of IIM Records in the Interior's offices, bureaus or similar sub-department organizations.[1] See Order Regarding Interior Department IIM Records Retention ("Retention Order"). These memoranda advised Interior employees "of their obligations regarding the retention of documents and data relating to the Department's duties to manage Indian trust funds and IIM accounts" and cautioned that "records be protected against loss, unauthorized destruction or modification, and illegal removal."

The Retention Order also authorized the Special Master "to oversee the Interior Department's retention and protection from destruction of IIM Records through, among other things, on-site visits to any location where IIM Records are maintained" and to "recommend to the Department that it take reasonable steps to protect IIM records found to be in jeopardy of destruction."

---

[1] An identical mandate was issued relating to documents maintained by the Department of the Treasury.

Pursuant to the Court's directive, between October 12 and October 19, 1999, I conducted a tour of 13 BIA Area and Agency Offices during which I visited the Anadarko Agency Office, Concho Agency Office, Crow Agency Office, Northern Cheyenne Agency Office, Ft. Belknap Agency Office, Ft. Peck Agency Office, Billings Area Office, Rosebud Agency Office and Pine Ridge Agency Office.[2]  I selected these locations because they jointly hold vast acreage of individual lands in trust and handle documents related to tens of thousands of individual interests.

Upon presentation of a letter of introduction provided to me by the Department of the Interior's Assistant Secretary Kevin Gover (see Exhibit 1), I was given a tour of the various facilities by either the Agency Superintendent, Area Director or the Agency Realty Officer.  As in my April trip, my primary focus was on the care and preservation of documents essential to the collection and disbursement of IIM funds.  These documents include, but are not limited to, leases, appraisals, rights of way, 90-day notices[3], journal vouchers, collection vouchers and allotment and enrollment (A&E) records.

As the attached photographs illustrate, every location I visited, with rare exception, boasted a singularly dedicated and knowledgeable staff who have overcome a glaring scarcity of resources to maintain IIM-related documents meticulously.  In my view, this shortage of adequate funding represents the single greatest threat to the proper maintenance of IIM documents.

---

[2]  Between April 14 and April 21, 1999, I toured 13 Bureau of Indian Affairs Area and Agency Offices in an effort to assess the state of IIM-related document preservation.  My findings were filed with the Court on June 7, 1999.

[3]  90-day notices are letters sent by an agency superintendent informing an allottee of a pending lease proposal affecting his or her allotted interest and seeking comment.

00002926

INDIVIDUAL SITE VISITS

During my April 1999 visit to the Anadarko Agency, I found documents strewn in exposed wooden sheds. Since that time, agency personnel assisted by BIA officials removed, boxed and catalogued these precariously maintained records and stored them inside the main Agency facility. See Exhibit 2. In addition, on every file cabinet, notices were posted which warned against removal of the enclosed documents. See Exhibit 3.

The nearby Concho Agency[4] maintains realty leases currently in use in a fireproof "Lektriever" storage system. Historical documents, most notably expired leases and 90-day notices, however, are housed in a non-fireproof room which is susceptible to fire or other disaster. See Exhibit 5.

Similar to the other agencies, the Crow Agency[5] is subject to the current freeze on transporting documents to archiving facilities.[6] This edict has stretched the already limited physical resources of the main facility and has forced the Agency to store its historical realty records, such as expired leases, in a non-fireproof wooden garage. See Exhibit 8. While A&E records, wills and probate documents are contained in a fireproof vault (see Exhibit 9), current leases and appraisals are not similarly safeguarded. See Exhibit 10. Agency personnel concede

---

[4] A Brief Summary of Concho Agency From Historical to Current is attached. See Exhibit 4.

[5] A brief background of the Billings Area Indian Reservations including Crow, Northern Cheyenne, Fort Belknap and Fort Peck, including an Annual Report of Caseloads, Acreages Under BIA is enclosed herein. A copy of the 1998 Annual Report for Minerals and Annual Report of Caseloads is also attached. See Exhibit 6.

[6] According to a directive issued by the Federal Records Center in Denver, Colorado dated December 9, 1996, "Records may not be shipped to the records centers until BIA Central Office instructs offices to resume normal activity." See Exhibit 7. This mandate is still in force.

00002927

that these documents are referred to and utilized on a regular basis and have not yet been electronically memorialized. One employee opined that their destruction would be nothing short of "disastrous."

The Northern Cheyenne Agency[7] has been plagued by four fires in recent years including a fire inside the Tribal Building in 1993, inside the Clinic in 1995, inside the High School in 1995 and inside the Busbee School in August 1999. Notwithstanding this inglorious record, the agency must store historical IIM documents, such as expired leases, in a non-fireproof vault with no sprinkler system in evidence (see Exhibit 12) and A&B cards, 90-day notices, probate files, timber sales contracts, assignment of inquiry permits, operators' management plans as well as powers-of-attorney, in file cabinets which are not fireproof and in buildings which are not fire-resistant and are not equipped with sprinkler systems. See Exhibit 13.

Recognizing the catastrophic implications a fire would have on IIM administration, Northern Cheyenne Agency Superintendent John White transmitted a memorandum on May 21, 1999, to the Billings Area Director which noted that: "[t]he agency's current filing cabinets are antiquated, the majority of which do not lock, and are non-fireproof. Furthermore, our staff has not had Records Management Training in several years. As you are aware, this agency's Tribal Priority Allocation (TPA) budget is not sufficient to cover our Records Management needs." See Exhibit 14. This message was underscored in a July 6, 1999 memorandum from the Acting Area Director of the Billings area to the Deputy Commissioner of Indian Affairs: "The Billings Area has identified a long standing need to improve the physical storage and security of all records. Several years ago funds were made available in our annual budget for a position in the Area

---

[7] A recent Agency Activity Report outlining realty activity is enclosed. See Exhibit 11.

00002928

Office to provide guidance for an Area and agency records improvement program. The funding continued for three years. Since that time Area and agency property management staff have tried to maintain records, but the resources are not available." See Exhibit 15.[8] The attached memoranda from the Superintendents of the Fort Peck Agency, the Blackfeet Agency, the Fort Belknap Agency as well as the Crown Agency is further evidence of the need for records cleanup funding. See Exhibit 16.

The Fort Belknap Agency was recently the scene of a deliberately set fire which claimed "[a]t least two boxes of old IIM files (records, dating 1962 and 1963), [which] were burned or partially burned before the fire was extinguished." See Exhibit 17. The dilapidated shed in which these documents were destroyed (and in which others are still maintained) was formerly a chlorination plant. See Exhibit 18. The contents of these boxes were apparently not inspected on site due to the presence of a dead mouse which alerted local officials to the possibility of hantavirus infection. According to a report entitled Ft. Belknap Records Damaged by Fire, this fire damaged four boxes, two of which contained IIM-related records. See Exhibit 19. Given the deplorable condition in which those records were maintained, disaster was inevitable.

The Fort Peck Agency, which oversees the administration of 4,165 allotments, stores its realty documents in a modern fireproof room. However, the door is not fireproof and, according to the Realty Officer, should the enclosed sprinkler system activate, the files stored inside would be ruined. See Exhibit 20.

---

[8] The Billings Area Director informed me that, in addition to the budget cut imposed in 1995, the Area Office lost its resource manager in 1996 which forced the Area Office to redeploy existing personnel.

00002929

The Rosebud Agency[9] maintains its historical IIM documents – including original trust patents, probates and allotment files – in a fireproof basement which is secured by a non-fireproof door. Valuable A&E cards, land sale documents and township and range files are stored in a non-fireproof environment. See Exhibit 22. Destruction of these documents, in the words of one of the realty officers, would constitute a "true disaster." Indeed, a recent Continuity of Operations Plan, presented by the Acting Area Director of the Aberdeen Area to the Rosebud Agency Superintendent, characterized the consequences of either fire, water, and smoke damage to be "high for the long term." See Exhibit 23. Compounding these storage concerns, the agency has recently undergone a reduction in force which led to the loss of two realty clerks and, as a result, an ever-increasing backlog of unfiled IIM records.

While the Pine Ridge Agency maintains its original land transaction files relating to its 8,274 allotments in a fireproof vault (see Exhibit 24), neither current leases, 90-day notices, comments appended to leases, or correspondence are maintained in a fireproof area or cabinet. See Exhibit 25. More disturbingly, IIM records such as collection vouchers, bills for collection, journal vouchers and public vouchers are recklessly stored in a wood and corrugated metal warehouse. See Exhibit 26. While one BIA employee assured me that she had microfilmed the contents of every box, I became concerned when that same employee expressed surprise when I uncovered an historical ledger inside one of those boxes. See Exhibit 27.

In sum, notwithstanding the exemplary fashion in which BIA employees are generally maintaining records, a profound lack of resources continues: (1) to compromise the agencies'

---

[9] A 1997 Annual Report of Caseloads, Acreages Under BIA and Surface Leasing is attached. See Exhibit 21.

00002930

ability to upgrade infrastructurally and assure the safe storage of IIM-related documents; (2) to

force the downsizing of key realty personnel; and (3) to curtail necessary employee training. As

such, irreplaceable IIM documents are jeopardized. Given the marginal economic base of the

clients these agencies serve, any disruption of the IIM collection and disbursement process due to

either the inadvertent or purposeful destruction of these documents would be devastating. It is

my recommendation, therefore, that the safeguarding of these records be prioritized and that

appropriate funds be allocated to ensure that these records are protected from destruction.


Respectfully submitted,


DATE: _10/25/99_

Alan L. Balaran
SPECIAL MASTER


7

00002931

THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELOISE PEPION COBELL, et al.,    )
                                 )
            Plaintiffs,          )
                                 )
      v.                         )      Civil Action No. 1:96CV01285 (RCL)
                                 )
BRUCE BABBITT, Secretary of the  )
      Interior, et al.,          )
                                 )
            Defendants.          )
_____   )

THIRD REPORT OF THE SPECIAL MASTER
REGARDING SITE VISITS TO AREA AND AGENCY OFFICES

On August 12, 1999, the Court authorized the Special Master "to oversee the Interior

Department's retention and protection from destruction of IIM Records through, among other

things, on-site visits to any location where IIM Records are maintained" and to "recommend to

the Department that it take reasonable steps to protect IIM records found to be in jeopardy of

destruction." Pursuant to this mandate, on November 1, 1999, I visited the agency offices at Fort

Berthold and Fort Totten, North Dakota.

Fort Berthold Agency

     The bulk of the income generated on allotted lands at the Fort Berthold Agency derives

from farming and grazing as well as oil and gas leases. According to the local Realty Officer,

IIM documents related to these leases, as well as rights-of-way and easements, are stored inside

the agency office and in an off-site warehouse. While the building which houses the Agency

Office is not fireproof, (see Exhibit 1), allotment and enrollment records are maintained in a

fireproof cabinet (see Exhibit 2) while enrollment files, appraisals, wills, testaments, collection

vouchers and historical maps are stored in a fireproof vault. See Exhibit 3. Documents which

are not so protected include 90-day notices, working probate files, grazing permits, "638 contracts," rights of way and range permits. See Exhibit 4. According to local officials, destruction of these documents, especially the 90-day notices and the probate files, would be disastrous.

In addition to the main agency facility, IIM records are also stored in an off-site warehouse and, until recently, in a nearby garage. Local officials informed me that, during two recent site visits by the Office of Trust Fund Management ("OTFM"), all of the documents housed in the garage as well as several boxes stored in the warehouse were removed to Albequerque, New Mexico.

The off-site warehouse consists of a wooden structure which is neither fireproof or temperature controlled. See Exhibit 5. Inside are boxes of IIM records piled against a wall or on the floor amidst furniture. See Exhibit 6. During their most recent visit in September 1999, OTFM agents reportedly removed at least one box of documents sitting in a puddle of water near sacks of fertilizer. I found others in equally egregious condition. See Exhibit 7. Markings on the outside of the boxes stored in the agency warehouse revealed their contents to include lease appraisals, allotment listings, collection and general vouchers, grazing permits, canceled oil leases and other IIM realty-related records. See Exhibit 8. While the vast majority of the stored materials appeared to be historical in nature, the Realty Officer informed me that many of the boxes contained land conveyances which are referenced on a monthly basis by realty personnel.

-2-

00002851

## Fort Totten Agency

The Fort Totten Agency realizes the bulk of its revenues from farming and grazing leases. See Exhibit 9. The agency's Realty Specialist, who accompanied me during my visit, serves simultaneously in the capacity of Acting Superintendent.

When I first arrived at the agency and explained the purpose for my visit, the Acting Superintendent informed me that, during a recent conference in Portland, Oregon, she was told that she did not have to grant me permission to photograph her facility. When I queried as to the specifics of this directive, the Acting Superintendent recanted and stated that she was simply told to be careful to whom she permitted access to agency records.

The main agency facility is not fireproof. Only wills and land transaction files relating to gifts and sales are maintained in a fireproof storage area. See Exhibit 10. Original IIM records, such as original allottee files, are kept in non-fireproof cabinets with a microfiche copy of each stored directly above the files in a plastic container. See Exhibit 11. Other realty records are stored in various rooms including a telephone closet (see Exhibit 12), while inactive lease files are kept in boxes on the floor. See Exhibit 13. The lack of adequate protection was a particular concern during my visit given the number of fires which were raging at the time in the vicinity of the agency. These fires were reportedly of such magnitude that all male agency personnel were out of the office engaged in fire-fighting efforts. The front page of the Bismarck Tribune reported that these fires, fanned by gale-force winds, were raging across western North Dakota. The attached newspaper photographs show a member of the Three Affiliated Tribes battling the blaze. See Exhibit 14.

-3-

00002852

When I inquired as to the existence of off-site warehouses in which IIM documents may be stored, the Acting Superintendent – who has been with the agency since 1977 – categorically and repeatedly denied the existence of any such facilities. It was not until I was near the end of my tour that a secretary informed me that the agency does, in fact, keep IIM records in an off-site "cold storage" unit.

This "cold storage" unit consists of a wooden and corrugated metal shed inside which appraisals more than five years old, inactive lessee files, and 90-day notices are stored. See Exhibit 15. As illustrated by the attached photographs, these documents are maintained in deplorable condition amidst gasoline canisters, tires, machinery and other debris. See Exhibit 16.

I must evaluate the Fort Totten Agency as among the worst sites I have visited concerning the care and maintenance of IIM documents. Its callous disregard for these records reveals a problem beyond that of insufficient resources. Together with what I perceived to be a duplicitous denial of the existence any off-site storage facility and a transparent attempt to prevent me from photographing the area, the Agency's deliberate indifference to the proper maintenance of IIM documents presents a disturbing profile.

-4-

00002853

In sum, I find that documents warehoused off-site[1] by the Fort Berthold and Fort Totten are in serious jeopardy.   I recommend immediate intervention.

Respectfully submitted,

DATE: 11/12/99

Alan L. Balaran
SPECIAL MASTER

---

[1] This finding should not be read to minimize the need for an infusion of resources to adequately assure the safety of documents stored within the main facilities of these agencies, as well.

-5-

00002854

# ATTACHMENTS TO THIRD REPORT OF THE SPECIAL MASTER REGARDING SITE VISITS TO AREA AND AGENCY OFFICES

## Cobell et al. v. Babbitt et al.,
### C.A. No. 96-1285

00002855



00002856



00002857





00002858



00002859

00002860



00002861



00002862



00002863





00002864



00002865



TRIBAL PURCHASES-VOLUME VII

CHASES-VOLUME VI

00002866



00002867



00002868



00002869



00002870



00002871



00002872





00002874



00002875





00002876



00002877





00002878



00002879



00002880



00002881



00002882



00002883





00002884





00002886



00002887



00002888

00002889



00002890



00002891



00002892

00002893







00002897



00002898



00002899

PAGE 1
Form 5-5425

UNITED STATES DEPARTMENT OF THE INTERIOR
BUREAU OF INDIAN AFFAIRS
BRANCH OF REAL PROPERTY MANAGEMENT

ANNUAL REPORT OF CASELOADS, ACREAGES UNDER BIA
AND SURFACE LEASING

AREA:    ABERDEEN                                          ON/OFF:_____ ON
AGENCY:  FORT TOTTEN                             303  RESERVATION: DEVILS LAKE SIOUX
                                                NO   STATE:       NORTH DAKOTA

## CASELOADS - (SHOWING ACREAGES AFFECTED BY, AND MONIES DERIVED FROM, THESE ACTIONS)

| Type of Cases | Previous Pending | New Cases | APPROVED: | Disapproved | Total Complete | Current Pending | Acreage Affected | Income, Proceeds Annual Rental Rate |
|---|---|---|---|---|---|---|---|---|
| Sales Transactions | 13 | 116 | 6 | 23 | 29 | 100 | 338.73 | $89,498.00 |
| Acquisitions | 0 | 55 | 55 | 0 | 55 | 0 | 338.73 | $0.00 |
| Patents-In-Fee | 0 | 0 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| Rights-Of-Way | 4 | 5 | 9 | 0 | 9 | 0 | 13.28 | $1,000.00 |
| Surface Leases | | | | | | | | |
| 1. Agriculture | 46 | 170 | 156 | 14 | 170 | 46 | 9766.41 | $151,224.90 |
| 2. Business | 0 | 0 | 0 | 0 | 0 | 0 | 0 | $0.00 |
| 3. Other | 51 | 60 | 35 | 25 | 60 | 51 | 385.04 | $145,158.70 |
| TOTAL SURFACE LEASES | 97 | 230 | 191 | 39 | 230 | 97 | 10151.45 | $296,383.60 |
| MINERAL LEASES | | | | | | | | |
| 1. Oil and Gas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2. Other than Oil & Gas | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL MINERAL LEASES | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Sales transactions includes exchanges, paritions, gifts, and all other such actions.
An exchange should be counted as two cases.

Patents-In-Fee includes orders removing restrictions and certificates of competency.

Surface Leases given at nominal rental rates should be shown under "3. Other" rather
than under "2. Permits should also be included.

Post-It® Fax Note    7671    Date 3/5/91  # of pages ▶ 2
To Titus Marks             From Rod
Co./Dept.                  Co. HBS
Phone #                    Phone #

00002900

Form 5425 (Back)

| OWNERSHIP | PREVIOUS BALANCE (ACRES) | ACQUISITION (ACRES) | DISPOSAL (ACRES) | PRESENT BALANCE (ACRES) | COUNTY | TYPE OF OWNERSHIP | | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | TRIBAL | INDIVIDUAL | GOVERNMENT | |
| TRIBAL */ | 29953.86 | 338.73 | 0 | 30292.59 | BENSON | 29953.86 | | | 29953.86 |
| INDIVIDUAL **/ | 33450.51 | 0 | 166.74 | 33283.77 | BENSON | | 33450.51 | | 33450.51 |
| GOVERNMENT ***/ | 343 | 0 | 0 | 343 | BENSON | | | 343 | 343 |
| TOTAL ACRES | 63747.37 | 338.73 | 166.74 | 63919.36 | | 29953.86 | 33450.51 | 343 | 63747.37 |

*/ Tribal Land: Includes___0_____acres of ceded tribal lands not restored.

   Tribal Land: Includes_2,485_ acres of tribal fee land.

**/ Government-owned Land: Includes___0____acres subsurginal land.

***/ Total Column: Includes__2,485___acres of land subject to taxation.

REMARKS:

| | | SUMMARY OF SURFACE LEASING AND PERMITS IN FORCE AND EFFECT | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | PREVIOUS TOTAL | | ADDED DURING PERIOD | | CANCELLED-TERMINATED DURING PERIOD | | PRESENT TOTAL | | ANNUAL RENTAL RATE |
| | NUMBER | ACRES | NUMBER | ACRES | NUMBER | ACRES | NUMBER | ACRES | |
| TRIBAL AGRICULTURE | 261 | 11616.37 | 28 | 2016.41 | 74 | 2906.64 | 215 | 10726.14 | $288,068.81 |
| BUSINESS | 4 | 5.1 | 0 | 0 | 0 | 0 | 4 | 5.1 | $156.25 |
| OTHER | 44 | 83.98 | 19 | 146.81 | 1 | 0.69 | 62 | 230.1 | $9,699.23 |
| TOTAL | 309 | 11705.45 | 47 | 2163.22 | 75 | 2907.33 | 281 | 10961.34 | $297,924.29 |
| INDIVIDUAL AGRICULTURE | 481 | 21856.21 | 162 | 7828.18 | 120 | 5354.8 | 523 | 24329.59 | $511,103.04 |
| BUSINESS | 2 | 19.3 | 0 | 0 | 0 | 0 | 2 | 19.3 | $3,000.00 |
| OTHER | 74 | 212.07 | 16 | 79.73 | 0 | 0 | 90 | 291.8 | $11,217.86 |
| TOTAL | 557 | 22087.58 | 178 | 7907.91 | 120 | 5354.8 | 615 | 24640.69 | $525,320.90 |

00002901



00002902





00002904





00002905



00002906



00002907



00002908



00002909

00002910



00002911



00002912

# Bismarck Tribune

Bismarck Edition, N.D.

Tuesday, November 2, 1999

Reach us
www.ndonline.com
800-472-2273

Single copy 50¢

Today
Mostly sunny

48 | Low
High | 18



# Fires rage across western N.D.

**■ Gale winds build biggest blaze in living memory**

**LAUREN DONOVAN**
Tribune Staff Writer

MCKENZIE COUNTY — Two Halloween-season fires raged across western North Dakota Sunday night and Monday, becoming one of the largest prairie fires in memory in a dry and windy fall.

**■ More on fire (1B)**

00002913



# Fires: Damage being assessed

FROM PAGE 1A ing Association could get a handle on the damage.

"There hasn't been anything of this extent in recent history," Thompson said. "If this is 40,000-60,000 acres (in this fire), that's a big chunk of land."

Cattle numbering in the thousands grazed on the public grasslands and private pastures toasted in Monday's fire.

"Ranchers are out now trying to find out how many cattle are lost. If we're lucky, the cattle got enough places where they could get out of the way," Thompson said.

Many landowners have permits to graze on the federal grasslands, and Thompson said the fire damage may force the forest service and the grazing association to work together to find alternative pastures.

"With a fire like this, normally the land needs some time to rest and recover," Thompson said.

The two groups already have a fire burning between them over a proposed grasslands management plan.

Ranchers are worried the forest service's plan would devastate ranchers who rely on public pasture land.

"We need to (work together), it wouldn't hurt us at all," Thompson said.

A grateful Denton Zubke, from rural Watford City, was among families alerted by a phone call around 7 p.m. that a fire was headed their way.

"We were all loaded in the van, getting ready to go to trick or treating. We saw the fire coming," Zubke said from his office at Dakota West Credit Union Monday in Watford City.

After checking on a neighbor, Zubke said he drove away from the fire, circled in behind it and returned to the house later.

"The kids were petrified. The fire department saved the house, but we lost a barn," Zubke said. "We had the kids in bed before 10 p.m. — that's how fast it went by."

Though the fire south of Watford City was related to a downed line, it appeared that power interruptions were minimal.

Janice Koeser, assistant manager at McKenzie Electric Cooperative, said the co-op had some outages, but none of them involved communities in its service area. She refused further comment.

00002915

# Dakota

Section **B**

[Tuesday, November 2, 1999]

Reach us
Randy Bradbury
City Editor
701-250-8251



The prairie fire west of Watford City, near the Montana border, consumed the ranch house owned by Ed and Shirley Barnes. The couple was not injured.

By MIKE McCLEARY of the Tribune

00002916

# Fires hit N.D. ranches hard

### 'It was just a big red ball. It's a disaster.'
#### Gladstone Fire Chief Joe K. Wanner

By KRIS FESER
Bismarck Tribune



Three Affiliated Tribes firefighter Jeff Miller walks along the edge of the prairie located west of Watford City, covering the hot spots. The charred prairie looms in the background.



00002918



00002919



00002920



00002921

00002922



00002923





00002924

**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ELOUISE PEPION COBELL, et al.,        )
                                           )
                Plaintiffs,         )
                                           )
                  v.              )  Civil Action No. 1:96CV01285 (RCL)
                                         )
BRUCE BABBITT, Secretary of the     )
        Interior, et al.,          )
                                         )
               Defendants.      )
_____)

**RECOMMENDATION AND REPORT OF THE SPECIAL MASTER**

**REGARDING THE DELAYED DISCLOSURE OF THE DESTRUCTION**

**OF UNCURRENT CHECK RECORDS**

**MAINTAINED BY THE DEPARTMENT OF THE TREASURY**

**(December 3, 1999)**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-
I       The Persons and Agencies Involved In This Litigation. . . . . . . . . . . . . . . . . . . . . . . . . -5-
II      Document Preservation and Production Obligations. . . . . . . . . . . . . . . . . . . . . . . . . . -7-
        A.      June 1996 to October 1996. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-
        B.      November 27, 1996 -"First Order for the Production of Information" . . . . . . . -9-
        C.      Subsequent Discussions Regarding the Need to Preserve Treasury Documents -10-
        D.      Defendants' Representations to this Court from December 1996 to December
                1998 Regarding Document Production. . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-
III     Other Incidents of Document Destruction at the Department of the Treasury . . . . . . -17-
        A.      The 1996 Bureau of Public Debt "Missing Box." . . . . . . . . . . . . . . . . . . . . . -17-
        B.      The June 1997 Destruction of Microfilms . . . . . . . . . . . . . . . . . . . . . . . . . . . -18-
IV      The Hyattsville Documents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -24-
        A.      The January 28, 1999 Discovery of the Destruction. . . . . . . . . . . . . . . . . . . -24-
                1.      Ms. Locks Discovers a Folder with Indian-Related Documents on Her
                        Chair and Reports This to Mr. Mazella Who Orders Her to Stop the
                        Destruction of These Documents. . . . . . . . . . . . . . . . . . . . . . . . . -24-
                2.      Mr. Mazella Reports the Document Destruction to Ms. Falanga. . . . . -25-
                3.      Ms. Falanga and Mr. Mazella Inform Ms. Constantine and Ms. McInerney
                        About the Document Destruction. . . . . . . . . . . . . . . . . . . . . . . . . -27-
                4.      Messrs. Wolin and Knight are Informed About the Document
                        Destruction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -30-
V       Events Following the Document Destruction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -31-
        A.      The February 1, 1999 Order for Document Preservation . . . . . . . . . . . . . . . . -31-
        B.      Review of the Remaining Hyattsville Documents. . . . . . . . . . . . . . . . . . . . . . -32-
        C.      Preparation for the February 11, 1999 Briefing of Mr. Knight. . . . . . . . . . . . -35-
        D.      Events Occurring Between February 22, 1999 and February 25, 1999. . . . . . . -37-
                1.      Mr. Regan's Voice-Mail Message for Ms. Constantine. . . . . . . . . . . . -37-
                2.      The Court's February 22, 1999 Contempt Order and Opinion. . . . . . -38-
                3.      The Meetings of February 23 and 24, 1999. . . . . . . . . . . . . . . . . . . -38-
        E.      The February 25, 1999 Treasury Meeting. . . . . . . . . . . . . . . . . . . . . . . . . . . . -39-
                1.      The Need to Perform Another Search of the Hyattsville Documents. . -39-
                2.      The Debate Concerning Responsiveness versus Relevance and Concerning
                        Disclosing the Destruction of the Documents. . . . . . . . . . . . . . . . . -41-
                3.      Colloquy Between Mr. Regan and Mr. Wolin. . . . . . . . . . . . . . . . . . . -48-
VI      Missed Opportunities by Treasury to Disclose the Destruction of the Hyattsville
        Documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -56-
        A.      Failure to Disclose to DOJ During a February 25, 1999 Meeting. . . . . . . . . . -58-
        B.      Failure to Disclose at the Status Conferences. . . . . . . . . . . . . . . . . . . . . . . . . -58-
        C.      Failure to Disclose in the March 16, 1999 "Defendants' Motion to Strike or Reject
                Plaintiffs Proposed Orders Regarding Document Retention," and in the March 19,
                1999 "United States' Memorandum Addressing Plaintiffs' Proposed Order
                Regarding Document Retention." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -59-
                1.      Defendants' March 16, 1999 Motion to Strike. . . . . . . . . . . . . . . . . . -59-

2.      Defendants' March 19, 1999 Memorandum. . . . . . . . . . . . . . . . . . . -60-

D.      Failure to Disclose in the March 26, 1999 "United States' Statement of Discovery Priorities and Response to Plaintiffs' Statement" and the Attached "Department of the Treasury <u>Cobell</u> Litigation Document Production Protocol." . . . . . . . . . . -61-

    1.      Defendants' March 26, 1999 Statement. . . . . . . . . . . . . . . . . . . . . . -61-

        a.      The Treasury Attorneys Draft Their Responses to the Proposed Order and Prepare the Document Production Protocol. . . . . -63-

        b.      The Supplement to the March 26, 1999 Protocol and Its Transformation into the Draft April 30, 1999 Letter From Rita Howard.   . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -65-

E.      Failure to Disclose in the April 12, 1999 "Response to Plaintiffs' Motion for Entry of a Proposed Order Regarding Document Production." . . . . . . . . . . . . . . . -72-

F.      Failure to Disclose in the May 3, 1999 "Defendant Secretary of the Treasury's Motion for Summary Judgment." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -73-

    1.      Treasury's Motion for Summary Judgment. . . . . . . . . . . . . . . . . . . . -73-

    2.      The Treasury Attorneys Prepare the Motion for Summary Judgment and the Footnote Regarding Disclosure.  . . . . . . . . . . . . . . . . . . . . . . . . -74-

G.      Failure to Report to the Office of the Inspector General, Department of the Treasury. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -77-

VII     Disclosure of the Hyattsville Document Destruction.  . . . . . . . . . . . . . . . . . . . . . . -78-

A.      Treasury Attorneys Disclose the Destruction of the Hyattsville Documents to DOJ. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -78-

B.      DOJ Discloses the Destruction to the Special Master and to Plaintiffs. . . . . . -79-

VIII    Findings and Conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -81-

A.      Treasury's Failure to Recognize the "Significance" of the <u>Cobell</u> Litigation . -81-

    1.      The Weekly Reports . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -81-

    2.      The Significance of <u>Cobell</u>. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -83-

B.      Treasury's  Failure to Keep Itself Informed of its Obligations under the Court's Orders. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -85-

    1.      The November 1996 Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -85-

    2.      Paragraph 19 - Disjunctive or Conjunctive. . . . . . . . . . . . . . . . . . . . -89-

C.      Breakdown in Communication Between Treasury Agencies and Between Treasury and the DOJ. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -91-

    1.      Strained Relations Between FMS and Main Treasury. . . . . . . . . . . . . -91-

    2.      Lack of Communication Between FMS and Main Treasury . . . . . . . . -93-

        a.      November 1998 Meetings . . . . . . . . . . . . . . . . . . . . . . . . . . -93-

        b.      Messrs. Wolin and Knight are Belatedly Informed of the <u>Cobell</u> Litigation and Treasury's Obligations . . . . . . . . . . . . . . . . . -97-

        c.      Inadequate Intra-Agency and Inter-Agency Communication. -100-

            (1)      The "Chain-of-Command" as a Barrier to Communication. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -100-

            (2)      Mistrust Between Treasury and ENRD. . . . . . . . . . . -105-

D.      Lack of Accountability by the Individual Attorneys  . . . . . . . . . . . . . . . . . . -108-

E.    Frequent Turnover of FMS Attorneys Assigned to the <u>Cobell</u> Litigation.  . .  -110-

F.    Failure to Comprehend Ethical Obligations under the Rules of Professional
      Responsibility and the Duty to Disclose Under the Federal Rules of Civil
      Procedure.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -112-

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  -117-

**INTRODUCTION**

On May 11, 1999, Senior Counsel Phillip Brooks, United States Department of Justice, Environmental and Natural Resources Division (DOJ/ENRD), informed the Special Master about "the loss of documents at the Department of the Treasury." Ex. 1 at 1. In his letter of that date, Mr. Brooks explained that, "on January 27, 1999, Treasury Department personnel stopped the destruction of an undifferentiated document collection stored in the basement of the Hyattsville [Maryland] facility of Treasury Financial Management Service (FMS)." Id. The letter also recounted that, in 1996, a box of documents was "apparently mislaid" "when documents were transferred from FMS [Financial Management Services] to the Bureau of Public Debt." Id. at 2.

Following receipt of this letter, the Court charged the Special Master with investigating the events surrounding the disposition of these documents emphasizing the reasons why the Defendants waited more than three months to inform the Court of the destruction. The following Report is the result of that investigation.[1]

On June 3, 1999, defendants filed their Report to the Special Master Concerning the Disposition of Uncurrent Check Records Maintained by the Department of the Treasury ("Tyler Report") (Ex. 1) .[2] The Tyler Report revealed that, between November 23, 1998 and January 28, 1999, 162 boxes containing historical documents (i.e., government forms reflecting disbursements

---

[1]    I decline the invitation on behalf of declarants' counsel to submit a draft "for the purpose of receiving their suggestions" (Fed. R. Civ. P. 53(e)(5)) prior to filing this Report with the Court. Rather, I will file a Supplemental Report addressing any such comments.

[2]    The Tyler Report is so named for convenience only. The Report was collaboratively authored by John R. Tyler, Senior Trial Counsel, Civil Division, Department of Justice; Catherine C. Pisaturo, Trial Attorney, Environment and Natural Resources Division, Department of Justice; and Patricia W. Milgram, Senior Counsel (Litigation), Bureau of Alcohol, Tobacco and Firearms, Department of the Treasury.

made by various federal agencies from the beginning of the twentieth century until approximately 1958) were destroyed at FMS' Hyattsville facility.  These boxes were part of a cache of 407 boxes and ledgers stored in the basement of that facility.[3]

Upon being apprised of the destruction of the 162 boxes, FMS attorneys, with the assistance of several FMS employees, conducted a "page by page" search of the remaining 245 boxes of material in an attempt to ascertain the nature and content of the destroyed records.  This search commenced on or about February 1, 1999 and concluded on or about February 11, 1999. This search yielded two boxes worth of files which referred to any one of the five named plaintiffs, Individual Indian Monies ("IIM"), or any Native American tribe, agency or individual.

The events leading to the destruction of the 162 boxes of documents are amply detailed in the Tyler Report and need not be repeated here.  In glaring contrast to its commendable level of specificity on the document destruction, however, the Tyler Report was inexplicably ambiguous in its narrative of the events which took place between January 28, 1999 – the date when FMS attorneys first became aware that documents potentially relevant to the <u>Cobell</u> litigation may have been destroyed – and May 11, 1999 – when the Court was <u>finally</u> notified of the destruction.  The particular paragraph of the Tyler Report that ultimately launched this investigation reads as follows:

---

[3]     Attached to a letter dated May 19, 1999 by Attorney Brian Ferrell, General Litigation Section DOJ/ENRD, was a "GAO Document Index" which denominated the names of the first and last file in each of the 407 boxes. Ex. 35.  While most of the names associated with the majority of the boxes are those of disbursing agents, Box #39 is labeled "Crow Indian Agency," Box # 47 is labeled "Fort Hall Indian Agency," and Box #80 is labeled "Rosebud Indian Agency."

In February, March, and again, in April 1999, the "GAO records,"[16] and the results of the review of the boxes of uncurrent check records that were not destroyed, were a topic of discussion by and among counsel who were handling the <u>Cobell</u> litigation. These boxes were discussed by counsel from time to time in the context of the myriad of matters that have arisen in this litigation in recent months. One discussion among counsel in late February 1999 concerned Treasury's effort to ascertain the universe of documents that might be relevant or potentially relevant to this lawsuit, for the intended purpose of identifying these documents to the Plaintiffs. The responsiveness and/or relevance of the uncurrent check records at the Hyattsville facility were discussed at that time. Subsequent discussions among counsel concerned the means by which the Special Master and the plaintiffs should be informed of the disposition of the records at issue. It appears that the attorneys who participated in these discussions had differing degrees of knowledge or understanding concerning the content and purpose of the records. They also have different recollections concerning what was said or understood about the nature of the records. The attorneys also had differing opinions concerning when to notify the Special Master that these records had been destroyed and differing recollections concerning internal discussions about this subject.

Ex. 1 (Tyler Report) at 15-16 (footnote 17 omitted).

As this description of events simply begged the question as to what actually transpired, I directed FMS former Deputy Chief Counsel Ingrid Falanga, FMS Senior Counsel Randy Lewis, FMS Senior Counsel Daniel Mazella, FMS Attorney-Advisor James Regan, Department of the Treasury Deputy Assistant General Counsel Eleni Constantine and Department of the Treasury Assistant General Counsel Roberta McInerney to submit declarations setting out their version of the events which transpired between January 28, 1999 and May 11, 1999. Upon receipt of these declarations, I then requested, from the declarants, the Department of the Treasury and the

_____

[16] It appears that counsel did not understand at that time the nature and purpose of the Hyattsville basement documents. They believed that the records at issue were historical GAO records consisting of reports of requests to GAO by disbursing officers to recredit the proceeds of outstanding checks to another account.

Department of Justice, all documents that related in any manner whatsoever to the document destruction referenced in the individual declarations. Over 15,000 pages were produced.

During the last week of July 1999 and the first week of August 1999, I interviewed the aforementioned counsel concerning the events which took place between January 28, 1999 and May 11, 1999; on September 3, 1999, I interviewed then-Acting General Counsel Neal Wolin.[4] The focus of these interviews was to determine why Treasury delayed more than 14 weeks before disclosing the destruction of documents that were potentially responsive/relevant to the Cobell litigation. Upon completing my interviews[5] and reviewing the pertinent documentation, I find that the issues underlying the delay by the Department of the Treasury in reporting the destruction of the Hyattsville documents can only be understood in the context of Treasury's role in the overall litigation. Accordingly, this Report first sets out the key players in the Cobell litigation – insofar as they are relevant to the present analysis – and narrates the relationship between the various branches of the Department of the Treasury as well as that agency's role in this litigation. This

---

[4]    In addition to being represented by Treasury counsel, Roberta McInerney was represented by Donald Barnes, Esq., Jenkins & Gilchrist; Eleni Constantine was represented by Lawrence H. Wechsler, Esq. and John Kern, Esq., Janis, Schuelke & Wechsler; Ingrid Falanga was represented by Reid Weingarten, Esq. and Eric Kitchen, Esq., Steptoe & Johnson; Randall Lewis was represented by Pamela Marple, Esq., Manatt, Phelps & Phillips; Daniel Mazella was represented by William Dobrovir, Esq.; and James Regan was represented by Wendy White, Esq., Shea & Gardner. Neal Wolin chose not to be represented by personal counsel.

[5]    Several of the individual declarants expressed concern at having counsel for Treasury present during their interviews. Accordingly, I conducted all the interviews with only with the declarant, myself, a law clerk and a court reporter in attendance. No objections were raised to proceeding in this manner. In addition, counsel for the declarants were permitted access only to the interview transcript of the individual they represented. Pursuant to a confidentiality agreement, a select number of attorneys at the Department of Justice and the Department of the Treasury were permitted access to all of the transcripts.

Report then details the events following the discovery of the Hyattsville document destruction and sets out my findings and conclusions.

I    <u>The Persons and Agencies Involved In This Litigation.</u>

Given the multitude of counsel representing the Defendants, in one capacity or another, whose names have surfaced in connection with this investigation, this section introduces only those attorneys who had a significant role in the Hyattsville document destruction and disclosure.

Within the Department of the Treasury, the two legal offices of particular relevance are the Office of the General Counsel, sometimes referred to as "Main Treasury," and the Office of the Chief Counsel, Financial Management Services ("FMS").

The Office of the General Counsel provides legal advice to the Department and its senior officials, including the Secretary of the Treasury. Ex. 17 at 5 (Wolin Dep.). Edward Knight was the General Counsel from September 1994 until his resignation in or around June of 1999. <u>Id.</u> at 4, 16. Neal S. Wolin has been the Acting General Counsel from June 12, 1999 to November 1999. <u>Id.</u> at 3-4. At the time of his interview, Mr. Wolin had been nominated by President Clinton to serve as the General Counsel and, on November 19, 1999, his nomination to that position was confirmed by the U.S. Senate.

The Deputy General Counsel, who reports directly to the General Counsel, supervises the Assistant General Counsels. <u>Id.</u> at 4-5. Neal S. Wolin was the Deputy General Counsel from April 17, 1995 to June of 1999. <u>Id.</u> at 4 (Wolin Dep.).

The Assistant General Counsel for Banking and Finance, who reports to the Deputy General Counsel, supervises the Deputy Assistant General Counsel for Banking and Finance and the non-supervisory attorneys in that office. Ex. 15 at 4-5 (McInerney Dep.). The Assistant

-5-

General Counsel for Banking and Finance also supervises the Chief Counsel for FMS and the

Chief Counsel for the Bureau of Public Debt ("BPD"). Id. at 4. Roberta McInerney has been the

Assistant General Counsel for Banking and Finance from April of 1997 to the present. Id. at 5-6.

Eleni Constantine, the Deputy Assistant General Counsel for Banking and Finance, reports

to the Ms. McInerney and shares with her the supervision of the non-supervisory attorneys in that

office. Ex. 11 at 4. (Constantine Dep.); Ex. 3, at ¶ 5 (Constantine Decl.). Ms. Constantine has

served in that capacity from April of 1998 to the present. Ex. 11, at 5 (Constantine Dep.).

The Chief Counsel of FMS reports to the Assistant General Counsel for Banking and

Finance and, in turn, supervises the Deputy Chief Counsel and the non-supervisory attorneys in

that office. Ex. 15, at 4 (McInerney Dep.). From 1997 to October 1998, David Ingold served as

Chief Counsel of FMS. Ex. 3, at ¶ 7 (Constantine Decl.). Ingrid Falanga served as the Acting

Chief Counsel from October of 1998 to March of 1999. Ex. 5, at ¶ 1 (Falanga Decl.). In March

1999, Debra Diener was selected to occupy the position of FMS Chief Counsel where she

currently serves. Ex. 3, at ¶ 7 (Constantine Decl.).

The Deputy Chief Counsel of FMS reports to the Chief Counsel and shares with that

person the supervision of the non-supervisory attorneys in that office. Ingrid Falanga was the

Deputy Chief Counsel from 1994 or 1995 to May of 1999. Ex. 12 at 4-5, 10 (Falanga Dep.).

The non-supervisory attorneys in FMS who report to the Deputy Chief Counsel and who

were involved in the Cobell litigation include: Steve Laughton, Randall S. Lewis, Daniel J.

Mazella and James J. Regan. Mr. Lewis was hired in March of 1992 and was promoted to Senior

Counsel as of February 1998. Ex. 6 at ¶ 1 (Lewis Decl.). Mr. Mazella was hired in September of

1990 and was promoted to Senior Attorney as of February 1998.  Ex. 7 at ¶¶ 1-2 (Mazella Decl.).

Mr. Regan was hired in February of 1993.  Ex. 16 at 4 (Regan Dep.).

## II    Document Preservation and Production Obligations.

### A.    June 1996 to October 1996.

On June 10, 1996, Plaintiffs filed the instant litigation seeking declaratory, injunctive, and

mandamus relief against the Secretaries of the Interior and Treasury, and the Assistant Secretary

of the Interior for Indian Affairs, for the "government's alleged mismanagement of Individual

Indian Money (IIM) accounts."  Cobell I, 30 F. Supp. 2d at 27, 29 & nn.3-4.  The five named

plaintiffs were certified, on Feb. 4, 1997, as "representatives of a class consisting of all present

and former beneficiaries of the IIM accounts."  Id. at 28.[6]

On June 12 and 15, 1996 - one week after this case was filed, Thaddeus Holt, Plaintiffs'

attorney, corresponded with James Simon of the Department of Justice ("DOJ") and expressly

requested that both the Department of the Interior and the Department of Treasury "take

_____

[6]    There are four published opinions arising from this litigation, of which three are
relevant to this Report:
    (1) On Nov. 5, 1998, this Court denied defendants' motions for summary judgment, to
dismiss, or for judgment on the pleadings; denied defendants' motion to dismiss claim for
retrospective relief; denied defendants' motion to adopt sampling approach; and denied plaintiffs'
motion to strike extraneous materials.  Cobell v. Babbitt, 30 F. Supp. 2d 24, 48 (D.D.C. 1998)
("Cobell I").
    (2) On Feb. 22, 1999, this Court found Secretaries Rubin & Babbitt and Assistant
Secretary Gover to be in contempt of this Court's orders governing defendants' document
production.  Cobell v. Babbitt, 37 F. Supp. 2d 6, 39-40 (D.D.C. 1999) ("Cobell II").
    (3) On June 7, 1999, this Court denied defendants' motion for summary judgment on the
common law claims and denied Treasury's motion for summary judgment on plaintiffs'
prospective claims for relief.  Cobell v. Babbitt, 52 F. Supp. 2d 11, 34 (D.D.C. 1999) ("Cobell
III").
    (4) On August 10, 1999, this Court ordered the payment of plaintiffs' attorneys' fees
pursuant to its contempt order.  Cobell v. Babbitt, 188 F.R.D. 122 (D.D.C. 1999).

reasonable steps to preserve documents that may be relevant to the above action." Ex. 18 (Holt letters, June 12 & 15, 1996).

Although Mr. Simon was notified by Mr. Holt of the need to preserve documents in mid-June of 1996, Mr. Simon did not specifically notify Treasury about this until July 15, 1996 when Mr. Simon informed Ms. McInerney who, in turn, notified Mr. Laughton, about "Congress' interest on the issue of whether Treasury destroyed records relating to Individual Indian Money (IIM) account" and the need to preserve all records related to the IIM account to avoid any adverse congressional reactions. Justice believes the matter to be quite serious." Ex. 2, Attachment 00214-00215 (Laughton e-mail, July 15, 1996).

During the week prior to Mr. Simon's and Ms. McInerney's calls, Mr. Laughton had notified various management officials that Treasury was "involved in litigation in Federal District Court involving the Individual Indian Money account - 14X6039, and "that all documents, including e-mails, related to the IIM account should continue to be retained. . . . Any such documents subject to disposal . . . should be retained in hard copy form for potential use in litigation." Id. (Laughton e-mail, July 10, 1996).

In response to Mr. Laughton's correspondence, Russell Morris, a management official at FMS, inquired whether the perception that documents were being destroyed "was a mis-representation of the mass cancellation of old check records and our on-going practice of scratching files of outdated checks." Id., Attachment 00216 (Morris e-mail, July 15, 1996). Mr. Laughton reassured Mr. Morris that his "impression [wa]s correct; however, Justice is taking a very expansive view of what FMS should retain." Id., Attachment 00217 (Laughton e-mail, July

15, 1996).  Mr. Laughton then stated that, "[b]asically FMS does not maintain any records related

to IIM accounts," meaning individual subaccounts as opposed to the overall numbers.  Id.

 In the summer of 1996, "FMS counsel also instructed agency personnel to retain all

documents related to the IIM account, including e-mails and accounting records such as

Statements of Transactions in STAR (Treasury's central accounting system), the check issue and

cancellation data in the automated Check Payment and Reconciliation (CP&R) system, and IIM

trust fund investment transaction data."  Ex. 2, at 11 (Tyler Report).

 On August 12, 1996, David Ingold, the then-Chief Counsel, FMS, advised Andrew

Eschen (DOJ) of the records possessed by FMS that "would be covered under the terms" of

Plaintiffs' proposed requests for interim relief.  Ex. 2, Attachment 00219-00221 (Ingold letter,

Aug. 12, 1996).  Mr. Ingold stated that FMS would retain Treasury checks and accounting

records (monthly summaries of transactions) beyond the record retention period; that investment

records are retained "for as long as the account is in existence;" and that all e-mail messages are

currently being printed out and archived (pursuant to a policy issued on Jan. 19, 1996) and that

those relating to IIM are also being retained electronically.  Id.

 **B.** **November 27, 1996 - "First Order for the Production of Information."**

 On November 27, 1996, this Court entered its "First Order for the Production of

Information" ("November 27 Order")[7] directing the "Defendants [to] furnish to Plaintiffs as soon

as practicable the following information and documents," of which there were 17 specified

---

 [7]  As discussed in greater detail below, the November 27 Order was the product of mutual
agreement between the Department of the Interior, the Department of Justice and the Plaintiffs.  It
appears that the Department of the Treasury was not involved in the drafting of this document nor
were they consulted at the time as to its implications.

categories (Nos. 2 and 3 were reserved).  Paragraph 19 of the November 27 Order ("Paragraph

19") called for the production of "[a]ll documents, records, and tangible things which embody,

refer to, or relate to IIM accounts of the five named plaintiffs or their predecessors in interest."

The November 27 Order further contemplated that document production be undertaken on a

rolling basis, such that "information and documents be furnished or produced as each such item is

prepared or becomes available, without waiting until all such information and documents are

available."

      The November 27 Order referred to "Defendants" in the plural throughout, and did not

distinguish between Interior and Treasury.  The Order, therefore, expressly covered both

Departments.

    **C.**    **Subsequent Discussions Regarding the Need to Preserve Treasury Documents.**

      On September 23, 1998, Mr. Mazella corresponded via e-mail with FMS Assistant

Commissioners and managers, "to remind the senior managers and those with responsibility for

records management and litigation coordination of the requirement that FMS preserve certain

records."  Ex. 7, at ¶ 9 (Mazella Decl.).  This e-mail, which was copied to Ms. Falanga, was

drafted in the context of obtaining reimbursement for the costs of preserving documents for this

litigation: "[a]s you all know, FMS has been under court order since August 1996 to preserve all

documents, including e-mails concerning the Cobell litigation, which could relate in any way to

IIM funds."  Ex. 2, Attachment 00243 (Mazella e-mail). Mr. Mazella declared that, in October,

1998, he, Edward Gronseth (Deputy Chief Counsel, Bureau of Public Debt), and Brenda Hoffman

(Attorney, BPD) coordinated "Treasury's policy to retain indefinitely Indian-related investment records." Ex. 7, at ¶ 10 (Mazella Decl.).

On Nov. 17, 1998, a meeting was convened which was attended by Mr. Mazella, Ms. Falanga, Ms. Locks, Ms. Hyman and other FMS managers,[8] during which "document retention issues relating to the lawsuit were discussed." "Ms. Locks recalled that "the discussion of document retention was addressed to specifically identified documents." Ex. 2, at 12-13 (Tyler Report); see also Ex. 7, at ¶ 13 (Mazella Decl.).[9]

---

[8]    Pamela Locks is the Director of the Financial Processing Division which has five branches.  Doris Hyman is the Manager of the Banking Operations Branch.

[9]    During his deposition, Mr. Mazella testified that the one section of the draft and final version of the Tyler Report "that I disagreed with" was the reference on page 13 where "Ms. Locks recalls that the discussion of document retention was addressed specifically to identify documents." Ex. 14, at 91 (Mazella Dep.).  Mr. Mazella testified that he "believe[s] that that statement was incorrect" and this sentence should either be deleted or revised to indicate "that the discussion at the November 17th [1998] meeting . . . was not addressed to any particular documents but to preserving all documents." Id. at 92.  Mr. Mazella testified that although he told this to Ms. Pisaturo (one of three co-authors of the Report), this sentence was left unchanged. Id.

According to the summary of this meeting, prepared by Ms. Jiovannah Diggs (Management Analyst - FMS Programs Branch), Mr. Mazella explained the status of Cobell and FMS' obligations to produce documents. Ex. 2, Attachment 00249 (Minutes of Nov. 17, 1998 meeting).  Specifically, Mr. Mazella explained that "[s]ince FMS reconciles payments disbursed by Interior and reports payment status, FMS may be required to produce documents to the court (such as microfilm check copies, SF-1219/1220's and investment records) as it relates to the IIM accounts." Id.  Ms. Diggs recorded that "Dan [Mazella] emphasized the importance of FMS being able to produce the documents and information that may be requested at the hearing. Therefore, he requested that all records pertaining to this litigation be placed on hold and not be destroyed until further notice.  Pam Locks stated that she has already placed a hold on microfilm check copies which are being produced from her area.  In response to Dan's request to place a hold on all records at the records center pertaining to IIM accounts, I [Ms. Diggs] informed him that we in Records Management will do our best to prevent the destruction of FI's records." Id.

On January 21, 1998, Mr. Regan (who was then assigned to this litigation) sent an e-mail

to Ms. Falanga, Mr. Mazella, and other FMS management, setting forth his "synopsis of our

current understanding of all Treasury records pertaining to the IIM account" and asking for their

review.  Ex. 2, Attachment 00237-00238A (Regan e-mail).  Mr. Regan itemized these records as

including (1) Investment Records; (2) Accounting Records - Summary Statements of

Transactions; (3) Treasury Checks; and (4) Limited Payability Check Records.  Id.

**D.**    **Defendants' Representations to this Court from December 1996 to December 1998 Regarding Document Production.**

On December 20, 1996, Defendants filed their "Status Report" setting forth their progress

complying with the November 27 Order.  Ex. 19 (Status Report).  Regarding Paragraph 19, the

Defendants represented as follows:

> Financial records relating to the five named plaintiffs was provided to plaintiffs on
> December 10, 1996.  Efforts are being made to locate and produce copies of all
> realty records relating to assets owned by each of the five named plaintiffs, and the
> defendants anticipate those records will be produced within sixty (60) days.
> Defendants have also requested that each of the five named plaintiffs identify the
> type and location of any and all property that they each own to expedite the
> location of all relevant records.

Id. at 7.

During the status calls in January and February of 1997, counsel for Defendants

represented to this Court that Defendants were in compliance with this Court's November 1996

Order and that Defendants would work with Plaintiffs to resolve any remaining problems.[10]

---

[10]   Notwithstanding these overtures, Ms. Falanga testified that in early 1998, Andrew
Eschen (DOJ) called Mr. Regan, the FMS attorney principally responsible for this litigation at the
time, "and wanted us to get affidavits or declarations from our clients to resist discovery."  Ms.
Falanga refused since "we had an entire branch that did nothing but produce check copies, so I
couldn't in good faith say that it was burdensome" to comply with Plaintiffs discovery requests.
Ex. 12, at 23-24 (Falanga Dep.).

Specifically:

- On January 21, 1997, Lewis Wiener (DOJ) represented to the Court that, although Plaintiffs had raised numerous concerns, "all of the commitments that the government made as to when it would produce documents, and the documents that would be produced, have been met. . . . We told them on December 27th [1996] what we would produce on what dates, and as far as I know, we are on track as producing the majority of the documents to date that we committed we would produce." Ex. 20, at 8 (Transcript of Status Call).

- On February 11, 1997, Mr. Wiener reiterated that Defendants "will continue to work with Plaintiffs to resolve whatever outstanding production matters remain unresolved." Ex. 21, at 5 (Transcript of Status Call).

- On September 15, 1997, counsel for Plaintiffs advised this Court that Defendants failed to produce any canceled checks. Ex. 22, at 5 (Transcript of Status Call).

- In their January 6, 1998 Status Report, which was submitted 14 months after the November 1996 Order, Defendants restated their objections to Plaintiffs' requests for document production relating to the Indian trust accounts. Plaintiffs then requested an informal conference to gather "all the people who are knowledgeable about the status, location, and need for the documents (including Treasury, Interior, Price Waterhouse and Arthur Andersen) and who are able to make binding commitments to produce the requested trust documents are present and can speak freely and informally . . . [which] will benefit all parties and the Court itself." Ex. 23, at 3 (Plaintiffs' Request for Informal Conference and Reply to Defendants' Status Report, Jan. 16, 1998) (emphasis in original).

- During the June 16, 1998 status call, counsel for Plaintiffs reiterated their concerns that responsive documents had not been produced. Mr. Gingold stated: "we discovered that most of the documents that are related to the five named plaintiffs have not been produced . . . It's been 18 months." Ex. 24, at 3 (Transcript of June 16, 1998 Status Call).

  Mr. Gingold further informed this Court that "We're also concerned about another aspect: documents that have not been turned up and are the subject of the November 27, 1996, production order . . ." Id. at 5. Mr. Gingold concluded by stating that: "[n]ot a single acknowledgment of receipt of funds for a single disbursement transaction has been produced. After 18 months and after we've been told that Treasury can produce checks in six months, not a single check has been produced. . . . notwithstanding the statements that have been made [by Defendants], there has been no true cooperation or effort in good faith to produce documents." Id. at 7. In response, Mr. Wiener claimed that "[t]hese allegations

-13-

that Plaintiffs have raised in this eleventh-hour filing yesterday are half-truths, selected portions of transcripts, and do not convey the full story of what's going on here." Id. at 14. Mr. Gingold rebutted that, (1) "even with the representations made by Mr. Wiener, they are fraught with incompleteness," id. at 32, and (2) "[a]gain, not a single check has been produced by Treasury. Not a single certification for disbursement of funds has been produced by Treasury. . . . If this is an explanation of the completeness of records, then it's a very, very serious problem. And we're not even talking about the predecessor accounts here. . . . There has been no effort to produce the documents required under the order." Id. at 35.

- In late August of 1998, two months later, Defendants moved to amend or modify this Court's discovery orders, and asserted that "Defendants have made good faith efforts to produce documents for the five-named plaintiffs in this case." Ex. 25, at 7 (Defendants' Consolidated Motion, Aug. 28, 1998).

- On September 14, 1998, Plaintiffs filed their response to Defendants' Aug. 28, 1998 motion in which they pointed out that, "[t]he November 1996 order was a negotiated one. When the government agreed to it there was no suggestion that it could not be complied with. There was no suggestion that it was overly broad. There was no suggestion that some 'temporal' limit should be put on it." Ex. 26, at 3 (Plaintiffs' Response to Defendants' Motion, Sept. 14, 1998). Plaintiffs also cited to the Defendants' Dec. 27, 1996 Status Report [Ex. 19, supra], which had expressed no reservations about their compliance with Paragraph 19 of the Nov. 1996 Order. Id. at 4.

- During the Sept. 14, 1998 status hearing, Mr. Wiener represented to this Court, regarding the status of Defendants' document production, that: "The long and short of this is . . . we will produce documents for the five named plaintiffs as part of our on-going document production." Ex. 27, at 5 (Transcript of Sept. 14, 1998 status hearing).

- During the November 6, 1998 status hearing - almost two years to the day after this Court entered the November 27 Order - this Court inquired as to: "when the government can bring itself into compliance with the prior orders requiring the documents to be produced as to the named plaintiffs and again perhaps you can tell me more at the November 23rd [1998] hearing how you expect to go about bringing yourself into compliance." Ex. 28, at 5-6 (Transcript of Nov. 6, 1998 Hearing).

- During the November 23, 1998 status and motions hearing, there was an extensive colloquy between counsel for the parties and this Court concerning Defendants'

discovery production.[11]  Mr. Wiener asserted that: "There are no discovery obligations that I understand we are in violation of for having not produced."  Ex. 29, at 19 (Transcript of Nov. 23, 1998 hearing).  Mr. Wiener also advised this Court that, "I have been advised by our witnesses that the document productions for BIA [Bureau of Indian Affairs] and Treasury will take less time than [will] the document production for the Office of Special Trustee [Department of the Interior]."  Id. at 67.

 Mr. Gingold responded by reminding this Court that "[t]o date, item 18 and item 19 of that [Nov. 1996] order remain outstanding. . . . We've received no documentation whatsoever with regard to predecessor accounts. . . . We've received no documentation whatsoever with regard to disbursements from the system."  Id. at 68.  Mr. Gingold further noted that "one of the problems we have had from the very beginning is what appears to be casual representations of problems and then a subsequent recognition that the problem doesn't seem to exist.  Over the past year Mr. Wiener and I have had many discussions with regard to documents that have not been produced."  Id. at 72.  Mr. Gingold summarized by asking, "What has been done?  I mean, we're talking about a year, two years ago this Court issued the first order of production, and today we are not much further ahead than we were two years ago.  How many more years are we going to go?"  Id. at 77.

Mr. Wiener responded: "I have put the people at the Department of Treasury at work.  They have told me that they will be able to produce documents for the specific five named plaintiffs, which I will personally turn over to plaintiffs' counsel."  Id. at 81.  Mr. Wiener also represented to this Court that "[t]hey [Treasury] say they have no documents on predecessor accounts.  The Court's order says documents for the five named plaintiffs or their predecessor accounts.  It doesn't say 'and,' it says 'or.'  We are producing and trying to produce, and are representing to this Court today what we are doing to produce those documents for the five named plaintiffs.  If they want documents for the predecessor accounts in lieu of the documents for the five named plaintiffs, then we can talk about how we're going to produce documents for them.  But we are proceeding in good faith, your honor."  Id. at 82-83.[12]

---

[11]  Coincidentally, on this very day, FMS staff issued the actual order for the destruction of the Hyattsville documents. Ex. 2, at 9 (Tyler Report).

[12]  During this status conference, the Court questioned "[w]hy hasn't Treasury produced copies of checks in response to paragraph 19 of the Court's order?"  Ex. 14, at 66 (Mazella Dep.), Mr. Mazella asserted that he had "provided Mr. Weiner . . . copies of checks that we had produced" the previous week, but Mr. Weiner did not tell this to the court.  Id.  Instead, Mr. Weiner responded that "[w]ell, Your Honor, I've put Treasury to work."  This response

- On November 24, 1998, the status conference and motions hearing before this court resumed. At that time, Mr. Wiener represented to this Court that "[t]he only documents that have not yet been produced to Plaintiffs, by our records, are the OST [Office of Special Trustee, Interior] documents." Ex. 30, at 108-109 (Transcript of Nov. 24, 1998 hearing). John Miller (Deputy Special Trustee for Policy in the Office of the Special Trustee for American Indians ("OST"), Dept. of the Interior), who testified on behalf of the Defendants, asserted that the Treasury documents will not be among those that his agency will be searching for or be able to find in their records. Id. at 122-123. Mr. Miller emphatically stated, "[n]ever Treasury" and that "[i]t will be a total accident if they're there." Id. at 123. FMS Director of Financial Processing Division Pamela Locks, testified that "[i]t is my understanding that other documents, unidentified documents, will be produced, and it could be produced in a shorter period of time [than two months]." Id. at 168-169. Mr. Wiener then corrected his previous representation as to Treasury's document production: "Your Honor, I alerted the Court before the break that I had been provided with copies of the canceled checks from the Department of Treasury. I provided them here today to our opponents. I have not yet provided a copy to my own experts. My immediate interest was in providing them to Plaintiffs first." Id. at 197-198.

- At the December 15, 1998 status hearing, the Court stated to Defendants' counsel that "[y]ou haven't produced the documents relating to the five named plaintiffs yet." Mr. Wiener responded that "[w]e have produced documents for three of the five named plaintiffs as we have previously represented." Ex. 31, at 7 (Transcript of Dec. 15, 1998 hearing).

- During the January 25, 1999 contempt hearing, the Defendants represented to the Court that: "I think, absolutely no question at this point, vis-a-vis Treasury, that Treasury has done everything that it could do. Because one thing is clear here, is that Treasury can't pull any of these copies of checks until they're provided with adequate information. . . ." Ex. 32, at 1490 (Transcript of Contempt Hearing). In response, this Court remarked that, "You know, that's a very troublesome point to the Court too, because I had all these statuses for two years, and I had a representative of the Treasury sitting there at the table at every one of these statuses. They went two years and never produced one single check, one single

---

apparently angered Mr. Mazella and caused him to complain to Mr. Weiner, who "apologized to me privately the next day for that." Id. at 66-67. Ms. Falanga corroborated Mr. Mazella's status-conference recollection: "[w]hen we finally did get the information [from DOJ and Interior] our people had to scramble in order to produce it timely. Dan [Mazella] turned the information over to Justice. Justice did not turn it over to the court and then [Mr. Wiener] represented to the court that Treasury essentially wasn't finished but they were making Treasury work." Ex. 12, at 72-73 (Falanga Dep.).

piece of paper.  And they waltz in here in November [1998] and their explanation is: 'Well, nobody at Interior every gave us a name or identifying data until November of '98.'  So two years later after my order, suddenly, they wake up and tell me they've never produced a thing, when they're sitting here, when representations are being made by the Department of Justice that everything's been produced.  How can they sit there silently, Treasury lawyers sitting there silently while that's being told to me, and never disclose to the Court what was going on?"  Id. at 1490-1491.  Mr. Brooks replied that "People weren't thinking.  They were thinking that it was a Department of Interior order, that the Department of the Interior had to produce the documents."  Id. at 1491.

## III    Other Incidents of Document Destruction at the Department of the Treasury.

The Hyattsville incident was not the first time that Treasury documents which may have been related to the Cobell litigation were either lost or destroyed.  On two separate occasions, Treasury attorneys failed to promptly disclose these events to the DOJ, the Plaintiffs and this Court.  For contextual reasons, these earlier incidents merit discussion.

### A.    The 1996 Bureau of Public Debt "Missing Box."

In November of 1996, "responsibility for investment of Federal trust funds was formally transferred from FMS to BPD [the Bureau of Public Debt]."  Ex. 37 (Ferrell letter to Special Master, June 4, 1999).  At that time, FMS sent 28 boxes by United Parcel Service ("UPS") to the BPD facility in Parkersburg, West Virginia.  Only 27 boxes were received.  Id.  Inquiries were made within BPD and with UPS, but the box was never traced and UPS informed BPD that the package was lost.  Id.  According to Mr. Ferrell, the "missing box contained either correspondence or 1081s" dating back to March of 1995, with all older records already located at the Federal Records Center.  Id.  However, Mr. Ferrell asserted that, since BPD "possesses a folder containing all investment/redemption requests submitted by BIA [Bureau of Indian Affairs]

-17-

and confirmations for all IIM account transactions . . . dating back to March 1, 1995," the BPD

"believes they are able to account for all investment documents related to the IIM account." *Id.*

Ms. Falanga testified that, at an unspecified time, BPD attorney Brenda Hoffman

"informed me that her bureau had investment-related documents that had been lost in shipment

between FMS and Public Debt. I advised her that we need to tell Ms. Constantine immediately.

We did, and the issue was added to our weekly to-do list." Ex. 12 at 190-192 (Falanga Dep.).

Ms. Falanga further testified that when she raised the subject of formally disclosing the missing

box, "Eleni [Constantine] essentially said no," and Ms. McInerney did not comment. Id. Ms.

Falanga is certain that she attempted to impress upon Ms. Hoffman the need "to notify the Court

about the destruction." Id.

On May 11, 1999, after disclosing the destruction of the Hyattsville documents, the DOJ

notified the Court about the BPD "missing box" problem. Ex. 1, at 2 (Brooks letter to the

Special Master). The following month, a more detailed analysis of this problem was provided in

which Mr. Ferrell concluded that, although the BPD cannot verify the contents of this box, the

BPD "believes that they are able to account for all investment documents relating to the IIM

account," and the missing records only go back to March of 1995. See Ex. 37, passim.

**B.    The June 1997 Destruction of Microfilms.[13]**

In July of 1997, Mr. Laughton, the FMS attorney who was principally responsible for the

Cobell litigation at that time, emphasized to FMS management the need to preserve documents

pertaining to Individual Indian Money records. Ex. 2, Attachment 00235 (Laughton e-mail, July

21, 1997). On that score, Mr. Laughton asserted: "I hope that is what we are doing." Id. Later

---

[13]  The deponents used the terms microfilm and microfiche interchangeably.

that week, Mr. Laughton spoke with Jim Sturgill (FMS), who confirmed that "the representation I made to DOJ in the August 12, 1996 letter regarding FMS' retention of microfilm copies of Treasury checks beyond 6 years 7 months was being implemented." Ex. 2, Attachment 00236 (Laughton memorandum, July 23, 1997). Mr. Laughton informed Andrew Eschen (DOJ) at this time that FMS was retaining these microfilms. Id.

During the January 11, 1999 contempt hearing, Mr. Sturgill testified that the Department of the Treasury destroys microfilms on a monthly basis: "As it aged, typically, on the beginning of every month, they would destroy the oldest month of microfilm." Ex. 32, at 57 (Transcript of contempt hearing). The Court then asked Mr. Sturgill, "And what you discovered when you went down there was that no one had ever communicated to the people who were actually destroying the microfilm your prior agreement not to destroy it?" to which he replied, "That's correct." Id. Mr. Sturgill testified that the instructions prohibiting the destruction of documents "were given orally to one of the supervisors to contact Johnson Controls," the contractor in charge of destroying old documents. Id. at 58. Mr. Sturgill asserted that, regarding his knowledge of this Court's November 1996 Order, "No, I wasn't aware of that order." He similarly claimed not to have "any knowledge" of Treasury's compliance with this Order. Id. at 60.

Mr. Mazella and Ms. Falanga each testified that they did not learn until early 1998 of the June 1997 destruction of the microfilm checks. Once aware of the destruction, Mr. Mazella and Ms. Falanga informed Mr. Eschen (DOJ) by telephone "that we didn't have all of the microfilm," and they subsequently sent him an inventory in April of 1998. Ex. 14, at 46-49 (Mazella Dep.).

Ms. Falanga recalled that "sometime in - between January and March of '98" she "discovered that [the microfilm check records] had just been destroyed." Ex. 12, at 24-25

-19-

(Falanga Dep.).  She testified that James Brake (FMS) had told her "they had just destroyed a bunch of microfilm.  And since I knew this was contrary to our agreement, I immediately called Justice to let them know and talked to Andy Eschen, and I left voice mails for Pam Locks [FMS] and told her we needed to talk immediately."  Id.

Ms. Falanga further recounted that "[s]he then met with the client and the assistant commissioner for that area [Mitch Levine] to essentially read them the riot act," since the destruction of the microfilms was contrary to the Mr. Laughton's representation that such documents would not be destroyed.  Id. at 29.  Ms. Falanga concluded her testimony on this event by stating that she advised Mr. Ingold to inform Ms. McInerney, "because the records indicated that Roberta McInerney had been involved in the original agreement to preserve the microfilm."  Id. at 31-32.  However, Ms. Falanga had no independent knowledge as to whether Mr. Ingold actually reported this destruction to Ms. McInerney.  Id.

In early February 1998, the FMS attorneys and staff took affirmative steps to ensure that no further destruction of any microfilms would occur.  Mr. Regan sent an e-mail to Ms. Falanga and Mr. Mazella informing them that he had spoken with the FMS management in charge of these records, and "reiterated that FMS should not destroy ANY microfilm copies of negotiated Treasury checks UNTIL FURTHER NOTICE given the matters at issue in Cobell."  Ex. 2, at 11 and Attachment 00239 (Regan e-mail, Feb. 5, 1998) (emphasis in original).

James Sturgill (FMS) then sent an e-mail to Ms. Locks, Ms. Falanga, Mr. Mazella, and others, stating that FMS will complete its inventory of the microfilm checks in storage and the dates covered.  Id., Attachment 00240 (Sturgill e-mail, Feb. 9, 1998).  Mr. Sturgill then

emphasized that: "Make sure WE DON'T DESTROY anything!  I'd suggest Pam [Locks] put out a memo to this effect."  Id. (emphasis in original.)

Ms. Locks then informed FMS attorneys that the microfilm inventory had already been completed.  Id., Attachment 00241 (Locks e-mail, Feb. 9, 1998).  Ms. Locks wrote that "I personally spoke with Herb [Taylor] last Friday to inform him not to destroy ANYTHING until further notice."  Id.  James Brake (FMS) then informed the outside contractor, who had destroyed the microfilms, that this was to stop: "This memorandum is a follow-up for you not to destroy any more microfilm until further notice."  Id., Attachment 00242 (Brake memorandum, Feb. 10, 1998).

Mr. Mazella recalled that, in March and April of 1998, he and Andrew Eschen (DOJ) drafted the declaration of Ms. Locks regarding these microfilm records.  Ex. 14, at 52-53 (Mazella Dep.).  Mr. Mazella testified that Mr. Ingold "asked me or directed me to make sure that the disclosure of how much microfilm was left was contained in the declaration of Ms. Locks."  Id.  However, Mr. Mazella testified that the final version reflected the input of Messrs. Ingold and Eschen, since it mentioned what was left, and did not mention that microfilms had been destroyed.  Id.  Noting his discomfort with this disclosure, "[b]ecause I was unsure that that was really a complete disclosure," Mr. Mazella admitted that Ms. Locks' declaration omitted the fact that certain microfilms had been destroyed.  Id. at 54.

Mr. Mazella testified that, in retrospect, he believed that Ms. Locks' declaration did not suffice to satisfy what he considered to be his duty to notify the Court about the microfilm destruction.  Id. at 56-57.  Mr. Mazella believed "that the Department of Justice should have made a more complete disclosure of the destruction of the microfilm," id. at 57, as Ms. Locks'

-21-

declaration "was drafted in a way so that it would not give a complete picture of what happened." Id. at 61.

Mr. Mazella remembers informing Ms. Falanga of the failure to disclose the destruction of the microfilms in Ms. Locks' declaration, and "that she was uncomfortable with that, also, but that was Mr. Ingold's decision." Id. at 56.

Mr. Mazella testified that, in late November 1998, he and Ms. Falanga informed Ms. Constantine and Ms. McInerney, for the first time, "that this destruction [of microfilms] had occurred" in 1997, and "so all of us . . . felt that disclosure should be made complete, and that was done so . . . in the Defendants' response to the show cause motion." Ex. 14, at 54-55 (Mazella Dep.).

Ms. Falanga also testified that, in late November 1998, Ms. Constantine and Ms. McInerney were informed of the microfiche destruction. Ex. 12, at 93-94 (Falanga Dep.). Ms. Falanga informed them "that I had talked to Susan Cook [DOJ/ Environment & Natural Resources Division ("ENRD")] who had been added to the case, and after I had reported the destruction of the microfilm, . . . Justice did not report to the court. What Justice did, with the agreement of the chief counsel [Mr. Ingold] and I wasn't involved, I was out at that period, they finessed the issue. They made an affirmative statement about the amount of microfilm we had, rather than say, we destroyed." Id. at 93-94. Ms. Falanga testified that she believed that this statement was in Ms. Locks' affidavit. Id. Ms. Falanga admitted that while she had raised her concerns with the Locks affidavit and the microfilm destruction with DOJ, these issues were not reported to this Court until the January 1999 contempt hearing, "and it was finessed in a motion to dismiss." Id. at 98.

-22-

Ms. Constantine testified that when Mr. Mazella and Ms. Falanga informed them, in late November of 1998, about the July 1997 destruction of the microfilms, that she "was quite concerned. I think Roberta [McInerney] was too. We felt that we immediately had to tell the General Counsel about this problem. This was a level of problem that had to go up right away." Ex. 11, at 57 (Constantine Dep.); see also Ex. 3, at ¶ 9 (Constantine Decl.).

Ms. McInerney testified that she "can't remember when I learned about that," Ex. 15, at 49 (McInerney Dep.), and that as of late 1998, she "wasn't so much involved even in the details like the microfiche. I was hardly even aware of the microfiche destruction. I was just wasn't that involved in the case." Id. at 75. Ms. McInerney also testified that "I don't remember being aware, to be honest, of the microfiche destruction until much later when we were talking about . . . . the summary judgment motion." Id. at 100.

The Treasury attorneys, during a December 1998 meeting with the DOJ/ ENRD attorneys, headed by Assistant Attorney General Lois Schiffer, "also advised DOJ of the inadvertent destruction of the microfiche checks and recommended immediate disclosure of this destruction to the Court, with which DOJ agreed." Ex. 3, at ¶ 12 (Constantine Decl.). Mr. Wolin testified that he attended this meeting, which occurred on or around December 28 or 29 of 1998, during which, he believed that the microfiche destruction was mentioned. Ex. 17, at 54-55 (Wolin Dep.).

Mr. Wolin testified that when he learned of the destruction of the microfiches, he "absolutely" expected Ms. Falanga and Mr. Mazella would have reported this destruction to him immediately, and this would have resulted in "a direct report to counsel at Justice and in turn to the court, absolutely." Ex. 17, at 56 (Wolin Dep.). Mr. Wolin testified that it was this event that

made him realize there was a need for better oversight from Main Treasury, and he therefore

assigned Ms. Constantine to this litigation for that purpose. Id. at 58-59.

In its Opinion holding then Secretary Rubin in contempt, this Court held that the

destruction of these microfiches, contrary to the preservation order, "is attributable to poor

instruction from management level officials" and, therefore, "is indicative of the [Treasury

Department's] overall performance in this litigation." Cobell II, 37 F. Supp. 2d at 28.

## IV    The Hyattsville Documents.

### A.    The January 28, 1999 Discovery of the Destruction.

#### 1.    Ms. Locks Discovers a Folder with Indian-Related Documents on Her Chair and Reports This to Mr. Mazella Who Orders Her to Stop the Destruction of These Documents.

According to the Tyler Report, on January 28, 1999, Ms. Locks  "found a folder on her

office chair which contained a reference to IIM accounts.  After making some inquiries, Ms. Locks

learned that the files had been pulled from the boxes in the basement, which were in the process of

being destroyed.  Concerned about the reference in the records to IIM, Ms. Locks interrupted a

meeting attended by FMS Senior Attorneys Dan Mazella and Randy Lewis.  Ms. Locks showed

Mr. Mazella the file folders, and indicated that the files were currently being destroyed.  Ms. Locks

inquired whether the documents might be relevant to the Cobell litigation.  Seeing the reference to

IIM, Mr. Mazella immediately instructed Ms. Locks to stop the disposition of the documents.  No

additional disposal took place following the order to stop."  Ex. 2, at 10 and Attachments 00051-

00053 (Tyler Report and Jan. 28, 1998 e-mails).

Mr. Mazella declared that Mr. Lewis and he "were conducting witness preparation . . .

when Ms. Locks informed us of the existence of the boxes in the basement at Hyattsville and that

the documents were being destroyed.  One of the files that Ms. Locks showed me had a listing of

IIM checks which appeared to have been outstanding and canceled and included the names of

payees.  Two other files . . . were clearly from disbursing officers from Bureau of Indian Affairs

agency or area offices.  I told Ms. Locks to go downstairs and stop destroying documents, which

was done."  Ex. 7, at ¶ 15 (Mazella Decl.).  Mr. Mazella expounded upon this during his

deposition when he testified that when he saw the "document which had the individual Indian

money and it had listings of payments and it had people's names on it, and that they were being

destroyed, I was shocked."  He recalled that "Ms. Locks told [him] that she had these documents

which were clearly potentially relevant to the litigation that were being destroyed.  And I told her

to stop destruction immediately.  To go downstairs and stop."  Ex. 14, at 126-128 (Mazella Dep.).

### 2.    Mr. Mazella Reports the Document Destruction to Ms. Falanga.

According to the Tyler Report, "[i]mmediately following the discovery of the material from

the basement referencing IIM accounts on or about January 28, 1999, Attorney Mazella contacted

Ingrid Falanga who was at a FMS meeting in Charlottesville, and she informed the FMS

commissioners . . . and apprised her of the situation."  Ex. 2, at 14 (Tyler Report).  Until that time,

Mr. Mazella claimed that "he was unaware of the existence of the Hyattsville boxes and/or their

contents (as well as the ledgers and other materials since discovered in the Hyattsville basement)

until Ms. Locks brought the files to my attention."  Id.

Ms. Falanga confirmed that she "first learned of the Hyattsville records" when Mr. Mazella

told her about their destruction.  Ex. 5, at ¶ 4 (Falanga Decl.).  Ms. Falanga recalled that "Mr.

Mazella informed me that he had immediately ordered everyone to stop the destruction of any and

all documents.  Mr. Mazella also informed me that he had learned from Doris Hyman, an FMS

employee, that these boxes probably had Indian-related documents in them.  I also believe that Mr.

Lewis informed me at this time that these appeared to be GAO documents." Id.  Ms. Falanga

testified that, at the time, she "considered them GAO documents" and not Treasury documents,

which would have "a different implication to me" for the Cobell litigation;[14] she recognized that

subsequently "there was a decision that they were, in fact, Treasury documents."  Ex. 12, at 42-44

(Falanga Dep.).  Ms. Falanga further testified that Mr. Lewis "informed me at the time that these

appeared to be GAO documents," but she was still concerned because Mr. Mazella said that Ms.

Hyman had told him that "these boxes probably had Indian-related documents in them," which

alerted her that "we had another crisis in Cobell." Id. at 58.  Specifically, Ms. Falanga testified that

even though she thought they were GAO documents, she was still concerned "first of all, because

they were in our facility.  Secondly, because they were from disbursing officers, which meant that

they involved payments.  They were related to Indians, which meant that they were related to

Cobell or potentially related to Cobell and they had been destroyed." Id. at 59.

    Ms. Falanga testified "that our client had screwed up again and we would have to tell the

court" and that this was "related to Cobell." Id. at 111-112.  Ms. Falanga informed the FMS

commissioners at the Charlottesville meeting about the destruction, and that these boxes may have

related to Cobell and the Indian documents.  Id.  Ms. Falanga does not recall Mr. Mazella telling

her why he thought they were Indian documents, "only that they were." Id.

### 3.    Ms. Falanga and Mr. Mazella Inform Ms. Constantine and Ms. McInerney About the Document Destruction.

---

[14]  Curiously, as of May 7, 1999, Ms. Falanga still "considered them GAO documents." Id. at 43.

According to the Tyler Report, "[a] conference call was then conducted with Mr. Mazella, Ms. Falanga, Eleni Constantine [] and Roberta McInerney []. The attorneys discussed the discovery of the boxes in the basement, the need to determine the nature of the records and the quantity of records disposed of, and the need to issue a mandate to preserve all records." Ex. 2, at 14 (Tyler Report).

Mr. Mazella declared that Ms. Falanga (who was in Charlottesville) and he "called Ms. McInerney and Ms. Constantine late that afternoon to inform them of the destruction of the boxes and the nature of the materials we had seen. I told Ms. McInerney and Ms. Constantine that I had been shown a file of what appeared to be listings of outstanding checks, labeled as IIM payments, which contained people's names. [They] instructed us . . . to have FMS attorneys search through the remaining boxes to see if any documents were responsive to the court's November Order." Ex. 7, at ¶ 16 (Mazella Decl.). Mr. Mazella testified that at the time he understood that these documents could be responsive to the November 27 Order, "and the fact that it had people's names meant that, you know, it was potentially responsive to the court's November Order" since it had names which might have "information about a named plaintiff" or their "predecessors in interest." Ex. 14, at 130 (Mazella Dep.). Mr. Mazella testified that, during this conference call, either Ms. Constantine or Ms. McInerney "said, do you mean to tell me that we have destroyed potentially responsive documents? And my answer was, yes." Id. at 133.

Ms. Falanga declared that Mr. Mazella and she "left an urgent message" for Ms. Constantine and Ms. McInerney and "when we reached Ms. McInerney and Ms. Constantine later that same day, we told them everything we knew about the situation . . . . we agreed that we would try to establish . . . whether there were any responsive documents in the remaining boxes."

Ex. 5, at ¶¶ 5-6 (Falanga Decl.).  Ms. Falanga testified that she informed Ms. McInerney and Ms.

Constantine that these documents "were Indian-related documents," although Ms. Falanga did not

actually say to them that these documents were related specifically to <u>Cobell</u>.  Ex. 12, at 115

(Falanga Dep.).  Ms. Falanga stated that Ms. McInerney, Ms. Constantine and she agreed that they

would determine whether there were any documents responsive to "any discovery order" in the

<u>Cobell</u> litigation.  <u>Id.</u> at 117.  Ms. Falanga admitted that she did not discuss with Ms. McInerney

and Ms. Constantine whether the destroyed documents should be disclosed to the court, and she

had no discussions with FMS counsel regarding disclosure to the court, since "[o]ur focus at that

time was trying to figure out what was there, what had been destroyed, and who did what, so that

when we did articulate it, we could reasonably articulate what had happened."  <u>Id.</u> at 136-137.

Ms. Constantine testified that she believed that Ms. Falanga was the first person to inform

her about the documents, and that her reaction was: "[w]hat are these documents. . ."  Ex. 11, at

81 (Constantine Dep.).  When Ms. Falanga said she didn't know, Ms. Constantine then responded,

"Well, wait a sec.  We're in the middle of a very contentious litigation.  We're in the process of

trying to find all of the relevant documents that are out there, and we discover that people are just

throwing away unknown documents.  This is bad.  We shouldn't have this situation."  <u>Id.</u> at 81-82.

Ms. Constantine declared that neither she nor Ms. McInerney "were aware of the nature of the

documents that had been destroyed nor of the period over which the destruction had occurred."

Ex. 3, at ¶ 18 (Constantine Decl.).  Ms. Constantine insisted that: "if I or any Treasury counsel had

known that the documents were potentially responsive, we would have immediately reported their

partial destruction to the [DOJ and the Court], as we had done with the microfiche."  <u>Id.</u>

Ms. Constantine testified that Ms. Falanga "told me they were GAO documents . . . she said something like probably more summary level accounting documents and that nobody knew what they were." Ex. 11, at 88 (Constantine Dep.). Ms. Constantine maintained that if she had known that these documents included specific references to either Indians or IIM accounts, she would have reacted differently: "[a]bsolutely. I believe I would have thought that those are responsive documents. . . . I believe I would have viewed those as responsive documents that we had to, you know, immediately, right away, inform the Court . . . that there was the potential that they had been destroyed," although she then elaborated that "We would have asked DOJ to inform the Court," instead of Treasury informing the Court directly. Id. at 88-89.

Ms. McInerney declared that "I recall having a telephone conference call with Ingrid Falanga, Eleni Constantine, and Dan Mazella during which Ms. Falanga and Mr. Mazella informed Ms. Constantine and me that a number of boxes of documents had been discarded at the FMS Hyattsville facility." Ex. 9, at ¶ 3 (McInerney Decl.). She recalled that "[t]he documents were generally described (by either Ingrid Falanga or Dan Mazella, I can't recall which one) as being old GAO records stored in the basement of FMS's Hyattsville facility about which the FMS lawyers had no prior knowledge. The documents were also described generally as non-Treasury documents that were not on any Treasury document retention schedule. Ms. Constantine and I asked Ms. Falanga . . . [to search] to determine what the documents were, whether they were responsive to any outstanding document production order in the Cobell litigation . . ." Id.

Ms. McInerney was confident that she was not informed about the specific nature of the documents, beyond Mr. Mazella having described them "as old GAO records, not even Treasury records, undifferentiated government-wide accounting records." Ex. 15, at 80 (McInerney Dep.).

-29-

Accordingly, "[h]er clear impression after the conversation was that they were summary level accounting documents.  That's what they seemed to be."  Id.

### 4.    Messrs. Wolin and Knight are Informed About the Document Destruction.

Ms. Constantine and Ms. McInerney both recalled briefing Messrs. Knight and Wolin about the document destruction shortly after they learned about it.  Ms. McInerney stated that "I recall that both Messrs. Knight and Wolin were very concerned about this issue . . ."  Ex. 9, at ¶ 3 (McInerney Decl.).  Ms. Constantine similarly declared that "after talking with Ms. Falanga together we immediately notified Mr. Wolin and Mr. Knight about the destruction."  Ex. 3, at ¶ 18 (Constantine Decl.).  Ms. McInerney testified that she told Messrs. Knight and Wolin "that it looked like we were probably okay here but we're nonetheless doing a search of the documents to make sure," based upon the representations made by FMS counsel.  Ex. 15, at 118-119 (McInerney Dep.).

Mr. Wolin testified that he was not told that the Hyattsville boxes contained Indian- related documents until either when he read the Tyler Report, or in early May when Ms. Constantine "came to finally tell me that there were materials in these boxes that were potentially responsive to the court's orders."  Ex. 17, at 62-64, 70 (Wolin Dep.).  Mr. Wolin emphasized that had he been so informed in late January, "I would have wanted to get the Justice Department on the line right away."  Id. at 67.

Regarding what should have been the correct procedure, Mr. Wolin was clear: "as soon as any Treasury lawyer was aware of information that there — was of the belief or had any reason to believe that there was material in those boxes that was potentially responsive to the court's orders,

discovery orders in this case, my view is they had an obligation to report it up their line, their

chain, and probably in any case to report it to the Justice Department lawyers with whom they

were having not a small amount of interaction on other matters." Id.

**V      Events Following the Document Destruction.**

   **A.      The February 1, 1999 Order for Document Preservation.**

       Ms. Constantine testified that, during the January 28, 1999 meeting, FMS counsel informed

Ms. McInerney and herself, "for the first time that there had not been any formal order regarding

the preservation of documents relevant to the litigation . . . and we determined that such an order

should be issued immediately." Ex. 3, at ¶ 18 (Constantine Declaration).[15]  Accordingly, Mr.

Mazella drafted a memorandum for FMS Commissioner Richard L. Gregg's signature, alerting the

FMS Assistant Commissioners regarding document production and preservation protocols.  Ex.

12, at 118 (Falanga Deposition).  Ms. Falanga testified that she reviewed and edited this

memorandum, id., as did Ms. Constantine.  Ex. 3, at ¶ 19 (Constantine Declaration).

   **B.      Review of the Remaining Hyattsville Documents.**

———————————

       [15]  During the FMS-Hyattsville site visit, Ms. Locks told the Special Master that she did
not know of any prohibition on Indian document destruction prior to February 1, 1999, and that
she would have known if such a policy prior to that time had been issued.  Tom Fisher also stated
that he first learned of the no-destruction and preservation policy for the Indian IIM documents
on or around February 10, 1999.

       Both Mr. Mazella and Ms. Falanga took issue with these assertions.  Mr. Mazella testified
that he informed Ms. Locks at the November 17, 1998 meeting with the FMS managers "of the
need to preserve all documents that are potentially relevant to the Cobell litigation."  Ex. 14, at
123-125 (Mazella Deposition).  Similarly, Ms. Falanga testified that Ms. Locks should have
known of her duty to preserve documents, and rejected Ms. Locks' claim that she was aware of
this duty, stating: "I don't believe it's possible."  Ex. 12, at 106-107 (Falanga Deposition).  Ms.
Falanga also remarked that "She [Ms. Locks] also said that with the destruction of the 1997
microfilm.  And at that time she was shown all of the e-mail traffic and directions to her to
preserve everything."  Id.

During or after the January 28, 1999 telephone conference between FMS and Main Treasury, Ms. Falanga "assigned James Regan . . . to review the remaining boxes of documents in Hyattsville." Ex. 5, at ¶ 8 (Falanga Declaration). Ms. Falanga testified that she ordered Mr. Regan to oversee the document search "because he had prior involvement with the case," because he was familiar with the scope of Paragraph 19, and "knew that we were looking for documents related to Cobell or to IIM accounts." Ex. 12, at 130-131 (Falanga Deposition).

On January 29, 1999, Messrs. Mazella, Lewis and Regan met with several FMS staff members at the Hyattsville facility to conduct a preliminary review of the remaining boxes. Ex. 6, at ¶ 5 (Lewis Declaration); Ex. 10, at ¶ 4 (Regan Declaration). Mr. Lewis declared that he personally "helped review one or two of the remaining boxes" at Hyattsville and that he understood that they were to search for the five named plaintiffs, but that he "did not find any documents relating to the five named plaintiffs. Ex. 6, at ¶ 5 (Lewis Declaration). Mr. Lewis further declared as to his understanding "that a second purpose was to search the remaining boxes for any files which logically could be linked to the Department of the Interior, in general, or the Individual Indian Monies trust fund, in particular, because we would have to review the remaining files again once we received the names of predecessors in interest from the Department of the Interior;" for that reason, Mr. Lewis pulled any file that pertained to Interior or Indians. Id.

Mr. Regan testified that Mr. Mazella's briefing of the participants at the beginning of this search was his "first . . . hearing or exposure to paragraph 19" of this Court's November 1996 discovery order. Ex. 16, at 86 (Regan Deposition). After a preliminary review of the boxes during this search, the FMS counsel "concluded that a page by page search of all of the remaining

Hyattsville records was necessary because . . . a smaller number of documents referenced individual payees." Ex. 10, at ¶ 4 (Regan Declaration).

On February 1, 1999, the two-week review of the boxes and ledgers remaining at FMS Hyattsville commenced. Ms. Locks notified her staff, including Tom Fisher and Check Reconciliation Branch Accountant Brent Weaver, that Mr. Regan would meet with them this morning, "before we start the 'basement excursion.'" Ex. 2, Attachment 00054 (Tyler Report). At this meeting, Mr. Regan briefed the search team of the need for the page-by-page search "because Treasury was under Court order to produce all documents and records relating or referring to the IIM accounts of the five named plaintiffs or their predecessors in interest." Ex. 10, at ¶ 6 (Regan Declaration). The search team was directed to search for any documents referencing IIM or any Indian tribe, agency, or individual name. Id.[16] Mr. Regan testified that he himself set "the search parameters [which] were designed to look for the five named plaintiffs." Ex. 16, at 171 (Regan Deposition). Mr. Regan testified that he "wrote down the names of the five main plaintiffs, which people copied." Id. at 87-89. Mr. Regan supervised this search for the rest of this week; Carolyn Talley (another FMS attorney) did so the following week, while Mr. Regan was away. Ex. 10, at ¶ 7 (Regan Declaration).

_____

[16]    During the Special Master's May 17, 1999 site visit to FMS-Hyattsville, several of the FMS staff discussed their participation in the search and the instructions they received. Mr. Weaver (the only member of the search team who actually had utilized the documents located in the boxes as part of his work), stated that he was instructed to look specifically for the five-named plaintiffs and any other name that was "Indian sounding." Prior to the search, he admitting having no knowledge of the Cobell litigation. Tom Fisher stated that the searchers were told the names to search for, but were never shown or given any written list of names. Rita Howard stated that the searchers reviewed each of the remaining boxes, and that two boxes worth of files and several ledgers were set aside. Pamela Locks stated that she did not know of any criteria for reviewing and pulling documents other than the names of the five plaintiffs, and anything that sounded like an Indian name.

Mr. Regan noted that "during the search I concluded in my own mind that they were potentially responsive," but he did not share this conclusion with the other FMS attorneys until February 25, 1999. Ex. 16, at 166-167 (Regan Deposition).

Ms. Falanga testified that, as of early February 1999, she was aware "that there were Indian-related documents that had payee names on them," and that these were potentially responsive documents. Ex. 12, at 119 (Falanga Deposition). Ms. Falanga further testified that although she was not personally involved with the search, she did examine one file and had "no doubt in my mind" that it was potentially responsive, because it was Indian related. Id. at 124-125. Ms. Falanga agreed that Mr. Regan also did not have "any doubt about" these documents were somehow related to Cobell. Id. at 138-139.

The search and review of the boxes and ledgers were completed by February 11, 1999. According to the Tyler Report, "[t]wo boxes worth of materials consisting of 114 files were culled during the page-by-page search of the 245 boxed records in accordance with the established search criteria . . . . No documents identifiable to the five named plaintiffs or their IIM accounts were found during this search of the 245 boxes." Ex. 2, at 15 (Tyler Report).

Mr. Regan testified that 114 files were "pulled in accordance with the criteria outlined in the search [meeting]," and asserted that the search criteria were in conformity with the November 27 Order: "[i]n my opinion, they were potentially responsive, and the results of the search were given to Ms. Falanga and Mr. Mazella." Ex. 16, at 101-103 (Regan Deposition). Mr. Regan admitted, however, that although they were subsequently able to rule out certain files as not being Indian-related, at that time (i.e., as of February 11, 1999), every file was potentially responsive to Paragraph 19, "because, let's see, most of them would have referenced individual[s]." Id. at 105.

C.    **Preparation for the February 11, 1999 Briefing of Mr. Knight.**

On or around January 29, 1999, Ms. Constantine instructed Mr. Mazella "to draft a summary of the <u>Cobell</u> litigation discovery status" for Mr. Knight, the General Counsel.  Ex. 7, at ¶ 20 (Mazella Declaration).  According to Mr. Mazella, "Ms. Constantine asked me by telephone to include . . . the number of times that FMS Office of Chief Counsel staff had sought confirmation that documents were being preserved.  Ms. Constantine told me that Mr. Knight wanted to have that information in order to be assured that the FMS' failure to preserve the Hyattsville boxes was not the lawyers' fault."  <u>Id.</u>  On February 8, 1999, Mr. Mazella and Ms. Falanga met with Ms. McInerney and Ms. Constantine to provide them with the requested information, <u>i.e.</u>, the occasions on which the FMS attorneys sought confirmation that documents were being preserved.  <u>Id.</u>  Mr. Mazella and Ms. Falanga revised their summary in accordance with Ms. Constantine's and Ms. McInerney's comments.  <u>Id.</u>

On February 11, 1999,[17] Ms. Constantine, Ms. McInerney, Ms. Falanga, Messrs. Mazella and Knight (and possibly Mr. Wolin) met to discuss the aforementioned document that was to be used to brief the Secretary of the Treasury regarding Treasury's discovery responses.  Ex. 4, at ¶ 1 (Constantine Supplemental Declaration).  According to Ms. Constantine, "Mr. Knight asked what the result of the review of the GAO documents had been.  FMS counsel [Ms. Falanga and/or Mr. Mazella] responded that the review was still ongoing and that so far nothing significant had turned up."  <u>Id.</u>  Ms. Constantine testified that the purpose of this meeting was "to go over the charts of the document" which Mr. Knight was to use to brief the Secretary on the document production.

_____

[17]    Mr. Mazella recalled that this meeting took place on February 12, 1999.  Ex. 7, at ¶ 20 (Mazella Declaration).

Ex. 11, at 118 (Constantine Deposition).  According to Ms. Constantine, "[w]e went over the chart, and Mr. Knight raised the question of, 'Well, weren't there those — some documents that we heard about, the GAO documents, nobody knew what they were?  What happened about them?'  And the FMS counsel [Ms. Falanga] responded that they were looking at the documents, and they were thoroughly reviewing them, and we would, you know, we would get back [to him]."  Id.  Ms. Constantine testified that Ms. Falanga's representation to Mr. Knight was "erroneous," since the search was completed and responsive documents had been uncovered.  Id. at 119-120.

Ms. Falanga testified that she told Ms. McInerney and Ms. Constantine that nothing responsive to Paragraph 19 had yet been found, "because we weren't finding any names in [of] the five named payees."  Ex. 12, at 140-141 (Falanga Deposition).  However, Ms. Falanga, who acknowledged that Paragraph 19 included the predecessors in interest and that the Hyattsville documents were "potentially responsive," admitted that she did not relay that conclusion to the other Treasury attorneys.  Id.

Mr. Mazella declared that, at this meeting with Mr. Knight, "all of us discussed the revised discovery summary, which included a brief discussion of FMS' progress in reviewing the boxes and ledgers in the Hyattsville basement."  Ex. 7, at ¶ 20 (Mazella Declaration).  Mr. Mazella admitted that he agreed with the statement that, as of this date, both he and Ms. Falanga "knew that the destroyed boxes potentially contained potentially responsive and/or potentially relevant documents."  Ex. 14, at 180-181 (Mazella Deposition).  Mr. Mazella further admitted that he did not recall that anyone told Mr. Knight about the destroyed boxes and their potential relevance: "I don't recall that we said that to him" and "No, I don't recall saying that to him directly" and no one else did so, either.  Id. at 181.  Mr. Mazella asserted that at this meeting, Ms. Constantine and

Ms. McInerney already knew about the relevance or responsiveness of the GAO boxes, since he had told them this on January 28, 1999.  Id. at 183.

Mr. Wolin testified that, had he known that potentially responsive documents had been pulled at that time, "he would have called Justice right away. . . . To tell them about that and to make it clear to them that, you know, together we needed to approach the court and obviously let the court know."  Ex. 17, at 91-92 (Wolin Deposition).

### D. Events Occurring Between February 22, 1999 and February 25, 1999.

#### 1. Mr. Regan's Voice-Mail Message for Ms. Constantine.

In late February, sometime prior to the February 25, 1999 meeting discussed below, Ms. Constantine declared and testified that she received a voice message from Mr. Regan advising her "that the [Hyattsville] documents were not responsive to the discovery order."  Ex. 3, at ¶ 24 (Constantine Declaration).

As Ms. Constantine recalled, Mr. Regan called to let her know that he had "completed the review of the GAO documents, and there's nothing responsive in there.  Give me a call if you want."  Ex. 11, at 112 (Constantine Deposition).  Ms. Constantine testified that "He said they were not responsive, and that's what I assumed he meant."  Id.

Mr. Regan did not recall leaving this voice-mail message, let alone telling Ms. Constantine that the documents were not responsive, "because I wouldn't have said that they were not responsive.  I would have said they were potentially responsive because we didn't have the names of the predecessors yet."  Ex. 16, at 153-154 (Regan Deposition).

#### 2. The Court's February 22, 1999 Contempt Order and Opinion.

On February 22, 1999, this court issued its Order and Memorandum Opinion finding Secretaries Rubin and Babbitt and Assistant Secretary of the Interior Gover in civil contempt of this court's discovery orders ("Contempt Order").  See Cobell II, 37 F. Supp. 2d 6, 9 (D.D.C. 1999).  The Court also appointed a Special Master "to oversee discovery, document production, and related matters and to effectuate compliance with this Court's orders" recognizing that "[t]he Defendants simply cannot be trusted to do this job themselves.  More alarmingly, their attorneys cannot be trusted to accurately inform the court should compliance become a further issue."  Id. at 37.

### 3.    The Meetings of February 23 and 24, 1999.

On February 23 and 24, 1999, following the issuance of the Contempt Order, Mr. Knight convened "daily" meetings of the Treasury attorneys responsible for this litigation: Ms. Constantine, Ms. Falanga, Ms. McInerney, and Messrs. Lewis, Mazella and Regan.  Ex. 16, at 70-71, 73 (Regan Deposition).

According to Mr. Regan, the focus of the February 23, 1999 meeting was "to understand why that [contempt finding] happened and what could be done to move forward in the case.  And there was a great focus on what we considered representational issues" to have the Civil Division of DOJ replace ENRD.  Id. at 79.  The focus of the February 24, 1999 meeting "was more or less an update" concerning the DOJ representational issues.  Id. at 80.

### E.    The February 25, 1999 Treasury Meeting.

-38-

In the late afternoon or early evening of February 25, 1999, the FMS and Main Treasury attorneys gathered in Ms. McInerney's office to await their "daily" meeting with Mr. Knight.[18] Since Mr. Knight was not immediately available, the six commenced discussing, among themselves, discovery-related issues arising from this court's contempt order, including the Hyattsville documents. See Ex. 2, at 15-16 (Tyler Report).

Among the topics discussed was the need to perform another search of the Hyattsville documents and whether the Hyattsville documents were "responsive" or "relevant" to the Cobell litigation.

### 1. The Need to Perform Another Search of the Hyattsville Documents.

As noted earlier in this Report, the deponents testified as to their respective understanding of the obligations imposed upon Treasury by Paragraph 19. Notwithstanding any differences in these interpretations, the declarants unanimously agreed that the remaining boxes at the Hyattsville facility would have to be searched a second time. On that issue, Mr. Lewis "recall[ed] a further understanding that the boxes would have to be searched again once we received the names of the predecessors in interest from [Interior] and believe that this point was addressed during the discussion." Ex. 6, at ¶ 7 (Lewis Declaration). For his part, Mr. Mazella recalled "a discussion about the documents being potentially responsive" because the Hyattsville documents might have the names of the predecessors in interest, and would have to be searched again. Ex. 14, at 206-207 (Mazella Deposition). Mr. Mazella recalled having discussions with Mr. Regan about the

---

[18]    The record reveals that Ms. McInerney was not present for the entire meeting, Ms. Constantine was sporadically absent, Ex. 9, at ¶ 4 (McInerney Declaration), while Mr. Wolin was present for a few minutes only. Ex. 17, at 112 (Wolin Deposition).

progress of the February search, and that "he [Mr. Regan] understood certainly that the boxes would have to be searched again once we knew who the predecessors in interest were . . . because the court was, you know, viewed paragraph 19 as being, and, rather than, or." Id. at 145.  Mr. Regan confirmed that "[t]here was a recognition and understanding among the group that the remaining Hyattsville records would have to be searched again whenever Treasury received the names of the predecessors in interest." Ex. 10, at ¶ 9 (Regan Declaration).  Ms. Falanga recalls that during the February 25 meeting,: "[w]e also discussed the fact that these documents were not responsive to the five named plaintiffs but that depending on the Court's decision regarding predecessors in interest, they could be responsive and would have to be searched again." Ex. 5, at ¶ 11 (Falanga Declaration).

From the perspective of Main Treasury, Ms. Constantine testified that she understood that, contrary to Mr. Regan's assertion, the need to go through Treasury documents again did not apply to the Hyattsville boxes: "Well, my reaction [to Mr. Regan's declaration] is that we did recognize, understand that there was a group of documents that would have to be searched again whenever we received the names of the predecessors in interest.  But my understanding was that the GAO documents were definitely not in that category." Ex. 11, at 153 (Constantine Deposition).  In that vein, Ms. Constantine rejected Mr. Mazella's testimony that she had asserted that the Hyattsville documents would have to be searched again once the predecessors in interest were known: "I have no recollection of saying that.  It doesn't make sense that I would say that.  My understanding of the documents was that they didn't have anybody's names on them, so what would be the point of doing that?" Id. at 155-156.

Finally, Ms. McInerney, in her declaration, relayed her understanding that there was no need to do another page-by-page search through the boxes, since, "[o]ne of the FMS lawyers (I do not recall specifically which one) stated his view that we did not need to do so because the overwhelming number of documents in the boxes did not relate in any way to the Department of Interior."  Ex. 9, at ¶ 4 (McInerney Declaration).

> ### 2.     The Debate Concerning Responsiveness versus Relevance  and Concerning Disclosing the Destruction of the Documents.

**(1) Randall Lewis.**  Mr. Lewis declared that the February 25 meeting was the "only informal meeting at which the Hyattsville boxes were discussed at length."  Ex. 6, at ¶ 7 (Lewis Dec.).  He recalled that his "discuss[ion] [of] the on-going review and summarization of documents available at Federal Records Centers, and [] James Regan[']s [] summary of the review of the remaining boxes at Hyattsville."  Id.

Acknowledging that, in the event that responsive or potentially responsive documents were destroyed, "there would be an affirmative duty" to inform the Court or DOJ or Plaintiffs of the destruction, Ex. 13, at 144 (Lewis Dep.), Mr. Lewis did not recall any discussion at this meeting concerning the difference between responsive and potentially relevant documents.  He attributed this lack of recollection to the fact that he had just finished his major presentation to this group, and was "thinking about what I needed to do based on our conversation about my documents and I just wasn't as focused on the rest of the conversation as others."  Id. at 220-221.

Regarding the discrepancy between Ms. Constantine and the other participants as to the discussion of the Hyattsville documents, Mr. Lewis opined that "it's conceivable — is that she truly did have a misunderstanding of the nature of documents, but I can't believe, given that I

know that those of us from FMS knew the nature of the documents and knew that they had to be reviewed again with regard to the predecessors in interest . . . . [and were] potentially responsive . . . . [and] were relevant." Id. at 231.  Notwithstanding, "we [in FMS] understood that distinction, and we knew that they had to be reviewed again . . ." Id. at 232.

(2) **Daniel Mazella.**  In his declaration, Mr. Mazella recounted that, during this meeting, "Ms. Constantine stated the position that she has consistently taken with respect to the Hyattsville boxes, which is that the documents that were found were not, as far as can be determined, responsive to the Court's November Order.  However, according to Ms. Constantine, Treasury would search the Hyattsville documents again once Treasury knew the identities of the predecessors in interest." Ex. 7, at ¶ 22 (Mazella Declaration).  Regarding the subject of disclosure, Mr. Mazella recalled that, "Ms. Falanga raised the issue of whether Justice should be told about the destruction of the boxes at that time and there was some discussion (it was Ms. Falanga's view that disclosure should be made at that time) . . ."

Mr. Mazella insisted that, "[a]t no time . . . has any Treasury lawyer suggested in my presence that no disclosure of the disposal of the Hyattsville boxes should be made to the court, Justice, or Plaintiffs." Id.

(3) **James Regan.**  Mr. Regan "d[id] not recall a specific discussion regarding the disclosure of the Hyattsville documents outside of Treasury during this meeting." Ex. 10, at ¶ 9 (Regan Declaration).  During the meeting, however, Mr. Regan "wanted to make two points: one is what the search was, what the search parameters were, so everybody was clear on that. . . . because we didn't have the names of the predecessors.  And, two, I wanted to make sure everybody knew what the search results were.  One is that we didn't find any documents

-42-

referencing the five named plaintiffs, but that we did find a smaller number of documents

representing — referencing IIM or individual monies." Ex. 16, at 121-122 (Regan Deposition).

Mr. Regan testified that his reason for clarifying that the Hyattsville documents were

potentially responsive is "because I felt that people were too relieved that those five named

plaintiffs' documents weren't found.  So I clarified that they were potentially responsive . . ." Id.

at 127.

As to the destruction between potentially relevant and potentially responsive documents,

Mr. Regan opined that "potentially relevant are documents that relate to the accounting portion of

the complaint, regarding an accounting of the IIM deposit fund account, 14X6039.  Whereas

responsive documents would be documents that specifically referenced the five named plaintiffs or

the predecessors in regards to their IIM accounts."  Id. at 136-137.

Mr. Regan emphasized the point that "it wasn't a question of whether Treasury was going

to disclose the matter.  It was a question of if and when."  Id. at 186.  For his part, Mr. Regan

"thought that they should be disclosed . . . And every time I was given the opportunity, I tried to

bring it up."  Id. at 190.

(4) **Ingrid Falanga.**  Ms. Falanga recounted that the assembled attorneys, "began

discussing the GAO documents with Ms. Constantine and how we should inform the Court about

the destruction of the GAO boxes.  To the best of my recollection, Ms. Constantine responded that

since the boxes did not contain responsive documents, we did not have to tell the Court

immediately.  I expressed a different point of view and we had a colloquy about discovery

obligations.  Mr. Regan interjected that these documents were 'potentially responsive' . . . . We

also discussed the fact that these documents were not responsive to the five named plaintiffs but

-43-

that depending on the Court's decision regarding predecessors in interest, they could be responsive and would have to be searched again." Ex. 5, at ¶ 11 (Falanga Declaration).

Ms. Falanga stated that during the meeting Mr. Regan "described the documents as potentially responsive to an accounting, when they were actually potentially relevant to an accounting," and she further stated that she corrected Mr. Regan on this point at the meeting. Ex. 12, at 131-132 (Falanga Deposition).

Ms. Falanga explained that, in her view, the potentially responsive category applies to documents related to the five named plaintiffs and their predecessors in interest; while the potentially relevant latter category applies to all documents which would assist in "an accounting." It was not until Treasury knew the names of the predecessors in interest could they determine whether the documents "were potentially responsive, but at the end of the day, they were potentially relevant and should be turned over." Id. at 151-152.

Ms. Falanga testified that Ms. Constantine asked about the Hyattsville boxes, and Mr. Regan explained the search parameters. Ms. Constantine "was making a statement that the bottom line was that we didn't have any responsive documents;" Mr. Regan then said that these documents were "potentially responsive," to which Ms. Constantine responded, "[b]ut you just told me that you didn't find anything with the five named plaintiffs," to which Mr. Regan talked along the lines of "[y]eah, but there's predecessors in interest." Id. at 150-151.

Ms. Falanga testified that during the conversation about responsiveness and relevance, she asked, "[h]ow are we going to tell the court?" Ms. Falanga stated that Ms. Constantine's reply was "an argument" about only telling the court about responsive documents, and only having to look where you thought there would be responsive documents, which "didn't make sense to me."

-44-

Ms. Falanga told Ms. Constantine that she didn't agree with this explanation, and she "told her we didn't want to look like Interior . . . not to be accused of deliberately destroying documents." Id. at 152-153.  Ms. Falanga reiterated that "we didn't want to look like Interior," and that Treasury "had been instructed [by Mr. Knight] to treat Justice and Interior as adversaries." Id. at 172-173.

Ms. Falanga testified that Ms. Constantine's strategy of non-disclosure was "just dig[ging] yourself deeper into a hole, but, again, Eleni [Constantine] is from Williams and Connolly" and the "strategy" that she and Andrew Eschen [DOJ] shared was "[n]ot revealing it, not running to the Court and saying, '[g]uess what, Your Honor?  Our client screwed up and destroyed more documents.'  That's what I would have done . . ." Id. at 174.  Ms. Falanga compared Ms. Constantine's response in this instance to her response to microfilm incident: "In my mind, Eleni was doing the same thing Justice had done last time, documents, microfilm, was destroyed . . . not reporting it immediately, finding a way to report it." Id. at 170.

Ms. Falanga asserted that this meeting was the first time that she had "explicitly" raised with Ms. Constantine and Ms. McInerney the need to raise the destruction of the Hyattsville boxes with the court. Id. at 154.  In response to Ms. Constantine's claimed lack of recollection of the decision not to disclose, Ms. Falanga found Ms. Constantine's "subsequent lapse of memory about the issue very troubling . . . unbelievable," since "I didn't think at first that she was not going to disclose the destruction." Id. at 200.

**(5) Eleni Constantine.**  Ms. Constantine testified that the FMS attorneys, including Mr. Regan, "were probably quite focused on the five named plaintiffs," whereas she had a different mind set, arising from the contempt hearing, "when I thought about responsive documents, even though we didn't have the names of the predecessors in interest, I had a pretty big category of

-45-

what was responsive documents.  It was anything that could be identified to an individual because we didn't know who the predecessors in interest were."  Ex. 11, at 114 (Constantine Deposition). Ms. Constantine "believe[d] that they [FMS] were operating under the same definition of responsive that I was; that is, it included anything that would be identifiable to an individual."  Id. at 142.

When Mr. Lewis began itemizing various documents as being responsive, however, Ms. Constantine recalled being "quite alarmed . . . it sounded like he was telling me we have these other categories of responsive documents that nobody had told me anything about before."  Id. at 143.  Ms. Constantine then stepped in to clarify the definitions: "'[n]ow, let's be clear on what our definitions are.  Responsive documents are anything that's identifiable to an individual,' and I said, 'We don't, you know we have the five named plaintiffs' names. We don't know who the predecessors in interest are.  Therefore, we have to treat anything that's identifiable to any individual as a responsive document right now.'"  Id.

Ms. Constantine then testified that all the attorneys present should have understood her definitions, since "I wanted to have clear terminology, so that when we spoke to each other, we would not have a misunderstanding."  Id. at 144.  Therefore, according to Ms. Constantine, when Mr. Regan spoke, "he certainly wasn't using the definition that I had just articulated and that was in my mind."  Id.  Ms. Constantine testified as to her puzzlement about Mr. Regan's having misunderstood her definition of responsiveness: "It doesn't make sense to me that he could have possibly said they were not responsive . . ."  Id. at 145-146.

Ms. Constantine did "not recall any discussion about informing [DOJ] of the loss of some of these documents at that time.  What I recall is a discussion and a general agreement to disclose

-46-

the facts about these documents on the list of potentially relevant but not responsive documents that we would soon be sending to Plaintiffs and the court." Ex. 3, at ¶ 26 (Constantine Declaration).

Conceding that "there was a discussion about disclosure" of these documents "on the list of potentially relevant but not responsive documents," Ms. Constantine nonetheless insisted that they did not discuss these documents as being responsive: "No, I didn't know the documents were potentially responsive, and had I known that, I would have behaved differently, as I did when I, in fact, found out that they were potentially responsive." Ex. 11, at 148-149 (Constantine Deposition).

Ms. Constantine concluded her testimony on this point by stating that: "[w]e made a decision to disclose it in the list of potentially relevant documents that we were preparing. We said at the end of the meeting that all information that we discussed in the meeting, including the GAO boxes, should go on the list, and including the fact that some of these documents had been destroyed." Id. at 163.

**(6) Roberta McInerney.** As did Ms. Constantine, Ms. McInerney understood "that the GAO boxes (including the 162 discarded boxes) were not responsive to any outstanding document production order because of their very nature. I also remember feeling a great sense of relief after the meeting due to my belief that the [documents] . . . were not responsive to any court order." Ex. 9, at ¶ 4 (McInerney Declaration).

Ms. McInerney testified that the issue of responsiveness was not the focus of this meeting, since she and others understood that the Treasury checks were the only responsive documents that Treasury had. Ex. 15, at 134 (McInerney Deposition). Ms. McInerney explained that when she

returned to the room, Mr. Lewis was finishing his explanations of the various categories of FMS

documents, "[a]nd so he got done with that and the meeting started to break up, and I said, '[w]ell,

wait a minute. Have we talked about the GAO boxes?' and everybody said, '[o]h yeah, we've

talked about the — we've already talked about the GAO boxes. We're done with that.' . . . And I

said, 'Getting to the bottom line, any responsive documents? Are they responsive?,' and James

Regan said no." Ms. McInerney emphasized, "He answered no, with one word." <u>Id.</u> at 139-140.

Ms. McInerney testified that she did not inform DOJ about the document destruction, since

she understood that "if they had in fact been summary-level accounting information, they wouldn't

have even been relevant to the case." <u>Id.</u> at 150-151.

Although Mr. Wolin was not present during the debate over the difference between

responsiveness and relevance, he testified that "responsive meant is there anything here that was

responsive to the discovery order." Ex. 17, at 118 (Wolin Deposition).

### 3.    <u>Colloquy Between Mr. Regan and Mr. Wolin.</u>[19]

**(1) Randall Lewis.** Mr. Lewis declared that, during Mr. Regan's discussion of the

Hyattsville boxes, Mr. Wolin "joined the discussion briefly and asked about the Hyattsville boxes.

My recollection is that Mr. Regan stated that the remaining boxes had been searched page-by-page

and that we had not found any documents responsive to the five named plaintiffs." Ex. 6, at ¶ 7

(Lewis Declaration).

---

[19] As a prefatory note, the deponents differed as to whether Mr. Wolin alone asked Mr.
Regan about the Hyattsville documents, or whether Ms. McInerney asked the initial question,
followed by Mr. Wolin's query. However, it is Mr. Regan's answers, and not the identity of the
questioners, that is important.

During his deposition, Mr. Lewis elaborated that it was Ms. Constantine who raised the discussion of the Hyattsville documents: "[a]t that point, everyone's primary concern . . . is whether they found any references to the five named plaintiffs. . . . The primary concern was whether there were any documents responsive to paragraph 19." Ex. 13, at 100-101 (Lewis Deposition).  Specifically, Mr. Lewis recalled that Mr. Regan was directly asked both by Eleni [Constantine] and again by Neal [Wolin], when he stuck his head in, whether they found any documents responsive with regard to the five named plaintiffs." Id. at 101.

Mr. Lewis disputed that portion of Ms. Constantine's recollection that Mr. Regan responded that the documents were not responsive to the November 1996 order, because "I don't believe that James stated it that broadly. . . . I believe Mr. Regan limited it to the five named plaintiffs." Id. at 103, 107.

Mr. Lewis recalled Ms. McInerney asking whether or not the GAO boxes contained any documents responsive to any outstanding document production order, and Mr. Regan responding no."  Mr. Lewis agreed that Mr. Wolin came in and also heard Mr. Regan's negative answer.  Id. at 109-110 & 221-222.  Mr. Lewis stated that this answer "[w]ithout proper context, it would have been — it probably would have been misleading to Mr. Wolin." Id. at 137.

**(2)  Daniel Mazella.**  Mr. Mazella recalled that, "[a]mong other topics, the group discussed the result of the review of the Hyattsville boxes, which had been completed the week before.  Mr. Wolin had stopped by briefly.  Mr. Wolin asked Mr. Regan how he knew that there were no documents relating to the five named plaintiffs in the Hyattsville boxes that were not destroyed.  Mr. Regan replied that he had gone through the boxes page by page." Ex. 7, at ¶ 21 (Mazella Declaration).

During his deposition, Mr. Mazella expanded upon this colloquy: "Ms. Constantine first said something to the effect of what about the GAO boxes," to which Mr. Regan replied, "something to the effect that the search of the boxes had been completed and that he had found no documents relating to the five named plaintiffs." Ex. 14, at 178, 185 (Mazella Deposition).  Mr. Wolin then entered the room, heard Mr. Regan's response, and asked "well, how do you know," and Mr. Regan replied, "because I went through the documents page-by-page," and Mr. Wolin in response, "I think he said, good answer." Id. at 190.

Mr. Mazella admitted that Mr. Wolin probably did not know that two boxes worth of files had been pulled, "I don't know whether or not the significance of the search and the results of the search were explained to him," or if he was told, "he may not have appreciated the impact."  After Mr. Wolin left the room, Mr. Regan then mentioned that they had pulled two boxes worth of files. Id. at 188-189.  What was clear from Mr. Mazella's testimony was that no one at the meeting clarified this aspect for Mr. Wolin.  Id. at 220-221, 223-224.

(3) James Regan.  According to Mr. Regan, "[d]uring Mr. Lewis' discussion [of the Federal Records Center documents] the issue was raised about whether the Hyattsville documents were responsive or potentially relevant."  Ex. 10, at ¶ 9 (Regan Declaration).  Mr. Regan explained how the page by page review was done, and "that a relatively small number of documents referencing IIM or individual monies were pulled from the remaining boxes, but that no documents identifiable to the five named plaintiffs were pulled."  Id.  Mr. Wolin then "asked how I knew that no documents referencing the five named plaintiffs were included in the remaining Hyattsville documents.  I replied that we had conducted a page by page search of the remaining documents and found no documents identifiable to the five named plaintiffs.  He said 'good answer.'"  Id.

-50-

Mr. Regan was emphatic in his testimony that Mr. Wolin's exact question was: "[h]ow do you know that none of the remaining boxes have any documents referencing the five named plaintiffs?" Ex. 16, at 124 (Regan Deposition). Mr. Regan admitted, however, that Mr. Wolin, in asking the question and hearing his response, was not fully informed as "I do not believe that he was in that room during my clarification regarding the potentially responsive, potential responsiveness of the documents." Mr. Regan believed that he "had adequately" informed Mr. Wolin of this by telling the rest of the group (i.e., all but Mr. Wolin) "that they were potentially responsive." Id. at 141-142. Mr. Regan could not recall anybody in the room informing Mr. Wolin that the documents were potentially responsive. Id. at 142-143.

Mr. Regan admitted that, without elaboration, the answer "no" to Mr. Wolin's query would be misleading: "I think it would . . . need to be limited to the five named plaintiffs for it not to be misleading. And I recall Mr. Wolin's question was limited to the question regarding whether we found any documents responsive to the five named plaintiffs and I responded that . . . the remaining boxes did not contain any documents responsive to the five named plaintiffs. I don't believe that was misleading." Id. at 151.

Mr. Regan rejected Ms. Constantine's declaration on this point: "I think that she has a different recollection than I do. My testimony is that I responded, specifically related that we did not find any documents related to the five named plaintiffs." Id. at 162. He emphasized that "I recall Mr. Wolin qualifying his question to the five named plaintiffs. I responded in accordance with that. That is specifically that my response was it's specifically limited [to] the five named plaintiffs and that's what I remember." Id. at 164.

-51-

Mr. Regan similarly rejected Ms. Constantine's statement that "I said, that they were by the very nature, by their nature, not responsive. I did not say that. I do not recall saying that." Id. at 164-165.

**(4) Ingrid Falanga.** Ms. Falanga recalled that when Ms. McInerney and Mr. Wolin entered the room and Ms. McInerney asked whether the documents were responsive, "Mr. Regan stated that there were no responsive documents in the GAO boxes. Mr. Wolin asked Mr. Regan how he knew that and Mr. Regan responded that we had gone through the boxes page by page." Ex. 5, at ¶ 11 (Falanga Declaration).

Ms. Falanga expanded upon this in her deposition testimony, stating that it was Ms. McInerney who first entered the room and asked whether the documents were responsive – which was understood by the other attorneys present to mean the five named plaintiffs. Ex. 12, at 157, 159 (Falanga Deposition). When Mr. Wolin entered the room shortly thereafter, "I believe that Roberta said to him [Mr. Wolin] they didn't find any responsive documents, and he said, 'How do you know?,' and James [Regan] said, 'Because I searched them page by page,' and he [Wolin] said, 'Good answer.'" Mr. Wolin was present for "five or six minutes." Id. at 159.

Ms. Falanga claimed that Mr. Wolin knew or "should have" known that their use of "responsive" was limited to the five named plaintiffs. Id. at 161. Ms. Falanga further claimed that Mr. Regan's answer, "that we hadn't found any documents responsive to the five named plaintiffs," "had to be a full answer because it was always a qualified answer because we still had to deal with the predecessors in interest." Id. at 161-162.

**(5) Eleni Constantine.** According to Ms. Constantine, Mr. Wolin walked in and asked about the GAO documents, "Mr. Regan responded that the documents were not responsive to the

November 1996 order." To Mr. Wolin's follow-up question, Mr. Regan "answered that he had

looked at the documents and that they were by their nature not responsive." Ex. 3, at ¶ 26

(Constantine Declaration).

Ms. Constantine testified that, prior to Mr. Wolin's arrival, "I recall that James [Mr.

Regan] started describing the search that they had done of the documents, and he said they had

been very thorough, that there were a large — I think he gave us a number — of extant boxes and

that they had gone through them page by page. And somewhere right about this point in his

discussion Neal Wolin came in and . . . had heard enough about the documents to figure out what

documents they were talking about, and he said, '[o]h yes. What happened about the GAO

documents?' It was a general question like that." Ex. 11, at 134-135 (Constantine Deposition).

Ms. Constantine recounted that Mr. Wolin, upon hearing Mr. Regan's "No," asked the

follow-through question, "[h]ow do you know about that? . . . And James [Regan] said, 'We

looked through them page by page.' And Neal [Wolin] said something like, 'Well, that's great.'

He was obviously pleased with the answer. . . . He was pleased at the result, not just at the

process." Id. at 138. Ms. Constantine agreed that Mr. Wolin "wouldn't have been as sanguine . . .

nor would Roberta [McInerney]" had they known that Mr. Regan's answer was incomplete and

that since two boxes worth of files containing Indian or IIM documents had been found and

segregated. Id. at 139-140.

Ms. Constantine dismissed Mr. Regan's recollection of this colloquy as being "very

unlikely." Id. at 137.

**(6) Roberta McInerney.** Ms. McInerney, in her declaration, stated that, "[i]n an effort to

get to what I perceived as the 'bottom line' issue with respect to the Hyattsville records, I asked

the lawyers in the room whether or not the 'GAO boxes' contained any documents responsive to any outstanding document production order.  I cannot recall which FMS lawyer answered the question, but one of them responded 'No.'"  Ex. 9, at ¶ 4 (McInerney Declaration).  Ms. McInerney declared that, concerning Mr. Wolin, "I recall that he also heard the negative answer to the question about whether or not the Hyattsville records were responsive to any outstanding document production order."  Id.

Ms. McInerney subsequently admitted that "nobody spoke up" in response to Mr. Regan's answer to Mr. Wolin's question, which was "an incorrect answer in and of itself" and was also misleading.  Ex. 15, at 158-160 (McInerney Deposition).

**(7) Neal Wolin.**  According to Mr. Wolin, when he entered Ms. McInerney's office to inform the attorneys that Mr. Knight would not be able to convene the "daily" meeting, he testified that "[i]t was clear that there was a discussion going on about the Hyattsville boxes.  And, again, somewhat sheepishly in sort of my inimitable fashion, I interrupted everything that was going on and I said, you know, is there anything potentially responsive, is there anything responsive in these documents, in those boxes?  And the answer that came back was, no.  Just there was nothing responsive."  Ex. 17, at 112 (Wolin Deposition).  Mr. Wolin explained that Mr. Regan's response "was a flat response . . . there was no ambiguity. . . . There was no conditions attached to it.  There were no sort of subject, you know, it was flat."  Id. at 113.

Jarred by the fact that "it's not often that you get a flat answer," id., Mr. Wolin asked Mr. Regan, "[w]ell, how do you know that?" id., to which Mr. Regan responded: "I looked at them page-by-page.  I did a page-by-page review or something, page-by-page."  Id. at 114.  Mr. Wolin recalled that he then "got up and said, good answer, and walked out."  Id.  Mr. Wolin testified that

-54-

none of the attorneys present offered any exceptions or qualifiers to Mr. Regan's responses and accordingly, he left the meeting unaware that individual names had been found among the remaining boxes at Hyattsville. Id. at 116-117.

Mr. Wolin firmly rejected Mr. Regan's assertion that he had asked a question about or limited to the five named plaintiffs: "No, I didn't ask anything in particular about the five named plaintiffs." Id. at 120. Mr. Wolin equally rejected Mr. Regan's contention that he qualified his answers in any way, "[h]e didn't — there was no qualification to his answer." Mr. Wolin explained that he enjoys a well-founded reputation for vigilantly pursuing a line of questioning: "I know that if I had gotten a question that left open the possibility of some issue having remained on the table, I wouldn't have walked out of that room until I had understood what the issue was, until I had tasked out an approach for proceeding forward or until I, you know, issued some instruction about how to proceed or something. And I asked a very flat, as I said, a very flat question. I got a very flat answer. It was so flat, in fact, that I asked a follow-up because I'm not used to getting flat answers, especially in complicated situations." Id. at 122-123.

Mr. Wolin explained that he would not have asked a question limited to the five named plaintiffs, because the answer thereto "isn't a particularly important answer. . . . What mattered was, was there anything there that was possibly potentially responsive." Id. at 124-25. "It wouldn't have made sense for me to ask about the five named plaintiffs . . . . And if I had gotten an answer that had talked about the five named plaintiffs, but suggested that there were other predecessors in interest or anything else that might have been responsive, which would have necessarily definitionally constituted a partial answer, I would not have asked, 'How do you know that?' because it wouldn't have been consequential to ask that. . . . I wanted the bottom line and I

-55-

wanted to know, you know, the full answer to the question, you know, is there something there that is potentially responsive that we need to notify the Court about?"  Id. at 130.

Mr. Wolin considered the declarations of Messrs. Lewis, Mazella and Regan regarding his colloquy with Mr. Regan to be incorrect.  As to Mr. Regan's declaration, Mr. Wolin testified that it "seems quite palpably not right. . . . untrue."  Id. at 125.  Regarding Mr. Mazella's declaration, "[t]his is the same rendition as Regan's, and it's not what I asked and not what I got in response." On this point, Mr. Wolin had "no doubt, none" that Mr. Mazella's declaration was inaccurate on this issue.  Id. at 128-129.  Mr. Lewis' declaration was also incorrect about this event: "I mean, it just wasn't what was asked and answered when I was in the room."  Id. at 129.

Mr. Wolin concluded that "information that was critical for Main Treasury lawyers to know and for Justice lawyers to know and, in turn, obviously the Court to know, was not brought forward in a way that was either clear or understood or heard."  Id. at 136-137.  Mr. Wolin considered this lack of communication as a systematic failure to let us know what was going on in a way that . . . we needed to know."  Despite his efforts, and the opportunities for the FMS attorneys to speak up, they "never" raised these issues.  Id. at 141-142.

## VI    Missed Opportunities by Treasury to Disclose the Destruction of the Hyattsville Documents.

This investigation revealed that Treasury attorneys failed to disclose the destruction of the Hyattsville documents to Main Treasury, Department of Justice, Plaintiffs, the Special Master and the Court, notwithstanding myriad opportunities to do so.  These opportunities included:  (1) a meeting held with DOJ attorneys on February 25, 1999; (2) status conferences and motions hearings from February to April of 1999; (3) in the March 16, 1999 "Defendants' Motion to Strike

-56-

or Reject Plaintiffs Proposed Orders Regarding Document Retention" and in the March 19, 1999

"United States' Memorandum Addressing Plaintiffs' Proposed Order Regarding Document

Retention;" (4) in the March 26, 1999 "United States' Statement of Discovery Priorities and

Response to Plaintiffs' Statement" and the attached "Department of the Treasury Cobell Litigation

Document Production Protocol;" (5) in the April 12, 1999 "Response to Plaintiffs' Motion for

Entry of a Proposed Order Regarding Document Production;" (6) in the May 3, 1999 "Defendant

Secretary of the Treasury's Motion for Summary Judgment."[20]  In addition, no

effort was made to disclose the matter to the Inspector General's office within the Department of

Treasury.

### A.    Failure to Disclose to DOJ During a February 25, 1999 Meeting.

---

[20]    As a threshold matter, it must be noted that the declarants met regularly among themselves during this time period.  There is some conflict, however, as to whether, and how, the disclosure of the Hyattsville documents was raised during these meetings.  For example, Ms. Constantine declared that, after she was formally tasked to assume lead responsibility within Treasury for this litigation (on March 15, 1999), she scheduled weekly meetings (usually on Monday afternoons), but "at none of these weekly meetings did any one raise any issue about the GAO documents."  Ex. 3, at ¶¶ 28-29 (Constantine Declaration).  Mr. Lewis, on the other hand, asserted that, from approximately February to April of 1999, that there were daily meetings of the FMS attorneys, and weekly meetings with Ms. Constantine and Ms. McInerney, and "I recall that numerous meetings included specific discussions of the status of the review of documents, including the Hyattsville documents."  Ex. 6, at ¶ 8 (Lewis Declaration).

In addition to these meetings, several of the declarants participated in weekly conference calls with the DOJ attorneys assigned to this case.  Mr. Regan testified that "I don't recall any discussion of the Hyattsville boxes" during these weekly conferences with DOJ, and, "to the best of my knowledge, it was never raised in a meeting, at one of those conference calls, that I was present."  Ex. 16, at 77-78 (Regan Deposition).

Ms. Constantine testified that, in the afternoon prior to the aforementioned February 25, 1999 meeting at Main Treasury, there was a "contentious" meeting at DOJ with the attorneys from Treasury (Ms. Constantine, Ms. Falanga, and Messrs. Lewis, Mazella and Regan) and with attorneys from the Department of the Interior, to plan their responses to this court's contempt order.  Ex. 11, at 123-125 (Constantine Deposition).  Ms. Constantine admitted that the issue of the destroyed Hyattsville documents did not come up, and none of the FMS attorneys raised it, although "I think that they should have."  Id. at 126-127, 130.

### B.    Failure to Disclose at the Status Conferences.

Other missed opportunities to disclose the destruction of the Hyattsville documents included the monthly status conferences convened by the Court.  As the Court noted, even prior to the January 1999 contempt hearing, a Treasury attorney was usually present at these status conferences.  Cobell II, 37 F. Supp. 2d at 18 ("[m]oreover, the Department of the Treasury sent an agency lawyer, Daniel Mazella, to nearly all of the status conferences in this case.").

After learning of the document destruction, the following Treasury attorneys attended the following status conferences and motions hearings:

(1) Tuesday, February 16, 1999 (Daniel Mazella)

(2) Tuesday, March 23, 1999 (Eleni Constantine)

(3) Tuesday, April 13, 1999 (Eleni Constantine, Daniel Mazella)

Ms. Constantine or Mr. Mazella could have disclosed the document destruction on any of these occasions but chose not to do so.

### C.    Failure to Disclose in the March 16, 1999 "Defendants' Motion to Strike or Reject Plaintiffs Proposed Orders Regarding Document Retention," and in

**the March 19, 1999 "United States' Memorandum Addressing Plaintiffs'**
**Proposed Order Regarding Document Retention."**

On March 4 and 11, 1999, Plaintiffs filed their Proposed Orders regarding Document

Retention.[21]  The revised order of March 11, 1999 requested "that Defendants [] immediately take

all steps necessary to preserve and protect all records of any kind related in any way whatsoever to

any and all past or present individual Indian trust accounts and all assets of any kind held now or at

any time in trust for the benefit of individual Indians, and Defendants shall retain such documents .

. ." and further requested "that Defendants shall take all steps necessary to ensure that all such

trust records and other information in the custody, control, or possession of Defendants . . . are so

preserved, protected, and made readily available."

### 1.    Defendants' March 16, 1999 Motion to Strike.

On March 16, 1999, Defendants moved to strike Plaintiffs' proposed order, largely on

procedural grounds.  Ms. Falanga and Mr. Mazella were both listed as "of counsel" on this motion.

In their Motion to Strike, Defendants asserted that they: "do not challenge the Court's authority to

ensure the preservation of evidence.  Nor do they deny their obligations to take all <u>reasonable</u> steps

to retain relevant documents or other information, which they have done."  (Memorandum, at 7-8)

(emphasis in original).  In a footnote, Defendants added that: "[m]ultiple directives have been

issued by . . . Treasury management to the offices that control records.  These will be discussed in

Defendants' March 19, 1999, filing regarding document retention policies and/or practices."

(Memorandum, at 8 n.5).

### 2.    Defendants' March 19, 1999 Memorandum.

---

[21]    The only significant difference between the two proposed orders is the explicit
inclusion of computers and related electronic devices in the revised order.

On March 19, 1999, Defendants filed their "Memorandum Addressing Plaintiffs' Proposed Order Regarding Document Production."  Ms. Falanga and Mr. Mazella were again listed as "of counsel."

In the introduction to the attached Memorandum, Defendants asserted that "the Department of Treasury recognize[s] the importance of document retention. . . . There is no question that the retention of these documents is of primary importance in this litigation." (Memorandum, at 2).  Defendants then argued that "Plaintiffs' proposed Order is unwarranted. There are government-wide policies and practices that require the retention of these documents." (Memorandum, at 2).  More specifically, on pages 6 through 8, Defendants set out the "Steps Taken By the Department of the Treasury to Preserve Documents," including: (1) the actions taken in 1996 after this litigation was filed, including those taken by Steve Laughton; (2) the discovery of the microfilm destruction in 1997, and the responses thereto; (3) the "freeze" placed on Treasury's records at the Federal Record Center (Suitland, Maryland); (4) the inventory by the Bureau of Public Debt of its records and the steps taken to preserve them;[22] and (5) the February 1, 1999 memorandum issued by FMS Commissioner Gregg regarding the need to preserve IIM-related documents.

However, the Hyattsville document destruction was not mentioned.[23]

---

[22]  The attached affidavit of Keith Rake, Deputy Assistant Commissioner, BPD (Defendants' Exhibit 10), noted the 1996 transfer from FMS to BPD of "some records relating to IIM account investment and redemption transactions."  However, this affidavit did not disclose the aforementioned "missing box" problem that occurred during the transfer of these records from FMS-Hyattsville to Parkersburg, West Virginia.

[23]  Mr. Mazella declared that while he and Ms. Falanga were drafting responses to the Preservation Order, they "raised the issue with Ms. Constantine of whether the disposal of the Hyattsville boxes should be disclosed."  Mr. Mazella recalled that "Ms. Constantine said no,

**D.    Failure to Disclose in the March 26, 1999 "United States' Statement of Discovery Priorities and Response to Plaintiffs' Statement" and the Attached "Department of the Treasury <u>Cobell</u> Litigation Document Production Protocol."**

**1.    <u>Defendants' March 26, 1999 Statement.</u>**

On March 26, 1999, Defendants filed with the Special Master the "United States' Statement of Discovery Priorities and Response to Plaintiffs' Statement," with the attached "Department of the Treasury <u>Cobell</u> Litigation Document Production Protocol."  As before, Ms. Falanga and Mr. Mazella were listed as "of counsel."

The purpose of this pleading was threefold: (1) to describe the Defendants' discovery priorities; (2) to respond to the Plaintiffs' March 4, 1999 "Discovery Priority List;" and (3) to describe the Defendants' document production protocols for the five named plaintiffs and their predecessors in interest.  This last category is directly relevant to this Report.

The "Department of the Treasury <u>Cobell</u> Litigation Document Production Protocol" is six pages in length, with an attached eight-page "Questionnaire and Certification in Support of the . . . Protocol," intended to be filled out by Treasury records management staff.  This Protocol begins by stating the language in Paragraph 19 and reiterating that Treasury "has produced all records and data responsive to paragraph 19 that are identifiable to the five named plaintiffs," (Protocol, at 1), and "is focused on the production of documents responsive to Paragraph 19 that are related to the predecessors in interest . . ."  (Protocol, at 2).

---

disclosure was not necessary, since documents that were found were not, as far as can be determined, responsive to the court's November Order."  Ex. 7, at ¶ 23 (Mazella Declaration).

In the definitions section, Treasury defined "responsive documents" as those "that correspond to information identified by Interior as responsive to paragraph 19," while "relevant documents" were defined as "summary level accounting information . . . referring to, or relating to, IIM deposit fund account 14x6039." (Protocol, at 3).[24]

The Protocol concludes with a "List of Documents Potentially Relevant to IIM Deposit Fund Account 14x6039." Three standard forms ("SF") were described, along with the "Investment/Redemption Requests" and the "Transaction Confirmations."

On pages 16-19, which summarized the Treasury Department's Protocol, attached as Exhibit 3, Treasury made four representations: (1) that Treasury will provide "a list of the Treasury documents and records that, although not responsive to Paragraph 19, may be relevant to the Plaintiffs' complaint concerning accounting of the IIM trust funds;" (2) that Treasury still needs identifying information to locate individual checks and payment records; (3) that Treasury has produced all "payment records" regarding the five named plaintiffs; and (4) that "Treasury completed its document production efforts in November and December, 1998." This narrative summary omits any mention of the existence Hyattsville documents, their destruction, or their potential responsiveness and/or relevance.

> **a.      The Treasury Attorneys Draft Their Responses to the Proposed Order and Prepare the Document Production Protocol.**

---

[24]  It must be noted that neither definition would encompass the Hyattsville documents, since "responsive" is limited to those records triggered by information received from the Department of the Interior while "relevant" includes only summary-level information, not data relating to individual payees.

Ms. Falanga declared that, prior to one of the weekly DOJ conference calls, "Ms. Constantine called and asked what we were going to discuss.  I asked her if she wanted to raise the issue of the GAO boxes and she stated that she did not want to raise it for the first time with the entire group on the line."  Ex. 5, at ¶ 12 (Falanga Declaration).  Regarding the document destruction disclosure in Treasury's response to Plaintiffs request for a proposed order, "Ms. Constantine disagreed and only a reference to preserving information about 'canceled payments' was made in our response."  Id. at ¶ 13.  Ms. Falanga further recounted that, "while Mr. Regan was preparing the Protocol, we [FMS attorneys] raised the issue of putting the destruction of the GAO boxes in the Protocol with Ms. Constantine.  Ms. Constantine stated that she did not believe that this issue belonged in the Protocol and wanted it put in the supplement to the Protocol . . ." Id. at ¶ 15.

Ms. Falanga testified that she believed that Treasury's response to Plaintiffs' order "is an appropriate vehicle in which to discuss the destruction of the documents and the remaining documents," but that Ms. Constantine disagreed.  Ex. 12, at 189 (Falanga Deposition).

Mr. Lewis recalled that Mr. Regan raised the issue as to whether disclosure should be made with "regard to the document production protocol."  Ex. 13, at 161 (Lewis Deposition). Specifically, "at one point, the protocol was going to have a very extensive attachment . . . . And at one point I believe it [disclosure] was going to be included with that, and I'm not sure how — my understanding is that that ended up not being attached that Eleni [Constantine] had decided that we would separately send a letter to the Plaintiffs with the table attached, and that it would be in there."  Id. at 162.

Mr. Mazella stated that "[d]uring the drafting of the March 26, 1999 filing . . . . Ms. Falanga, Ms. Constantine and I discussed on the telephone on March 26, 1999 whether the existence and disposal of the Hyattsville boxes should be disclosed.  For the same reasons explained in paragraph 23 above, Ms. Constantine said no."  Ex. 7, at ¶ 24 (Mazella Declaration).

Mr. Regan testified that he was assigned to oversee the preparation of the Protocol. Ex. 16, at 59-60 (Regan Deposition).  He recalls that, "when [he] raised it [disclosure] with Ingrid Falanga regarding the Protocol supplement, she readily agreed that this would be the time to do it, and we went to Debbie Diener, who was relatively new as Chief Counsel, but she readily said, yep, let's do it, let's fax it to Eleni [Constantine]."  Id. at 193.[25]  Mr. Regan could not recall, however, why this disclosure ultimately was not included in the Protocol.  Id. at 197-198.

Regarding Ms. Falanga's assertion that they had discussed the disclosure for the Protocol, Ms. Constantine "d[id] not recall any discussion about the GAO documents in connection with the Protocol.  I am certain however, that no one suggested to me that the GAO documents might be responsive in connection with preparation of the protocol — or at any other time until April 30."  Ex. 3, at ¶ 52 (Constantine Declaration).  Ms. Constantine also declared that Mr. Regan had said it was taking longer than expected to locate and compile all these documents, but "I do not recall anyone raising any issue about the GAO documents during the preparation of the Protocol."  Id. at ¶ 31.

---

[25]    Mr. Regan stated that he subsequently uncovered some notes "that looked like an outline of what should be in the document production protocol.  It was like four pages of notes in my handwriting, and at the end there's a reference to Hyattsville boxes, saying something to the effect to find out, you know, who had custody of these and talk to Pam [Locks] or something to that effect."  Id. at 197.

As to Ms. Falanga's purported query prior to the DOJ conference call, Ms. Constantine again "ha[d] no recollection of that question from Ingrid and that answer," Ex. 11, at 168 (Constantine Deposition), nor did she have any recollection "of anyone bringing that issue up in connection with this pleading, nor do I have any recollection of disagreeing with that." Id. at 168-170.  Ms. Constantine admitted thinking "that we should have put in there the destruction of the documents . . . Nobody brought it to my attention . . . But, nonetheless, this period of time I was the last person in Treasury to sign off on this document, and the buck stops here on that issue." Id.

Ms. McInerney testified that she "wasn't involved in the drafting" of the Protocol or the other pleadings, and so did not testify about this issue.  Ex. 15, at 169 (McInerney Deposition). Mr. Wolin also was not involved with the drafting of these pleadings, and was unaware of this debate.  Ex. 17, at 133 (Wolin Deposition).

> **b.** **The Supplement to the March 26, 1999 Protocol and Its Transformation into the Draft April 30, 1999 Letter From Rita Howard.**

After Treasury submitted its Document Production Protocol, it was decided that the "Supplement" which was originally designated to accompany the protocol was to be transmitted in the form of a letter to go out on April 30, 1999 under the signature of Rita Howard, Project Manager, Treasury Document Production Protocol ("Draft Letter").  The April 30, 1999 letter was not actually sent to Plaintiffs and the Special Master until May 18, 1999.  During the Special Master's May 17, 1999 site visit to FMS-Hyattsville, Ms. Howard stated that she had composed

the Draft Letter notifying DOJ of the document destruction, after being alerted by Mr. Regan that Indian records may have been in the destroyed boxes.[26]

The Draft Letter was addressed to plaintiffs' attorney Dennis Gingold. Attached to the letter were Enclosure A ("Survey of Treasury Functions/Processes and Associated Documents: Narrative Summary) (15 pages) and Enclosure B ("Types of Documents Potentially Relevant to Plaintiffs' Complaint Seeking a Proper Accounting of the IIM Deposit Fund Account 14X6039") (8 pages). See Ex. 34 (May 18, 1999 Letter from B. Ferrell to the Special Master, with attached draft April 30, 1999 Letter).

The key paragraph, for the purposes of this investigation, is at the top of page 5:

Treasury had in its possession approximately 407 boxes of historical General Accounting Office (GAO) Form 5046 (Statement of Outstanding Checks) records which were submitted by all government disbursing officers to GAO, and a limited number of ledger books. The records generally are reports of requests to GAO to recredit the proceeds of the checks to the disbursing account. These records are undifferentiated by agency and date to the first half of the 20th century. These GAO documents were stored in a basement of FMS' Hyattsville facility and were not included on any FMS document retention schedule. In January 1999, janitorial contractors and/or clerical staff threw away approximately 262 [sic, read 162] of these boxes. When program management became aware of this destruction this activity was immediately stopped. FMS counsel immediately conducted a page by page search of the remaining 245 boxes with the assistance of program staff. No documents identifiable to the five named plaintiffs were found.

On the last page of Enclosure B, under "GAO Historical Documents," reflecting GAO Form 5046, Statement of Outstanding Checks, the Hyattsville documents were described as

---

[26] Although DOJ received a copy of the Draft Letter on April 30, 1999, the DOJ attorneys did not review it in detail until the following week, "and therefore did not learn of the existence of the boxes, until the evening of May 6, 1999." See Ex. 36, at n.1 (May 20, 1999 Letter from B. Ferrell to the Special Master).

follows: "245 boxes undifferentiated by agency. These documents date to the first half of the 20th century." The existence of a "Limited Number of Ledger Books" was also noted. [27]

Ms. Falanga testified that "when I got ready to leave the agency [in late April 1999], I forced the issue" of disclosing the Hyattsville document destruction to the court. She believed that her actions precipitated this disclosure, (Ex. 12, at 179-180 (Falanga Deposition)) and that by "raising it with Debbie [Diener] and then going back to Eleni [Constantine]," she ensured that "this information was going to be revealed, if you will, in the supplement to the Protocol, and in my mind, that was the last document where it could be revealed." Id.

Ms. Falanga testified that "she was increasingly uneasy. The further away we got from the original destruction, the harder it got to explain and the less likely we were to find an appropriate vehicle to put it in." Id. at 209. Furthermore, in her review, the Supplement itself was misleading, "as when I saw the Supplement and it was only an affirmative statement and it wasn't that they were actually destroyed, yeah, it was another finesse." Id. In short, Ms. Falanga believed that this was misleading to the Court. Id. at 210.

Mr. Mazella declared that his "understanding from Mr. Regan and Ms. Falanga was that the existence of the Hyattsville boxes and their partial disposal (being categorized as potentially relevant to the litigation) would be disclosed to the Court and Special Master, the Plaintiffs and

---

[27]    The final version of this letter was not sent by Ms. Howard to Mr. Ferrell until May 24, 1999. See Ex. 33 (R. Howard Letter to B. Ferrell, with Enclosure). The attached "Types of Documents Potentially Relevant to Plaintiffs' Complaint Seeking a Proper Accounting of the IIM Deposit Fund Account 14X6039" (8 pages) is similar to "Enclosure B" of the draft version, except for the deletion of the entry "GAO Historical Documents" from the final version. Also, the final version states that while these documents are "potentially relevant" they "are not responsive to Paragraph 19 . . . since they are not identifiable to any individual." This statement is new to the final version, and was not present in the original April 30, 1999 draft version.

Justice in the April 30, 1999 submission." Ex. 7, at ¶ 24 (Mazella Declaration). He recalled that Ms. Falanga asked him to participate in a conference call with Mr. Regan and Ms. Constantine "concerning the reference to the Hyattsville boxes in the April 29, 1999 submission to the Special Master." Apparently, Ms. Falanga was concerned because Ms. Constantine, in an earlier telephone conversation with Mr. Regan, reportedly could not recall any discussions with FMS attorneys about the Hyattsville boxes. "I reminded Ms. Constantine of the phone call she and Ms. McInerney had with Ms. Falanga and myself on or around January 28, 1999, wherein Ms. Falanga and I first brought the issue to her and Ms. McInerney's attention. After I faxed [them] a copy of their handwritten revisions to Commissioner Gregg's February 1, 1999 memorandum, they both remembered the phone call . . ." Id. at ¶ 25.

Mr. Regan testified that "as I was preparing the Protocol Supplement I know that I drafted a blurb about the Hyattsville documents that I emailed to her [Ms. Howard] . . . So, she would have been aware of the blurb, the language of the blurb that ultimately got faxed to Justice on April 30th." Ex. 16, at 180 (Regan Deposition). Mr. Regan testified that the Protocol Supplement was to include "all documents FMS/Treasury has that are potentially relevant to the accounting issue" but that it "wasn't intended to include responsive documents." Id. at 200.

Mr. Regan declared that he met with Ms. Falanga on April 29, 1999, "and stated that I thought it would be appropriate to disclose the remaining and discarded Hyattsville documents in the Protocol Supplement. She agreed that this was appropriate . . ." Ex. 10, at ¶ 12 (Regan Declaration). Mr. Regan and Ms. Falanga then met with Debra Diener, "who readily agreed that we should disclose the Hyattsville documents," and instructed Mr. Regan to fax the draft Protocol

Supplement "including the explicit language referencing the Hyattsville documents to Ms.

Constantine for review." Id.

Mr. Regan stated that, on April 30, 1999, "Ms. Constantine called me directly to give me

her comments on the draft Protocol Supplement." Id. at ¶ 13. Mr. Regan asked Ms. Constantine

about the Hyattsville documents; after she read his proposed language, "I said I thought they were

potentially relevant because a small portion of the documents culled during the page by page

search of the remaining documents referenced Native American field offices and Individual Indian

Monies." Id.

Later that same day, Ms. Constantine called Mr. Regan in response to Ms. Falanga's voice-

mail message "which explain[ed] that the Hyattsville documents were the same documents she had

mentioned on other occasions," and Mr. Regan explained to her his recollection of the February

25, 1999 meeting. Id. at ¶ 14. According to Mr. Regan, Ms. Constantine replied, "She said ok

and words to the effect that she had been so focused on the five named plaintiffs that she must

have blocked it out." Id.

Ms. Constantine recalled that when she received the April 29, 1999 draft list of potentially

relevant documents, she first discussed it with Mr. Regan, including the fact that it mentioned the

Hyattsville documents. Ex. 3, at ¶ 36 (Constantine Declaration). Ms. Constantine asserted that

"this was the first time I had ever seen a description of these documents in writing." Id.

Concerned that they might be responsive Ms. Constantine asked Mr. Regan "many questions about

the documents in an effort to find out what they were, and whether my concerns were well

founded" id., and Ms. Constantine "told Mr. Regan that we could not file the list until we resolved

whether these documents were responsive and I asked him to send the draft immediately to [DOJ] so that we could discuss this issue and other problems with the document with them." Id.

Ms. Constantine declared that she "immediately reported to Ms. McInerney my concerns with the GAO documents. I said to her that it appeared that we had a significant problem regarding the destruction of records . . ." Id. at ¶ 38. Later this day, she "received a voice mail from Ingrid Falanga saying that she had heard that I was concerned about the GAO documents and that I should recall we had agreed to disclose them on the list of potentially relevant but not responsive documents." Id. at ¶ 40.

Ms. Constantine testified that as she and Mr. Regan began working their way through the draft of the April 30 letter, she came to the paragraph on page 5 about document destruction, and "[t]here was a discussion in the draft — there was a sentence in the draft paragraph that said something like: Although FMS counsel told program people not to destroy these documents, they did. And I didn't think that was a helpful sentence to have in this document. I mean, it may have been true, but why are we telling the Plaintiffs that? You know, you have to identify with your client vis-a-vis the Plaintiffs. . . . So we took that out." Ex. 11, at 185 (Constantine Deposition). As she kept reading this draft April 30 letter, "Ms. Constantine thought, well, this is really strange. These are not the type of documents that I thought they were. I was beginning to get alarmed at this . . ." so she asked Mr. Regan if they were relevant, "and he said, yes, I think they are relevant, and somebody who is doing an accounting might want to have these documents." Id. at 186. Ms. Constantine testified that she realized that if these were responsive documents, "we should make a separate disclosure immediately about these documents." Id. She immediately told Ms. McInerney, and said "Roberta, we have a big problem, we have these potentially — we might have

potentially responsive documents that have been destroyed, and we haven't told the court about them, and we need to tell the court right now." Id. at 187.  Ms. Constantine also informed Ms. McInerney that she "was going to call the Justice Department and tell them that we had a big problem with this document, that we were going to sort it out as soon as possible, but we weren't going to file it today.  And I did call Sandra Schraiman [DOJ] and told her that." Id. at 189.

Ms. Constantine testified that Mr. Regan "did not" tell her that they had pulled two boxes worth of documents, or that some of the files specifically referenced IIM accounts." Id. at 188. She further rejected Mr. Regan's contention that he had repeatedly specified that the documents were not responsive with regard to the five named plaintiffs: "[w]ell, that's not my recollection at all, and I really don't think that happened because . . . we just had a definition of what was responsive, and it includes anything identifiable with any individual.  Plus, remember, the Judge has told us forget about the five named plaintiffs.  You know, we reminded him [Mr. Regan] about the contempt order and the new focus of the case." Id. at 192.

Ms. McInerney declared that, after the February 25, 1999 meeting, the next "specific meeting" involving the Hyattsville documents occurred on April 30, 1999,  Ex. 9, at ¶ 4 (McInerney Declaration.), when "Ms. Constantine came into my office visibly upset and agitated," and "indicated that we had a big problem with the April 30 expansive list of documents because . . . [the destroyed documents] may have contained documents that were potentially responsive to the Court's outstanding document production order." Id.  Ms. McInerney recalled that she and Ms. Constantine discussed this and agreed that, at the time of the February 25 meeting, it was their understanding that the Hyattsville documents were not responsive.  Id. Ms. McInerney speculated that "there probably was confusion and miscommunication among the various lawyers" at this

-71-

meeting, and she "suspected that the FMS lawyer [Mr. Regan] who told us the Hyattsville records were not responsive . . . probably was focusing on the five named plaintiffs, and not the predecessors in interest." Id. She believed that was the reason why "they did not give the correct answer to Mr. Wolin's questions." Ex. 15, at 165 (McInerney Deposition).

Ms. McInerney later "apologized to the Justice Department when we told them about this. I said I'm really sorry that we didn't tell you about this earlier. I had no idea that these documents were responsive. I thought they weren't even relevant, and that's why I didn't tell you." Id. at 179.

**E**    **Failure to Disclose in the April 12, 1999 "Response to Plaintiffs' Motion for Entry of a Proposed Order Regarding Document Production."**

On March 25, 1999, Plaintiffs submitted to the Special Master their "Motion in Support of Document Protection Order." In the supporting memorandum, Plaintiffs argued that "[e]ntrance of the proposed order is imperative. Whether or not directives have gone out from the departmental level not to destroy documents, there is credible evidence that Indian trust documents have been lost or deliberately destroyed in Interior field offices, the Interior Solicitor's Office in Washington, D.C., and the Treasury Department . . ." (Memorandum, at 1).

Defendants filed their response on April 12, 1999. As with the previous pleadings, Ms. Falanga and Mr. Mazella were listed as "of counsel."

In the introductory section to their response, Defendants stated that "[t]he loss, or even the potential loss, of evidence during the pendency of a case is not a matter to be treated lightly. But merely alleging, without factual support, that 'there is credible evidence that Indian trust

documents have been lost or deliberately destroyed' is not a sufficient basis to impose injunctive relief." (Response, at 2).

The section of this Response referring specifically to the Department of the Treasury began by rejecting Plaintiffs' assertions regarding certain deposition testimony, which does not pertain to this Report. The response then discussed the 1997 microfilm destruction and the subsequent efforts taken to preserve all microfilms and concluded by noting that the March 26, 1999 Protocol "sets out the actions Treasury is undertaking to provide Plaintiffs access to all documents which, while not responsive to any outstanding discovery request, may be potentially relevant to Plaintiffs' claims regarding a proper accounting of the IIM deposit fund account." (Response, at 14). This filing, too, made no mention of the Hyattsville documents or their destruction.

Mr. Regan declared that, around April 7 and 8, 1999, he was assigned to assist Mr. Mazella in the preparation of Treasury's response to Plaintiffs' request for an order regarding the documents, but since Mr. Mazella was ill, Mr. Regan assumed the primary role. Ex. 10, at ¶ 10 (Regan Declaration). Mr. Regan stated that "I went into [Ms.] Falanga's office and asked whether the Hyattsville documents should be mentioned in Treasury's draft portion of the reply. She told me that this filing was not the appropriate vehicle for raising the issue." Id.

**F.    Failure to Disclose in the May 3, 1999 "Defendant Secretary of the Treasury's Motion for Summary Judgment."**

**1.    Treasury's Motion for Summary Judgment.**

On May 3, 1999, Treasury filed its Motion for Summary Judgment on which Ms. Constantine and Gregory Till (Office of General Counsel, Treasury) were listed as "of counsel." In relevant part, the gravamen of this pleading was that Treasury's role in maintaining records and

-73-

disbursing monies was, for the most part, ministerial, and that principal responsibility for managing the IIM accounts rested with the Department of the Interior.

On page 31 of this Motion, Defendants asserted that: "Treasury previously has agreed to suspend the retention schedule and retain microfilm copies of checks during its participation in the litigation." Footnote 18 to this sentence stated, in its entirety, that, "[a]s this court is aware, in July 1997, Treasury discovered that approximately nine months of microfilm (January 1999 to September or October 1999) that was supposed to be preserved had inadvertently been destroyed. . . . At that time, Treasury undertook took steps to ensure that this did not recur" (internal citations omitted).

Again, the Hyattsville document destruction was not mentioned.

On June 7, 1999, the Court denied Treasury's motion for summary judgment. See Cobell III, 52 F. Supp. 2d at 32. The Court based its decision on the grounds that "Treasury generates trust documents that are highly relevant to an accounting of the IIM system and, therefore, highly relevant to this litigation," and that "Treasury has demonstrated a clear inability to retain these documents, at least for the purposes of this litigation." Id. at 33-34.

**2.    The Treasury Attorneys Prepare the Motion for Summary Judgment and the Footnote Regarding Disclosure.**

The three attorneys principally involved with the drafting of Treasury's summary judgment motion were Ms. Constantine, Ms. Falanga and Mr. Mazella. The following discussion details the events surrounding their failure to include any mention of the Hyattsville documents in the drafting of this pleading.

Ms. Falanga recalled "rais[ing] the issue of the GAO boxes with Ms. Constantine because the Department of Justice wanted to include a footnote in the motion about the destruction of checks/microfilm which we had identified previously to the Court. Ms. Constantine did not want to include the issue of the GAO boxes in the footnote." Ex. 5, at ¶ 16 (Falanga Declaration). Ms. Falanga maintained that, "Mr. Regan and I immediately went to Ms. Debra Diener, the FMS Chief Counsel, and expressed our concern that Ms. Constantine had previously decided that we should inform the Special Master about the destroyed boxes . . . and now Ms. Constantine appeared not to remember the issue. Ms. Diener suggested that I call Ms. Constantine and explain that these were documents that we had discussed in January, 1999, and that she had decided to put the information in the supplement to the Protocol. I left Ms. Constantine a message to that effect. Mr. Regan subsequently informed me that Ms. Constantine had called him back and, according to Mr. Regan, she stated that she must be blocking an unpleasant memory." Id.

Mr. Mazella recalled "coming into Ms. Falanga's office during the weekend when the brief was being drafted, after a discussion among Mr. Till, Ms. Constantine, Ms. Falanga and Mr. Regan had apparently concluded. I recall that the result of the discussion among those individuals was that the footnote would not include a reference to the Hyattsville boxes." Ex. 7, at ¶ 26 (Mazella Declaration).[28]

Mr. Lewis testified that when Mr. Regan brought up the subject of disclosing the document destruction in the motion for summary judgment, Ms. Falanga said that Ms. Constantine "had said that that wasn't the proper vehicle" for such a disclosure. Ex. 13, at 160 (Lewis Deposition).

---

[28]  After his deposition, Mr. Mazella submitted a supplemental declaration to state that Paragraph 26 of his original declaration had been added after he read Mr. Regan's declaration. See Ex. 8, at ¶ 4 (Mazella Supplemental Declaration, Aug. 9, 1999).

Mr. Regan declared that, at a meeting with Ms. Falanga, Messrs. Mazella, Lewis and Till, "I asked Ms. Falanga whether we should include a reference to the Hyattsville documents in the [summary judgment] motion since a footnote referenced remedial measures taken in the aftermath of the inadvertent destruction of microfilm checks." Ex. 10, at ¶ 15 (Regan Declaration). Mr. Regan stated that Ms. Diener then arrived and said that "this issue would be coordinated with Ms. Constantine." Id.

Mr. Regan recalled that later that afternoon, "Ms. Diener stopped in and advised me and Ms. Falanga that Ms. Constantine appreciated the comment on the Hyattsville documents but that she did not believe the Summary Judgment Motion was the appropriate place to mention the GAO records because they were not Treasury records and Treasury shouldn't have had them in the first place." Id.

Ms. Constantine "d[id] not recall any call with Mr. Regan or Ms. Falanga about the GAO documents in connection with the summary judgment motion." Ex. 3, at ¶ 53 (Constantine Declaration). In her deposition, Ms. Constantine reiterated "hav[ing] no recollection of any discussion about GAO boxes in connection with the footnote." Ex. 11, at 175-176 (Constantine Deposition). Regarding the discussion about the footnote, Ms. Constantine acknowledged that, "it is true that Justice wanted to include that footnote . . . When we got to the footnote, I said, you know, there's this footnote Justice wants — stuck this footnote in here about the destruction of the microfiche, I don't see why we have it in there. I took it out. I didn't see any point in the summary judgment motion of reiterating this particular point." Id. at 176-177. "The GAO boxes didn't come up in our discussion" of this footnote. Id. at 177.

Ms. Constantine expressly rejected Mr. Regan's statement that she had told Regan that she must be blocking an unpleasant memory.  Id. at 181.

Ms. Constantine declared that, late in the week of April 26, 1999, she and Ms. McInerney received from FMS counsel (including Ms. Falanga) "extensive comments . . . about the summary judgment memorandum; to the best of my recollection, none of these comments related to the GAO documents."  Ex. 3, at ¶ 33 (Constantine Declaration).

G.    **Failure to Report to the Office of the Inspector General, Department of the Treasury.[29]**

Mr. Lewis testified that, after Debra Diener became Chief Counsel (FMS), he "may have on a couple of occasions mentioned [to her] that . . . we probably needed to consider whether we needed to make a referral to Treasury's Inspector General."  Mr. Lewis was unable, however, to recall Ms. Diener's response, if any.  Ex. 13, at 154-156 (Lewis Deposition).  Mr. Lewis testified that he knew that the Inspector General was charged with the responsibility "to investigate instances in which employees may have engaged in activity that was inconsistent with agency regulations or even law," and that he suspected some misconduct "with regard to the destruction of documents."  Id. at 157.

Mr. Wolin stated the Inspector General's office's "statutory mandate is to review [reports] of malfeasance."  Ex. 17, at 103-104 (Wolin Deposition).  As such, it would be acceptable to report a breach of ethical duties by an attorney directly to that office: "[a]nyone can report

---

[29]    While a report to the Inspector General does not technically constitute a "disclosure" to the Court, it may be argued that prompt notification to the IG would have brought both Messrs. Knight and Wolin into the loop much sooner which, in turn, may have led to an earlier disclosure.

-77-

something.  Anyone who thinks that there is malfeasance going on — I would say malfeasance

would include willful neglect of a court order - that is appropriately reported to the Inspector

General and there are hotlines for that and so forth."  Id. at 105.  However, Mr. Wolin testified

that none of the Treasury attorneys reported any such ethical breach arising from this litigation:

"[n]ot to my knowledge.  And I suspect I would know about it if it were to have occurred."  Id. at

105.

The Inspector General, in fact, was not notified during this time frame (from January 28,

1999 to May 11, 1999) about the document destruction and/or the delay in officially reporting the

matter.  The Treasury Department did not refer this matter to its Inspector General until June 11,

1999, one month after the disclosure of the document destruction.  See Ex. 38 (Letter from R.

Dodge (DOJ) to the Special Master).

**VII    Disclosure of the Hyattsville Document Destruction.**

**A.    Treasury Attorneys Disclose the Destruction of the Hyattsville Documents to DOJ.**

On May 6, 1999, the decision was finally made at Treasury to formally disclose the

existence of the Hyattsville documents and their partial destruction.

Ms. Constantine declared that, on or after May 6, 1999, she spoke to Mr. Mazella about

the GAO documents, and "I determined for the first time that these documents were potentially

responsive because some of them could be identified to individuals."  Ex. 3, at ¶ 42 (Constantine

Declaration).  Ms. Constantine asserted, however, that Mr. Mazella incorrectly described the

documents to her, as he "told me again that the documents were GAO records, not Treasury

records, and said that they were never transmitted to any records custodian at Treasury."  Id.

-78-

At this time, Ms. Constantine, Ms. McInerney and Messrs. Wolin and Knight "agreed that an immediate disclosure would be made."  Id.  Thus, DOJ submitted on behalf of Treasury the May 11, 1999 letter regarding the document destruction.  Id.

Ms. Constantine testified that it wasn't "until after May 6th [1999]" that she learned that "the documents are not summary level accounting documents.  They do reference individuals, and they belong to the Treasury Department."  Ex. 11, at 94 (Constantine Deposition).  Furthermore, "I don't believe I really understood the nature of the documents until I read the report that was filed on June 3rd.  Because even on May 6th, they were represented to me as being GAO documents."  Id. at 95.

Mr. Wolin testified that, not until May 7, 1999, did he learn that the destroyed documents may have been responsive, "when Eleni [Constantine] came to finally tell me that there were material in these boxes that were potentially responsive to the court's orders."  Ex. 17, at 70 (Wolin Deposition).

## B.    DOJ Discloses the Destruction to the Special Master and to Plaintiffs.

On May 11, 1999, Phillip A. Brooks (DOJ/ENRD Senior Counsel) wrote to the Special Master (cc: Plaintiffs' counsel), informing them of the "loss of documents at the Department of Treasury."  Mr. Brooks stated: "[w]e have not yet determined whether any of the lost documents are responsive to any outstanding document request, or even whether such documents are significant to this litigation."  See Ex. 1, at 1 (Brooks letter to the Special Master).  This letter stated that only "last Friday" did DOJ learn "that on January 27 [28] 1999, Treasury Department personnel stopped the destruction of an undifferentiated document collection stored in the basement of the Hyattsville facility . . ."  Id.  This letter further explained that the remaining boxes

were searched, and "approximately two boxes worth of Interior-related records were segregated from the remaining 245 boxes and have been set aside."  Id.  This letter also briefly mentioned the "missing box" from the move of records from FMS-Hyattsville to the Bureau of Public Debt (Parkersburg, West Virginia) in 1996.  Id. at 2.

**VIII    Findings and Conclusions.**

As articulated above, the events leading up to the destruction of the Hyattsville documents and the delays attendant to its ultimate disclosure can only be understood in the context of Treasury's role in the <u>Cobell</u> litigation.  While the previous sections described the events which transpired between January 28, 1999 and May 11, 1999, this section will set out my findings as to why these events unfolded as they did.  I find that Treasury's delay in informing the Court about the Hyattsville document destruction stemmed from a confluence of factors, including: (1) Treasury's failure to recognize the "significance" of the <u>Cobell</u> litigation; (2) Treasury's  failure to keep itself informed of its obligations under the Court's orders; (3) the breakdown in communication between Treasury agencies and between Treasury and the DOJ; (4) a lack of accountability on the part of the individual attorneys; (5) the frequent turnover of FMS attorneys assigned to the <u>Cobell</u> litigation; and (6) the failure of the Treasury attorneys to comprehend their ethical obligations regarding Treasury's duty to disclose.

In my view, these deficiencies represented a disturbing trend to withhold information from the Court and a chronic need  patently poor decisions instead of promptly acting to remedy them.

**A.    Treasury's Failure to Recognize the "Significance" of the *Cobell* Litigation.**

**1.    The Weekly Reports.**

Mr. Wolin explained that he, Mr. Knight, and the attorneys in the Office of the General Counsel were customarily advised of ongoing litigation within each of Treasury's divisions via a weekly report prepared by each of the six Assistant General Counsels.  In addition to reporting on general activities, these weekly reports summarized the litigation activities of the respective offices. Ex. 17, at 9-11 (Wolin Dep.).  Mr. Wolin testified that these weekly reports amounted to "about

an inch thick of paper every week." Id. at 10. Ms. McInerney testified that these weekly reports "contain literally a listing of sort of every single project or item that anybody has worked on, and that can include very small items or larger items." Ex. 15, at 7 (McInerney Dep.). Ms. Constantine testified that a typical weekly report would have "about 25 matters in our office [alone]. Then there is attached the weekly report [of the three Chief Counsels who report to Ms. McInerney]." Ex. 11, at 8 (Constantine Dep.).

According to Mr. Wolin, until "the very end of 1998 or the very beginning of 1999, I think it's accurate to say that the Cobell matter was mentioned quite episodically, but on page 3 or 4 of the FMS report, which was in turn attached to the Roberta McInerney's [weekly] report." Ex. 17, at 10-11 (Wolin Dep.). Mr. Wolin testified that he did not become aware of the Cobell litigation until sometime in 1997, "through reading one of these squibs in the infamous weekly report" – a delay which Mr. Wolin characterized as "disturbing" given the significance of this case and the Secretary's status as a defendant. Id. at 31-32. Nonetheless, Mr. Wolin thought, at that time, that this case was not as important for Treasury since it appeared to implicate the "purely ministerial" function of FMS. Id.

Ms. McInerney testified that "I was not made aware of the Cobell litigation until November of 1998, other than through the weekly reports that are filed every Friday. . . . I understand that the Cobell litigation was reported on the weekly reports, but I have gone back and looked at some of them. It was buried in the back along with a lot of other miscellaneous litigation." Ex. 15, at 7 (McInerney Dep.). Ms. McInerney testified that these weekly reports did not suffice to bring important matters to her attention: "if somebody just says, oh, it was in the weekly report, so that's why I didn't bring it to your attention. That's not acceptable and everybody knows that is not

acceptable. . . . It's not sufficient for me to report it in the weekly report and say, oh, I did my job." Id. at 67.

Ms. Constantine testified that, although "there had been mention in the weekly reports of the [Cobell] case," it was not until November of 1998 that any of the FMS attorneys "had actually come over and spoken to us about the case." Ex. 11, at 48 (Constantine Dep.). Ms. Constantine testified that the weekly reports did not indicate to her the significance of this case: "I don't have a whole lot of recollection of them. They didn't seem to convey anything particularly alarming." Id. at 49.

Ms. Falanga testified that, prior to November of 1998, she did not know whether Mr. Ingold (then-Chief Counsel) had reported on Cobell to Main Treasury during their weekly meetings (as she only attended those meetings in Mr. Ingold's absence). She was aware, however, that FMS made "reports in our weekly [report] about our activities on the litigation." Ex. 12, at 67 (Falanga Dep.). Ms. Falanga specified that "we were reporting it in our weekly report to [Main] Treasury, the activities that were going on and the amount of time we were spending on it." Id. at 71.

Mr. Mazella testified that he first heard of the Cobell litigation sometime in 1996, since it "was discussed at a staff meeting and among the staff attorneys" of FMS and that Steve Laughton "reported regularly on the status of the case in a weekly report" which went up the hierarchy at Treasury. Ex. 14 at 20-22 (Mazella Dep.).

### 2.    The Significance of *Cobell*.

Mr. Wolin testified that he and then-General Counsel Knight expected Treasury attorneys to be "fully engaged" in litigation involving the Department: "Our policy — Ed Knight used to

have a phrase that we used to employ quite a lot, which is 'over-lawyering a case,' and I think it's

fair to say that we consistently encouraged people to be more engaged, more involved, and

certainly not less. . . . But it's clearly from my perspective . . . not acceptable to not engage quite

vigorously in litigation involving the Secretary like this." Ex. 17. at 47-48 (Wolin Dep.).

Mr. Wolin explained that, because Treasury is involved with thousands of cases every year,

most cases were handled entirely at the level of one of the Chief Counsel's offices, and only a small

number of cases were treated as "significant litigation" and brought to the attention of the General

Counsel and the Deputy General Counsel. Id. at 7-8. Mr. Wolin described a General Counsel

order "which sets forward a process by which significant litigation matters are meant to be

reported up the chain and on a regular basis to the General Counsel." Id. at 13.

According to Mr. Mazella, the General Counsel Order referred to by Mr. Wolin, provides

that "[w]here you have what's called significant litigation, then the pleadings have to be reviewed

by normally either the Assistant General Counsel [Ms. McInerney] or her designee before things

are filed." Ex. 14, at 31 (Mazella Dep.). Mr. Mazella stated that the decision to elevate a case to

the level of significant litigation "is an agreement between the Assistant General Counsel and the

Chief Counsel." He speculated that such a decision ultimately rests with "main Treasury" and not

the Office of the Chief Counsel. Id. at 32-33.

Ms. Falanga defined significant litigation as "litigation that has potential[ly] precedential

effects on all of Treasury or deals with a significant Treasury program that is of particular

importance to the Administration." Ex. 12, at 11 (Falanga Dep.). She explained that "Treasury

generally maintains a list of significant litigation that is reported all the way up the chain and has

involvement from the General Counsel's office." Id. at 12. Ms. Falanga testified that, in

-84-

November of 1998, she made the decision to elevate <u>Cobell</u> to the level of significant litigation.  <u>Id.</u> at 69-72.

Besides Ms. Falanga, several of the Treasury attorneys testified as to their understanding that the <u>Cobell</u> litigation had reached the threshold of "significant litigation."  Ms. McInerney testified that as "I've learned more and more about this case," she realized that "the case is a very, very significant case, clearly."  Ex. 15, at 60 (McInerney Dep.).  Mr. Mazella testified that "I would say it [<u>Cobell</u>] is now [<u>i.e.</u>, as of his deposition on August 3, 1999]" significant litigation, and as of late November 1998, there was "an implicit understanding" that <u>Cobell</u> rose to the level of significant litigation.  Ex. 14, at 36-38 (Mazella Dep.).  Mr. Mazella "recall[ed] there is an e-mail or memo to the file by Mr. Laughton, which essentially says, '[b]y agreement between the then-Assistant General Counsel for Banking and Finance and the then-Chief Counsel of FMS, <u>Cobell</u> would not be treated as significant litigation.  That was in 1996."  <u>Id.</u> at 36.

### B.    Treasury's  Failure to Keep Itself Informed of its Obligations under the Court's Orders

Several of the declarants testified that they were not aware of Treasury's discovery obligations under the Court's November 27 Order until much later, and that Treasury did not affirmatively attempt to obtain copies of the pleadings other than requesting the copies from DOJ.

### 1.    The November 1996 Order.

For example, Mr. Mazella testified that he first became aware of this Order in "May of 1998, when the Court's scheduling order came out."  Ex. 14 at 70 (Mazella Dep.).  He then asked Andrew Eschen (DOJ) about the November 1996 Order and whether "it has anything to do with us?"  Mr. Eschen replied, "No."  Mr. Mazella testified that he thought this was not a lie, but was a

misunderstanding by Mr. Eschen as to Treasury's burden of production.  Id. at 102, 106-107.  Mr.

Mazella testified that, although he had asked Mr. Eschen for a copy of the Order in May of 1998,

he did not receive it until November 1998.  Id. at 117; see also Ex. 3, at ¶ 8 (Constantine Decl.).

　　　　Although Mr. Mazella was aware of the Cobell litigation since 1996, and was assigned to it

in March of 1998, he maintained that he was not informed, until "mid-June 1998, by Mr. Eschen of

Justice that Treasury had a burden of production under paragraph 19 of the Court's November

Order."  Ex. 7, at ¶ 8 (Mazella Decl.); see also Ex. 14, at 73 (Mazella Dep.).  Mr. Mazella declared

that he then tried to get "identifying information" from the Department of the Interior "to locate

and retrieve microfilm copies of negotiated checks and any other potentially responsive

information identifiable to any of the five named plaintiffs or their predecessors in interest."  Ex. 7,

at ¶ 8 (Mazella Decl.).  However, as of June 1998, Mr. Mazella recognized that it was too late to

comply with the Court's Order, because "the deadline was June 30th [1998], and Mr. Christie [of

Interior] had testified that he had not looked up any of the information, the financial transactions

which would have enabled Treasury to search for the microfilm copies of checks.  And so by the

time I was aware of the burden of production, the deadline had essentially passed."  Ex. 14, at 73

(Mazella Dep.).

　　　　Ms. Falanga testified that Mr. Mazella did not inform her of the Nov. 1996 Order until

sometime in the fall of 1998: "I don't know the exact date but it was more towards November

[1998] and not as early as March [1998]. . . . It may have been September, October [1998], I'm

not sure when.  Ex. 12, at 79 (Falanga Dep.).  Ms. Falanga testified that when she first heard of

Paragraph 19, she "thought we were in trouble. . . . Because the way I read Paragraph 19 it

encompassed a requirement to produce a lot more than we had been asked to produce.  We

weren't just required to produce checks. We would basically be required to produce everything . . ." Id. at 79-80.

Ms. Falanga testified that she then attempted to inform the Treasury Office of General Counsel (Ms. McInerney and Ms. Constantine) about the November 1996 Order: "We tried to get on their calendar but our meeting was canceled. And, so, we were continuing to brief the issue up our chain of command and, like I say, we actually briefed Roberta and Eleni's client, the assistant [] fiscal secretary, Don Hammond." Id. at 81.

Ms. Constantine declared that she and Ms. McInerney met with Ms. Falanga and Mr. Mazella, in late November of 1998, and the latter two "explained that FMS counsel only learned that the [Nov. 1996] order applies to Treasury in May 1998, when Mr. Mazella heard about it at a status conference, and that despite repeated requests, ENRD [DOJ] did not provide FMS counsel a copy of the discovery order at issue until November 1998." Ex. 3, at ¶ 8 (Constantine Decl.).

Ms. McInerney testified that while Mr. Mazella and Ms. Falanga told her about Paragraph 19 of the Order in late November of 1998, she did actually not see this order until February of 1999. Ex. 15, at 83-84 (McInerney Dep.).

Ms. Falanga admitted that prior to the Nov. 28, 1998 meeting, Main Treasury was unaware of Paragraph 19 since she did not inform them directly, but had only told Mr. Ingold. Ex. 12, at 82, 84 (Falanga Dep.). She believed that Mr. Mazella had told Main Treasury, but admitted that her belief was only based on the fact that "he was coordinating all this." Id. at 85.

Mr. Mazella testified that "the first time we asked for a complete copy of all pleadings was at the time of the contempt trial," in January of 1999. Id. at 116. When questioned why FMS did not take the initiative to get their own copies of the pleadings, Ms. Falanga testified that it would

-87-

not have made sense for Mr. Mazella to go to the courthouse to get a copy of the Nov. 1996

Order or the other pleadings, "because Justice was representing us and they were supposed to

provide us with the documents that we needed to respond to." Id. at 90 (Falanga Dep.). Ms.

McInerney testified that Treasury was "usually provided with copies" of the pleadings and that it

was unusual for this not to happen in this litigation. Ex. 15, at 48-49 (McInerney Dep.). Ms.

McInerney further testified that she did not raise any questions as to why Treasury was not getting

the pleadings upon their filing: "I didn't ask that question . . . at the time." Id. at 49. She "was

told again by Mr. Mazella and Ms. Falanga that the Justice Department often did not notify

Treasury of meetings, status conferences, many things. Did not send them copies of documents."

Id. at 63.

Mr. Wolin testified that when Mr. Mazella had first learned the November 27 Order, "I

think that he ought to have made it known to his supervisors. . . . Both the fact of [the Order] and

the scope." Ex. 17, at 51-52 (Wolin Dep.). Mr. Wolin emphasized that FMS should have notified

somebody at Main Treasury. Id. at 52-53. The decision by Mr. Mazella and the other FMS

attorneys not to tell Main Treasury until late 1998 "was not a correct decision." Id. at 53.

Mr. Wolin emphasized that, "the minute that someone suggested in Judge Lamberth's court

that there was a show-cause possibility that involved the Secretary of the Treasury, I would have

wanted to known about that within the hour. . . . Well, it goes without saying that any proceeding

in which the Secretary of the Treasury is potentially subject to a contempt order is something that

we very much want to focus on with as much intensity as we can bring to bear." Id. at 53-54.

2.    **Paragraph 19 - Disjunctive or Conjunctive.**

Testimony adduced during this investigation revealed conflicting understandings as to whether Paragraph 19 was to be interpreted conjunctively (i.e., the five named plaintiffs and their predecessors in interest) or disjunctively (either one but not both entities).

Ms. Constantine testified that while the FMS attorneys "were probably quite focused on the five named plaintiffs," she maintained a broader perspective, since "I really started from the contempt hearing, where the Court made quite clear that this disjunctive argument was a bunch of hooey, he didn't like it at all, and we had to focus on the predecessors in interest as well." Ex. 11, at 114 (Constantine Deposition).

Ms. Falanga testified, that at the time of the FMS attorneys' early February 1999 search through the Hyattsville documents, and dating back to the January 1999 contempt hearing, she understood that Paragraph 19 was to be read in the conjunctive, and she testified that this understanding was shared by the FMS attorneys. Ex. 12, at 121 (Falanga Deposition).[30]

Mr. Lewis testified that he knew, at the time of this court's discussion during the contempt hearing, that Paragraph 19 was not to be read as disjunctive, and he testified that he understood that this was known to the entire FMS trial team, since "that was the subject of discussion at the two meetings" on February 23 and 24, 1999. Ex. 13, at 113-114 (Lewis Deposition).

Ms. McInerney testified that none of the FMS attorneys, including Mr. Mazella or Ms. Falanga, told her that Paragraph 19 of this Order was phrased in the disjunctive, and she testified

---

[30] On a related issue, Ms. Falanga testified that Treasury and DOJ differed in their interpretation of Paragraph 19 insofar as "Justice thought it only applied to checks and we thought it applied to everything." Ex. 12, at 80 (Falanga Dep.).

that she "absolutely" understood that the document request covered both the named Plaintiffs and their predecessors in interest.  Ex. 15, at 86-89 (McInerney Deposition).

Mr. Mazella testified that he understood, while attending the January 1999 contempt hearing, that the court "made that quite clear" that Paragraph 19 was to be read as conjunctive, not disjunctive, and that this was also conveyed in the contempt opinion.  Ex. 14, at 142-143 (Mazella Deposition).

Mr. Regan's testimony on this point lacks clarity, but it appears that his view is that when he formulated the search parameters for the February 1999 search through the remaining Hyattsville boxes, "the search parameters were designed to look for the five named plaintiffs."  Ex. 16, at 171 (Regan Deposition).  However, Mr. Regan also testified that "the search parameters were designed to be broader because we didn't have the names of the predecessors."  Id. at 170. Mr. Regan asserted that his search design was acceptable at that time since the "contempt decision was not published until February 22nd . . . . At that point the court ruled that it wasn't the five named plaintiffs or [their] predecessors and [sic] interests, it was the five named plaintiffs and predecessors and [sic] interests that would constitute what would be responsive to paragraph 19." Id. at 169.

During the contempt hearing in January and in its February 22, 1999 opinion, this court unambiguously resolved this debate in favor of a conjunctive interpretation of Paragraph 19. Specifically, the Court noted that,"[t]he language of the November 27, 1996 Order is clear and reasonably specific.  Even the Defendants admit that this language is 'facially plain.' . . . Of course, this concession merely reflects pride of authorship — the Defendants proposed, participated in the drafting of, and consented to this language themselves. . . . It is ironic, however, that the one thing

-90-

the Defendants have done an outstanding job on in the handling of this case — i.e., the drafting of paragraph 19 — is the very thing they seek to categorize as ambiguous." Cobell II, 37 F. Supp. 2d at 16-17.

This court specifically rejected the interpretation offered by Mr. Wiener during the November 23, 1998 status conference, crimped "as one def[ying] all logic." Id. at 17. Recognizing that "[t]his is certainly not the only instance of creative interpretation by the Defendants, but it is a telling example," id., the court therefore concluded, "paragraph 19 of the First Order of Production is clear and reasonably specific when viewed unambiguously. . . . the Defendants' unilateral misinterpretation cannot create an ambiguity when one does not exist." Id. at 18.

### C.    Breakdown in Communication Between Treasury Agencies and Between Treasury and the DOJ.

#### 1.    Strained Relations Between FMS and Main Treasury.

The lack of communication between FMS and Main Treasury can trace its roots to the historical tensions between the two organizations. Aside from the issues that led to the removal of Mr. Ingold by Main Treasury officials (detailed below), Mr. Lewis acknowledged that FMS' relationship with Ms. Constantine in particular "has been at time strained, dating back to prior issues, not this litigation." Ex. 13, at 195 (Lewis Dep.). Specifically, a "high-profile project" involving Secretary of the Treasury Rubin became "very contentious between senior people in [the FMS] office" which led to a "strained relationship with Eleni [Constantine]." Id. at 196.

Beyond any tensions caused by prior litigation, it bears note that, when Ms. Falanga, the then-Acting Chief Counsel (FMS) applied for promotion to be the Chief Counsel, she was turned

down for the position; and, on February 22, 1999, it was announced within Treasury that Debra

Diener would be appointed to this position.

Ms. Falanga testified that, although she applied for this position, "I didn't want it, but I had

to apply for it because I was actually performing that function even before the Chief Counsel [Mr.

Ingold] left, and it just would have looked bizarre [not to have applied].  I also didn't want to

work as somebody's deputy."  Ex. 12, at 213 (Falanga Deposition).  Ms. Falanga stated that she

left Treasury, because "I was tired of Treasury.  I was tired of the commute.  There was no

promotion potential.  I had sort of exhausted that.  I wanted to change . . ."  Id. at 212.  Ms.

Falanga claimed that there was no animosity between Main Treasury and herself, since Ms.

McInerney "was one of my references on my resume" although since she was also a panelist for

this position, her name had to be removed from Ms. Falanga's resume.  Id. at 214.

Mr. Mazella concurred that, although Ms. Falanga had applied for the job, she "had

ambivalent feelings" about wanting it, so she was "not upset" about not getting it.  Ex. 14, at 236-

237 (Mazella Deposition).

According to Ms. Constantine, both she and Ms. McInerney recommended against Ms.

Falanga's promotion.  Ex. 11, at 206-207 (Constantine Deposition).  Ms. McInerney noted that

she had not recommended Ms. Falanga for the Chief Counsel position, and that by time of the

February 25, 1999 meeting, Ms. Falanga knew that she wasn't going to get the job.  Ex. 15, at

170-172 (McInerney Deposition).

2.    **Lack of Communication Between FMS and Main Treasury.**

      a.    **November 1998 Meetings.**

Immediately following the November 23-24, 1998 status hearing before the Court, the attorneys from FMS and Main Treasury met to discuss the Cobell litigation. Although the exact dates of these meetings cannot be ascertained, the first meeting was attended by Ms. Constantine, Ms. Falanga, Mr. Mazella and Ms. McInerney. Ex. 3, at ¶ 8 (Constantine Decl.). Immediately thereafter, Ms. Constantine and Ms. McInerney met with Mr. Wolin to report what they had learned from Ms. Falanga and Mr. Mazella. Id. at ¶ 10; Ex. 12, at 109-110 (Falanga Dep.). The following day, Ms. Constantine, Ms. McInerney and Mr. Wolin met with Mr. Knight to discuss these issues. Ex. 3, at ¶ 11 (Constantine Decl.).

Ms. Constantine declared that the purpose of the meeting with Ms. Falanga and Mr. Mazella was for them "to brief us on the Cobell litigation. Although the litigation had been ongoing for two years at that point, this was the first time that FMS counsel had asked to meet with Main Treasury counsel [] about the case." Ex. 3, at ¶ 8 (Constantine Decl.). According to Ms. Constantine, "Ms. Falanga and Mr. Mazella informed us that the Court had set a contempt hearing . . . for failure to produce documents responsive to a court order in the case issued in November 1996." Id. "Ms. Falanga and Mr. Mazella informed us that they were very concerned about [DOJ ENRD's] representation of Treasury in this case. They stated that ENRD had not informed FMS counsel about the order when it was entered or for a year and a half thereafter." Id. Further, "[t]hey explained that FMS counsel only learned that the order applies to Treasury in May 1998, when Mr. Mazella heard about it at a status conference, and that despite repeated requests, ENRD did not provide FMS counsel a copy of the discovery order at issue until November 1998."

Id.  Ms. Constantine recalled FMS counsel stating "that the discovery order at issue required the production of checks by Treasury and that Treasury had been unable to produce checks by the discovery deadline because it had not received from either DOJ or Interior the information necessary to locate the checks, which are not searchable by payee." Id.  According to Ms. Constantine, Mr. Mazella and Ms. Falanga informed them that Treasury had no other responsive documents, since the "summary level accounting documents relating to the IIM deposit account . . . were by definition not responsive to the document production order at issue because they did not relate to any individual." Id. at ¶ 9.

Ms. Constantine testified she found the delay by the FMS attorneys in meeting with main Treasury counsel about Cobell to be "alarming," (Ex. 11, at 45 (Constantine Dep.)) "because at the time I heard about the case, the case was in bad shape, and one hopes to hear about these cases before they get to that point." Id. at 46.  While "there had been mention in the weekly reports of the case, [ ] this was the first time that they [FMS attorneys] had actually come over and spoken to us about the case, and it was the first time that I became aware of this contempt hearing." Id. at 49.  Ms. Constantine testified that she was "concerned that they — that Ingrid [Falanga] had not sought a meeting with us on this case earlier.  I was concerned about that." Id. at 53.

As to Mr. Wolin's reaction upon learning of this news, Ms. Constantine testified: "[h]e was angry and upset that they [FMS attorneys] hadn't made us [Main Treasury] aware of these issues." Id. at 63.

Ms. Falanga testified that, prior to the late November 1998 meeting, the Office of General Counsel at Main Treasury (Ms. Constantine, Ms. McInerney and Mr. Wolin) was unaware of Paragraph 19 in the Nov. 1996 Order.  Ex. 12, at 82 (Falanga Dep.).  However, Ms. Falanga

maintained that Ms. Constantine erred by conflating two meetings that were actually several weeks apart. According to Ms. Falanga, at the first meeting, Ms. Falanga and Mr. Mazella informed Main Treasury of the upcoming contempt hearing and of the document production issues, id. at 92-93, while at the second meeting, they informed Main Treasury of their concerns about DOJ/ENRD's representation of Treasury. Id. at 86-89.

Ms. Falanga also took issue with Ms. Constantine's recollection that "Ms. McInerney and I [Ms. Constantine] had asked [the FMS attorneys] whether Treasury might have other responsive documents" [Ex. 3, at ¶ 9 (Constantine Decl.)]. Ex. 12, at 91-92 (Falanga Dep.). Ms. Falanga also did not recall either Ms. Constantine or Ms. McInerney asking them about Treasury's potential exposure to the discovery rules: "they weren't really asking, you know, okay, did you respond to all of discovery and questions of that nature." Id. at 93.

Mr. Mazella testified that, at the meeting in November 1998, Ms. Falanga and he told Ms. Constantine and Ms. McInerney that "we had an extant discovery request that we were past the deadline." Ex. 14, at 157 (Mazella Dep.). Mr. Mazella confirmed that he also told them that DOJ was not adequately representing the interests of Treasury and was not timely providing them with needed information. Id.

Mr. Mazella also disagreed with Ms. Constantine's recollection that FMS informed Main Treasury in November of 1998 about the show cause motion and the Court having set the contempt hearing, since the show cause motion was not filed and the court order issued until December of 1998. Id. at 163-164. Mr. Mazella similarly did not recall "Ms. McInerney and [Ms. Constantine] ask[ing] whether Treasury might have other responsive documents" [Ex. 3, at ¶ 9 (Constantine Decl.)]. Ex. 14, at 167 (Mazella Dep.). Mr. Mazella testified that "I do know that

-95-

there was a discussion . . . along the lines that the checks were the only things that, the only

information that Ms. Falanga and I knew about at that time that might be responsive to the court's

November [1996] order." Id. at 167-168.  Mr. Mazella testified that "I don't remember" the

statement, as described in Ms. Constantine's declaration [Ex. 3, at ¶ 9 (Constantine Decl.)], that

the FMS attorneys told Main Treasury "that Treasury also had summary level accounting

documents relating to the IIM deposit account but these, by definition, not responsive to the

document production order at issue because they did not relate to any individual." Id. at 169.

Ms. McInerney testified that, at the late November 1998 meeting, Mr. Mazella and Ms.

Falanga "explained the existence of this Cobell litigation, reminded [us] of the existence of it, and

said that Judge Lamberth had scheduled a show cause hearing as to why the Secretaries of Interior

and Treasury should not be held in contempt." Ex. 15, at 40 (McInerney Dep.).  Ms. McInerney

testified that her reaction was that "I was very unhappy" and that she told them "Well, [why] is this

just being brought to my attention now? . . . . How could this have happened?  What do you mean?

You can't be serious." Id.  Ms. McInerney recounted that Mr. Mazella and Ms. Falanga told them

that DOJ didn't tell them of the November 27 Order until May or June of 1998, and that Mr.

Mazella and Ms. Falanga then waited until November of 1998 to tell her of this Order. Id. at 41.

Ms. McInerney testified that the FMS attorneys said that the November 27 Order "had been

drafted with Interior counsel, Justice counsel and Plaintiffs' counsel, but Treasury was not at the

table during the drafting," but that Treasury was still bound by the order. Id.  Ms. McInerney

testified that she was concerned about the delay by FMS counsel in reporting the existence of this

Order to her. Id. at 54-55 & 65.

Ms. McInerney could not corroborate Ms. Constantine's declaration [Ex. 3, at ¶ 9 (Constantine Decl.)] that "Ms. McInerney and I [Ms. Constantine] asked whether Treasury might have other responsive documents. We were told that checks were the only documents that Treasury had that could be identified to individual IIM money recipients and, therefore, might be responsive." Ex. 15, at 50 (McInerney Dep.). Ms. McInerney also could not recall "asking [whether Treasury might have other responsive documents] at that particular meeting." Id. at 51.

### b.    Messrs. Wolin and Knight are Belatedly Informed of the *Cobell* Litigation and Treasury's Obligations.

Immediately following the late November 1998 meeting with Ms. Falanga and Mr. Mazella, Ms. Constantine and Ms. McInerney met with Mr. Wolin to "to report to him what we had learned from Ms. Falanga and Mr. Mazella. We expressed serious concern that FMS counsel had not brought to our attention the serious problems in the case until this point. At a later meeting, Mr. Wolin expressed his strong displeasure to Ms. Falanga and Mr. Mazella in my presence." Ex. 3, at ¶ 10 (Constantine Decl.).

Ms. McInerney confirmed Ms. Constantine's declaration. Ex. 15, at 53-54 (McInerney Dep.). She recalled that Mr. Wolin "said something like, I can't believe we're just learning about this. How could this have happened?" Id. at 54.

Ms. Falanga admitted in her testimony that "Mr. Wolin started lecturing me again about not having raised this sooner and he had an open door policy and I should have come to him. I was in the precarious situation where I had to clean up some of what was left behind by the former chief counsel [Mr. Ingold]. . . . I basically took over whatever the crisis was and dealt with that." Ex.

12, at 109-110 (Falanga Dep.).  Ms. Falanga testified that, after she told Mr. Wolin "that I had

brought it to his attention as soon as I could," he apologized.  Id.

Mr. Wolin confirmed that this meeting was the first instance that he was made aware of the

forthcoming contempt hearing in January of 1999 (Ex. 17, at 39-40 (Wolin Dep.)) and was

"absolutely" the first occasion where he learned of the concerns shared by Ms. Falanga and Mr.

Mazella about DOJ's representation of Treasury.  Id. at 41.

According to Ms. Constantine, "Mr. Wolin, Ms. McInerney, and I met the next day with

the General Counsel, Edward S. Knight, to advise him of the situation."  Ex. 3, at ¶ 11

(Constantine Decl.).  Mr. Wolin confirmed that this meeting occurred, and he believed that this

was the first time that Mr. Knight had heard of the upcoming contempt hearing.  Ex. 17, at 40

(Wolin Dep.).

Mr. Wolin testified that it was not until December 21, 1998 that he found out that the

Cobell case "was anything other than the run-of-the-mill ministerial case," i.e., when Ms.

Constantine told him about this Court's Order to show cause why Defendants should not be held

in contempt, which was entered on December 18, 1998.  Id. at 33 (Wolin Dep.).  Mr. Wolin

testified that he immediately informed Mr. Knight about the show-cause order and that the case

involved individual Indian money accounts.  Id. at 34.  Mr. Wolin recalled that it was around this

time that he first learned of the November 1996 discovery order.  Id. at 42.  He testified that this

delay in reporting was problematic, since "a piece of litigation of this magnitude needed to have

been made very clearly aware to the supervisor -- up the supervisory chain."  Id.  Even so, Mr.

Wolin believed at the time that Treasury "produced everything we could produce. . . . Again, in

this end-of-December period, and through — through some weeks thereafter, I was told that we had produced the material that we could produce responsive to the court's [order]." Id. at 43.

As of late December 1998, Messrs. Wolin and Knight became "personally engaged and involved in the case" since it "was a case in which the Secretary was at risk, big case, enormously important equities, a very unhappy court." Id. at 75-76. Mr. Wolin recalled insisting to Mr. Mazella and Ms. Falanga that they were to report everything that occurred "to Main Treasury" and that he wanted to be timely appraised of "anything of substance" that arose. Id. at 60.

Ms. Constantine declared that, in late January of 1999, following the contempt hearing, Ms. McInerney and she met with Mr. Knight regarding document production and to discuss "our shared understanding that all responsive documents that could possible be identified had been disclosed to Plaintiffs" and nothing further could be produced without information from Interior to help identify other documents. Ex. 3, at ¶ 14 (Constantine Decl.). Ms. Constantine declared that Ms. McInerney and she then informed Ms. Falanga and her staff that they should search for further responsive documents, which "would be summary level accounting documents." Id.

Ms. Constantine stated that in December of 1998, she, Ms. McInerney, Ms. Falanga and Mr. Wolin met with DOJ/ENRD attorneys, including Lois Schiffer, the Assistant Attorney General, "to review our concerns about the case." Ex. 3, at ¶ 12 (Constantine Decl.). According to Ms. Constantine, "Ms. Schiffer and other DOJ attorneys stated that such documents [summary level accounting records] were not responsive because they could not be identified to individuals." Id. [31]

---

[31] It bears mention that, during the January 13, 1999 contempt hearing, Bradley Preber (of Arthur Andersen), a defense witness, testified on cross-examination that the Treasury checks would be responsive to paragraph 19 of the November 1996 order: "If it's related to the five

c.    **Inadequate Intra-Agency and Inter-Agency Communication.**

(1)    **The "Chain-of-Command" as a Barrier to Communication.**

Mr. Wolin and several of the declarants testified that at Treasury, there was a "chain-of-command" by which matters would be reported upwards and orders would be promulgated downwards.

Notwithstanding the institutional necessity of reporting significant events linearly through the chain of command, (Ex. 17 at 8-13 (Wolin Dep.)), Mr. Wolin testified that this procedure could be bypassed, and that any Treasury staffer was welcome to come directly to his office to address any issue. He acknowledged that, while on other occasions FMS attorneys and staff had availed themselves of this open-door policy, it was never done in the context of the Cobell litigation. Id. at 21-24. Mr. Wolin further testified that he and Mr. Knight, the then-General Counsel, wanted to know about significant litigation on a timely basis, and that FMS had presented a problem in the past regarding their failure to promptly inform him and/or Mr. Knight about significant litigation. Id. at 15-17.[32]

_____

named [Plaintiffs] and specifically relates to documents which may be held at Treasury, then I'd say, yes, that it does include Treasury documents." Ex. 32 at 588 (Transcript of Contempt Hearing).

[32]    In that regard, Mr. Wolin and Ms. McInerney testified that the former Chief Counsel of FMS, Mr. Ingold, was a barrier to communications. As mentioned in the previous paragraphs, several of the FMS attorneys testified that they were unsure whether Mr. Ingold actually transmitted information to Main Treasury. Mr. Wolin testified Mr. Ingold "wasn't as interested in sharing with us some of the operations of his office as we preferred, and ultimately it cost him his job." Ex. 17, at 26 (Wolin Dep.). Mr. Wolin perceived that the FMS staff under Mr. Ingold felt that they had to adhere to the formal hierarchy: "I do think that David Ingold ran an FMS Chief Counsel's office that was that sort of way. In fact, when I asked FMS lawyers to come to [Main] Treasury to brief me on various maters I had to tease out with an enormous amount of vigor the views of other FMS lawyers at the table because I think to some extent they were concerned that they might speak out of school in a way that Dave Ingold didn't appreciate." Id. at 100.

Mr. Wolin characterized the <u>Cobell</u> litigation as the largest "disconnect" he had encountered between FMS and Main Treasury.  <u>Id.</u> at 20.  He emphasized that if either Ms. Constantine or Ms. McInerney had improperly directed an FMS attorney not to disclose a sensitive matter, that attorney "could have come to me.  Or they could have gone to [General Counsel] Knight. . . . it wasn't as though we were sitting up there on Mount Olympus unable to talk to anyone."  <u>Id.</u> at 103.  Mr. Wolin emphasized that "If they [FMS attorneys] view themselves as having been stymied in their attempt to pass it up the chain of command, there are multiple ways to get that information, to make that information known to the next, to the next level."  <u>Id.</u> at 106.

Mr. Wolin insisted that the "weekly reports," while ostensibly facilitating communication up the chain-of-command, did not suffice to place Main Treasury on notice of the consequences the Department faced in this litigation.  He also asserted that he did not find credible the declarations of several of the FMS attorneys who had claimed that they could not go outside the chain-of-command to discuss discovery issues with DOJ, "because FMS lawyers were talking to the Justice lawyers all the time on a full range of issues in this case" and it was "certainly not the case that . . . every communication between FMS and Justice needed to be run through Main

---

Ms. McInerney testified that Mr. Ingold's practice was to monopolize communications between FMS and Main Treasury:  "He didn't like staff to say very much in meetings with me.  He preferred to do the talking.  So I had some concerns about the FMS Chief Counsel's Office."  Ex. 15, at 39 (McInerney Dep.).  Ms. McInerney elaborated upon the inadequate communication through the chain-of-command between FMS and Main Treasury: "I felt that sometimes things were reported to me that didn't need to be reported and them sometimes things that should have been reported weren't reported.  I mean, I felt that they didn't appreciate, they didn't have a sense of priority always, and that I would have preferred more effective reporting."  <u>Id.</u> at 38.

Ms. Falanga testified that "basically, he [Mr. Ingold] took a hands-off approach towards this case."  Ex. 12, at 69 (Falanga Dep.).

Treasury lawyers or that we were the only ones permitted to talk about certain subjects." Id. at

99-100 (Wolin Dep.).  Mr. Wolin reiterated his doubts regarding the FMS attorneys' declarations

on this point: "I don't find it particularly credible because they were talking to Justice about all

kinds of things that we didn't." Id. at 101.

Mr. Lewis testified that the chain-of-command concerning the Cobell litigation consisted of

Ms. Falanga on top, "then Dan Mazella, then basically everyone else would have been about the

same, and it would have been myself and Susan Leiter." Ex. 13, at 116 (Lewis Dep.).  Mr. Lewis

testified that before the November 1998 contempt hearing, Ms. Constantine and Ms. McInerney

"were not formally part of the litigation team but were being briefed regularly on the progress, and

Eleni [Constantine] attended most, if not all, of the contempt hearing." Id. at 117.  Mr. Lewis

stated that, after the contempt hearing, Ms. Constantine "was now in charge of the litigation team,

and the litigation team was expanded." Id. at 118.  While Ms. Falanga initially determined whether

documents were responsive or relevant, "once Eleni Constantine became involved, because of her

position, she would have had ultimate responsibility for making that determination." Id. at 128-

129.  As to his own role within this chain-of-command, "[e]verything is very hierarchical, and I just

did not consider even a possibility that I would go around my superiors.  You just wouldn't go

around your superiors and make a statement like that or I wouldn't call Justice on something like

that, independent of going up the chain.  You just don't do it." Id. at 166.

Mr. Mazella testified that the chain-of-command between FMS and Main Treasury is a

function of whether or not a case falls into the category of significant litigation.  Ex. 14, at

31(Mazella Dep.).  For ordinary cases, the Chief Counsel of FMS "is responsible for reviewing or

approving pleadings," while for significant litigation, "then the pleadings have to be reviewed by

normally either the Assistant General Counsel [Ms. McInerney] or her designee before things are filed." Id. Mr. Mazella testified that this chain-of-command also existed with regard to communications with DOJ: "in matters which would involve the department, then there would be that coordination with [Main Treasury] before communication [with DOJ] occurred." Id. at 32. Mr. Mazella believed that by reporting something to Main Treasury (Mr. Wolin, Ms. McInerney and/or Ms. Constantine), that sufficed to satisfy his obligations to report to the Court, "because of the hierarchy and chain-of-command." Id. at 43. Accordingly, when Mr. Mazella reported issues to then-Chief Counsel, Mr. Ingold, "I thought it was his responsibility to take whatever action was appropriate." Id. at 73. Mr. Mazella reiterated that it was the Chief Counsel "who was responsible for informing" Main Treasury of issues. Id. at 96. Although Mr. Mazella recalled that he informed Mr. Ingold about the destruction of the microfilms and the inability of FMS in June of 1998 to comply with the discovery order, he does not know whether Mr. Ingold actually notified Main Treasury. Id. at 55, 98-101. Mr. Mazella assumed that Mr. Wolin had been informed, in February of 1999, about the results of the review of the remaining Hyattsville boxes, since "I thought that was being raised through my chain of command through Ms. Falanga and Ms. Constantine." Id. at 228.

Mr. Regan testified that the chain-of-command within FMS for this litigation consisted of Ms. Falanga and her successor, Debra Diener on top, "Dan Mazella and Randy Lewis as senior attorneys," followed by several junior attorneys and Mr. Regan himself. Ex. 16, at 49-53 (Regan Dep.). Mr. Regan considered his disclosure obligation to be discharged since "whenever I had the chance to bring it up when I was working on different filings, I brought it up," and "every time I was working on something I'd bring it up, well, maybe we should do it then." Id. at 187, 189.

Mr. Regan deferred to those higher up in the chain-of-command, since "the people that were making decisions about the case had a broader knowledge of the case than I did during that period of time, in early February [1999]," and they "had a broader — very broad understanding of strategy and whatever, and there might have been other reasons that I wasn't aware of or hadn't been privy to certain meetings." Id. at 190-191.

Ms. McInerney explained, pursuant to the chain-of-command, FMS attorneys with something significant to disclose to the court, such as document destruction, "would have gone through Main Treasury," since "their obligation would have been to tell us about it and then we would probably would have called Justice with them to tell them about this." Ex. 15, at 97-98 (McInerney Dep.).

Ms. Falanga testified that the chain-of-command between FMS and Main Treasury came into being when a case was elevated to the category of significant litigation "or if there's any other reason we think Treasury should be involved." Ex. 12, at 30 (Falanga Dep.). Ms. Falanga described the operation of the chain-of-command from her perspective as Deputy Chief Counsel when she was informed of the microfilm destruction in early 1998: "I informed the Chief Counsel [Mr. Ingold], who reported to Roberta McInerney and John Bowman." Id. at 31. Ms. Falanga was unsure, however, whether Mr. Ingold actually informed Main Treasury of this discovery, although "[i]t was my advice that he should. . . . typically when something like that happened that had a potential consequence, it would be reported to [Main] Treasury." Id. [33]

### (2)    Mistrust Between Treasury and ENRD.

---

[33] As the Court recognized, one "primary way that this entire process has been mishandled, [] is the total lack of coordination and oversight." Cobell II, 37 F. Supp. 2d at 30-31.

-104-

The investigation revealed a degree of tension between Treasury and DOJ which often delayed the timely communication of important issues. Specifically, several of the declarants harbored serious misgivings about being represented by DOJ/ENRD.

Ms. McInerney testified that, as of late November 1998, "she was more concerned at that time about our representation from the Justice Department" than about the conduct of the FMS attorneys. Ex. 15, at 54-55 (McInerney Dep.). She recounted how, after the November 23-24, 1998 hearing, "we prepared internally talking points about representational issues we had with the Justice Department. And I know that Mr. Knight used those to talk to senior people about the Justice Department to express the concern that Treasury had about the fact that we really felt that the Justice Department had ignored Treasury in this litigation." Id. at 69. Ms. McInerney expanded upon this by discussing her perception of the views held by Messrs. Knight and Wolin, as of late 1998 onwards, that they "believed that we had not been adequately represented by the Justice Department and, in general, had gotten advice, very bad advice from the Justice Department on how to handle this litigation," although she also recognized that "we had some concerns about the FMS" as well. Id. at 120.

Ms. Constantine testified that, as of late November 1998, "the relationship with the Justice [attorneys] was a serious problem." Ex. 11, at 62 (Constantine Dep.). Ms. Constantine elaborated by remarking that "I felt that, to the extent that the [DOJ] attorneys previously handling the case had not paid adequate attention to the Treasury Department, Justice was responding right away, they were adding these two new people, and that they were going to be sure that the Treasury Department issues were dealt with." Id. at 65. According to Ms. Constantine, as of late 1998,

while "there may have been some fault with FMS, but that the main fault was over at DOJ, and we had to get better representation over there."  Id. at 79.

Ms. Falanga recalled that, around November of 1998, she met with her senior (non-attorney) management at FMS, and "[w]e were pitching that we thought we needed different representation" from DOJ.  Ex. 12, at 70 (Falanga Dep.).  At the time of the November 23-24, 1998 status conference, Ms. Falanga recalled that "[w]e had a laundry list . . . [that] kept growing as to what Justice was doing in their representation.  After the first incident or second incident I made it a policy that we generally did not speak to Justice unless there were two attorneys on the phone because they seemed to forget their promises and agreements."  Id. at 73-74.  Ms. Falanga claimed that when Mr. Mazella and she raised the representation issue with Mr. Wolin, after the November 23-24, 1998 hearing, that he read the transcript section pertaining to DOJ's statements about Treasury, "and he didn't think it was that bad and didn't think we needed different representation."  Id. at 101-102.  "Two weeks later, when the Judge announced that he was going to have a contempt hearing, then we were berated for not raising the [representation] issue sooner."  Id. at 104.  Ms. Falanga also testified that, after a meeting with Sandra Schraibman at DOJ (which occurred sometime after Feb. 25, 1999), her view of the relationship with DOJ was that "Justice is doing it again, they're expending all their time and energy on defending Interior, you know, and they have a long laundry list and they're forgetting about us again."  Id. at 168.

Mr. Lewis confirmed the strained relationship between Treasury and DOJ, that while "no one told me that directly . . . . [i]t was a bad relationship."  Ex. 13, at 208-209 (Lewis Dep.).  Mr. Lewis perceived that "there was a strong sense on the part of Treasury that everything was being done [by DOJ] to put the best light on Interior, even if it hurt Treasury . . ."  Id. at 224.  For

-106-

example, he recounted how DOJ tried to get FMS to certify the answers to over 500 requests for admissions with only a half-days' notice, and when Ms. Falanga protested to DOJ, shortly before midnight that day, that FMS did not have "the chance to review everything" and would miss the deadline, DOJ belatedly informed Ms. Falanga that DOJ had already requested and obtained an extension from the Plaintiffs without having notified FMS of this extension. In short, DOJ had the FMS attorneys work until midnight even though the Department of Justice knew that this was not necessary. Id. at 225-227.

Mr. Mazella testified that he became concerned about the possible conflict of interest in ENRD's representation of both the Treasury and the Interior Defendants. Ex. 14, at 68-69 (Mazella Dep.). Mr. Mazella stated that these two defendant agencies had divergent interests in this litigation and ENRD historically enjoyed a closer legal relationship with Interior than with Treasury. Id. From Mr. Mazella's perspective, Interior was not cooperating with Treasury's requests for information, and Andrew Eschen of ENRD was not helping Treasury with its attempts to get the required information from Interior. Id.

Mr. Regan recalled that, during the Feb. 23, 1999 meeting in Mr. Knight's office, "there was a great focus on what we considered representational issues with the Department of Justice, so there was an effort to document where we felt the Justice Department representation was less than Treasury would have liked and that this would be used to support Ed Knight's effort to have some representation from the Civil Division at Justice to take part in the litigation moving forward and not just the [ENRD] because the Civil Division knew Treasury's programs better than the [ENRD] at Justice." Ex. 16, at 79 (Regan Dep.). Mr. Regan testified that the Feb. 24, 1999 meeting was a progress report "on producing this errata sheet which would set out the

representational issues so that Mr. Knight could contact counterparts at Justice to request representation by the Civil Division." Id. at 80.

Mr. Wolin testified that, prior to late November 1998, he was unaware that FMS was concerned about Treasury's representation by ENRD. Although Mr. Wolin could not recall exactly when he was notified of their concerns, "it certainly came up in due course that there were concerns that FMS lawyers expressed about DOJ's representation, and to some extent, they continued to come up." Ex. 17, at 41 (Wolin Dep.).

D.    **Lack of Accountability by the Individual Attorneys.**

On February 22, 1999, the court issued its contempt order against Secretaries Rubin and Babbitt and Assistant Secretary of the Interior Gover. Cobell II, 37 F. Supp. 2d 6, 9 (D.D.C. 1999). In so doing, the Court set forth the mechanism by which only these three individuals could be held in civil contempt. Id. at 8 & n.1. Initially, Plaintiffs' Consolidated Motion for Order to Show Cause why Defendants Should not be Held in Contempt and for Sanctions for Failure to Comply with Court Orders (December 9, 1988), "included as parties to the contempt trial Defendants and their employees responsible for this case, including their attorneys.'" Id. at n.1. However, on December 16, 1998, counsel for Defendants "filed a motion seeking to remove all names of Defendants' employees and agents, and to hold responsible only the 'Defendants,' which would include only the two Secretaries and the Assistant Secretary." This motion was granted. Id. This motion was signed solely by Susan Cook (DOJ/ENRD); no attorneys from either Treasury or Interior were listed. The rationale provided in this motion for the change was that "Plaintiffs seek relief against Defendants as a whole and not against particular personalities, employees or attorneys." (Motion for Leave to File Alternative Form of Order, at 1).

-108-

This court recognized that "to the extent that Secretary Babbitt, Secretary Rubin, and Assistant Secretary Gover are the only parties to be held responsible by this court's order today, it is by their own choice, since they (through their counsel) consented to their agents and attorneys removing themselves from formal responsibility . . . . the court must assume that counsel had the permission of their three clients to ask the court to hold only the Defendants, and not their agents or attorneys, responsible for the failure to comply with this court's orders." Cobell II, 37 F. Supp. 2d at 8 n.1. This court concluded by stating that it "views it as unfortunate for Secretary Rubin that he has been tarnished with this contempt citation. What personal involvement he has had in this fiasco is unknown to the court, but what is clear is that he has totally delegated his responsibility to others and they have miserably failed to comply with this court's orders, as detailed in this opinion." Id. at 39.

Ms. McInerney testified that Mr. Knight and she "had not been aware either that the Justice Department had filed a motion on December 16th [1998] to remove from the defendant's side of the equation, employees and counsel I think it said, so leaving just the Secretary there, and when I saw the contempt order, I was extremely unhappy about that." Ex. 15, at 126 (McInerney Deposition). Ms. McInerney testified that Mr. Knight, upon seeing this footnote, "went ballistic and said, '[w]hat the heck is this? Who took [this decision]?' . . . We thought, oh my God, another effort by Justice to take themselves out of the limelight and hurt Treasury." Id. at 126-127. She stated that "Mr. Knight said, 'Did anybody know about this?,' and Eleni [Constantine] and I . . . we said we didn't know about it, and I called FMS . . . called Ingrid [Falanga] and said did you know about this, you know, this motion, and Ingrid said, 'No, we didn't know about it.'" Id. at 127.

Ms. Constantine confirmed that "[t]his footnote caused the General Counsel to go totally ballistic when he read it, and he wanted to know who had consented to this order, and who had put the Secretary personally on the line, and why weren't the attorneys standing up and taking the fall." Ex. 11, at 127 (Constantine Deposition).

E. **Frequent Turnover of FMS Attorneys Assigned to the _Cobell_ Litigation.**

To a lesser extent, the problems identified herein can be attributed to the frequent turnover, within FMS, of the attorneys assigned to this case. This turnover resulted in a lack of continuity and prevented the creation of an institutional memory necessary to prevent matters from being overlooked.

Specifically, from July of 1996 to September of 1997, Steve Laughton was, the FMS attorney principally responsible for this litigation. Ex. 13, at 48-49 (Lewis Dep.); see also Ex. 2, Attachment 00214-00215 (Laughton e-mails, July 10/15, 1996). Mr. Laughton was then transferred to a different project and the case was assigned to James Regan, another FMS staff attorney in early September of 1997. Ex. 16, at 43 (Regan Dep.). Mr. Regan testified that he only worked on this case for "basically the fall of '97 and a little bit in the winter," before being reassigned to regulatory work. Id.

In March of 1998, Ms. Falanga assigned Mr. Mazella as the third staff attorney principally working on the Cobell litigation, after David Ingold (then Chief Counsel, FMS) transferred Mr. Regan to "exclusively debt collection related work." Ex. 7, at ¶ 3 (Mazella Decl.). Mr. Mazella then had to come up to speed on this litigation: he declared that he then "familiarized myself with the memoranda and e-mails" to FMS Commissioners and their staffs "regarding FMS' promises to Plaintiffs, through Justice and Congress, that it would preserve all records related to Treasury's

Deposit Account No. 14X6039." Id. at ¶ 6.  Mr. Mazella testified that he started attending the monthly status conferences.  Ex. 14, at 71 (Mazella Dep.).

Mr. Wolin testified that, in or around December 28 or 29 of 1998, he "absolutely" realized that more direct oversight from main Treasury was needed over the Cobell litigation, and assigned Ms. Constantine to "be quite focused on this litigation" with Ms. McInerney also to become more involved.  Ex. 17, at 58-59 (Wolin Dep.).  Ms. Constantine's oversight role was corroborated by Mr. Mazella, who declared that "[b]eginning in December, 1998, Ms. Constantine took an active role in prosecuting the Cobell litigation."  Ex. 7, at ¶ 2 (Mazella Decl.).  Prior to this time, responsibility for this litigation remained within FMS, with no direct involvement by Main Treasury attorneys.

Mr. Lewis testified that he "was not formally brought into working on the litigation, until, I believe, December 22, 1998," although he had handled two phone calls in September or October of 1997, when Mr. Regan was the principal FMS attorney on this case.  Ex. 13, at 47, 49 (Lewis Dep.).

Mr. Regan testified that Ms. Falanga reassigned him to this case on January 14, 1999, (Ex. 16, at 43 (Regan Dep.); see also Ex. 10, at ¶ 3 (Regan Decl.)), because of testimony during the contempt hearing about alleged document destruction at Treasury, and because there was a need for "surveying all documents we had and making sure we were on board and up to speed with everything FMS has in different record centers."  Id. at 58.  From that time through May 11, 1999, Mr. Regan testified that he spent "90 percent, 95 percent" of his time on this litigation.  Id. at 54.

Ms. Falanga testified that she "was in charge" within FMS for the Cobell litigation.  Ex. 12, at 19 (Falanga Dep.).  As of early 1999, after the three aforementioned FMS staff attorneys were

all assigned to this litigation, Ms. Falanga testified that of the three, Mr. Mazella "was more or less

the lead," while Mr. Lewis, with his accounting background "was more or less the lead for

preparing the expert report," and Mr. Regan "was more junior, but he also had responsibilities."

Id.

### F.    Failure to Comprehend Ethical Obligations under the Rules of Professional Responsibility and the Duty to Disclose Under the Federal Rules of Civil Procedure.

Treasury's failure to timely and accurately inform this Court and the Plaintiffs of the loss or

destruction of documents that were responsive to Plaintiffs' document requests is the core of this

Report.  This section sets forth the Treasury attorneys' understanding and knowledge of their

ethical obligations and their duty to disclose.

During their depositions, the six declarants all testified regarding (1) their understanding of

their ethical obligations and their ongoing training, if any, in the field of professional

responsibility;[34] (2) their knowledge of their obligations under the Federal Rules of Civil Procedure

---

[34]    The Rules of Professional Conduct governing the conduct at issue in this report
are as follows:
Rule 3.3. Candor toward the tribunal.
(a) A lawyer shall not knowingly:
(1) Make a false statement of material fact or law to a tribunal;
. . . .
D.C. Rules of Professional Conduct, Rule 3.3(a)(1) (1999).

Rule 3.4.  Fairness to opposing party and counsel.
A lawyer shall not:
(a) Obstruct another party's access to evidence or alter, destroy, or conceal
evidence, or counsel or assist another person to do so, if the lawyer reasonably
should know that the evidence is or may be the subject of discovery or subpoena in
any pending or imminent proceeding. . . .

(d) In pretrial procedure, make a frivolous discovery request or fail to make

with regard to pre-trial discovery; and (3) their awareness of their disclosure obligations in light of the January, 1999 contempt hearing in this proceeding.[35]

Ms. Constantine testified that she only participates in the "required ethics training" that is government-wide and not attorney specific. Ex. 11, at 18-19 (Constantine Dep.). As a member of the District of Columbia bar, Ms. Constantine noted that she is not required to take any Continuing Legal Education ("CLE") courses, including those relevant to professional responsibility. Id. Notwithstanding her civil litigation experience prior to joining Treasury, she admitted that "I've actually never practiced as a litigator under the 1993 amendments" to the Federal Rules of Civil Procedure governing discovery production. Id. at 16. As to the ethical concerns raised by this litigation, Ms. Constantine testified that "the check destruction was a problem for me as well. I mean, I didn't understand why this hadn't yet been disclosed. . . . But it stuck in my mind that it hadn't been disclosed, and that these were, according to them, potentially responsive documents, and therefore we had . . . a series of problems here . . . ." Id. at 58-59.

---

reasonably diligent effort to comply with a legally proper discovery request by an opposing party;

. . . .

D.C. Rules of Professional Conduct, Rules 3.4(a), 3.4(d) (1999).

The U.S. District Court for the District of Columbia has adopted the Rules of Professional Conduct as adopted by the District of Columbia Court of Appeals. See Local Civil Rule 83.15(a), District Court for the District of Columbia (1999).

[35] Ms. Constantine and Mr. Regan are members of the District of Columbia bar; Ms. Falanga is a member of the Maryland bar, and Mr. Lewis is a member of the Texas bar, all of which have adopted the Rules of Professional Conduct. Mr. Mazella is a member of the Virginia bar, which currently follows the older Model Code of Professional Responsibility, although its provisions are similar (compare Disciplinary Rule 7-105 with Model Rule 3.3; and Disciplinary Rule 7-109(a) with Model Rule 3.4). The Virginia Supreme Court has adopted the Rules of Professional Conduct, effective January 1, 2000.

Ms. Falanga testified that she is only required to take the "regular Government ethics training" for all government employees, since her Maryland bar does not require CLE or other ongoing professional responsibility courses. Ex. 12 at 8-9 (Falanga Dep.). She does admit, however to having a working knowledge of the Federal Rules of Civil Procedure, and has taken various DOJ courses on litigation topics which have updated her regarding changes to these Rules. Id. at 15. As to the ethical concerns raised by this litigation, Ms. Falanga testified that she recognized that the way in which the disclosure of the missing or destroyed documents was "getting very, very close . . . to violating my responsibility" as an attorney. Id. at 194-195. Ms. Falanga testified that, notwithstanding Ms. Constantine's reassurance that "I don't think that's a problem. We're all one government," Ms. Falanga was concerned that, after her departure, she would be blamed for these actions because her name was on the pleadings. Id. at 195-196.

Mr. Lewis admitted having little litigation experience, other than the present action: "it's the first time I've been in the courtroom." Ex. 13, at 4-8 (Lewis Dep.). Mr. Lewis testified that he has had no exposure to the Federal Rules of Civil Procedure, including the discovery rules, between law school (he graduated in 1991) and his involvement with Cobell. Id. at 5, 13-14. While he is required by the Texas bar to take 3 hours of CLE professional responsibility courses annually, he was unable to recall what courses he has taken to satisfy this requirement. Id. at 16-17.

Ms. McInerney testified that she has no prior trial experience, and that she has limited experience with discovery production. Ex. 15, at 26-30 (McInerney Dep.). Admitting no familiarity with the Federal Rules of Civil Procedure governing discovery, Ms. McInerney testified that she is nonetheless familiar with the need to respond to discovery requests, and is "aware of the

need to preserve documents, generally, and respond to discovery requests and be responsive." Id. at 31.

Mr. Mazella testified that, while he has had extensive litigation and discovery experience. Ex. 14, at 6-19 (Mazella Dep.)) the bulk of his experience has been in the arena of agency contract appeals and the Federal Rules of Civil Procedure prior to 1993. Id. at 11. As to the ethics training he receives -- both as a government attorney and as a member of the Virginia bar -- Mr. Mazella averred that he has a duty of candor: "if there are issues which for whatever reason, need to be raised to the Court or to opposing counsel, then each [agency] attorney has a duty to try to make sure that that happens." Id. at 27-29. As to the ethical concerns raised by this litigation, Mr. Mazella testified that he satisfied his obligations by reporting problems with the DOJ attorneys in litigating this case to Mr. Wolin, Ms. McInerney and Ms. Constantine. Id. at 42-44.

Prior to the Cobell litigation, Mr. Regan had no prior experience with document production. Ex. 16, at 12-15 (Regan Dep.). He has, however, attended and instructed general ethics classes for government employees. Id. at 20-21 & 27-28. Regarding the Federal Rules of Civil Procedure governing discovery, Mr. Regan admits to a "passing knowledge." Id. at 16.

Mr. Wolin testified that the Hyattsville document destruction should have been raised in the pleadings (prior to May of 1999): "[t]o the extent that anyone was aware that there was potentially responsive material in the boxes that were destroyed at Hyattsville, that absolutely needed to be made aware to the court in the context of pleadings that talked about document issues. . . . as I said before, my view is and, you know, the great lesson of Washington it seems to me is that when you learn of something bad you disclose it to everyone immediately in a fully transparent manner.

And that in my perspective is at Treasury we had nothing to hide on the underlying merits of this case. Nothing to hide in any of the documents we had." Ex. 17, at 93-94 (Wolin Deposition).

Mr. Wolin testified that he was skeptical that the FMS attorneys could not inform DOJ about the document destruction, "because FMS attorneys were talking to the Justice lawyers all the time on a full range of issues in this case." Id. at 99, 101.

Mr. Wolin testified that even if Ms. Constantine had told the FMS attorneys not to do anything about disclosing the documents, the FMS attorneys could have approached Ms. McInerney or Messrs. Wolin and/or Knight. Id. at 102-103.

According to Mr. Wolin "anyone who is in possession . . . has a belief that material has been destroyed that is potentially responsive to a court order has an obligation to pass it up the chain of command. If they view themselves as having been stymied in their attempt to pass it up the chain of command, there are multiple ways to get that information . . . to the next level." Id. at 106-107. In his view, it is "unacceptable to sit on information like that and have the result be that no one knows and no action is taken." Id.

**CONCLUSION**

From the inception of this litigation in June 1996, the Court has issued numerous orders and given countless directives to preserve and produce documents potentially relevant and/or responsive to this litigation. It was against the backdrop of these orders and the obligations they imposed on the parties, that, on January 28, 1999, Ms. Locks first discovered a file which referenced IIM and individual payees, realized that certain files related to this litigation may have been destroyed, and informed her agency counsel, Mr. Mazella. As of the time this destruction first came to light, every FMS attorney should have been on notice that the documents destroyed at the Hyattsville facility were potentially responsive or potentially relevant to the Cobell litigation.

However one reconciles the conflicting testimony of the declarants, my investigation revealed: (1) that Treasury failed to inform DOJ (and the Court) of the document destruction in a timely manner;[36] (2) that Treasury attorneys failed to keep themselves fully and timely informed of pleadings and court orders which directly affected their Secretary; (3) that FMS attorneys knowingly allowed the Deputy General Counsel to walk out of a meeting with the mistaken impression that none of the destroyed documents were potentially responsive and/or relevant; (4) that, despite FMS's abysmal record of reporting significant matters in a timely manner, Main Treasury did not insert itself into the Cobell litigation for more than two years and, once involved, did not actively oversee FMS' search of the documents (and their utilization of search criteria which can most charitably be described as comical); (5) that, prior to this investigation, no one at Main Treasury bothered to review a single Hyattsville file, or insisted on receiving regular written

---

[36] Concomitantly, it appeared that DOJ possessed no independent mechanism for verifying information given them by Treasury before making representations to the Court based upon that information.

updates concerning the status of the search, or cared to review the GAO Document Index – with its explicit references to Indian Agencies; (6) that representations were made to the Court which, at worst, were patently untrue, at best, were misleading insofar as they reported a false state of compliance or, at minimum, reflected a failure to diligently investigate and authenticate facts prior to certifying them to the Court as accurate; and (7) that the aforementioned events took place at the exact time the Secretary of the Treasury was held in contempt for violation of his discovery obligations.[37]

    This is a system clearly out of control.

    Had FMS counsel expended the same energy ensuring that DOJ, the Court, the Plaintiffs, and/or the Inspector General were notified of the document destruction as they spent shifting the blame to other agencies and to one another, the problems described above would not have reached the crescendo that they did and this investigation would not have been necessary.  Had Main Treasury acted in accordance with its supervisory function and managed this litigation in a manner commensurate with its significance, again, this investigation would be superfluous.  Unfortunately, those charged with supervising this litigation fell woefully short of their responsibilities.  It can only be assumed that Treasury's indifference stemmed from the vain hope that it would be summarily dismissed from the case or that the Court would not find its Secretary in contempt.  These assumptions were incorrect.

    At a minimum, those attorneys who were aware of the Hyattsville document destruction from its inception and yet chose to take no action to ensure timely notification are guilty, in my

---

[37]   That Treasury chose not to disclose the destruction of the documents while the Court was contemplating whether to find the Secretary Rubin in contempt raises even more troubling inferences.

-118-

view, of violating the Rules of Professional Conduct which demand candor to the Court and

fairness to the plaintiffs and plaintiffs' counsel.[38]  Notwithstanding declarants' self-serving

------

[38]  The D.C. Circuit explicitly rejected the assertion by a federal agency attorney, in an appeal of an administrative decision, that agency attorneys were somehow held to lower ethical standards:

> The notion that government lawyers have obligations beyond those of private lawyers did not originate in oral argument in this case.  A government lawyer 'is the representative not of an ordinary party to a controversy,' the Supreme Court said long ago in a statement chiseled on the walls of the Justice Department, 'but of a sovereignty whose obligation . . . is not that it shall win a case, but that justice shall be done.'  Berger v. United States, 295 U.S. 78, 88 (1935).  The Supreme Court was speaking of government prosecutors in Berger, but no one, to our knowledge (at least prior to oral argument) has suggested that the principle does not apply with equal force to the government's civil lawyers.

Freeport-McMoRan Oil & Gas Co. v. FERC, 962 F.2d 45, 47 (D.C. Cir. 1992).  The D.C. Circuit noted that an Executive Order reiterated this higher standard for government attorneys: "The United States sets an example for private litigation by adhering to higher standards than those required by the rules of procedure in the conduct of Government litigation in federal court." Id. (citing Executive Order on Civil Justice Reform, 27 Weekly Comp. Pres. Doc. 1485 (Oct. 23, 1991)).  Several older D.C. Circuit cases, arising under the Model Code, reflect this pattern of upholding government attorneys to a higher standard.  See, e.g., Gray Panthers v. Schweiker, 716 F.2d 23, 33 (D.C. Cir. 1983) ("There is, indeed, much to suggest that government counsel have a higher duty to uphold because their client is not only the agency they represent but also the public at large."); Douglas v. Donovan, 704 F.2d 1276, 1279 (D.C. Cir. 1983) ("government attorneys, who have special responsibilities to both this court and the public at large")

Courts in other jurisdictions have similarly recognized the ethical obligations incumbent upon government attorneys.  See, e.g., Williams v. Sullivan, 779 F. Supp. 471, 472 (W.D. Mo. 1991) ("It is the Court's view that there is a special duty imposed upon government lawyers to seek justice and to develop a full and fair record.); Pipkin v. City of Moore, 735 F. Supp. 1004, 1010 (W.D. Okla. 1990) ("Plaintiff has presented no authority excluding or exempting attorneys in public employment from the strictures of the Code of Professional Responsibility . . . and it is the view of this Court that it would be against public policy to set apart attorneys employed in public service from compliance therewith."), aff'd 930 F.2d 34 (10th Cir. 1991) (table); Silverman v. Ehrlich Beer Corp., 687 F. Supp. 67, 69-70 (S.D.N.Y. 1987) ("First, an attorney in the employ of the government is not on the same footing as a private attorney.  He or she has the August majesty of the sovereign behind his or her every utterance . . . . As a result, the attorney representing the government must be held to a higher standard than that of the ordinary lawyer."); Jones v. Heckler, 583 F. Supp. 1250, 1256 n.7 (N.D. Ill. 1984) ("counsel for the United States

-119-

iterations that the issue was never "whether" to disclose the document destruction but "when," the

question remains why, after repeated opportunities to do so, Treasury chose a squib on page five

of a letter from Rita Howard to Plaintiffs' counsel as the mechanism for that disclosure.[39]  What

make these violations particularly egregious is that they were by no means  isolated incidents in this

litigation.  Rather, they constituted part of a greater pattern of obfuscation that has permeated the

Cobell litigation and has manifested itself on other occasions including: (1) the delayed disclosure

of the destruction of the microfilm checks and the loss of the Bureau of Public Debt "missing box";

(2) the repeated misrepresentations that Treasury was in full compliance with Paragraph 19 of the

November 1996 Order; (3) the ongoing objections to plaintiffs' requests for document

preservation orders on the false premise that such steps were unnecessary; and (4) the silence

during status conferences and pleadings when critical facts concerning Treasury's discovery

responses and obligations were either omitted or misstated.

---

has a special responsibility to the justice system"); Zimmerman v. Schweiker, 575 F. Supp. 1436, 1440 (E.D.N.Y. 1983) ("As a United States Attorney General put it more than a hundred years ago, 'in the performance of [] his duty, [a government attorney] is not a counsel giving advice to the government as his client, but [is] a public officer, acting judicially, under all the solemn responsibilities of conscience and legal obligations.'") (citation omitted).

[39]  Indeed, the record reveals at least twelve instances in which Treasury attorneys failed to disclose the destruction of the Hyattsville documents.  These opportunities include: the February 25, 1999 meeting with DOJ; the February 16, 1999 status conference; the March 23, 1999 status conference; the April 13, 1999 motions hearing; the March 16, 1999 Motion to Strike plaintiffs' proposed document retention order; the March 19, 1999 Memorandum regarding plaintiffs' proposed document retention order; the March 26, 1999 Statement of Discovery Priorities and the Department of Treasury Cobell Litigation Document Production Protocol; the Supplement to the March 26, 1999 Protocol; the April 12, 1999 Response to plaintiffs' proposed order; and the May 3, 1999 Motion for Summary Judgment.  In addition, Treasury attorneys could have availed themselves at any time, of contacting Messrs. Wolin and Knight, DOJ officials or the Office of the Inspector General.

In light of the foregoing, I recommend that the Department of the Treasury and the Department of Justice be required to report to the Court all steps they have taken to ensure that these incidents will never be repeated.  I further recommend that this Court take no action at this time until the Court can review what corrective and/or disciplinary measures have been taken to hold accountable those responsible for the conduct described above.

I do intend to allow the affected individuals the opportunity to address the finding contained in this Report, following which I will file a Supplemental Report in response.

Respectfully submitted,

DATE:_____                    _____
                                       Alan L. Balaran
                                       SPECIAL MASTER

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELOUISE PEPION COBELL, et al.,      )
                                    )
        Plaintiffs,                 )
                                    )
            v.                      )        Case No. 1:96CV01285
                                    )        (Judge Lamberth)
GALE A. NORTON, Secretary of the    )
Interior, et al.,                   )
                                    )
        Defendants.                 )
                                    )

**NOTICE OF FILING OF INTERIOR DEFENDANTS'
TWENTY-FIRST STATUS REPORT**

Interior Defendants hereby give notice of the filing of their twenty-first report due in

accordance with the Order of December 21, 1999.

A copy of the report is attached hereto.

Dated: May 2, 2005                      Respectfully submitted,
                                        ROBERT D. McCALLUM, JR.
                                        Associate Attorney General
                                        PETER D. KEISLER
                                        Assistant Attorney General
                                        STUART E. SCHIFFER
                                        Deputy Assistant Attorney General

                                        J. CHRISTOPHER KOHN
                                        Director
                                        JOHN T. STEMPLEWICZ
                                        Senior Trial Counsel
                                        JOHN J. SIEMIETKOWSKI
                                        Trial Attorney
                                        Commercial Litigation Branch
                                        Civil Division
                                        P.O. Box 875
                                        Ben Franklin Station
                                        Washington, D.C. 20044-0875
                                        Telephone (202) 514-3368

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 2, 2005 the foregoing *Notice of Filing of Interior Defendants' Twenty-First Status Report* was served by Electronic Case Filing, and on the following who is not registered for Electronic Case Filing, by facsimile:

> Earl Old Person (*Pro se*)
> Blackfeet Tribe
> P.O. Box 850
> Browning, MT 59417
> Fax (406) 338-7530

Kevin P. Kingston

Case 1:06-cv-02236-JR    Document 32-14    Filed 04/29/2008    Page 3 of 76

## Notices

<u>1:96-cv-01285-RCL</u> <u>COBELL, et al v. NORTON, et al</u>

### U.S. District Court

### District of Columbia

Notice of Electronic Filing

The following transaction was received from Siemietkowski, John entered on 5/2/2005 at 7:08 PM and filed on 5/2/2005

**Case Name:** COBELL, et al v. NORTON, et al
**Case Number:** 1:96-cv-1285
**Filer:** ALL FEDERAL DEFENDANTS
**Document Number:** 2950

**Docket Text:**
NOTICE *Notice of Filing of Interior Defendants' Twenty-First Status Report* by ALL FEDERAL DEFENDANTS (Attachments: # (1) DOIs 21st Status Report)(Siemietkowski, John)

The following document(s) are associated with this transaction:

**Document description:** Main Document
**Original filename:** J:\C-Financial\Cobell\Current Filing\00_Notice_96cv1285_05022005.pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=5/2/2005] [FileNumber=751967-0] [
454abcd4303e469687a5c2750e1c65db5e29de88cc26a679234c1eb8206cbfeb5bcf24
b5dd3455675b9cc9cef5536482201b85b08a22625c1f3d021b46cbcd25]]
**Document description:** DOIs 21st Status Report
**Original filename:** J:\C-Financial\Cobell\Current Filing\01_DoIs 21st Status Report.pdf
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=973800458 [Date=5/2/2005] [FileNumber=751967-1] [
aa2a7c3acb23834436e6e30c9d77ec06a5102fab9eeb216d4e7a3345676a6bedf06c07
8208d12e5633426793e608d41d57eb83bcba2029598ca3cf1f6fd6c42c]]

### 1:96-cv-1285 Notice will be electronically mailed to:

Cynthia L. Alexander    cynthia.alexander@usdoj.gov,

Henry A. Azar , Jr    henry.azar@usdoj.gov,

Donald Michael Barnes    dbarnes@porterwright.com,

Alan I. Baron    Alan.Baron@hklaw.com

Howard Christopher Bartolomucci    hcbartolomucci@hhlaw.com,

Michael James Bearman    mbearman@mckennalong.com,

05/02/2005

David Booth Beers    dbeers@sheagardner.com,

Steven F. Benz    sbenz@khhte.com,

Kenneth Lee Blalack , II    lblalack@omm.com,

L. Barrett Boss    bboss@cozen.com, ahenry@cozen.com;skerkhoff@cozen.com

Dwight Phillip Bostwick    dwight.bostwick@baachrobinson.com,

Stanley M. Brand    sbrand@brand-frulla.com,

William H. Briggs , Jr    bbriggs@rdblaw.com,

Mark Kester Brown    mkesterbrown@attglobal.net,

Stephen M. Byers    sbyers@crowell.com,

Plato Cacheris    pcacheris@troutrichards.com

Christina M. Carroll    ccarroll@mckennalong.com,

Robert Christopher Cook    ccook@jonesday.com,

John Charles Cruden    john.cruden@usdoj.gov,

Timothy Edward Curley    timothy.curley@usdoj.gov,

Richard Lee Cys    rickcys@dwt.com, carolkaltenbaugh@dwt.com

William Aaron Dobrovir    dobrovirpc@aol.com,

Herbert Lawrence Fenster    hfenster@mckennalong.com,

Eugene R. Fidell    efidell@feldesmantucker.com,

Lisa Freiman Fishberg    lfishberg@coburnandschertler.com

Hamilton Phillips Fox , III    phil.fox@sablaw.com

William Leonard Gardner    wgardner@morganlewis.com,

John Albert Gibbons    gibbonsj@dsmo.com,

Dennis M. Gingold    dennismgingold@aol.com, grempel@earthlink.net

Michael D. Goodstein    mdg@reslawgrp.com,

Jill Elise Grant    jgrant@nordhauslaw.com,
dgrove@nordhauslaw.com;sjoshi@nordhauslaw.com;kdunlop@nordhauslaw.com

Richard A. Guest     richardg@narf.org, jeremy@narf.org

Keith M. Harper     harper@narf.org, hargrow@narf.org;apaige@narf.org

Andrew Dewald Herman     aherman@brand-frulla.com, jcohen@brand-frulla.com

Tracy Lyle Hilmer     tracy.hilmer@usdoj.gov,

Charles Allen Hobbs     chobbs@hsdwdc.com, judan@hsdwdc.com

John F. Hundley     jhundley@troutcacheris.com

Douglas B. Huron     huron@hellerhuron.com,

Michael X. Imbroscio     mimbroscio@cov.com,

Amy B. Jackson     ajackson@troutcacheris.com

Daniel Gordon Jarcho     djarcho@mckennalong.com,

Julie B. Kaplan     julie.kaplan@reslawgrp.com, mlw@reslawgrp.com

Lisa Bondareff Kemler     lisa@zwerlingkemler.com,

J. Christopher Kohn     chris.kohn@usdoj.gov,

David Sidney Krakoff     dkrakoff@mayerbrownrowe.com,

John R. Kresse     john.kresse@usdoj.gov,

Elliott H Levitas     elevitas@kilpatrickstockton.com,

Bradley S. Lui     blui@mofo.com,

Robert D. Luskin     rluskin@pattonboggs.com,

Christopher B. Mead     cmead@londonandmead.com,

Mark E. Nagle     mnagle@sheppardmullin.com,

Larry Allen Nathans     nathans@nathanslaw.com

Jonathan Brian New     jonathan.new@usdoj.gov,

Anne Doris Noto     anoto@sonosky.com,

Nathaniel D. Owens     wwlwms@aol.com,

Terry M. Petrie     terry.petrie@usdoj.gov,

Brian Michael Privor    bprivor@morganlewis.com

Michael John Quinn    michael.quinn3@usdoj.gov,

B. Michael Rauh    rauh@blankrome.com

John T. Richards , Jr    jtr@troutrichards.com,

Marc Evan Rindner    mrindner@rdblaw.com,

Jennifer R. Rivera    jennifer.rivera@usdoj.gov,

Martha Purcell Rogers    mrogers@ober.com

Steven John Roman    romans@dsmo.com,

Kerri L. Ruttenberg    kruttenberg@cozen.com

Robert A. Salerno    robert.salerno@piperrudnick.com,

Phillip Martin Seligman    phillip.seligman@usdoj.gov,

John Joseph Siemietkowski    john.siemietkowski@usdoj.gov

Gregory S. Smith    greg.smith@sablaw.com

Mary Lou Soller    msoller@milchev.com,

Sandra Peavler Spooner    sandra.spooner@usdoj.gov,

John Thomas Stemplewicz    john.stemplewicz@usdoj.gov,
john.o'connor2@usdoj.gov;sandra.spooner@usdoj.gov;kevin.kingston2@usdoj.gov;james.st.john@usdoj

William M. Sullivan , Jr    wsullivan@winston.com

Ilana Z. Sultan    isultan@mayerbrownrowe.com

Jonathan Turley    jturley@law.gwu.edu,

Jonathan K. Tycko    jtycko@tzslaw.com

Barbara Ann Van Gelder    bvangeld@wrf.com,

Gino D. Vissicchio    gino.vissicchio@usdoj.gov,

Kathleen Elizabeth Voelker    kathleenvoelker@aol.com,

John Warshawsky    john.warshawsky@usdoj.gov, john.o'connor2@usdoj.gov

Dodge Wells    dodge.wells@usdoj.gov,

05/02/2005

Judith Lynne Wheat    judith.wheat@verizon.net,

Thomas Edward Wilson    twilson@bcr-dc.com,

Emily M. Yinger    emyinger@hhlaw.com

Roger Eric Zuckerman    rzuckerman@zuckerman.com,

John Kenneth Zwerling    jz@zwerlingkemler.com,

**1:96-cv-1285 Notice will be delivered by other means to:**

Jason B. Aamodt
WRIGHTSMAN MANSION
1645 South Cheyenne Avenue
Tulsa, OK 74119

ALBERT LEE BYNUM
492-2948
504 Brewton Street
Gadsden, AL 35903-3804

Bruce Allen Baird
COVINGTON & BURLING
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401

E. Lawrence Barcella , Jr
PAUL, HASTINGS, JANOFSKY & WALKER, L.L.P.
1299 Pennsylvania Avenue, NW
10th Floor
Washington, DC 20004-2400

Robert W. Biddle
BENNETT & NATHANS, L.L.P.
120 East Baltimore Street
Baltimore, MD 21202

Edith R. Blackwell
1849 C Street NW
Washington, DC 20240

Michael R. Bromwich
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON
1001 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20004

Tom C. Clark
U.S. DEPARTMENT OF JUSTICE

Land & Natural Resources Division
Ben Franklin Station
P.O. Box 7611
Washington, DC 20044-1420

Andrew M. Eschen
U.S. DEPARTMENT OF JUSTICE
ENRD, Ben Franklin Station
P.O. Box 663
Washington, DC 20044-0663

Brian L. Ferrell
U.S. DEPARTMENT OF JUSTICE
ENRD, Ben Franklin Station
P.O. Box 663
Washington, DC 20044-0663

Charles Walter Findlay , III
UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources
P.O. Box 663
Ben Franklin Station
Washington, DC 20044

Timothy Patrick Garren
U.S. DEPARTMENT OF JUSTICE
Civil Rights Division
1425 New York Avenue, NW
Room 8128
Washington, DC 20035

Sarah D. Himmelhoch
UNITED STATES DEPARTMENT OF JUSTICE
Environment and Natural Resources
P.O. Box 663
Washington, DC 20044

Sydney Jean Hoffmann
THE LAW OFFICES OF PLATO CACHERIS
1100 Connecticut Avenue, NW
Suite 730
Washington, DC 20036

George Joseph Hughes
HUGHES & BENTZEN, PLLC
1667 K Street, NW
Suite 520
Washington, DC 20006

EDDIE JACOBS
P.O. Box 2322

Oklahoma City, OK 73101

Amalia D. Kessler
U.S. DEPARTMENT OF JUSTICE
Commercial Litigation Branch
P.O. Box 875
Washington, DC 20044-0875

Leslie B. Kiernan
ZUCKERMAN SPAEDER, LLP
1201 Connecticut Avenue, NW
Suite 600
Washington, DC 20036

Erik Lloyd Kitchen
STEPTOE & JOHNSON, L.L.P.
1330 Connecticut Avenue, NW
Washington, DC 20036

Robert Craig Lawrence
U.S. ATTORNEY'S OFFICE
Judiciary Center Building
555 Fourth Street, NW
Room 10-417
Washington, DC 20530

Pamela J. Marple
CHADBOURNE & PARKE
1200 New Hampshire Avenue, NW
Washington, DC 20036

Marshall L. Matz
OLSSON, FRANK & WEEDA, P.C.
1400 16th Street, NW
Suite 400
Washington, DC 20036-2220

Melissa Heitmann McNiven
BAACH, ROBINSON & LEWIS PLLC
1201 F Street, NW
Suite 500
Washington, DC 20004

Nicole Jo Moss
COVINGTON & BURLING
1201 Pennsylvania Avenue, NW
Washington, DC 20004-2401

EARL OLD PERSON
P.O. Box 486
Browning, MT 59486

Jeffrey D. Robinson
BAACH ROBINSON & LEWIS PLLC
1201 F Street, NW
Suite 500
Washington, DC 20004

Neil James Ruther

29 West Susquehanna Avenue
Suite 610
Towson, MD 21204

Sandra Marguerite Schraibman
U.S. DEPARTMENT OF JUSTICE
Federal Programs Branch
901 E Street, NW
Suite 976
Washington, DC 20530

Seth Brandon Shapiro
U.S. DEPARTMENT OF JUSTICE
Civil Division/Ben Franklin Station
P.O. Box 875
Washington, DC 20044

Geoffrey D. Strommer
HOBBS, SRAUS, DEAN & WALKER
851 South West Sixth Avenue
Portland, OR 97204

Lawrence H. Wechsler
JANIS, SCHUELKE & WECHSLER
1728 Massachusetts Avenue, NW
Washington, DC 20036

Laura C. Zimmitti
ROSS, DIXON & BELL, LLP
2001 K Street, NW
Suite 400
Washington, DC 20006-2688



THE SECRETARY OF THE INTERIOR

WASHINGTON

MAY 0 2 2005

Christopher Kohn
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875

Re:    _Cobell v. Norton_ – *Status Report to the Court Number Twenty-One*

Dear Mr. Kohn:

Enclosed is the Department of the Interior's *Status Report to the Court Number Twenty-One (For the Period January 1, 2005 through March 31, 2005).*  Please forward a copy to the Court.

This is the fourteenth report in the revised Report format.  My signature on this Report reflects my belief that my personal observations are true and correct, and that the information provided to me by others for inclusion in my observations, as well as accompanying sections of the Report are correct to the best of my knowledge.

Thank you for your assistance.

Sincerely,

Gale A. Norton

Gale A. Norton

Enclosure

# Status Report to the Court
# Number Twenty-One

**For the Period**
**January 1, 2005 through March 31, 2005**



**May 2, 2005**

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................. 1

II.    SECRETARY GALE NORTON'S OBSERVATIONS ............................ 2

  A.   INFORMATION TECHNOLOGY ........................................... 4

  B.   CADASTRAL SURVEY .................................................... 11

  C.   MINERALS MANAGEMENT SERVICE ................................. 14

  D.   OFFICE OF HISTORICAL TRUST ACCOUNTING ................... 16

III.   OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS ......... 25

  A.   TRUST REVIEW AND AUDIT .......................................... 27

  B.   OST-OFFICE OF THE CHIEF INFORMATION OFFICER ............ 29

    1.   RECORDS MANAGEMENT ........................................ 29

  C.   TRUST ACCOUNTABILITY ............................................. 33

    1.   TRUST BUSINESS PROCESS MODELING ...................... 33

    2.   TRUST DATA QUALITY AND INTEGRITY ..................... 36

    3.   INDIAN FIDUCIARY TRUST TRAINING PROGRAM ......... 39

    4.   RISK MANAGEMENT .............................................. 41

    5.   REGULATIONS, POLICIES AND PROCEDURES ............... 42

  D.   FIELD OPERATIONS ................................................... 44

    1.   APPRAISAL ......................................................... 44

  E.   TRUST SERVICES ...................................................... 47

    1.   CURRENT ACCOUNTING ACTIVITIES ......................... 47

IV.    BUREAU OF INDIAN AFFAIRS .......................................... 52

  A.   TRUST REGULATIONS, POLICIES AND PROCEDURES ............ 52

  B.   FRACTIONATION ....................................................... 55

  C.   PROBATE ............................................................... 58

ACRONYMS AND ABBREVIATIONS .......................................... 60

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                                    **Introduction**

## I.  INTRODUCTION

This *Status Report to the Court Number Twenty-One* (Report) represents the period from January 1, 2005, through March 31, 2005.  The Report is presented for the purpose of informing the Court on the progress of trust reform activities occurring during this reporting period, and progress of the historical accounting of individual Indian beneficiary funds managed by Interior.[1]

This Report is prepared in a manner consistent with previous reports to the Court.  Each manager in charge of an area of trust administration and the director of the historical accounting project are submitting reports on the progress of their respective activities.

A glossary of acronyms and abbreviations is included in this Report.  The glossary is located at the end of the Report.

---

[1]  This report contains information on the broad trust reform efforts underway at Interior.  Accordingly, it may include information on reform efforts that are not within the scope of the *Cobell* litigation.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

May 2, 2005                                  **Secretary Gale Norton's Observations**

## II.    SECRETARY GALE NORTON'S OBSERVATIONS

Interior staff reported continuing progress during this reporting period. Implementation of the Fiduciary Trust Model continued on schedule. We are implementing FTM initially at two pilot BIA agencies, Concho and Anadarko. At these pilot sites, we introduced new systems to process work, substantially eliminated backlogs in recording vital information into the new title system, and distributed probates. We plan to soon send new performance statements to all beneficiaries, giving them more detailed information on their trust assets and trust income. Across the country, follow-on agencies will use the lessons learned at the pilot agencies to improve their work processes and eliminate many of the backlogs in processing information. It is our goal for each agency to eventually be operating at the same high standard at the end of this process.

A primary FTM goal is providing ready access to information for beneficiaries. Our new beneficiary call center, modeled after a major private sector call center, handled more than 13,000 calls during its first four months of operation. We were able to address 93 percent of the inquiries during the initial call. We needed to refer only seven percent of the calls to trust officers or BIA officials for further resolution.

As reported previously, the American Indian Probate Reform Act requires Interior to notify Indian Country about its provisions before the law fully takes effect. We drafted a notice during this reporting period and began mailing it to approximately 290,000 beneficiaries. We are also publishing the notice in the Federal Register and local newspapers. We expect the notice requirements to be completed during the next reporting period. I will then be able to certify, as required by the Act, that the notice has been given. Many of the provisions of the new law will become effective one year from the date of my certification. Last quarter, I reported we were training selected BIA, OST and call center employees about the Act. These employees are now trained and available to answer questions as beneficiaries receive our mailings.

Congress has held several hearings during this reporting period wherein the impact of the *Cobell* litigation and the FY2006 trust activity appropriations were discussed. A number of members expressed concerns about using funds for litigation and accounting, instead of for other programs with more direct benefit for Indian people. As previously reported, our FY2005 budget request for historical accounting was $109 million. However, Congress reduced that amount during the appropriation process to $57.2 million. Our FY2006 budget proposal requests approximately $135 million.

During this reporting period, the historical accounting project team focused its efforts on judgment and per capita accountings and high-dollar land-based accountings. As a result, approximately 47,000 judgment and per capita accounts have been reconciled since the beginning of this project. The accounting work continues to disclose very few accounting discrepancies.

Approximately 400 million pages of records have been collected to be used in completing the historical accounting. Although plaintiffs continue to report to the press and the Court that few records exist, the facts show otherwise. Far more records exist than anyone anticipated when the

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                    **Secretary Gale Norton's Observations**

accounting exercise began several years ago. Of course, having records is only the first step in accounting. Scanning, indexing, and creating electronic files so that the records are readily usable by accountants is very time consuming and very expensive. Thus far, over 110,000 boxes of records have been indexed and more than seven million pages of records have been scanned.

As the Court is aware, Interior asked its Inspector General to verify the security of its computer systems through penetration testing. Although this process is designed to identify vulnerabilities, we were disappointed that it did find some. Steps taken to address these findings immediately have been described in documents already submitted to the Court. On the more encouraging side, Interior ranked in the top one-third of federal agencies in the annual House Government Reform Committee computer security rating.

During this reporting period, the President nominated Lynn Scarlett to be the Deputy Secretary for the Department. I am very pleased with her nomination. Her experience as the Assistant Secretary for Policy, Management and Budget of the Department will serve her well in this new position. Also during this reporting period, Assistant Secretary for Indian Affairs David Anderson resigned. At my request, James Cason, Associate Deputy Secretary for the Department, agreed to temporarily assume the duties of the Assistant Secretary for Indian Affairs. In addition, Patrick Ragsdale was selected to be the Director of the Bureau of Indian Affairs. Mr. Ragsdale has an extensive background in all areas of the BIA. He moved to his new position from being the Director of Trust Review and Audit in the Office of the Special Trustee for American Indians.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                             **Information Technology**

## A.    INFORMATION TECHNOLOGY

### Introduction

This section describes the status of Interior IT systems, particularly the systems that house or provide access to IITD or provide various computing capabilities, including functions critical to the proper administration of the individual Indian trust responsibilities within Interior. In addition, this section describes various efforts being made to improve IITD security within Interior, pursuant to OMB Circular A-130 Appendix III, and the status of Internet connectivity.

### Accomplishments and Completions

**Computer Security:**

Interior continues to make progress in ensuring IT security and, in particular, addressing the potential risks associated with unauthorized access to IITD from the Internet. A primary focus for this reporting period has been validating and improving the C&A packages completed previously. C&A packages for systems with IITD were reviewed, and deficiencies noted and addressed. The most noteworthy accomplishments and completions during the reporting period are described below.

*Prevention and Monitoring*

- Interior continued testing Internet-accessible systems against the SANS Top 20 vulnerability list. For the fourth consecutive reporting period, no hosts were found to have vulnerabilities listed in the SANS Top 20.
- The Interior Inspector General continued unannounced penetration testing exercises for Internet-facing systems, completing reviews for three bureaus and offices during this reporting period. These bureaus and offices detected and blocked some intrusion attempts, but vulnerabilities of varying degrees that could be exploited were noted by the OIG. Bureau and office reports have been provided to Interior OCIO and deficiencies are being incorporated into the POA&M process for remediation. As Interior notified the Court on April 8, 2005, the IG memorandum to BLM stated that, "[the OIG] could have easily compromised the confidentiality, integrity and availability of the identified Indian Trust data residing on those systems." Those systems/servers were promptly disconnected from the Internet. The OIG expects to continue penetration testing for all bureaus and offices throughout FY2005.
- BIA completed a major replacement and/or upgrade of most of the workstations that are connected to the BIA network. BIA updated over 5000 computer workstations with current versions of both the operating system and the virus protection software. The upgrades are expected to significantly enhance BIA's ability to centrally manage and protect its critical applications throughout the network.
- BLM installed a new Bureau-wide monitoring system following the successful implementation of VBNS services. This is expected to allow BLM telecommunications specialists to respond much faster to any outbreaks of virus or other threats causing unusual

4

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                    **Information Technology**

bandwidth utilization.  Unusual bandwidth utilization may indicate the need for investigation for potential attacks.

- BLM completed approximately 40% of its migration from BLM's Active Directory to the Department's Active Directory.  BLM expects to complete the migration by May 1, 2005.

*Policies and Guidance*

- The Interior CIO issued a memorandum, "Re-Accreditation of Bureau of Indian Affairs Information Systems," to the Assistant Secretary for Indian Affairs on January 26, 2005.  As a result of independent review by the Interior CIO of BIA C&A packages, the AS-IA was asked to update 12 packages and re-accredit those systems when complete.  During this reporting period, these C&A packages were updated and the systems re-accredited.

- The Interior CIO issued a memorandum, "Re-Accreditation of Bureau of Land Management Information System," to the Assistant Secretary for Land and Minerals Management on January 27, 2005.  Upon independent review by the Interior CIO, the Assistant Secretary for Land and Minerals Management was asked to update one package and re-accredit the trust system when complete.  During this reporting period, this C&A package was updated and the system re-accredited.[2]

- The Interior CIO issued a memorandum, "Fiscal Year 2004 Federal Information Security Management Act Report on the Department of the Interior's Security Program," to the Inspector General on February 4, 2005.  This memorandum responded to and requested clarification of portions of the OIG's 2004 annual FISMA report.

- The Interior CIO and the Director of the Office of Acquisition and Property Management jointly issued OCIO Directive 2005-001, "Internet Protocol Version 6 (IPv6)."  The directive provides policy for department-wide deployment of next generation internetworking protocols.  IPv6 is designed to expand available IP address space, improve end-to-end security, and improve quality of service.

*Training and Awareness*

- A revised version of IT security awareness training was deployed in January 2005 and the annual cycle of training was reset.  The latest version of the training incorporates updates to Department guidance and OIG recommendations for content.  With just over two months of the training delivered, 42% of Interior staff (30,172 of 71,729) has completed training.  Interior is pursuing 100% completion by July 29, 2005.

- The quarterly MMS Information Security Awareness Newsletter, Winter 2004, was distributed to employees and contractors on January 25, 2005, to keep users abreast of IT security issues.

---

[2] This system was not identified in the OIG report referenced above.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

_____

**May 2, 2005**                                    **Information Technology**
_____

### E-Authentication and HSPD-12

- Interior signed a MOU with GSA to support the development and implementation of a common, government-wide electronic authentication service.
- A logical access deployment plan was created and approved by the E-Authentication workgroup outlining Interior's plans for implementing the information technology components of HSPD-12. The plan consists of objectives, goals, bureau and office milestones, and the strategy for meeting the mandates outlined in HSPD-12.

## Plans of Action and Milestones

Interior made progress in both identifying and completing corrective actions this quarter, accomplishing an overall 6% reduction in outstanding actions. Through extensive C&A activities by bureaus and offices, as well as normal review processes such as management control reviews and audits by the Interior OIG, Interior identified an additional 58 program and 367 system weaknesses during the last reporting period. The efforts of the bureaus and offices resulted in resolving 35 program and 465 system weaknesses, and an overall decrease in the number of weaknesses reported through POA&M.

## A-130 Certification and Accreditation:

C&A reviews conducted by a qualified third party have been completed for 54 C&A packages in this reporting period. Twenty-two of the 54 C&A package reviews were repeated for trust systems to ensure that deficiencies noted from initial reviews were addressed. Remaining C&A packages (102 or 60%) are scheduled for review in this fiscal year. Bureaus and offices completed comprehensive reviews of the trust systems or systems containing trust data, updated and improved the documentation, and re-scored the C&A packages. After updating and improving the documentation, re-scoring the C&As resulted in significant increases per element, with many packages receiving the highest possible score in the elements of risk assessment, system security plans and system test and evaluation.

## IT Systems Architecture:

### Phase 3B – Business Reference Model

Eight bureaus and offices collected and populated information for Phase 3B in the DEAR. Phase 3B focused on cross-mapping Interior's system inventory to the functions and activities performed by the system as defined in the OMB and Interior BRM. The Interior BRM details at a more granular level the functions and activities performed within Interior. This cross-mapping supports Interior's modernization blueprint analyses for determining potentially duplicative systems and systems that may benefit from integration, thus improving overall portfolio management. Interior now expects to validate Phase 3B populated data and make appropriate updates and corrections during the next reporting period.

- MMS completed the DEAR Phase 3B update in February 2005, including the review, verification and correction of all previous inventories.

6

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                                        **Information Technology**

- MMS started activities to prepare for DEAR Phase 4 to validate the previous inventory efforts. MMS initiated planning for the new inventory which maps the Interior DRM to existing or planned IT systems.
- BIA completed 75% of activities associated with relating Indian Affairs systems to components of the Federal Enterprise Architecture Service Reference Model, and identifying relationships between those systems and the main, infrastructural components in the TRM.
- BIA incorporated the Interior TRM into the BIA repository.

### DOI Land and Resource Management System

Interior bureaus and offices reviewed the draft DLRM FRD, which identifies the high-level functional and performance requirements that were gathered in a series of meetings with subject matter experts across Interior. Review comments were addressed and changes were incorporated in the document. Briefings are planned with Interior bureaus and offices to complete the approval process. After approval of the FRD, this project is expected to enter the acquisition phase.

### Leasing System Module Independent Verification and Validation

The DLRM system is expected to provide a long-term solution for the legacy functionality of the CGI leasing software module, formerly a part of the TAAMS project. As an interim solution:
- The TESC directed OST to proceed with UAT of the salvageable portion of the TAAMS leasing module. The formal UAT occurred March 29-30, 2005. The results are expected to be reported during the next reporting period.
- Initial work on data quality efforts to support conversion from the legacy systems has begun.

### TrustNet

- As reported in the last status report to the Court, OHA had connected its Arlington office, two field offices, and its ZANTAZ connection to the Department's ESN operations. OHA's ZANTAZ connection is a point-to-point connection between OHA and the ZANTAZ facility. ZANTAZ is not directly connected to the ESN. During the current reporting period, all remaining OHA field office connections were routed through the ESN operations. With the completion of this task, OHA's wide area network is connected to ESN.
- SOL completed its move to ESN in February 2005, and expects to complete C&A activities during the next reporting period.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                        **Information Technology**

## ZANTAZ

- BIA sent to ZANTAZ back-up tapes of the two e-mail servers that had not been copying e-mail to the ZANTAZ Digital Safe from July to December 2004. ZANTAZ restored these BIA back-up tapes to the Digital Safe. Interior reported on this incident to the Court January 31, 2005.
- As reported to the Court on March 18, 2005, SOL discovered it was not using a buffer server. Following this discovery, a buffer server was installed.
- Also noted in the report to the Court of March 18, 2005, when NBC upgraded its ZANTAZ software, its e-mails likely did not travel to the ZANTAZ Digital Safe on February 15-17, 2005. NBC expects to send back-up tapes from these days to ZANTAZ to permit inclusion of these e-mails in the Digital Safe.
- Also noted in the report to the Court of March 18, 2005, due to a network problem, SOL e-mails queued for three days in early March before being forwarded to the Digital Safe.
- The OSM VPN connection to ZANTAZ was down March 8-11, 2005, which delayed the transmission of live e-mail messages to the ZANTAZ Digital Safe. Also in March, OSM discovered an additional potential problem in the transmission of live e-mail messages to the ZANTAZ Digital Safe. Interior is investigating these incidents.

## Current Status

### A-130 Certification and Accreditation:

Ninety-four percent of Interior systems have full authority to operate (ATO) status. While this reflects a reduction from the previous reporting period, none of the remaining systems remanded to IATO contain IITD. Based on internal quality reviews of the relevant C&A packages, BLM remanded six systems to IATO status until supporting documentation could be corrected. Common supporting documentation is often included by reference; Interior is now requiring inclusion of each referenced document in hard copy with each C&A package. Interior continues its active management and appropriate response to quality review issues as part of FISMA-required management of deficiencies.

Although not required by FISMA or A-130, Interior expects to perform a 100% quality review of the C&A packages by the end of FY2005. C&A reviews conducted by a qualified third party have been completed for 40% of the bureau and office accreditations. Areas in C&A packages identified for improvement are expected to be tracked using the POA&M process. This process resulted in successful review and improvement of several trust system C&A documents.

### Reports:

- Interior issued its second quarter FISMA update to OMB identifying that 98% of systems have completed contingency plans with 91% of those plans having been tested. The overall number of POA&M deficiencies decreased by 6% as 500 issues were closed, but 425 added.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

May 2, 2005                                                             **Information Technology**

- The U. S. House of Representatives Government Reform Committee (Rep. Tom Davis, Chairman) published its annual FISMA report card, raising Interior from an "F" in FY2003 to a "C+" in FY2004. This places Interior above the average federal grade, ranking in the top third of the 24 listed agencies.
- *Federal Computer Week* issued its annual Fed 100 for 2005, a listing of 100 federal IT professionals recognized for their efforts to improve IT in the federal government. In the Fed 100, Brian Burns, AS-IA, CIO, is noted for his progress in providing American Indian Tribes access to better technology.

## Delays and Obstacles

There are many challenges that must be addressed regarding the integration, performance, funding, security, and data integrity of Interior IT systems. Interior initiated or completed steps to address some of the challenges reported in this and previous reporting periods. However, delays and obstacles listed here still impede progress in achieving Interior's IT management goals:

## Litigation

- Employee fears about becoming personally implicated in the *Cobell* litigation continue to undermine creativity and decision-making. This impediment has worsened within Interior as depositions have been scheduled for many Interior employees, including those without decision-making authority.
- Uncertainty over reconnection status is hampering progress on several IT projects which would improve efficiency and IT security.

## Funding

- Funding availability will continue to dictate the timing of IT-related initiatives. Interior's FY2005 budget will require managing a variety of IT-related requirements and tradeoffs.

## Denied Internet Access

- Several Interior bureaus and offices (BIA, OHA, OST and SOL) have not been permitted by the Court to have Internet access since December 5, 2001. Lack of Internet access impedes work processes and the ability to communicate effectively, both internally and externally. Maintaining security on internal systems is more difficult without access to the Internet for research, reporting, and patch management. Similarly, promulgation of policy and training is substantially hampered by the lack of interconnectivity and Internet access.
- Lack of Internet access limits Interior's ability to provide services to Indian beneficiaries. As noted in GAO testimony before the House of Representatives Committee on Resources, *Indian Issues: Timeliness of the Tribal Recognition Process Has Improved, but It Will Take Years to Clear the Existing Backlog of Petitions* (GAO-05-347T), on February 10, 2005, "The main impediment to completely implementing the Strategic Plan and to making all of

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                        **Information Technology**

the information that has been compiled more accessible to the public is the fact that BIA continues to be disconnected from the Internet because of ongoing computer security concerns involving Indian trust funds."

**Assurance Statement**

I concur with the content of the information contained in the Information Technology section of the *Status Report to the Court Number Twenty-One*. The information provided in this section is accurate to the best of my knowledge.

Date:   April 26, 2005

Name: *Signature on File*
       W. Hord Tipton
       Interior Chief Information Officer

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                                    **Cadastral Survey**

### B.    CADASTRAL SURVEY

**Introduction**

Cadastral surveys provide assurance that land boundaries for individual Indian and tribal trust lands are identified appropriately. By federal law, surveys of Indian lands are to be performed under BLM's direction and control. Official surveys, whether preexisting or new, identify the location of land boundaries of Indian trust assets and determine official acreage. The official surveys are integral to realty transactions, resource management activities, litigation support and the federal system of patent, allotment and survey records maintained by BLM. Ownership information, distribution of trust assets, and management of trust accounts may be related to or based upon information recorded in official surveys.

**Accomplishments and Completions**

**Training**

The latest LTIC class, attended by 32 individuals from BIA, BLM, OST and tribal governments across the country, was held during this reporting period. The attendees were a mix of cadastral surveyors, realty specialists/officers, resource managers, attorneys, self-governance specialists, leasing compliance officers/managers, accountants, paralegal specialists, natural resource specialists, public service directors, probate clerks and agency superintendents.

BLM presented a course for BLM employees on the impact of the Indian Self-Determination and Education Assistance Act and the Tribal Self-Governance Act on providing commercial activities related to cadastral services.

**GCDB Data Collection for High Priority Areas**

The fourth GCDB pilot project to develop a CGIS was funded in this reporting period. BIA, OST, BLM and the four participating Tribes continue to implement these projects.

**Interagency Agreements for Cadastral Survey Services**

A modification to the BIA-BLM interagency agreement for FY2005 funding was signed during this reporting period. This modification provides supplemental funding to BLM for cadastral survey services on trust and restricted lands throughout Indian country.

**Interior Indian Trust Lands Boundary Standards (Draft)**

BIA, BLM, OST and tribal representatives attended two working group meetings and finalized the draft standards, together with relevant portions of the departmental and bureau manuals and handbooks. These drafts were then distributed to BIA, BLM, OST and Tribes for comments.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                             **Cadastral Survey**

## Current Status

### Funding of the Recommendations Outlined in the FTM

During this reporting period, representatives of the Cadastral Survey Program presented to the TESC recommendations and a budget necessary to achieve the FTM goals as they relate to cadastral surveys. FY2005 funds were allocated for this purpose in this reporting period. FY2006 and FY2007 budget requirements are being developed.

The first six BLM Indian land surveyor positions were advertised during this reporting period. It is anticipated that these positions will be filled during the next reporting period. These six surveyors are expected to be located in the following BIA regional offices: Southern Plains, Eastern Oklahoma, Midwest, Great Plains, Navajo and Northwest. The remaining six BIA regions are expected to receive their BLM Indian land surveyors in FY2006.

### Missing BIA Indian Service Survey Records and Unofficial Survey Records

BLM and OTR have begun to discuss searching for survey-related records. As previously reported, BLM continues to search, on an as needed basis, for records and unofficial surveys performed by BIA surveyors in the 19th and 20th centuries. These surveys records may be found filed with inactive BIA records that may be at agency locations or stored at the AIRR.

## Delays and Obstacles

### Disconnection from the Internet

The Court-ordered disconnection from the Internet continues to adversely impact the way communications are handled between BLM, BIA, OST and SOL, including the way CARS is being implemented.

### Limited Resources

Addressing the majority of cadastral survey services needs is dependent upon future funding of FTM initiatives.

12

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                      **Cadastral Survey**

## Assurance Statement

I concur with the content of the information contained in the Cadastral Survey section of the *Status Report to the Court Number Twenty-One*. The information provided in this section is accurate to the best of my knowledge.

Date:   April 21, 2005

Name: *Signature on File*
        Donald A. Buhler
        Chief Cadastral Surveyor
        Bureau of Land Management

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

---

**May 2, 2005**                                **Minerals Management Service**

---

## C.    MINERALS MANAGEMENT SERVICE

### Introduction

Minerals Revenue Management, an MMS program, is responsible for collecting, accounting for, and distributing mineral revenues from both federal and Indian mineral leases, and for evaluating industry compliance with laws, regulations and lease terms. MRM maintains reported information and distributes revenues at the lease level. BIA maintains individual Indian ownership records that are used to provide information to OST for disbursement of the lease revenues to individual Indian beneficiaries.

### Current Status

### Indian Oil Rule

As previously reported, a proposed rule for valuing crude oil produced from Indian leases is expected to be published by August 31, 2005. MMS held three public workshops to gather preliminary comments and conduct preliminary consultation in anticipation of publishing a new proposed rule regarding Indian oil royalty valuation. The Oklahoma City workshop, held on March 8, 2005, included 14 representatives (8 industry and 6 Indian). The March 9, 2005, Albuquerque workshop included 6 representatives (2 industry and 4 Indian). The Billings workshop was held on March 16, 2005, and included 9 representatives (1 industry, 7 Indian, and 1 BIA). Indian representatives at these workshops included both tribal and individual Indian mineral owners.

### Payment Receipt Date Verification

The MRM's upgrade to the PeopleSoft software was successfully completed January 17, 2005. With the completion of the PeopleSoft upgrade, software changes and system enhancements are underway. As previously reported, once completed and tested, further errors are expected to be prevented. MMS will then devote resources to identify prior errors in the Indian mineral revenue distribution file.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                    **Minerals Management Service**

**Assurance Statement**

I concur with the content of the information contained in the Minerals Management Service section of the *Status Report to the Court Number Twenty-One*.  The information provided in this section is accurate to the best of my knowledge.

Date:   April 21, 2005

Name:  *Signature on File*
        Cathy J. Hamilton
        Chief of Staff
        Minerals Revenue Management
        Minerals Management Service

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

May 2, 2005                                    **Office of Historical Trust Accounting**

### D.    OFFICE OF HISTORICAL TRUST ACCOUNTING

**Introduction**

OHTA was established by Secretarial Order No. 3231 on July 10, 2001, and is charged with planning, organizing, directing and executing the historical accounting of IIM and tribal trust accounts.

**Current Status**

**Judgment IIM Accounts**

OHTA continues to perform historical accounting procedures on Judgment IIM accounts. During this reporting period, OHTA completely reconciled an additional 3,345 accounts in Subgroups[3] as follows:  902 accounts in Subgroup A, 1,676 accounts in Subgroup B, 411 accounts in Subgroup C, and 356 accounts in Subgroup D.  Of the 40,046 Judgment IIM accounts completely reconciled as of March 31, 2005, quality control review has been completed for 38,475 accounts.  OHTA expects to complete quality control review of the other 1,571 completely reconciled accounts during the next reporting period.

As more data—particularly from the "Paper Records Era"—are collected and keyed into the transaction listings, some accounts are reclassified into Subgroups different from their original classification.  The following tables present the total number of Judgment IIM accounts in each Subgroup reconciled as of March 31, 2005, including accounts reconciled in previous reporting periods.  The tables also report balances and throughput.

---

[3]  Subgroup A contains Judgment IIM accounts with receipt deposit(s) and monthly interest postings through December 31, 2000, and no disbursement of funds.  Subgroup B contains only Judgment IIM accounts with receipt deposit(s) and monthly interest postings with a single disbursement.  Subgroup C contains only Judgment IIM accounts with receipt deposit(s) and monthly interest postings with multiple disbursements.  Subgroup D contains accounts with both (1) Judgment transactions with receipt deposit(s) and monthly interest postings, and (2) land-based transactions (income from land interests owned by the account holder).

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                    **Office of Historical Trust Accounting**

## Status of Work

### Judgment IIM Accounts Open as of 12/31/00

**Number of Accounts: 33,205      Balances Total: $80,839,699      Throughput\* Total: $140,694,346**

|  | Subgroup A | Subgroup B | Subgroup C | Subgroup D | Totals |
|---|---|---|---|---|---|
| **Completely Reconciled** | | | | | |
| Number of Accounts | 19,012 | 3 | -- | 1,751 | 20,766 |
| $ Balances Reconciled | $53,301,518 | -- | -- | $727,571 | $54,029,089 |
| $ Throughput\* Reconciled | $53,384,367 | $6,823 | -- | $20,001,157 | $73,392,347 |
| **Partially Reconciled** | | | | | |
| Number of Accounts | 0 | 1 | 2 | 4,383 | 4,386 |
| $ Balances | -- | -- | -- | $8,830,703 | $8,830,703 |
| $ Throughput\* Reconciled | -- | $4,890 | $3,415 | $2,983,922 | $2,992,227 |
| $ Throughput to be Reconciled\*\* | -- | $6,430 | $17,682 | $25,315,600 | $25,339,712 |
| **Paper Records Era Reconstruction** | | | | | |
| Number of Accounts\*\*\* | | | | | 8,053 |
| $ Balances to be Reconciled | | | | | $17,979,907 |
| $ Throughput to be Reconciled\*\* | | | | | $38,970,060 |

17

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                    **Office of Historical Trust Accounting**

## Status of Work

## Judgment IIM Accounts Open as of or after 10/25/94 but Closed Prior to 12/31/00

**Number of Accounts: 47,334        Balances Total: $0        Throughput\* Total: $499,956,704**

|                                   | Subgroup A | Subgroup B | Subgroup C | Subgroup D | Totals |
|-----------------------------------|------------|------------|------------|------------|--------|
| **Completely Reconciled**         |            |            |            |            |        |
| Number of Accounts                | NA         | 16,257     | 2,170      | 853        | 19,280 |
| $ Balances Reconciled             | NA         | --         | --         | --         | --     |
| $ Throughput\* Reconciled         | NA         | $106,572,211 | $36,284,840 | $14,418,457 | $157,275,508 |
| **Partially Reconciled**          |            |            |            |            |        |
| Number of Accounts                | NA         | 1,901      | 1,031      | 10,156     | 13,088 |
| $ Balances                        | NA         | --         | --         | --         | --     |
| $ Throughput\* Reconciled         | NA         | $2,187,583 | $2,139,507 | $10,153,496 | $14,480,586 |
| $ Throughput to be Reconciled\*\* | NA         | $8,612,558 | $9,992,957 | $120,612,127 | $139,217,642 |
| **Paper Records Era Reconstruction** |         |            |            |            |        |
| Number of Accounts\*\*\*          |            |            |            |            | 14,966 |
| $ Balances Reconciled             |            |            |            |            | --     |
| $ Throughput to be Reconciled     |            |            |            |            | $188,982,968 |

   \* Throughput is defined as the sum of the receipts and disbursements in the Electronic Records Era portion
      of an account.
  \*\* Throughput relating to respective accounts to be reconciled.
\*\*\* Distribution of reconstructed Paper Records Era accounts unknown.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                    **Office of Historical Trust Accounting**

A majority of the remaining Judgment IIM accounts (as well as some Per Capita IIM accounts) require conversion of transaction data from manual ledgers to electronic format. As of March 31, 2005, OHTA has searched approximately 3,300 boxes of stored records for manual ledgers required to complete the account history for Judgment and Per Capita IIM accounts that originated in the "Paper Records Era." Approximately 250,000 transactions for 27,000 Judgment and Per Capita IIM accounts have been located and entered into electronic format as a result of this effort.

**Per Capita IIM Accounts**

OHTA continues to perform historical accounting procedures on Per Capita IIM accounts. During this reporting period, OHTA completely reconciled an additional 198 accounts in Subgroups[4] as follows: 158 accounts in Subgroup A, 30 accounts in Subgroup B, and 10 accounts in Subgroup C. Of the 7,558 Per Capita IIM accounts completely reconciled as of March 31, 2005, quality control review has been completed for 7,360 accounts. OHTA expects to complete quality control review of the other 198 completely reconciled accounts during the next reporting period.

As more data—particularly from the "Paper Records Era"—are collected and keyed into the transaction listings, some accounts are reclassified into Subgroups different from their original classification. The following tables present the total number of Per Capita IIM accounts in each Subgroup reconciled as of March 31, 2005, including accounts reconciled in previous reporting periods. The tables also report balances and throughput.

---

[4] Subgroup A contains Per Capita IIM accounts with receipt deposit(s) and monthly interest postings through December 31, 2000, and no disbursement of funds. Subgroup B contains only Per Capita IIM accounts with receipt deposit(s) and monthly interest postings with a single disbursement but do not necessarily disburse the entire balance of the account. Subgroup C contains only Per Capita IIM accounts with receipt deposit(s) and monthly interest postings with multiple disbursements but do not necessarily disburse the entire balance of the account. Subgroup D contains accounts with both (1) Per Capita transactions with receipt deposit(s) and monthly interest postings, and (2) land-based transactions (income from land interests owned by the account holder).

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                           **Office of Historical Trust Accounting**

### Status of Work

## Per Capita IIM Accounts Open as of 12/31/00

**Number of Accounts: 9,013      Balances Total: $69,486,684      Throughput\* Total: $98,208,350**

|  | Subgroup A | Subgroup B | Subgroup C | Subgroup D | Totals |
|---|---|---|---|---|---|
| **Completely Reconciled** | | | | | |
| Number of Accounts | 2,137 | 654 | 519 | 77 | 3,387 |
| $ Balances Reconciled | $11,415,807 | $5,936,630 | $4,378,158 | $235,879 | $21,966,474 |
| $ Throughput\* Reconciled | $12,833,464 | $7,482,761 | $6,180,076 | $455,274 | $26,951,575 |
| **Partially Reconciled** | | | | | |
| Number of Accounts | -- | 191 | 699 | 4,535 | 5,425 |
| $ Balances | -- | $2,135,314 | $8,543,731 | $36,650,503 | $47,329,548 |
| $ Throughput\* Reconciled | -- | $2,224,321 | $9,505,600 | $31,572,341 | $43,302,262 |
| $ Throughput to be Reconciled\*\* | -- | $728,211 | $3,947,251 | $23,149,120 | $27,824,582 |
| **Paper Records Era Reconstruction** | | | | | |
| Number of Accounts\*\*\* | | | | | 201 |
| $ Balances to be Reconciled | | | | | $190,662 |
| $ Throughput to be Reconciled | | | | | $129,931 |

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                    **Office of Historical Trust Accounting**

### Status of Work

### Per Capita IIM Accounts Open as of or after 10/25/94 but Closed Prior to 12/31/00

**Number of Accounts: 10,020        Balances Total: $0        Throughput* Total: $93,733,222**

|  | Subgroup A | Subgroup B | Subgroup C | Subgroup D | Totals |
|---|---|---|---|---|---|
| **Completely Reconciled** | | | | | |
| Number of Accounts | NA | 3,511 | 635 | 25 | 4,171 |
| $ Balances Reconciled | NA | -- | -- | -- | -- |
| $ Throughput* Reconciled | NA | $36,948,110 | $8,656,406 | $428,746 | $46,033,262 |
| **Partially Reconciled** | | | | | |
| Number of Accounts | NA | 581 | 646 | 2,659 | 3,886 |
| $ Balances | NA | -- | -- | -- | -- |
| $ Throughput* Reconciled | NA | $2,625,257 | $4,701,805 | $10,416,610 | $17,743,672 |
| $ Throughput to be Reconciled** | NA | $5,440,311 | $7,882,222 | $15,921,504 | $29,244,037 |
| **Paper Records Era Reconstruction** | | | | | |
| Number of Accounts*** | | | | | 1,963 |
| $ Balances to be Reconciled | | | | | -- |
| $ Throughput to be Reconciled | | | | | $712,251 |

   * Throughput is defined as the sum of the receipts and disbursements in the Electronic Records Era portion
     of an account.
  ** Throughput relating to respective accounts to be reconciled.
*** Distribution of reconstructed Paper Records Era accounts unknown.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**        **Office of Historical Trust Accounting**

## Mailings to Judgment and Per Capita IIM Account Holders

During this reporting period, OHTA mailed an additional 2,335 Historical Statements of Account with an accompanying transmittal letter explaining the Statement, bringing the total number of Statements mailed to Judgment IIM account holders to 11,872. A toll-free telephone number is available to account holders and/or their parents or guardians in the event they have questions about the mailings.

On March 24, 2005, the Department of Justice filed a Third Submission with the U.S. District Court in compliance with the May 28, 2004, Order regarding Historical Statements of Account. This Third Submission transmits four generic letters with accompanying redacted Statements requesting approval from the Court to use these letters for the next mailing of 28,107 Statements to Judgment and Per Capita account holders.

## Land-Based IIM Accounts

OHTA continues to conduct reconciliation work on High-Dollar Transactions identified as equal to or in excess of $100,000, and on National Sample Transactions under $100,000 in Land-Based IIM accounts. A final report on this work is expected during FY2005 when reconciliation is completed.

## OHTA SDA Distribution Project

The results of the OHTA SDA Distribution Project, as of March 31, 2005, are provided in the following table.

### SDA Distribution Progress

|  | Number of Accounts | Dollars |
|---|---|---|
| SDA that remained to be resolved as of December 31, 2004 - Reported in the *Status Report to the Court Number Twenty* | 12,919 | 34,208,548 |
| Interest posted on undistributed SDA and additional collections (net of disbursements thereof) credited to SDA during this reporting period | -- | 1,763,023 |
| SDA resolved during this reporting period | (321) | (3,634,892) |
| SDA remaining to be resolved as of March 31, 2005 | 12,598 | $32,336,679 |

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                    **Office of Historical Trust Accounting**

The following table reflects the SDA dollars resolved by type of recipient during this reporting period. Recipients in the "other" category include transfers to the Miscellaneous Receipts Account at Treasury, account reclassifications and transfers to the Federal Finance System.

|  | Transfers to IIM Accounts | Transfers to Tribal Accounts | Paid to Non-Indian Third Party | Other | Total |
|---|---|---|---|---|---|
| Dollars resolved during this reporting period | $1,012,969 | $2,171,536 | $121,822 | $328,565 | $3,634,892 |

## Imaging/Coding – Individual Indian Trust Documents

OHTA's IIM imaging and coding efforts continued during this reporting period, and the updated *Coding and Imaging Manual* is now expected to be released during the next reporting period. As of March 31, 2005, OHTA had completed the following imaging and coding work.

### Imaging and Coding Progress

|  | Pages Scanned | Documents Coded | Documents Loaded into Accounting Reconciliation Tool |
|---|---|---|---|
| Work results from July 9, 2003 (commencement of imaging and coding), through December 31, 2004 – Reported in the *Status Report to the Court Number Twenty* | 6,400,046 | 223,390 | 223,339 |
| Work results during this reporting period | 666,999 | 15,476 | 13,667 |
| Cumulative results through the end of this reporting period | 7,067,045 | 238,866 | 237,006 |

## Delays and Obstacles

OHTA's ability to search for trust records necessary to its ongoing historical accounting projects has continued to be impacted by limited access to certain records, including: 1) records being prepared for shipment, in transit to the AIRR, or being processed by NARA; and 2) records held in Albuquerque because of Court orders in *Pueblo of Laguna v. United States*, *Jicarilla Apache v. United States*, and *Osage Nation and/or Tribe of Indians of Oklahoma v. United States*. In addition, OHTA has reached the maximum capacity for the number of people who can work in the archival storage area at the Lenexa FRC. OHTA and OTR have negotiated a contract with NARA to expand record storage and workspace at the Lenexa FRC for the purpose of

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

---

**May 2, 2005**                                        **Office of Historical Trust Accounting**

---

conducting expanded imaging, coding and document searching of the records. OHTA expects the expansion to be completed during the next reporting period.

For fiscal years 2003 through 2005, the enacted appropriations have been below the President's requests. This has prevented OHTA from making the progress it projected in the January 6, 2003, Plan filed with the Court.

**Assurance Statement**

I concur with the contents of the information contained in the Office of Historical Trust Accounting section of the *Status Report to the Court Number Twenty-One*. The information provided in this section is accurate to the best of my knowledge.

Date:        April 27, 2005

Name:        *Signature on File*
             Bert T. Edwards, Executive Director
             Office of Historical Trust Accounting

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**          **Office of the Special Trustee for American Indians**

## III.   OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS

### Introduction

The Office of the Special Trustee for American Indians was created by the American Indian Trust Fund Management Reform Act of 1994. The 1994 Act provides direction to the Department of the Interior on accounting for Indian trust funds and reforming the operation of the Indian fiduciary trust. The Special Trustee's responsibilities under the Act include creating a comprehensive strategic plan for the operation of the trust and providing oversight of the accounting for Indian trust funds and the reform of the trust.

In addition to the role of the Special Trustee set forth in the Act, the Secretary assigned other duties to the Special Trustee, including accounting and investing of collected funds, developing a risk management program, managing a reengineering effort of the trust business processes and creating an audit and review function to grade the performance of various Interior bureaus and offices and Tribes that perform fiduciary trust functions.

### Special Trustee's Observations

### Trust Initiatives for the 21st Century

Work continued on the development of an implementation plan that will result in the installation of the Fiduciary Trust Model throughout Interior. Extensive work was done at the Anadarko and Concho BIA pilot agency offices to convert title systems, reduce backlogs and improve business processes.

### Trust Review and Audit

OTRA continued its work of evaluating trust operations at various BIA agencies and Tribes. Several reports are now final and corrective action plans are expected to be prepared for agencies and Tribes where deficiencies in operations were found. In particular, a report concerning the sale of rights-of-way in the Navajo Region is being drafted by OTRA. The report is expected to be made available to the Navajo Region office and a corrective action plan requested during the next reporting period.

### Appraisals

Interior's Appraisal Services Directorate, Chief Appraiser has selected a deputy who will principally be in charge of the contract between OST and Interior ASD. This person is expected to be employed and begin a full review of the OAS program during the next reporting period. Recruitment for five additional review appraisers began during this reporting period and these appraisers are expected to be hired during the next reporting period. As a result of turnover and time requirements of hiring new appraisers, the backlog of appraisals has grown. Additional concerns of the Chief Appraiser focus on needed training of existing appraisers and hiring contract appraisers timely.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                    **Office of the Special Trustee for American Indians**

In order to resolve the issue of methodology for appraising renewals of rights-of-way, I have directed the ASD, Chief Appraiser to use his professional judgment and follow the USPAP guidelines for these kinds of appraisals. He is expected to have a policy developed for this kind of appraisal during the next reporting period, which the field appraisers can use as guidance. Finally, new appraisals of certain rights-of-way previously appraised by former Navajo Region appraiser Anson Baker are expected to be completed during the next reporting period.

**American Indian Probate Reform Act**

The notice required by AIPRA has been developed. Publication of the notice as required by the Act began during this reporting period by Interior's initiating the mailing of notices to Indian owners of trust or restricted land. Additional mailings and publication of the notice in newspapers and the Federal Register are expected to occur during the next reporting period. After the notice requirements are met, the Secretary is expected to execute a certification that the notice has been provided. One year from the date of her certification, the probate provisions become effective. In addition, some other sections of the Act do not take effect until one year after certification.

<u>Conclusion</u>

I am satisfied that trust reform is moving forward. The work at Concho and Anadarko indicates that BIA and OST employees are committed to improving their management of the trust. Together with the implementation of new trust IT systems and conversion of many old legacy systems to new systems, productivity should increase and the ability to stay current and eliminate backlogs is expected to improve greatly the delivery of services to beneficiaries of the trust.

Weaknesses continue in the administration of the appraisal program. In response, the ASD Chief Appraiser has committed his resources to improve delivery of services to bring appraisals current, particularly with regard to the requirements of the ILCA program. Further, the time required entering data into new systems is a challenge to trust reform. OST continues to provide contractors to assist with data entry functions to ensure that new IT systems can be used as soon as possible as systems of record.

<u>Assurance Statement</u>

The comments and observations are provided by the Special Trustee for American Indians and reflect the opinion of the Special Trustee only.

Date:  April 21, 2005

Name: *Signature on File*
       Ross O. Swimmer
       Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

May 2, 2005                                                **Trust Review and Audit**

### A.    TRUST REVIEW AND AUDIT

**Introduction**

OTRA reports directly to the Special Trustee for American Indians. OTRA was created by OST as a response to trust initiatives developed during the tribal consultation process of 2002. OTRA conducts performance audits, examinations and reviews of Interior entities as well as Tribes that manage fiduciary trust activities. Examinations are routinely conducted at locations that perform trust operations, and are planned to result in a performance rating.

**Current Status**

**Indian Trust Examinations**

During this reporting period, OTRA initiated field work on appropriate trust examinations for FY2005. The examination plan provides coverage for FY2005 of 32% of all trust income transactions and 42% of trust assets. This plan is expected to bring the two-year totals to 58% and 68% respectively.

OTRA staff issued one final and ten draft reports for examinations performed at various agencies and Tribes within the Southern Plains and Eastern Oklahoma regions. These examinations were part of the pilot test reported in the previous report to the Court. Once comments from respective agencies and Tribes are received and incorporated into the report, these ten reports will be finalized. Comments must be received within 30 days from the issue date of the report.

**Annual Interior Indian Trust Funds Financial Statement Audit**

The Indian trust funds financial statement audit, required by the American Indian Trust Fund Management Reform Act of 1994, is conducted by an independent auditor under OIG management. The independent auditor initiated work on the FY2005 audit during this reporting period and is expected to continue through the first quarter of FY2006.

**Annual Audit Corrective Actions**

During this reporting period, in response to the FY2004 audit, OST managers reported progress on implementing corrective action plans addressing material weaknesses, non-compliance issues and management letter comments.

**Compliance Reviews**

During this reporting period, 11 cases were in inventory. One case was closed without the need for a final report. Field work or report drafting continued on the remaining ten.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                    **Trust Review and Audit**

### Indian Trust Rating System

The first version of the "Trust Examination Guide" was issued and is being utilized by OTRA to conduct examinations. Work continues to expand and modify the "Trust Examination Guide" to include examination planning, final report writing and close-out of the examination.

### Delays and Obstacles

Lack of Internet access impedes OTRA's work processes and its ability to communicate effectively, both internally and externally.

### Assurance Statement

I concur with the content of the information contained in the Trust Review and Audit section of the *Status Report to the Court Number Twenty-One*. The information provided in this section is accurate to the best of my knowledge.

Date:    April 20, 2005

Name:  *Signature on File*
         D. Jeff Lords
         Acting Director, Office of Trust Review and Audit
         Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

May 2, 2005                                          **Records Management**

B.    **OST-OFFICE OF THE CHIEF INFORMATION OFFICER**

1.    **RECORDS MANAGEMENT**

**Introduction**

The Office of Trust Records was established in 1999 to develop and implement a program for the economical and efficient management of trust records, consistent with the 1994 Act, the Federal Records Act and other statutes and implementing regulations. The OTR records management program has been developed and implemented, and continues to evolve, to ensure that necessary Indian records are maintained, records retention schedules are consistent with retention needs, and records are safeguarded throughout their life-cycles.

**Accomplishments and Completions**

**American Indian Records Repository**

During this reporting period, approximately 12,920 indexed boxes of inactive Indian records were moved to the AIRR in Lenexa, KS, from OTR's facilities in Albuquerque, NM. Approximately 104,370 indexed boxes are located in the AIRR as of the end of this reporting period.

**Records Indexing Project**

Indexing of approximately 111,611 boxes was completed by the end of this reporting period. Priority for the indexing of boxes of Indian records continued to be given to those boxes of records potentially responsive to tribal trust litigation, and included boxes required by OHTA for litigation discovery requests.

Approximately 5,000 boxes of records, including approximately 1,200 boxes from SPRO and Anadarko Agency reported in the previous report to the Court, were moved from BIA/OST locations and OTR to the Lenexa Annex for indexing during this reporting period. Once indexed, these boxes will be stored in the AIRR.

**Record Keeping Requirements**

During this reporting period, NPS and the Fish and Wildlife Service amended prior certifications sent to the Assistant Deputy Secretary that had stated that neither agency maintained Indian fiduciary trust records. As reported in the *Status Report to the Court Number Seventeen,* the prior certifications had indicated NPS and FWS had assessed their respective record series and that no record series had been identified as containing IFTR. Each agency has identified a subset of one records series as potentially containing IFTR. Each agency has taken steps to protect and prevent destruction of these records. Also during this reporting period, BLM provided its certification to the Assistant Deputy Secretary that it had completed the identification of BLM

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

May 2, 2005                                                    Records Management

records series containing IFTR and has identified the series as permanent in its records schedules.

**Training**

OTR provided records management training for 38 BIA-identified records contacts during this reporting period.

**Equipment Purchases**

OTR provided 54 pieces of fireproof filing equipment to OST and 402 pieces to BIA programs during this reporting period.

**Current Status**

**Safeguarding Records**

During this reporting period, the contractor finished the report on the 283 boxes of records that were or may have been damaged or contaminated by mold, mildew, mouse droppings or other adverse elements. Out of the 283 boxes assessed, 140 boxes were determined to have some records within them where portions of the record are illegible or unclear. The contractor estimated that less than 1% of the total pages of records assessed for this project are completely illegible. The report was transmitted to NARA for review and to request assistance in remediation of the records. It is anticipated that OTR and NARA will begin to address remediation of damaged records after NARA completes its review of the report during the next reporting period.

**Record Keeping Requirements**

A Federal Register Notice was published on February 2, 2005, announcing tribal consultation meetings on the proposed language for management of fiduciary trust records that will be negotiated for the FY2006 funding agreements for compacted and contracted Tribes. All meetings were concluded during this reporting period. Written comments will be accepted through April 1, 2005. It is anticipated that comments and remarks received from the Tribes during the consultation period will be evaluated in the next reporting period.

**Site Assessments**

During this reporting period, OTR furnished written site assessment reports of BIA records programs at the following agencies: Osage, Miami, Talihina, Chickasaw, Okmulgee, Zuni, Ramah and Wewoka. OTR furnished written reports on the site assessments of OST records programs at the following offices: Eastern Oklahoma Region office and Osage Agency. Reports of tribal records programs were sent to OTRA for transmittal to the following Tribes: Osage Nation, Eastern Shawnee Tribe of Oklahoma, Chickasaw Nation of Oklahoma, Choctaw Nation and the Wyandotte Nation. OTR forwarded the site assessment report on the Creek Nation to

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

May 2, 2005                                               **Records Management**

OTRA during the previous reporting period, but inadvertently did not report it in the previous report to the Court.

OTR completed records management site assessments of BIA and OST programs located at the SWRO and BIA programs at Jicarilla and Mescalero Agencies during March 2005. It is anticipated these reports will be completed and forwarded in the next reporting period.

**Records Retention Schedules**

OTR sent the following electronic systems records schedules to the BIA for final review and approval: Anadarko Real Estate Module (REM); Indian Forestry Database (InfoDat); Continuous Forest Inventory (CFI); and Geographic Information System (GIS). Once BIA approval is received, OTR will forward the systems records schedules to the Archivist of the United States for approval. It is anticipated that this will occur in the next reporting period.

**Records Evaluation**

As reported in the *Status Report to the Court Number Twenty,* some boxes of materials provided to attorneys conducting discovery for tribal trust litigation were found to contain torn documents. Thirty-one boxes were set aside by OTR for evaluation by OST because they were marked by the OST field office located in the BIA SWRO as containing duplicates or other non-record material.

These boxes remain at OTR pursuant to a litigation hold. Once the boxes are released, OST can carry out its plans to verify whether any potential records in these boxes are also filed at the field office. OST plans to do this by taking the boxes to the field office and comparing documents to documents maintained at the field office. This review is intended to determine whether the contents might be federal/trust records or whether the contents had been properly marked as non-record duplicates. OST will implement its plan when SOL informs OST that the boxes can be returned to OST.

## Delays and Obstacles

Lack of Internet access continues to hinder OTR's ability to provide access to the record index database for authorized users of the records. If Internet access were available, authorized researchers could conduct their searches remotely from their respective work sites and only visit OTR when necessary to inspect specific boxes.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                             **Records Management**

## Assurance Statement

I concur with the content of the information contained in the Records Management section of the *Status Report to the Court Number Twenty-One*. The information provided in this section is accurate to the best of my knowledge.

Date:    April 26, 2005

Name: *Signature on File*
         Ethel J. Abeita
         Director, Office of Trust Records
         Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                    **Trust Business Process Modeling**

### C.    TRUST ACCOUNTABILITY

### 1.    TRUST BUSINESS PROCESS MODELING

**Introduction**

Interior is working to build a highly effective fiduciary trust services organization by implementing the business objectives contained in the CTM. Those business objectives are being used to guide implementation of the FTM. Implementation of the FTM is a collaborative effort of BIA, OST, BLM, MMS and OHA, and is integrated with Interior's other trust reform initiatives. The FTM is being implemented to transform the current trust business processes into more efficient, consistent, integrated and fiscally responsible business processes that meet the needs and priorities of the beneficiaries.

**Accomplishments and Completions**

During this reporting period, the "To-Be" Model and the resulting FTM were filed with the Court.

**FTM - General**

An FTM implementation team meeting was held February 1-3, 2005, in Albuquerque. Draft language addressing outstanding issues related to direct pay and fee interests has been forwarded to senior management for review and comment. The FTM project schedules and the AIPRA implementation schedule were consolidated into a single trust reform implementation schedule.

Standardized handbook development guidance has been finalized and approved by TPMC and BIA Office of Trust Services. This guidance has been issued to BIA handbook team leaders and provides a standard template for developing drafts. TPMC reengineering staff has been heavily involved with the BIA handbook teams to bring elements of the FTM into operation.

A "General Guidance and References" handbook (containing commonly used acronyms, general authorities, etc.) has been drafted by the reengineering staff and submitted to BIA for review.

**Organizational Impacts**

On March 9, 2005, OHA published regulations in the Federal Register authorizing the transfer of the BIA ADM positions to OHA. This transfer enabled the creation of a single adjudication office for probate, as outlined in the FTM, which began operations as a newly formed OHA Probate Hearings Division. The objective is to improve the level of service to beneficiaries through timely adjudication of trust estates.

The FTM implementation team requested OAS create an Indian Minerals Valuation Unit to perform minerals valuations for acquisition purposes. A proposal was presented to and accepted

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                                **Trust Business Process Modeling**

by the TESC. OAS is expected to respond to a proposed implementation schedule during the next reporting period. Responsibility for valuations for mineral leases would remain with BLM.

As recommended in the FTM, BLM and BIA have initiated the placement of BLM cadastral surveyors in regional offices, and the development of a certified federal survey program.

### Ownership

Consistent with the Fiduciary Trust Model, BLM, BIA and OST have jointly drafted the Interior Indian Trust Lands Boundary Standards for the preparation of boundary evidence in land or resource transactions for the benefit of individual Indians and Indian Tribes. These standards are expected to streamline the delivery of trust cadastral services by standardizing and formalizing existing best practices. These draft standards, together with relevant portions of the departmental and bureau manuals and handbooks, were distributed to BIA, BLM, OST and Tribes for comment.

### Land and Natural Resource Management

The reengineering staff has developed a proof-of-concept prototype designed to provide an automated solution to current manual leases produced in the field. The prototype includes mandatory provisions that automatically populate depending upon the type of land use authorization. An additional set of optional provisions that can be selected is included, and the prototype provides flexibility to include unique provisions that may arise during land use authorization negotiations. It is expected during the next reporting period that OST and BIA will explore the feasibility of testing the prototype's functionality at BIA's pilot agencies.

### Trust Beneficiary Call Center

TBCC successfully completed a pilot test to connect the Concho and Anadarko agencies to the TBCC tracking system. The connection will allow FTOs and staff to document and track beneficiary calls, walk-ins and correspondence.

### Current Status

Since beginning operations in December 2004 through the end of this reporting period, the TBCC received 13,141 calls and provided a first-line resolution for 93% (12,221) of these calls. First-line resolution means the person answering the call resolved the inquiry without referral or escalation.

TBCC completed a roll-out schedule for re-directing toll-free calls to TBCC. The roll-out will be implemented by region, and is expected to begin in June 2005 and finish in December 2005. Re-directing the toll-free calls to TBCC is expected to relieve some of the workload for Interior staff in field locations.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                                    **Trust Business Process Modeling**

During this reporting period, reengineering staff continued to develop training curriculum to support the implementation of Phase 1 projects, and to develop job skills models for clarifying roles performed in each of the FTM business processes.

TPMC continued developing a communication strategy to promote the implementation of FTM business processes to internal and external stakeholders. Implementation of a communication plan is expected to begin during the next reporting period.

### Delays and Obstacles

Major obstacles affecting the ability of Interior to build a trust services delivery model include:
- lack of Internet access, and
- sheer complexity of reengineering the existing trust business processes to achieve integrated and consistent business processes.

### Assurance Statement

I concur with the content of the information contained in the Trust Business Process Modeling section of the *Status Report to the Court Number Twenty-One.* The information provided in this section is accurate to the best of my knowledge.

Date:   April 20, 2005

Name: *Signature on File*
       John Bennett
       Acting Deputy Special Trustee, Trust Accountability
       Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                    **Trust Data Quality and Integrity**

## 2.    TRUST DATA QUALITY AND INTEGRITY

### Introduction

The success of trust reform depends, in part, on the accuracy of data generated from the maintenance of trust assets, ownership of trust assets, distribution of trust income, and management of trust accounts. The DQ&I project focuses on accomplishing three initiatives: (1) validating/correcting current CDE to their respective source documents, (2) implementing Post-QA review processes which will help ensure that on-going updates to CDE remain accurate, and (3) providing trust transaction and real property asset statements to beneficiaries, after CDE validation/correction has been completed for a location. CDE are defined as those trust data elements that are needed to provide: (1) timely and accurate payments to beneficiaries, (2) timely and accurate transaction listings and asset inventories to beneficiaries, and (3) effective management of the assets. Examples of CDE are beneficiary name, account number, tract identification number, and land ownership interests.

### Accomplishments and Completions

During this reporting period, TPMC's contractors completed the following tasks, which eliminated or reduced backlogs:

- Completed re-labeling of 998 Farming and Grazing files for the Anadarko Agency to complete this 1,429 file re-labeling task.

- Completed re-labeling 226 Anadarko Agency Unitization & Communitization files.

- Processed 743 Concho and Anadarko Agency probate orders by: (1) verifying 2,663 landowner ID numbers, (2) encoding 3,009 landowner ID numbers into the land title system, and (3) copying the probate orders for distribution to various LTROs for posting.

- Researched 121 Papago Agency probate orders, of which 78 required encoding into IRMS.

### Current Status

The DQ&I project continued at: (1) SPRO-LTRO for all SPRO agency/field office locations (Anadarko Agency, Concho Agency, Pawnee Agency, Horton Agency and Shawnee Field Office), (2) GPRO-LTRO for the Pine Ridge Agency, (3) Pima Agency and (4) PRO-LTRO for the Palm Springs Field Office, Northern California Agency and Southern California Agency.

During this reporting period, TPMC's contractor:

- Supported the Concho Agency with research and correction of cases where a beneficiary had been assigned more than one unique landowner ID number in the various trust systems. These landowners with multiple ID numbers were identified during the CDE

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                    Trust Data Quality and Integrity

validation/correction task; 209 out of 390 landowner IDs were researched during the reporting period.

- Encoded Concho Agency encumbrance effective/expiration dates into the land title system. During the reporting period 95% of 2,872 encumbrance effective/expiration dates were encoded.

- Encoded Anadarko Agency encumbrance effective/expiration dates into the land title system. During the reporting period, 15% of 9,945 encumbrance effective/expiration dates were encoded.

- Supported Fort Belknap Agency's SDA distribution efforts, by encoding 46 out of 247 probate orders into IRMS. Of the 803 Fort Belknap Agency probate orders inventoried last reporting period, 247 were identified to be encoded by the contractor.

- Assisted PRO-LTRO with determining the correct landowner ID number in the land title system. 169 out of 535 BIA certified IDs have been verified in the land title system.

- Encoded 152 of the 252 Concho Agency CDEs previously identified for BIA correction. BIA corrected 79 of the variances and the remaining 21 will be returned to BIA for further research and correction, and are expected to be completed during the next reporting period.

- Encoded 90.4% of the Anadarko Agency CDE corrections for which TPMC's contractor was originally responsible. Research efforts on the remaining tracts are ongoing but are significantly more time-intensive than was previously experienced. The contractor also encoded 40.7% of the Anadarko Agency CDE previously identified for BIA correction. These tasks are expected to be completed during the next reporting period.

- Encoded into the land title system an additional 37 Concho Agency CDE and 13,470 Anadarko Agency CDE, which did not exist in the former BIA legacy land title system, for a total of 9,487 encoded at Concho and 14,881 at Anadarko. Examples of these CDE are: (1) agency contract number, (2) document effective date and (3) document cancellation date. This task is expected to be completed during the next reporting period.

**Delays and Obstacles**

During this reporting period, the following delays and obstacles impeded the progress of the DQ&I project:

- Securing timely BIA trust system logon IDs and security profile set-ups.

- Lack of access to the Internet, which has resulted in: (1) communication delays; (2) adverse project coordination issues; (3) increased administrative program costs; and (4) the overall DQ&I project being unable to take full advantage of available information technology.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                    **Trust Data Quality and Integrity**

**Assurance Statement**

I concur with the content of the information contained in this Trust Data Quality and Integrity section of the *Status Report to the Court Number Twenty-One.* The information provided in this section is accurate to the best of my knowledge.

Date:   April 26, 2005

Name:  *Signature on File*
       John E. White
       Trust Reform Officer
       Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                    **Indian Fiduciary Trust Training Program**

## 3.    INDIAN FIDUCIARY TRUST TRAINING PROGRAM

### Introduction

Interior has a continuing responsibility to provide adequate staffing, supervision and training for trust fund management and accounting activities. Fiduciary trust training is essential to the success of Interior's trust reform efforts and forms an integral part of all training for Interior employees who are involved in the management of Indian trust assets.

### Accomplishments and Completions

OST offered three sessions of the course, *Fiduciary Overview Program*, presented by Cannon Financial Institute, with 76 BIA, OST, MMS and tribal personnel attending during this reporting period. A total of 670 people have attended this course since March 2003. This course compares and contrasts the federal Indian trust administered through Interior with private sector trusts administered through banks and other financial institutions.

Cannon personnel presented the *Fiduciary Behavior* and *Asset Management* specialty courses to 42 OST and BIA personnel. These two courses are part of the previously reported certification program. Additional sessions of these courses are expected to be presented during the next reporting period.

During this reporting period, OST training staff conducted 16 sessions to provide training in TFAS, CSS, StrataVision and the historical query database to 219 OST, BIA and contractor staff.

*The New Hire Handbook for the Supervisor* was distributed to BIA and OST supervisors during this reporting period.

34 OST trust officers, BIA superintendents and deputy superintendents for trust completed the three-week orientation program for trust. This course is expected to be presented again during the next reporting period.

OST coordinated training sites and produced training materials for the AIPRA that was held the last two weeks of this reporting period for 170 BIA, OST and tribal employees.

### Current Status

Construction continues on the NIPTC in Albuquerque and is expected to be completed by the end of CY2005.

Coordination efforts are underway for TFAS, CSS, Stratavision, Historical Query, TAAMS, and Interagency Handbook training for OST and BIA staff at Concho and Anadarko agencies. Training is expected to begin during the next reporting period.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                     **Indian Fiduciary Trust Training Program**

**Delays and Obstacles**

The lack of Internet access inhibits electronic communication with other governmental agencies and contractors, hinders the research of training tools and potential contractors, and restricts OST's ability to access online training programs.

**Assurance Statement**

I concur with the content of the information contained in the Indian Fiduciary Trust Training Program section of the *Status Report to the Court Number Twenty-One.* The information provided in this section is accurate to the best of my knowledge.

Date:   April 15, 2005

Name:  *Signature on File*
         Dianne M. Moran
         Director, Trust Training
         Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                              **Risk Management**

4.    **RISK MANAGEMENT**

**Introduction**

The objectives of the risk management initiative are to design, deliver, and implement a comprehensive risk management program that includes extensive management controls for monitoring and evaluating Interior's Indian trust asset management program. The risk management program continues to be implemented by TPMC. OTRA monitors and evaluates management corrective action plans to mitigate control deficiencies.

**Accomplishments and Completions**

At the beginning of this reporting period, risk management contracts were awarded for: 1) content development and training; and 2) system maintenance and enhancement.

**Current Status**

MMS initiated its identification of business processes for the purpose of developing information needed to assess and mitigate risks using the RM-PLUS tool. BLM and OST began validating their previously-identified business processes and risk factors.

During the next reporting period, BIA is expected to provide a point of contact necessary to implement the risk management program.

**Delays and Obstacles**

The lack of Internet access complicates the implementation and use of RM-PLUS since it was designed as a web-based application.

**Assurance Statement**

I concur with the content of the information contained in the Risk Management section of the *Status Report to the Court Number Twenty-One*. The information provided in this section is accurate to the best of my knowledge.

Date:   April 20, 2005

Name: *Signature on File*
        John Bennett
        Acting Deputy Special Trustee, Trust Accountability
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                      **Regulations, Policies and Procedures**

### 5.    REGULATIONS, POLICIES AND PROCEDURES

**Introduction**

OTP in OST was established on April 21, 2003, to assist Interior in establishing "consistent, written policies and procedures for trust fund management and accounting" as stated in the 1994 Act. OTP oversees and facilitates the development, promulgation and coordination of trust-related regulations, policies, procedures and other materials to guide the proper discharge of Interior's fiduciary responsibilities. OTP is separate from BIA's PPA, which is responsible for policies, procedures and regulations affecting all BIA activities. PPA activities thus are reported in the BIA section of the reports to the Court.

**Accomplishments and Completions**

The investment policy for tribal and IIM funds was completed and issued.

The procedure for making claims on missing or lost Treasury checks was completed and issued.

**Current Status**

OTP continues to convert frequently-used paper forms into fillable electronic forms. These forms are then placed on Infonet where they can be retrieved from any workstation, filled in electronically and printed.

As a result of extensive comments received, additional work by OTP is necessary to amend the draft of an OST Directives Handbook and Manual. Publication is expected by the end of CY2005.

A meeting was held between program SMEs and OTP to finalize the Disbursing DOP. A similar meeting to finalize the Reporting and Reconciliation DOP is scheduled for the next reporting period.

**25 CFR 124 – Deposits of Proceeds of Lands Withdrawn for Native Selection under the Alaska Native Claims Settlement Act.** Final approval and publication of the rule is expected by the end of the next reporting period.

**25 CFR 1200 – American Indian Trust Fund Management Reform Act.** The rule has been reassigned to a special working group for substantive review and change. Publication is expected by the end of CY2005.

**Delays and Obstacles**

Lack of access to the Internet and its repository of online statutes, the Federal Register and other resources continues to present challenges to this office.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                    **Regulations, Policies and Procedures**

### Assurance Statement

I concur with the content of the information contained in the Office of Trust Regulations, Policies and Procedures section of the *Status Report to the Court Number Twenty-One.* The information provided in this section is accurate to the best of my knowledge and belief.

Date:   April 28, 2005

Name: *Signature on File*
        Richard V. Fitzgerald, Director
        Office of Trust Regulations, Policies and Procedures
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                                                    **Appraisal**

### D.    FIELD OPERATIONS

### 1.    APPRAISAL

**Introduction**

The Office of Appraisal Services is responsible for the Indian land valuation program, which was established to provide impartial estimates of market value for a variety of real property interests on land owned in trust or restricted status by individual Indians, Alaska Natives and Indian Tribes. Various regulations governing Indian trust land actions require valuations. To meet this requirement, an appraisal or other valuation method is used to ensure that fair and just compensation is received on Indian land transactions. The types of land actions are varied. Major types include commercial, industrial, recreational, agricultural and other types of leases; rights-of-way; land sales and land exchanges; grazing and range permits and assessment of trespass damages.

**Accomplishments and Completions**

An Indian Minerals Valuation Unit is being established as a part of the ASD to support the sale and acquisition of minerals on federal and Indian lands. This is expected to incorporate the FTM's proposed Indian minerals sale and acquisition initiative.

The Deputy Chief Appraiser position was filled during this reporting period.

**Current Status**

NBC-ASD, in coordination with OST, continues to conduct a comprehensive analysis of OAS staffing and training requirements. An assessment of the vacant regional appraiser position located in the Eastern Region was completed, and the position is expected to be advertised during the next reporting period.

Work continued on a directive to address the proper appraisal methods and techniques to be used by OAS appraisers. The directive is expected to be issued during the next reporting period.

Work continues to revise and update the OAS appraisal handbook, in conjunction with an updated department-wide appraisal handbook. This project still is expected to be completed during FY2005.

Work continues on the cooperative effort between OAS and NBC to establish regional contracts with independent contractors to perform appraisals and alleviate backlogs. A revised scope of work for a blanket purchase order in the Northwest Region has been developed and is expected to be readvertised during the next reporting period. This approach will be duplicated in those regions where this approach may be proven to be successful. The use of contractors is expected to be considered as part of the staffing analysis discussed above.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                                          **Appraisal**

OAS advertised five review appraiser positions to fill critical needs in the Northwest, Rocky Mountain, Midwest and Navajo Regions.

**Appraisal Backlog**

As of this reporting period, the appraisal backlogs are as follows:

|                  | Appraisal Backlog As of 12/31/04 | Appraisal Backlog As of 03/31/05 |
|------------------|---------------------------------:|---------------------------------:|
| Northwest        | 51                               | 166                              |
| Rocky Mountain   | 152                              | 139                              |
| Midwest          | 14                               | 21                               |
| Western          | 37                               | 9                                |
| Southwest        | 8                                | 6                                |
| E. Oklahoma      | 55                               | 33                               |
| Navajo           | 182                              | 203                              |
| Pacific          | 7                                | 13                               |
| Alaska *         | 135                              | 318                              |
| Eastern          | 0                                | 0                                |
| Southern Plains  | 6                                | 1                                |
| Great Plains     | 46                               | 80                               |
| **Total**        | **693**                          | **989**                          |

*Due to extreme weather conditions, Alaska appraisers inspect properties during the summer months and complete the reports during the winter months.

This table does not include appraisal backlog information from the compacted and contracted Tribes. In the MOUs that are currently being negotiated with Tribes, reporting backlog information on a quarterly basis is required. This information is expected to be incorporated into future reports to the Court.

**Delays and Obstacles**

The inability to utilize the Internet as a tool to communicate with outside contacts to research comparable sales and other information is a continuing hardship.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                                                 **Appraisal**

**Assurance Statement**

I concur with the content of the information contained in the Appraisal section of the *Status Report to the Court Number Twenty-One*.  The information provided in this section is accurate to the best of my knowledge.

Date:   April 26, 2005

Name: *Signature on File*
          Brian M. Holly, MAI
          Appraisal Services Directorate
          National Business Center

46

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

May 2, 2005                                       **Current Accounting Activities**

### E.     TRUST SERVICES

#### 1.     CURRENT ACCOUNTING ACTIVITIES

**Introduction**

Current accounting activities focus on: a) whereabouts unknown accounts; b) trust funds accounting system; c) special deposit accounts; d) small balance accounts; and e) accounting discrepancies.

WAU are classified as such for various reasons, including (a) new accounts established without an address, (b) mail returned for invalid address and (c) account holder refused or did not claim mail. A variety of methods and means are used to locate WAU account holders.

TFAS is a generic term for a COTS trust fund accounting system that provides the basic receipt, accounting, investment, disbursing and reporting functions common to commercial trust funds management operations. All IIM accounts have been converted to this system.

SDA are temporary accounts for the deposit of trust funds that cannot immediately be credited to the proper account holders. As explained in the BIA/OST Interagency Handbook Procedures, this type of account is to be used only as an exception to the rule that trust funds immediately be deposited to the credit of, and then distributed as soon as practicable to, the individual and tribal beneficiaries. The SDA project has two sub-projects: the retrospective (pre-January 1, 2003 receipts) and the prospective (post-December 31, 2002 receipts) phases. OHTA has responsibility for "resolution" (i.e., research and distribution of funds) of the retrospective phase, while BIA has comparable responsibility for the prospective phase. This section of the report to the Court thus addresses only the prospective phase.

Small balance accounts are defined as those with balances of $.01 - $1.00 and no activity in the preceding eighteen months. Management expenses for these accounts are considerable, in part because (as directed by Congress) annual statements must be sent to these account holders.

Various accounting discrepancies that existed prior to the conversion to TFAS still need research and resolution. Some may impact individual accounts. At present, OST has a daily and monthly reconciliation process in place to ensure that transactional reporting to Treasury is accurate and that any discrepancies are researched and reconciled during the next accounting period. While this process ensures resolution of current discrepancies in timely fashion, separate research and reconciliation efforts are needed to address the pre-TFAS discrepancies.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

May 2, 2005                                    **Current Accounting Activities**

### a.    Whereabouts Unknown Accounts

**Accomplishments and Completions**

During this reporting period, TPMC staff conducted WAU beneficiary outreach at the Pima Agency, Winnebago Agency, Santee Sioux Tribe, Omaha Tribe of Nebraska, Resighini Rancheria, Yurok Tribe and Karuk Tribe of Northern California. As a result of these outreach efforts, TPMC received current addresses for 138 WAU account holders.

**Current Status**

Priority continues to be placed on securing current addresses for account holders of the rolling top 100 highest dollar balance WAU accounts. During this reporting period, 16 of the top 100 WAU accounts, with combined account balances in excess of $2 million, were updated with current addresses. During the next reporting period, OST expects to hire a contractor to focus exclusively on securing current addresses for or determining the status of the top 100 WAU accounts.

During this reporting period, 2,129 accounts were added to the WAU list and 5,721 account holders were located. As of March 31, 2005, there were 48,587 WAU accounts with a combined balance of $73,934,529.95. The following table illustrates the number of accounts stratified by account balance and WAU category:

| Account balance | Correspondence/ Check Returned | Account Setup No Address | Awaiting Address Confirmation | Refused/ Unclaimed Mail | Total |
|---|---|---|---|---|---|
| Equal to or over $100,000 | 21 | 9 | 0 | 0 | 30 |
| Under $100,000 and equal to or over $50,000 | 40 | 12 | 0 | 0 | 52 |
| Under $50,000 and equal to or over $5,000 | 2,422 | 860 | 0 | 2 | 3,284 |
| Under $5,000 and equal to or over $1,000 | 6,682 | 1,890 | 1 | 5 | 8,578 |
| Under $1,000 and equal to or over $100 | 9,445 | 3,725 | 2 | 8 | 13,180 |
| Under $100 and equal to or over $1 | 12,766 | 5,490 | 2 | 14 | 18,272 |
| Under $1 | 3,593 | 1,582 | 8 | 8 | 5,191 |
| **Total** | **34,969** | **13,568** | **13** | **37** | **48,587** |

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                      **Current Accounting Activities**

### Delays and Obstacles

The influx of WAU accounts categorized as "Account Setup No Address" causes the total number of WAU accounts to remain relatively constant. These accounts primarily result from probates lacking addresses for individual heirs.

There are 19,834 supervised IIM account holders (minors, emancipated minors, adults in need of assistance, and non-compos mentis) coded as WAU. Updating supervised account addresses presents a challenge because, in addition to securing the current address, BIA Social Services must also verify the address changes to these accounts. OST plans to work with BIA leadership to get the appropriate approvals to update 253 account addresses that have been obtained.

The lack of Internet access limits communication effectiveness. OST and its contractor must rely primarily on mail and telephone communication with IIM account holders.

### b.        Trust Funds Accounting System

### Current Status

OST continued working with BIA and systems contractors to produce statements of assets for beneficiaries at the two pilot agencies, Concho and Anadarko. Review of the data during testing indicated that the program offices needed to clear some data anomalies. After clean-up of the data is completed, statements of assets are expected to be mailed in the fourth quarter of FY2005.

### c.        Special Deposit Account Activity

### Current Status

BIA has the responsibility for distribution of SDA funds received since January 1, 2003 (prospective receipts). It is the policy of BIA to distribute funds within 30 days of receipt into SDA. During this reporting period, there were 10,508 receipt transactions posted in SDA. Of these, 3,895 were aged more than 30 days as of March 31, 2005.

During this reporting period, aged funds were held in 113 more SDA than in the previous reporting period. Undistributed aged receipts increased by 1,414 and the combined dollar amount increased by $3,418,888.46. As of March 31, 2005, funds were held in SDA with a combined dollar amount of $5,685,462.08 which represented 5,262 undistributed receipts aged over 30 days from January 1, 2003, through March 31, 2005. As of March 31, 2005, there were 1,146 receipts in 243 SDA for a combined dollar amount of $632,363.95 aged over one year.

During this reporting period, TPMC staff concentrated on assisting agency staff in performing work necessary to distribute aged receipts at the Fort Belknap, Fort Hall, Rosebud, Pima and Eastern Navajo agencies. TPMC staff and contractors spent a combined six weeks at these five agencies. Through these efforts, in coordination with the efforts of BIA, aged receipts totaling

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                        **Current Accounting Activities**

$3.4 million were distributed from SDA during the reporting period. In addition, OST staff and contractors provided guidance and training to agency staff in: (1) encoding lease and allotment numbers on transactions; (2) accessing reports from an electronic storage application; and (3) utilizing aging reports in SDA management.

During this reporting period, OST contractor staff also assisted Papago, Pima and Fort Belknap agencies with encoding a backlog of probate orders to BIA's distribution ownership system, which is necessary prior to distribution of funds.

## Delays and Obstacles

Some BIA agencies still are not utilizing StrataVision to obtain current aging reports to assist in the monitoring and management of their SDA receipt activity. OST continues to make training available to encourage the use of StrataVision.

### d.    Small Balance Accounts

As of March 31, 2005, there were 14,811 accounts that have a $.01 - $1.00 balance with no activity for the previous 18 months. The total sum included in those accounts is $2,102.07. Statements are sent to account holders for these accounts on an annual basis pursuant to direction from Congress.

### e.    Accounting Discrepancies

Interior's proposal to resolve the difference between the subsidiary account ledger (liabilities) and the IIM investment pool (assets), of approximately $6 million, has been approved by OMB. Authorizing and appropriating legislation is expected to be submitted to Congress during the next reporting period.

OST is waiting for guidance from SOL on whether non-trust WAU may be transferred to the Treasury Unclaimed Moneys Account. When the guidance is received, OST's draft procedure for such transfers is expected to be put into final form.

OST plans to work with SOL to develop a solution for the resolution of pre-1994 unposted interest. Consideration will be given to the comments previously received from the private sector. Legislation may be necessary.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                          **Current Accounting Activities**

**Assurance Statements**

I concur with the content of the information contained in the Accounting Discrepancies
subsection of the Current Accounting Activities section of the *Status Report to the Court Number
Twenty-One*. The information provided in this subsection is accurate to the best of my
knowledge.

Date:   May 2, 2005

Name:   *Signature on File*
        Margaret Williams
        Deputy Special Trustee, Trust Services
        Office of the Special Trustee for American Indians

I express no opinion on the content of the Accounting Discrepancies subsection, above. I concur
with the content of the information contained in the balance of the Current Accounting Activities
section of the *Status Report to the Court Number Twenty-One*, and this information is accurate to
the best of my knowledge.

Date:   April 21, 2005

Name:   *Signature on File*
        John Bennett
        Acting Deputy Special Trustee, Trust Accountability
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                    **Trust Regulations, Policies and Procedures**

IV.    **BUREAU OF INDIAN AFFAIRS**

A.    **TRUST REGULATIONS, POLICIES AND PROCEDURES**

**Introduction**

The Office of Planning and Policy Analysis in the Office of the Assistant Secretary – Indian Affairs was established on April 21, 2003. PPA is responsible for developing and promulgating Indian Affairs directives. PPA is separate from OST's Office of Trust Regulations, Policies and Procedures, whose activities are reported in the OST section of the status reports to the Court.

**Accomplishments and Completions**

**25 CFR 15 and 43 CFR 4 - Probate of Indian Trust Estates** – The final rule consolidating the ADM and ALJ positions into OHA was published during this reporting period.

**Current Status**

**25 CFR 161 - Navajo Partitioned Lands Grazing Permits** – The Navajo Nation's special session of its Intergovernmental Relations Committee, to consider legislation approving the proposed regulation for final publication in the Federal Register, was rescheduled. The completion date for this regulation remains undetermined.

**25 CFR 162 Subparts C & D – Residential Leases and Business Leases** – The final rule continues on schedule for publication by the end of the third quarter of FY2005.

**25 CFR 216 - Surface Exploration, Mining, and Reclamation of Lands** – The project continues on schedule and publication of the final rule is still expected by the end of the first quarter of FY2007.

**25 CFR 243 - Reindeer in Alaska** – Changes have been made to the proposed rule as a result of public comments. The information collection part of the Federal Register notice is being prepared for submittal to OMB for approval. The final rule now is expected to be published by the end of the third quarter of FY2005.

The following projects are in various stages of completion, and they are expected to be published by the end of the fourth quarter of CY2005:

**25 CFR 151 - Acquisition and Disposal Handbook** – Consists of four parts:
- Fee-to-Trust (in editing)
- Trust-to-Trust (in initial drafting)
- Trust-to-Fee (in initial drafting)
- Government-to-Government (in initial drafting)

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                    **Trust Regulations, Policies and Procedures**

**25 CFR 162 - Surface Leasing Handbook** – Consists of three parts:
- Business (in initial drafting)
- Residential (in initial drafting)
- Agriculture (in initial drafting)

**25 CFR 166 - Grazing Permits Handbook** (in initial drafting)

**25 CFR 169 – Rights-of-Way Handbook** (in editing)

**National Environmental Policy Act Compliance Handbook** – The project is in the final approval stage and publication now is expected during the next reporting period.

**IAM Parts 1, 2, 3 and 7 containing delegations of authority** – The project is on hold while issues related to reorganization are resolved.

**IAM Part 13 - Indian Self-Determination** –The project now is scheduled for publication by the end of the fourth quarter of FY2005.

**BIAM Conversion to IAM**

The following BIAM parts are in the process of being converted to the IAM:

**35 BIAM Information Resources Management** – The IAM has been finalized and is awaiting final approval. Publication is expected by the end of the third quarter of FY2005. The handbook is expected to be published by the end of the fourth quarter of FY2005.

**46 BIAM Facilities Management** – The workgroup has received final comments on the IAM and the corresponding handbook and is incorporating them into the final draft. Completion is still expected by the end of the third quarter FY2005.

**51 BIAM Indian Rights Protection** – No activity has taken place with this project. The completion date remains undefined.

**54 BIAM Resources/Land** – The completion date remains undefined.

**54 BIAM Real Property Management** – The completion date remains undefined.

**57 BIAM Road Construction** – A draft outline of this IAM now is complete. The completion date for the final IAM remains undefined.

**58 BIAM Road Maintenance** – Work groups have been convened and are working on converting the BIAM to IAM/handbook format. A second draft has been completed and sent to BIA management for review. The completion date remains undefined.

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

| May 2, 2005 | Trust Regulations, Policies and Procedures |
|---|---|

**66 BIAM Social Services** – No additional activities have taken place with this project. The completion date remains undefined.

## Delays and Obstacles

Lack of access to the Internet has hindered PPA's ability to research statutes and departmental manuals and makes distribution of documents for review by Tribes more difficult and costly.

## Assurance Statement

I concur with the content of the information contained in the Trust Regulations, Policies and Procedures - BIA section of the *Status Report to the Court Number Twenty-One*. The information provided in this section is accurate to the best of my knowledge.

Date:   April 20, 2005

Name   *Signature on File*
         Bruce Blanchard
         Acting Director, Office of Planning and Policy Analysis
         Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                                                                         **Fractionation**

### B.    FRACTIONATION

**Introduction**

Fractionation of Indian trust and restricted land stems from the federal Indian policy of the 19th
Century.  Fractionation occurs as land passes from one generation to the next and more and more
heirs or devisees acquire an undivided interest in the land.  This is a complex and potentially
emotionally-charged issue, due primarily to cultural differences, historical legacy and family
associations of the present owners with the original Indian owners of those lands.  Efforts to
address this complex issue are coordinated primarily through the BIA Indian Land Consolidation
Office, which seeks to help Tribes make use of the opportunities offered by the Indian Land
Consolidation Act, as amended in 2000.  ILCO is operating pilot projects and, from there, a
nationwide plan is being implemented to promote consolidation of the ownership of Indian land.

**Accomplishments and Completions**

- Acquired 17,921 fractional interests during this reporting period, for a cumulative total of
  135,582 interests for ILCP in the Midwest, Northwest, Western, Eastern Oklahoma, Navajo,
  Rocky Mountain and Great Plains Regions.  Of the total interests acquired, 89% were
  interests of less than 2% ownership in the respective tracts of land.
- Acquired a cumulative total equivalent of 115,462.55 acres for the project reservations.
- Finalized a cooperative agreement with the Confederated Salish and Kootenai Tribe for
  performance of non-inherently federal ILCP activity on the Flathead Reservation.
- Began active acquisition programs for the Navajo Nation and the Crow Reservations.
- Added three reservations (Grand Portage, Ho Chunk, Bois Forte) in the Midwest Region and
  have begun active acquisition programs for each reservation.
- Developed and implemented procedures to assure compliance with *Cobell* Court orders with
  regard to written communication to potential sellers.

**Current Status**

ILCO now is managing active acquisition programs for 18 reservations within seven BIA
regions. The Winnebago Tribe of Nebraska officially withdrew from ILCP in January 2005,
because of a disagreement over the use of the national contractor to acquire fractionated interests
on that reservation.  The Tribe may reconsider and rejoin the program in the future.

Current ILCP activities include:

- Implementing ILCO's national expansion strategy;
- Targeting and acquiring *Youpee* interests;
- Developing the Land Consolidation Tracking System, which is expected to be operational
  and available to all ILCP acquisition sites by the end of May 2005.  LCTS is an automated
  case management system that is expected to be located on BIA's intranet.  The new system
  should enable ILCP to track acquisition cases from receipt of an application to the final

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

May 2, 2005                                                                           **Fractionation**

recording of an approved deed. The system will also automate use of standard forms and maintain a data base for report and outreach purposes;

- Testing of MAD/LCP, which was completed on seven of the 14 reservations within the Great Plains Region. The system is currently operating at the Pine Ridge and Rosebud Reservations. MAD/LCP adds two components, an accounting module and an appraisal module to the MADS to accommodate ILCP acquisition activities. The accounting upgrade will process ILCP purchase payments, keep track of purchase balances, track income related to the lien, print the form for a satisfaction of lien, and change the owner account number, upon satisfaction of the lien, from the ILCP purchase account to the Tribal Proceeds of Labor account. The appraisal module will interface with ILCP to post electronically appraised values to the owner master file and print out land owner inventories with appraised values. It is anticipated that all participating locations within the Great Plains Region will have this system operational by the end of this fiscal year.

**Delays and Obstacles**

- Providing support to the Great Plains and Southwest region LTROs to assist with recording ILCP deeds, re-vesting *Youpee* interests, researching ownership files and recording to ownership records reduces the availability of ILCP funds for acquisitions of land interests.
- The need to reconcile ownership records causes delays in the expansion of ILCP. Reconciliation is expected to improve as a result of the ongoing implementation of the CGI title system.
- Recruiting qualified staff at remote locations is a challenge.
- Probate backlog and *Youpee* issues continue to impede the land-purchase transaction process.
- Lack of Internet access results in slower processing of applications from potential sellers and hinders searches for WAU account holders.
- Lack of receipt of surface and subsurface values has delayed some acquisition programs and may delay expansion efforts because the values are not being received in a timely manner to coincide with projected acquisition activity. Land acquisitions for the Crow Reservation will be limited until a reservation-wide appraisal is available.
- Lack of a case management and tracking system outside of the Great Plains and Midwest regions impacts on current administrative and reporting requirements and may delay future expansion efforts because work activities will remain highly labor intensive. Ongoing discussions with the AS-IA, CIO are aimed at identification and deployment of a case management and tracking tool to assist all remaining project sites.
- Continuing delay in obtaining timely access for BIA and contract employees to various BIA computer systems including CGI Title, IRMS, MADS, Lotus Notes, and TFAS creates delays in the timely acquisition of fractionated interests because users are unable to access critical data, information and communication systems. ILCO is working with the AS-IA OCIO to resolve the matter.
- Lack of adequate staff at the AS-IA, Office of Budget Management, Division of Accounting Operations, had resulted in untimely encoding of program expenditures to FFS in January 2005. This was resolved when one additional staff member was added. However, as ILCP expands to include more reservations, the Division of Accounting Operations may receive

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

_____

**May 2, 2005**                                                    **Fractionation**
_____

increased requests to encode program expenditures in a timely manner.  It is important that timely encoding to FFS is accomplished because Interior's Budget Office and OMB use data from FFS to verify the amounts expended through ILCP.  Timely encoding also enables ILCO to do accurate projections and confirm expenditures for reporting purposes.

**Assurance Statement**

I concur with the content of the information contained in the Fractionation section of the *Status Report to the Court Number Twenty-One*.  The information provided in this section is accurate to the best of my knowledge.

Date:   April 20, 2005

Name: *Signature on File*
        Robert R. Jaeger
        Director, Indian Land Consolidation Office
        Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

May 2, 2005                                                                              **Probate**

### C.    PROBATE

#### Introduction

Federal law permits Indian owners to pass title to their trust assets by testamentary devise or by intestate succession, and imposes upon Interior the duty of determining the legal heirs. In order to perform this duty, BIA, OHA and OST coordinate their work to accomplish the probate process.

#### Accomplishments and Completions

#### Case Preparation

As of the end of this reporting period, 11,799 probate cases were in the case preparation stage.

#### Case Adjudication

In this reporting period, Interior implemented a major provision of the FTM by consolidating all Indian probate adjudication functions in a new Probate Hearings Division within OHA. The Division is dedicated exclusively to Indian probate adjudications. ALJs, IPJs, attorneys and support positions from most of OHA's field offices were realigned to the new division; and 10 ADMs and 10 support positions from BIA were transferred to OHA. Regulations reflecting the consolidation were published at 45 FR 11804 (March 9, 2005). Currently, the Probate Hearings Division has approximately 50 positions; when fully staffed, it will have approximately 90 positions.

In this reporting period, deciding officials received 1,063 cases and issued decisions on 676 cases.

#### Case Closure

In this reporting period, OST distributed funds and closed 1,139 accounts in TFAS representing 1,085 estates. TFAS, as of the end of March 2005, contained 28,132 open estate accounts, which is an increase of 85 from the 28,047 estate accounts at the end of the last reporting period.

#### Current Status

#### Probate Case Management and Tracking System

As previously reported, ProTrac was developed to provide probate case tracking information and to assist in the management of probate cases within BIA, OHA and OST. Each BIA regional office and corresponding agencies continued in the process of encoding new cases, examining "initial load" cases and making corrections. Data-cleanup continued for this period, with the end goal to replace the monthly manual spreadsheet report described in previous reports. The monthly manual caseload spreadsheet report is scheduled to be discontinued in June 2005, and

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                                                    **Probate**

ProTrac will then be the source of probate data. Meetings were scheduled, to be held in the next reporting period, to verify and validate codes, forms and reports in ProTrac, and finalize corrections. The meeting regarding program enhancements to ProTrac, reported in the previous report to the Court, has been postponed.

**Probate Handbook**

As previously reported, Interior's draft handbook of Indian probate procedures, dated September 30, 2003, was circulated in final draft form and reviewed by field probate users. Publication is now expected in the beginning of the third quarter of CY2005, with addenda to be provided later to address AIPRA provisions.

**Delays and Obstacles**

The following obstacles have been identified as having an impact on the progress of the probate program:

- Lack of access to the Internet, which includes the inability to use electronic mail communication between OHA and BIA/OST;
- Fractionation of ownership of Indian lands;
- Numerous initiatives competing for resources (e.g., *Youpee* revestitures, *Cobell* requirements, CGI title conversion, realty system development);
- Cultural diversities regarding the subject of death;
- Implementation of the probate reorganization has impacted available resources.

**Assurance Statement**

I concur with the content of the information contained in the Probate section of the *Status Report to the Court Number Twenty-One*. The information provided in this section is accurate to the best of my knowledge.

Date:   April 27, 2005

Name: *Signature on File*
          William Titchywy
          Special Projects Director
          Western Region
          Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005** **Acronyms and Abbreviations**

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| 1994 Act (or Act) | American Indian Trust Fund Management Reform Act of 1994 |
| A-130 | Office of Management and Budget Circular A-130 Appendix III |
| ADM | Attorney Decision Makers |
| AFMSS | Automated Fluid Mineral Support System |
| AIPRA | American Indian Probate Reform Act |
| AIRR | American Indian Records Repository |
| ALJ | Administrative Law Judges |
| ARO | Alaska Region office |
| ART | Accounting Reconciliation Tool |
| AS-IA | Assistant Secretary-Indian Affairs |
| ASD | Appraisal Services Directorate |
| ATO | authority to operate |
| BIA | Bureau of Indian Affairs |
| BIAM | Bureau of Indian Affairs Manual |
| BLM | Bureau of Land Management |
| BOR | Bureau of Reclamation |
| BPA | Blanket Purchase Agreement |
| BRM | Business Reference Model |
| C&A | Certification and Accreditation |
| CARS | Cadastral Automated Request System |
| CDE | Critical Data Elements |
| CFI | Continuous Forest Inventory |
| CGI | Software vendor successor to TAAMS vendor |
| CGIS | Cadastral Geographic Information Systems |
| CIFTA | Certified Indian Fiduciary Trust Analyst |
| CIFTS | Certified Indian Fiduciary Trust Specialist |
| CIO | Chief Information Officer |
| CISSP | Certified Information System Security Professional |
| COTS | Commercial off-the-shelf |
| CSIRC | Computer Security Incident Response Capability |
| CSIRT | Computer Security Incident Response Team |
| CSS | Customer StrataStation |
| CTM | Comprehensive Trust Management Plan |
| DAA | Designated Approving Authority |
| DEAR | DOI Enterprise Architecture Repository |
| DLRM | DOI Land and Resource Management |
| DOP | Desk Operating Procedure |
| DM | Departmental Manual |
| DOI | Department of the Interior |
| DQ&I | Data Quality and Integrity |
| DRM | Data Reference Model |
| ENA | Eastern Navajo Agency |
| EORO | Eastern Oklahoma Region office |

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                    **Acronyms and Abbreviations**

| | |
|---|---|
| ERO | Eastern Region office |
| ESN | Enterprise Services Network |
| FAR | Federal Acquisition Regulation |
| FIMO | Farmington Indian Minerals Office |
| FISMA | Federal Information Security Management Act |
| FRC | Federal Records Center |
| FRD | Functional Requirements Document |
| FTM | Fiduciary Trust Model |
| FTO | Fiduciary Trust Officer |
| GAO | Government Accountability Office |
| GCDB | Geographic Coordinate Data Base |
| GIS | Geographic Information System |
| GLAD | Great Lakes Agency Database System |
| GPRO | Great Plains Region office |
| GPS | Global Positioning System |
| GSA | General Services Administration |
| GSS | General Support Systems |
| HSPD-12 | Homeland Security Presidential Directive 12 |
| IAM | Indian Affairs Manual |
| IATO | Interim Approval to Operate |
| IFTR | Indian Fiduciary Trust Records |
| IG | Inspector General |
| IIM | Individual Indian Money |
| IITD | Individual Indian Trust Data |
| ILCA | Indian Land Consolidation Act |
| ILCO | Indian Land Consolidation Office |
| ILCP | Indian Land Consolidation Project |
| InfoDat | Indian Forestry Database |
| Interior | Department of the Interior |
| IP | Internet Protocol |
| IPJ | Indian Probate Judges |
| IPv6 | Internet Protocol Version 6 |
| IRM | Information Resources Management |
| IRMS | Integrated Records Management System |
| IRS | Internal Revenue Service |
| ISA | Information Security Assessment |
| IT | Information Technology |
| IV&V | independent verification and validation |
| LAN | Local area network |
| LCTS | Land Consolidation Tracking System |
| LRIS | Land Records Information System |
| LTIC | Land Tenure in Indian Country |
| LTRO | Land Titles and Records Office |
| MA | Major Applications |
| MAD/LCP | Management Accounting Distribution/Land Consolidation Program |

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                    **Acronyms and Abbreviations**

| | |
|---|---|
| MADS | Management Accounting Distribution System |
| MMD | Missing Mandatory Documents for Unrestricted Accounts |
| MMS | Minerals Management Service |
| MOU | Memorandum or Memoranda of Understanding |
| MRM | Minerals Revenue Management |
| MWRO | Midwest Region office |
| NARA | National Archives and Records Administration |
| NBC | National Business Center |
| NIPTC | National Indian Programs Training Center |
| NIST | National Institute of Standards and Technology |
| NPS | National Park Service |
| NRO | Navajo Region office |
| NWRO | Northwest Region office |
| O&G | Oil and Gas |
| OAS | Office of Appraisal Services |
| OCIO | Office of the Chief Information Officer |
| OHA | Office of Hearings and Appeals |
| OHTA | Office of Historical Trust Accounting |
| OIG | Office of the Inspector General |
| OMB | Office of Management and Budget |
| OSM | Office of Surface Mining |
| OST | Office of the Special Trustee for American Indians |
| OTFM | Office of Trust Funds Management |
| OTP | Office of Trust Regulations, Policies and Procedures |
| OTR | Office of Trust Records |
| OTRA | Office of Trust Review and Audit |
| PLSS | Public Land Survey System |
| PMSO | Project Management Support Office |
| POA&M | Plans of Actions and Milestones |
| Post-QA | Post Quality Assurance |
| PPA | Office of Planning and Policy Analysis |
| PRO | Pacific Region office |
| ProTrac | Probate Case Management and Tracking System |
| QA | Quality Assurance |
| QC | Quality Control |
| RAF | Recommended Action Forms |
| RDRS | Royalty Distribution and Reporting System |
| REM | Real Estate Module |
| RFP | Request for Proposal |
| RM-PLUS | Risk Management Assessment/Evaluation tool |
| RMRO | Rocky Mountain Region office |
| SANS | SysAdmin, Audit, Network, Security |
| SDA | Special Deposit Accounts |
| SDLC | System Development Life Cycle |
| SMEs | Subject Matter Experts |

*STATUS REPORT TO THE COURT NUMBER TWENTY-ONE*

**May 2, 2005**                                        **Acronyms and Abbreviations**

| | |
|---|---|
| SMS | System Management Servers |
| SOL | Office of the Solicitor |
| SPRO | Southern Plains Region office |
| SSA | Social Security Administration |
| SSM | System Security Manager |
| SSP | System Security Plan |
| ST&E | Security Test and Evaluation |
| STIGs | Security Technical Implementation Guides |
| SUS | System Update Servers |
| SWRO | Southwest Region office |
| TAAMS | Trust Asset and Accounting Management System |
| TAP | Technical Architecture Profile |
| TBCC | Trust Beneficiary Call Center |
| TESC | Trust Executive Steering Committee |
| TFAS | Trust Fund Accounting System |
| TPMC | Trust Program Management Center |
| TRAC | Trust Tracking and Coordination |
| Treasury | Department of the Treasury |
| TRM | Technical Reference Model |
| TRO | Temporary Restraining Order |
| UAT | User Acceptance Testing |
| USGS | United States Geological Survey |
| USPAP | Uniform Standards of Professional Appraisal Practice |
| VBNS | Very High Performance Backbone Network Service |
| VPN | Virtual Private Network |
| WAN | Wide area network |
| WAU | Whereabouts Unknown |
| WRO | Western Region office |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

ELOUISE PEPION COBELL, et al.,       )
                                     )
        Plaintiffs,                  )
                                     )
                v.                   )        Case No. 1:96CV01285
                                     )        (Judge Lamberth)
GALE A. NORTON, Secretary of the     )
Interior, et al.,                    )
                                     )
        Defendants.                  )
_____      )

**NOTICE OF FILING OF INTERIOR DEFENDANTS'
TWENTY-SECOND STATUS REPORT**

Interior Defendants hereby give notice of the filing of their twenty-second report due in

accordance with the Order of December 21, 1999.

A copy of the report is attached hereto.

Dated: August 1, 2005              Respectfully submitted,
                                   ROBERT D. McCALLUM, JR.
                                   Associate Attorney General
                                   PETER D. KEISLER
                                   Assistant Attorney General
                                   STUART E. SCHIFFER
                                   Deputy Assistant Attorney General


                                    /s/ John J. Siemietkowski
                                   J. CHRISTOPHER KOHN
                                   Director
                                   JOHN T. STEMPLEWICZ
                                   Senior Trial Counsel
                                   JOHN J. SIEMIETKOWSKI
                                   Trial Attorney
                                   Commercial Litigation Branch
                                   Civil Division
                                   P.O. Box 875
                                   Ben Franklin Station
                                   Washington, D.C. 20044-0875
                                   Telephone (202) 514-3368

CERTIFICATE OF SERVICE

I hereby certify that, on August 1, 2005, the foregoing *Notice of Filing of Interior Defendants'*

*Twenty-Second Status Report* was served by Electronic Case Filing, and by facsimile on the

following who is not registered for Electronic Case Filing.

Earl OldPerson (pro se)
Blackfeet Tribe
PO Box 850
Browning, MT  59417
(406)338-7530

/s/Jay St. John



THE SECRETARY OF THE INTERIOR

WASHINGTON

AUG - 1 2005

Christopher Kohn
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875

    Re:   *Cobell v. Norton* – *Status Report to the Court Number Twenty-Two*

Dear Mr. Kohn:

Enclosed is the Department of the Interior's *Status Report to the Court Number Twenty-Two (For the Period April 1, 2005 through June 30, 2005).* Please forward a copy to the Court.

This is the 15th report in the revised Report format. My signature on this Report reflects my belief that my personal observations are true and correct, and that the information provided to me by others for inclusion in my observations, as well as accompanying sections of the Report are correct to the best of my knowledge.

Thank you for your assistance.

               Sincerely,

               Gale A. Norton

Enclosure

# Status Report to the Court
# Number Twenty-Two

---

**For the Period**
**April 1, 2005 through June 30, 2005**



**August 1, 2005**

---

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**

<div align="center">

**TABLE OF CONTENTS**

</div>

I.    INTRODUCTION ................................................................................. 3

II.   SECRETARY GALE NORTON'S OBSERVATONS ................................. 4

  A.   INFORMATION TECHNOLOGY ......................................................... 6

  B.   CADASTRAL SURVEY ...................................................................... 15

  C.   MINERALS MANAGEMENT SERVICE ............................................... 18

  D.   OFFICE OF HISTORICAL TRUST ACCOUNTING ............................ 19

III.  OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS .......... 29

  A.   TRUST REVIEW AND AUDIT ............................................................ 32

  B.   OST-OFFICE OF THE CHIEF INFORMATION OFFICER .................... 34

    1.   RECORDS MANAGEMENT ........................................................... 34

  C.   TRUST ACCOUNTABILITY ............................................................... 37

    1.   TRUST BUSINESS PROCESS MODELING ....................................... 37

    2.   TRUST DATA QUALITY AND INTEGRITY ..................................... 40

    3.   INDIAN FIDUCIARY TRUST TRAINING PROGRAM ....................... 43

    4.   RISK MANAGEMENT ................................................................... 45

    5.   REGULATIONS, POLICIES AND PROCEDURES ............................. 47

  D.   FIELD OPERATONS ......................................................................... 49

    1.   APPRAISAL ................................................................................. 49

  E.   TRUST SERVICES ............................................................................ 52

    1.   CURRENT ACCOUNTING ACTIVITIES ......................................... 52

IV.   BUREAU OF INDIAN AFFAIRS ......................................................... 57

  A.   TRUST REGULATIONS, POLICIES AND PROCEDURES .................... 57

  B.   FRACTIONATION ............................................................................ 59

  C.   PROBATE ....................................................................................... 61

ACRONYMS AND ABBREVIATIONS ........................................................ 63

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                                                    **Introduction**

### I.    INTRODUCTION

This *Status Report to the Court Number Twenty-Two* (Report) represents the period from April 1, 2005, through June 30, 2005.  The Report is presented for the purpose of informing the Court on the progress of trust reform activities occurring during this reporting period, and progress of the historical accounting of individual Indian beneficiary funds managed by Interior.[1]

This Report is prepared in a manner consistent with previous reports to the Court.  Each manager in charge of an area of trust administration and the director of the historical accounting project are submitting reports on the progress of their respective activities.

A glossary of acronyms and abbreviations is included in this Report.  The glossary is located at the end of the Report.

---

[1]   This report contains information on the broad trust reform efforts underway at Interior.  Accordingly, it may include information on reform efforts that are not within the scope of the *Cobell* litigation.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

---

**August 1, 2005**                                 **Secretary Gale Norton's Observations**

---

## II.    SECRETARY GALE NORTON'S OBSERVATONS

I continue to be deeply impressed with the dedicated efforts of the many Interior employees, most of whom are American Indians, who are working to ensure that Interior's fiduciary trust responsibilities are met.  Our management team, headed by Jim Cason and Ross Swimmer, has worked hard to improve the organization and professionalism of our trust activities, as well as our other Indian responsibilities.  They are making methodical progress on issues that have been ignored for decades.  My own experience with Interior's employees and the work they do simply cannot be reconciled with the disparaging remarks made by the Court in its July 12 opinion.

Of course, I am also constantly reminded of the difficulties we face in transforming a century-old system into a modern, beneficiary-centered financial services organization.  At the cutting edge of this transition is the implementation of the Fiduciary Trust Model at the pilot agencies of Concho and Anadarko.  Their work includes the conversion of data from key legacy computer systems to new systems that eventually will be installed at all BIA agencies.  As a result of interfacing software components of TAAMS leasing and title with TFAS, we will be able to provide comprehensive asset statements to beneficiaries served by these two agencies.  The Office of Special Trustee expects these statements to be sent to beneficiaries during the next reporting period.

Lessons learned from implementing the FTM at these locations will help significantly as we move forward to other BIA agencies.  Although considerable work will be necessary to implement changes at each agency in the future, this progress at the pilot agencies is a major accomplishment toward reform of the Indian trust.

Another important step in trust reform is implementation of the American Indian Probate Reform Act.  The Act's notice requirement was satisfied during this reporting period.  On June 20, 2005, I certified that the notice provisions had been met through mailings and publication.  As a result, certain provisions in the Act will become effective in one year.  During this year, training will continue for Interior staff, and beneficiaries will have an opportunity to become familiar with the various probate changes that might affect them.

As part of the implementation of trust improvements, we began an Interior Regulatory Initiative during this reporting period.  To the best of my knowledge, this is the most comprehensive updating of trust-related regulations in decades.  The Regulatory Initiative brings together multi-agency working groups consisting of employees from BIA, OST, BLM, NBC, SOL, OHA and OHTA.  Instead of the traditional slow process of writing individual regulations and then circulating them through the Department for incremental editing, the groups have been brainstorming about necessary changes, using their varied expertise to identify improvements, and working together to create drafts.  The working groups are developing regulations that further the FTM, comply with requirements of the new probate act, and streamline other business processes.  Some of the draft regulations are expected to be presented for consultation by the end of the calendar year.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                               **Secretary Gale Norton's Observations**

With the recent introduction by Senators McCain and Dorgan of a bill, S.1439, to settle the accounting claims in the *Cobell* litigation, I think it is appropriate to summarize the substantial progress the Department has made since 2001 in performing the historical accounting. This progress has been made in spite of the fact that Congress continues to appropriate significantly less for accounting work than the Administration requests. For FY2006, for example, the Senate and House passed versions of the Interior appropriations bill that each propose to give the Department only $58 million of the $135 million it requested.

I have been informed that, as of June 30, 2005, the Office of Historical Trust Accounting had fully reconciled 52,165 of the 99,572 judgment and per capita accounts (including some with no current balance). Statements detailing the results of the accounting have been mailed to 12,122 account holders, and OHTA is awaiting permission from the court to send the results to an additional 28,107 account holders.

From OHTA's description of the accounting results to date, there do not appear to be any systemic accounting issues or bias in the accounting results. Differences between accounting ledgers and supporting documentation sometimes favor account holders and sometimes disadvantage them. In other words, the dollar differences go both ways. The differences found do not seem to indicate fraud, theft, or misapplication of accounting rules. Rather, the differences appear to be random computational, posting, or distribution errors.

The accounting and trust reform efforts continue in the midst of significant litigation-related demands on the Department's time and resources. As I write this, the Court's hearing on IT security at the Department is drawing to a close. I understand that, since April 26, Interior has produced over 4.5 million pages of documents for the hearing and nearly 20 employees have provided testimony. While the hearing is meant to assess vulnerabilities in the security measures that the Department has taken to protect the Indian trust data that it stores electronically, I am concerned that the litigation itself, in which detailed information on those security measures is being made available to the public, may present the greatest vulnerability that the Department faces in the area of IT security.

In the past few days, Interior has also devoted considerable high-level attention to this Court's recent order that Interior put a notice in every written communication that Interior sends to present and former IIM account holders. We are concerned this will be a huge task that will impose ongoing requirements on potentially thousands of employees for an indefinite period and that will negatively impact Interior's relationship with Indian beneficiaries.

As mentioned earlier, legislation has been introduced in Congress to address individual Indian trust claims. I look forward to the opportunity to work with Congress on this issue. I hope that this legislation will finally address longstanding issues that have been unresolved for decades, and allow both Interior and Indian Country to focus on the future.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

August 1, 2005                                              **Information Technology**

## A.    INFORMATION TECHNOLOGY

### Introduction

This section describes the status of Interior IT systems, particularly the systems that house or provide access to IITD or provide various computing capabilities, including functions critical to the proper administration of the individual Indian trust responsibilities within Interior.  In addition, this section describes various efforts being made to improve IITD security within Interior, pursuant to OMB Circular A-130 Appendix III, and the status of Internet connectivity.

### Accomplishments and Completions

**Computer Security:**

Interior continues to make progress in ensuring IT security and, in particular, addressing the potential risks associated with unauthorized access to IITD from the Internet.  A primary focus for this reporting period has been providing documentation responsive to the April 25, 2005, Court Order.  Over 4.5 million pages of documentation have been collected and produced pursuant to this Order.  Additional efforts were focused on responding to penetration test results from our contracted monitoring program through the Inspector General, preparing for the annual FISMA evaluation, completing site and facility compliance reviews, conducting annual IT security awareness training, and continuing to validate and improve the C&A packages completed previously.  The most noteworthy accomplishments and completions during the reporting period are described below.

*Prevention and Monitoring*

- Interior continued testing Internet-accessible systems against an operational security profile based on the SANS Top 20 vulnerability list.  For the fifth consecutive reporting period, no hosts were found to have vulnerabilities listed in the SANS Top 20.  The SANS Top 20 lists the ten most commonly exploited vulnerabilities in Windows, and the ten most commonly exploited vulnerabilities in Unix.  Although there are thousands of security incidents each year affecting these operating systems, the overwhelming majority of successful attacks target one or more of these twenty services.  These monthly scans assist bureaus and offices in prioritizing their IT security efforts so they can address the most dangerous network vulnerabilities first.

- Interior initiated more robust automated vulnerability scan testing of Internet-accessible systems to include more than the SANS Top 20 vulnerability listing.  Potential vulnerabilities were detected and are being analyzed or have been mitigated.  Results from these heightened scanning activities are expected to be reflected in future reports as Interior further refines the process.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

August 1, 2005                                   **Information Technology**

- Potential incidents that were reported to DOI-CIRC during this reporting period, are as follows:

| Type of Incident | Number Unsuccessful | Number Successful |
|---|---|---|
| Intrusion | 0 | 0 |
| DoS/DDoS | 1 | 0 |
| Virus/Malicious Code | 835,251 | 10 |
| System Misuse | 61,547 | 4 |
| Social Engineering | 161 | 0 |
| Web Defacement | 0 | 0 |
| Root Compromise | 7 | 0 |
| User Compromise | 0 | 0 |
| Hoax | 0 | 0 |
| Scanning/Probes | 307,515,988 | 10 |
| Trojan/Backdoor | 10 | 0 |
| Other (Incidents N/A to above categories) | 45,455,606 | 9 |
| *Total* | **353,868,575** | **33** |

- The types of incidents reported in the "Other" category include any type of potential incident not included in the other areas. Examples of those incidents include: laptop theft, e-mail address spoofing and spam/fraudulent e-mail received. Of the 33 reported successful incidents occurring during this reporting period, none appear to have resulted in any known compromise of sensitive data. Successful incidents are those that could not be prevented or blocked by Interior at the time of their occurrence.

- In the previous reporting period, BLM received initial results from the contracted penetration testing. The IG's contractors reported successful penetration of BLM's external perimeter and Intranet servers. The contractor also noted the presence of up-to-date patches on servers, and external DNS servers were identified as being compliant with best security practices. Two IITD servers responded to a ping test. However, the contractors did not report exploit of servers containing IITD. Attempts to exploit IITD would have met additional layers of security controls. These include password protection on the underlying databases, application-level security implemented via internally defined access control lists and implementation of strong passwords on BLM's Indian trust software application user accounts.

  After the contractor penetration testing, BLM took immediate action to further increase its IT security. BLM implemented the recommendations made in the IG penetration report and, as

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                                    **Information Technology**

a result, has significantly strengthened BLM's overall IT security architecture. BLM first responded to the initial results by taking immediate steps to further protect IITD by disconnecting trust servers and workstations from the BLM network. There has been a long-standing issue in BLM concerning the need to segregate these servers into a virtual private network. These servers are not expected to be reconnected until the segmentation is completed. BLM implemented corrective actions for the technical vulnerabilities identified by the IG. These actions have improved the level of BLM's network security. BLM has also joined the Departmental WAN (ESN), which provides another layer of network security. BLM has slowly been restoring Internet services after thorough testing and verification of security improvements, and expects to continue to implement longer-term solutions that prevent and detect vulnerabilities.

- NBC received initial results from the contracted penetration testing initiated in the last reporting period. The IG's contractor that performed the NBC penetration testing was able to access some of the components of the NBC systems. During the testing, the IG contractor did not access any NBC-hosted IITD applications. These applications are isolated and protected; penetration into that portion did not occur.

  The IG's contractor did successfully penetrate a reporting database allowing viewing of confidential personnel information pertaining to Interior employees and employees in other agencies using Interior financial services. NBC has initiated an extensive remediation plan to address vulnerabilities identified in the penetration testing against NBC systems. Immediate action was taken to resolve or mitigate critical vulnerabilities. During this reporting period, 21 of 37 identified remediation tasks have been completed, and NBC continues to track progress of remaining tasks.

  As part of the remediation effort, NBC purchased additional tools to identify web application and database vulnerabilities. Using one of those tools, approximately 50 critical web applications have gone through an initial vulnerability scan and remediation effort, and are being rescanned. NBC has also begun initial database vulnerability scans and analysis.

- During this reporting period, the IG's contractor conducted extensive penetration testing against MMS systems, but was unable to access its systems or data.

- OST upgraded its intrusion detection sensors, which enhanced its network monitoring capability by allowing more of its network to be monitored.

- OHA completed the migration of its network operating systems to Interior's Active Directory, providing a single operating directory for control of user access to network resources.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                         **Information Technology**

*Policies and Guidance*

- The Interior CIO issued OCIO Directive 2005-007, "FY 2005 Plans of Action and Milestones (POA&M) Process Verification," to the heads of bureaus and offices on May 3, 2005. This directive establishes criteria for maintaining, improving and certifying the POA&M process.

- The Interior CIO issued a memorandum, "Enterprise Services Network (ESN) Connection Approval Process," to the bureau and office chief information officers on May 24, 2005. This memorandum establishes a connection approval process for creating a single WAN by joining bureau WANs. BLM was the first bureau to complete the process and join the Department's WAN (ESN).

*Training and Awareness*

- Interior completed annual IT security awareness training for over 92% of Interior staff as of the end of this reporting period.

- Interior entered into an agreement with OPM to provide online training as a means to deliver role-based IT security training for bureaus and offices subscribing to this service.

- The quarterly MMS Information Security Awareness Newsletter, Spring 2005, was distributed to employees and contractors to keep users abreast of IT security issues.

**Plans of Action and Milestones:**

Interior tracked 1,659 POA&M recorded weaknesses, of which 521 weaknesses were identified this quarter and 1,138 weaknesses were carried over from the second quarter. Interior remediated and closed out 453 weaknesses this quarter. Interior is currently tracking 1,206 open weaknesses.

**A-130 Certification and Accreditation:**

During this reporting period, 42 non-trust and 2 trust C&A packages were independently reviewed by a contractor. In addition, C&A packages that had not met minimum compliance review scores on initial reviews continue to be improved.

**IT Systems Architecture:**

Interior's enterprise architecture program was rated the highest among 25 federal agencies assessed by OMB. DOI's EA program received a 4.06 rating, with the average rating among federal agencies being a 3.19. This rating signifies the architecture is being operationalized across Interior and is providing performance impact to business operations. This is consistent with Interior's previously-reported self-assessment. Interior's top-rated IT architecture program greatly adds to Interior's position that we are adequately securing our IT systems and data.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                                              **Information Technology**

The "Department of the Interior Transition Plan" was developed, reviewed and submitted to OMB for assessment. This document provides a structured approach for closing the gap between Interior's current or "as-is" architecture and its conceptual target architecture. This approach is supported by a structured methodology and supporting tools (e.g., DEAR), which are used to improve Interior's mission performance.

Approximately 63% of Interior's systems inventory contained in DEAR has been mapped to the BRM. During this reporting period, Interior launched a Department-wide effort for mapping its systems inventory contained in DEAR to the DRM. The DRM contains high-level categories of data managed by DOI (e.g., recreation, financial, etc.). This information is useful in determining potential authoritative data sources in Interior's system portfolio. At the time of this report, approximately 68% of the systems contained in DEAR have been mapped to the DRM. As noted in the last Status Report to the Court, Interior continues to validate Phase 3B populated data and make appropriate updates and corrections as needed.

### *DOI Land and Resource Management System (DLRM)*

As previously reported, the DLRM system is expected to provide a long-term solution for the legacy functionality of the CGI leasing software module, formerly a part of the TAAMS project.

The FRD for DLRM was approved, which is expected to enable the DLRM to replace certain legacy systems and interface with other systems as required. The acquisition phase of the project began with the assignment of a contracting officer and the solicitation is expected to be published in August 2005.

The UAT for Version 2.0 of the realty (leasing) portion of TAAMS was conducted through April 1, 2005. The tests covered range, forestry, surface, minerals, rights-of-way, and leasing reports. The tests were successful for all of the areas, and it was determined that the reports are suitable for use but may need more modification. Use of TAAMS as an interim solution for leasing was approved by the TESC. The TAAMS pilot went "live" at the Anadarko and Concho agencies on June 30, 2005.

### ESN

- The ESN was certified and accredited on April 15, 2005.

- Five ESN Internet gateways were installed. These gateways are expected to provide consolidated Internet service to the Department with additional layers of perimeter security.

- On June 28, 2005, BLM became the first bureau to be connected to the ESN.

### ZANTAZ

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                    **Information Technology**

- As noted in the previous reporting period, OSM had discovered an additional transmission problem in March. This was determined to be a problem involving a Dynamic Linking Library file installed on 53 workstations. The problem lasted from March 7 through March 23. Affected messages were retransmitted to ZANTAZ on April 5 and 6. From April 5 through April 10, there was a disruption in OSM's VPN to ZANTAZ, which delayed transmission of messages to ZANTAZ. OSM experienced similar problems for the periods of May 14 through May 19 and from May 30 through June 2, again delaying the transmission of messages to ZANTAZ. During this reporting period, OSM migrated from GroupWise to Outlook in order to resolve these transmission problems.

- As noted in the previous reporting period, NBC's e-mail messages likely did not travel to the ZANTAZ Digital Safe on February 15-17, 2005. NBC sent three back-up tapes containing e-mail messages captured during that time period to ZANTAZ. The NBC tapes have been processed and messages successfully restored.

- As reported in open court on June 30, 2005, NBC discovered on June 21, 2005, that some of its e-mail servers were not transmitting all e-mail messages to the ZANTAZ Digital Safe. NBC expects to correct the issue during the next reporting period. Other bureaus and offices that transmit e-mail messages to the Digital Safe are being tested for similar issues. As reported in open court on July 17, 2005, so far, only SOL and BIA report similar problems.

- Though these systems do not house or access IITD, NBC wishes the Court to be aware of two matters involving its Boise and Reston offices: (1) Prior to March 1, 2005, Boise did not retain backup tapes indefinitely; (2) Prior to October 30, 2004, Reston did not retain backup tapes indefinitely.

- On May 13 and 17, 2005, due to a BLM server outage, BLM was unable to send e-mail messages to the ZANTAZ Digital Safe. In both cases, after BLM resolved the issue, messages queued during these incidents went to ZANTAZ.

**A-130 Certification and Accreditation:**

- Ninety-seven percent of Interior systems have full authority to operate (ATO) status. C&A reviews conducted by a qualified third party have been completed for 67% of the C&A packages as of the end of this reporting period. 67% of these packages received passing scores.

- 43 systems were identified as responsive to the current evidentiary hearing. Of these, 34 have received passing scores and nine are pending initial or second review.

**Reports:**

These reports may be of interest to the Court.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                    **Information Technology**

- GAO issued "Internet Protocol Version 6: Federal Agencies Need to Plan for Transition and Manage Security Risks" (GAO 05-471) and "Internet Protocol Version 6: Federal Agencies Need to Plan for Transition and Manage Security Risks" (GAO-05-845T). These reports cover issues regarding emerging technology issues government-wide.

- GAO issued "Information Security: Federal Agencies Need to Improve Controls over Wireless Networks" (GAO-05-383). This report assesses the status of wireless networks generally.

- GAO issued "Information Security: Emerging Cybersecurity Issues Threaten Federal Information Systems" (GAO-05-231). This report assesses the challenges from new IT security threats government-wide.

- GAO issued "Information Security: Improving Oversight of Access to Federal Systems and Data by Contractors Can Reduce Risk" (GAO-05-362). This report assesses risks and responses to contractor access to IT systems and data government-wide.

- GAO issued "Information Security: Continued Efforts Needed to Sustain Progress in Implementing Statutory Requirements" (GAO-05-483T). This report addresses implementation of FISMA government-wide.

- The President's Information Technology Advisory Committee issued a Report to the President, February 2005, "Cyber-Security: A Crisis of Prioritization." This report concludes a year-long study of the security of IT infrastructure of the U.S., with particular attention to intentional attacks, considering the potential impacts to national and homeland security, as well as everyday life of all American citizens. This report provides suggestions to improve the Nation's cyber-security.

<u>**Delays and Obstacles**</u>

As can be seen from the many GAO reports noted above, there are many challenges that must be addressed regarding the integration, performance, funding, security, and data integrity of IT systems generally. Like other federal agencies, Interior must address these challenges for its IT systems. Interior initiated or completed steps to address some of the challenges reported in this and previous reporting periods. However, delays and obstacles listed here impede progress in achieving Interior's IT management goals:

**Litigation**

- Collection and production of documents and court appearances have placed significant strain on available staff and contractor resources throughout most of this reporting period, resulting in substantial delays in accomplishing planned and required work. The extent of the effort required for this document production resulted in significant backlogs and rescheduling that

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                                    **Information Technology**

will hamper Interior's efforts for months to come.  Production of documents has exceeded 4.5 million pages.  Examples of impacted actions include:

- o  FISMA compliance actions
- o  Interior's financial audit
- o  OMB and Congressional reporting requirements
- o  Migration to a single e-mail messaging system
- o  Migration to a single Active Directory system
- o  Complying with HSPD-12 for implementing E-Authentication in Interior
- o  Delay in moving Interior bureaus and offices to a single WAN

- Employee fears about becoming personally implicated in the *Cobell* litigation have been heightened as individuals from varying levels in Interior have been required to testify at the evidentiary hearing.  These fears continue to undermine communication and decision-making, and along with burn-out from demands for volumes of document production, are contributing factors to low employee morale.

**Funding**

- Considerable expense was incurred as a result of collecting and producing over 4.5 million pages of material for the litigation.  This expense diminished the funding available for security improvement and program evaluation.

- Funding availability will continue to dictate the timing of IT-related initiatives.  Interior's FY2005 and FY2006 budgets will require managing a variety of IT-related requirements and tradeoffs.

**Staffing**

Interior is experiencing high staff and management turnover in critical IT positions, particularly IT security.  Resulting impacts to communication, efficiency, and oversight are impeding IT security service area functions.

**Denied Internet Access**

Several Interior bureaus and offices (BIA, OHA, OST and SOL) have not been permitted by the Court to have Internet access since December 5, 2001.  Lack of Internet access impedes work processes and the ability to communicate effectively, both internally and externally.  Maintaining security on internal systems is more difficult without access to the Internet for research, reporting, and patch management.  Similarly, promulgation of policy and training is substantially hampered by the lack of interconnectivity and Internet access.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                      **Information Technology**

**Assurance Statement**

I concur with the content of the information contained in the Information Technology section of the *Status Report to the Court Number Twenty-Two*. The information provided in this section is accurate to the best of my knowledge.

Date:   August 1, 2005

Name: *Signature on File*
        W. Hord Tipton
        Interior Chief Information Officer

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

August 1, 2005                                                    **Cadastral Survey**

B.    **CADASTRAL SURVEY**

**Introduction**

Cadastral surveys provide assurance that land boundaries for individual Indian and tribal trust lands are identified appropriately.  By federal law, surveys of Indian lands are to be performed under BLM's direction and control.  Official surveys, whether preexisting or new, identify the location of land boundaries of Indian trust assets and determine official acreage.  The official surveys are integral to realty transactions, resource management activities, litigation support and the federal system of patent, allotment and survey records maintained by BLM.  Ownership information, distribution of trust assets, and management of trust accounts may be related to or based upon information recorded in official surveys.

**Accomplishments and Completions**

**Inventory of Cadastral Needs**

The development of a FY2006, FY2007 and FY2008 nationwide inventory of requests for cadastral survey services in Indian country was a major focus of BLM and BIA during this reporting period.

Approximately 1,280 survey services with an estimated cost of $75.9 million dollars were requested for FY2006, FY2007 and FY2008.  The breakout for survey services requested for each year is as follows: FY2006, 565 requests at an estimated cost of $40.8 million dollars; FY2007, 545 requests at an estimated cost of $25.8 million dollars; and FY2008, 170 requests at an estimated cost of $9.3 million dollars.  BLM and BIA used CARS to determine the highest priority of the requested surveys, and to aid in the distribution of the proposed appropriation of eight million dollars for survey services to be performed during FY2006.  The proposed appropriation for cadastral survey services is expected to facilitate completion of Indian trust projects valued as high as $90.5 million dollars.

**Educational Opportunity and Outreach**

BLM and the Oregon Institute of Technology have agreed to a cooperative partnership and have signed an assistance agreement during this reporting period.  The objective of this agreement is to emphasize the public land surveying curriculum and to partner with American Indian Tribes and organizations to promote and encourage survey education for individual Indians.

**Current Status**

**Interior Indian Trust Lands Boundary Standards (Draft)**

The Draft Boundary Standards were revised based upon comments received.  The standards and comments received are currently being reviewed by SOL.  Upon completion of SOL review, an updated draft will be provided to agencies and other affected parties.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                                      **Cadastral Survey**

**Funding of the Recommendations Outlined in the FTM**

During this reporting period, the FY2006 budget necessary to achieve the FTM goals as they relate to cadastral surveys was agreed to be funded by OST in the amount of $2,075,000. This funding will assist BLM in the hiring of 12 BLM Indian land surveyors to be located at BIA regional offices.

The BLM Indian land surveyors for the Midwest and Northwest Regions have been hired and have reported to their respective duty locations. The BLM Indian land surveyors for the Southern Plains, Eastern Oklahoma and Navajo Regions are hired and are currently scheduled to report during the next reporting period. The Great Plains BLM Indian land surveyor position was re-advertised at the end of this reporting period and it is anticipated that the individual selected will also report during the next reporting period. The remaining six BIA regions are expected to receive their BLM Indian land surveyors in FY2006.

The Certified Federal Surveyor (CFedS) program is one of the FTM components for BLM. During this reporting period, a CFedS design committee provided a design of the concept and implementation process for CFedS. The CFedS project manager position is expected to be advertised at the BLM National Training Center during the next reporting period. The final implementation plan is expected to be developed in FY2005, with the first CFedS certification expected to be awarded in FY2006.

**Missing BIA Indian Service Survey Records and Unofficial Survey Records**

BLM has sent two experienced land surveyors to the AIRR to search for any survey-related records or unofficial survey plats or maps that may assist them to properly and legally identify, locate, survey or resurvey Indian lands. As a result of their investigation, BLM believes that there is no significant amount of Indian survey records at this one facility. Further, they believe that there is no one facility housing any significant amount of these records. These records could possibly be located at the various NARA facilities, local agency offices, tribal facilities, other storage facilities and possibly private collections. BLM will continue the search for any records or documents that may assist them in defining Indian lands. Further reporting on this matter will be limited to significant developments.

<u>**Delays and Obstacles**</u>

**Disconnection from the Internet**

The Court-ordered disconnection from the Internet continues to adversely impact the way communications are handled between BLM, BIA, OST and SOL, including the way CARS is being implemented. BLM's productivity has decreased, and the cost associated with dual networks has caused the cost of survey services to increase. This issue continues to impact BLM's ability to provide cadastral services in an effective and cost efficient manner to clients.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                              **Cadastral Survey**

**Funding of the FTM**

Planning and scheduling of out-year FTM work is dependent on future funding.

**Assurance Statement**

I concur with the content of the information contained in the Cadastral Survey section of the *Status Report to the Court Number Twenty-Two*. The information provided in this section is accurate to the best of my knowledge.

Date:   July 21, 2005

Name: *Signature on File*
         Donald A. Buhler
         Chief Cadastral Surveyor
         Bureau of Land Management

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

August 1, 2005                                    **Minerals Management Service**

### C.    MINERALS MANAGEMENT SERVICE

**Introduction**

Minerals Revenue Management, an MMS program, is responsible for collecting, accounting for, and distributing mineral revenues from both federal and Indian mineral leases, and for evaluating industry compliance with laws, regulations and lease terms.  MRM maintains reported information and distributes revenues at the lease level.  BIA maintains individual Indian ownership records that are used to provide information to OST for disbursement of the lease revenues to individual Indian beneficiaries.

**Current Status**

**Indian Oil Rule**

MMS started a new rulemaking process for the valuation of oil produced from tribal and allotted Indian lands.  In anticipation of publishing this new proposed rule, MMS held consultations with Indian tribes and individual Indian mineral owners during this reporting period, to gather additional comments on the draft proposal.  As previously reported, a proposed rule for valuing crude oil produced from Indian leases is expected to be published by August 31, 2005.

**Payment Receipt Date Verification**

With the successful completion of the PeopleSoft upgrade, in January 2005, software changes and system enhancements are being user-tested.  Once implemented, further errors are expected to be prevented.  MMS expects to devote resources to identify prior errors in the Indian mineral revenue distribution file.

**Assurance Statement**

I concur with the content of the information contained in the Minerals Management Service section of the *Status Report to the Court Number Twenty-Two*.  The information provided in this section is accurate to the best of my knowledge.

Date:   July 18, 2005

Name: *Signature on File*
        Cathy J. Hamilton
        Chief of Staff
        Minerals Revenue Management
        Minerals Management Service

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                    **Office of Historical Trust Accounting**

## D.    OFFICE OF HISTORICAL TRUST ACCOUNTING

### Introduction

OHTA was established by Secretarial Order No. 3231 on July 10, 2001, and is charged with planning, organizing, directing and executing the historical accounting of IIM and tribal trust accounts.

### Current Status

### Judgment IIM Accounts

OHTA continues to perform historical accounting procedures on Judgment IIM accounts. OHTA received the electronic IIM transaction data files it uses for the Judgment IIM account historical accounting in 2003 from one of its contractors, which had received the data files directly from OST in 1999; the data files were received by OHTA from a system that was not connected to the Internet.  Since its 2001 inception, neither OHTA nor its contractors have stored the data on a system that was connected to the Internet. During this reporting period, OHTA completely reconciled an additional 3,718 accounts in Subgroups[2] as follows:  163 accounts in Subgroup A, 1,777 accounts in Subgroup B, 752 accounts in Subgroup C, and 1,026 accounts in Subgroup D.  Of the 43,764 Judgment IIM accounts completely reconciled as of June 30, 2005, quality control review has been completed for 43,032.  OHTA expects to complete quality control review of the other 732 completely reconciled accounts during the next reporting period.

As more data—particularly from the "Paper Records Era"—are collected and keyed into the transaction listings, some accounts are reclassified into Subgroups different from their original classification.  The following tables present the total number of Judgment IIM accounts in each Subgroup reconciled as of June 30, 2005, including accounts reconciled in previous reporting periods.  The tables also report balances and throughput.

---

[2]  Subgroup A contains Judgment IIM accounts with receipt deposit(s) and monthly interest postings through December 31, 2000, and no disbursement of funds.  Subgroup B contains only Judgment IIM accounts with receipt deposit(s) and monthly interest postings with a single disbursement.  Subgroup C contains only Judgment IIM accounts with receipt deposit(s) and monthly interest postings with multiple disbursements.  Subgroup D contains accounts with both (1) Judgment transactions with receipt deposit(s) and monthly interest postings, and (2) land-based transactions (income from land interests owned by the account holder).

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                          **Office of Historical Trust Accounting**

## Status of Work

## Judgment IIM Accounts Open as of 12/31/00

**Number of Accounts: 33,205     Balances Total: $80,839,699     Throughput\* Total: $140,694,346**

|  | Subgroup A | Subgroup B | Subgroup C | Subgroup D | Totals |
|---|---|---|---|---|---|
| **Completely Reconciled** | | | | | |
| Number of Accounts | 19,175 | 3 | -- | 2,669 | 21,847 |
| $ Balances Reconciled | $54,074,289 | -- | -- | $2,213,844 | $56,288,133 |
| $ Throughput\* Reconciled | $54,123,292 | $6,823 | -- | $24,807,946 | $78,938,061 |
| **Partially Reconciled** | | | | | |
| Number of Accounts | 0 | 1 | 2 | 3,644 | 3,647 |
| $ Balances | -- | -- | -- | $7,220,871 | $7,220,871 |
| $ Throughput\* Reconciled | -- | $4,890 | $3,415 | $4,758,732 | $4,767,037 |
| $ Throughput to be Reconciled\*\* | -- | $6,430 | $17,682 | $19,833,265 | $19,857,377 |
| **Paper Records Era Reconstruction** | | | | | |
| Number of Accounts\*\*\* | | | | | 7,711 |
| $ Balances to be Reconciled | | | | | $17,330,695 |
| $ Throughput to be Reconciled\*\* | | | | | $37,131,871 |

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                    **Office of Historical Trust Accounting**

## Status of Work

### Judgment IIM Accounts Open as of or after 10/25/94 but Closed Prior to 12/31/00

**Number of Accounts: 47,334        Balances Total: $0        Throughput\* Total: $499,956,704**

|  | **Subgroup A** | **Subgroup B** | **Subgroup C** | **Subgroup D** | **Totals** |
|---|---|---|---|---|---|
| **Completely Reconciled** | | | | | |
| Number of Accounts | NA | 18,034 | 2,922 | 961 | 21,917 |
| $ Balances Reconciled | NA | -- | -- | -- | -- |
| $ Throughput\* Reconciled | NA | $119,721,664 | $42,128,416 | $16,369,365 | $178,219,445 |
| **Partially Reconciled** | | | | | |
| Number of Accounts | NA | 1,705 | 1,030 | 9,726 | 12,461 |
| $ Balances | NA | -- | -- | -- | -- |
| $ Throughput\* Reconciled | NA | $1,703,629 | $2,132,236 | $10,005,851 | $13,841,716 |
| $ Throughput to be Reconciled\*\* | NA | $7,819,900 | $9,995,614 | $115,609,251 | $133,424,765 |
| **Paper Records Era Reconstruction** | | | | | |
| Number of Accounts\*\*\* | | | | | 12,956 |
| $ Balances Reconciled | | | | | -- |
| $ Throughput to be Reconciled | | | | | $174,470,778 |

    \* Throughput is defined as the sum of the receipts and disbursements in the Electronic Records Era portion
     of an account.
    \*\* Throughput relating to respective accounts to be reconciled.
    \*\*\* Distribution of reconstructed Paper Records Era accounts unknown.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                    **Office of Historical Trust Accounting**

A majority of the remaining Judgment IIM accounts (as well as some Per Capita IIM accounts) require conversion of transaction data from manual ledgers to electronic format. As of June 30, 2005, OHTA has searched approximately 4,750 boxes of stored records for manual ledgers required to complete the account history for Judgment and Per Capita IIM accounts that originated in the "Paper Records Era." Approximately 260,000 transactions for 27,000 Judgment and Per Capita IIM accounts have been located and entered into electronic format as a result of this effort.

**Per Capita IIM Accounts**

OHTA continues to perform historical accounting procedures on Per Capita IIM accounts. OHTA received the electronic IIM transaction data files it uses for the Per Capita IIM historical accounting in 2003 from one of its contractors, which had received the data files directly from OST in 1999; the data files were received by OHTA from a system that was not connected to the Internet. Since its 2001 inception, neither OHTA nor its contractors have stored the data on a system that was connected to the Internet. During this reporting period, OHTA completely reconciled an additional 843 accounts in Subgroups[3] as follows: 95 accounts in Subgroup B, 583 accounts in Subgroup C, and 165 accounts in Subgroup D. Of the 8,401 Per Capita IIM accounts completely reconciled as of June 30, 2005, quality control review has been completed for 7,558 accounts. OHTA expects to complete quality control review of the other 843 completely reconciled accounts during the next reporting period.

As more data—particularly from the "Paper Records Era"—are collected and keyed into the transaction listings, some accounts are reclassified into Subgroups different from their original classification. The following tables present the total number of Per Capita IIM accounts in each Subgroup reconciled as of June 30, 2005, including accounts reconciled in previous reporting periods. The tables also report balances and throughput.

---

[3] Subgroup A contains Per Capita IIM accounts with receipt deposit(s) and monthly interest postings through December 31, 2000, and no disbursement of funds. Subgroup B contains only Per Capita IIM accounts with receipt deposit(s) and monthly interest postings with a single disbursement but do not necessarily disburse the entire balance of the account. Subgroup C contains only Per Capita IIM accounts with receipt deposit(s) and monthly interest postings with multiple disbursements but do not necessarily disburse the entire balance of the account. Subgroup D contains accounts with both (1) Per Capita transactions with receipt deposit(s) and monthly interest postings, and (2) land-based transactions (income from land interests owned by the account holder).

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                **Office of Historical Trust Accounting**

### Status of Work

### Per Capita IIM Accounts Open as of 12/31/00

**Number of Accounts:  9,013      Balances Total: $69,486,684      Throughput\* Total: $98,208,350**

|  | Subgroup A | Subgroup B | Subgroup C | Subgroup D | Totals |
|---|---|---|---|---|---|
| **Completely Reconciled** | | | | | |
| Number of Accounts | 2,137 | 661 | 993 | 204 | 3,995 |
| $ Balances Reconciled | $11,415,807 | $5,979,031 | $9,263,079 | $1,397,660 | $28,055,577 |
| $ Throughput\* Reconciled | $12,833,464 | $7,615,300 | $13,055,610 | $2,354,592 | $35,858,966 |
| **Partially Reconciled** | | | | | |
| Number of Accounts | -- | 184 | 519 | 4,114 | 4,817 |
| $ Balances | -- | $2,092,914 | $6,068,783 | $33,078,749 | $41,240,446 |
| $ Throughput\* Reconciled | -- | $2,146,115 | $6,906,068 | $28,001,842 | $37,054,025 |
| $ Throughput to be Reconciled\*\* | -- | $673,878 | $2,857,000 | $21,634,550 | $25,165,428 |
| **Paper Records Era Reconstruction** | | | | | |
| Number of Accounts\*\*\* | | | | | 201 |
| $ Balances to be Reconciled | | | | | $190,661 |
| $ Throughput to be Reconciled | | | | | $129,931 |

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                    **Office of Historical Trust Accounting**

## Status of Work

## Per Capita IIM Accounts Open as of or after 10/25/94 but Closed Prior to 12/31/00

**Number of Accounts: 10,020     Balances Total: $0     Throughput\* Total: $93,733,222**

|  | Subgroup A | Subgroup B | Subgroup C | Subgroup D | Totals |
|---|---|---|---|---|---|
| **Completely Reconciled** | | | | | |
| Number of Accounts | NA | 3,599 | 744 | 63 | 4,406 |
| $ Balances Reconciled | NA | -- | -- | -- | -- |
| $ Throughput\* Reconciled | NA | $38,394,289 | $11,118,986 | $1,220,587 | $50,733,862 |
| **Partially Reconciled** | | | | | |
| Number of Accounts | NA | 498 | 541 | 2,630 | 3,669 |
| $ Balances | NA | -- | -- | -- | -- |
| $ Throughput\* Reconciled | NA | $2,034,067 | $3,675,659 | $10,350,849 | $16,060,575 |
| $ Throughput to be Reconciled\*\* | NA | $4,593,194 | $6,450,528 | $15,215,881 | $26,259,603 |
| **Paper Records Era Reconstruction** | | | | | |
| Number of Accounts\*\*\* | | | | | 1,945 |
| $ Balances to be Reconciled | | | | | -- |
| $ Throughput to be Reconciled | | | | | $679,182 |

   \* Throughput is defined as the sum of the receipts and disbursements in the Electronic Records Era portion
    of an account.
  \*\* Throughput relating to respective accounts to be reconciled.
\*\*\* Distribution of reconstructed Paper Records Era accounts unknown.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                        **Office of Historical Trust Accounting**

**Mailings to Judgment and Per Capita IIM Account Holders**

During this reporting period, OHTA mailed an additional 250 Historical Statements of Account with an accompanying transmittal letter explaining the Statement, bringing the total number of Statements mailed to Judgment IIM account holders to 12,122. A toll-free telephone number is available to account holders and/or their parents or guardians in the event they have questions about the mailings. Since OHTA began mailing Statements, approximately 2 % of the Statement recipients have inquired regarding their Statements, the substantial majority of which related to the reason the Statement was provided to the account holder. The remaining 4,974 Statements could not be mailed to Judgment IIM account holders because no known addresses were available. With this latest mailing, OHTA completed the mailing of all deliverable Statements in the group of 17,096 Statements that the Court permitted OHTA to transmit to account holders in its October 22, 2004, Order.

Of the 12,122 Statements mailed, 11% were returned as undeliverable for various reasons. OHTA has re-mailed Statements using forwarding addresses provided by the U.S. Postal Service, and by TFAS/Trans Union and Bank of America search services. Returned Statements will continue to be re-mailed as forwarding addresses become available.

**Land-Based IIM Accounts**

OHTA continues to conduct reconciliation work on High-Dollar Transactions identified as equal to or in excess of $100,000, and on National Sample Transactions under $100,000 in Land-Based IIM accounts. A final report on this work is expected later in FY2005 when reconciliation is completed. OHTA received the electronic IIM transaction data files it uses for the Land-Based IIM reconciliations in 2003 from one of its contractors, which had received the data files directly from OST in 1999; the data files were received by OHTA from a system that was not connected to the Internet. Since its 2001 inception, neither OHTA nor its contractors have stored the data on a system that was connected to the Internet.

# Note:  This section continues on the next page.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                    **Office of Historical Trust Accounting**

### OHTA SDA Distribution Project

The results of the OHTA SDA Distribution Project, as of June 30, 2005, are provided in the following table.

#### SDA Distribution Progress

|  | Number of Accounts | Dollars |
|---|---|---|
| SDA that remained to be resolved as of March 31, 2005 - Reported in the *Status Report to the Court Number Twenty-One* | 12,598 | $32,336,679 |
| Interest posted on undistributed SDA and additional collections credited to SDA during this reporting period - net of disbursements exceeded additional collections resulting in a net negative figure | -- | (1,253,018) |
| SDA resolved during this reporting period | (377) | (3,624,301) |
| SDA remaining to be resolved as of June 30, 2005 | 12,221 | $27,459,360 |

The following table reflects the SDA dollars resolved by type of recipient during this reporting period. Recipients in the "other" category include transfers to the Miscellaneous Receipts Account at Treasury, account reclassifications and transfers to the Federal Finance System.

|  | Transfers to IIM Accounts | Transfers to Tribal Accounts | Paid to Non-Indian Third Party | Other | Total |
|---|---|---|---|---|---|
| Dollars resolved during this reporting period | $892,914 | $1,408,950 | $166,278 | $1,156,159 | $3,624,301 |

### Interest Recalculation

In the January 6, 2003, *Historical Accounting Plan for Individual Indian Money Accounts*, Interior planned to recalculate expected interest payments in each IIM account. Historical accountings for Judgment and Per Capita IIM include an interest recalculation. Also, OST performs an interest recalculation on all SDA distributions for each recipient of previously undisbursed SDA funds in the OHTA population.

During this reporting period, OHTA directed its contractor to begin this process for Land-Based IIM accounts. Completion of the interest recalculation effort will account for approximately 40% of the total number of transactions in land-based accounts and will help facilitate the identification and resolution of data gaps in the electronic records.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                          **Office of Historical Trust Accounting**

### Imaging/Coding – Individual Indian Trust Documents

OHTA's IIM imaging and coding efforts continued during this reporting period.  Updates to the *Coding and Imaging Manual* were released on May 24, 2005.  Updates included a new section detailing the requirements for imaging documents to be loaded into OHTA's Accounting Reconciliation Tool.

As of June 30, 2005, OHTA had completed the following imaging and coding work.

### Imaging and Coding Progress

|  | **Pages Scanned** | **Documents Coded** | **Documents Loaded into Accounting Reconciliation Tool** |
|---|---|---|---|
| Work results from July 9, 2003 (commencement of imaging and coding), through March 31, 2005 – Reported in the *Status Report to the Court Number Twenty-One* | 7,067,045 | 238,866 | 237,006 |
| Work results during this reporting period | 693,145 | 18,100 | 14,947 |
| Cumulative results through the end of this reporting period | 7,760,190 | 256,966 | 251,953 |

### Observations on Quality of Data and Supporting Documents

As OHTA's five professional accounting firms have performed reconciliations of the various types of IIM accounts and transactions, they have reported no evidence of fraudulently altered documents or unauthorized access to computer systems.

### Delays and Obstacles

OHTA's ability to search for trust records necessary to its ongoing historical accounting projects was impacted during portions of this reporting period by limited access to certain records, including: (1) records being prepared for shipment, in transit to the AIRR, or being processed by NARA; and (2) records held in Albuquerque because of Court orders in *Pueblo of Laguna v. United States*, *Jicarilla Apache v. United States*, and *Osage Nation and/or Tribe of Indians of Oklahoma v. United States*.

The enacted appropriations for FY2003 through FY2005 have been below the President's requests.  This has prevented OHTA from making the progress it projected in the January 6, 2003 Plan, filed with the Court.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                    **Office of Historical Trust Accounting**

OHTA has now completed the mailing of all deliverable Statements in the group of 17,096 Statements that the Court has permitted OHTA to transmit to account holders.  An additional 28,107 Statements have been awaiting Court approval for mailing since March 24, 2005.

**Assurance Statement**

I concur with the contents of the information contained in the Office of Historical Trust Accounting section of the *Status Report to the Court Number Twenty-Two*.  The information provided in this section is accurate to the best of my knowledge.

Date:        July 28, 2005

Name:        *Signature on File*
             Bert T. Edwards, Executive Director
             Office of Historical Trust Accounting

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

August 1, 2005                    **Office of the Special Trustee for American Indians**

### III.    OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS

**Introduction**

The Office of the Special Trustee for American Indians was created by the American Indian Trust Fund Management Reform Act of 1994. The 1994 Act provides direction to the Department of the Interior on accounting for Indian trust funds and reforming the operation of the Indian fiduciary trust. The Special Trustee's responsibilities under the Act include creating a comprehensive strategic plan for the operation of the trust and providing oversight of the accounting for Indian trust funds and the reform of the trust. In addition to other trust reform–related duties assigned by the Secretary, the Special Trustee accepted the transfer of the Office of Appraisal Services from BIA to OST.

**Special Trustee's Observations**

**Trust Initiatives for the 21st Century**

During this reporting period, a major FTM implementation milestone was reached at the two BIA pilot agencies, Concho and Anadarko. As of June 30, 2005, these two agencies completed the process of converting their systems to the new TAAMS title system and TAAMS leasing system, both of which are now working as an integrated system with TFAS. During the next reporting period, statements of account that contain trust asset ownership information as well as the status of deposits and balances of funds are expected to be sent to beneficiaries of these two agencies. A schedule for systems conversion at the other agencies is expected to be completed during the next reporting period.

Final approval of the functional requirements for the next generation of land management software, DLRM, was given by the affected bureaus and offices during this reporting period. It is expected that an RFP can be released by the end of CY2005.

As part of FTM implementation, BLM began hiring surveyors to be stationed at BIA regional offices. Their presence is expected to help expedite survey requests, prioritize requests and determine when surveys are actually needed, to avoid unnecessary surveys. The remaining regional surveyors are expected to be hired during FY2006.

During this reporting period, an Interior Regulatory Initiative was begun to develop regulations that further the implementation of the FTM, comply with requirements of AIPRA, and streamline other business processes. The Regulatory Initiative working groups consist of employees from BIA, OST, BLM, NBC, SOL, OHA and OHTA. Some of the draft regulations are expected to be published by the end of CY2005.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                    **Office of the Special Trustee for American Indians**

OTR was organized within OST to improve the records management within Indian affairs-related bureaus and offices. Since September 2002, OTR has been managed directly by the Assistant Deputy Secretary. During this reporting period, management of OTR began moving from the Assistant Deputy Secretary to OST. In the future, OTR will be under the direct management of the CIO for OST. The records assessment function has been transferred to OTRA so that records assessments can be done in coordination with regular reviews and audits of other trust functions. OTRA will continue to report to the Court as a separate administrative function.

**American Indian Probate Reform Act**

The required notice to Indian landowners was completed during this reporting period. Certification of the notice was made by the Secretary so that the required one year period for implementation of many sections of the Act has begun to run. Consideration is being given to enlist non-profit organizations to assist with drafting wills and doing estate planning for individuals affected by the Act.

**Appraisals**

During this reporting period, the deputy to the Chief Appraiser of the Appraisal Services Directorate reported for duty. However, after two weeks on the job, this person decided to return to his previous employment. The Chief Appraiser is now in the process of advertising this position and expects to have a selection by the end of this calendar year.

A week of appraisal training and review of policies and procedures is scheduled for the first week of August 2005. This training will be for all OAS appraisers and staff. The training is expected to focus on the appraiser's "Yellow Book" standards and USPAP.

The reappraisal of the Navajo rights-of-way reported on in the last report was completed during this reporting period. The appraisals are under review and results of the appraisals are expected to be available during the next reporting period. A policy for appraising renewal of rights-of-way was released by the Chief Appraiser during this reporting period and has been made available to the field appraisers for their use.

Several review appraisers were hired during this reporting period as reported in the Appraisal section of this report. The Director continues to report problems in hiring sufficient staff to meet the appraisal needs.

<u>**Conclusion**</u>

Reform of the fiduciary trust is proceeding. The conversion at the Concho and Anadarko pilot agencies demonstrates that the FTM can be implemented, and provides the business process tools to BIA to manage its part of the fiduciary trust. While obstacles remain, I believe that the foundation for fiduciary trust reform has been laid and that building on this foundation will allow Interior to execute more efficiently its legal obligations to trust beneficiaries.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                    **Office of the Special Trustee for American Indians**

<u>**Assurance Statement**</u>

The comments and observations are provided by the Special Trustee for American Indians and reflect the opinion of the Special Trustee only.

Date:  July 26, 2005

Name: *Signature on File*
          Ross O. Swimmer
          Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                    **Trust Review and Audit**

### A.    TRUST REVIEW AND AUDIT

#### Introduction

OTRA reports directly to the Special Trustee for American Indians.  OTRA was created by OST as a response to trust initiatives developed during the tribal consultation process of 2002.  OTRA conducts performance audits, examinations and reviews of Interior entities as well as Tribes that manage fiduciary trust activities.  Examinations are routinely conducted at locations that perform trust operations, and are planned to result in a performance rating.

#### Current Status

**Indian Trust Examinations**

During this reporting period, OTRA performed 11 trust reviews.  Three draft reports were issued for comment and 16 final reports were issued.

On May 1, 2005, OTR transferred three employees to OTRA to perform trust records management assessments for Interior.  This transfer facilitates a separation of duties between records training and management and the assessment function.  Future reporting on trust records assessments will be provided by OTRA.  Since the transfer, OTRA has completed seven trust record assessments and expects to issue either draft or final reports during the next reporting period.

**Annual Interior Indian Trust Funds Financial Statement Audit**

The Indian trust funds financial statement audit, required by the American Indian Trust Fund Management Reform Act of 1994, is conducted by an independent auditor under OIG management.  The independent auditor continued work on the FY2005 audit during this reporting period and is expected to complete work during the first quarter of FY2006.

**Annual Audit Corrective Actions**

During this reporting period, in response to the FY2004 audit, OST managers reported continued progress on implementing corrective action plans addressing material weaknesses, non-compliance issues and management letter comments.

**Compliance Reviews**

Compliance reviews are generated by information received from beneficiaries, employees and the public.  During this reporting period, 10 cases were in inventory.  Two cases were closed and final reports issued.  Field work or report drafting continued on the remaining eight.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                **Trust Review and Audit**

## Delays and Obstacles

Lack of Internet access impedes OTRA's work processes and its ability to communicate effectively, both internally and externally.

## Assurance Statement

I concur with the content of the information contained in the Trust Review and Audit section of the *Status Report to the Court Number Twenty-Two*.  The information provided in this section is accurate to the best of my knowledge.

Date:   July 20, 2005

Name:  *Signature on File*
       D. Jeff Lords
       Acting Director, Office of Trust Review and Audit
       Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                                      **Records Management**

## B.    OST-OFFICE OF THE CHIEF INFORMATION OFFICER

## 1.    RECORDS MANAGEMENT

### Introduction

The Office of Trust Records was established in 1999 to develop and implement a program for the economical and efficient management of trust records, consistent with the 1994 Act, the Federal Records Act and other statutes and implementing regulations.  The OTR records management program has been developed and implemented, and continues to evolve, to ensure that necessary Indian records are maintained, records retention schedules are consistent with retention needs, and records are safeguarded throughout their life-cycles.

### Accomplishments and Completions

**American Indian Records Repository**

During this reporting period, approximately 560 boxes of inactive Indian records were moved to the Annex in Lenexa, KS, from OTR's facilities in Albuquerque, NM.  Boxes that are collected and need to be indexed are sent to the Annex for indexing prior to being placed in AIRR.  Approximately 119,570 indexed boxes are located in the AIRR as of the end of this reporting period.  OTR has historically reported the number of boxes transferred to AIRR for storage.  However, NARA uses cubic feet as the measure for records stored.  Thus far, NARA reports that they are currently storing 126,437 cubic feet of indexed records at AIRR.  OTR will begin including NARA's measure as well in future reports.

**Records Indexing Project**

Indexing of approximately 120,110 boxes has been completed as of the end of this reporting period.  The number of completed boxes (indexed and quality reviewed) differs from the number of boxes stored at AIRR because not all completed boxes are sent to AIRR from the Annex before the end of the reporting period.  Priority for the indexing of boxes of Indian records continued to be given to those boxes of records potentially responsive to tribal trust litigation, and included boxes required by OHTA for litigation discovery requests.

Approximately 4,550 boxes of inactive records were moved from BIA/OST field locations to the Lenexa Annex for indexing during this reporting period.  Once indexed, these boxes will be stored in the AIRR.

During the past reporting period, the electronic data base containing the index of records was identified by Interior as a separate system of records.  As a result, an assessment of the system was required to determine if the system met the conditions of the Privacy Act.  During the indexing of records, some information is entered into the electronic data base that may contain personal identifiers (such as a name and account number).  Therefore, the electronic Box Index Search System has been classified as a Privacy Act system of records by Interior.  The Privacy

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                                **Records Management**

Act notice has been prepared and is being circulated within Interior for surname and signature.  It is anticipated that a Federal Register notice soliciting public comments will be published during the next reporting period.

**Training**

OTR provided records management training for 199 BIA and 17 OST identified records contacts during this reporting period.

**Equipment Purchases**

The existing contract, to supply fireproof filing equipment, was modified during the reporting period to increase the contract amount.  It is anticipated that pending requests for equipment will be filled during the next reporting period.

**Current Status**

**Safeguarding Records**

The 283 boxes of inactive records that were or may have been damaged or contaminated by mold, mildew, mouse droppings or other adverse elements were shipped to NARA for remediation on June 30, 2005.  Two additional boxes were identified during final shipments of the collection as requiring remediation.  The two boxes were assessed in June by Carino Conservation and were also sent to NARA for remediation bringing the total number of such boxes to 285.  The actual box count for purposes of shipment was 284 as two map groups were consolidated as one box in order to ship.

**Record Keeping Requirements**

During the reporting period, written comments on the proposed language for management of fiduciary trust records were received and considered from approximately 60 tribal leaders, staff and consultants.  The proposed language was modified in light of comments received.  The final language will be used in negotiations for FY2006 annual funding agreements with compacted and contracted Tribes.  The final negotiation guidance is anticipated to be published in the Federal Register during the next reporting period.

**Site Assessments**

OTR conducted three records management site assessments of BIA and OST programs located at the Southwest Regional Office and Concho Agency and at the Navajo Regional OST field office during the reporting period.

During this reporting period, OTR completed and distributed site assessment reports to BIA programs located at:  Southern Pueblos Agency, Jicarilla Agency, Concho Agency, Mescalero Agency, Eastern Oklahoma Regional Office, Southwest Regional Office and Ute Mountain Ute

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

---

**August 1, 2005**                                                    **Records Management**

---

Agency. Site assessments reports were also completed and sent to the Principal Deputy Special Trustee for OST programs located at: Southwest Regional Office, Navajo Regional Office, and Concho Agency.

In May 2005, the responsibility for conducting site assessments of trust records management for BIA and OST was transferred to OTRA. This office is now responsible for conducting trust site assessments and issuing site assessment reports. Appropriate OTR personnel were transferred along with the transfer of function. Beginning with this report, OTRA will include a report on the status of site assessments in its section of the *Status Report to the Court*.

**Records Retention Schedules**

Following receipt of BIA approval, OTR sent the following electronic systems records schedules to the Archivist of the United States for approval: Anadarko Real Estate Module (REM); Indian Forestry Database (InfoDat); Continuous Forest Inventory (CFI); and Geographic Information System (GIS). OTR is awaiting approval of the schedules; however, NARA has pending to OTR a request for additional technical analysis related to the GIS schedule.

**Records Evaluation**

As previously reported, 31 boxes set aside for evaluation remain at OTR in Albuquerque pursuant to a litigation hold. Once the boxes are released, OST expects to verify whether any potential records in these boxes are also filed at the OST SWRO. OST expects to conduct this verification when SOL informs OST that the boxes can be returned to OST.

**Delays and Obstacles**

Lack of Internet access continues to hinder OTR's ability to provide remote access to the record index database for authorized users of the records. If Internet access were available, authorized researchers could conduct their searches from their respective work sites and only visit AIRR when necessary to inspect specific boxes.

**Assurance Statement**

I concur with the content of the information contained in the Records Management section of the *Status Report to the Court Number Twenty-Two.* The information provided in this section is accurate to the best of my knowledge.

Date: July 19, 2005

Name: *Signature on File*
          Ethel J. Abeita
          Director, Office of Trust Records
          Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                    **Trust Business Process Modeling**

<div style="text-align:center">

C.    **TRUST ACCOUNTABILITY**

1.    **TRUST BUSINESS PROCESS MODELING**

</div>

**Introduction**

Interior is working to build a highly effective fiduciary trust services organization by implementing the business objectives contained in the CTM.  Those business objectives are being used to guide implementation of the FTM.  Implementation of the FTM is a collaborative effort of BIA, OST, BLM, MMS and OHA, and is integrated with Interior's other trust reform initiatives.  The FTM is being implemented to transform the current trust business processes into more efficient, consistent, integrated and fiscally responsible business processes that meet the needs and priorities of the beneficiaries.

**Accomplishments and Completions**

The General Guidance and References handbook (containing commonly used acronyms, general authorities, etc.) was completed, approved by BIA, and put into use by the handbook teams.

**Current Status**

**FTM - General**

A FTM communication plan has been developed to provide strategy and tactics for communicating FTM initiatives to all affected audiences.  Reengineering staff began incorporating the plan into FTM implementation schedules to ensure both internal and external parties receive appropriate information.

A site visit was performed at one BIA agency to discuss FTM-related training curriculum development.  Comments were solicited from employees relative to personal training preferences to assist in the completion of the FTM training task deliverable.

Reengineering staff participated in two Interior Regulatory Initiative meetings.  Staff and team members identified regulations impacted by the FTM, and began drafting new and amended regulations to support the FTM.

Comments from senior management regarding direct pay and fee interests in trust parcels have been forwarded to the Regulatory Initiative group for their consideration and drafting of regulations.

During this reporting period, several draft BIA handbooks were sent to a contractor for editing and formatting, with handbook drafting and review expected to continue through CY2005.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

August 1, 2005                                    **Trust Business Process Modeling**

**Trust Beneficiary Call Center**

Since beginning operations in December 2004 through the end of this reporting period, the TBCC received 32,129 calls and provided a first-line resolution for 92.7% (29,782) of these calls.  Currently, toll-free calls have been re-directed to the TBCC from the Southern Plains, Eastern Oklahoma, Pacific and Western Regions.  During this reporting period, the TBCC provided a first line resolution for 7,779 calls from beneficiaries serviced by these regions. Based on an average call time of 03:15, the TBCC provided 421 hours of time available to staff at the agencies for other purposes.  Re-directing all toll-free calls to TBCC is scheduled to be completed by the end of CY2005.

During this reporting period, access to the TBCC tracking system was provided to the FTOs and staff to allow recording and documenting of all types of beneficiary contact.  Use of the same tracking system database by the TBCC and field locations should result in beneficiaries receiving consistent and timely responses.

**Universal Support Function**

Reengineering staff completed draft skills models for BIA Real Estate Services, Natural Resources, Forestry, Probate, Title, OST Trust Services and a General Skills model.  It is expected that during the next reporting period, skills models for OST Field Operations and Appraisals and BIA Energy & Minerals will be drafted.  All are expected to be completed by the end of FY2005.

Reengineering staff is currently developing a proof-of-concept model to fully automate the CSS work ticket process.  The process, which is heavily dependent upon paper faxes, can be automated, with little or no cost, to reduce significantly the amount of paper records generated. A concept of operations has been drafted and will be presented to senior management during the next reporting period.

**Delays and Obstacles**

Major obstacles affecting the ability of Interior to build a trust services delivery model include:
- lack of Internet access, and
- sheer complexity of reengineering the existing trust business processes to achieve integrated and consistent business processes.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                              **Trust Business Process Modeling**

<u>**Assurance Statement**</u>

I concur with the content of the information contained in the Trust Business Process Modeling section of the *Status Report to the Court Number Twenty-Two.*  The information provided in this section is accurate to the best of my knowledge.

Date:   July 21, 2005

Name:  *Signature on File*
        John Bennett
        Acting Deputy Special Trustee, Trust Accountability
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

---

**August 1, 2005**                                    **Trust Data Quality and Integrity**

---

## 2.    TRUST DATA QUALITY AND INTEGRITY

### Introduction

The success of trust reform depends, in part, on the accuracy of data generated from the maintenance of trust assets, ownership of trust assets, distribution of trust income, and management of trust accounts.  The DQ&I project focuses on three primary initiatives:  (1) assisting BIA with document encoding into the trust systems, (2) validating/correcting CDE to their respective source documents and (3) implementing Post-QA processes.

### Accomplishments and Completions

During this reporting period, TPMC's contractors:

- Encoded 1,563 leases and 796 ROW documents into the TAAMS Realty Module for the Anadarko Agency.

- Encoded 564 leases and 332 ROW documents into the TAAMS Realty Module for the Concho Agency.

- Encoded remaining Concho Agency encumbrance effective/expiration dates into the land title system, and OST was notified that the remaining Anadarko Agency encumbrances' effective/expiration dates were entered into the land title system.

- Created an inventory of 3,177 performance bonds, of various types, for the Concho and Anadarko Agencies.

- Assisted PRO-LTRO with determining the correct landowner ID number in the land title system.  Verified remaining 366 of 535 BIA-certified IDs in the land title system.

- Scanned trust conveyance documents necessary to perform CDE validation/correction for the Cheyenne River Agency.

- Implemented Post-QA processes at the GPRO-LTRO for all GPRO agencies.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                    **Trust Data Quality and Integrity**

<u>Current Status</u>

The DQ&I project continued for: (1) SPRO-LTRO, (2) GPRO-LTRO, (3) Pima Agency and (4) PRO-LTRO for the Palm Springs Field Office, Northern California Agency and Southern California Agency.

During this reporting period, TPMC:

- Supported the Concho Agency with research and correction of instances where a beneficiary had been assigned more than one unique landowner ID number in the various trust systems. Landowners with multiple ID numbers were identified during the CDE validation/correction task. Sixty-eight out of 390 landowner IDs were researched during the reporting period for a total of 277 researched and identified to date. The remaining 113 landowner ID numbers were identified as belonging to landowners outside the Southern Plains Region and will require additional research by the responsible BIA agencies.

- Assisted the Concho Agency to reduce RDRS encoding backlogs by encoding five probate orders, nine oil and gas leases, and 25 landowner ID changes.

- Supported Fort Belknap Agency's SDA distribution efforts, by encoding 87 out of 247 probate orders into IRMS, for a total of 133 probate orders encoded to date. Of the 803 Fort Belknap Agency probate orders inventoried, 247 were identified to be encoded by the contractor.

- Assisted PRO-LTRO with conversion cleanup by encoding 100 trust patent documents into the land title system.

- Determined that six of the previously reported 252 Concho Agency CDE title variances in the land title system were not in error. In the previous reporting period, 231 CDE were corrected and encoded. During this reporting period, three CDE were encoded for a total of 234 to date. Twelve remaining CDE variances require further research.

- Encoded an additional 2,418, for a total of 12,600 Anadarko Agency CDE title and encumbrance variances recorded in the land title system. Research on the remaining tracts is ongoing but is significantly more time-intensive than was previously experienced. This research was expected to be completed during the last reporting period but was deferred in order to assist Anadarko Agency with its conversion to a new realty system.

- Encoded into the land title system an additional 486 Concho Agency CDE and 17,303 Anadarko Agency CDE, which did not exist in the former BIA legacy land title system, for a total of 9,973 encoded at Concho and 32,184 at Anadarko.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                    **Trust Data Quality and Integrity**

### Delays and Obstacles

Lack of access to the Internet has resulted in:  (1) communication delays; (2) adverse project coordination issues; (3) increased administrative program costs; and (4) the overall DQ&I project being unable to take full advantage of available information technology.

### Assurance Statement

I concur with the content of the information contained in this Trust Data Quality and Integrity section of the *Status Report to the Court Number Twenty-Two*.  The information provided in this section is accurate to the best of my knowledge.

Date:   July 26, 2005

Name: *Signature on File*
        John E. White
        Trust Reform Officer
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                **Indian Fiduciary Trust Training Program**

<h2 style="text-align:center">3.     INDIAN FIDUCIARY TRUST TRAINING PROGRAM</h2>

**Introduction**

Interior has a continuing responsibility to provide adequate staffing, supervision and training for trust fund management and accounting activities. Fiduciary trust training is essential to the success of Interior's trust reform efforts and forms an integral part of all training for Interior employees who are involved in the management of Indian trust assets.

**Accomplishments and Completions**

Cannon Financial Institute personnel presented the *Accounting, Guardianship, Fiduciary Behavior* and *Asset Management* specialty courses to 125 OST, BIA, and tribal personnel. These four courses are part of the previously reported certification program. Additional sessions of these courses are expected to be presented during the next reporting period.

During this reporting period, OST training staff conducted 10 sessions to provide training in TFAS, CSS, StrataVision and the historical query database to 240 OST, BIA and contractor staff.

Additional training for TFAS, CSS, StrataVision, Historical Query, TAAMS, ProTrac and Lockbox training was provided to the Concho and Anadarko agencies' staff.

OST and BIA staff presented the three-day course, *Trust Fundamentals,* to 34 OST, BIA and tribal staff. This course includes such topics as the history and policy of Indian trust, current trust reform activities, job roles and responsibilities, and organization and working relationships. This course is expected to be presented again during the next reporting period.

**Current Status**

Construction continues on the NIPTC in Albuquerque and is expected to be completed by the end of CY2005.

**Delays and Obstacles**

The lack of Internet access inhibits electronic communication with other governmental agencies and contractors, hinders the research of training tools and potential contractors, and restricts OST's ability to access online training programs.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                    **Indian Fiduciary Trust Training Program**

**Assurance Statement**

I concur with the content of the information contained in the Indian Fiduciary Trust Training Program section of the *Status Report to the Court Number Twenty-Two.* The information provided in this section is accurate to the best of my knowledge.

Date:   July 19, 2005

Name:  *Signature on File*
       Dianne M. Moran
       Director, Trust Training
       Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

August 1, 2005                                                      **Risk Management**

### 4.    RISK MANAGEMENT

#### Introduction

The objectives of the risk management initiative are to design, deliver, and implement a comprehensive risk management program that includes extensive management controls for monitoring and evaluating Interior's Indian trust asset management program.  The risk management program continues to be implemented by TPMC.  OTRA monitors and evaluates management corrective action plans to mitigate control deficiencies.

#### Accomplishments and Completions

During this reporting period:

- BIA provided a point of contact to help coordinate the implementation of the risk management program and the RM-PLUS tool throughout BIA for the trust programs.
- The security and risk review was completed for the RM-PLUS tool.

#### Current Status

The risk management program using the RM-PLUS tool was proposed to the Cherokee Nation as a pilot Tribe in FY2006.

MMS continued and OSM initiated their identification of business processes needed to assess and mitigate program risks through the use of the RM-PLUS tool.  BLM and OST continued validation of their previously-identified business processes and program risk factors.

During the next reporting period, new BIA business processes are expected to be incorporated into the RM-PLUS tool at the Concho and Anadarko pilot agencies.  Training for OST, BIA, BLM, MMS and OSM is expected to be provided for the RM-PLUS tool.  All assessments utilizing RM-PLUS should be completed by September 1, 2005.

#### Delays and Obstacles

The lack of Internet access complicates the implementation and use of RM-PLUS, since it was designed as a web-based application.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

---

**August 1, 2005**                                                    **Risk Management**

---

<u>Assurance Statement</u>

I concur with the content of the information contained in the Risk Management section of the *Status Report to the Court Number Twenty-Two*.  The information provided in this section is accurate to the best of my knowledge.


Date:   July 21, 2005

Name:  *Signature on File*
            John Bennett
            Acting Deputy Special Trustee, Trust Accountability
            Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

August 1, 2005                                    Regulations, Policies and Procedures

## 5.    REGULATIONS, POLICIES AND PROCEDURES

**Introduction**

OTP in OST was established on April 21, 2003, to assist Interior in establishing "consistent, written policies and procedures for trust fund management and accounting" as stated in the 1994 Act.  OTP oversees and facilitates the development, promulgation and coordination of trust-related regulations, policies, procedures and other materials to guide the proper discharge of Interior's fiduciary responsibilities.  OTP is separate from BIA's PPA, which is responsible for policies, procedures and regulations affecting all BIA activities.  PPA activities thus are reported in the BIA section of the reports to the Court.

**Accomplishments and Completions**

Changes to four chapters of the Account Maintenance Desk Operating Procedure were completed and issued.

Changes to the policy for handling telephone requests for changes to an unsupervised IIM account were completed and issued.

Two IT policies were completed and issued: "Email Usage" and "IT Support Requirements Document."

**Current Status**

OTP continues to work on amendments to the draft OST Directives System Handbook.  Publication of the handbook is expected by the end of CY2005.

Work continues on the Reporting and Reconciliation and the Disbursing DOPs.  Completion and issuance is expected during the next reporting period.  In addition, work began on an Osage DOP for account maintenance and disbursement because of statutes and regulations unique to the Osage Tribe.  Completion is expected by the end of CY2005.

**25 CFR 124 – Deposits of Proceeds of Lands Withdrawn for Native Selection under the Alaska Native Claims Settlement Act.**  During the reporting period, this final rule was approved and presented to the Office of the Federal Register for publication.  Due to a technical problem the rule was returned by the Office of the Federal Register and is now scheduled to be published during the next reporting period.

**25 CFR 1200 – American Indian Trust Fund Management Reform Act.**  Work continues on this rule and publication is expected by the end of CY2005.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                    **Regulations, Policies and Procedures**

### Delays and Obstacles

Lack of access to the Internet and its repository of online statutes, the Federal Register and other resources continues to present challenges to this office.

### Assurance Statement

I concur with the content of the information contained in the Office of Trust Regulations, Policies and Procedures section of the *Status Report to the Court Number Twenty-Two*. The information provided in this section is accurate to the best of my knowledge.

Date:   July 29, 2005

Name:  *Signature on File*
        Philip Viles, Director
        Office of Trust Regulations, Policies and Procedures
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                                                                      **Appraisal**

### D.    FIELD OPERATONS

### 1.    APPRAISAL

**Introduction**

The Office of Appraisal Services, under a management contract with NBC-ASD, is responsible for Indian land valuations.  The contract was established to provide impartial estimates of market value for a variety of real property interests on land owned in trust or restricted status by individual Indians, Alaska Natives and Indian Tribes.  Various regulations governing Indian trust lands require valuations.  To meet this requirement, an appraisal or other valuation method is used to determine fair market value of Indian lands.

**Accomplishments and Completions**

The Deputy Chief Appraiser position was filled during this reporting period.  However, the newly appointed Deputy resigned on June 10, 2005.  Actions are underway to advertise and fill the position as quickly as possible.

**Current Status**

An Indian Minerals Valuation Unit is being established as a part of ASD to support the sale and acquisition of minerals on federal and Indian lands.  This is expected to incorporate the FTM's proposed Indian minerals sale and acquisition initiative.  ASD expects to complete the establishment of the unit during the next reporting period.

ASD, in coordination with OST, continues to conduct a comprehensive analysis of OAS staffing and training requirements.  The position of Eastern Regional Appraiser has been advertised, and candidates are currently being interviewed.  A selection is expected during the next reporting period.

The reappraisal of the Navajo rights-of-way reported on in the last report was completed during this reporting period.  The appraisals are under review and results of the appraisals are expected to be available during the next reporting period.

Work continued on directives to address the proper appraisal methods and techniques to be used by OAS appraisers.  Directives addressing the proper appraisal methodology for rights-of-way, and the administrative shelf-life of appraisals, were issued to regional supervisory appraisers during this reporting period.

Work continued to revise and update the OAS appraisal handbook, in conjunction with an updated department-wide appraisal handbook.  This project is expected to be completed during FY2005.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                                                                         **Appraisal**

Work continued on the cooperative effort between OAS and NBC to establish regional contracts with independent contractors to perform appraisals and alleviate backlogs. Efforts are underway to streamline the requisition and outsourcing process. This approach will be duplicated in those regions where this approach may prove to be successful. The scope of work for a blanket purchase order in the Northwest Region is still under revision, and is now expected to be completed during the next reporting period.

OAS filled five review appraiser positions to meet critical needs in the Great Plains, Rocky Mountain, Midwest and Navajo Regions. Efforts continue to fill the vacant regional appraiser position in the Northwest Region. No selection was made during this reporting period. Solicitation of additional candidates and selection is expected during the next reporting period.

**Appraisal Backlog**

The appraisal backlogs are as follows:

|                  | Appraisal Backlog As of 3/31/05 | Appraisal Backlog As of 6/30/05 |
|------------------|--------------------------------:|--------------------------------:|
| Northwest        | 166                             | 402                             |
| Rocky Mountain   | 139                             | 592                             |
| Midwest          | 21                              | 38                              |
| Western          | 9                               | 42                              |
| Southwest        | 6                               | 27                              |
| E. Oklahoma      | 33                              | 51                              |
| Navajo           | 203                             | 21                              |
| Pacific          | 13                              | 2                               |
| Alaska           | 318                             | 293                             |
| Eastern          | 0                               | 0                               |
| Southern Plains  | 1                               | 11                              |
| Great Plains     | 80                              | 10                              |
| **Total**        | **989**                         | **1,489**                       |

This table does not include appraisal backlog information from the compacted and contracted Tribes. The MOUs that are currently being negotiated with Tribes require quarterly reporting of backlog information. This information is expected to be incorporated into future reports to the Court.

**Delays and Obstacles**

The inability to utilize the Internet as a tool to communicate with outside contacts to research comparable sales and other information is a continuing hardship.

Difficulties continue in recruiting and hiring qualified appraisers. ASD is exploring methods to overcome problems experienced with hiring appraisers.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                                          **Appraisal**

**Assurance Statement**

I concur with the content of the information contained in the Appraisal section of the *Status Report to the Court Number Twenty-Two*.  The information provided in this section is accurate to the best of my knowledge.

Date:   July 26, 2005

Name: *Signature on File*
        Brian M. Holly, MAI
        Appraisal Services Directorate
        National Business Center

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                       **Current Accounting Activities**

           **E.**      **TRUST SERVICES**

           **1.**         **CURRENT ACCOUNTING ACTIVITIES**

<u>**Introduction**</u>

Current accounting activities focus on: a) whereabouts unknown accounts; b) trust funds accounting system; c) special deposit accounts; d) small balance accounts; and e) accounting discrepancies.

WAU are classified as such for various reasons, including (a) new accounts established without an address, (b) mail returned for invalid address and (c) account holder refused or did not claim mail. A variety of methods and means are used to locate WAU account holders.

TFAS is a generic term for a COTS trust fund accounting system that provides the basic receipt, accounting, investment, disbursing and reporting functions common to commercial trust funds management operations.

SDA are temporary accounts for the deposit of trust funds that cannot immediately be credited to the proper account holders. As explained in the BIA/OST Interagency Procedures Handbook, this type of account is to be used only as an exception to the rule that trust funds immediately be deposited to the credit of, and then distributed as soon as practicable to, the individual and tribal beneficiaries. The SDA project has two sub-projects: the retrospective (pre-January 1, 2003 receipts) and the prospective (post-December 31, 2002 receipts) phases. OHTA has responsibility for "resolution" (i.e., research and distribution of funds) of the retrospective phase, while BIA has comparable responsibility for the prospective phase. This section of the report to the Court thus addresses only the prospective phase.

Small balance accounts are defined as those with balances of $.01 - $1.00 and no activity in the preceding eighteen months. Management expenses for these accounts are considerable, in part because (as directed by Congress) annual statements must be sent to these account holders.

Various accounting discrepancies that existed prior to the conversion to TFAS still need research and resolution. Some may impact individual accounts. At present, OST has a daily and monthly reconciliation process in place to ensure that transactional reporting to Treasury is accurate and that any discrepancies are researched and reconciled during the next accounting period. While this process ensures resolution of current discrepancies in timely fashion, separate research and reconciliation efforts are needed to address the pre-TFAS discrepancies.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                      **Current Accounting Activities**

### a.    Whereabouts Unknown Accounts

**Accomplishments and Completions**

During this reporting period, TPMC staff conducted one WAU beneficiary outreach at the Gathering of Nations Pow Wow in Albuquerque, NM.  As a result of this outreach effort, TPMC received current addresses for 36 WAU account holders.

**Current Status**

Priority continues to be placed on securing current addresses for account holders of the rolling top 100 highest dollar balance WAU accounts.  During this reporting period, 4 of the top 100 WAU accounts, with combined account balances in excess of $473,000, were updated with current addresses.  OST now expects to hire a contractor during the next reporting period to focus on securing current addresses for, or determining the status of, the top 100 WAU accounts.

During this reporting period, 5,060 accounts with a combined balance of $1.8 million were added to the WAU list, and 4,456 account holders with a combined balance of $8.7 million were located.  As of June 30, 2005, there were 49,191 WAU accounts with a combined balance of $68,679,335.  The following table illustrates the number of accounts stratified by account balance and WAU category:

| Account balance | Correspondence/ Check Returned | Account Setup No Address | Awaiting Address Confirmation | Refused/ Unclaimed Mail | Total |
|---|---|---|---|---|---|
| Equal to or over $100,000 | 21 | 9 | 0 | 0 | 30 |
| Under $100,000 and equal to or over $50,000 | 38 | 13 | 0 | 0 | 51 |
| Under $50,000 and equal to or over $5,000 | 2,149 | 834 | 0 | 2 | 2,985 |
| Under $5,000 and equal to or over $1,000 | 6,446 | 1,661 | 2 | 5 | 8,114 |
| Under $1,000 and equal to or over $100 | 9,103 | 3,498 | 3 | 6 | 12,610 |
| Under $100 and equal to or over $1 | 12,388 | 5,187 | 3 | 8 | 17,586 |
| Under $1 | 3,562 | 4,235 | 11 | 7 | 7,815 |
| **Total** | **33,707** | **15,437** | **19** | **28** | **49,191** |

**Delays and Obstacles**

The influx of WAU accounts categorized as "Account Setup No Address" causes the total number of WAU accounts to remain relatively constant.  These accounts primarily result from a lack of address for individual heirs named in probate orders or recipients of per capita distributions.  However, as asset statements are created for non-financial asset owners without current addresses in the TAAMS title system, WAUs are expected to increase significantly.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                    **Current Accounting Activities**

There presently are 18,576 supervised IIM account holders (minors, emancipated minors, adults in need of assistance, and non-compos mentis) coded as WAU. Updating supervised account addresses coded as WAU presents a challenge, since BIA Social Services must verify the address changes to these accounts.

The lack of Internet access limits communication effectiveness. OST and its contractor must rely primarily on mail and telephone communication with IIM account holders.

### b.      Trust Funds Accounting System

**Current Status**

Enhancements to TFAS and the implementation of an interface between TFAS and TAAMS for use at the pilot agencies were completed during this reporting period. As a result, account holder statements identifying sources of income and listing all assets owned at the pilot agencies are expected to be sent during the next reporting period.

### c.      Special Deposit Account Activity

**Current Status**

BIA has the responsibility for distribution of SDA funds received since January 1, 2003 (prospective receipts). It is the policy of BIA to distribute funds within 30 days of receipt into SDA. During this reporting period, there were 5,912 receipt transactions posted to SDA. Of these, 1,043 were undistributed and aged more than 30 days as of June 30, 2005.

During this reporting period, aged funds were held in 32 fewer SDA than in the previous reporting period. Undistributed aged receipts decreased by 853 and the combined dollar amount decreased by $2,553,368.94. As of June 30, 2005, funds were held in SDA with a combined dollar amount of $3,132,093.14, which represented 4,409 undistributed receipts aged over 30 days from January 1, 2003, through June 30, 2005. As of June 30, 2005, there were 1,314 receipts in 301 SDA aged more than one year for a combined dollar amount of $863,330.39.

During this reporting period, OST concentrated on assisting BIA staff in performing work necessary to distribute aged receipts at the Pima and Eastern Navajo agencies. OST staff and contractors spent a combined four weeks at these agencies. Through these efforts, in coordination with the efforts of BIA, aged receipts totaling $2.5 million were distributed from SDA during the reporting period.

During this reporting period, OST contractors also continued to assist Pima and Fort Belknap agencies to reduce their backlogs by encoding probate orders into BIA's legacy realty system. Reducing their backlogs assists these agencies with their SDA distribution efforts.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                    **Current Accounting Activities**

<u>Delays and Obstacles</u>

Some BIA agencies still are not utilizing StrataVision to obtain current aging reports to assist in the monitoring and management of their SDA receipt activity. OST continues to make training available to encourage the use of StrataVision.

### d.    Small Balance Accounts

As of June 30, 2005, there were 14,289 accounts that have a $.01 - $1.00 balance with no activity for the previous 18 months. The total sum included in those accounts is $2,043.58. Statements are sent to account holders for these accounts on an annual basis pursuant to direction from Congress.

### e.    Accounting Discrepancies

Interior's proposal to resolve the difference between the subsidiary account ledger (liabilities) and the IIM investment pool (assets), of approximately $6 million, has been approved by OMB. A legislative proposal has been submitted to congressional staff with a request that it be introduced.

# Note:  This section continues on the next page.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                       **Current Accounting Activities**

**Assurance Statements**

I concur with the content of the information contained in the Accounting Discrepancies subsection of the Current Accounting Activities section of the *Status Report to the Court Number Twenty-Two*. The information provided in this subsection is accurate to the best of my knowledge.

Date:   July 25, 2005

Name:  *Signature on File*
        Margaret Williams
        Deputy Special Trustee, Trust Services
        Office of the Special Trustee for American Indians

I express no opinion on the content of the Accounting Discrepancies subsection, above. I concur with the content of the information contained in the balance of the Current Accounting Activities section of the *Status Report to the Court Number Twenty-Two*, and this information is accurate to the best of my knowledge.

Date:   July 21, 2005

Name:  *Signature on File*
        John Bennett
        Acting Deputy Special Trustee, Trust Accountability
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

August 1, 2005                                    **Trust Regulations, Policies and Procedures**

IV.    **BUREAU OF INDIAN AFFAIRS**

A.    **TRUST REGULATIONS, POLICIES AND PROCEDURES**

<u>Introduction</u>

The Office of Planning and Policy Analysis (PPA) in the Office of the Assistant Secretary – Indian Affairs was established on April 21, 2003.  PPA is responsible for developing and promulgating Indian Affairs directives.  PPA is separate from OST's Office of Trust Regulations, Policies and Procedures, whose activities are reported in the OST section of the status reports to the Court.

<u>Accomplishments and Completions</u>

**National Environmental Policy Act Compliance Handbook** – The handbook supporting 59 IAM was published during the reporting period.

<u>Current Status</u>

A Regulatory Initiative is underway within Interior to develop and update trust-related regulations.  The following previously-reported regulations are included in this Initiative:

- **25 CFR 151 – Land Acquisitions**
- **25 CFR 162 – Leases and Permits**
- **25 CFR 166 – Grazing Permits**
- **25 CFR 216 – Surface Exploration, Mining, and Reclamation of Lands**

Development of handbooks associated with these regulations is expected to be deferred until such time as the Regulatory Initiative is complete.

**25 CFR 161 – Navajo Partitioned Lands Grazing Permits** – The Navajo Nation's Intergovernmental Relations Committee met and approved the final rule.  The rule is expected to be published in the Federal Register during the fourth quarter of FY2005.

**25 CFR 169 – Rights-of-Way Over Indian Lands** – The Rights-of-Way Handbook is in final editing.

**25 CFR 243 – Reindeer in Alaska** – Publication was delayed and is now expected by the end of CY2005.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                    **Trust Regulations, Policies and Procedures**

**BIAM Conversion to IAM[4]**

**35 BIAM Information Resources Management –** Revisions have been incorporated into a new 60 IAM.  Publication is expected in the fourth quarter of FY2005.  The handbook is expected to be published by the end of the fourth quarter FY2005.

**Delays and Obstacles**

Lack of access to the Internet has hindered PPA's ability to research statutes and departmental manuals and makes distribution of documents for review by Tribes more difficult and costly.

**Assurance Statement**

I concur with the content of the information contained in the Trust Regulations, Policies and Procedures – BIA section of the *Status Report to the Court Number Twenty-Two*.  The information provided in this section is accurate to the best of my knowledge.

Date:   July 26, 2005

Name: *Signature on  File*
          Bruce Blanchard
          Director, Office of Planning and Policy Analysis
          Bureau of Indian Affairs

---

[4] Certain BIAM conversion items previously reported are not considered relevant to trust reform and have been omitted from this report.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

August 1, 2005                                                 **Fractionation**

### B. FRACTIONATION

### Introduction

Fractionation of Indian trust and restricted land stems from the federal Indian policy of the 19th Century. Fractionation occurs as land passes from one generation to the next and more and more heirs or devisees acquire an undivided interest in the land. This is a complex and potentially emotionally-charged issue, due primarily to cultural differences, historical legacy and family associations of the present owners with the original Indian owners of those lands. Efforts to address this complex issue are coordinated primarily through the BIA Indian Land Consolidation Office, which seeks to help Tribes make use of the opportunities offered by the Indian Land Consolidation Act, as amended in 2004. ILCO is operating several acquisition projects and, from there, a nationwide plan is being implemented to promote consolidation of the ownership of Indian land.

### Accomplishments and Completions

- Acquired 24,693 fractional interests during this reporting period, for a cumulative total of 162,589 interests for ILCP in the Midwest, Northwest, Western, Eastern Oklahoma, Navajo, Rocky Mountain and Great Plains Regions.[5]
- Of the total interests acquired, 88% were interests of less than 2% ownership in the respective tracts of land.
- Acquired a cumulative total equivalent of 153,965.95 acres for the project reservations.

### Current Status

ILCO continues to manage active acquisition programs for 18 reservations within seven BIA regions. ILCO had expended all funding available to acquire fractionated interests by June 1, 2005. ILCO received $7.6 million from OST to continue acquisition activities. Presently, all acquisition sites are utilizing these funds to process land sale applications.

Due to the volume of beneficiary requests to sell their land interests, the annual appropriations for purchases and additional funding from OST are expected to be exhausted before the end of FY2005. During this period, ILCO expects to use its program staff to prepare for acquisitions during the next fiscal year, subject to available funding.

Current ILCP activities include:

- Implementing ILCO's national expansion strategy.
- Targeting and acquiring *Youpee* interests.

---

[5] Reconciliation of the 1999 monthly program reports for one acquisition site resulted in an increase of 2,314 acquired fractionated interests that were less than 2% or the total tract. The reconciliation increases the cumulative total to 162,589 (through May).

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

---

**August 1, 2005**                                                                **Fractionation**

---

- The Land Consolidation Tracking System development, which has been delayed and is now expected to be operational and available to all ILCP acquisition sites by the end of the next reporting period.
- Testing of the MAD/LCP, which continues on one of twelve agencies in the Great Plains Region. Testing has been completed on the other eleven agencies.

## Delays and Obstacles

- Providing support to the Great Plains and Southwest Regional LTROs to assist with recording ILCP deeds, re-vesting *Youpee* interests, researching ownership files and recording to ownership records reduces the availability of ILCP funds for acquisitions of land interests.
- Probate backlog and *Youpee* issues continue to impede the land-purchase transaction process.
- Lack of Internet access results in slower processing of applications from potential sellers and hinders searches for WAU account holders.

## Assurance Statement

I concur with the content of the information contained in the Fractionation section of the *Status Report to the Court Number Twenty-Two.* The information provided in this section is accurate to the best of my knowledge.

Date: July 19, 2005

Name: *Signature on File*
        Robert R. Jaeger
        Director, Indian Land Consolidation Office
        Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                                                                    **Probate**

### C.    PROBATE

**Introduction**

Federal law permits Indian owners to pass title to their trust assets by testamentary devise or by intestate succession, and imposes upon Interior the duty of determining the legal heirs. In order to perform this duty, BIA, OHA and OST must coordinate their work to accomplish the probate process.

**Accomplishments and Completions**

**Case Preparation**

Case preparation is the initial stage of the probate process. During this stage of the process, information is researched and gathered regarding the identity and whereabouts of presumptive heirs, and an inventory of the trust assets of an estate is prepared. As of the end of this reporting period, 9,264 probate cases were in the case preparation stage.

**Case Adjudication**

In this reporting period, deciding officials received 1,166 cases and issued decisions in 843 cases.

**Financial Case Closure**

In this reporting period, OST distributed funds and closed 1,469 accounts in TFAS representing 1,439 estates. TFAS, as of the end of June 2005, contained 30,143 open estate accounts, which is an increase of 2,011 from the 28,132 estate accounts at the end of the last reporting period.

**Current Status**

**Probate Case Management and Tracking System**

Each BIA regional office and corresponding agency continued the process of encoding new cases, examining "initial load" cases and making corrections. Data-cleanup continued for this period, with ProTrac now the source of probate data.

**Probate Handbook**

During this reporting period, the Interior probate handbook was provided to a contractor for editing and formatting. Publication is expected during the next reporting period. An addendum to the handbook incorporating AIPRA is expected to be accomplished after publication of regulations.

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                                                                     **Probate**

### Delays and Obstacles

The following obstacles have been identified as having an impact on the progress of the probate program:

- Lack of access to the Internet, which includes the inability to use electronic mail communication between OHA and BIA/OST;
- Fractionation of ownership of Indian lands;
- Numerous initiatives competing for resources (e.g., *Youpee* revestitures, *Cobell* requirements);
- Cultural diversities regarding the subject of death;
- Completion of implementation of the probate reorganization.

### Assurance Statement

I concur with the content of the information contained in the Probate section of the *Status Report to the Court Number Twenty-two*. The information provided in this section is accurate to the best of my knowledge.

Date:   July 26, 2005

Name:   *Signature on File*
        William Titchywy
        Acting Special Projects Director
        Western Region
        Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                    **Acronyms and Abbreviations**

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| 1994 Act (or Act) | American Indian Trust Fund Management Reform Act of 1994 |
| A-130 | Office of Management and Budget Circular A-130 Appendix III |
| ADM | Attorney Decision Makers |
| AFMSS | Automated Fluid Mineral Support System |
| AIPRA | American Indian Probate Reform Act |
| AIRR | American Indian Records Repository |
| ALJ | Administrative Law Judges |
| ARO | Alaska Region office |
| ART | Accounting Reconciliation Tool |
| AS-IA | Assistant Secretary-Indian Affairs |
| ASD | Appraisal Services Directorate |
| ATO | authority to operate |
| BIA | Bureau of Indian Affairs |
| BIAM | Bureau of Indian Affairs Manual |
| BLM | Bureau of Land Management |
| BOR | Bureau of Reclamation |
| BPA | Blanket Purchase Agreement |
| BRM | Business Reference Model |
| C&A | Certification and Accreditation |
| CARS | Cadastral Automated Request System |
| CDE | Critical Data Elements |
| CFedS | Certified Federal Surveyor |
| CFI | Continuous Forest Inventory |
| CGI | Software vendor successor to TAAMS vendor |
| CGIS | Cadastral Geographic Information Systems |
| CIFTA | Certified Indian Fiduciary Trust Analyst |
| CIFTS | Certified Indian Fiduciary Trust Specialist |
| CIO | Chief Information Officer |
| CIRC | Computer Incidents Response Center |
| CISSP | Certified Information System Security Professional |
| COTS | Commercial off-the-shelf |
| CSIRC | Computer Security Incident Response Capability |
| CSIRT | Computer Security Incident Response Team |
| CSS | Customer StrataStation |
| CTM | Comprehensive Trust Management Plan |
| DAA | Designated Approving Authority |
| DEAR | DOI Enterprise Architecture Repository |
| DDoS | Distributed Denial of Service |
| DLRM | DOI Land and Resource Management |
| DM | Departmental Manual |
| DNS | Domain Name Server |
| DOI | Department of the Interior |

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                    **Acronyms and Abbreviations**

| | |
|---|---|
| DOP | Desk Operating Procedure |
| DoS | Denial of Service |
| DQ&I | Data Quality and Integrity |
| DRM | Data Reference Model |
| ENA | Eastern Navajo Agency |
| EORO | Eastern Oklahoma Region office |
| ERO | Eastern Region office |
| ESN | Enterprise Services Network |
| FAR | Federal Acquisition Regulation |
| FIMO | Farmington Indian Minerals Office |
| FISMA | Federal Information Security Management Act |
| FRC | Federal Records Center |
| FRD | Functional Requirements Document |
| FTM | Fiduciary Trust Model |
| FTO | Fiduciary Trust Officer |
| GAO | Government Accountability Office |
| GCDB | Geographic Coordinate Data Base |
| GIS | Geographic Information System |
| GLAD | Great Lakes Agency Database System |
| GPRO | Great Plains Region office |
| GPS | Global Positioning System |
| GSA | General Services Administration |
| GSS | General Support Systems |
| HSPD-12 | Homeland Security Presidential Directive 12 |
| IAM | Indian Affairs Manual |
| IATO | Interim Approval to Operate |
| IEA | Interior Enterprise Architecture |
| IFTR | Indian Fiduciary Trust Records |
| IG | Inspector General |
| IIM | Individual Indian Money |
| IITD | Individual Indian Trust Data |
| ILCA | Indian Land Consolidation Act |
| ILCO | Indian Land Consolidation Office |
| ILCP | Indian Land Consolidation Project |
| InfoDat | Indian Forestry Database |
| Interior | Department of the Interior |
| IP | Internet Protocol |
| IPJ | Indian Probate Judges |
| IPv6 | Internet Protocol Version 6 |
| IRM | Information Resources Management |
| IRMS | Integrated Records Management System |
| IRS | Internal Revenue Service |
| ISA | Information Security Assessment |
| IT | Information Technology |

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                    **Acronyms and Abbreviations**

| | |
|---|---|
| IV&V | independent verification and validation |
| LAN | Local area network |
| LCTS | Land Consolidation Tracking System |
| LRIS | Land Records Information System |
| LTIC | Land Tenure in Indian Country |
| LTRO | Land Titles and Records Office |
| MA | Major Applications |
| MAD/LCP | Management Accounting Distribution/Land Consolidation Program |
| MADS | Management Accounting Distribution System |
| MMD | Missing Mandatory Documents for Unrestricted Accounts |
| MMS | Minerals Management Service |
| MOU | Memorandum or Memoranda of Understanding |
| MRM | Minerals Revenue Management |
| MWRO | Midwest Region office |
| NARA | National Archives and Records Administration |
| NBC | National Business Center |
| NIPTC | National Indian Programs Training Center |
| NIST | National Institute of Standards and Technology |
| NPS | National Park Service |
| NRO | Navajo Region office |
| NWRO | Northwest Region office |
| O&G | Oil and Gas |
| OAS | Office of Appraisal Services |
| OCIO | Office of the Chief Information Officer |
| OHA | Office of Hearings and Appeals |
| OHTA | Office of Historical Trust Accounting |
| OIG | Office of the Inspector General |
| OMB | Office of Management and Budget |
| OSM | Office of Surface Mining |
| OST | Office of the Special Trustee for American Indians |
| OTFM | Office of Trust Funds Management |
| OTP | Office of Trust Regulations, Policies and Procedures |
| OTR | Office of Trust Records |
| OTRA | Office of Trust Review and Audit |
| PLSS | Public Land Survey System |
| PMSO | Project Management Support Office |
| POA&M | Plans of Actions and Milestones |
| Post-QA | Post Quality Assurance |
| PPA | Office of Planning and Policy Analysis |
| PRO | Pacific Region office |
| ProTrac | Probate Case Management and Tracking System |
| QA | Quality Assurance |
| QC | Quality Control |
| RAF | Recommended Action Forms |

*STATUS REPORT TO THE COURT NUMBER TWENTY-TWO*

**August 1, 2005**                                    **Acronyms and Abbreviations**

| | |
|---|---|
| RDRS | Royalty Distribution and Reporting System |
| REM | Real Estate Module |
| RFP | Request for Proposal |
| RM-PLUS | Risk Management Assessment/Evaluation tool |
| RMRO | Rocky Mountain Region office |
| ROW | Rights-of-Way |
| SANS | SysAdmin, Audit, Network, Security |
| SDA | Special Deposit Accounts |
| SDLC | System Development Life Cycle |
| SMEs | Subject Matter Experts |
| SMS | System Management Servers |
| SOL | Office of the Solicitor |
| SPRO | Southern Plains Region office |
| SSA | Social Security Administration |
| SSM | System Security Manager |
| SSP | System Security Plan |
| ST&E | Security Test and Evaluation |
| STIGs | Security Technical Implementation Guides |
| SUS | System Update Servers |
| SWRO | Southwest Region office |
| TAAMS | Trust Asset and Accounting Management System |
| TAP | Technical Architecture Profile |
| TBCC | Trust Beneficiary Call Center |
| TESC | Trust Executive Steering Committee |
| TFAS | Trust Fund Accounting System |
| TPMC | Trust Program Management Center |
| TRAC | Trust Tracking and Coordination |
| Treasury | Department of the Treasury |
| TRM | Technical Reference Model |
| TRO | Temporary Restraining Order |
| UAT | User Acceptance Testing |
| USGS | United States Geological Survey |
| USPAP | Uniform Standards of Professional Appraisal Practice |
| VBNS | Very High Performance Backbone Network Service |
| VPN | Virtual Private Network |
| WAN | Wide area network |
| WAU | Whereabouts Unknown |
| WRO | Western Region office |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

ELOUISE PEPION COBELL, et al.,   )
   )
   Plaintiffs,   )
   )
     v.   )     Case No. 1:96CV01285
   )     (Judge Lamberth)
GALE A. NORTON, Secretary of the   )
Interior, et al.,   )
   )
   Defendants.   )
_____)

**NOTICE OF FILING OF INTERIOR DEFENDANTS'
TWENTY-FOURTH STATUS REPORT**

Interior Defendants hereby give notice of the filing of their twenty-fourth report due in

accordance with the Order of December 21, 1999.

A copy of the report is attached hereto.

Dated: February 1, 2006        Respectfully submitted,
        ROBERT D. McCALLUM, Jr.
        Associate Attorney General
        PETER D. KEISLER
        Assistant Attorney General
        STUART E. SCHIFFER
        Deputy Assistant Attorney General
        J. CHRISTOPHER KOHN
        Director

        /s/ John J. Siemietkowski_____
        ROBERT E. KIRSCHMAN, Jr.
        (D.C. Bar No. 406635)
        Assistant Director
        JOHN J. SIEMIETKOWSKI
        Trial Attorney
        Commercial Litigation Branch
        Civil Division
        P.O. Box 875
        Ben Franklin Station
        Washington, D.C. 20044-0875
        Phone (202) 514-3368
        Fax (202) 514-9163

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on February 1, 2006 the foregoing *Notice of Filing of Interior Defendants' Twenty-fourth Status Report* was served by Electronic Case Filing, and on the following who is not registered for Electronic Case Filing, by facsimile:

Earl Old Person (*Pro se*)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
Fax (406) 338-7530

/s/ Kevin P. Kingston
Kevin P. Kingston



THE SECRETARY OF THE INTERIOR

WASHINGTON

JAN 3 1 2006

J. Christopher Kohn
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875

    Re:   *Cobell v. Norton* – *Status Report to the Court Number Twenty-Four*

Dear Mr. Kohn:

Enclosed is the Department of the Interior's *Status Report to the Court Number Twenty-Four (For the Period October 1, 2005 through December 31, 2005).* Please forward a copy to the Court.

This is the 17th report in the revised Report format. My signature on this Report reflects my belief that my personal observations are true and correct, and that the information provided to me by others for inclusion in my observations, as well as accompanying sections of the Report are correct to the best of my knowledge.

Thank you for your assistance.

                      Sincerely,

                      Gale A. Norton

Enclosure

# Status Report to the Court
# Number Twenty-Four

---

**For the Period**
**October 1, 2005 through December 31, 2005**



**February 1, 2006**

---

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**

## TABLE OF CONTENTS

I.      **INTRODUCTION**...................................................................... 1

II.    **SECRETARY GALE NORTON'S OBSERVATIONS**............................... 2

  A.   **INFORMATION TECHNOLOGY**................................................ 3

  B.   **CADASTRAL SURVEY**............................................................ 12

  C.   **MINERALS MANAGEMENT SERVICE**..................................... 14

  D.   **OFFICE OF HISTORICAL TRUST ACCOUNTING**..................... 16

III.   **OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS**.......... 18

  A.   **TRUST REVIEW AND AUDIT**................................................. 20

  B.   **OST-OFFICE OF THE CHIEF INFORMATION OFFICER**............. 21

      1.   **RECORDS MANAGEMENT**.............................................. 21

  C.   **TRUST ACCOUNTABILITY**.................................................... 24

      1.   **TRUST BUSINESS PROCESS MODELING**........................ 24

      2.   **TRUST DATA QUALITY AND INTEGRITY**....................... 26

      3.   **INDIAN FIDUCIARY TRUST TRAINING PROGRAM**......... 28

      4.   **RISK MANAGEMENT**.................................................... 30

      5.   **REGULATIONS, POLICIES AND PROCEDURES**............... 31

  D.   **FIELD OPERATIONS**............................................................ 33

      1.   **APPRAISAL**.................................................................. 33

  E.   **TRUST SERVICES**............................................................... 36

      1.   **CURRENT ACCOUNTING ACTIVITIES**.......................... 36

IV.   **BUREAU OF INDIAN AFFAIRS**................................................... 41

  A.   **TRUST REGULATIONS, POLICIES AND PROCEDURES**............. 41

  B.   **FRACTIONATION**............................................................... 43

  C.   **PROBATE**.......................................................................... 45

**ACRONYMS AND ABBREVIATIONS**................................................ 47

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                                              **Introduction**

## I.     INTRODUCTION

This *Status Report to the Court Number Twenty-Four* (Report) represents the period from October 1, 2005, through December 31, 2005.  The Report is presented for the purpose of informing the Court on the progress of trust reform activities occurring during this reporting period, and progress of the historical accounting of individual Indian beneficiary funds managed by Interior.[1]

This Report is prepared in a manner consistent with previous reports to the Court.  Each manager in charge of an area of trust administration and the director of the historical accounting project are submitting reports on the progress of their respective activities.

A glossary of acronyms and abbreviations is included in this Report.  The glossary is located at the end of the Report.

---

[1]   This report contains information on the broad trust reform efforts underway at Interior.  Accordingly, it may include information on reform efforts that are not within the scope of the *Cobell* litigation.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006                              **Secretary Gale Norton's Observations**

## II.    SECRETARY GALE NORTON'S OBSERVATIONS

As previously reported, Interior is engaged in a significant Regulatory Initiative to bring our trust and trust-related regulations into compliance with changes in the law and to update those regulations that are part of the implementation of trust improvements. The first draft of the regulations has been distributed to tribes and other stakeholders for their review. This draft represents the first major revision of these regulations in many years. Consequently, we plan to engage in discussions with major Indian organizations, hold consultation sessions to obtain broad input from interested individuals and tribes, and receive written comments – all before we incorporate these comments and publish the proposed regulations in the Federal Register to start the formal public comment period.

During the last reporting period, Congress passed appropriations for FY2006. Our requests for funds to continue work on trust reform were included. However, our request for $135 million for the Office of Historical Trust Accounting was reduced to $57 million. This money is expected to be used for IIM, SDA, and tribal accounting.

On December 8, 2005, the Associate Deputy Secretary and the Special Trustee testified before the House Resources Committee regarding legislation proposed by the Committee to settle *Cobell*. The draft legislation was identical to that introduced by the Senate Indian Affairs Committee earlier in CY2005. The testimony addressed the proposed legislation, the impact of the appellate decision vacating the structural injunction, and the results to date of the historical accounting project.

OHTA reports that it has reconciled more than 65,000 judgment and per capita accounts. OHTA continues to await Court permission to send historical statements of account to 28,107 judgment and per capita account holders. In addition, OHTA completed reconciliation of thousands of land-based transactions during the electronic era. Imaging and coding of documents needed for other land-based reconciliations continued during this reporting period.

Based on the information now available from the work of the past three years, and the recent appellate court decision vacating the district court's structural injunction, Interior is considering modifying its January 6, 2003, accounting plan. This process is focusing on lessons learned from work already completed, guidance in the appellate court decision, statistical sampling parameters, accounting costs, and the history of congressional funding.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006                                          **Information Technology**

### A.    INFORMATION TECHNOLOGY

**Introduction**

This section describes the status of Interior IT systems, particularly the systems that house or provide access to IITD or provide various computing capabilities, including functions critical to the proper administration of the individual Indian trust responsibilities within Interior.  In addition, this section describes various efforts being made to improve IITD security within Interior, pursuant to OMB Circular A-130 Appendix III, and the status of Internet connectivity.

**Accomplishments and Completions**

**ESN:**

- Interior connected BOR, NBC and FWS to the ESN Internet gateways to complete Phase 1 of the ESN project.  ESN provides consolidated Internet service to Interior with additional layers of perimeter security and additional security tools.

- Interior continues to implement Phase 2, which provides centrally managed Internet services.

**Computer Security:**

The primary focus for this reporting period has been preparation and submission of annual reports, including FISMA, assurance statements and the Performance and Accountability Report.  Interior continued to make progress in enhancing IT security, which includes:

- Performing continuous monitoring of Internet-accessible systems;

- Implementing additional ESN capabilities; and,

- Implementing corrective actions for weaknesses identified by the Interior penetration tests and audits of financial systems.

 The most noteworthy accomplishments and completions during the reporting period are described below.

*Prevention and Monitoring*

- Interior continued its external perimeter extended vulnerability scan testing of Internet-accessible systems, using capabilities established at ESN.  Monthly reports tally the number of potential critical and major vulnerabilities, as well as the number of potential SANS Top 20 vulnerabilities.  In most cases, a critical vulnerability allows a remote attacker to gain full control over the target without a user account on the system, and a major vulnerability allows a remote attacker to gain full control over the target if the attacker is logged onto the system.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                    **Information Technology**

In addition to the vulnerability assessment performed, an independent information assurance test is conducted to verify whether vulnerabilities identified are false positives. As of the end of this reporting period, 40 critical, 32 major and zero SANS Top 20 vulnerabilities were identified. All identified critical or major vulnerabilities were either remediated or were false positives.

- Twenty-eight successful incidents involving non-trust bureaus were reported to DOI-CIRC during this reporting period. These incidents were primarily virus (or other malware) infections of limited scope and duration. Only two successful incidents were reported from trust bureaus: a laptop misconfiguration (corrected) and a server theft (currently being investigated for prosecution by external law enforcement). There was no IITD involved.

- Interior acquired an Interior-wide license for an internal scanning tool to be deployed at ESN, and is preparing to conduct Interior-wide internal vulnerability scans in test mode.

- OST completed integration of additional monitoring tools, enabling near real-time monitoring and correlation of security related events.

- NBC initiated a number of major security projects as corrective actions in response to the March and July OIG penetration test results. These are on-going activities that are expected to continue through the fiscal year:
    - Investigation, testing and implementation of encryption mechanisms; and
    - An independent security assessment, including penetration testing.

- As previously reported to the Court, MMS detected an unauthorized change of an administrator password on the contracted MRMSS (Data Warehouse) in August 2005. Final security scans and a security review were conducted by an independent contractor, which confirmed that the integrity of IITD was not compromised.

*Policies and Guidance*

- The BLM Assistant Director for Information Resources issued Instruction Memorandum 2006-13, "Revised Policy and Guidance for the Bureau of Land Management (BLM) Regarding the Movement of Federal Records" to state directors, center directors and assistant directors on October 3, 2005. This instruction memorandum established policy, procedures, and documentation requirements governing the movement of Indian fiduciary trust records. It also restated existing policy for the movement of all other official BLM records.

- The Interior CIO issued "Implementing OCIO Directive 2005-007 for Fiscal Year (FY) 2006 Plans of Actions and Milestones (POA&M) and Federal Information Security Management Act (FISMA) Performance Measures" to the heads of bureaus and offices on November 4, 2005. This memorandum provides guidance in completing POA&Ms and FISMA performance measures.

4

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                          **Information Technology**

- The Interior CIO and the Director of the Office of Acquisition and Property Management issued "Follow-on Consolidated IT Blanket Purchase Agreement for Select Hardware Equipment Purchases" to the heads of bureaus and offices on November 14, 2005. This memorandum provides a vehicle for bureaus and offices to acquire standardized IT hardware that meets Interior's security and architecture requirements.

- The Interior CIO issued "Distribution of the Department of the Interior's (DOI) Technology Reference Model (TRM) Version 3.0" to the bureau and office CIOs on November 30, 2005. This directive establishes current standards for hardware and software acquisition, and governance processes for maintaining these standards.

- The BLM Director of the Law Enforcement and Security Office issued Information Bulletin 2006-026 "Implementation of HSPD-12" to all field offices on November 16, 2005. The bulletin transmitted Interior memoranda on the requirements of HSPD-12 and a common identification standard for federal employees and contractors. It also requires training for all Smart Card[2] sponsors, registrars, and issuers.

- The Interior CIO issued "Enterprise Access Control Services (Active Directory)" to the bureau and office CIOs on December 21, 2005. This memorandum provided guidance and requirements for enterprise access control services implementation.

- The MMS CIO issued "FY2006 MMS IT Security Role-Based Training Requirements for IT-Related Professionals" to associate directors and IT-related professionals on November 8, 2005. This established FY2006 IT security training requirements for IT professionals.

*Training and Awareness*

- The Interior CIO received training through Interior's new role-based training module on earned value management, electronic mail security, overview of wireless network security, and advanced wireless network security.

- Interior held an Interior-wide IT conference, "The Business of Information," November 15-18, 2005. During this conference, Interior and its bureaus and offices provided presentations on a variety of IT security topics, including Indian trust responsibilities, C&A, FISMA requirements, E-Authentication and HSPD-12, managing POA&Ms, and IT security role-based training.

---

[2] A Smart Card is an encoded badge or token used for employee identification, verification, and various authorizations such as building access, security clearances, purchasing, electronic signatures, and computer log-on access.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                              **Information Technology**

**Plans of Action and Milestones:**

Interior tracked 1,631 POA&M recorded weaknesses, of which 323 weaknesses were identified this quarter and 1,308 weaknesses[3] were carried over from the fourth quarter. Interior remediated and closed out 302 weaknesses this quarter. Interior is currently tracking 1,329 open weaknesses. All bureaus and offices with trust systems certified the completion of POA&M corrective actions.

BLM's major POA&M accomplishments included an updated and tested contingency plan for the Denver Data Center, establishing and staffing a full-time employee with specific responsibility for POA&M management, and closing technical weaknesses on two non-trust BLM systems.

OHA closed four POA&M items, with the nine remaining items prioritized and scheduled for completion during the next reporting period. More POA&M items are expected to be opened during the re-certification and accreditation of OHANet, scheduled for completion in the next reporting period.

**A-130 Certification and Accreditation:**

IATO documents for the GeoCommunicator and General Land Office systems were signed by the BLM Director in December 2005. The systems were reconnected to the Internet and are operational.

BLM has instituted an internal quality control of its C&A activities.

**IT Systems Architecture:**

Interior integrated data elements from its automated C&A document repository and tracking system into DEAR for more seamless and integrated reporting. After successful testing of DEAR, Interior expects to retire the separate C&A module of the security repository.

The MMS EA Team is preparing an overarching MMS EA modernization blueprint. This blueprint, or roadmap, is expected to represent, at a high level, a business-driven view of the direction EA is heading over the next 1-3 years. The roadmap is expected to include a description of the current baseline with a focus on the target or future architecture. A transition plan of activities and milestones to implement that architecture will also be incorporated in the roadmap.

---

[3] Reported incorrectly in the previous status report as 1,314 due to a data transposition error.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                                                **Information Technology**

**E-Authentication and HSPD-12:**

- BLM installed an updated version of its credential management system, and decommissioned the older identity management system.  BLM has issued over 6,200 Smart Cards.

**Staffing:**

- Several architects within Interior are now Certified Enterprise Architects, including the Interior Chief Architect, Interior Data Architect, OSM Architect and two MMS Architects. These architects received certification from the Federal Enterprise Architecture Committee Institute in December 2005.  Certification is equivalent to five graduate-level university courses.  Benefits of having Certified Enterprise Architects include:

  o Continued maturation of EA programs.
  o Training in EA best practices and a standard body of knowledge recognized by both private and public sectors.
  o Understanding of the OMB and GAO EA policies, guidelines and maturity frameworks.
  o Reduction in risks towards accomplishing business and IT modernization projects.

- BLM hired an IT Security Policy Manager and an IT Risk Management Program Manager at its headquarters office this reporting period.

**Current Status**

**A-130 Certification and Accreditation:**

Ninety-eight percent of Interior systems have full ATO status.

**ZANTAZ:**

Extensive contract negotiations with ZANTAZ continued in this reporting period.  Bureaus and offices affected by the ZStage issues are preparing to ship their tapes to ZANTAZ for restoration.

NBC in Denver expects to have its servers updated to correct ZStage issues in the next reporting period.

OST implemented an automated process to resend to the ZANTAZ Digital Safe any e-mail that did not have a valid Z Archive value.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                              **Information Technology**

**Reports:**

These reports were issued during this reporting period and are likely to be of interest to the Court.

- The Interior CIO submitted the FY2005 FISMA report to OMB on October 14, 2005. Included in the submission was a discussion of the differences between the CIO and IG sections of the report as well as Secretary Norton's transmittal letter requesting OMB to provide assistance in determining where, between these two perspectives, OMB's intent in measuring FISMA compliance lies.

- The Interior IG issued a report, "Annual Evaluation of the Information Security Program of the Department of the Interior (Report No. NSM-EV-MOI-0013-2005)," on October 6, 2005. This report presents the results of the OIG annual evaluation of Interior's IT security program, as required by FISMA, including a re-cap of related reports issued earlier in FY2005. Portions of this report were included in the Secretary's annual FISMA report noted above.

- Interior issued a report on November 10, 2005, on a Departmental IT security program assessment conducted by an independent contractor. The findings of this report contributed to Interior's overall assessment of the effectiveness of the IT security program, which is reflected in the annual FY2005 FISMA report and the FY2005 Performance and Accountability Report. The assessment reviewed Interior's IT security program's self-assessed 3.63 maturity level using the NIST 5-level maturity scale. The overall assessment confirms Interior's progress in developing a sound IT security program. The report also provided recommendations for further progress.

- Interior issued its FY2005 Performance and Accountability Report on November 15, 2005. The report provides results from several IT-related reviews, including FISMA evaluations, OIG and GAO reviews, and compliance with various financial-related mandates.

  o In October 2005, Interior's bureaus and offices completed assurance statements for IT security relating to compliance with the OMB Circular A-123, "Management Accountability and Control," the Federal Managers' Financial Integrity Act, the Federal Financial Management Improvement Act, A-130 and FISMA. The results were included in the Performance and Accountability Report.

  o Interior's Inspector General issued "Independent Auditors' Report on the Department of the Interior's Annual Report on Performance and Accountability for Fiscal Year 2005 (Report No. X-IN-MOA-0011-2005)" on November 15, 2005. This report, included in the Performance and Accountability Report, transmitted the audit report from an independent certified public accounting firm of Interior's financial statements for FY2005 and FY2004. The independent auditor issued an unqualified opinion, with fourteen reportable conditions, of which two were considered to be material weaknesses.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006                                        **Information Technology**

- In November, BLM issued a report on the findings of a management control review of the New Mexico State Office information management programs. The review, conducted August 15-24, 2005, focused on records management and Indian trust programs in the New Mexico State Office, Farmington District Office, Albuquerque Field Office, Oklahoma Field Office, and the Oklahoma Field Station. Records (including IITD) storage facilities and procedures were reviewed for compliance with BLM policies and with the directions of this Court. Generally, the records management and Indian trust programs were found to be sound. A number of recommendations were made to improve the programs, including the purchase of fire-proof records storage cabinets.

**MRM Legacy Media:**

MRM has approximately 30,000 legacy system back-up tapes containing data that is redundant to data in MRMSS. In addition, the legacy back-up tapes represent only snapshots of data and mainframe system files at various points in time during legacy processing, and would have been suitable solely for recovering legacy mainframe operations as part of a disaster recovery plan. Preserving these legacy tapes would not serve any useful purpose because MRMSS contains current and legacy data representing the history of processing for MRMSS, as well as the legacy period. All data in the legacy databases, both Indian and federal, were fully converted to MRMSS in mid-2001. MRM subsequently discontinued its legacy mainframe data center, including disposing of the mainframe hardware and associated peripherals. As a result, MRM intends to effect the disposal of these tapes.

<u>Delays and Obstacles</u>

Like other federal agencies, Interior must address many challenges regarding the integration, performance, funding, security, and data integrity of IT systems. Interior initiated or completed steps to address some of the challenges reported in this and previous reporting periods. However, delays and obstacles listed here impede progress in achieving Interior's IT management goals:

**Litigation**

- Delays caused by last summer's extensive collection and production of documents and by court appearances put Interior several months behind in completing many required IT and IT security activities. These include completing corrective actions from audits and on POA&Ms, updating of required security policies and procedures, and implementing initiatives critical to continued improvements in IT security.

- Employee fears about becoming personally implicated in the *Cobell* litigation continue to undermine communication and decision-making, and are contributing factors to low employee morale.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                    **Information Technology**

**Staffing**

- Interior is experiencing high staff and management turnover in critical IT positions, particularly IT security. Recruitment challenges to attract qualified candidates continue, particularly in light of litigation impacts.

- The Interior Deputy CIO and Chief Information Security Officer positions were vacant during this reporting period. After being vacant since 2004, the Deputy CIO position is expected to be filled in the next reporting period. The Department's IT security staff was at 40% at the end of the reporting period, resulting in impacts to communications, efficiency, and oversight that are impeding IT security service area functions.

- The OST Deputy CIO position became vacant at the end of the reporting period.

**Funding and Resources**

- OCIO, along with Interior bureaus and offices, is responding to an extraordinary level of scrutiny, including OIG evaluations and audits, GAO evaluations and audits, and OMB- and NIST-required reviews. With the significant increase in review, Interior is expending considerable efforts in data collection, document production and related workloads, which diminishes the resources available for IT security-related activities.

- Funding availability will continue to dictate the timing of IT-related initiatives. Interior's FY2006 budget will require managing a variety of IT-related requirements and tradeoffs. Interior continues to prioritize its IT security needs in its budget requests within fiscal constraints.

**Denied Internet Access**

- Several Interior bureaus and offices (BIA, OHA, OST and SOL) have not been permitted by the Court to have Internet access since December 5, 2001. Lack of Internet access impedes work processes and the ability to communicate effectively, both internally and externally.

- Maintaining security on internal systems is more difficult without access to the Internet for research, reporting, and patch management. Similarly, promulgation of policy and training is substantially hampered by the lack of interconnectivity and Internet access.

- The concerns over potential future Court-ordered Internet shutdowns or other Court-ordered disruptions create uncertainty over how to proceed with enterprise initiatives and security improvements. Contingency planning for either external or internal disconnections (and all potential permutations) takes resources from planned and daily activities. For example, MMS continues to pay for separate Internet connections, duplicating services provided by ESN, to maintain capabilities in the event the Court orders an NBC shutdown. The

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                           **Information Technology**

possibility of future disruptions also raises concern over Interior's ability to provide services to its non-Interior customers.

**<u>Assurance Statement</u>**

I concur with the content of the information contained in the Information Technology section of the *Status Report to the Court Number Twenty-Four*.  The information provided in this section is accurate to the best of my knowledge.

Date:   January 24, 2006

Name:  *Signature on File*
         W. Hord Tipton
         Interior Chief Information Officer

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006                                          **Cadastral Survey**

B.    **CADASTRAL SURVEY**

**Introduction**

Cadastral surveys provide assurance that land boundaries for individual Indian and tribal trust lands are identified appropriately.  By federal law, surveys of Indian lands are to be performed under BLM's direction and control.  Official surveys, whether preexisting or new, identify the location of land boundaries of Indian trust assets and determine official acreage.  The official surveys are integral to realty transactions, resource management activities, litigation support and the federal system of patent, allotment and survey records maintained by BLM.  Ownership information, distribution of trust assets, and management of trust accounts may be related to or based upon information recorded in official surveys.

**Accomplishments and Completions**

**Hiring of all 12 BLM Indian Lands Surveyors**

During this reporting period, the FTM goal to hire 12 BLM Indian lands surveyors for the 12 BIA regions was accomplished.

The BLM Indian lands surveyors for the Southern Plains and Alaska Regions reported to their respective duty locations in this reporting period.  The BLM Indian lands surveyors for the Midwest, Eastern Oklahoma, Great Plains and Northwest Regions are actively working with BIA staff and others in addressing survey boundary issues.  The lands surveyors for Eastern, Navajo, Pacific, Rocky Mountain, Southwest and Western Regions are scheduled to report during the next reporting period.

**Current Status**

**Interior Indian Trust Lands Boundary Standards (Draft)**

The Draft Boundary Standards continue to be reviewed and revised based upon comments received from SOL.  The SOL review is expected to be completed during the next reporting period, at which time an updated draft will be provided to Interior bureaus, offices and other affected parties.

**Implementation of the FTM**

During this reporting period the FTM goals continued to be implemented.  These goals as they relate to cadastral survey are:  (1) funding for the 12 BLM Indian lands surveyors located in the BIA Regions; (2)  creation of the Certified Federal Surveyor program (where state licensed land surveyors can be certified to perform commercial activities under the direction and control of BLM); (3) improving the maintenance of the Public Land Survey System within Indian Country; and (4) creation of one standardized source of land status information based on cadastral data that delineates the official legal land descriptions.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                                    **Cadastral Survey**

The CFedS program certification panel and test writing committee met during this reporting period.   The certification panel's membership is comprised of representatives from OST, BIA, BLM and the private sector.  The certification panel prepared a draft manual and handbook for the administration and oversight of the CFedS program.  The test writing committee is comprised of professional land surveyors from the BLM.  The test writing committee began preparation of the final certification test.  It is anticipated that the CFedS program will assure survey integrity, and should increase the production of surveys.

**<u>Delays and Obstacles</u>**

**Disconnection from the Internet**

The Court-ordered disconnection from the Internet continues to adversely impact the way communications are handled between BLM, BIA, OST and SOL, including the way CARS is being implemented and the review of the Interior Indian Trust Lands Boundary Standards**.** BLM's productivity has decreased, and the cost associated with dual networks has caused the cost of survey services to increase.  This issue continues to impact BLM's ability to provide cadastral services in an effective and cost efficient manner to clients.

**Funding of the FTM**

Planning and scheduling of out-year FTM work is dependent on future funding.

**<u>Assurance Statement</u>**

I concur with the content of the information contained in the Cadastral Survey section of the *Status Report to the Court Number Twenty-Four*.  The information provided in this section is accurate to the best of my knowledge.

Date:   January 27, 2006

Name: *Signature on File*
        Donald A. Buhler
        Chief Cadastral Surveyor
        Bureau of Land Management

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006                                     **Minerals Management Service**

### C.    MINERALS MANAGEMENT SERVICE

<u>Introduction</u>

Minerals Revenue Management, an MMS program, is responsible for collecting, accounting for, and distributing mineral revenues from both federal and Indian mineral leases, and for evaluating industry compliance with laws, regulations and lease terms.  MRM maintains reported information and distributes revenues at the lease level.  BIA maintains individual Indian ownership records that are used to provide information to OST for disbursement of the lease revenues to individual Indian beneficiaries.

<u>Current Status</u>

**Indian Oil Rule**

MMS continued with the rulemaking process for the valuation of oil produced from tribal and allotted Indian lands.  The proposed rule for valuing crude oil produced from Indian leases now is expected to be published in February 2006.

**Payment Receipt Date Verification**

MMS continues to work with its contractor on system modifications that will allow MMS to identify prior errors, if any, in the Indian mineral revenue distribution file.  Any potential additional interest that may be due to recipients would be identified upon review and analysis of the data produced from the system modifications.

**MRM Legacy Media**

MRM has approximately 30,000 legacy system back-up tapes containing data that is redundant to data in MRMSS.  In addition, the legacy back-up tapes represent only snapshots of data and mainframe system files at various points in time during legacy processing, and would have been suitable solely for recovering legacy mainframe operations as part of a disaster recovery plan. Preserving these legacy tapes would not serve any useful purpose because MRMSS contains current and legacy data representing the history of processing for MRMSS, as well as the legacy period.  All data in the legacy databases, both Indian and federal, were fully converted to MRMSS in mid-2001.  MRM subsequently discontinued its legacy mainframe data center, including disposing of the mainframe hardware and associated peripherals.  As a result, MRM intends to effect the disposal of these tapes.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                    **Minerals Management Service**

<u>**Assurance Statement**</u>

I concur with the content of the information contained in the Minerals Management Service section of the *Status Report to the Court Number Twenty-Four*.  The information provided in this section is accurate to the best of my knowledge.


Date:   January 26, 2006

Name: *Signature on File*
            Cathy J. Hamilton
            Chief of Staff
            Minerals Revenue Management
            Minerals Management Service

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006                              **Office of Historical Trust Accounting**

## D.    OFFICE OF HISTORICAL TRUST ACCOUNTING

### Introduction

OHTA was established by Secretarial Order No. 3231 on July 10, 2001, and is charged with planning, organizing, directing and executing the historical accounting of IIM and tribal trust accounts.  Since its 2001 inception, neither OHTA nor its contractors have stored the IIM transaction data used to perform historical accounting on a system connected to the Internet.

### Current Status

#### Judgment and Per Capita IIM Accounts

OHTA continues to perform historical accounting procedures on Judgment and Per Capita IIM accounts.  During this reporting period, OHTA completely reconciled an additional 2,903 Judgment IIM accounts and 3,164 Per Capita IIM accounts.

Results through December 31, 2005, are summarized in the table below.

|  | Judgment Accounts | | Per Capita Accounts | |
|---|---|---|---|---|
|  | Number of Accounts | Percent of Total | Number of Accounts | Percent of Total |
| Total at December 31, 2000 (including accounts open at October 25, 1994, but closed prior to December 31, 2000) | 80,539 | 100.00% | 19,033 | 100.00% |
| Reduction for accounts subsequently determined to be outside of the scope of the population | (835) | (1.04%) | N/A | N/A |
| Reconciled January 1, 2001, through September 30, 2005 | (47,616) | (59.12%) | (11,922) | (62.64%) |
| Reconciled this reporting period | (2,903) | (3.60%) | (3,164) | (16.62%) |
| Remaining to be reconciled at December 31, 2005 | 29,185 | 36.24% | 3,947 | 20.74% |

#### Mailings to Judgment and Per Capita IIM Account Holders

OHTA has not mailed any Historical Statements of Account during this reporting period.  A submission to mail 28,107 additional Historical Statements of Account, filed with the Court on March 24, 2005, is still pending approval.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006                          **Office of Historical Trust Accounting**

**OHTA SDA Distribution Project - Undistributed SDA Balances at December 31, 2002**

During this reporting period, 145 SDA involving $1,217,075 were resolved and distributed. There remain 11,818 SDA involving $19,357,040 to resolve and distribute.  Distributions of SDA balances to rightful owners during the period January 1, 2003, through December 31, 2005, total $38,847,657, including interest of $2,711,962 posted from January 1, 2003, through the date of distribution.[4]

**Land-Based IIM Accounts**

Work continued on Land-Based IIM accounts during the reporting period.

**Interest Recalculation**

Interior plans to recalculate expected interest payments for each IIM account.  This recalculation has been performed on the reconciled Judgment and Per Capita IIM accounts discussed above, for which no significant differences were found.

**Imaging/Coding – Individual Indian Trust Documents**

During this reporting period, OHTA completed scanning 781,122 pages, coding 82,591 documents and loading 42,263 documents into ART.  All documents are checked for quality and accuracy before they are loaded into ART for reconciliation.  This additional quality check accounts for the difference between the number of documents coded and number of documents loaded into ART.

**Delays and Obstacles**

Enacted appropriations for FY2003 through FY2006 have been below the President's requests, thus limiting the scope of the historical accounting that could be performed.

**Assurance Statement**

I concur with the contents of the information contained in the Office of Historical Trust Accounting section of the *Status Report to the Court Number Twenty-Four.*  The information provided in this section is accurate to the best of my knowledge.

Date:       January 27, 2006

Name:       *Signature on File*
            Bert T. Edwards, Executive Director
            Office of Historical Trust Accounting

---

[4] Interior also distributed approximately $12 million during the two year period ending December 31, 2002, resulting in the distribution of approximately $51 million in SDA.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006                    **Office of the Special Trustee for American Indians**

### III.    OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS

**Special Trustee's Observations**

**Trust Initiatives for the 21st Century**

The Concho and Anadarko pilot agencies have now become the model for implementing the FTM at all other BIA agencies.  All agencies in the Southern Plains Region expect to complete their conversion of IT systems and implementation of new business processes during the first quarter of CY2006.  Further, the Rocky Mountain Region has begun the conversion process.  The transformation of the remaining agencies will be complete when all data and systems have been encoded, validated and reconciled.  In addition, training needs to be conducted on the new operating systems, manuals, handbooks, and business processes.

**Regulatory Initiative**

The Associate Deputy Secretary distributed drafts of regulatory language to Tribes, congressional staff and other interested parties to begin the consultation process.  Consultation sessions with Tribes and other stakeholders are expected to be held prior to publishing proposed regulations in the Federal Register in CY2006.

**Annual Indian Trust Funds Financial Statement Audit**

During this reporting period, OIG sent OST the "Independent Auditors' Report on the Tribal and Other Trust Funds and Individual Indian Monies Trust Funds Financial Statements for Fiscal Years 2005 and 2004 Managed by the Office of the Special Trustee for American Indians."  In transmitting the auditor's findings to OST, OIG noted that the contractor "issued a qualified opinion on OST's financial statements because inadequacies in certain Department of the Interior trust-related systems and processes made it impracticable to extend auditing procedures sufficiently to satisfy auditors as to the fairness of trust fund balances."  I generally concurred with the report's findings and recommendations, and noted specific actions being taken by OST to correct the auditor's two reported material weaknesses.  The Assistant Secretary for Policy, Management and Budget is responsible for tracking implementation of recommendations to correct these weaknesses.

**American Indian Probate Reform Act**

Technical amendments to the Act were enacted that enable non-competitive contracts to be given to non-profit organizations for their help with training legal practitioners on AIPRA and educating beneficiaries about the impact of the Act.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                    **Office of the Special Trustee for American Indians**

<u>Conclusion</u>

Trust reform continues to improve the delivery of beneficiary services throughout Indian Country, as exemplified by:

- milestones reached at the pilot agencies in the Southern Plains Region,
- the Trust Beneficiary Call Center,
- a lockbox system for collection and immediate deposit of receipts into the trust fund system,
- placement of experienced fiduciary trust officers at field offices and three urban locations,
- a records program run by trained, professional staff, and
- a state-of-the-art records repository.

These and other improvements ensure greater accountability and service to beneficiaries.

<u>Assurance Statement</u>

The comments and observations are provided by the Special Trustee for American Indians and reflect the opinion of the Special Trustee only.

Date:   January 25, 2006

Name: *Signature on File*
        Ross O. Swimmer
        Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                                      **Trust Review and Audit**

### A.    TRUST REVIEW AND AUDIT

__Introduction__

OTRA reports directly to the Special Trustee for American Indians.  OTRA was created by OST as a response to trust initiatives developed during the tribal consultation process of 2002.  OTRA conducts performance audits, examinations and reviews of Interior entities as well as Tribes that manage fiduciary trust activities.  Examinations are routinely conducted at locations that perform trust operations, and are planned to result in a performance rating.

__Current Status__

**Indian Trust Examinations**

During this reporting period, OTRA performed 12 trust reviews.  Five draft reports were issued for comment and 26 final reports were issued.  In the *Status Report to the Court Number Twenty-Three*, OTRA reported that it issued seven final reports; there were actually nine.

OTRA completed seven trust record assessments and issued seven final reports during this reporting period.  In the *Status Report to the Court Number Twenty-Three*, OTRA reported that it issued 22 final reports; there were actually 23.

**Compliance Reviews**

Compliance reviews are generated by information received from beneficiaries, employees and the public.  During this reporting period, eight cases were in inventory.  One case was added to the inventory.  Field work or report drafting continued on the remaining cases.

__Delays and Obstacles__

Lack of Internet access impedes OTRA's work processes and its ability to communicate effectively, both internally and externally.

__Assurance Statement__

I concur with the content of the information contained in the Trust Review and Audit section of the *Status Report to the Court Number Twenty-Four*.  The information provided in this section is accurate to the best of my knowledge.

Date:   January 31, 2006

Name: *Signature on File*
        D. Jeff Lords
        Acting Director, Office of Trust Review and Audit
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006                                              **Records Management**

### B.    OST-OFFICE OF THE CHIEF INFORMATION OFFICER

### 1.    RECORDS MANAGEMENT

**<u>Introduction</u>**

The Office of Trust Records was established in 1999 to develop and implement a program for the economical and efficient management of trust records, consistent with the 1994 Act, the Federal Records Act and other statutes and implementing regulations. The OTR records management program has been developed and implemented, and continues to evolve, to ensure that necessary Indian records are maintained, records retention schedules are consistent with retention needs, and records are safeguarded throughout their life-cycles.

**<u>Accomplishments and Completions</u>**

**American Indian Records Repository**

Approximately 130,015 indexed boxes are located in the AIRR as of the end of this reporting period. As previously reported, OTR has historically reported the number of boxes transferred to AIRR for storage. However, NARA uses cubic feet as the measure for records stored. Thus far, NARA reports that it is currently storing 131,236 cubic feet of indexed inactive records at AIRR. Some boxes are larger than one cubic foot (e.g., map boxes).

**Records Indexing Project**

Indexing of approximately 131,710 boxes has been completed as of the end of this reporting period. The number of completed boxes (indexed and quality reviewed) differs from the number of boxes stored at AIRR because not all completed boxes were sent to AIRR from the Annex before the end of the reporting period.

Approximately 6,835 boxes of inactive records were moved from BIA/OST field locations to the Lenexa Annex for indexing during this reporting period. Once indexed, these boxes will be stored in the AIRR.

**Training**

OTR provided records management training for 19 BIA- and OST-identified records contacts and 79 tribal employees during this reporting period.

**Equipment Purchases**

Forty-one pieces of fireproof filing equipment were delivered to BIA and OST offices during this reporting period.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006                                    **Records Management**

## Current Status

### Safeguarding Records

As reported, 283 boxes of inactive records that were or may have been damaged or contaminated by mold, mildew, mouse droppings or other adverse elements were shipped to NARA for remediation in June 2005. As reported in the OTR Activity Report for November 2005 (filed December 15, 2005), the number has increased to 289 boxes as a result of holdings maintenance being performed. Some boxes cannot hold the entire contents of the original box and are placed in an "overflow box" which is kept with the original box. On December 23, 2005, OTR received a memorandum from the Preservation Specialist overseeing this project for NARA. As reported in the OTR Activity Report for December 2005 (filed January 13, 2006), the memorandum states that: 145 boxes are ready to be released for reference use (and have been sent for indexing and subsequent storage at AIRR); 60 boxes require simple holdings maintenance work; 21 boxes require humidification and flattening treatment; 39 boxes are badly damaged and require handling by a preservation specialist for further care; 16 boxes are exceptionally damaged and require specialized treatment; and 8 boxes contain oversized maps that could be copied in order to facilitate handling and promote preservation. NARA expects that a treatment plan will be provided to OTR in January 2006 for those boxes requiring further care. As reported in *Status Report to the Court Number Twenty-One,* the contractor estimated that less than 1% of the total pages of records assessed for this project are completely illegible.

### National Archives Records

As reported in the OTR Activity Report for November 2005, OTR received a copy of a letter dated December 9, 2005, addressed to Dennis Gingold, Esq., from Jason Baron, Esq., Director of Litigation, Office of the General Counsel, National Archives and Records Administration providing "a further update concerning the incidents of attempted records disposal at Main Archives which occurred September 2005." A copy of the letter was filed with the November 2005 Activity Report.

### Records Retention Schedules

OTR received approval from the Archivist of the United States for the following electronic systems records schedules: the REM used in Anadarko (Southern Plains Region), InfoDat and CFI.

OTR continues to await NARA approval on seven electronic systems records schedules: GIS, MADS, Keyfile System, GLADS, Alaska Title Plant Database, Land Title Mapper, and BISS.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                                **Records Management**

**Records Evaluation**

As previously reported, 31 boxes set aside for evaluation remain at OTR in Albuquerque pursuant to a litigation hold.  There has been no change during this reporting period.

**Delays and Obstacles**

Lack of Internet access continues to hinder OTR's ability to provide remote access to the record index database for authorized users of the records.  If Internet access were available, authorized researchers could conduct their searches from their respective work sites and only visit AIRR when necessary to inspect specific boxes.

**Assurance Statement**

I concur with the content of the information contained in the Records Management section of the *Status Report to the Court Number Twenty-Four.*  The information provided in this section is accurate to the best of my knowledge.

Date:   January 23, 2006

Name:  *Signature on File*
          Ethel J. Abeita
          Director, Office of Trust Records
          Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006                                    **Trust Business Process Modeling**

C.    **TRUST ACCOUNTABILITY**

1.    **TRUST BUSINESS PROCESS MODELING**

## Introduction

Interior is working to build a highly effective fiduciary trust services organization by implementing the business objectives contained in the CTM. Those business objectives are being used to guide implementation of the FTM. Implementation of the FTM is a collaborative effort of BIA, OST, BLM, MMS and OHA, and is integrated with Interior's other trust reform initiatives. The FTM is being implemented to transform the current trust business processes into more efficient, consistent, integrated and fiscally responsible business processes that meet the needs and priorities of the beneficiaries.

## Current Status

The final standardized leasing and permitting, rights-of-way and LTRO handbooks were completed and delivered to BIA. It is expected that these handbooks will be adopted during the next reporting period.

Regulations implementing the FTM were drafted as part of the Interior Regulatory Initiative.

Skills modeling has been completed for the fiduciary trust positions required to implement the FTM. Skill sets have been defined and validated for general and technical skills. Managerial skill sets have been defined and are expected to be validated during the next reporting period. Training needs have been identified for those general skills which were ranked as "critical" and "very important" to particular job functions, providing the foundation for curriculum development. Identification of training needs for the technical skills is expected to be completed before the end of FY2006.

OST participated with BLM on the development of a CFedS draft manual and handbook.

An initial site visit was held at the pilot agencies to determine whether processes are performed timely; to review workflows; to determine metrics; to standardize and automate forms; to schedule ongoing training; and to determine appropriate staffing needs.

Work has begun on developing a conveyance handbook and a minerals handbook. Drafts of four chapters for the minerals handbook have been completed for solids; fluids; coal; and sand, gravel and aggregates.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                              **Trust Business Process Modeling**

## Delays and Obstacles

Lack of Internet access impedes communication with other trust bureaus and offices, and hinders the expansion of reengineered processes that utilize the Internet.  This exacerbates the sheer complexity of reengineering the existing trust business processes.

## Assurance Statement

I concur with the content of the information contained in the Trust Business Process Modeling section of the *Status Report to the Court Number Twenty-Four.*  The information provided in this section is accurate to the best of my knowledge.

Date:   January 27, 2006

Name:  *Signature on File*
        John Bennett
        Acting Deputy Special Trustee, Trust Accountability
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006                              **Trust Data Quality and Integrity**

## 2.    TRUST DATA QUALITY AND INTEGRITY

### Introduction

The success of trust reform depends, in part, on the accuracy of data generated from the maintenance of trust assets, ownership of trust assets, distribution of trust income, and management of trust accounts. The DQ&I project focuses on three primary initiatives: (1) assisting BIA with document encoding into the trust systems, (2) validating/correcting CDE to their respective source documents and (3) implementing Post-QA processes.

### Accomplishments and Completions

During this reporting period, TPMC's contractors:

- Scanned trust conveyance documents necessary to perform CDE validation/correction for the Fort Berthold Agency.

- Completed pre-conversion encoding of documents supporting TAAMS Leasing deployment at the Horton, Shawnee and Pawnee Agencies.

- Researched and verified ID numbers for 578 beneficiaries, enabling the SPRO-LTRO to begin encoding their probate order backlog in TAAMS Title for the Horton, Shawnee and Pawnee Agencies.

- Analyzed remaining 95 Concho Agency and 19 Anadarko Agency variances in tract ownership between TAAMS Title and the REM legacy realty system. Provided summary correction sheets to BIA.

### Current Status

The DQ&I project expanded to include RMRO-LTRO and Miami Agency. Operations continued for: (1) SPRO, (2) GPRO-LTRO, (3) Pima Agency and (4) PRO-LTRO.

During this reporting period, TPMC:

- Assisted Concho Agency to reduce RDRS data entry backlogs by encoding 22 probate orders, 4 oil and gas leases, and 9 landowner ID changes.

- Continued the CDE validation/correction task for Shawnee Agency and initiated encoding of encumbrance data into TAAMS Leasing.

- Initiated CDE validation/correction work and encoding of encumbrance data into TAAMS Leasing for Horton and Pawnee Agencies.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006                                    **Trust Data Quality and Integrity**

- Performed additional global ID changes in TAAMS Title for SPRO, achieving 80% completion.

- Commenced scanning of encumbrance documents at RMRO-LTRO.

- Provided staff to assist RMRO-LTRO with recording 2,018 encumbrance documents in TAAMS Title.

- Scanned 17% of trust documents necessary to perform CDE validation/correction for Rosebud Agency.

- Conducted a site assessment and scanned 77% of trust documents necessary to perform CDE validation/correction for Miami Agency.

## Delays and Obstacles

Lack of access to the Internet has resulted in: (1) communication delays; (2) adverse project coordination issues; (3) increased administrative program costs; and (4) the overall DQ&I project being unable to take full advantage of available information technology.

## Assurance Statement

I concur with the content of the information contained in this Trust Data Quality and Integrity section of the *Status Report to the Court Number Twenty-Four.* The information provided in this section is accurate to the best of my knowledge.

Date:  January 23, 2006

Name: *Signature on File*
        John E. White
        Trust Reform Officer
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006                              **Indian Fiduciary Trust Training Program**

## 3.    INDIAN FIDUCIARY TRUST TRAINING PROGRAM

**Introduction**

Interior has a continuing responsibility to provide adequate staffing, supervision and training for trust fund management and accounting activities.  Fiduciary trust training is essential to the success of Interior's trust reform efforts and forms an integral part of all training for Interior employees who are involved in the management of Indian trust assets.

**Accomplishments and Completions**

OST offered two sessions of the course, *Fiduciary Overview Program*, presented by Cannon Financial Institute, with 52 OST, BIA and tribal personnel attending during this reporting period. A total of 736 people have attended this course since March 2003.  Two additional sessions are expected to be presented during the next reporting period.  This course compares and contrasts the federal Indian trust administered through Interior with private sector trusts administered through banks and other financial institutions.

During this reporting period, Cannon Financial Institute personnel also presented the *Risk Management, Wills & Probate, Accounting* and *Asset Management* specialty courses to 183 OST, BIA and tribal personnel.  These four courses are part of the previously reported six-course certification program.  Additional sessions of all six specialty courses are expected to be presented during the next reporting period.

During this reporting period, 20 OST personnel completed the *Certified Indian Fiduciary Trust Specialist* review session.

During this reporting period, OST training staff conducted six training sessions in TFAS, CSS, StrataVision and the historical query database for 59 OST, BIA and contractor staff.

OST and BIA staff presented the three-day course, *Trust Fundamentals,* to 35 OST, BIA and tribal staff.  This course includes such topics as the history and policy of Indian trust, current trust reform activities, job roles and responsibilities, and organization and working relationships. This course is expected to be presented again during the next reporting period.

During this reporting period, OST training staff conducted two weeks of the three week *Fiduciary Trust Officer and Deputy Superintendent for Trust Orientation Program.*  Fifteen OST and BIA staff attended the training.  The third week is expected to be presented during the next reporting period.

**Current Status**

Construction continues on the NIPTC in Albuquerque.  Opening ceremonies are expected to be held during April, 2006.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                    **Indian Fiduciary Trust Training Program**

<u>Delays and Obstacles</u>

The lack of Internet access inhibits electronic communication with other governmental agencies and contractors, hinders the research of training tools and potential contractors, and restricts OST's ability to access online training programs.

<u>Assurance Statement</u>

I concur with the content of the information contained in the Indian Fiduciary Trust Training Program section of the *Status Report to the Court Number Twenty-Four.* The information provided in this section is accurate to the best of my knowledge.

Date:   January 17, 2006

Name: *Signature on File*
        Dianne M. Moran
        Director, Trust Training
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                              **Risk Management**

### 4.    RISK MANAGEMENT

#### Introduction

The objectives of the risk management initiative are to design, deliver, and implement a comprehensive risk management program that includes extensive management controls for monitoring and evaluating Interior's Indian trust asset management program. The risk management program continues to be implemented by TPMC. OTRA monitors and evaluates management corrective action plans to mitigate control deficiencies.

#### Accomplishments and Completions

During this reporting period:

- Risk management content was accepted by OSM staff.

- OST risk management corrective action plans were loaded into the RM-PLUS tool to provide automated tracking.

#### Current Status

The RM-PLUS tool content for the Trust Beneficiary Call Center is under development.

OST continues to work with OSM and BLM on the IT security requirements to allow training to begin on the RM-PLUS tool.

#### Delays and Obstacles

The lack of Internet access complicates the implementation and use of RM-PLUS, since it is designed as a web-based application.

#### Assurance Statement

I concur with the content of the information contained in the Risk Management section of the *Status Report to the Court Number Twenty-Four*. The information provided in this section is accurate to the best of my knowledge.

Date:   January 23, 2006

Name:  *Signature on File*
       John Bennett
       Acting Deputy Special Trustee, Trust Accountability
       Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006                    Regulations, Policies and Procedures

## 5.    REGULATIONS, POLICIES AND PROCEDURES

**Introduction**

OTP in OST was established on April 21, 2003, to assist Interior in establishing "consistent, written policies and procedures for trust fund management and accounting" as stated in the 1994 Act.  OTP oversees and facilitates the development, promulgation and coordination of trust-related regulations, policies, procedures and other materials to guide the proper discharge of Interior's fiduciary responsibilities.  OTP is separate from BIA's PPA, which is responsible for policies, procedures and regulations affecting all BIA activities.  PPA activities thus are reported in the BIA section of the reports to the Court.

**Current Status**

OTP continues to develop the draft OST Directives System Handbook.  Publication of the handbook still is expected by the end of the second quarter of FY2006.

The Reporting and Reconciliation DOP, which includes procedures for reconciling financial transactions and preparing financial statements, as well as reporting to Treasury, IRS and beneficiaries, was delayed in order to include enhanced processes.  Completion and issuance now is expected during the next reporting period.

Proposed changes to the Account Maintenance DOP and the Disbursing DOP, specific to the Osage Nation, were completed and sent for field staff review.  Final issuance is now expected in the next reporting period.

**25 CFR 1200 – American Indian Trust Fund Management Reform Act.**  As a result of edits during the final approval process, publication now is expected by the end of the next reporting period.

**Delays and Obstacles**

Lack of access to the Internet and its repository of online statutes, the Federal Register and other resources continues to present challenges to this office.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                    **Regulations, Policies and Procedures**

**Assurance Statement**

I concur with the content of the information contained in the Office of Trust Regulations, Policies and Procedures section of the *Status Report to the Court Number Twenty-Four*.  The information provided in this section is accurate to the best of my knowledge.


Date:   January 23, 2006

Name: *Signature on File*
        Philip Viles, Director
        Office of Trust Regulations, Policies and Procedures
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                                                 **Appraisal**

### D.    FIELD OPERATIONS

### 1.    APPRAISAL

__Introduction__

The Office of Appraisal Services, under a management contract with NBC-ASD, is responsible for Indian Land valuations. The contract was established to provide impartial estimates of market value for a variety of real property interests on land owned in trust or restricted status by individual Indians, Alaska Natives, and Indian Tribes. Various regulations governing Indian trust lands require valuations. To meet this requirement, an appraisal or other valuation method is used to determine fair market value of Indian lands.

__Accomplishments and Completions__

The MOU between OST and NBC for management of OAS was renewed for FY2006.

A Deputy Chief Appraiser for Policy and Compliance, and a Deputy Chief Appraiser for OST have been hired. Both are scheduled to report for duty in the next reporting period.

The position of Regional Supervisory Appraiser for the OAS Northwest Region was filled during this reporting period. OAS also filled a permanent review appraiser position in the Rocky Mountain Region.

The establishment of the OME within ASD was completed. The Chief Minerals Appraiser and the primary support staff are expected to be hired in the next reporting period. OME will establish the line of authority for mineral appraisals and will perform mineral evaluation services for clients in support of ILCA.

OAS has contracted to facilitate the migration of the Appraisal Request and Review Tracking System (ARRTS) into OAS, conduct a fractionated interest study, and provide contracted appraisal services.

__Current Status__

ASD, in coordination with OST, continues to conduct a comprehensive analysis of OAS staff and training requirements. Temporary review appraiser positions were added in the Alaska, Rocky Mountain and Western Regions, to help reduce the backlog in those areas. The contracted appraisal services will provide additional support in the Rocky Mountain and Northwest Regions to supplement the existing workforce.

A department-wide appraisal policy handbook, which incorporates the OAS handbook section, was completed in draft form and circulated for comment. Comments continue to be solicited and the handbook is expected to be approved by the end of the third quarter of FY2006.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                                    **Appraisal**

**Appraisal Backlog**

As of this reporting period, the appraisal backlogs are as follows:

|  | **Appraisal Backlog As of 9/30/05** | **Appraisal Backlog * As of 12/30/05** |
|---|---|---|
| Northwest | 470 | 285 |
| Rocky Mountain | 811 | 758 |
| Midwest | 43 | 62 |
| Western | 37 | 153 |
| Southwest | 13 | 12 |
| Eastern Oklahoma | 68 | 85 |
| Navajo | 15 | 30 |
| Pacific | 0 | 0 |
| Alaska | 325 | 407 |
| Eastern | 0 | 0 |
| Southern Plains | 4 | 4 |
| Great Plains | 10 | 5 |
| **TOTAL** | **1,796** | **1,801** |

> \* The backlog includes all requests from BIA whether or not they are required for a proposed transaction. The requests are addressed in priority order based on factors such as court-ordered transactions, economic transactions, and rights-of-way transactions. The remaining appraisal requests for which no transaction is pending may appear on the backlog list until appraisal staff has completed priority assignments.

This table does not include appraisal backlog information from the compacted and contracted Tribes. The MOUs that currently are being negotiated with Tribes require quarterly reporting of backlog information. This information is expected to be incorporated into future reports to the Court.

<u>**Delays and Obstacles**</u>

The inability to utilize the Internet as a tool to communicate with outside contacts to research comparable sales and other information is a continuing hardship.

Difficulties continue in recruiting qualified appraisers for permanent, temporary and contract positions, particularly in remote locations.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                                                    **Appraisal**

**Assurance Statement**

I concur with the content of the information contained in the Appraisal section of the *Status Report to the Court Number Twenty-Four.*  The information provided in this section is accurate to the best of my knowledge.

Date:   January 26, 2006

Name: *Signature on File*
         Brian M. Holly, MAI
         Appraisal Services Directorate
         National Business Center

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006                                    **Current Accounting Activities**

### E.    TRUST SERVICES

### 1.    CURRENT ACCOUNTING ACTIVITIES

<u>**Introduction**</u>

Current accounting activities focus on:  (a) whereabouts unknown accounts; (b) trust funds accounting system; (c) special deposit accounts; (d) small balance accounts; and (e) accounting discrepancies.

WAU are classified as such for various reasons, including (a) new accounts established without an address, (b) mail returned for invalid address and (c) account holder refused or did not claim mail.  A variety of methods and means are used to locate WAU account holders.

TFAS is a generic term for a COTS trust fund accounting system that provides the basic receipt, accounting, investment, disbursing and reporting functions common to commercial trust funds management operations.

SDA are temporary accounts for the deposit of trust funds that cannot immediately be credited to the proper account holders.  As explained in the BIA/OST Interagency Procedures Handbook, this type of account is to be used only as an exception to the rule that trust funds immediately be deposited to the credit of, and then distributed as soon as practicable to, the individual and tribal beneficiaries.  The SDA project has two sub-projects: the retrospective (pre-January 1, 2003, receipts) and the prospective (post-December 31, 2002, receipts) phases.  OHTA has responsibility for "resolution" (i.e., research and distribution of funds) of the retrospective phase, while BIA has comparable responsibility for the prospective phase.  This section of the report to the Court thus addresses only the prospective phase.

Small balance accounts are defined as those with balances of $.01 - $1.00 and no activity in the preceding eighteen months.  Management expenses for these accounts are considerable, in part because (as directed by Congress) annual statements must be sent to these account holders.

Various accounting discrepancies that existed prior to the conversion to TFAS still need research and resolution.  Some may impact individual accounts.  At present, OST has a daily and monthly reconciliation process in place to ensure that transactional reporting to Treasury is accurate and that any discrepancies are researched and reconciled during the next accounting period.  While this process ensures resolution of current discrepancies in timely fashion, separate research and reconciliation efforts are needed to address the pre-TFAS discrepancies.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006                                          **Current Accounting Activities**

### a.     Whereabouts Unknown Accounts

**Current Status**

During this reporting period, 2,330 accounts with a combined balance of $2.3 million were added to the WAU list, and 4,268 account holders with a combined balance of $5.6 million were located.

Priority continues to be placed on securing current addresses for account holders of the rolling top 100 highest dollar balance WAU accounts. During this reporting period, 10 of the top 100 WAU accounts, with combined account balances in excess of $1.1 million, were updated with current addresses.

As of December 31, 2005, there were 44,692 WAU accounts with a combined balance of $64,320,390. The following table illustrates the number of accounts stratified by account balance and WAU category:

| Account balance | Correspondence/ Check Returned | Account Setup No Address | Awaiting Address Confirmation | Refused/ Unclaimed Mail | Total |
|---|---|---|---|---|---|
| Equal to or over $100,000 | 19 | 10 | 0 | 0 | 29 |
| Under $100,000 and equal to or over $50,000 | 39 | 15 | 0 | 0 | 54 |
| Under $50,000 and equal to or over $5,000 | 1,983 | 806 | 0 | 2 | 2,791 |
| Under $5,000 and equal to or over $1,000 | 6,024 | 1,571 | 4 | 7 | 7,606 |
| Under $1,000 and equal to or over $100 | 8,234 | 3,128 | 7 | 3 | 11,372 |
| Under $100 and equal to or over $1 | 11,641 | 4,654 | 10 | 3 | 16,308 |
| Under $1 | 3,216 | 3,300 | 12 | 4 | 6,532 |
| **Total** | 31,156 | 13,484 | 33 | 19 | 44,692 |

**Delays and Obstacles**

The influx of WAU accounts categorized as "Account Setup No Address" causes the total number of WAU accounts to remain relatively constant. These accounts primarily result from a lack of current addresses for individual heirs named in probate orders or recipients of per capita distributions. Also, accounts are being created in TFAS for non-financial asset owners in order to generate asset statements. Many of these owners do not have current addresses. As a result, the total number of WAU is expected to increase significantly.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006            **Current Accounting Activities**

There presently are 16,844 supervised IIM account holders (minors, emancipated minors, adults in need of assistance, and non-compos mentis) coded as WAU. Updating supervised account addresses coded as WAU presents a challenge, since BIA Social Services must verify and update the address changes to these accounts.

The lack of Internet access limits communication effectiveness. OST and its contractor must rely primarily on mail and telephone communication with IIM account holders.

### b.     Trust Funds Accounting System

**Accomplishments and Completions**

For pilot agency account holders, TFAS began automatically posting real property income to accounts based upon the beneficial title interest recorded in TAAMS.

A trust funds receivable system for the pilot agencies was implemented.

A commercial lockbox for receipt of fiduciary trust funds was implemented nationwide. During this reporting period, 16,412 checks totaling in excess of $131 million were collected.

### c.     Special Deposit Account Activity

**Current Status**

BIA has the responsibility for distribution of SDA funds received since January 1, 2003 (prospective receipts). It is the policy of BIA to distribute funds within 30 days of receipt into SDA. During this reporting period, there were 27,178 receipt transactions posted to SDA. Of these, 6,956 were undistributed and aged more than 30 days as of December 31, 2005.

During this reporting period, aged funds were held in 205 more SDA than in the previous reporting period. Undistributed aged receipts increased by 7,887 and the combined dollar amount increased by $2,222,261.29. As of December 31, 2005, funds were held in SDA with a combined dollar amount of $3,764,723.98, which represented 9,285 undistributed receipts aged over 30 days from January 1, 2003, through December 31, 2005. As of December 31, 2005, there were 706 receipts in 185 SDA aged more than one year for a combined dollar amount of $450,907.52.

During this reporting period, OST contractors continued to assist the Fort Belknap Agency to reduce its backlogs by encoding probate orders into BIA's IRMS. Reducing backlogs assists agencies with their SDA distribution efforts.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                    **Current Accounting Activities**

<u>Delays and Obstacles</u>

Some BIA agencies still are not utilizing StrataVision to obtain current aging reports to assist in the monitoring and management of their SDA receipt activity.  OST continues to make training available to encourage the use of StrataVision.

### d.    Small Balance Accounts

As of December 31, 2005, there were 15,670 accounts that have a $.01 - $1.00 balance with no activity for the previous 18 months.  The total sum included in those accounts is $2,459.82.  Statements are sent to account holders for these accounts on an annual basis pursuant to direction from Congress.

### e.    Accounting Discrepancies

As previously reported, Interior submitted to Congress a legislative proposal to resolve the approximate $6 million difference between the subsidiary account ledger (liabilities) and the IIM investment pool (assets).  During this reporting period, congressional staff requested additional and detailed information regarding the proposal, which is expected to be submitted during the next reporting period.

# Note:  This section continues on the next page.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006                                    **Current Accounting Activities**

**Assurance Statements**

I concur with the content of the information contained in the Accounting Discrepancies subsection of the Current Accounting Activities section of the *Status Report to the Court Number Twenty-Four*.  The information provided in this subsection is accurate to the best of my knowledge.

Date:   January 25, 2006

Name: *Signature on File*
          Margaret Williams
          Deputy Special Trustee, Trust Services
          Office of the Special Trustee for American Indians


I express no opinion on the content of the Accounting Discrepancies subsection, above.  I concur with the content of the information contained in the balance of the Current Accounting Activities section of the *Status Report to the Court Number Twenty-Four*, and this information is accurate to the best of my knowledge.

Date:   January 27, 2006

Name: *Signature on File*
          John Bennett
          Acting Deputy Special Trustee, Trust Accountability
          Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                    **Trust Regulations, Policies and Procedures**

IV.    **BUREAU OF INDIAN AFFAIRS**

A.    **TRUST REGULATIONS, POLICIES AND PROCEDURES**

**Introduction**

The Office of Planning and Policy Analysis (PPA) in the Office of the Assistant Secretary – Indian Affairs was established on April 21, 2003. PPA is responsible for developing and promulgating Indian Affairs directives. PPA is separate from OST's Office of Trust Regulations, Policies and Procedures, whose activities are reported in the OST section of the status reports to the Court.

**Accomplishments and Completions**

**25 CFR 243 – Reindeer in Alaska –** The final rule was published in the Federal Register on January 13, 2006, and will take effect on February 13, 2006.

**60 IAM Information Resources Management –** On December 27, 2005, AS-IA approved 60 IAM 1.

**Current Status**

**Regulatory Initiative**

The Regulatory Initiative covers the following draft regulations:

- **25 CFR 15 - Indian Probates**
- **25 CFR 151 – Land Acquisitions**
- **25 CFR 152 - Land Disposals**
- **25 CFR 162, Subparts A, B, E, F, G and H – Leases and Permits**
- **25 CFR 166 – Grazing Permits**
- **25 CFR 179 – Life Estates**
- **25 CFR 18/New – Tribal Probate Codes**
- **25 CFR New – Administrative Accounting and Appeals Process**
- **25 CFR New – WAU**
- **25 CFR New - Fees**
- **43 CFR 4 – OHA**

The preliminary draft regulations have been distributed to Indian Affairs staff and Tribes as part of the consultation effort prior to publication in the Federal Register. Publication is expected before the end of CY2006.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006                    **Trust Regulations, Policies and Procedures**

**25 CFR 216 – Surface Exploration, Mining, and Reclamation of Lands –** Publication of the proposed revisions is expected during the third quarter of CY2006.  This regulation has been removed from the Regulatory Initiative.

**25 CFR 162 – Leases and Permits, Subparts C and D – Residential Leases and Business Leases –** The project continues on schedule, with the final rule expected to be published during the first quarter of CY2006.

**25 CFR 169 – Rights-of-Way Over Indian Lands –** Publication of the handbook was delayed and is currently under review by SOL.  The handbook is expected to be published in the second quarter of CY2006.

**Delays and Obstacles**

Lack of access to the Internet has hindered PPA's ability to research statutes and departmental manuals and makes distribution of documents for review by Tribes more difficult and costly.

**Assurance Statement**

I concur with the content of the information contained in the Trust Regulations, Policies and Procedures – BIA section of the *Status Report to the Court Number Twenty-Four*.  The information provided in this section is accurate to the best of my knowledge.

Date:   January 27, 2006

Name:  *Signature on File*
         Debbie L. Clark
         Acting Director, Office of Planning and Policy Analysis
         Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                                          **Fractionation**

## B.    FRACTIONATION

### Introduction

Fractionation of Indian trust and restricted land stems from the federal Indian policy of the 19th Century.  Fractionation occurs as land passes from one generation to the next and more and more heirs or devisees acquire an undivided interest in the land.  This is a complex and potentially emotionally-charged issue, due primarily to cultural differences, historical legacy and family associations of the present owners with the original Indian owners of those lands.  Efforts to address this complex issue are coordinated primarily through the BIA Indian Land Consolidation Office, which seeks to help Tribes make use of the opportunities offered by the Indian Land Consolidation Act, as amended in 2004.  ILCO is operating several acquisition projects and, from there, a nationwide plan is being implemented to promote consolidation of the ownership of Indian land.

### Accomplishments and Completions

- Acquired 18,783 fractional interests during this reporting period, for a cumulative total of 202,775 interests for ILCP in the Midwest, Northwest, Western, Eastern Oklahoma, Navajo, Rocky Mountain and Great Plains Regions.
- Of the total interests acquired, 86% were interests of less than 2% ownership in the respective tracts of land.
- Acquired a cumulative total equivalent of 228,837.49 acres for the project reservations.

### Current Status

ILCO continues to manage active acquisition programs for 18 reservations within seven BIA regions.  All acquisition sites have been provided set budgets and guidance to assist their achievement of identified acquisition goals for FY2006.

Due to the volume of beneficiary requests to sell their land interests, the annual appropriations for purchases are expected to be exhausted before the end of the FY2006.  If funds are exhausted, there currently is no expectation of additional acquisition funding.

Current ILCP activities include:

- Maintaining current support for the 18 participating reservations based on available funding;
- Continuing to target and acquire additional *Youpee* interests.
- Continuing implementation of LCTS.  Completed field staff training in November 2005. Continuing to work with AS-IA CIO to obtain acceptance from BIA's Change Control Board of the first user version.  Until acceptance is granted, field staff will maintain manual report efforts and will also begin to populate LCTS fields for comparison of data and report generation accuracy.  Comparison of data from both sources will be validated over a period

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                                    **Fractionation**

of at least two months to ensure accuracy and efficiency of LCTS.  LCTS project is expected to be completed during FY2006.

## Delays and Obstacles

- Providing support to the Great Plains and Southwest Regional LTROs to assist with recording ILCP deeds, re-vesting *Youpee* interests, researching ownership files and recording to ownership records reduces the availability of ILCP funds for acquisitions of land interests.
- Probate backlog and *Youpee* issues continue to impede the land-purchase transaction process.
- Lack of Internet access results in slower processing of applications from potential sellers and hinders searches for WAU account holders.

## Assurance Statement

I concur with the content of the information contained in the Fractionation section of the *Status Report to the Court Number Twenty-Four.*  The information provided in this section is accurate to the best of my knowledge.

Date:   January 12, 2006

Name: *Signature on File*
　　　　Robert R. Jaeger
　　　　Director, Indian Land Consolidation Office
　　　　Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                                         **Probate**

### C.    PROBATE

**Introduction**

Federal law permits Indian owners to pass title to their trust assets by testamentary devise or by intestate succession, and imposes upon Interior the duty of determining the legal heirs.  BIA, OHA and OST must coordinate their work to complete the probates of Indian estates. Information on the status of probates is contained within the ProTrac system.  Each BIA regional office and corresponding agency is responsible for encoding new cases, examining "initial load" cases and making corrections.  Data-cleanup continues in an effort to make ProTrac a more complete source of probate data.

**Current Status**

**Case Preparation**

According to ProTrac, 7,775 probate cases are in the case preparation stage.

**Case Adjudication**

According to ProTrac, 4,671 probate cases are in the case adjudication stage.  As reported by OHA, deciding officials received 1,524 cases and issued decisions in 1,035 cases.  OHA reported 3,434 cases pending.

**Case Closure**

According to ProTrac, there are 4,446 cases in the closing stage.  Cases in the closing stage are ones that have been adjudicated but not distributed either in TFAS or at the LTRO.

**Financial Case Closure**

OST reported that it distributed funds and closed 1,225 accounts in TFAS, representing 1,175 estates.  As of the end of December 2005, TFAS contained 30,368 open estate accounts, which is an increase of 132 from the 30,236 estate accounts at the end of the last reporting period.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                                         **Probate**

**Probate Handbook**

During this period, SOL completed its review of the handbook.  Publication is expected to occur in the next reporting period.

**<u>Delays and Obstacles</u>**

The following obstacles have been identified as having an impact on the progress of the probate program:

- Lack of access to the Internet, which includes the inability to use electronic mail communication between OHA and BIA/OST;
- Continued fractionation of ownership of Indian lands;
- Numerous initiatives competing for resources (e.g., *Youpee* revestitures, *Cobell* requirements);
- Cultural diversities regarding the subject of death;
- Completion of implementation of the probate reorganization.

**<u>Assurance Statement</u>**

I concur with the content of the information contained in the Probate section of the *Status Report to the Court Number Twenty-Four*.  The information provided in this section is accurate to the best of my knowledge.

Date:  January 27, 2006

Name: *Signature on File*
        William Titchywy
        Acting Special Projects Director
        Western Region
        Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

February 1, 2006                                      **Acronyms and Abbreviations**

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| 1994 Act (or Act) | American Indian Trust Fund Management Reform Act of 1994 |
| A-130 | Office of Management and Budget Circular A-130 Appendix III |
| ADM | Attorney Decision Makers |
| AFMSS | Automated Fluid Mineral Support System |
| AIMS | ActivCard Identity Management System |
| AIPRA | American Indian Probate Reform Act |
| AIRR | American Indian Records Repository |
| ALIS | Alaska Land Information System |
| ALJ | Administrative Law Judges |
| ARO | Alaska Region office |
| ARRTS | Appraisal Request and Review Tracking System |
| ART | Accounting Reconciliation Tool |
| AS-IA | Assistant Secretary-Indian Affairs |
| ASD | Appraisal Services Directorate |
| ATO | authority to operate |
| BIA | Bureau of Indian Affairs |
| BIAM | Bureau of Indian Affairs Manual |
| BISS | Box Index Search System |
| BLM | Bureau of Land Management |
| BOR | Bureau of Reclamation |
| BPA | Blanket Purchase Agreement |
| BRM | Business Reference Model |
| C&A | Certification and Accreditation |
| CARS | Cadastral Automated Request System |
| CDE | Critical Data Elements |
| CFedS | Certified Federal Surveyor |
| CFI | Continuous Forest Inventory |
| CGI | Software vendor successor to TAAMS vendor |
| CGIS | Cadastral Geographic Information Systems |
| CIFTA | Certified Indian Fiduciary Trust Analyst |
| CIFTS | Certified Indian Fiduciary Trust Specialist |
| CIO | Chief Information Officer |
| CIRC | Computer Incidents Response Center |
| CISSP | Certified Information System Security Professional |
| CMS | Credential Management System |
| COTS | Commercial off-the-shelf |
| CPIC | Capital Planning and Investment Control |
| CSIRC | Computer Security Incident Response Capability |
| CSIRT | Computer Security Incident Response Team |
| CSS | Customer StrataStation |
| CTM | Comprehensive Trust Management Plan |
| DAA | Designated Approving Authority |
| DEAR | DOI Enterprise Architecture Repository |

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                    **Acronyms and Abbreviations**

| | |
|---|---|
| DDoS | Distributed Denial of Service |
| DLRM | DOI Land and Resource Management |
| DM | Departmental Manual |
| DNS | Domain Name Server |
| DOI | Department of the Interior |
| DOP | Desk Operating Procedure |
| DoS | Denial of Service |
| DQ&I | Data Quality and Integrity |
| DRM | Data Reference Model |
| EA | Enterprise Architecture |
| ENA | Eastern Navajo Agency |
| EORO | Eastern Oklahoma Region office |
| ERO | Eastern Region office |
| ESN | Enterprise Services Network |
| FAMS | Facilities Asset Management System |
| FAR | Federal Acquisition Regulation |
| FFMIA | Federal Financial Management Improvement Act |
| FIMO | Farmington Indian Minerals Office |
| FIPS | Federal Information Processing Standards |
| FISMA | Federal Information Security Management Act |
| FMFIA | Federal Managers' Financial Integrity Act |
| FRC | Federal Records Center |
| FRD | Functional Requirements Document |
| FTM | Fiduciary Trust Model |
| FTO | Fiduciary Trust Officer |
| GAO | Government Accountability Office |
| GCDB | Geographic Coordinate Data Base |
| GIS | Geographic Information System |
| GLO | General Land Office |
| GLADS | Great Lakes Agency Database System |
| GPRO | Great Plains Region office |
| GPS | Global Positioning System |
| GSA | General Services Administration |
| GSS | General Support Systems |
| HSPD-12 | Homeland Security Presidential Directive 12 |
| IAM | Indian Affairs Manual |
| IATO | Interim Approval to Operate |
| IEA | Interior Enterprise Architecture |
| IFTR | Indian Fiduciary Trust Records |
| IG | Inspector General |
| IIM | Individual Indian Money |
| IITD | Individual Indian Trust Data |
| ILCA | Indian Land Consolidation Act |
| ILCO | Indian Land Consolidation Office |
| ILCP | Indian Land Consolidation Project |

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                      **Acronyms and Abbreviations**

| | |
|---|---|
| IM | Instruction Memorandum |
| InfoDat | Indian Forestry Database |
| Interior | Department of the Interior |
| IP | Internet Protocol |
| IPJ | Indian Probate Judges |
| IPv6 | Internet Protocol Version 6 |
| IQCS | Incidence Qualification and Certification System |
| IRM | Information Resources Management |
| IRMS | Integrated Records Management System |
| IRS | Internal Revenue Service |
| ISA | Information Security Assessment |
| IT | Information Technology |
| IV&V | independent verification and validation |
| LAN | Local area network |
| LCTS | Land Consolidation Tracking System |
| LMS | Learning Management System |
| LR2000 | Legacy Rehost 2000 System |
| LRIS | Land Records Information System |
| LTIC | Land Tenure in Indian Country |
| LTRO | Land Titles and Records Office |
| MA | Major Applications |
| MAD/LCP | Management Accounting Distribution/Land Consolidation Program |
| MADS | Management Accounting Distribution System |
| MMD | Missing Mandatory Documents for Unrestricted Accounts |
| MMS | Minerals Management Service |
| MOU | Memorandum or Memoranda of Understanding |
| MRM | Minerals Revenue Management |
| MRMSS | Minerals Revenue Management Support System |
| MWRO | Midwest Region office |
| NARA | National Archives and Records Administration |
| NBC | National Business Center |
| NILS | National Integrated Lands System |
| NIPTC | National Indian Programs Training Center |
| NIST | National Institute of Standards and Technology |
| NPS | National Park Service |
| NRO | Navajo Region office |
| NWRO | Northwest Region office |
| O&G | Oil and Gas |
| OAS | Office of Appraisal Services |
| OCIO | Office of the Chief Information Officer |
| OHA | Office of Hearings and Appeals |
| OHTA | Office of Historical Trust Accounting |
| OIG | Office of the Inspector General |
| OME | Office of Minerals Evaluation |
| OMB | Office of Management and Budget |

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                    **Acronyms and Abbreviations**

| | |
|---|---|
| OSM | Office of Surface Mining |
| OST | Office of the Special Trustee for American Indians |
| OTFM | Office of Trust Funds Management |
| OTP | Office of Trust Regulations, Policies and Procedures |
| OTR | Office of Trust Records |
| OTRA | Office of Trust Review and Audit |
| PAR | Performance and Accountability Report |
| PIV | Personal Identity Verification |
| PLSS | Public Land Survey System |
| PMSO | Project Management Support Office |
| POA&M | Plans of Actions and Milestones |
| Post-QA | Post Quality Assurance |
| PPA | Office of Planning and Policy Analysis |
| PRIS | Production and Response Information System |
| PRO | Pacific Region office |
| ProTrac | Probate Case Management and Tracking System |
| QA | Quality Assurance |
| QC | Quality Control |
| RAF | Recommended Action Forms |
| RAS | Rangeland Administration System |
| RDRS | Royalty Distribution and Reporting System |
| REM | Real Estate Module |
| RFP | Request for Proposal |
| RM-PLUS | Risk Management Assessment/Evaluation tool |
| RMRO | Rocky Mountain Region office |
| ROW | Rights-of-Way |
| SANS | SysAdmin, Audit, Network, Security |
| SCADA | Supervisory Control and Data Acquisition |
| SDA | Special Deposit Accounts |
| SDLC | System Development Life Cycle |
| SMEs | Subject Matter Experts |
| SMS | System Management Servers |
| SOL | Office of the Solicitor |
| SPRO | Southern Plains Region office |
| SSA | Social Security Administration |
| SSM | System Security Manager |
| SSP | System Security Plan |
| ST&E | Security Test and Evaluation |
| STIGs | Security Technical Implementation Guides |
| SUS | System Update Servers |
| SWRO | Southwest Region office |
| TAAMS | Trust Asset and Accounting Management System |
| TAP | Technical Architecture Profile |
| TBCC | Trust Beneficiary Call Center |
| TESC | Trust Executive Steering Committee |

*STATUS REPORT TO THE COURT NUMBER TWENTY-FOUR*

**February 1, 2006**                                      **Acronyms and Abbreviations**

| | |
|---|---|
| TFAS | Trust Fund Accounting System |
| TPMC | Trust Program Management Center |
| TRAC | Trust Tracking and Coordination |
| Treasury | Department of the Treasury |
| TRM | Technical Reference Model |
| TRO | Temporary Restraining Order |
| UAT | User Acceptance Testing |
| USGS | United States Geological Survey |
| USPAP | Uniform Standards of Professional Appraisal Practice |
| VBNS | Very High Performance Backbone Network Service |
| VPN | Virtual Private Network |
| WAN | Wide area network |
| WAU | Whereabouts Unknown |
| WRO | Western Region office |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

ELOUISE PEPION COBELL, et al.,    )
    )
    Plaintiffs,    )
    )
    v.    )    Case No. 1:96CV01285
    )    (Judge Lamberth)
DIRK KEMPTHORNE, Secretary of the  )
    Interior, et al.,    )
    )
    Defendants.    )
_____)

**NOTICE OF FILING OF INTERIOR DEFENDANTS'
TWENTY-SIXTH STATUS REPORT**

Interior Defendants hereby give notice of the filing of their twenty-sixth report due in

accordance with the Order of December 21, 1999.

A copy of the report is attached hereto.

Dated: July 31, 2006    Respectfully submitted,
    PETER D. KEISLER
    Assistant Attorney General
    STUART E. SCHIFFER
    Deputy Assistant Attorney General
    J. CHRISTOPHER KOHN
    Director

    /s/ John J. Siemietkowski____
    ROBERT E. KIRSCHMAN, Jr.
    (D.C. Bar No. 406635)
    Assistant Director
    JOHN J. SIEMIETKOWSKI
    Trial Attorney
    Commercial Litigation Branch
    Civil Division
    P.O. Box 875
    Ben Franklin Station
    Washington, D.C. 20044-0875
    Phone (202) 514-3368
    Fax (202) 514-9163

CERTIFICATE OF SERVICE

I hereby certify that, on July 31, 2006 the foregoing *Notice of Filing of Interior Defendants' Twenty-Sixth Status Report* was served by Electronic Case Filing, and on the following who is not registered for Electronic Case Filing, by facsimile:

Earl Old Person (*Pro se*)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
Fax (406) 338-7530

/s/ Kevin P. Kingston
Kevin P. Kingston



THE SECRETARY OF THE INTERIOR

WASHINGTON

JUL 2 7 2006

J. Christopher Kohn
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875

Re:    *Cobell v. Kempthorne* – *Status Report to the Court Number Twenty-Six*

Dear Mr. Kohn:

Enclosed is the Department of the Interior's *Status Report to the Court Number Twenty-Six (For the Period April 1, 2006 through June 30, 2006).* Please forward a copy to the Court.

My signature on this report reflects my reliance on the assurances of those who have compiled the report that the information contained herein is accurate.

Thank you for your assistance.

Sincerely,

DIRK KEMPTHORNE

Enclosure

# Status Report to the Court
# Number Twenty-Six

**For the Period**
**April 1, 2006 through June 30, 2006**



**July 27, 2006**

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                    **Table of Contents**

### TABLE OF CONTENTS

I.     **INTRODUCTION**.................................................................. 1

  A.  **INFORMATION TECHNOLOGY** ...................................... 2

  B.  **CADASTRAL SURVEY** ....................................................... 9

  C.  **MINERALS MANAGEMENT SERVICE** ........................... 12

  D.  **OFFICE OF HISTORICAL TRUST ACCOUNTING** .............. 14

II.   **OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS**.................. 18

  A.  **TRUST REVIEW AND AUDIT** .................................... 20

  B.  **OST-OFFICE OF THE CHIEF INFORMATION OFFICER**................................. 22

    1.  **RECORDS MANAGEMENT** ...................................... 22

  C.  **TRUST ACCOUNTABILITY** ......................................... 25

    1.  **TRUST BUSINESS PROCESS MODELING** ................ 25

    2.  **TRUST DATA QUALITY AND INTEGRITY** .............. 27

    3.  **INDIAN FIDUCIARY TRUST TRAINING PROGRAM** ... 30

    4.  **RISK MANAGEMENT** ............................................ 32

    5.  **REGULATIONS, POLICIES AND PROCEDURES** ........... 34

  D.  **FIELD OPERATIONS** .................................................. 35

    1.  **APPRAISAL** ........................................................... 35

  E.  **TRUST SERVICES** ....................................................... 38

    1.  **CURRENT ACCOUNTING ACTIVITIES** .................. 38

III.  **BUREAU OF INDIAN AFFAIRS** ...................................... 42

  A.  **TRUST REGULATIONS, POLICIES AND PROCEDURES** ......... 42

  B.  **FRACTIONATION** ........................................................ 44

  C.  **PROBATE** ................................................................... 46

**ACRONYMS AND ABBREVIATIONS**............................................... 48

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                              **Introduction**

## I.    INTRODUCTION

This *Status Report to the Court Number Twenty-Six* (Report) represents the period from April 1, 2006, through June 30, 2006.  The Report is presented for the purpose of informing the Court of actions taken since the issuance of the preceding quarterly report.  In addition, the Report references some matters that might be of interest to the Court, including delays in and obstacles to trust reform activities, and a report on the progress of the historical accounting of individual Indian beneficiary funds managed by Interior.[1]

This Report is prepared in a manner consistent with previous reports to the Court.  Managers from the Office of the Chief Information Officer, Bureau of Indian Affairs, Bureau of Land Management, Minerals Management Service, Office of the Special Trustee for American Indians, and Office of Historical Trust Accounting submit reports on the status of their respective Indian trust activities.

A change in the Report format Interior brings to the Court's attention is that Section E, Trust Services, Subsection 1, Current Accounting Activities, will not include a subsection on Accounting Discrepancies.  Previous reports explained that certain historic discrepancies resulted from overpayments to Indian beneficiaries and several legislative initiatives have been presented to Congress requesting authority to resolve these discrepancies.  Should this matter be resolved, it will be addressed in a future report to the Court.

A glossary of acronyms and abbreviations is included in this Report.  The glossary is located at the end of the Report.

---

[1]   This Report contains information on the broad trust reform efforts underway at Interior.  Accordingly, it may include information on reform efforts that are not within the scope of the *Cobell* litigation.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                      **Information Technology**

### A.     INFORMATION TECHNOLOGY

**<u>Introduction</u>**

This section describes the status of Interior IT systems, particularly the systems that house or provide access to IITD or provide various computing capabilities, including functions critical to the proper administration of the individual Indian trust responsibilities within Interior.  In addition, this section describes various efforts being made to improve IITD security within Interior, pursuant to OMB Circular A-130 Appendix III, and the status of Internet connectivity.

**<u>Accomplishments and Completions</u>**

**Computer Security:**
Interior continued to make progress in enhancing IT security by planning and conducting exercises for contingencies, addressing privacy issues and implementing corrective actions for weaknesses tracked through the POA&M process.  The most noteworthy accomplishments, completions and challenges during the reporting period are described below.

>   *ESN:*
>   - Reconfigured DNS services from individual bureau servers to a single Interior-wide server.  This enhances the security posture of the Department by reducing the number of external-facing systems that must be managed and secured.
>
>   *Prevention and Monitoring:*
>   - Interior has determined that the process for external vulnerability scanning needs refining and has initiated process review and improvement.  Expected changes will further enhance the integrity of the external scanning results.
>
>   - There were no successful security incidents detected during this reporting period that resulted in the compromise of trust systems or data.
>
>   *MMS*
>   - MMS completed a thorough investigation of the incident involving the MRM Internet Portal that was previously reported to the Court on August 25, 2005, and in the *Status Report to the Court Number Twenty-Three*.  MMS has taken appropriate remediation actions based on a risk analysis and has informed the Interior CIO of its intent to make the MRM Internet Portal operational.
>
>   *Policies and Guidance*
>   - The Interior CIO issued "Data Standardization Procedures (OCIO DIRECTIVE 2006-011)" to the assistant secretaries and heads of bureaus and offices on April 18, 2006.  Generally, the standardization of data enables seamless sharing of data and allows for easier translation and reconciliation of data, thus reducing costs involved in converting data to an acceptable form before use.

2

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                    **Information Technology**

- The Interior CIO issued memorandum "Departmental Web Standards Handbook" to the Deputy Secretary, Associate Deputy Secretary, assistant secretaries, heads of bureaus and offices, and bureau chief information officers on May 1, 2006. This memorandum transmitted the first version of the Departmental Web Standards Handbook, which provides guidance for the development and management of web-related initiatives.

- The Interior CIO issued "Controlled Logical Access Policy (OCIO DIRECTIVE 2006-015)" to the heads of bureaus and offices, and bureau chief information officers on June 1, 2006. This directive transmitted Interior's policy on the factors to be considered to determine the appropriate authentication methods for information systems. These factors include the information system's security categorization and residual risks.

- The Interior CIO issued "Office of Management and Budget (OMB) Requirements for Safeguarding Personally Identifiable Information (OCIO DIRECTIVE 2006-016)" to the Deputy Secretary, assistant secretaries, deputy assistant secretaries, Associate Deputy Secretary, heads of bureaus and offices, and bureau chief information officers on June 15, 2006. This directive transmitted guidance to review policies and procedures involved in safeguarding Personally Identifiable Information (PII) as required in OMB's memorandum M-06-15.

- The Secretary of the Interior issued "Important Notice on Safeguarding Personally Identifiable Information" to all employees on June 20, 2006. This notice reminded all employees of their responsibility in safeguarding PII entrusted to them. It also emphasized what information is considered PII, the consequences of mismanagement of that information and the policy and procedures for reporting violations.

- BLM issued the following Instruction Memoranda (IM):
  - IM 2006-133 was issued on April 17, 2006, and establishes current fiscal year policies for IT security controls for computers used on incident support activities.
  - IM 2006-137 was issued on April 20, 2006, and sets policies requiring regular updates of security patches for laptop and notebook computers.
  - IM 2006-140 was issued on April 25, 2006, and implements the departmental POA&M standard.
  - IM 2006-154 was issued on May 11, 2006, and establishes procedural requirements for requesting background investigations for BLM employees and contractors.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                    **Information Technology**

*Training and Awareness*
- Interior participated in a nation-wide Federal Continuity of Operations Program exercise. This exercise tested existing IT disaster and recovery plans, including notification of key personnel, relocation of primary processing to backup sites and return to normal operations following the event. This exercise evaluates plans for continued operation in the event of local, regional or nation-wide events, and enables planners to identify potential weaknesses or deficiencies in the plans.

**Plans of Action and Milestones:**
- Interior has reduced weaknesses, tracked by POA&M, an average of 9.4 percent for each of the last two quarters. Interior remediated and closed out 272 weaknesses during this reporting period. Interior continues to address the remaining 1,098 open weaknesses.

**A-130 Certification and Accreditation:**
- NBC has completed an independent security assessment of its IT environment to determine the current status of their information security program and establish a target for improvement for any weaknesses. Remediation plans have been developed for identified weaknesses and are being tracked through the POA&M process.

- Land Ownership Tracking System (LOTS) was erroneously referred to as a BIA system in the last *Status Report to the Court*. LOTS is operated by an Indian Tribe to track land ownership and is not an Interior trust system. It is expected that the functionality of LOTS will be incorporated into TAAMS once TAAMS is made available to tribes.

- OHANet was issued a new accreditation on June 30, 2006 after undergoing re-certification and accreditation due to significant changes in access and security controls.

**IT Systems Architecture:**
- DOI upgraded the DEAR software to eliminate the need for each bureau to have separate databases that require periodic updates to the master database. This upgrade enables all modifications to bureau EA records to be made in real-time to the master DEAR database repository.

- OCIO sponsored a two-day design review, attended by representatives from all bureaus and offices, to formulate plans for establishing one set of logical access controls in support of several proposed or forthcoming Department-wide IT systems (e.g., Enterprise Messaging System, Financial Business Management System, DLRM). The enterprise-wide active directory would enable identification and authentication of authorized users to Interior's IT systems. The review team determined that the "best security practice" would be to segment, on a unique subnet, the systems that required higher security controls, regardless of whether they were trust or non-trust. This allows for increased security, greater control of user access and more rigorous monitoring of traffic between that subnet and the rest of the networks.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                    **Information Technology**

- The MMS Council of Information Management Officials and senior IT staff convened for an IT summit. The purpose of the summit was to focus on how MMS could centralize IT functions to eliminate redundancies, achieve cost savings, and provide better service delivery to the programs. Among the initial priority areas of focus was IT security. A focus team was formed and charged with developing recommendations for reorganizing IT security in MMS.

**E-Authentication and HSPD-12:**
- Interior met OMB's quarterly milestones for E-Authentication. These included reporting to OMB all existing and planned web-based systems that require electronic authentication and identifying the application that will provide the e-authentication service.

**Staffing:**
- Interior filled several key positions this reporting period, including a CISO, IT Enterprise Trust Architect and NBC CISO.

**Current Status**

**A-130 Certification and Accreditation:**
- All trust systems that are currently in DEAR have full ATO status.

- BIA's TAAMS is undergoing re-certification and re-accreditation and is expected to be completed during next reporting period.

**ZANTAZ:**
- All tapes from bureaus and offices affected by ZStage issues documented in previous reports to the Court have been restored with the exception of the 268 blank BIA tapes.

- A statement of work has been developed and forwarded to Interior's contracting office that seeks a forensic analysis of the 268 blank BIA tapes documented in the previous status report to the Court.

- The tape that was sent to ZANTAZ by BIA on March 31, 2006, as noted in the previous report to the Court, has been restored. The tape contained 154 mailboxes holding 41,894 unique messages.

- The three BIA ZStage irregularities noted in the previous report to the Court are awaiting a response from ZANTAZ.

- BLM discovered that messages had not been transmitted to ZANTAZ from May 8, 2006, through May 26, 2006, due to a corrupted configuration file. The problem was corrected and 25 backup tapes are ready to be shipped to ZANTAZ.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                    **Information Technology**

- OSM suffered a ZANTAZ outage that resulted from a physical break in the connection line to ZANTAZ. All data was cached by the SENDMAIL buffer and re-sent upon repair of the line. No data was lost.

- NBC noted irregularities related to anti-virus software upgrades at BLM. NBC reported the issue to BLM, which is working with ZANTAZ to resolve it. It is unclear whether some messages between NBC Denver and BLM users reach the digital safe.

**Reports:**
These reports were among those issued during this reporting period.

- OMB issued "Safeguarding Personally Identifiable Information (M-06-15)," to the heads of departments and agencies on May 22, 2006. The memorandum responds to a growing concern about safeguarding PII, which had been spotlighted in the news with the theft of a VA laptop containing PII. It discusses the law and background in safeguarding PII and directs a review of all related policies and processes and requires corrective actions as appropriate. It also required that agency employees be reminded of their responsibilities to safeguard PII and of the penalties for violating the rules.

- OMB issued "Protection of Sensitive Agency Information (M-06-16)," to the heads of departments and agencies on June 23, 2006. The memorandum directs agencies to protect sensitive data on mobile devices and to ensure remote access connections involving sensitive data are properly secured within 45 days. This memorandum was issued due to a growing list of agencies where PII was potentially or actually compromised. It directs encryption of all data stored on mobile devices and requires two-factor authentication for remote access, time-out of connections after a period of inactivity and logging of all PII data accesses.

## Delays and Obstacles

Like other federal agencies, Interior must address many challenges regarding the integration, performance, funding, security, and data integrity of IT systems. Interior initiated or completed steps to address some of the challenges reported in this and previous reporting periods. However, delays and obstacles listed below impede progress in achieving Interior's IT management goals.

**Litigation**
- Employee fears about becoming personally implicated in the *Cobell* litigation continue to undermine communication and decision-making, slow the deployment of enterprise-wide systems, and are contributing factors to low employee morale. These fears have recently been reinforced by plaintiffs' latest Court filing seeking contempt against Interior officials.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                            **Information Technology**

- On June 2, 2006, Interior filed with the Court a notice of its intent to bring ALIS and the Indian component of AFMSS on-line.  In response to plaintiffs' threats of contempt, BLM decided to keep these two systems off-line for the time being.  Although BLM is manually processing all Indian-related Applications for Permits to Drill and related applications, lack of access to automated solutions continues to slow the leasing process, thereby negatively impacting the flow of revenue to Indian trust beneficiaries.

**Staffing**
- Interior is experiencing high staff and management turnover in critical IT positions, particularly IT security.  Recruitment challenges to attract qualified candidates continue, particularly in light of litigation impacts.

- Interior's Deputy CISO, NBC's CIO, BIA's CIO, BLM's Deputy CIO and BIA's C&A Program Manager positions were vacant at the end of this reporting period.

**Funding and Resources**
- Planning for replacement of aging systems is significantly impacted due to problems with deploying enterprise-wide applications.  Without connectivity between the disconnected and online bureaus and offices, new systems would require two instances (one for the on-line network and one for the off-line network).

- As previously reported, the DLRM system is expected to provide a long-term solution for the legacy functionality of the CGI leasing software module, formerly a part of the TAAMS project.  This project is currently on hold due to resource constraints (e.g. project funding).

- Savings are generated by retiring obsolete systems and reducing duplication of retained data.  These savings are critical to enhancing and developing new trust systems with more robust security and operational capabilities.  As previously reported, MRM expected to dispose of 30,000 legacy backup tapes that contain data redundant to data in the new MRMSS.  Due to objections by tribal litigants, MRM has continued postponement of disposal of these tapes pending resolution of objections.

**Denied Internet Access**
- Several Interior bureaus and offices (BIA, OHA, OST and SOL) have not been permitted by the Court to have Internet access since December 5, 2001.  Lack of Internet access impedes work processes and the ability to communicate effectively, both internally and externally.  For example:

  - OMB's e-Government initiative requires agencies to web-enable as many of their applications as possible.  Without internet access, Interior cannot comply with this and other OMB initiatives, like consolidation of agencies' network infrastructures.

  - Implementation of true enterprise-wide applications is difficult.  Plans and funding call for only a single instance of an application to service all bureaus and offices.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                    **Information Technology**

Many of these applications rely upon the internet to service external as well as internal customers. Providing access to the disconnected bureaus and offices would eliminate duplicate systems, networks, and data. Duplicate systems require a significant increase in resources to manually transfer data between the two systems.

- Coordination and dissemination of new policies and training is delayed due to the need to deliver material physically. Even after receipt, considerable re-work is required to tailor web-based training programs to run locally. A recent example is the FY 2006 Annual Federal Information System Security Awareness Training. This course is normally completed on-line through DOI LEARN, but must also be duplicated in stand-alone CD-ROM and paper forms for the off-line bureaus.

- Ensuring Continuity of Operations and Continuity of Government through the implementation of contingency plans requires rapid notification of an event. The lack of Internet access degrades Interior's capabilities to notify all of its bureaus and offices in a timely and efficient manner. Additionally, without remote access, disconnected bureaus and offices will be unable to provide services to their customers in the event of extended contingency periods that may result from pandemics or major natural events.

- The concerns over potential future Court-ordered Internet shutdowns or other Court-ordered disruptions create uncertainty over how to proceed with enterprise initiatives and security improvements. Contingency planning for either external or internal disconnections (and all potential permutations) takes resources from planned and daily activities.

## <u>Assurance Statement</u>

I concur with the content of the information contained in the Information Technology section of the *Status Report to the Court Number Twenty-Six*. The information provided in this section is accurate to the best of my knowledge.

Date:  July 24, 2006

Name: *Signature on File*
        W. Hord Tipton
        Interior Chief Information Officer

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

<u>July 27, 2006</u>                                                              **Cadastral Survey**

### B.    CADASTRAL SURVEY

<u>Introduction</u>

Cadastral surveys provide assurance that land boundaries for individual Indian and tribal trust lands are identified appropriately. By federal law, surveys of Indian lands are to be performed under BLM's direction and control. Official surveys, whether preexisting or new, identify the location of land boundaries of Indian trust assets and determine official acreage. The official surveys are integral to realty transactions, resource management activities, litigation support and the federal system of patent, allotment and survey records maintained by BLM. Ownership information, distribution of trust assets, and management of trust accounts may be related to or based upon information recorded in official surveys.

<u>Accomplishments and Completions</u>

**Inventory of Cadastral Needs**

The development of a FY2007, FY2008 and FY2009 nationwide inventory of requests for cadastral survey services in Indian Country was a major focus of BLM and BIA during this reporting period.

Approximately 1,450 survey services with an estimated cost of $127.4 million were requested for FY2007, FY2008 and FY2009. The breakout for survey services requested for each year is as follows: FY2007, 901 requests at an estimated cost of $72.5 million; FY2008, 311 requests at an estimated cost of $30.7 million; and FY2009, 239 requests at an estimated cost of $24.2 million. BLM and BIA used CARS to determine the highest priority of the requested surveys, and to support distribution of the proposed appropriation of $16.4 million for survey services to be performed during FY2007. The proposed $16.4 million appropriation for cadastral survey services is expected to facilitate completion of Indian trust projects with estimated values totaling $128 million.

**Cadastral Survey Trust Manager**

During this reporting period, the Cadastral Survey Trust Manager was hired. This individual will coordinate BLM's efforts for improving the condition of the infrastructure of the PLSS within Indian country and facilitate the creation of a standardized source of digital land information based on existing survey or resurvey data. The Cadastral Survey Trust Manager will direct FTM efforts and set policy and guidance for the implementation of the Cadastral portion of the FTM. This manager will also develop and maintain a national inventory of cadastral field survey and GCDB collection needs for Tribes, reservations and BIA regions.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                      **Cadastral Survey**

<u>**Current Status**</u>

**Interior Standards for Indian Trust Lands Boundary Evidence**

BLM provided the draft standards in April 2006 for Indian Trust Lands Boundary Evidence to PMB for inclusion in the Departmental Directives system. After these standards are incorporated by the Department, BLM and BIA will start using these standards to improve boundary evidence within Indian Country.

**Rights-of-Way Over Indian Lands**

BLM provided comments on the draft regulations for 25 CFR 169, Rights-of-Way Over Indian Lands in support of the Regulatory Initiative.

**Implementation of the FTM**

During this reporting period, the BLM continued to implement FTM goals. These goals as they relate to cadastral survey are: (1) funding for the 12 BLM Indian lands surveyors located in the BIA Regions; (2) creation of the CFedS program (where state licensed land surveyors can be certified to perform commercial activities under the direction and control of BLM); (3) improving the maintenance of the PLSS within Indian Country; and (4) creation of one standardized source of land status information based on cadastral data that delineates the official legal land descriptions.

The CFedS program completed filming the majority of its video lectures to be used in the certification process. The program also began accepting applications for the first pilot class, which is scheduled to begin during the next reporting period.

The inventory of the survey boundary conditions of the exterior boundaries of 325 Indian reservations was evaluated and serves as the basis for prioritizing funding allocations and the commitment of resources to meet BLM's fiduciary trust responsibilities. A number of funding proposals for improving the surveys were provided to the Department for consideration.

<u>**Delays and Obstacles**</u>

**Disconnection from the Internet**

The Court-ordered disconnection from the Internet continues to adversely impact the way communications are handled between BLM, BIA, OST and SOL, including the way CARS is being implemented and the review of the Interior Indian Trust Lands Boundary Standards. BLM's productivity has decreased, and the cost associated with dual networks has caused the cost of survey services to increase. This issue continues to impact BLM's ability to provide cadastral services in an effective and cost efficient manner to clients.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                                 **Cadastral Survey**

**Funding of the FTM**

Planning and scheduling of out-year FTM work is dependent on future funding.

**Assurance Statement**

I concur with the content of the information contained in the Cadastral Survey section of the *Status Report to the Court Number Twenty-Six*. The information provided in this section is accurate to the best of my knowledge.

Date:   July 12, 2006

Name:   *Signature on File*
          Donald A. Buhler
          Chief Cadastral Surveyor
          Bureau of Land Management

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                    **Minerals Management Service**

### C.    MINERALS MANAGEMENT SERVICE

**Introduction**

Minerals Revenue Management, an MMS program, is responsible for collecting, accounting for, and distributing mineral revenues from both federal and Indian mineral leases, and for evaluating industry compliance with laws, regulations and lease terms. MRM maintains reported information and distributes revenues at the lease level. BIA maintains individual Indian ownership records that are used to provide information to OST for disbursement of the lease revenues to individual Indian beneficiaries.

**Current Status**

**Indian Oil Rule**

MMS continued with the rulemaking process for the valuation of oil produced from tribal and allotted Indian lands. The proposed rule was published in February 2006, and the comment period ended on April 14, 2006. During this reporting period, MMS received and reviewed comments from Tribes, industry trade associations, industry producers, and an individual.

**Payment Receipt Date Verification**

On May 18, 2006, MMS provided BIA and OST with some corrections to payment data on prior transactions. Transactions for individual beneficiaries with corrected payment dates and/or types will require analysis by BIA and OST to determine if principal or interest is due to the beneficiaries. No further action is required on this issue by MMS.

**MRM Legacy Media**

As previously reported, MRM expected to dispose of 30,000 legacy backup tapes that contain data redundant to data in the new MRMSS. Due to objections by tribal litigants, MRM has continued postponement of tape disposal pending resolution of the objections.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                    **Minerals Management Service**

<u>**Assurance Statement**</u>

I concur with the content of the information contained in the Minerals Management Service section of the *Status Report to the Court Number Twenty-Six*.  The information provided in this section is accurate to the best of my knowledge.


Date:   June 30, 2006

Name:  *Signature on File*
        Cathy J. Hamilton
        Chief of Staff
        Minerals Revenue Management
        Minerals Management Service

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                               **Office of Historical Trust Accounting**

### D.    OFFICE OF HISTORICAL TRUST ACCOUNTING

**Introduction**

OHTA was established by Secretarial Order No. 3231 on July 10, 2001, and is charged with planning, organizing, directing and executing the historical accounting of IIM and tribal trust accounts. Since its 2001 inception, neither OHTA nor its contractors have stored the IIM transaction data used to perform historical accounting on a system connected to the Internet.

**Current Status**

**Meta-Analysis Report**

On June 23, 2006, the National Opinion Research Center at the University of Chicago (NORC), a contractor for OHTA, issued its Report on a meta-analysis study it undertook of reconciliations and audits of the IIM and Tribal Trust Funds. Meta-analysis is a statistical technique for summarizing, integrating, comparing, and interpreting a collection of disparate studies that have a common topic or a common theme. Meta-analysis can be used to strengthen results by combining the findings of similar studies on the same topic. It can also be used to broaden the domain of the information, enabling the assertion of a stronger conclusion than is possible on the basis of any of the separate studies. A particular use of meta-analysis is to provide evidence of robustness of results over different assumptions or approaches undertaken in different analyses.

Historical audit and reconciliation studies addressing the soundness of the Indian Trust systems have been conducted by the General Services Administration's Indian Trust Accounting Division, Arthur Andersen LLP (which conducted tribal trust fund reconciliations covering 1972-1992), the Government Accountability Office, and Interior's Office of the Inspector General, among others. NORC's research identified 536 reconciliations and 286 audits conducted by these entities from the late 19th century to the present of 934 potentially relevant studies. NORC was able to obtain copies of 822 studies, of which 332 were deemed to be out-of-scope in that the findings did not address the soundness of the Trust Systems. Of the 490 in-scope studies reviewed, 227 are reconciliations and 263 are audits.

Reconciliations look for *actual error* by identifying any instances in which the records of the transactions for the chosen time and accounts do not match the source documents. Of the 227 reconciliations, 210 had net underpayment dollar error of under 0.1%, based on aggregate dollars reconciled, and only 5 had net underpayment dollar error above 1.0%.

Audits look at system processes and pass judgment on the overall management and compliance with accounting standards as a way of measuring *risk of error*. This risk is independent of whether actual error occurred. NORC reports that the findings of the 263 audits indicated that there were some chronic problems in the overall management or compliance. These problems have been, or are being, addressed.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                     **Office of Historical Trust Accounting**

This NORC report provides a *qualitative* assessment of the studies to identify those with sufficient data to support a judgment about the reliability of the study findings.  NORC is planning a *quantitative* meta-analysis to bring results into sharper focus with more rigorous statistical analysis of data.

NORC found no evidence of widespread fraud in the Indian Trust system.  NORC reports that there is considerable evidence from the meta-analysis that the system has performed far better than is generally recognized.

**Judgment and Per Capita IIM Accounts**

OHTA continues to perform historical accounting procedures on Judgment and Per Capita IIM accounts.  During this reporting period, OHTA reconciled an additional 4,871 Judgment IIM accounts.

Results through June 30, 2006, are summarized in the table below.

|  | **Judgment Accounts** | | **Per Capita Accounts** | |
|---|---|---|---|---|
|  | **Number of Accounts** | **Percent of Total** | **Number of Accounts** | **Percent of Total** |
| Total at December 31, 2000 (including accounts open at or after October 25, 1994, but closed prior to December 31, 2000) | 80,539 | 100% | 19,033 | 100% |
| Reduction for accounts subsequently determined to be outside of the scope of the population | (867) | (1%) | N/A | N/A |
| Reconciled January 1, 2001, through March 31, 2006 | (54,337) | (68%) | (17,108) | (90%) |
| Reconciled this reporting period | (4,871) | (6%) | - | - |
| Remaining to be reconciled at June 30, 2006 | 20,464 | 25% | 1,925 | 10% |

**Mailings to Judgment and Per Capita IIM Account Holders**

As previously reported, on March 9, 2006, a fourth submission for permission to mail 20,402 Historical Statements of Account (Statements) was filed with the U.S. District Court, and, on March 24, 2005, a third submission to mail 28,107 Statements was also filed with the Court. Mailing of these 48,509 Statements is still pending Court approval.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                    **Office of Historical Trust Accounting**

In its October 22, 2004, Order, the Court permitted OHTA to transmit Statements to 17,096 Judgment IIM account holders; of this number, 4,974 Statements could not be sent because the account holders were classified as WAU. During the previous reporting period, 826 of these WAUs were mailed to new addresses obtained by OST. OHTA continues to work with OST and contractors to identify addresses for the 4,148 remaining WAU account holders.

Although OHTA has not mailed any new Statements during this reporting period, late in this reporting period, OHTA identified addresses for an additional 690 WAU account holders. These addresses were provided to OST for verification, and OHTA expects to mail the Statements during the next reporting period. OHTA continues to re-mail Statements that are returned as forwarding addresses become available.

**Confirming Accuracy of Electronic Records Era Accounting**

During FY2006, the following activity occurred to provide assurances for the accuracy of transactions and accounts in the Electronic Records Era (1985-2000).

### *Land-Based IIM Transactions*

- As of June 30, 2006, all but three of 1,822 identified High Dollar transactions have been reconciled. OHTA expects to complete these three reconciliations during the next reporting period.

- A land-to-dollars pilot test was commenced at the Horton and Colville Agencies. This test is designed to detect whether surface or subsurface revenues were recorded in the IIM system.

### *All IIM Accounts (Land-Based, Judgment, and Per Capita)*

- Data validation for transaction completeness was substantially completed for the Alaska, Western and Pacific Regions, and commenced in the Northwest Region (4 of 12 total Regions). This process consists of multiple tests designed to detect data and transactions missing from the electronic data set, as well as potential posting errors.

- A transaction mapping test was performed on transfers and reversals to ensure that funds transferred among IIM accounts were properly recorded.

- A balance comparison test was conducted to confirm that the transactions printed on a Historical Statement of Account will correspond to the final balance shown.

- An account number review was conducted to ensure that reused and changed account numbers were appropriately identified, allowing OHTA to print statements with the appropriate transactions for each account.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                    **Office of Historical Trust Accounting**

**OHTA SDA Distribution Project - Undistributed SDA Balances at December 31, 2002**

During this reporting period, 116 SDA involving $950,180 were resolved and distributed.  There remain 11,554 SDA involving $17,580,352 to resolve and distribute.  Distributions of SDA balances to rightful owners during the period January 1, 2003, through June 30, 2006, total $40,994,801, including interest of $3,082,418 posted from January 1, 2003, through the date of distribution.  Of the SDA remaining at June 30, 2006, 8,033 accounts have balances less than $500 (70% of SDA) involving $671,457 (4% of SDA dollar balances).

**Imaging/Coding – Individual Indian Trust Documents**

During this reporting period, OHTA completed scanning 160,319 pages, coding 43,355 documents and loading 47,010 documents into ART.  As of June 30, 2006, the ART contained 8.7 million coded IIM images, 5.2 million coded tribal images (13.9 million total coded images).  These images constitute 1.4 million documents.  All documents are checked for quality and accuracy before they are loaded into ART for reconciliation.

**Revision to *Accounting Standards Manual***

As previously reported, periodic revisions are routinely made to the *Accounting Standards Manual*.  Another revision was issued on April 28, 2006.

**Accounting Plan**

As previously reported, Interior expects to modify the January 6, 2003, accounting plan.  Modifications will be based on lessons learned from work already completed, court decisions, statistical sampling parameters, accounting costs, and the history of congressional funding.

**Delays and Obstacles**

Enacted appropriations for FY2003 through FY2006 have been below the President's requests, thus limiting the historical accounting that could be performed.

**Assurance Statement**

I concur with the contents of the information contained in the Office of Historical Trust Accounting section of the *Status Report to the Court Number Twenty-Six*.  The information provided in this section is accurate to the best of my knowledge.

Date:        July 20, 2006

Name:        *Signature on File*
             Bert T. Edwards, Executive Director
             Office of Historical Trust Accounting

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                    **Office of the Special Trustee for American Indians**

## II.    OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS

**Introduction**

The Office of the Special Trustee for American Indians was created by the American Indian Trust Fund Management Reform Act of 1994.  The 1994 Act provides direction to the Department of the Interior on accounting for Indian trust funds and reforming the operation of the Indian fiduciary trust.  The Special Trustee's responsibilities under the Act include creating a comprehensive strategic plan for the operation of the trust and providing oversight of the accounting for Indian trust funds and the reform of the trust.

**Special Trustee's Observations**

During this reporting period, a new Secretary of the Interior, Dirk Kempthorne, was confirmed by the United States Senate.  Briefing papers were presented to Secretary Kempthorne, and several meetings have been held with the Secretary to advise him of the status of the Indian trust, including trust reform initiatives, the historical accounting effort and the *Cobell* litigation.  It is my opinion that Secretary Kempthorne fully supports the trust reform and accounting efforts underway.  In addition, meetings continue to be held with members of Congress to seek resolution of the costly *Cobell* litigation through legislation.

During this reporting period, seven agencies in the Great Plains Region made the conversion to the TAAMS leasing system.  This enables BIA to track leasing activity, ownership and income distribution electronically to ensure more accountability and efficiency in the Indian trust system.  These efforts follow conversion activities in the Southern Plains Region completed earlier this year, where work continues to encode and validate information and clean up data transferred from legacy systems.  Handbooks have been distributed by BIA to support trust activities, new business processes are being taught and desk operating manuals are in development.  Conversion to the new TAAMS system is expected to be completed in both the Great Plains and Rocky Mountain Regions during the next reporting period.

Publication of proposed regulations, as a part of the Regulatory Initiative, is expected to begin during the next reporting period.  The publication of the proposed regulations will be staggered to allow time for review and consultation by Tribes and other stakeholders.  Additional tribal consultation meetings are scheduled for July and August 2006.

A major accomplishment during this reporting period was the dedication of the National Indian Programs Training Center in Albuquerque, NM.  The availability of this space provides the BIA and other Interior bureaus and offices a permanent facility to offer classes and training to employees engaged in all areas of Indian affairs work.  No such training center has been available in the past, and courses had to be presented wherever space could be located on a temporary basis.  The new facility contains state-of-the-art equipment and will be managed by DOI University employees who have extensive experience in providing on-site training.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                    **Office of the Special Trustee for American Indians**

Appropriation bills have been passed by the House and Senate. It is not expected that a conference committee will be formed to resolve the differences between the House and Senate during FY2006. As a result, Interior is likely to be operating on a continuing resolution at least through much of the first quarter of FY2007. The House proposal limits the available funding for OHTA to $45 million and the Senate limits it to $50 million. The Administration requested $56.4 million. If the lower amounts are finally enacted, the result may be to extend the time for completion of the historical accounting. In addition, report language in HR 109-465, requires "the Department to report quarterly on the use of Bureau of Indian Affairs, Operation of Indian Programs funds for ongoing litigation support costs associated with the Cobell case." This arises out of a concern from Congress that Interior is using BIA operating funds to finance the litigation expenses of *Cobell.*

Another part of the appropriation relates to the Indian Land Consolidation Program. The Administration requested an increase of $25.4 million for a total of $59.4 million. Both houses of Congress have proposed leaving the program funding at the current level of $34 million. Fractionation of Indian land ownership continues to be among the greatest difficulties, if not the greatest facing the Indian trust.

Continued lack of Internet connectivity continues to cause loss of productivity and requires use of expensive, alternative methods to obtain and transmit information. The Internet is a key delivery mechanism for communications and services to individuals and Tribes, and must be available to Indians and Tribes as access becomes available. With Internet access, many account holders would be able to obtain account and asset information "online" rather than having to use the call center or make personal visits to field offices.

### Assurance Statement

The comments and observations are provided by the Special Trustee for American Indians and reflect the opinion of the Special Trustee only.

Date:   July 21, 2006

Name:   *Signature on File*
         Ross O. Swimmer
         Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                          **Trust Review and Audit**

### A.    TRUST REVIEW AND AUDIT

**Introduction**

OTRA reports directly to the Special Trustee for American Indians.  OTRA was created by OST as a response to trust initiatives developed during the tribal consultation process of 2002.  OTRA conducts performance audits, examinations and reviews of Interior entities as well as Tribes that manage fiduciary trust activities.  Examinations are routinely conducted at locations that perform trust operations, and are planned to result in a performance rating.  Also, compliance reviews are undertaken in response to information and complaints received from beneficiaries, employees and the public.

**Accomplishments and Completions**

The Indian Trust Rating System (ITRS) is now being applied to all Indian trust examinations.  The purpose of the ITRS is to measure performance of fiduciary trust activities accomplished in whole or part by the respective Interior offices and/or the Tribes that have compacted trust activities.  The rating system evaluates key components of management, asset management, compliance, and operations that are common to all organizations that manage fiduciary trust activities.  The Indian trust examination process includes conducting on-site visits to evaluate operations and compliance, performing sufficient testing to verify the integrity of trust operations, and analyzing the effectiveness of management and management controls.  Based upon the results of an examination, OTRA assigns an overall rating reflecting the quality of the administration of fiduciary trust functions.

**Current Status**

**Indian Trust Examinations**

OTRA performed 13 trust reviews.  One draft report was issued for comment and eight final reports were issued.

OTRA completed 30 trust record assessments and issued 18 final reports.

OTRA followed-up on the findings in the reports already issued.  Fifteen letters were sent to regions, agencies and Tribes asking for updates on the findings reported in the reviews.  OTRA received five responses and continues to await updates requested during this and previous reporting periods.

**Compliance Reviews**

Six cases were in inventory.  Two reviews were closed.  Field work or report drafting continued on the remaining cases.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                            **Trust Review and Audit**

### Delays and Obstacles

Lack of Internet access impedes OTRA's work processes and its ability to communicate effectively, both internally and externally.

### Assurance Statement

I concur with the content of the information contained in the Trust Review and Audit section of the *Status Report to the Court Number Twenty-Six.* The information provided in this section is accurate to the best of my knowledge.

Date:   July 20, 2006

Name:  *Signature on File*
         D. Jeff Lords
         Director, Office of Trust Review and Audit
         Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                    **Records Management**

### B.    OST-OFFICE OF THE CHIEF INFORMATION OFFICER

### 1.    RECORDS MANAGEMENT

**<u>Introduction</u>**

The Office of Trust Records was established in 1999 to develop and implement a program for the economical and efficient management of trust records, consistent with the 1994 Act, the Federal Records Act and other statutes and implementing regulations. The OTR records management program has been developed and implemented, and continues to evolve, to ensure that necessary Indian records are maintained, records retention schedules are consistent with retention needs, and records are safeguarded throughout their life-cycles.

**<u>Accomplishments and Completions</u>**

**American Indian Records Repository**

Approximately 142,261 indexed boxes are located in the AIRR as of the end of this reporting period. Thus far, NARA reports that it is currently storing 146,312 cubic feet of indexed inactive records at AIRR. Some boxes are larger than one cubic foot (e.g., map boxes).

**Records Indexing Project**

Indexing of approximately 143,080 boxes has been completed as of the end of this reporting period. The number of completed boxes (indexed and quality reviewed) differs from the number of boxes stored at AIRR because not all completed boxes were sent to AIRR from the Annex before the end of the reporting period.

Approximately 9,235 boxes of inactive records were moved from BIA/OST field locations to the Lenexa Annex for indexing during this reporting period. Once indexed, these boxes will be stored in the AIRR.

**Training**

OTR provided records management training for 105 BIA and OST identified records contacts and 31 tribal employees during this reporting period.

**Equipment Purchases**

221 pieces of fireproof filing equipment were delivered to BIA, OST and tribal offices during this reporting period.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                 **Records Management**

## Current Status

### Safeguarding Records

As reported, 283 boxes of inactive records that were or may have been damaged or contaminated by mold, mildew, mouse droppings or other adverse elements were shipped to NARA for remediation in June 2005.

NARA completed remediation of the original boxes in April 2006 except for those materials in six boxes that were beyond NARA's capabilities to repair. The materials NARA could not repair consisted of one box that has about 25% of its contents covered with a tar-like substance; one entire box that had mold and the files are stuck together; and one box of green bar printouts from 1989 oil and gas royalty disbursements that have holes in the printout caused by insects. Three boxes have extensive water damage and the contents are stuck together and NARA recommended the contents should not be separated or further damage will result. OTR contracted with a paper conservationist to review the damaged materials to determine if further remedial action can or should be taken with the boxes that NARA could not repair. The conservator's opinion is that much of the information can be salvaged by either physical stabilization or recovery of the information through reproduction techniques. OTR plans to contract for conservator services in the next reporting period.

### Records Retention Schedules

The BIA Geographic Information System records schedule was resubmitted to NARA during this reporting period. NARA had requested additional information for its review of the schedule.

### Records Management Policies and Procedures

As reported previously, OTR received a request from the OST Regional Fiduciary Trust Administrator for the Northwest and Alaska Regions to conduct an investigation into possible unauthorized destruction of federal records or non-records material stored at the OST field office in Portland. In addition, as reported in the OTR Monthly Activity Report for April 2006, a notebook containing microfiche was determined to be missing from the same office. OST's investigation, which included OTR and OTRA, was concluded subsequent to the current reporting period. OST determined that the documents and microfiche disposed of or lost were non-records.

As reported in the OTR Monthly Activity Report for June 2006, OTR was informed by OTRA that the BIA Crow Agency, Forestry Department, was vandalized on or about June 7, 2006. A laptop and USB memory drive are missing. The laptop contains duplicate information regarding forest plot reports which include tree heights, diameter, number of trees per plot, regeneration information, fuels data, canopy cover, pictures of plots with general east/west directions, and road-to-center plot. It also contains information on the last 30 years of forest inventories (completed in 10-year increments). There is no ownership data on the laptop or memory drive. The incident, and the loss, was reported to BIA Law Enforcement Service.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                    **Records Management**

<u>Delays and Obstacles</u>

Lack of Internet access continues to hinder OTR's ability to provide remote access to the record index database for authorized users of the records. If Internet access were available, authorized researchers could conduct their searches from their respective work sites and only visit AIRR when necessary to inspect specific boxes or request documents from specific boxes.

<u>Assurance Statement</u>

I concur with the content of the information contained in the Records Management section of the *Status Report to the Court Number Twenty-Six*. The information provided in this section is accurate to the best of my knowledge.

Date:  July 19, 2006

Name: *Signature on File*
        Ethel J. Abeita
        Director, Office of Trust Records
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

| July 27, 2006 | Trust Business Process Modeling |
| --- | --- |

C.    **TRUST ACCOUNTABILITY**

1.    **TRUST BUSINESS PROCESS MODELING**

**Introduction**

Interior is working to build a highly effective fiduciary trust services organization by implementing the business objectives contained in the CTM.  Those business objectives are being used to guide implementation of the FTM.  Implementation of the FTM is a collaborative effort of BIA, OST, BLM, MMS and OHA, and is integrated with Interior's other trust reform initiatives.  The FTM is being implemented to transform the current trust business processes into more efficient, consistent, integrated and fiscally responsible business processes that meet the needs and priorities of the beneficiaries.

**Accomplishments and Completions**

Reengineering staff conducted follow-up site visits to further assess post-conversion activities and lockbox implementation at pilot agencies.  A report with recommendations on the site visits was submitted to senior management for review.

The DOP for Lockbox Receipting will be completed during the next reporting period; the draft has been submitted to senior management for review.  Reengineering staff presented this DOP at pre-conversion meetings for the Great Plains Region.  Superintendents, tribal representatives, and line officers from several agencies within the Great Plains Region were in attendance.

**Current Status**

As a part of the Interior Regulatory Initiative, reengineering staff participated in revising the draft regulations for Rights-of-Way.  It is expected that these regulations will become a part of the Regulatory Initiative.

Drafting continues on the following handbook chapters:  Sales and Exchanges of Tribal Trust or Restricted Land; Negotiated Sales, Gifts and Exchanges of Individually Owned Lands; Tribal Tract Purchases; Consolidation by Sale of Highly Fractionated Tracts; Partitions in Kind; and Mortgages and Deeds of Trust.  The draft Fluid Minerals handbook and the draft Sand, Gravel and Aggregates handbook have been delivered to BIA for review.

The Collection and Distribution handbook is being drafted and is expected to be ready for delivery to the BIA in the next reporting period.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                   **Trust Business Process Modeling**

### Delays and Obstacles

Lack of Internet access impedes communication with other trust bureaus and offices, and hinders the expansion of reengineered processes that utilize the Internet. This exacerbates the complexity of reengineering the existing trust business processes.

### Assurance Statement

I concur with the content of the information contained in the Trust Business Process Modeling section of the *Status Report to the Court Number Twenty-Six*. The information provided in this section is accurate to the best of my knowledge.

Date:   July 20, 2006

Name:   *Signature on File*
         Margaret Williams
         Deputy Special Trustee, Trust Accountability
         Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                    **Trust Data Quality and Integrity**

## 2.    TRUST DATA QUALITY AND INTEGRITY

### Introduction

The success of trust reform depends, in part, on the accuracy of data generated from the maintenance of trust assets, ownership of trust assets, distribution of trust income, and management of trust accounts. The DQ&I project focuses on three primary initiatives: (1) assisting BIA with document encoding into the trust systems, (2) validating/correcting CDE to their respective source documents and (3) implementing Post-QA processes.

### Accomplishments and Completions

During this reporting period, TPMC's contractors completed:

- DQ&I site assessments at Western and Navajo Regions.

- Encoding of 2,337 Pine Ridge Agency and 296 Fort Totten Agency encumbrance documents into TAAMS Leasing to support each agency's conversion effort.

- Encoding 992 active encumbrance documents, for a total of 1,634 encoded, into TAAMS Leasing at Rosebud Agency.

- TAAMS Title - legacy realty ownership comparison analysis for Fort Totten, Standing Rock, Turtle Mountain, Crow Creek, Pine Ridge, Fort Berthold, Rosebud, Sisseton, and Winnebago Agencies.

- Post-QA review of encumbrance document encoding for Crow Creek, Lower Brule, Yankton, Fort Totten, Cheyenne River, Turtle Mountain and Standing Rock Agencies, using scanned images.

- Two Global ID research and encoding tasks for SPRO, which resulted in 309, for a cumulative total of 651, Global ID changes being made in TAAMS Title.

- Encoding of 166 active encumbrance documents, for a total of 432, into TAAMS Leasing for Miami Agency.

- Analysis of ownership data for 155 Miami Agency tracts and provided assistance with researching and correcting variances identified.

- Encoding 63 Alabama-Coushatta encumbrance documents into TAAMS Leasing for the SPRO.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                    **Trust Data Quality and Integrity**

- Encoding of missing required data into TAAMS Title for 1,061 RMRO-LTRO encumbrance documents, for a total of 5,993, which allowed the full record to be mapped electronically into TAAMS Leasing.

- Scanning of 4,191 active encumbrance documents, for a total of 10,044 documents scanned, at RMRO-LTRO to prepare for encumbrance document validation/correction task.

## Current Status

The DQ&I Project continues to assist the BIA with TAAMS Leasing conversion efforts by:

- Validating and correcting Shawnee Agency beneficiary ownership data.

- Recording 1,242 conveyance and encumbrance documents, for a total of 5,575 at RMRO-LTRO.

- Scanning Sisseton Agency encumbrance documents; scanned images are used to conduct Post-QA review on BIA encoding into TAAMS Leasing.

- Performing 58 probate order inventory verifications, for a total of 82 performed to date, for the Concho and Miami Agencies.

- Initiating another Global ID and research and encoding task for the SPRO LTRO, achieving 10% completion.

- Verifying the accuracy of land owner ID numbers in probate orders for the SPRO-LTRO; land owner ID numbers for 66 of 380 probate orders were verified by the end of the quarter.

- Performing CDE validation/correction on 71 Horton Agency trust land tracts.

## Delays and Obstacles

Lack of access to the Internet has resulted in: (1) communication delays; (2) adverse project coordination issues; (3) increased administrative program costs; and (4) the overall DQ&I project being unable to take full advantage of available information technology.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                    **Trust Data Quality and Integrity**

**<u>Assurance Statement</u>**

I concur with the content of the information contained in the Trust Data Quality and Integrity section of the *Status Report to the Court Number Twenty- Six.*  The information provided in this section is accurate to the best of my knowledge.


Date:    July 24, 2006

Name: *Signature on File*
          John E. White
          Trust Reform Officer
          Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                    **Indian Fiduciary Trust Training Program**

### 3.    INDIAN FIDUCIARY TRUST TRAINING PROGRAM

**Introduction**

Interior has a continuing responsibility to provide adequate staffing, supervision and training for trust fund management and accounting activities. Fiduciary trust training is essential to the success of Interior's trust reform efforts and forms an integral part of all training for Interior employees who are involved in the management of Indian trust assets.

**Accomplishments and Completions**

During this reporting period, Cannon Financial Institute awarded the *Certified Indian Fiduciary Trust Specialist* designation to ten OST personnel.

Dedication ceremonies for the NIPTC were held on Thursday, April 27, 2006.

**Current Status**

OST offered one session of the course, *Fiduciary Overview Program*, presented by Cannon Financial Institute, with 29 OST, BIA and tribal personnel attending during this reporting period. A total of 822 people have attended this course since March 2003. This course compares and contrasts the federal Indian trust administered through Interior with private sector trusts administered through banks and other financial institutions.

During this reporting period, Cannon Financial Institute personnel presented five of the specialty courses to 95 OST, BIA and tribal personnel. The specialty courses, *Risk Management, Probate*, *Trust Accounting*, *Asset Management*, *Fiduciary Behavior* and *Guardianships* are part of the *Certified Indian Fiduciary Trust Specialist* certification program as described in previous reports.

During this reporting period, OST training staff conducted 12 training sessions in TFAS, CSS, StrataVision and the historical query database for 149 OST, BIA and contractor staff.

OST and BIA staff presented the three-day course, *Trust Fundamentals*, to 34 OST, BIA and tribal staff. This course includes such topics as the history and policy of Indian trust, current trust reform activities, job roles and responsibilities, and organization and working relationships.

**Delays and Obstacles**

The lack of Internet access inhibits electronic communication with other governmental agencies and contractors, hinders the research of training tools and potential contractors, and restricts OST's ability to access online training programs.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                    **Indian Fiduciary Trust Training Program**

**Assurance Statement**

I concur with the content of the information contained in the Indian Fiduciary Trust Training Program section of the *Status Report to the Court Number Twenty-Six.* The information provided in this section is accurate to the best of my knowledge.

Date:  July 14, 2006

Name:  *Signature on File*
        Dianne M. Moran
        Director, Trust Training
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006** **Risk Management**

## 4.    RISK MANAGEMENT

### Introduction

The objectives of the risk management initiative are to design, deliver, and implement a comprehensive risk management program that includes extensive management controls for monitoring and evaluating Interior's Indian trust asset management program. The risk management program continues to be implemented by TPMC. OTRA monitors and evaluates management corrective action plans to mitigate control deficiencies.

### Accomplishments and Completions

As previously reported, RM-PLUS content for OST trust programs is under review to meet the revised OMB Circular A-123 requirements. These revisions became effective in FY2006 and include expanded requirements for documentation, monitoring and reporting. During this reporting period, the Senior Assessment Team identified OST's Significant Financial Reports to be addressed in accordance with OMB Circular A-123. A management control plan, a testing work plan and the sample selection were also drafted.

During this reporting period, OST updated and closed out eight corrective action plans that mitigated identified risks. The eight remaining corrective action plans are expected to be updated and/or closed during the next reporting period.

### Current Status

RM-PLUS content for TBCC, Lockbox and Financial Reporting has been completed, which will permit the risk assessments to be performed during the next reporting period.

OSM provided its required IT security documents, was provided training and conducted its risk assessment utilizing RM-PLUS during this reporting period.

OST continues to work with BLM on the required IT security documents for its training and testing of risk assessments, which are currently scheduled for August 1, 2006.

### Delays and Obstacles

The lack of Internet access complicates the implementation and use of RM-PLUS, since it is designed as a web-based application.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                              **Risk Management**

<u>**Assurance Statement**</u>

I concur with the content of the information contained in the Risk Management section of the *Status Report to the Court Number Twenty-Six*.  The information provided in this section is accurate to the best of my knowledge.

Date:   July 20, 2006

Name:  *Signature on File*
         Margaret Williams
         Deputy Special Trustee, Trust Accountability
         Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                    **Regulations, Policies and Procedures**

### 5.    REGULATIONS, POLICIES AND PROCEDURES

**Introduction**

OTP in OST was established on April 21, 2003, to assist Interior in establishing "consistent, written policies and procedures for trust fund management and accounting" as stated in the 1994 Act. OTP oversees and facilitates the development, promulgation and coordination of trust-related regulations, policies, procedures and other materials to guide the proper discharge of Interior's fiduciary responsibilities. OTP is separate from BIA's PPA, which is responsible for policies, procedures and regulations affecting all BIA activities. PPA activities thus are reported in the BIA section of the reports to the Court.

**Accomplishment and Completions**

The OST Directives System Handbook received final approval from OST management and was published. OTP will work with program offices during the next reporting period to implement the changes.

**Current Status**

Work on the Reporting and Reconciliation DOP is 75% complete. Approval and issuance of the entire DOP now is expected during the next reporting period.

Due to realignment of processes specific to the Osage Nation and assumption of some of those processes by BIA, final issuance of the Account Maintenance DOP and the Disbursing DOP is now expected in the next reporting period.

**Delays and Obstacles**

Lack of access to the Internet and its repository of online statutes, the Federal Register and other resources continues to present challenges to this office.

**Assurance Statement**

I concur with the content of the information contained in the Office of Trust Regulations, Policies and Procedures section of the *Status Report to the Court Number Twenty-Six*. The information provided in this section is accurate to the best of my knowledge.

Date:   July 12, 2006

Name: *Signature on File*
          Philip Viles, Director
          Office of Trust Regulations, Policies and Procedures
          Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                    **Appraisal**

D.    **FIELD OPERATIONS**

1.    **APPRAISAL**

**Introduction**

The Office of Appraisal Services, under a management contract with NBC-ASD, is responsible for Indian Land valuations.  The contract was established to provide impartial estimates of market value for a variety of real property interests on land owned in trust or restricted status by individual Indians, Alaska Natives, and Indian Tribes.  Various regulations governing Indian trust lands require valuations.  To meet this requirement, an appraisal or other valuation method is used to determine fair market value of Indian lands.

**Accomplishments and Completions**

The fractionated interest study was completed during this reporting period and is expected be presented to the TESC for approval during the next reporting period.

**Current Status**

OAS continues to examine its operations, make improvements and monitor staff training requirements.  Audits of the workload are used to impose deadlines and help reduce the backlog.

The position of OME Chief was filled during the reporting period, and the office currently is filling critical positions.

A mass-appraisal system currently is being developed for the Great Plains Region.

Roll out of the ITARS pilot is expected during the next reporting period.

As part of the DOI Regulatory Initiative, OAS staff participated in revising the draft regulations for Rights-of-Way.  It is expected that these regulations will become a part of the Regulatory Initiative.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                    **Appraisal**

**Appraisal Backlog**

As of this reporting period, the appraisal backlogs are as follows:

| Region | Appraisal Backlog As of 03/31/06 | Appraisal Backlog * As of 06/30/06 |
|---|---|---|
| Northwest | 166 | 150 |
| Rocky Mountain | 661 | 326 |
| Midwest | 42 | 69 |
| Western | 69 | 26 |
| Southwest | 15 | 3 |
| Eastern Oklahoma | 75 | 157 |
| Navajo | 80 | 71 |
| Pacific | 4 | 4 |
| Alaska | 399 | 410 |
| Eastern | 0 | 0 |
| Southern Plains | 45 | 7 |
| Great Plains | 0 | 2 |
| **TOTAL** | **1,556** | **1,225** |

> \* The backlog often includes all requests from BIA, even when the property to be appraised has yet to be defined and whether or not an appraisal is required for a proposed transaction. The requests are addressed in priority order based on factors such as court-ordered transactions, economic transactions, and rights-of-way transactions.

This table does not include appraisal backlog information from the compacted and contracted Tribes. OAS continues its efforts to obtain the backlog information from Tribes.

**<u>Delays and Obstacles</u>**

The inability to utilize the Internet as a tool to communicate with outside contacts to research comparable sales and other information is a continuing hardship.

Difficulties continue in recruiting qualified appraisers for permanent, temporary and contract positions, particularly in remote locations.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                      **Appraisal**

<u>**Assurance Statement**</u>

I concur with the content of the information contained in the Appraisal section of the *Status Report to the Court Number Twenty-Six.* The information provided in this section is accurate to the best of my knowledge.

Date: July 24, 2006

Name: *Signature on File*
        Brian M. Holly, MAI
        Appraisal Services Directorate
        National Business Center

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

__July 27, 2006__                                          __Current Accounting Activities__

       **E.**     **TRUST SERVICES**

       **1.**     **CURRENT ACCOUNTING ACTIVITIES**

__Introduction__

Current accounting activities focus on: (a) whereabouts unknown accounts; (b) trust funds accounting system; (c) special deposit accounts; and (d) small balance accounts.

WAU are classified as such for various reasons, including (1) new accounts established without an address, (2) mail returned for invalid address and (3) account holder refused or did not claim mail. A variety of methods and means are used to locate WAU account holders.

TFAS is a generic term for a COTS trust fund accounting system that provides the basic receipt, accounting, investment, disbursing and reporting functions common to commercial trust funds management operations.

SDA are temporary accounts for the deposit of trust funds that cannot immediately be credited to the proper account holders. As explained in the BIA/OST Interagency Procedures Handbook, this type of account is to be used only as an exception to the rule that trust funds immediately be deposited to the credit of, and then distributed as soon as practicable to, the individual and tribal beneficiaries. The SDA project has two sub-projects: the retrospective (pre-January 1, 2003, receipts) and the prospective (post-December 31, 2002, receipts) phases. OHTA has responsibility for "resolution" (i.e., research and distribution of funds) of the retrospective phase, while BIA has comparable responsibility for the prospective phase. This section of the report to the Court thus addresses only the prospective phase.

Small balance accounts are defined as those with balances of $.01 - $1.00 and no activity in the preceding eighteen months. Management expenses for these accounts are considerable, in part because (as directed by Congress) annual statements must be sent to these account holders.

       **a.**     **Whereabouts Unknown Accounts**

During this reporting period the management and operation of the WAU Project was transferred to OST – Field Operations. In an effort to improve the efficiency of the project, all WAU account update activities are being entered into the same tracking system being used by the Trust Beneficiary Call Center and the Fiduciary Trust Officers. Use of the tracking system should enhance reporting abilities and prevent duplicate account updates.

__Current Status__

During this reporting period, 10,733 accounts with a combined balance of $7.7 million were added to the WAU list, and 3,316 account holders with a combined balance of $4.6 million were located.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                    **Current Accounting Activities**

Priority continues to be placed on securing current addresses for account holders of the rolling top 100 highest dollar balance WAU accounts. During this reporting period, 18 of the top 100 WAU accounts, with combined account balances in excess of $1.3 million, were updated with current addresses.

As of June 30, 2006, there were 53,867 WAU accounts with a combined balance of $65,767,600. The following table illustrates the number of accounts stratified by account balance and WAU category.

| Account Balance | Correspondence/ Check Returned | Account Setup No Address | Awaiting Address Confirmation | Refused/ Unclaimed Mail | Total |
|---|---|---|---|---|---|
| Equal to or over $100,000 | 16 | 9 | 0 | 0 | 25 |
| Under $100,000 and equal to or over $50,000 | 37 | 9 | 0 | 0 | 46 |
| Under $50,000 and equal to or over $5,000 | 2,239 | 786 | 0 | 1 | 3,026 |
| Under $5,000 and equal to or over $1,000 | 5,919 | 1,499 | 5 | 7 | 7,430 |
| Under $1,000 and equal to or over $100 | 8,016 | 2,955 | 12 | 3 | 10,986 |
| Under $100 and equal to or over $1 | 11,544 | 4,539 | 30 | 3 | 16,116 |
| Under $1 | 3,524 | 12,667 | 46 | 1 | 16,238 |
| **Total** | 31,295 | 22,464 | 93 | 15 | 53,867 |

## Delays and Obstacles

The influx of WAU accounts categorized as "Account Setup No Address" causes the total number of WAU accounts to remain relatively constant. These accounts primarily result from a lack of current addresses for individual heirs named in probate orders or recipients of per capita distributions. Also, accounts are being created in TFAS for non-financial asset owners in order to generate asset statements. Many of these owners do not have current addresses. As a result, the total number of WAU is expected to increase significantly.

As of the end of the reporting period there were 16,883 supervised IIM account holders (minors, emancipated minors, adults in need of assistance, and non-compos mentis) coded as WAU. Updating supervised account addresses coded as WAU presents a challenge, since BIA Social Services must verify and update the address changes to these accounts.

The lack of Internet access limits communication effectiveness. OST and its contractor must rely primarily on mail and telephone communication with IIM account holders.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                    **Current Accounting Activities**

### b.    Trust Funds Accounting System

**Accomplishments and Completions**

During this reporting period, seven agencies from the Great Plains Region were converted to the TAAMS Leasing module. The seven agencies are: Fort Totten, Turtle Mountain, Crow Creek, Lower Brule, Cheyenne River, Standing Rock and Yankton. The interface between TAAMS and TFAS allows for quarterly account statements of performance to be produced for beneficiaries, including related ownership and encumbrance information of trust assets managed at the converted agencies. This interface is expected to permit the distribution of these enhanced account statements to begin during the next reporting period.

### c.    Special Deposit Account Activity

**Current Status**

BIA has the responsibility for distribution of SDA funds received since January 1, 2003 (prospective receipts). It is the policy of BIA to distribute funds within 30 days of receipt into SDA. During this reporting period, there were 6,829 receipt transactions posted to SDA.

During this reporting period, aged funds were held in 92 more SDA than in the previous reporting period. Undistributed aged receipts decreased by 346 and the combined dollar amount decreased by $450,292.45. As of June 30, 2006, funds were held in SDA with a combined dollar amount of $1,534,468.02, which represented 3,763 undistributed receipts aged over 30 days from January 1, 2003, through June 30, 2006. As of June 30, 2006, there were 707 receipts in 203 SDA aged more than one year for a combined dollar amount of $542,633.67.

During this reporting period, OST contractors continued to assist the Fort Belknap Agency to reduce its backlogs by encoding probate orders into BIA's IRMS. Reducing backlogs assists agencies with their SDA distribution efforts. OST staff and contractors also assisted BIA staff in performing work necessary to distribute aged receipts at the FIMO, and the Eastern Navajo, Rosebud and Pine Ridge Agencies.

**Delays and Obstacles**

Lack of use of the Internet continues to delay access to information useful to resolving SDA.

### d.    Small Balance Accounts

As of June 30, 2006, there were 24,070 accounts that have a $.01 - $1.00 balance with no activity for the previous 18 months. The total sum included in those accounts is $2,459.82. Statements are sent to account holders for these accounts on an annual basis pursuant to direction from Congress.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                    **Current Accounting Activities**

<u>Assurance Statements</u>

I concur with the content of the information contained in the Whereabouts Unknown Accounts subsection of the Current Accounting Activities section of the *Status Report to the Court Number Twenty-Six*. The information provided in this subsection is accurate to the best of my knowledge.

Date:   July 19, 2006

Name:   *Signature on File*
        Bryan Marozas
        Program Manager
        Beneficiary Call Center


I express no opinion on the content of the Whereabouts Unknown Accounts subsection, above. I concur with the content of the information contained in the balance of the Current Accounting Activities section of the *Status Report to the Court Number Twenty-Six*, and this information is accurate to the best of my knowledge.

Date:   July 20, 2006

Name:   *Signature on File*
        Margaret Williams
        Deputy Special Trustee, Trust Accountability
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                         **Trust Regulations, Policies and Procedures**

III.   **BUREAU OF INDIAN AFFAIRS**

A.   **TRUST REGULATIONS, POLICIES AND PROCEDURES**

**Introduction**

The Office of Planning and Policy Analysis (PPA) in the Office of the Assistant Secretary – Indian Affairs was established on April 21, 2003.  PPA is responsible for developing and promulgating Indian Affairs directives.  PPA is separate from OST's Office of Trust Regulations, Policies and Procedures, whose activities are reported in the OST section of the status reports to the Court.

**Accomplishments and Completions**

**Forest Management Deductions, Indian Forest Management Handbook, Vol. 11 –** The handbook supporting 53 IAM was published during the reporting period and is referenced at 53 IAM 11-H, Forest Management Deductions.

**Current Status**

**Regulatory Initiative –** During this reporting period, comments received during the initial consultation period were considered and incorporated into the draft regulations.  The regulations being proposed during this phase of the Regulatory Initiative amend regulations addressing: probate (25 CFR 15); rules applicable to probate hearings and appeals (43 CFR 4); Indian land records and title documents (25 CFR 150); conveyance of Indian trust or restricted land and removal of trust or restricted status (25 CFR 152); life estates and future interests (25 CFR 179); and create a new CFR part addressing tribal probate codes (25 CFR 18).  These regulations are expected to be proposed during the next reporting period.  Additional tribal consultation meetings have been scheduled for July and August 2006.

**25 CFR 216 – Surface Exploration, Mining, and Reclamation of Lands –** The project was delayed, with publication of the proposed revisions now expected during the first quarter of CY2007.

**25 CFR 162 – Leases and Permits, Subparts C and D – Residential Leases and Business Leases –** Publication of the final rule has been cancelled because the proposed regulatory changes to this part will now be included in the Regulatory Initiative.

**25 CFR 224 – Tribal Energy Resource Agreements –** The proposed rule is under internal review and now is expected to be published during the fourth quarter of CY2006.

**25 CFR 292 – Gaming on Trust Lands Acquired After October 17, 1998 –** During this reporting period, consultation with tribal leaders and the public on the draft regulations were held in Connecticut, New Mexico, California, and Minnesota.  The proposed rule now is expected to be published during the third quarter of CY2006.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                    **Trust Regulations, Policies and Procedures**

---

**Delays and Obstacles**

Lack of access to the Internet has hindered PPA's ability to research statutes and departmental manuals and makes distribution of documents for review by Tribes more difficult and costly.

**Assurance Statement**

I concur with the content of the information contained in the Trust Regulations, Policies and Procedures – BIA section of the *Status Report to the Court Number Twenty-Six*.  The information provided in this section is accurate to the best of my knowledge.

Date:   July 12, 2006

Name: *Signature on File*
        Debbie L. Clark
        Deputy Assistant Secretary – Indian Affairs (Management)
        Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                                              **Fractionation**

## B.    FRACTIONATION

### Introduction

Fractionation of Indian trust and restricted land stems from the federal Indian policy of the 19th Century.  Fractionation occurs as land passes from one generation to the next and more and more heirs or devisees acquire an undivided interest in the land.  This is a complex and potentially emotionally-charged issue, due primarily to cultural differences, historical legacy and family associations of the present owners with the original Indian owners of those lands.  Efforts to address this complex issue are coordinated primarily through the BIA Indian Land Consolidation Office, which seeks to help Tribes make use of the opportunities offered by the Indian Land Consolidation Act, as amended in 2004.  ILCO is operating several acquisition projects and, from there, a nationwide plan is being implemented to promote consolidation of the ownership of Indian land.

### Accomplishments and Completions

- Acquired 21,056 fractional interests during this reporting period, for a cumulative total of 234,772 interests for ILCP in the Midwest, Northwest, Western, Eastern Oklahoma, Navajo, Rocky Mountain and Great Plains Regions.
- Of the total interests acquired, 85.5% were interests of less than 2% ownership in the respective tracts of land.
- Acquired a cumulative total equivalent of 285,367.69 acres for the project reservations.

### Current Status

ILCO has fully implemented the revised strategy for all reservations participating in ILCP.  Each acquisition site has been notified to implement new criteria to target purchases of fractionated interests on tracts of land that have at least 200 interests.  This new criteria is expect to reduce the number of highly fractionated tracts and increase the number of interests acquired on 1,577 targeted tracts.

ILCO has suspended acquisition activities on the Salish-Kootenai Reservation because there were no surface tracts and only two mineral tracts that met the revised criteria.  ILCO also suspended the acquisition program on the Quinault Reservation because of the relatively low number of target tracts available for purchase and on the Gila River Reservation because of the high cost per acre of land.  Program funding from these locations has been redirected to other locations where more interests can be purchased for less cost.  These three reservations will be replaced by three highly fractionated reservations.

The Sisseton-Whapeton Reservation in South Dakota has been added to ILCP.  A meeting with the Winnebago Tribe of Nebraska was held on June 28, 2006.  ILCO is awaiting a tribal resolution supporting the restart of ILCP on that reservation.  ILCO is also awaiting a reply to a letter of invitation sent to the Wind River Reservation.  These three reservations are among the top ten most highly fractionated reservations in the nation.

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                                                 **Fractionation**

Other ILCP activities include:

- Coordinating with OAS and LTROs to prepare for acquisitions at reservations added to the program.
- Continuing to target and acquire additional *Youpee* interests.
- Continuing implementation of LCTS.  LCTS is expected to be fully deployed by the end of FY2006.

### Delays and Obstacles

- Probate and LTRO backlogs and *Youpee* issues continue to impede acquisitions.
- Lack of Internet access results in slower processing of applications from potential sellers and hinders searches for WAU account holders.
- Delay in obtaining land and mineral values impede acquisitions.

### Assurance Statement

I concur with the content of the information contained in the Fractionation section of the *Status Report to the Court Number Twenty-Six.*  The information provided in this section is accurate to the best of my knowledge.

Date:   July 14, 2006

Name: *Signature on File*
         Robert R. Jaeger
         Director, Indian Land Consolidation Office
         Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                              **Probate**

## C.    PROBATE

### Introduction

Federal law permits Indian owners to pass title to their trust assets by testamentary devise or by intestate succession, and imposes upon Interior the duty of determining the legal heirs.  BIA, OHA and OST must coordinate their work to complete the probates of Indian estates. Information on the status of probates is contained within the ProTrac system.  Each BIA regional office and corresponding agency is responsible for encoding new cases, examining "initial load" cases and making corrections.  The majority of the data-cleanup for ProTrac has been completed, which should make ProTrac a more complete source of probate data.

### Current Status

**Case Preparation**

According to ProTrac, 7,337 probate cases are in the case preparation stage.

**Case Adjudication**

According to ProTrac, 6,571 probate cases are in the case adjudication stage.  As reported by OHA, deciding officials received 2,372 cases and issued decisions in 1,454 cases.  OHA reported 4,874 cases pending.

**Case Closure**

According to ProTrac, there are 4,843 cases in the closing stage.  Cases in the closing stage are ones that have been adjudicated but not distributed in TFAS, LTRO, or in the Lease Distribution System.  According to ProTrac, 1,344 cases have been closed during this reporting period.

**Financial Case Closure**

OST reported that it distributed funds and closed 2,884 accounts in TFAS, representing 2,773 estates.  As of the end of June 2006, TFAS contained 30,428 open estate accounts, which is a decrease of 152 from the 30,580 estate accounts at the end of the last reporting period.

**Probate Handbook**

Due to recently effective AIPRA provisions, the final version of the probate handbook will be delayed to allow incorporation of the procedures necessary to implement AIPRA.

### Delays and Obstacles

The following obstacles have been identified as having an impact on the progress of the probate program:

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                                 **Probate**

- Lack of access to the Internet, which includes the inability to use electronic mail communication between OHA and BIA/OST;
- Continued fractionation of ownership of Indian lands;
- Numerous initiatives competing for resources (e.g., *Youpee* revestitures, *Cobell* requirements);
- Cultural diversities regarding the subject of death;
- BIA probate reorganization has not been completed.

## Assurance Statement

I concur with the content of the information contained in the Probate section of the *Status Report to the Court Number Twenty-Six*.  The information provided in this section is accurate to the best of my knowledge.

Date:   July 11, 2006

Name:  *Signature on File*
          William Titchywy
          Acting Special Projects Director
          Western Region
          Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                   **Acronyms and Abbreviations**

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| 1994 Act (or Act) | American Indian Trust Fund Management Reform Act of 1994 |
| A-123 | Office of Management and Budget Circular A-123, Management's Responsibility for Internal Control |
| A-130 | Office of Management and Budget Circular A-130 Appendix III |
| ADM | Attorney Decision Makers |
| AFMSS | Automated Fluid Mineral Support System |
| AIMS | ActivCard Identity Management System |
| AIPRA | American Indian Probate Reform Act |
| AIRR | American Indian Records Repository |
| ALIS | Alaska Land Information System |
| ALJ | Administrative Law Judges |
| ARO | Alaska Region office |
| ARRTS | Appraisal Request and Review Tracking System |
| ART | Accounting Reconciliation Tool |
| AS-IA | Assistant Secretary-Indian Affairs |
| ASD | Appraisal Services Directorate |
| ATO | authority to operate |
| BIA | Bureau of Indian Affairs |
| BIAM | Bureau of Indian Affairs Manual |
| BISS | Box Index Search System |
| BLM | Bureau of Land Management |
| BOR | Bureau of Reclamation |
| BPA | Blanket Purchase Agreement |
| BRM | Business Reference Model |
| C&A | Certification and Accreditation |
| CARS | Cadastral Automated Request System |
| CDE | Critical Data Elements |
| CFedS | Certified Federal Surveyor |
| CFI | Continuous Forest Inventory |
| CGI | Software vendor successor to TAAMS vendor |
| CGIS | Cadastral Geographic Information Systems |
| CIFTA | Certified Indian Fiduciary Trust Analyst |
| CIFTS | Certified Indian Fiduciary Trust Specialist |
| CIO | Chief Information Officer |
| CIRC | Computer Incidents Response Center |
| CISO | Chief Information Security Officer |
| CISSP | Certified Information System Security Professional |
| CMS | Credential Management System |
| COTS | Commercial off-the-shelf |
| CPIC | Capital Planning and Investment Control |
| CSIRC | Computer Security Incident Response Capability |
| CSIRT | Computer Security Incident Response Team |
| CSS | Customer StrataStation |

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                  **Acronyms and Abbreviations**

| | |
|---|---|
| CTM | Comprehensive Trust Management Plan |
| DAA | Designated Approving Authority |
| DEAR | DOI Enterprise Architecture Repository |
| DDoS | Distributed Denial of Service |
| DLRM | DOI Land and Resource Management |
| DM | Departmental Manual |
| DMZ | De-Militarized Zone |
| DNS | Domain Name Server |
| DOI | Department of the Interior |
| DOP | Desk Operating Procedure |
| DoS | Denial of Service |
| DQ&I | Data Quality and Integrity |
| DRM | Data Reference Model |
| EA | Enterprise Architecture |
| ENA | Eastern Navajo Agency |
| EORO | Eastern Oklahoma Region office |
| ERO | Eastern Region office |
| ESN | Enterprise Services Network |
| ETP | Enterprise Transition Plan |
| FAMS | Facilities Asset Management System |
| FAR | Federal Acquisition Regulation |
| FBMS | Financial Business Management System |
| FFMIA | Federal Financial Management Improvement Act |
| FIMO | Farmington Indian Minerals Office |
| FIPS | Federal Information Processing Standards |
| FISMA | Federal Information Security Management Act |
| FMFIA | Federal Managers' Financial Integrity Act |
| FRC | Federal Records Center |
| FRD | Functional Requirements Document |
| FTM | Fiduciary Trust Model |
| FTO | Fiduciary Trust Officer |
| GAO | Government Accountability Office |
| GCDB | Geographic Coordinate Data Base |
| GIS | Geographic Information System |
| GLO | General Land Office |
| GLADS | Great Lakes Agency Database System |
| GPRO | Great Plains Region office |
| GPS | Global Positioning System |
| GSA | General Services Administration |
| GSS | General Support Systems |
| HSPD-12 | Homeland Security Presidential Directive 12 |
| IAM | Indian Affairs Manual |
| IATO | Interim Approval to Operate |
| ICR | Internal Control Review |
| IEA | Interior Enterprise Architecture |

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                    **Acronyms and Abbreviations**

| | |
|---|---|
| IFTR | Indian Fiduciary Trust Records |
| IG | Inspector General |
| IIM | Individual Indian Money |
| IITD | Individual Indian Trust Data |
| ILCA | Indian Land Consolidation Act |
| ILCO | Indian Land Consolidation Office |
| ILCP | Indian Land Consolidation Project |
| IM | Instruction Memorandum |
| InfoDat | Indian Forestry Database |
| Interior | Department of the Interior |
| IP | Internet Protocol |
| IPJ | Indian Probate Judges |
| IPv6 | Internet Protocol Version 6 |
| IQCS | Incidence Qualification and Certification System |
| IRM | Information Resources Management |
| IRMS | Integrated Records Management System |
| IRS | Internal Revenue Service |
| ISA | Information Security Assessment |
| IT | Information Technology |
| ITARS | Indian Trust Appraisal Request Tracking System |
| ITRS | Indian Trust Rating System |
| IV&V | independent verification and validation |
| LAN | Local area network |
| LCTS | Land Consolidation Tracking System |
| LMS | Learning Management System |
| LR2000 | Legacy Rehost 2000 System |
| LRIS | Land Records Information System |
| LTIC | Land Tenure in Indian Country |
| LTRO | Land Titles and Records Office |
| MA | Major Applications |
| MAD/LCP | Management Accounting Distribution/Land Consolidation Program |
| MADS | Management Accounting Distribution System |
| MMD | Missing Mandatory Documents for Unrestricted Accounts |
| MMS | Minerals Management Service |
| MOU | Memorandum or Memoranda of Understanding |
| MRM | Minerals Revenue Management |
| MRMSS | Minerals Revenue Management Support System |
| MWRO | Midwest Region office |
| NARA | National Archives and Records Administration |
| NBC | National Business Center |
| NILS | National Integrated Lands System |
| NIPTC | National Indian Programs Training Center |
| NIST | National Institute of Standards and Technology |
| NORC | National Opinion Research Center |
| NPS | National Park Service |

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006** **Acronyms and Abbreviations**

| | |
|---|---|
| NRO | Navajo Region office |
| NWRO | Northwest Region office |
| O&G | Oil and Gas |
| OAS | Office of Appraisal Services |
| OCIO | Office of the Chief Information Officer |
| OHA | Office of Hearings and Appeals |
| OHTA | Office of Historical Trust Accounting |
| OIG | Office of the Inspector General |
| OME | Office of Minerals Evaluation |
| OMB | Office of Management and Budget |
| OSM | Office of Surface Mining |
| OST | Office of the Special Trustee for American Indians |
| OTFM | Office of Trust Funds Management |
| OTP | Office of Trust Regulations, Policies and Procedures |
| OTR | Office of Trust Records |
| OTRA | Office of Trust Review and Audit |
| PAR | Performance and Accountability Report |
| PII | Personally Identifiable Information |
| PIV | Personal Identity Verification |
| PLSS | Public Land Survey System |
| PMB | Policy, Management and Budget |
| PMSO | Project Management Support Office |
| POA&M | Plans of Actions and Milestones |
| Post-QA | Post Quality Assurance |
| PPA | Office of Planning and Policy Analysis |
| PRIS | Production and Response Information System |
| PRO | Pacific Region office |
| ProTrac | Probate Case Management and Tracking System |
| QA | Quality Assurance |
| QC | Quality Control |
| RAF | Recommended Action Forms |
| RAS | Rangeland Administration System |
| RDRS | Royalty Distribution and Reporting System |
| REM | Real Estate Module |
| RFP | Request for Proposal |
| RM-PLUS | Risk Management Assessment/Evaluation tool |
| RMRO | Rocky Mountain Region office |
| ROW | Rights-of-Way |
| SANS | SysAdmin, Audit, Network, Security |
| SCADA | Supervisory Control and Data Acquisition |
| SDA | Special Deposit Accounts |
| SDLC | System Development Life Cycle |
| SMEs | Subject Matter Experts |
| SMS | System Management Servers |
| SOL | Office of the Solicitor |

*STATUS REPORT TO THE COURT NUMBER TWENTY-SIX*

**July 27, 2006**                                                    **Acronyms and Abbreviations**

| | |
|---|---|
| SPRO | Southern Plains Region office |
| SSA | Social Security Administration |
| SSM | System Security Manager |
| SSP | System Security Plan |
| ST&E | Security Test and Evaluation |
| Statements | Historical Statements of Account |
| STIGs | Security Technical Implementation Guides |
| SUS | System Update Servers |
| SWRO | Southwest Region office |
| TAAMS | Trust Asset and Accounting Management System |
| TAP | Technical Architecture Profile |
| TBCC | Trust Beneficiary Call Center |
| TESC | Trust Executive Steering Committee |
| TFAS | Trust Fund Accounting System |
| TPMC | Trust Program Management Center |
| TRAC | Trust Tracking and Coordination |
| Treasury | Department of the Treasury |
| TRM | Technical Reference Model |
| TRO | Temporary Restraining Order |
| UAT | User Acceptance Testing |
| USGS | United States Geological Survey |
| USPAP | Uniform Standards of Professional Appraisal Practice |
| VBNS | Very High Performance Backbone Network Service |
| VPN | Virtual Private Network |
| WAN | Wide area network |
| WAU | Whereabouts Unknown |
| WRO | Western Region office |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

ELOUISE PEPION COBELL, et al.,    )
                                  )
        Plaintiffs,               )
                                  )
            v.                    )        Case No. 1:96CV01285
                                  )        (Judge Robertson)
DIRK KEMPTHORNE, Secretary of the )
    Interior, et al.,             )
                                  )
    Defendants.                   )
_____ )

**NOTICE OF FILING OF INTERIOR DEFENDANTS'
TWENTY-NINTH STATUS REPORT**

Interior Defendants hereby give notice of the filing of their twenty-ninth report due in

accordance with the Order of December 21, 1999.

A copy of the report is attached hereto.

Dated: May 1, 2007                Respectfully submitted,
                                  PETER D. KEISLER
                                  Assistant Attorney General
                                  MICHAEL F. HERTZ
                                  Deputy Assistant Attorney General
                                  J. CHRISTOPHER KOHN
                                  Director

                                   /s/ Robert E. Kirschman, Jr.
                                  ROBERT E. KIRSCHMAN, Jr.
                                  (D.C. Bar No. 406635)
                                  Deputy Director
                                  Commercial Litigation Branch
                                  Civil Division
                                  P.O. Box 875
                                  Ben Franklin Station
                                  Washington, D.C. 20044-0875
                                  Phone (202) 616-0328
                                  Fax (202) 514-9163

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 1, 2007 the foregoing *Notice of Filing of Interior Defendants' Twenty-Ninth Status Report* was served by Electronic Case Filing, and on the following who is not registered for Electronic Case Filing, by facsimile:

Earl Old Person (*Pro se*)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
Fax (406) 338-7530

  /s/ Kevin P. Kingston  
Kevin P. Kingston



THE SECRETARY OF THE INTERIOR

WASHINGTON

APR 3 0 2007

J. Christopher Kohn
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875

     Re:    *Cobell v. Kempthorne* – *Status Report to the Court Number Twenty-Nine*

Dear Mr. Kohn:

Enclosed is the Department of the Interior's *Status Report to the Court Number Twenty-Nine (For the Period January 1, 2007 through March 31, 2007).*  Please forward a copy to the Court.

My signature on this report reflects my reliance on the assurances of those who have compiled the report that the information contained herein is accurate.

Thank you for your assistance.

Sincerely,

DIRK KEMPTHORNE

Enclosure

# Status Report to the Court
# Number Twenty-Nine

---

**For the Period**
**January 1, 2007 through March 31, 2007**



**May 1, 2007**

---

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                    **Table of Contents**

## TABLE OF CONTENTS

INTRODUCTION.................................................................................................. 1

I.      OFFICE OF HISTORICAL TRUST ACCOUNTING ................................. 3

II.     OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS.................... 9

  A.    TRUST SERVICES – CURRENT ACCOUNTING................................... 11

  B.    OFFICE OF TRUST RECORDS ........................................................ 15

  C.    TRUST ACCOUNTABILITY ............................................................ 19

    1.    TRUST BUSINESS PROCESS MODELING.................................. 19

    2.    TRUST DATA QUALITY AND INTEGRITY................................. 21

    3.    INDIAN FIDUCIARY TRUST TRAINING PROGRAM ..................... 23

    4.    RISK MANAGEMENT............................................................. 25

    5.    TRUST REGULATIONS, POLICIES AND PROCEDURES ............... 27

  D.    TRUST REVIEW AND AUDIT ......................................................... 29

  E.    OFFICE OF APPRAISAL SERVICES ................................................. 31

III.    INDIAN AFFAIRS....................................................................... 35

  A.    TRUST REGULATIONS, POLICIES AND PROCEDURES ..................... 35

IV.     BUREAU OF INDIAN AFFAIRS ..................................................... 37

  A.    FRACTIONATION ........................................................................ 37

  B.    PROBATE .................................................................................. 39

V.      OTHER TOPICS ......................................................................... 41

  A.    INFORMATION TECHNOLOGY ...................................................... 41

  B.    CADASTRAL SURVEY .................................................................. 47

  C.    MINERALS MANAGEMENT SERVICE ............................................. 51

ACRONYMS AND ABBREVIATIONS............................................................. 53

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                    **Table of Contents**

*THIS PAGE INTENTIONALLY BLANK*

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                                **Introduction**

## INTRODUCTION

This *Status Report to the Court Number Twenty-Nine* (Report) represents the period from January 1, 2007, through March 31, 2007.  The Report is presented for the purpose of informing the Court of actions taken since the issuance of the preceding quarterly report.  The Report includes delays in and obstacles to trust reform activities.  A report on the progress of the historical accounting of individual Indian beneficiary funds managed by Interior is a primary part of the Report.[1]

This Report is prepared in a manner consistent with previous reports to the Court.  Managers from the Office of Historical Trust Accounting, Office of the Special Trustee for American Indians, Office of the Chief Information Officer, Bureau of Indian Affairs, Bureau of Land Management, and Minerals Management Service submit reports on the status of their respective Indian trust activities.

A glossary of acronyms and abbreviations is included in this Report.  The glossary is located at the end of the Report.

---

[1]  This Report contains information on the broad trust reform efforts underway at Interior.  Accordingly, it may include information on reform efforts that are not within the scope of the *Cobell* litigation.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                                **Introduction**

## THIS PAGE INTENTIONALLY BLANK

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                    **Office of Historical Trust Accounting**

## I.    OFFICE OF HISTORICAL TRUST ACCOUNTING

### Introduction

OHTA was established by Secretarial Order No. 3231 on July 10, 2001, and is charged with planning, organizing, directing and executing the historical accounting of IIM and Tribal Trust Fund accounts. OHTA's historical accounting includes all transactions in IIM accounts open on or after October 25, 1994 (the enactment date of the American Indian Trust Fund Management Reform Act), through December 31, 2000. OST has issued quarterly IIM account statements since the end of 2000.

### Current Status

**Land-Based IIM Transactions**

A land-to-dollars pilot test was completed at the BIA Horton agency and continued at the Colville agency. These tests were conducted in the Electronic Records Era. Land-to-dollars tests are used to test whether expected surface or subsurface revenues were recorded in the IIM Trust Fund systems. The purpose of the pilot tests is to learn how to best perform such tests and provide information on the processes and resources needed to perform such tests.

NORC's report of the Horton agency pilot test describing the process and results was delivered to OHTA on March 31, 2007. The primary conclusions reached in the Horton agency pilot were that the land-to-dollars tests can be performed by randomly selecting allotments from reservation maps, seeking leases for specific time periods, and verifying that expected revenues are credited to IIM accounts of appropriate owners.

Nearly all the revenue documents (leases, permits) have been identified and collected for the randomly selected allotments in the Colville agency pilot. This pilot test is expected to be completed during the next reporting period.

OHTA continues to research and examine Indian Trust Fund records from the Paper Records Era in order to determine the accuracy and reliability of transactions that may be included in Historical Statements of Account for *Cobell* class members.

**Treasury and GAO Settlement Process**

NORC completed an analysis of randomly sampled ISSDA account settlement packages examined, settled and certified by Treasury auditors from 1890 through 1920 and ISSDA account settlement packages examined, settled and certified by GAO auditors from 1921 through 1950. NORC concluded that Treasury and GAO had a standard process to examine, settle and certify the balance of ISSDA accounts containing IIM and Tribal Trust funds regularly and continually between 1890 and 1950. Although Treasury and GAO audited some IIM account balances, the evidence is inconclusive whether auditing IIM account balances was a consistent part of their standard process. The entire certification process was detailed enough to establish

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**           **Office of Historical Trust Accounting**

that internal controls existed in the processing of Indian Trust funds for the Treasury and GAO settlement periods.  The Treasury and GAO samples were randomly selected from the sampling population of 20,700 Treasury and 23,000 GAO ISSDA account settlement packages, located at the NARA Archives II facility in College Park, MD.

**Judgment and Per Capita IIM Accounts**

In order to devote greater priority to Land-Based IIM accounts, and since reconciliation of over 85% of the Judgment and Per Capita IIM accounts has been completed, OHTA has deferred further historical accounting procedures on the remaining Judgment and Per Capita IIM accounts.

For reconciliations completed to date, Interior reconciled all transactions in each Judgment and Per Capita IIM account.  Most Judgment and Per Capita IIM accounts have one credit posting and many interest postings.  Because numerous accounts are usually associated with each Judgment or Per Capita distribution, by reconciling a payment in one account, Interior can also reconcile all related accounts.  As part of the reconciliation process, Interior recalculated the interest posted to each account.

Results through March 31, 2007, are summarized in the table below.

| | Judgment Accounts | | Per Capita Accounts | |
|---|---|---|---|---|
| | **Number of Accounts** | **Percent of Total** | **Number of Accounts** | **Percent of Total** |
| Total at December 31, 2000 (including accounts open at or after October 25, 1994, but closed prior to December 31, 2000) | 80,539 | - | 19,033 | - |
| Reduction for accounts coded incorrectly as Judgment or Per Capita accounts - <br> - Reduction through December 31, 2006 <br> - Reduction identified in this reporting period | (2,721) <br><br> - | - <br><br> - | (28) <br><br> - | - <br><br> - |
| Total after reductions | 77,818 | 100% | 19,005 | 100% |
| Reconciled January 1, 2001, through December 31, 2006 | (65,694) | (84%) | (17,532) | (92%) |
| Reconciled this reporting period | (485) | ( 1%) | - | (0%) |
| Remaining to be reconciled at March 31, 2007 | 11,639 | 14% | 1,473 | 8% |

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                    **Office of Historical Trust Accounting**

**Mailings to Judgment and Per Capita IIM Account Holders**

On January 26, 2007, OHTA filed its Fifth Submission to the Court to mail 17,621 Judgment and Per Capita Historical Statements of Account. As previously reported, on March 9, 2006, the Fourth Submission for permission to mail 20,402 Historical Statements of Account was filed with the Court. The Third Submission to mail 28,107 Historical Statements of Account was filed on March 24, 2005. Mailing of these 66,130 Historical Statements of Account still awaits approval from the Court.

In *Status Reports to the Court Number Twenty-Two, Twenty-Six* and *Twenty-Seven*, the number of WAU was understated by 1,208. This error occurred because the 1,208 Historical Statements of Account mailed in November 2002 were incorrectly included as part of the 17,096 authorized by the Court's October 22, 2004 Order. While the total number of Historical Statements of Account mailed was correctly reported, the number of WAU statements remaining to be mailed now is 5,201.

**System Tests - Confirming Accuracy of Electronic Records Era Accounting**

Data completeness validation is a process consisting of multiple tests (Transaction Mapping, Balance Comparison, and Account Number Tests), which are designed to detect accounts and transactions missing from the electronic data set, as well as potential posting errors. During prior reporting periods and continuing in this reporting period, this activity has provided assurance for the accuracy of transactions and accounts in the Electronic Records Era (1985-2000).

**Interest Recalculation**

As previously reported, interest recalculation (the verification of periodic interest accruals posted to IIM accounts) was performed on Judgment and Per Capita IIM accounts, and Alaska Land-Based IIM accounts. During this reporting period, OHTA commenced interest recalculation work in the Pacific and Western Regions, as well as all accounts originating after the installation of TFAS.

All semi-annual and monthly interest accruals are being recalculated and compared to actual interest postings in the IIM Trust Fund for each Land-Based IIM account receiving a Historical Statement of Account. An interest factor was determined for each time period by OTFM, based upon the actual IIM Trust Fund investment pool earnings.

**OHTA SDA Distribution Project - Undistributed SDA Balances at December 31, 2002**

SDA are temporary accounts for the deposit of monies that could not immediately be credited to the proper owners. Historically, monies came from various sources, and owners were tribal or IIM account holders or other parties. The SDA project has two phases: the retrospective (pre-January 1, 2003, receipts) and the prospective (post-December 31, 2002, receipts). OHTA has responsibility for "resolution" (*e.g.*, research and distribution of funds) of the retrospective phase, while BIA has comparable responsibility for the prospective phase. This section of the

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                    **Office of Historical Trust Accounting**

report to the Court addresses only the retrospective phase. Information on the prospective phase is in the Trust Services – Current Accounting Activities section of the report.

During this reporting period, 70 SDA involving $533,089 in pre-December 31, 2002, principal and interest were resolved and distributed. There remain 11,344 SDA involving $16,257,452 to resolve and distribute. Total distributions of SDA balances to the owners during the period January 1, 2003, through March 31, 2007, equal $43,057,831, including interest posted from January 1, 2003, through the date of distribution. Of SDA remaining at March 31, 2007, 7,942 accounts (70% of SDA) have balances less than $500 involving $658,688 (4% of SDA dollar balances).

**Imaging/Coding - Individual Indian Trust Documents**

OHTA and its contractors continue to collect and image IIM transaction documents and encode the data to be used to perform the historical accounting. The imaging process converts the original paper records into electronic images. The coding process captures specific identifying information (*e.g.,* IIM account number, date, type of transaction and amount), from an imaged document so that the imaged document can be retrieved at a later time. A document may consist of several related records (images) that can be grouped together for further analysis.

All coded documents are quality-control checked for accuracy before they are loaded into ART for analysis. OHTA and its contractors have never stored IIM transaction data used to perform historical accounting on a system connected to the Internet.

During this reporting period, OHTA completed revisions to the November 1, 2004, OHTA *Coding and Imaging Manual (CI Manual)*. The *CI Manual* standardizes the imaging and coding process for various Indian Trust Fund records. The March 30, 2007, *CI Manual* is currently available in paper format. OHTA expects to distribute paper format copies of the *CI Manual* during the next reporting period and to complete an electronic version of the *CI Manual*. The changes reflect necessary updates for coding IIM records and incorporate new coding requirements for tribal records.

During this reporting period, OHTA completed imaging 148,312 IIM pages, coding 34,330 IIM documents and loading 35,538 IIM documents into ART. As of March 31, 2007, ART contained 9.1 million coded IIM images and 8.1 million coded Tribal images (17.2 million total coded IIM and tribal images). These images constitute 2.5 million IIM and tribal documents.

**Revised** *Accounting Standards Manual (ASM)*

On March 30, 2007, OHTA distributed a complete revision of the *ASM*. The revisions principally add tribal responsibilities to the *ASM*. The *ASM* is now available in both electronic (CD) and paper format.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                              **Office of Historical Trust Accounting**

**OHTA's Federal Records Management**

OHTA continues to work with NARA staff on the transfer of ART data and documentation to NARA's Electronic and Special Media Records Services Division in College Park, MD. Transfer of the system data and system documentation now is expected to occur during the next reporting period.

During this reporting period, OHTA prepared 75 cubic feet of inactive records to be transferred to AIRR for permanent storage and preservation.

**Historical Accounting Plan for Individual Indian Money Accounts**

Interior is reviewing proposed modifications to its Historical Accounting Plan for IIM Accounts. The Plan incorporates lessons learned from historical accounting work already completed, Court decisions, statistical sampling parameters, accounting costs and congressional funding.  Interior expects the modified Plan to be completed during the next reporting period.

**<u>Delays and Obstacles</u>**

Prior to February 16, 2007, when the President signed an entire year CR using FY2006 funding levels, OHTA experienced interruptions to some of its activities due to reduced funding.

**<u>Assurance Statement</u>**

I concur with the contents of the information contained in the Office of Historical Trust Accounting section of the *Status Report to the Court Number Twenty-Nine.*  The information provided in this section is accurate to the best of my knowledge.

Date:        May 1, 2007

Name:        *Signature on File*
             Bert T. Edwards, Executive Director
             Office of Historical Trust Accounting

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                    **Office of Historical Trust Accounting**

*THIS PAGE INTENTIONALLY BLANK*

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

| | |
|---|---|
| **May 1, 2007** | **Office of the Special Trustee for American Indians** |

## II.    OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS

### Introduction

The Office of the Special Trustee for American Indians was created by the American Indian Trust Fund Management Reform Act of 1994. The 1994 Act provides direction to the Department of the Interior on accounting for Indian trust funds and reforming the operation of the Indian fiduciary trust. The Special Trustee's responsibilities under the Act include creating a comprehensive strategic plan for the operation of the trust and providing oversight of the accounting for Indian trust funds and the reform of the trust.

### Special Trustee's Observations

#### Congressional Action

Congress enacted an FY2007 appropriation for OST at the FY2006 level. The FY2008 budget has been submitted and is substantially the same for OST as the FY2007 appropriation, with the exception of reducing the budget request for the Indian Land Consolidation Program from approximately $34 million to $10 million for FY2008. This reduction allows Congress and the Administration to evaluate the program and determine whether other methods should be adopted to increase the consolidation of highly fractionated land.

Although no bill has been introduced to replace the settlement legislation proposed in the last Congress (S.1439), the Administration sent to Congress a proposal to spend up to $7 billion to resolve a variety of Indian claims. Included in the proposal are funds to settle the *Cobell* lawsuit in lieu of continuing to spend money on historical accounting, settlement of all individual and tribal mismanagement claims, and a substantial amount directed to elimination of fractionation over ten years. The proposal also recommends that the trust be converted to an owner-managed trust so that Tribes and individuals have greater decision-making authority in the management of their assets.

#### Interior Management Changes

The Senate confirmed Mr. Carl Artman to be the Assistant Secretary-Indian Affairs. Mr. Artman is responsible for the management and oversight of the Bureau of Indian Affairs, which is responsible for the management of non-financial trust assets. These assets include surface interests, minerals, timber and water located on individual and tribal lands. In addition, BIA is responsible for probating Indian estates and maintaining the record title to all lands held in trust by the United States on behalf of Indians.

The Acting Deputy Assistant Secretary-Indian Affairs for Policy and Economic Development has transferred to a new position within Interior and has been replaced by Mr. George Skibine.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                **Office of the Special Trustee for American Indians**

**Government Accountability Office Report**

During this reporting period, GAO sent a report to Congress, GAO-07-295R, "Office of the Special Trustee for American Indians: Financial Statement Audit Recommendations and the Audit Follow-up Process." The report addresses deficiencies identified and reported in the Indian trust funds' financial statement audits for fiscal years 1996 through 2005.

The report indicates that most of the audit weaknesses cited by independent accountants have been resolved and that two material weaknesses remain. The first weakness concerns unresolved financial reporting matters from prior audit periods, and requires congressional action to resolve. The second weakness relates to OST's reliance on processing of Indian trust transactions at BIA, which has been addressed by implementation of the lockbox and related procedures.

In its conclusions, GAO stated, "OST's and Interior's procedures and controls are designed to meet the requirements of applicable guidance, and controls are in place to reasonably ensure that audit follow-up objectives are achieved for financial statement audits."

**Palm Springs Agency**

A recent congressional inquiry to OIG raised questions about trust asset management at the BIA Palm Springs agency. In 1992, OIG reported on management weaknesses at the Palm Springs agency. In responding to the recent inquiry, OIG indicated that many of its 1992 recommendations have not been adopted and that problems remain at the agency. As a result of this information, I have directed the Office of Trust Review and Audit to conduct a review of the agency to determine its compliance with laws, regulations and policies regarding trust asset management and appropriate remediation. OTRA's report is expected to be available during the next reporting period.

**<u>Assurance Statement</u>**

The comments and observations are provided by the Special Trustee for American Indians and reflect the opinion of the Special Trustee only.

Date:  April 23, 2007

Name: *Signature on File*
       Ross O. Swimmer
       Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                    **Trust Services – Current Accounting**

## A.  TRUST SERVICES – CURRENT ACCOUNTING

**<u>Introduction</u>**

Current accounting activities focus on:  (a) the trust funds accounting system; (b) special deposit accounts; (c) whereabouts unknown accounts; and (d) small balance accounts.

One of the mandates implicit in the 1994 Act is to provide adequate systems for tracking and managing trust assets.  Interior converted to a new trust funds accounting system, TFAS, in April 2000.  The system is used by seven of the ten largest commercial trust departments in the United States.  TFAS allows Interior to reconcile with Treasury and value financial assets on a daily basis, invest with Treasury and meet the statement of performance requirements outlined in the 1994 Act.

Interior next converted its title records to an updated, automated title system, TAAMS Title, which was completed in CY2005.  Currently, Interior is in the process of converting the legacy leasing systems to the TAAMS lease management module.  Once locations are converted to the TAAMS lease management module, encumbrance and ownership information is reflected in TFAS.  Then, using the information reflected in TFAS, funds received at the lockbox[2] can be distributed and statements of performance can be generated.

SDA are temporary accounts for the deposit of monies that could not immediately be credited to the proper owners.  The SDA project has two phases: the retrospective (pre-January 1, 2003, receipts) and the prospective (post-December 31, 2002, receipts).  OHTA has responsibility for "resolution" (*e.g.*, research and distribution of funds) of the retrospective phase, while BIA has comparable responsibility for the prospective phase.

Currently, for non-converted agencies (and RDRS), SDA are used as temporary accounts for deposits of trust monies that cannot immediately be credited to the proper IIM or tribal trust accounts.  For converted agencies, however, SDA use is restricted to deposits of trust monies when distribution is delayed pending a reconciliatory action involving: 1) litigation or appeals, 2) legal opinions or policy changes, or 3) when a survey is required.  Converted agencies also utilize "T" SDA (tribal accounts), which receive TAAMS distributions designated for Tribes or ILCP lien repayments.  The "T" SDA are designed to be flow-through accounts, with automated distributions to the Tribe's proceeds of labor accounts or ILCP lien repayment accounts.

Accounts are classified as WAU for many reasons.  New accounts (for financial and non-financial assets) are sometimes established without an address, often as a result of probate.  Sometimes account holder statements are returned due to an invalid address or an account holder refuses or does not claim mail.  A variety of methods and means are used to locate WAU account holders.

---

[2] "Lockbox" represents the process of using a post office box that the contractor or bank maintains to receive proceeds for the sale or use of trust lands, which are then deposited for distribution to the beneficiaries.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                    **Trust Services – Current Accounting**

Small balance accounts are defined as those with balances of $.01 - $1.00 and no activity in the preceding eighteen months. Management expenses for these accounts are considerable, in part because (as directed by Congress) annual statements must be sent to these account holders.

### a.        Trust Funds Accounting System

**Current Status**

At converted agencies, the interface between TAAMS and TFAS allows quarterly account statements of performance to include ownership and encumbrance information of trust assets. During this reporting period, Alaska, Southwest and Eastern regions were converted to TAAMS leasing. The Midwest Region is expected to be converted in June 2007. All regions and agencies are scheduled for conversion by September 30, 2007.

### b.        Special Deposit Account Activity

**Current Status**

BIA has the responsibility for distribution of SDA funds received since January 1, 2003 (prospective receipts). It is the policy of BIA to distribute funds within 30 days of receipt into SDA. During this reporting period, there were 7,546 receipt transactions posted to SDA.

During this reporting period, aged funds (those held in SDA longer than 30 days) were held in 166 fewer SDA than in the previous reporting period. Undistributed aged receipts decreased by 948 and the combined dollar amount decreased by $388,416.30. As of March 31, 2007, aged SDA totaled $687,951.66, which represented 2,426 undistributed receipts. As of March 31, 2007, there were 1,945 receipts in 218 SDA aged more than one year totaling $512,412.23.

During this reporting period, OST staff and contractors assisted BIA staff in performing work necessary to distribute aged and current receipts at the Colville, Fort Belknap, Eastern Navajo and Wind River Agencies, as well as the Navajo Region and the Federal Indian Minerals Office.

**Delays and Obstacles**

Resolution of SDA totaling over $257,936.48 is delayed by ongoing activities, including adjudication of range rates, need for cadastral surveys, need for SOL opinions, and other litigation-related matters.

Inability to use the Internet also continues to delay access to information useful to resolving SDA.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                    **Trust Services – Current Accounting**

---

### c.    Whereabouts Unknown Accounts

**Current Status**

Priority continues to be placed on securing current addresses for account holders of the rolling top 100 highest dollar balance WAU accounts.  During this reporting period, 12 of the top 100 WAU accounts, with combined account balances in excess of $682,000 were updated with current addresses.

During this reporting period, 12,164 accounts with a combined balance of $7.0 million were added to the WAU list, and 4,382 account holders with a combined balance of $5.9 million were located.

As of March 31, 2007, there were 62,640 WAU accounts with a combined balance of $67.9 million.  The following table illustrates the number of accounts stratified by account balance and WAU category.

| Account Balance | Correspondence/ Check Returned | Account Setup No Address | Awaiting Address Confirmation | Refused/ Unclaimed Mail | Total |
|---|---|---|---|---|---|
| Equal to or over $100,000 | 11 | 8 | 0 | 0 | 19 |
| Under $100,000 and equal to or over $50,000 | 34 | 13 | 0 | 0 | 47 |
| Under $50,000 and equal to or over $5,000 | 2,415 | 723 | 0 | 2 | 3,140 |
| Under $5,000 and equal to or over $1,000 | 5,953 | 1,445 | 0 | 4 | 7,402 |
| Under $1,000 and equal to or over $100 | 8,934 | 3,029 | 9 | 3 | 11,975 |
| Under $100 and equal to or over $1 | 14,519 | 5,503 | 13 | 5 | 20,040 |
| Under $1 | 7,886 | 12,107 | 24 | 0 | 20,017 |
| **Total** | 39,752 | 22,828 | 46 | 14 | 62,640 |

**Delays and Obstacles**

Due to implementation of the FTM, accounts continue to be created in TFAS for non-financial asset owners in order to generate asset statements.  Many of these owners do not have current addresses.  As a result, the total number of WAU has increased.  After the FTM implementation

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                    **Trust Services – Current Accounting**

is completed, however, the rate of WAU is expected to stabilize. The accounts categorized as WAU will then mainly consist of account holders that cannot be located, account holders that have moved without a forwarding address, and accounts that are established without an address for heirs of a probate or recipients of per capita distributions.

The lack of Internet access limits communication effectiveness. OST and its contractor must rely primarily on mail and telephone communication with IIM account holders.

### d.    Small Balance Accounts

**Current Status**

As of March 31, 2007, there were 19,241 accounts that have a $.01 - $1.00 balance with no activity for the previous 18 months. The total sum included in those accounts is $5,517.55. Statements are sent to account holders for these accounts on an annual basis pursuant to direction from Congress.

**Assurance Statements**

I concur with the content of the information contained in the Whereabouts Unknown Accounts subsection of the Current Accounting Activities section of the *Status Report to the Court Number Twenty-Nine*. The information provided in this subsection is accurate to the best of my knowledge.

Date:   April 24, 2007

Name:  *Signature on File*
        Bryan Marozas
        Program Manager, Beneficiary Call Center
        Office of the Special Trustee for American Indians


I express no opinion on the content of the Whereabouts Unknown Accounts subsection, above. I concur with the content of the information contained in the balance of the Current Accounting Activities section of the *Status Report to the Court Number Twenty-Nine*, and this information is accurate to the best of my knowledge.

Date:   April 27, 2007

Name:  *Signature on File*
        Margaret Williams
        Deputy Special Trustee, Trust Accountability
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                         **Office of Trust Records**

### B.  OFFICE OF TRUST RECORDS

### Introduction

The Office of Trust Records was established in 1999 to develop and implement a program for the economical and efficient management of trust records, consistent with the 1994 Act, the Federal Records Act and other statutes and implementing regulations.  The OTR records management program has been developed and implemented, and continues to evolve, to ensure that necessary Indian records are maintained, records retention schedules are consistent with retention needs, and records are safeguarded throughout their life-cycles.

### Accomplishments

### American Indian Records Repository

The American Indian Records Repository was built by Interior in collaboration with NARA for the purpose of consolidating and preserving Indian records at one NARA regional records center.  The facility, located in Lenexa, Kansas, opened in May 2004.  Prior to the opening of AIRR, Indian records were stored in various NARA regional records centers, BIA, and other government facilities across the United States.  All Indian records from the NARA regional centers have been shipped to AIRR, while records continue to be collected from the other locations for shipment to AIRR.  Indian records are indexed at the AIRR Annex before being transferred to AIRR for storage.  A file level index of the contents of each box is stored in an electronic data base called the Box Index Search System.

Approximately 5,223 boxes of inactive records were moved from BIA/OST field locations to the Lenexa Annex for indexing during this reporting period.  Indexing of approximately 154,420 boxes has been completed as of the end of this reporting period.  Approximately 151,600 indexed boxes have been sent to AIRR for permanent storage.

### Training

OTR provided records management training for 198 BIA and OST records contacts and 52 tribal employees during this reporting period.  OTR provided records management training to Tribes as they requested training.

### Current Status

### Safeguarding Records

As previously reported, in November 2006, OTR's conservation contractor conducted an in depth review of box contents and drafted a remediation plan.  OTR had determined that two boxes contained trust records and would undergo repair/conservation.  The other boxes did not contain trust records and were to be stored at the AIRR without remediation.  However, it was subsequently decided by OTR that the contents of all six boxes would undergo

15

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                    **Office of Trust Records**

repair/conservation, which was completed in this reporting period. The conservator separated pages, flattened, cleaned and repaired documents as necessary. Parallel files were set up as necessary (parallel files are composed of copies of the original documents that will be used for research, if necessary, in order to safeguard the original documents).

Also, as previously reported, NARA recommended copying of maps from eight oversized boxes for preservation purposes. Several of the large maps were too big for NARA's copiers. Remediation of these maps by the contractor was also completed during this reporting period. The large maps were cleaned, repaired and, when possible, flattened. OTR reviewed the maps after they were treated and determined that the maps will be copied, on a case by case basis, when requested by researchers.

**Records Retention Schedules**

The Archivist of the United States approved the BIA Geographic Information System (GIS) electronic record schedule on March 30, 2007.

As previously reported, records retention schedules for thirteen BIA electronic records systems were forwarded to NARA in November and December 2006. NARA is reviewing the records schedules and has requested additional information on six systems.

Records retention schedules for three OST electronic records systems were developed and forwarded to NARA during the last week of December 2006. NARA is reviewing the OST electronic systems records schedules and has requested additional information on two systems.

Paper records retention schedules for all OST offices were sent to NARA for review and approval during this reporting period. NARA has informed OTR that it is anticipated that schedules will be forwarded to the Archivist of the United States in the next reporting period.

**Delays and Obstacles**

Lack of Internet access continues to hinder OTR's ability to provide remote access to the record index database for authorized users of the records. If Internet access were available, authorized researchers could conduct their searches from their respective work sites and only visit AIRR when necessary to inspect specific boxes or request documents from specific boxes.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                              **Office of Trust Records**

**Assurance Statement**

I concur with the content of the information contained in the Office of Trust Records section of the *Status Report to the Court Number Twenty-Nine.*  The information provided in this section is accurate to the best of my knowledge.


Date:   April 18, 2007


Name: *Signature on File*
          Ethel J. Abeita
          Director, Office of Trust Records
          Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                          **Office of Trust Records**

*THIS PAGE INTENTIONALLY BLANK*

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                     **Trust Business Process Modeling**

### C.  TRUST ACCOUNTABILITY

### 1.      TRUST BUSINESS PROCESS MODELING

**<u>Introduction</u>**

Interior is working to build a highly effective fiduciary trust services organization by implementing the business objectives contained in the Comprehensive Trust Management Plan. The CTM laid the groundwork for the development of the Fiduciary Trust Model.  The FTM is being implemented to transform the current trust business processes into more efficient, consistent, integrated and fiscally responsible business processes that meet the needs and priorities of the beneficiaries.  Implementation of the FTM is a collaborative effort of BIA, OST, BLM, MMS and OHA, and is integrated with Interior's other trust reform initiatives.

**<u>Accomplishments</u>**

During this reporting period, a draft of the Land Conveyances (25 CFR 152) handbook was completed and delivered to BIA for review.  This draft includes the following chapters:  Sales and Exchanges of Tribal Trust or Restricted Land; Negotiated Sales, Gifts and Exchanges of Individually Owned Land; Tribal Tract Purchases; and Consolidation by Sale of Highly Fractionated Tracts.

**<u>Current Status</u>**

During this reporting period, drafting continued on regulations related to minerals, 25 CFR Parts 200-207.

During this reporting period, OST reengineering staff provided support for converting RDRS to the oil and gas royalty management module within TAAMS, which included identification of system requirements.

OST reengineering staff continued to support the Interior Regulatory Initiative.  The comment period for the Phase I regulations ended on March 12, 2007, and work groups began reviewing comments and revising the proposed regulations.

**<u>Delays and Obstacles</u>**

Lack of Internet access impedes communication with other trust bureaus and offices, and hinders the expansion of reengineered processes that utilize the Internet.  This exacerbates the complexity of reengineering the existing trust business processes.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                    **Trust Business Process Modeling**

<u>Assurance Statement</u>

I concur with the content of the information contained in the Trust Business Process Modeling section of the *Status Report to the Court Number Twenty-Nine.* The information provided in this section is accurate to the best of my knowledge.

Date:   April 27, 2007

Name:  *Signature on File*
        Margaret Williams
        Deputy Special Trustee, Trust Accountability
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                    **Trust Data Quality and Integrity**

## 2.    TRUST DATA QUALITY AND INTEGRITY

### Introduction

The success of trust reform depends, in part, on the accuracy of data generated from the maintenance of trust assets, ownership of trust assets, distribution of trust income, and management of trust accounts.  The DQ&I project focuses on three primary initiatives.  The first initiative is assisting BIA with document encoding into TAAMS Title and TAAMS Leasing.  Currently, BIA is converting to TAAMS Leasing, which tracks the use of Indian trust land.  BIA completed its conversion to TAAMS Title, used to record Indian trust land title activity.

The second initiative involves the validation and correction of critical data elements (CDE) to their respective source documents.  CDE are defined as those trust data elements that are needed to provide:  (1) timely and accurate payments to beneficiaries; (2) timely and accurate transaction listings and asset inventories to beneficiaries, and (3) effective management of the assets.  Examples of CDE are beneficiary name, account number, tract identification number, and land ownership interests.

The third initiative is implementation of a Post-QA process.  The Post-QA process compares the encoded CDE in TAAMS to the CDE in the respective source document(s).  The purpose of performing Post-QA is to help ensure the ongoing accuracy of CDE encoded into TAAMS.

### Accomplishments

During this reporting period, TPMC's contractors completed:

### Encoding

Encoding of surface leases for Jicarilla (17), Laguna (104), Mescalero (55), Northern Pueblos (137), Ramah (423), Southern Pueblos (21), Southern Ute (479), Ute Mountain Ute (189), Zuni (65), Papago (494) and Ft. Yuma (100) Agencies and SWRO (12).

Encoding of ROW documents for Jicarilla (46), Laguna (99), Mescalero (52), Northern Pueblos (120), Ramah (57), Southern Pueblos (33), Southern Ute (619), Ute Mountain Ute (126), Zuni (48) and Papago (166) Agencies and SWRO (4).

Encoding of mineral leases for Jicarilla (50), Southern Ute (228) and Ute Mountain Ute (122) Agencies.

Encoding of 255 ERO land tracts in TAAMS Title.

Applying payment schedules in TAAMS Leasing for 126 surface leases at Fort Hall Agency.

21

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                    **Trust Data Quality and Integrity**

Encoding of probate orders into RDRS for Concho Agency.  This ongoing program work has been assumed by agency personnel.

## Current Status

The DQ&I Project staff continues to assist BIA with TAAMS Leasing conversion efforts by:

- Encoding ROW documents for GPRO LTRO (2,539) and surface leases for MWRO (242).

- Researching land ownership interest variances for Great Lakes (778) and Minnesota (2,164) Agencies.

- Conducting Post-QA review of 18,236 transactions encoded into the trust systems at numerous locations during the quarter for a cumulative total of 118,648.

## Delays and Obstacles

Lack of access to the Internet has resulted in:  (1) communication delays; (2) adverse project coordination issues; (3) increased administrative program costs; and (4) the overall DQ&I project being unable to take full advantage of available information technology.

## Assurance Statement

I concur with the content of the information contained in the Trust Data Quality and Integrity section of the *Status Report to the Court Number Twenty-Nine.*  The information provided in this section is accurate to the best of my knowledge.

Date:   April 24, 2007

Name:  *Signature on File*
        John E. White
        Trust Reform Officer, Trust Accountability
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                    **Indian Fiduciary Trust Training Program**

### 3.    INDIAN FIDUCIARY TRUST TRAINING PROGRAM

**Introduction**

Interior has a continuing responsibility to provide adequate staffing, supervision and training for trust fund management and accounting activities.  Fiduciary trust training is essential to the success of Interior's trust reform efforts and forms an integral part of all training for Interior employees who are involved in the management of Indian trust assets.

**Current Status**

During this reporting period, Cannon Financial Institute personnel presented:

- One *Indian Fiduciary Trust Principles* course to 22 OST, BIA and tribal personnel. Completion of this course, passing an exam and reviewing a DVD entitled *Fiduciary Concepts* are requirements of the *Certified Indian Fiduciary Trust Analyst* certification.

- Five specialty courses to 70 OST and BIA personnel.  The specialty courses, *Risk Management, Probate, Trust Accounting, Asset Management*, and *Fiduciary Behavior and Guardianships* are part of the *Certified Indian Fiduciary Trust Specialist* certification program.

During this reporting period, OST training staff conducted 10 training sessions for 114 OST, BIA, and contractor staff on the use of TFAS and related systems and reporting programs that include:

- CSS – used to enter, approve and post cash transactions;

- Stratavision – contains daily, weekly and monthly reports from OST systems for viewing by OST and BIA staff;

- Historical Query Database – contains account transaction history going back to 1985; and

- TFR – Trust Funds Receivable – used for tracking lockbox receipts.

OST and BIA staff presented one *Trust Fundamentals* course to 16 OST and DOI University staff.  This course includes such topics as the history and policy of Indian trust, current trust reform activities, job roles and responsibilities, and organization and working relationships.

**Delays and Obstacles**

The lack of Internet access inhibits electronic communication with other governmental agencies and contractors, hinders the research of training tools and potential contractors, and restricts OST's ability to access online training programs.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                         **Indian Fiduciary Trust Training Program**

**Assurance Statement**

I concur with the content of the information contained in the Indian Fiduciary Trust Training Program section of the *Status Report to the Court Number Twenty-Nine.* The information provided in this section is accurate to the best of my knowledge.

Date:   April 23, 2007

Name: *Signature on File*
     Dianne M. Moran
     Director, Office of Trust Training
     Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                    **Risk Management**

## 4.    RISK MANAGEMENT

### Introduction

The Deputy Special Trustee, Trust Accountability is responsible for overseeing OST's risk management program, which is implemented by the Trust Program Management Center.  As of this reporting period, this section will address only OST's risk management program.

TPMC risk management staff identify and document OST programs, policies, procedures and processes, both trust and administrative activities.  TPMC staff also develop, operate and maintain risk-based management tools to support and monitor the risk levels and implementation of corrective actions.  In addition, TPMC staff facilitate program reviews, which include testing of program operations, financial reports, and compliance with the law.  These reviews provide the basis for OST's interim and annual statements of assurance.

### Accomplishments

OST completed its FY2007 risk assessment and submitted a comprehensive risk management plan that identifies the schedule of internal control reviews for all OST programs over the course of the next three fiscal years.  Both documents were submitted to PMB, which oversees risk management for Interior.

### Current Status

OST is expanding RM-PLUS to include a section that addresses risks and associated internal controls at the senior management level.

OST is also finalizing its FY2007 methodology and plan for the testing of program operations efficiency and effectiveness, financial reporting reliability, and compliance with the laws and regulations.  These tests and reviews provide the basis for OST's interim and annual statements of assurance.  Testing is expected to be completed during the third quarter of FY2007.

As previously reported, OST submitted, draft guidance to PMB for Indian trust bureaus and offices to meet the A-123 requirements.  Until such time as PMB issues formal guidance, TPMC will continue to monitor OST's compliance with A-123.

As of January 1, 2007, OST had 35 open corrective action plans.  During this reporting period, there was no corrective action plan activity.

### Delays and Obstacles

The lack of Internet access complicates coordination among bureaus and offices, and hampers implementation and use of RM-PLUS, since it is designed as a web-based application.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                    **Risk Management**

<u>**Assurance Statement**</u>

I concur with the content of the information contained in the Risk Management section of the *Status Report to the Court Number Twenty-Nine.* The information provided in this section is accurate to the best of my knowledge.

Date:   April 27, 2007

Name:  *Signature on File*
       Margaret Williams
       Deputy Special Trustee, Trust Accountability
       Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                    **Trust Regulations, Policies and Procedures**

## 5.    TRUST REGULATIONS, POLICIES AND PROCEDURES

### Introduction

The Office of Trust Regulations, Policies and Procedures was established on April 21, 2003, to assist Interior in establishing "consistent, written policies and procedures for trust fund management and accounting," as stated in the 1994 Act.  OTP oversees and facilitates the development, promulgation and coordination of trust-related regulations, policies, procedures and other materials to guide the proper discharge of Interior's fiduciary responsibilities.  OTP is separate from BIA's Office of Planning and Policy Analysis, which is responsible for policies, procedures and regulations affecting all BIA activities.  PPA activities are reported in the BIA section of the report to the Court.

### Accomplishments

During this reporting period, OTP initiated a process whereby an impact analysis is completed whenever a policy, procedure, desk operating procedure or delegation of authority is developed or modified.

OTP issued seven new or revised policies and procedures on March 1, 2007.  These policies and procedures include guidance on:

- Development of Corrective Action Plans in Response to Internal and External Agency Audit/Review Recommendations;

- Laptop Inventory Requirements;

- Procedures used in business processes administered by the Budget, Finance and Administration division; and

- Address and Direct Deposit Updates for Individual Indian Monies (IIM).

### Current Status

OST and BIA worked to finalize the Osage Nation Account Maintenance DOP and the Osage Nation Disbursing DOP.  These DOPs are now scheduled to be completed during the next reporting period.

### Delays and Obstacles

Lack of access to the Internet and its repository of online statutes, the Federal Register and other resources continues to present challenges to this office.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                          **Trust Regulations, Policies and Procedures**

<u>**Assurance Statement**</u>

I concur with the content of the information contained in the Office of Trust Regulations, Policies and Procedures section of the *Status Report to the Court Number Twenty-Nine*.  The information provided in this section is accurate to the best of my knowledge.


Date:   April 26, 2007

Name:  *Signature on File*
          Nina C. Alexander
          Director, Office of Trust Regulations, Policies and Procedures
          Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                      **Trust Review and Audit**

### D. TRUST REVIEW AND AUDIT

**Introduction**

OTRA reports directly to the Special Trustee for American Indians.  OTRA was created by OST as a response to trust initiatives developed during the tribal consultation process of 2002.  OTRA conducts performance audits, examinations and reviews of Interior entities as well as Tribes that manage fiduciary trust activities.  Examinations are routinely conducted at locations that perform trust operations, and are planned to result in a performance rating.  Also, compliance reviews are undertaken in response to information and complaints received from beneficiaries, employees and the public.

**Current Status**

**Indian Trust Examinations**

The Indian trust examination process includes conducting on-site visits to evaluate operations and compliance, performing sufficient testing to verify the integrity of trust operations, and analyzing the effectiveness of management and management controls.  Based upon the results of an examination, OTRA assigns an overall rating reflecting the quality of the administration of fiduciary trust functions.  OTRA follows up on findings in its reports with regions, agencies, and Tribes.

During this reporting period, OTRA performed trust reviews at nine sites, issued nine trust review draft reports for comment and issued 17 final reports.  OTRA performed three follow-up exams for corrective action implementation from examinations performed in prior reporting periods.

**Records Assessments**

The record assessment is a focused evaluation of records maintenance and security.  OTRA completed 17 trust record assessments and issued 11 final reports.

**Compliance Reviews**

Two compliance reviews are pending with fieldwork and/or report drafting continuing on these cases.

**Delays and Obstacles**

Lack of Internet access impedes OTRA's work processes and its ability to communicate effectively, both internally and externally.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                              **Trust Review and Audit**

**Assurance Statement**

I concur with the content of the information contained in the Trust Review and Audit section of the *Status Report to the Court Number Twenty-Nine.*  The information provided in this section is accurate to the best of my knowledge.


Date:   April 19, 2007


Name:  *Signature on File*
         D. Jeff Lords
         Director, Office of Trust Review and Audit
         Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                        **Office of Appraisal Services**

## E.  OFFICE OF APPRAISAL SERVICES

### Introduction

The Office of Appraisal Services, under a management contract with NBC-ASD, is responsible for Indian Land valuations.  The contract was established to provide impartial estimates of market value for a variety of real property interests on land owned in trust or restricted status by individual Indians, Alaska Natives, and Indian Tribes.  Various regulations governing Indian trust lands require valuations.  To meet this requirement, an appraisal or other valuation method is used to determine fair market value of Indian lands.

### Accomplishments

The Office of Minerals Evaluation within ASD is now fully staffed.  The office delivered approximately 12,000 evaluations of mineral interests for ILCP during the reporting period.

As previously reported, OAS contracted the development of ITARS.  The project was completed and a nationwide roll-out of the application was conducted during the reporting period.

A specialized training curriculum for staff Review Appraisers, developed in conjunction with the American Society of Farm Managers and Rural Appraisers, was offered to all OAS and ASD staff during the reporting period.  Courses offered were "Introduction to Appraisal Review," "Appraisal Review Under USPAP," "Appraisal Review Under UASFLA" and "Advanced Appraisal Review Case Studies."

### Current Status

The Deputy Chief Appraiser for Policy and Compliance and the Deputy Chief Appraiser for OST continued to implement and enforce consistent standards and practices for OAS operations during the reporting period.  Audits of workload as well as internal procedural changes have improved quality of OAS's work product and its ability to meet deadlines and manage backlogs.

OAS has continued to work closely with BIA realty staff to improve lines of communication between the two offices and clarify policies for staff to gain understanding of their respective roles and responsibilities with regard to appraisal requests.

OAS is working with the OST Office of External Affairs to obtain appraisal backlog information from compacted and contracted Tribes, and is working to ensure that reporting requirements are incorporated into annual MOUs.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                    **Office of Appraisal Services**

**Appraisal Backlog**

As of this reporting period, the appraisal backlogs are as follows:

| Region | Appraisal Backlog As of 12/31/06 | Appraisal Backlog * As of 03/31/07 |
|---|---|---|
| Northwest | 0 | 27 |
| Rocky Mountain | 55 | 261 |
| Midwest | 85 | 71 |
| Western | 0 | 0 |
| Southwest | 0 | 8 |
| Eastern Oklahoma | 91 | 64 |
| Navajo | 16 | 20 |
| Pacific | 0 | 7 |
| Alaska | 277 | 442 |
| Eastern | 8 | 0 |
| Southern Plains | 9 | 8 |
| Great Plains | 10 | 8 |
| **TOTAL** | **551** | **916** |

* The backlog often includes all requests from BIA, even when the property to be appraised has yet to be defined and whether or not an appraisal is required for a proposed transaction. The requests are addressed in priority order based on factors such as court-ordered transactions, economic transactions, and rights-of-way transactions.

This table does not include appraisal backlog information from the compacted and contracted Tribes. This information is expected to be incorporated into future reports to the Court.

**Delays and Obstacles**

The inability to utilize the Internet as a tool to communicate with outside contacts to research comparable sales and other information is a continuing hardship.

During this reporting period, the Rocky Mountain Region experienced significant increase in appraisal requests from ILCP. In the Alaska Region, unresolved policy issues regarding advertised sales and gift deeds have contributed to an increased backlog.

Difficulties continue in recruiting qualified appraisers for contract positions, particularly in remote locations.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                    **Office of Appraisal Services**

## Assurance Statement

I concur with the content of the information contained in the Appraisal section of the *Status Report to the Court Number Twenty-Nine.*  The information provided in this section is accurate to the best of my knowledge.

Date:   April 27, 2007

Name: *Signature on File*
        Kathryn J. Gearheard, MAI
        Appraisal Services Directorate
        National Business Center

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                **Office of Appraisal Services**

*THIS PAGE INTENTIONALLY BLANK*

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                    **Trust Regulations, Policies and Procedures**

III.    **INDIAN AFFAIRS**

A.  **TRUST REGULATIONS, POLICIES AND PROCEDURES**

<u>Introduction</u>

The Office of Planning and Policy Analysis in the Office of the Assistant Secretary – Indian Affairs was established on April 21, 2003. PPA is responsible for developing and promulgating Indian Affairs directives. PPA is separate from OST's Office of Trust Regulations, Policies and Procedures, whose activities are reported in the OST section of the status reports to the Court.

<u>Current Status</u>

**Regulatory Initiative –** On August 8, 2006, BIA and the Office of the Secretary proposed to amend several regulations related to Indian trust management (71 FR 45173). Phase I of the Regulatory Initiative involves the promulgation of regulations related to probate, probate hearings and appeals, tribal probate codes, life estates and future interests in Indian land, Indian land titles of record, and conveyances of trust or restricted land. The public comment period again was extended and ended on March 12, 2007. The work groups began considering and incorporating comments in anticipation of the final rule.

Phase II, in addition to the Tribal Trust Fund Accounting and Appeals regulation, now includes Land Acquisitions (25 CFR 151). This phase includes tribal consultation and publication of the draft rules.

As previously reported, during CY2007 Interior expects to begin Phase III of the Regulatory Initiative. This phase includes tribal consultation and proposal of the regulations affecting leasing, grazing and rights-of-way.

**25 CFR 216 – Surface Exploration, Mining, and Reclamation of Lands –** This regulation is undergoing additional program review and revisions by the Indian Affairs Division of Energy and Minerals. A work group is expected to meet in May and resume work on the proposed rule, which is expected to be published during the fourth quarter of CY2007.

**25 CFR 224 – Tribal Energy Resource Agreements –** The Office of Indian Energy and Economic Development received SOL comments on the draft final rule during this reporting period. The final rule now is expected to be published during the second quarter of CY2007.

<u>Delays and Obstacles</u>

Lack of access to the Internet has hindered PPA's ability to research statutes and departmental manuals, and makes distribution of documents for review by Tribes more difficult and costly.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                    **Trust Regulations, Policies and Procedures**

**Assurance Statement**

I concur with the content of the information contained in the Trust Regulations, Policies and Procedures – BIA section of the *Status Report to the Court Number Twenty-Nine*.  The information provided in this section is accurate to the best of my knowledge.


Date:   April 26, 2007

Name:  *Signature on File*
           Debbie L. Clark
           Deputy Assistant Secretary – Indian Affairs (Management)
           Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                                                    **Fractionation**

### IV.    BUREAU OF INDIAN AFFAIRS

### A.  FRACTIONATION

**Introduction**

Fractionation of Indian trust and restricted land stems from the federal Indian policy of the 19th Century.  Fractionation occurs as land passes from one generation to the next and more and more heirs or devisees acquire an undivided interest in the land.  This is a complex and potentially emotionally-charged issue, due primarily to cultural differences, historical legacy and family associations of the present owners with the original Indian owners of those lands.  Efforts to address this complex issue are coordinated primarily through the BIA Indian Land Consolidation Office, which seeks to help Tribes make use of the opportunities offered by the Indian Land Consolidation Act, as amended in 2004.  ILCO is operating several acquisition projects that purchase undivided interests in highly fractionated tracts.  A nationwide plan is being implemented to promote consolidation of the ownership of Indian land.

**Accomplishments**

- Indian Land Consolidation Program acquired 26,900 fractional interests during this reporting period.
- Of the total interests acquired during this reporting period, 84% were interests of less than 2% ownership in the respective tracts of land.
- ILCP acquired the equivalent of 41,706.43 acres during this reporting period.
- As a result of ILCP purchases, Tribes now have 100% ownership of 276 tracts.

**Current Status**

- ILCP continued to support the Great Plains Region LTRO by assisting with recording ILCP deeds, re-vesting *Youpee* interests, researching ownership files, and recording to ownership records.
- A total of 16 reservations located in five BIA Regions are participating in ILCP.

**Delays and Obstacles**

- Probate and LTRO backlogs and *Youpee* issues continue to impede acquisitions.
- Lack of Internet access results in slower processing of applications from potential sellers and hinders searches for WAU account holders.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                      **Fractionation**

## Assurance Statement

I concur with the content of the information contained in the Fractionation section of the *Status Report to the Court Number Twenty-Nine.* The information provided in this section is accurate to the best of my knowledge.

Date:   April 18, 2007

Name:  *Signature on File*
        Robert R. Jaeger
        Director, Indian Land Consolidation Office
        Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                                  **Probate**

### B.  PROBATE

**Introduction**

Federal law permits Indian owners to pass title to their trust assets by testamentary devise or by intestate succession, and imposes upon Interior the duty of determining the legal heirs.  BIA, OHA and OST must coordinate their work to complete the probates of Indian estates.  Information on the status of probates is contained within the ProTrac system.  Each BIA regional office and corresponding agency is responsible for encoding new cases, examining "initial load" cases and making corrections.  The majority of the data-cleanup for ProTrac has been completed, which should make ProTrac a more complete source of probate data.

**Current Status**

**Case Preparation**

Case preparation is the initial stage of the probate process.  During this stage information is researched and gathered regarding the identity and whereabouts of potential heirs, and an inventory of the trust assets of an estate is prepared.  According to ProTrac, 7,768 probate cases are in the case preparation stage.

**Case Adjudication**

Depending on the complexity of the case, probates are adjudicated by OHA Administrative Law Judges, Indian Probate Judges, or Attorney Decision Makers.  According to ProTrac, 5,950 probate cases are in the case adjudication stage.  As reported by OHA, deciding officials received 1,400 cases and issued decisions in 1,843 cases.  OHA reported 4,296 cases pending.

**Case Closure**

Cases in the closing stage are ones that have been adjudicated but not updated in TFAS, LTRO, or the Lease Distribution System.  According to ProTrac, there are 3,491 cases in the closing stage and 1,567 cases were closed during this reporting period.

**Financial Case Closure**

Financial case closure is the posting and recording of ownership and distribution of assets after the case has been adjudicated.  OST reported that it distributed funds and closed 2,037 accounts in TFAS, representing 2,002 estates.  As of the end of March 2007, TFAS contained 31,310 open estate accounts, which is an increase of 116 from the 31,194 estate accounts at the end of the last reporting period.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                                                                **Probate**

## Delays and Obstacles

The following obstacles have been identified as having an impact on the progress of the probate program:

- Lack of access to the Internet, which includes the inability to use electronic mail communication between OHA and BIA/OST;
- Continued fractionation of ownership of Indian lands;
- Numerous initiatives competing for resources (e.g., *Youpee* revestitures, *Cobell* requirements);
- Cultural differences regarding the subject of death;
- BIA probate reorganization has not been completed.

## Assurance Statement

I concur with the content of the information contained in the Probate section of the *Status Report to the Court Number Twenty-Nine*.  The information provided in this section is accurate to the best of my knowledge.

Date:   April 24, 2007

Name:  *Signature on File*
         William Titchywy
         Director, Probate Division
         Office of Trust Services
         Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                    **Information Technology**

## V.    OTHER TOPICS

### A.  INFORMATION TECHNOLOGY

**Introduction**

This section describes the status of Interior IT systems, particularly the systems that house or provide access to IITD or provide various computing capabilities, including functions critical to the proper administration of the individual Indian trust responsibilities within Interior.  In addition, this section describes various efforts being made to improve IITD security within Interior, pursuant to OMB Circular A-130 Appendix III, and challenges due to no Internet connectivity at four bureaus.

**Accomplishments**

**Computer Security:**
Interior continues to make progress in enhancing IT security through improvements to the vulnerability scanning process and the re-Certification & Accreditation of systems.  The most noteworthy accomplishments, completions and challenges during the reporting period are described below.

*Prevention and Monitoring*
- ESN is working with BIA to improve the strength of firewall configurations and the functionality of the BIA Intrusion Detection System for TrustNet.
- ESN has implemented a new product for ongoing assessment of external vulnerabilities which is part of Interior's proactive monitoring program.
- During the reporting period ESN perimeter security controls successfully blocked more than one million network attacks.

*Policies and Guidance*
- On January 16, 2007, the acting Interior CIO issued "Security Threats Posed by Trusted Insiders" to bureau and office CIOs.  This memo summarized the IT security risks posed by trusted insiders and reiterated the risk mitigation activities that bureaus and offices should undertake to address these threats.
- On February 26, 2007, the acting Interior CIO issued "Fiscal Year (FY2007) Annual End-User Federal Information Systems Security Awareness Training" to assistant secretaries and heads of bureaus and offices.  This memo requires all users of Interior IT systems to complete annual security awareness training no later than July 31, 2007.
- On March 22, 2007, the Deputy Secretary issued "Cyber Security Responsibilities" to all Interior employees and contractors.  This memo reminded all employees and contractors of their obligation to be knowledgeable about their roles and responsibilities in terms of cyber security.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                      **Information Technology**

**Plan of Action and Milestones:**

- As reported to OMB, Interior has continued to remediate and close out a significant number of weaknesses, eliminating 418 during this reporting period. However, 542 new weaknesses were identified and added; many resulted from self-assessments, independent financial audits and findings based on OIG reports. This reflects Interior's proactive efforts to identify, track and correct security weaknesses. Interior continues to address the remaining 2,014 open weaknesses.
- All weaknesses are categorized as having a risk impact level of high, medium or low. These ratings are used to prioritize efforts to correct weaknesses. Of the 2,014 open weaknesses, 474 (23.5%) are rated high, 997 (49.5%) are rated medium and 543 (27%) are rated low.
- The POA&M statistics include NPS and USGS, which are not trust bureaus. POA&M statistics for trust bureaus are: 155 (14.6%) high, 474 (44.6%) medium, 433 (40.8%) low, for a total of 1,062.
- During the reporting period, Interior submitted to OMB corrected POA&M data for the first quarter of FY2007 as follows: 256 weaknesses closed, 444 new weaknesses identified and a total of 1890 open weaknesses.

**IT Systems Architecture:**

- Interior completed the final draft of the Management Planning and National Environmental Policy Act (NEPA) architectural blueprint. The architectural blueprint recommends business, data, service and technology improvements for Interior land use planning in compliance with NEPA. NEPA affects the management of both federal and Indian trust lands.

**Staffing:**

- The following positions were filled during the reporting period:
  o NBC Deputy CIO
  o BIA C&A Project Manager.

**Current Status**

**A-130 Certification and Accreditation:**

All trust systems that are currently tracked in DEAR now have full ATO status.

- The FWS Isolated Realty Network received full ATO status on March 9, 2007.
- New BIA trust systems:
  o The Trust Active Directory, described in the previous report to the court, received full ATO status on February 15, 2007.
  o All BIA LANs have been associated with one of four geographic zones. Each of these zones will be a separate C&A boundary. C&A activities for each of these four zones, is currently underway and is expected to be completed in the next reporting period.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                    **Information Technology**

**ZANTAZ:**
- The contract was awarded in December 2006 for the forensic analysis of the 268 blank BIA tapes documented in the *Status Report to the Court Number Twenty-Five*. Due to personnel changes, performance under this contract is now scheduled to begin in April 2007.
- As reported in the previous status report to the court, ZANTAZ received the 25 BLM tapes. During this reporting period, ZANTAZ processed the tapes for delivery of messages to the digital safe. Preparation of processed tapes for return to BLM is being performed according to Interior's tape handling policy.
- In February 2007, BLM's Alaska State Office experienced a problem transmitting to ZANTAZ for approximately 11 hours. During this period of time, email was not sent to ZANTAZ. The backup tapes that contain the emails that were not sent during that period are expected to be delivered to ZANTAZ for processing in the next reporting period.
- As reported in the prior three reports, NBC and BLM are both experiencing incompatibilities between anti-virus software and ZANTAZ software. BLM has been working with ZANTAZ to resolve the problem. BLM continues to test a new version of ZANTAZ.
- On March 27, 2007, ZANTAZ notified Interior that a file containing pass codes used to control access to ZANTAZ technical support services was inadvertently sent to another ZANTAZ customer. ZANTAZ customer service notified the individual receiving the file within five minutes of the error. Following investigation, ZANTAZ found no indication that the security of Interior data was compromised. ZANTAZ informed Interior that the file was immediately quarantined. ZANTAZ has changed all pass codes issued to customers to mitigate risks associated with the error.

**Training and Awareness:**
- NBC has begun 2007 Role-Based Security Training as required by FISMA, and is at 35% completion for the individuals required to receive this training.
- Twelve BIA employees & contractors attended a five day training session on "Security Manager Module," a commercial software product that enhances BIA's ability to monitor and respond to network events.
- An MMS contractor presented a three-day Certification and Accreditation course to a number of MMS IT security personnel. This course encompassed all aspects of C&A and leads to certification as a C&A professional.

**Incidents:**
- On December 28, 2006, four tribal computers, four tribal flash drives and an unknown number of tribal CDs were stolen from a 638 tribal office operated on behalf of OST and located on Yakama Nation property. This incident was reported to local police and remains under investigation. An OCIO task force evaluated the types and sensitivity of the data involved. It was determined that the data files that were stolen contained copies of information regarding real property, lessees and lessors, such as:
  - names and addresses of each lessee and lessor;

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                **Information Technology**

    o   lease number, term and date;
    o   type, character and legal description of the property that is the subject of the lease appraisal;
    o   number of acres leased, rental price per acre and total value of the lease.

The analysis also determined that because the information is generally publicly available, the risk of identity theft from the compromise of this information was low. Interior expects to send a notification letter to each of the approximately 200 affected individuals. This letter summarizes the incident, the results of the analysis and recommends that individuals follow best practices for preventing identity theft by continually monitoring their credit reports.

- OHA reported potential misuse of a laptop computer in December 2006. The investigation of this incident by OIG is ongoing.
- During a routine internal review of NBC Appraisal Services Directorate records, an appraisal record containing general Indian trust data was found included in work product on an NBC network connected personal computer. However, the record did not contain IITD. The record was moved from the personal computer to a storage device. NBC Security performed a forensics analysis on the personal computer to ensure that there was no malicious code or other evidence of compromise that would have posed a threat to the information and found no such evidence.
- On January 18, 2007, visual evidence indicated that an attempt had been made to physically break into the BLM computer room containing the servers for the LR2000 system. The cylinder lock on the door had been scratched and rotated from its normal vertical key-insertion position. No other doors appeared to have been forced. There was no evidence that the intruder gained access. Although the lock was not compromised, BLM coordinated with GSA (the building owner) to install an additional metal plate over the lock mechanism to prevent similar break-in attempts in the future.
- In January 2007, a BIA contractor who was conducting probate remediation efforts for the Eastern Region shipped four BIA computers to the contractor's facility in Albuquerque. The contractor did not follow the required "wipe and backup" procedures before shipping the computers. It is not known if the computers were encrypted or contained any sensitive information or data (e.g., privacy or trust). BIA's Office of IT Security and Privacy is in the process of assessing both Interior and bureau specific policies related to the transfer of equipment.
- In February 2007, a BIA Contracting Officers' Representative identified and reported to BIA OISP that incumbent contractor personnel who were retained on a newly awarded contract did not have proper background checks as required under federal guidelines. All contractor personnel who did not have a valid background investigation were immediately removed from proximity to the IT systems. Background investigations have been initiated for these individuals and are currently pending results from OPM. These individuals will not be authorized to access systems until favorable background investigations have been received.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                    **Information Technology**

**Reports:**

These reports were among those issued during this reporting period.

- Using input provided by agency OIGs, Congressman Davis issued the Seventh Report Card on Computer Security at Federal Departments and Agencies on April 12, 2007. Interior was one of eight agencies receiving a failing grade. Overall, the government received a grade of "C-."

- On March 13, 2007, the OIG issued a Notice of Findings and Recommendations. This NFR indicated that during the course of an information technology security evaluation conducted March 6 – 9, 2007, the OIG was able to readily obtain unauthorized access to very sensitive information. Interior has taken the following steps to respond to this NFR and the recommendations that it contains:
  o Informed all bureau and office CIOs of the findings and recommendations and directed that immediate corrective action be taken.
  o Established an Internal Security Improvement Team to develop:
    ▪ additional near-term and longer-term actions needed to address specific issues related to the NFR and results of reviews and assessments of any remaining risks;
    ▪ an enhanced and comprehensive defense-in-depth strategy to enhance Interior's IT security posture.
  o Defined corrective and/or mitigating actions to be taken by all Interior bureaus and offices by April 27, 2007. The results of these actions will be reported in the next quarterly report.
  o As a result of this incident, the IG is conducting an investigation.

**Delays and Obstacles**

Like other federal agencies, Interior must address many challenges regarding the integration, performance, funding, security, and data integrity of IT systems. Interior initiated or completed steps to address some of the challenges reported in this and previous reporting periods. However, delays and obstacles listed below impede progress in achieving Interior's IT management goals.

**Staffing**

- Interior is experiencing high staff and management turnover in critical IT positions, particularly IT security.

- As announced during the previous reporting period, the Interior CIO retired from federal service on January 3, 2007. The Interior Deputy Secretary named the CIO for the USGS to replace the FWS CIO as the acting Interior CIO effective March 12, 2007.

- The following positions remained vacant at the end of this reporting period:
  o Interior's Deputy CISO, Security Policy Lead and Trust Security Officer
  o NBC's IT Security Manager,
  o ESN's Enterprise Security Officer,
  o MMS's MRM IT Security Manager,
  o BLM's IT Security Manager, and
  o BIA's CIO.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                    **Information Technology**

**Funding and Resources**
- Limited congressional appropriations have impacted the ability of Interior to fill personnel vacancies, complete projects and meet deadlines.
- Court orders requiring bureaus to maintain email backup tapes for indefinite periods require the acquisition and maintenance of an extremely large volume of expensive backup tape media. This cost burden on Interior bureaus and offices has diverted funding from other Interior programs.

**Denied Internet Access**
Four Interior bureaus and offices (BIA, OHA, OST and SOL) have not been permitted by the Court to have Internet access since December 5, 2001. As previously reported and detailed in the *Status Report to the Court Number Twenty-Eight*, lack of Internet access impedes work processes and the ability to communicate effectively, both internally and externally.

The following is one of many examples of how bureaus and offices are impacted by lack of Internet access:

- SOL is representing BLM before the administrative tribunal that hears matters pertaining to Arizona Department of Water Resources. The ALJ hearing this case is requiring electronic filings of all protests and written materials relevant to the case. However, due to lack of Internet access, SOL's difficulty in complying with this requirement has reduced its efficiency by requiring SOL attorneys to travel to BLM's office to file and obtain access to court documents.

**<u>Assurance Statement</u>**

I concur with the content of the information contained in the Information Technology section of the *Status Report to the Court Number Twenty-Nine*. The information provided in this section is accurate to the best of my knowledge.

Date:   April 30, 2007

Name: *Signature on File*
        Karen Siderelis
        Department of the Interior Chief Information Officer (Acting)

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                        **Cadastral Survey**

### B.  CADASTRAL SURVEY

**Introduction**

Cadastral surveys provide assurance that land boundaries for individual Indian and tribal trust and restricted lands are identified appropriately.  By federal law, surveys of Indian lands are to be performed under BLM's direction and control and in conformity with the rules and regulations under which other public lands are surveyed.  Official surveys, whether preexisting or new, identify the location of land boundaries of Indian trust assets and determine official acreage.  The official surveys are integral to realty transactions, resource management activities, litigation support and the federal system of patent, allotment and land tenure records maintained by BLM, BIA and local governments.  Ownership information, distribution of land-based trust assets, and management of land-based trust accounts may be related to or based upon information recorded in official surveys.

**Accomplishments**

**Survey Backlog**

Of the 55 backlogged surveys (pre-FY2006), 15 were completed during this reporting period.  The majority of the remaining backlogged surveys are anticipated to be completed by the end of the next reporting period.  Surveys are considered works-in-progress using a two-year cycle and are not considered backlogged during that time.  Backlogs may occur as a result of litigation, water boundary issues, weather, budget, project scope, etc.

**Certified Federal Surveyor Program (CFedS)**

The BLM Cadastral Program has deployed CFedS, a voluntary certification program for state licensed land surveyors.  This certification is expected to enhance cadastral services under the direction and control of BLM on Indian lands.  It is anticipated that the CFedS program will assure boundary integrity, and should increase the production of marked and documented trust lands and their boundaries.  During this reporting period:

- Sixty-nine members of the initial group of CFedS candidates successfully completed the curriculum by passing the final examination.  These individuals are to be recognized for their efforts at an American Congress on Surveying and Mapping (ACSM) sponsored ceremony on May 4, 2007 in Phoenix, Arizona.

- The registration period for the second session of the CFedS Certification Program opened on March 15 and will close on April 15, 2007.  As many as 200 professional land surveyors are expected to enroll.

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                    **Cadastral Survey**

<u>**Current Status**</u>

**Interior Standards for Indian Trust Lands Boundary Evidence**

The Standards for Indian Trust Lands Boundary Evidence are expected to increase efficiencies in land transactions and boundary issues by establishing standard processes and formal procedures for consulting between title and realty specialists, resource managers and cadastral surveyors on land tenure and boundary issues. The standards should also save money, improve record systems and standardize existing processes. The standards are in final draft format.

BLM submitted the final draft standards through the Assistant Secretary, Lands and Mineral Management, to the Assistant Secretary, PMB for inclusion in the Departmental Directives system. These standards are expected to be incorporated as directives by the end of FY2007, at which time other Interior bureaus and offices will be able to use these standards. In the meantime, BLM is monitoring its own use of the standards through a performance tracking system.

**Implementation of the FTM**

During this reporting period, BLM continued to implement FTM goals. These goals as they relate to cadastral services are: (1) funding and support for the 12 BLM Indian Lands Surveyors located in the BIA Regions; (2) deployment and continued development of the CFedS program; (3) improving and extending the PLSS within Indian Country; and (4) creation of a CGIS to be used as a foundation layer of BIA and tribal GIS, which should include legal land descriptions, ownership status, uses and encumbrances, as well as surveys. Further development of the CGIS awaits a variety of decisions including available funding, an IT platform and departmental direction.

<u>**Delays and Obstacles**</u>

**Disconnection from the Internet**

The Court-ordered disconnection from the Internet continues to hamper communications and service delivery between BLM, BIA, OST and SOL. This includes the way CARS is being implemented and the review of the Interior Standards for Indian Trust Lands Boundary Evidence. BLM's productivity has decreased, and the cost associated with dual networks has caused the cost of survey services to increase. This issue continues to impact BLM's ability to provide cadastral services in an effective and cost efficient manner to its trust clients.

**Funding of the FTM**

Proper planning, scheduling and implementation of future FTM work are dependent on funding. The reduced levels and erratic distribution of funding provided by the continuing resolution for Interior's FY2007 budget are negatively impacting the designed implementation of the FTM

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                      **Cadastral Survey**

initiatives.  If the program had been funded at 100% of the BIA's 2007 budget justification, then 165 surveys would have started in FY2007.  With the reduction of funds associated with working under the FY2007 Continuing Resolution, 79 surveys will not be started.  Planning survey projects involves long-term commitment of professional services.  Uncertainty of funding impacts the planning for resources, which increases overall costs.

## Assurance Statement

I concur with the content of the information contained in the Cadastral Survey section of the *Status Report to the Court Number Twenty-Nine*.  The information provided in this section is accurate to the best of my knowledge.

Date:   April 25, 2007

Name:  *Signature on File*
        Donald A. Buhler
        Chief Cadastral Surveyor
        Bureau of Land Management

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                                    **Cadastral Survey**

*THIS PAGE INTENTIONALLY BLANK*

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                    **Minerals Management Service**

## C.  MINERALS MANAGEMENT SERVICE

### Introduction

Minerals Revenue Management, an MMS program, is responsible for collecting, accounting for, and distributing mineral revenues from both federal and Indian mineral leases, and for evaluating industry compliance with laws, regulations and lease terms.  MRM maintains reported information and distributes revenues at the lease level.  BIA maintains individual Indian ownership records that are used to provide information to OST for disbursement of the lease revenues to individual Indian beneficiaries.

### Current Status

**Indian Oil Valuation Rule**

MMS continued with the rulemaking process for the valuation of oil produced from tribal and allotted Indian lands.  The proposed rule was published in February 2006, and the comment period ended in April 2006.  MMS received and reviewed comments from Tribes, industry trade associations, industry producers, and an individual.  MMS decided not to issue the rule as proposed in 2006 based on comments received.  MMS instead is making amendments to the existing 1988 Indian Oil Valuation Rule and anticipates publishing the final rule in September 2007.  Following publication of the final rule, MMS expects to convene a negotiated rulemaking committee to address issues regarding the "major portion" calculation for oil produced from Indian leases.

### Assurance Statement

I concur with the content of the information contained in the Minerals Management Service section of the *Status Report to the Court Number Twenty-Nine*.  The information provided in this section is accurate to the best of my knowledge.

Date:   April 23, 2007

Name: *Signature on File*
        Richard J. Adamski
        Chief of Staff
        Minerals Revenue Management
        Minerals Management Service

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                    **Minerals Management Service**

*THIS PAGE INTENTIONALLY BLANK*

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                            **Acronyms and Abbreviations**

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| 1994 Act (or Act) | American Indian Trust Fund Management Reform Act of 1994 |
| A-123 | Office of Management and Budget Circular A-123, Management's Responsibility for Internal Control |
| A-130 | Office of Management and Budget Circular A-130 Appendix III |
| ADM | Attorney Decision Makers |
| AFMSS | Automated Fluid Mineral Support System |
| AIMS | ActivCard Identity Management System |
| AIPRA | American Indian Probate Reform Act |
| AIRR | American Indian Records Repository |
| ALIS | Alaska Land Information System |
| ALJ | Administrative Law Judges |
| ARO | Alaska Region office |
| ARRTS | Appraisal Request and Review Tracking System |
| ART | Accounting Reconciliation Tool |
| AS-IA | Assistant Secretary-Indian Affairs |
| ASD | Appraisal Services Directorate |
| ASM | Accounting Standards Manual |
| ATO | authority to operate |
| BIA | Bureau of Indian Affairs |
| BIAM | Bureau of Indian Affairs Manual |
| BILS | BLM Indian Lands Surveyors |
| BISS | Box Index Search System |
| BITSM | Bureau Information Technology Security Manager |
| BLM | Bureau of Land Management |
| BOR | Bureau of Reclamation |
| BPA | Blanket Purchase Agreement |
| BRM | Business Reference Model |
| C&A | Certification and Accreditation |
| CARS | Cadastral Automated Request System |
| CDE | Critical Data Elements |
| CFedS | Certified Federal Surveyor |
| CFI | Continuous Forest Inventory |
| CGI | Software vendor successor to TAAMS vendor |
| CGIS | Cadastral Geographic Information Systems |
| CI Manual | Coding and Imaging Manual |
| CIFTA | Certified Indian Fiduciary Trust Analyst |
| CIFTS | Certified Indian Fiduciary Trust Specialist |
| CIO | Chief Information Officer |
| CIRC | Computer Incidents Response Center |
| CISO | Chief Information Security Officer |
| CISSP | Certified Information System Security Professional |
| CMS | Credential Management System |
| COTS | Commercial off-the-shelf |

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                         **Acronyms and Abbreviations**

| | |
|---|---|
| CP&R | Check Payment and Reconciliation |
| CPIC | Capital Planning and Investment Control |
| CSIRC | Computer Security Incident Response Capability |
| CSIRT | Computer Security Incident Response Team |
| CSS | Customer StrataStation |
| CTM | Comprehensive Trust Management Plan |
| DAA | Designated Approving Authority |
| DEAR | DOI Enterprise Architecture Repository |
| DDoS | Distributed Denial of Service |
| DLRM | DOI Land and Resource Management |
| DM | Departmental Manual |
| DMZ | De-Militarized Zone |
| DNS | Domain Name Server |
| DOI | Department of the Interior |
| DOP | Desk Operating Procedure |
| DoS | Denial of Service |
| DQ&I | Data Quality and Integrity |
| DRM | Data Reference Model |
| EA | Enterprise Architecture |
| ENA | Eastern Navajo Agency |
| EORO | Eastern Oklahoma Region office |
| ERA | Electronic Records Era |
| ERO | Eastern Region office |
| ESN | Enterprise Services Network |
| ETP | Enterprise Transition Plan |
| FAMS | Facilities Asset Management System |
| FAR | Federal Acquisition Regulation |
| FBMS | Financial Business Management System |
| FFMIA | Federal Financial Management Improvement Act |
| FIMO | Farmington Indian Minerals Office |
| FIPS | Federal Information Processing Standards |
| FISMA | Federal Information Security Management Act |
| FMFIA | Federal Managers' Financial Integrity Act |
| FOIA | Freedom of Information Act |
| FRC | Federal Records Center |
| FRD | Functional Requirements Document |
| FTM | Fiduciary Trust Model |
| FTO | Fiduciary Trust Officer |
| FWS | U.S. Fish and Wildlife Service |
| GAO | Government Accountability Office |
| GCDB | Geographic Coordinate Data Base |
| GIS | Geographic Information System |
| GLO | General Land Office |
| GLADS | Great Lakes Agency Database System |
| GPRO | Great Plains Region office |

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                    **Acronyms and Abbreviations**

| | |
|---|---|
| GPS | Global Positioning System |
| GSA | General Services Administration |
| GSS | General Support Systems |
| HSPD-12 | Homeland Security Presidential Directive 12 |
| IAM | Indian Affairs Manual |
| IATO | Interim Approval to Operate |
| ICR | Internal Control Review |
| ICRs | Information Collection Requests |
| IEA | Interior Enterprise Architecture |
| IFTR | Indian Fiduciary Trust Records |
| IG | Inspector General |
| IIM | Individual Indian Money |
| IITD | Individual Indian Trust Data |
| ILCA | Indian Land Consolidation Act |
| ILCO | Indian Land Consolidation Office |
| ILCP | Indian Land Consolidation Project |
| IM | Instruction Memorandum |
| InfoDat | Indian Forestry Database |
| Interior | Department of the Interior |
| IP | Internet Protocol |
| IPJ | Indian Probate Judges |
| IPv6 | Internet Protocol Version 6 |
| IQCS | Incidence Qualification and Certification System |
| IRM | Information Resources Management |
| IRMS | Integrated Records Management System |
| IRN | Isolated Realty Network |
| IRS | Internal Revenue Service |
| ISSDA | Indian Service Special Disbursing Agents |
| ISA | Information Security Assessment |
| ISIT | Internal Security Improvements Team |
| IT | Information Technology |
| ITARS | Indian Trust Appraisal Request Tracking System |
| ITIMS | Integrated Transportation Information Management System |
| ITRS | Indian Trust Rating System |
| IV&V | independent verification and validation |
| LAN | Local area network |
| LCTS | Land Consolidation Tracking System |
| LMS | Learning Management System |
| LR2000 | Legacy Rehost 2000 System |
| LRIS | Land Records Information System |
| LTIC | Land Tenure in Indian Country |
| LTRO | Land Titles and Records Office |
| MA | Major Application |
| MAD/LCP | Management Accounting Distribution/Land Consolidation Program |
| MADS | Management Accounting Distribution System |

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                    **Acronyms and Abbreviations**

| | |
|---|---|
| MMD | Missing Mandatory Documents for Unrestricted Accounts |
| MMS | Minerals Management Service |
| MOU | Memorandum or Memoranda of Understanding |
| MRM | Minerals Revenue Management |
| MRMSS | Minerals Revenue Management Support System |
| MWRO | Midwest Region office |
| NARA | National Archives and Records Administration |
| NBC | National Business Center |
| NFR | Notice of Findings and Recommendations |
| NILS | National Integrated Lands System |
| NIPTC | National Indian Programs Training Center |
| NIST | National Institute of Standards and Technology |
| NORC | National Opinion Research Center |
| NPS | National Park Service |
| NRO | Navajo Region office |
| NWRO | Northwest Region office |
| O&G | Oil and Gas |
| OAS | Office of Appraisal Services |
| OCIO | Office of the Chief Information Officer |
| OHA | Office of Hearings and Appeals |
| OHTA | Office of Historical Trust Accounting |
| OIG | Office of the Inspector General |
| OISP | Office of IT Security and Privacy |
| OME | Office of Minerals Evaluation |
| OMB | Office of Management and Budget |
| OSM | Office of Surface Mining |
| OST | Office of the Special Trustee for American Indians |
| OTFM | Office of Trust Funds Management |
| OTP | Office of Trust Regulations, Policies and Procedures |
| OTR | Office of Trust Records |
| OTRA | Office of Trust Review and Audit |
| PAR | Performance and Accountability Report |
| PII | Personally Identifiable Information |
| PIV | Personal Identity Verification |
| PLSS | Public Land Survey System |
| PMB | Policy, Management and Budget |
| PMSO | Project Management Support Office |
| POA&M | Plans of Actions and Milestones |
| Post-QA | Post Quality Assurance |
| PPA | Office of Planning and Policy Analysis |
| PRIS | Production and Response Information System |
| PRO | Pacific Region office |
| ProTrac | Probate Case Management and Tracking System |
| QA | Quality Assurance |
| QC | Quality Control |

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                    **Acronyms and Abbreviations**

| | |
|---|---|
| RAF | Recommended Action Forms |
| RAS | Rangeland Administration System |
| RDRS | Royalty Distribution and Reporting System |
| REM | Real Estate Module |
| RFP | Request for Proposal |
| RM-PLUS | Risk Management Assessment/Evaluation tool |
| RMRO | Rocky Mountain Region office |
| ROW | Rights-of-Way |
| SANS | SysAdmin, Audit, Network, Security |
| SCADA | Supervisory Control and Data Acquisition |
| SDA | Special Deposit Accounts |
| SDLC | System Development Life Cycle |
| SMEs | Subject Matter Experts |
| SMS | System Management Servers |
| SOL | Office of the Solicitor |
| SPRO | Southern Plains Region office |
| SSA | Social Security Administration |
| SSM | System Security Manager |
| SSP | System Security Plan |
| ST&E | Security Test and Evaluation |
| Statements | Historical Statements of Account |
| STIGs | Security Technical Implementation Guides |
| SUS | System Update Servers |
| SWRO | Southwest Region office |
| TAAMS | Trust Asset and Accounting Management System |
| TAP | Technical Architecture Profile |
| TBCC | Trust Beneficiary Call Center |
| TESC | Trust Executive Steering Committee |
| TFAS | Trust Fund Accounting System |
| TPMC | Trust Program Management Center |
| TRAC | Trust Tracking and Coordination |
| Treasury | Department of the Treasury |
| TRM | Technical Reference Model |
| TRO | Temporary Restraining Order |
| UAT | User Acceptance Testing |
| USGS | United States Geological Survey |
| USPAP | Uniform Standards of Professional Appraisal Practice |
| VBNS | Very High Performance Backbone Network Service |
| VPN | Virtual Private Network |
| WAN | Wide area network |
| WAU | Whereabouts Unknown |
| WRO | Western Region office |

*STATUS REPORT TO THE COURT NUMBER TWENTY-NINE*

**May 1, 2007**                                    **Acronyms and Abbreviations**

*THIS PAGE INTENTIONALLY BLANK*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELOUISE PEPION COBELL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:96CV01285 |
| | ) | (Judge Lamberth) |
| DIRK KEMPTHORNE, Secretary of the Interior, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**NOTICE OF FILING OF THE TWENTY-SEVENTH QUARTERLY REPORT
FOR THE DEPARTMENT OF THE TREASURY**

The Department of the Treasury has prepared its *Twenty-Seventh Quarterly Report on
Actions Taken By the Department of the Treasury to Retain IIM-Related Documents Necessary
For an Accounting* and submits it to the Court in accordance with this Court's Order of
December 21, 1999.

A copy of the report is attached hereto.

Dated: September 1, 2006

Respectfully submitted,
PETER D. KEISLER
Assistant Attorney General
STUART E. SCHIFFER
Deputy Assistant Attorney General
J. CHRISTOPHER KOHN
Director

/s/ John J. Siemietkowski
ROBERT E. KIRSCHMAN, Jr.
(D.C. Bar No. 406635)
Assistant Director
JOHN J. SIEMIETKOWSKI
Trial Attorney
Commercial Litigation Branch
Civil Division
P.O. Box 875
Ben Franklin Station

Washington, D.C. 20044-0875
Phone (202) 514-3368
Fax (202)  514-9163

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on September 1, 2006 the foregoing *Notice of Filing of the Twenty-Seventh Quarterly Report for the Department of the Treasury* was served by Electronic Case Filing, and on the following who is not registered for Electronic Case Filing, by facsimile:

> Earl Old Person (*Pro se*)
> Blackfeet Tribe
> P.O. Box 850
> Browning, MT 59417
> Fax (406) 338-7530

> /s/ Kevin P. Kingston
> Kevin P. Kingston



**DEPARTMENT OF THE TREASURY**
BUREAU OF THE PUBLIC DEBT
WASHINGTON. DC 20239-0001

September 1, 2006

MEMORANDUM FOR:    PETER D. KEISLER
                        ASSISTANT ATTORNEY GENERAL
                        CIVIL DIVISION
                        U.S. DEPARTMENT OF JUSTICE

FROM:                PAUL G. WOLFTEICH
                        CHIEF COUNSEL
                        BUREAU OF THE PUBLIC DEBT
                        DEPARTMENT OF THE TREASURY

SUBJECT:          TWENTY-SEVENTH QUARTERLY REPORT
                        *COBELL v. KEMPTHORNE*

Included with this cover memorandum is the "Twenty-Seventh Quarterly Report on
Actions Taken by the Department of the Treasury to Retain IIM-Related Documents
Necessary for an Accounting" (the Report). The Report has been prepared by the
Department of the Treasury pursuant to the Court Order and Opinion in *Cobell v. Babbitt*
(D.D.C. CV No. 96-1285), filed December 21, 1999.

The Report includes information concerning the Financial Management Service ("FMS"),
the Bureau of the Public Debt ("BPD"), and certain Departmental Offices ("DO"). The
Report was prepared based on information provided by a number of program offices from
the above-described organizations. The preparation of the Report included circulation of
drafts of the Report to program offices that are responsible for the actions described in
the Report. Comments were received from those offices and incorporated in the Report.
Senior officials of FMS, BPD and DO reviewed the Report before it was submitted to the
Department of Justice.

The Department of the Treasury stands ready to respond to any questions or concerns the
Court may have after reviewing the Report.

**TWENTY-SEVENTH QUARTERLY REPORT ON ACTIONS TAKEN
BY THE DEPARTMENT OF THE TREASURY TO RETAIN
IIM-RELATED DOCUMENTS NECESSARY FOR AN ACCOUNTING**
*Cobell, et al. v. Kempthorne, et al.*
September 1, 2006

This is the Department of the Treasury's ("Treasury") Twenty-Seventh Quarterly Report, pursuant to the Court's December 21, 1999 Order ("Order") in the above-captioned case. It covers activities occurring over a three-month period from June 1, 2006 through August 31, 2006. The Order requires Treasury to report on the steps it has taken since the last quarterly report to rectify a single breach of its trust responsibilities, namely the destruction of IIM trust materials after their age exceeded six years and seven months. Cobell, et al. v. Babbitt, et al., 91 F.Supp. 2d 1, 50, 59 (D.D.C. 1999).

Treasury continues to preserve IIM-related documentation pursuant to the Court's August 12, 1999 Order, which defines the trust records that Treasury must retain. During the past quarter, Treasury again issued reminders to ensure the retention of required records. The reminders issued this quarter include letters reminding banks (see Attachments A and B), Secret Service (see Attachment C), the National Archives and Records Administration (NARA) (see Attachments D and E), and a contractor (see Attachment F), to continue retaining pertinent records. In addition, employees of the Financial Management Service (FMS) and the Bureau of the Public Debt (BPD) were again reminded to continue preserving records related to this litigation (see Attachments G and H), and retention instructions to pertinent Departmental Office (DO) employees continue to be posted on DO's intranet site (see Attachment I).

On June 14, 2006, Federal Reserve Bank (FRB) attorneys representing each FRB district participated in a conference call, during which representatives of the FMS Chief Counsel's Office provided an update on the Indian trust litigation and a reminder that no FRB fiscal agency records may be destroyed unless approved in writing by Treasury.

During this reporting period, FMS experienced two incidents in which certain of its records were exposed to water. One occurred as a result of unprecedented rainfall at the end of June 2006; the other occurred as a result of a sprinkler system water main break.

The basement of FMS' Hyattsville, Maryland office flooded on June 25, 2006, exposing to water the bottom drawers of a large group of file cabinets containing FMS' working-copy set of microfilm copies of negotiated Treasury checks. This working copy set was created to be used by FMS' Check Claims Branch personnel to obtain copies of checks needed for carrying out business functions without having to access original negotiated checks from the Federal Records Centers. The water exposure is believed to have affected the quality of the check images on at least portions of some of the water-exposed microfilm cartridges. FMS is continuing to investigate the extent of any damage, but it is believed that much of the information on those microfilms is available from other FMS records.

On July 14, 2006 and July 17, 2006, NARA informed FMS and BPD, respectively, that boxes from several accessions of their paper records stored at the Washington National Records Center in Suitland, Maryland (WNRC) became wet as the result of a sprinkler that burst due to a water main break on July 2, 2006.  Approximately 124 boxes of FMS records were affected by the water leak, some of which contain types of records that could include IIM-related records (e.g., Treasury checks and check claims documents).  Approximately 18 boxes of BPD records were affected, all of which contain Savings Bond records.  NARA has advised FMS and BPD that it sent all affected boxes to a remediation contractor, to be dried using freeze-drying techniques, and that it expects all of the boxes to be returned in good condition to the WNRC, possibly by the end of November 2006.

**INDEX TO ATTACHMENTS**

*The Department of the Treasury's Twenty-Seventh Quarterly Report*
*September 1, 2006*

**Attachment A**       August 1, 2006 letters mailed by FMS to Mellon Bank and Bank of America, reminding them to continue preserving all records pertinent to  two lockbox accounts used to process IIM deposits (the account at Mellon Bank is open; the account at Bank of America is closed).

**Attachment B**       Examples of August 2, 2006 Business Alert Message sent by FMS to all banks that act as Treasury's financial agents and August 11, 2006 letter sent by FMS to all banks that formerly acted as Treasury's financial agents, reminding them to continue to retain, indefinitely, records associated with Interior's deposits to the Treasury General Account.

**Attachment C**       August 11, 2006 letter issued by FMS, reminding the U.S. Secret Service to continue preserving, until further notice, all Treasury checks that FMS forwards for investigation and related information and records.

**Attachment D**       August 14, 2006 letter from BPD to NARA, reminding NARA to continue the "freeze" on BPD records at Federal Records Centers.

**Attachment E**       August 14, 2006 letter from FMS to NARA, reminding NARA to continue the "freeze" on FMS records at Federal Records Centers.

**Attachment F**       August 30, 2006 letter from FMS to Didlake, Inc., reminding Didlake, Inc. to continue retaining closed check claims case records indefinitely.

**Attachment G**       Global e-mail issued August 10, 2006 to all FMS employees, and posted on FMS' intranet site, reminding employees to continue retaining records related to this litigation indefinitely and to continue utilizing the "Cobell Archive" mailbox to retain all IIM-related e-mail.

**Attachment H**       Global e-mail issued August 21, 2006 to all BPD employees, and posted on BPD's intranet site, reminding employees to continue preserving IIM-related records indefinitely and sending all IIM-related e-mail to BPD's dedicated mailbox.

**Attachment I**       Retention instructions issued to DO employees and posted on DO's intranet site, including steps for sending e-mail documents to DO's dedicated "Cobell" mailbox.

DEPARTMENT OF THE TREASURY
FINANCIAL MANAGEMENT SERVICE
WASHINGTON, D.C. 20227
August 1, 2006

Ms. Elaine Friedman, Vice President
Mellon Bank
Mellon Client Service Center
Suite 1260
Pittsburgh, PA  15259-0001

Re:  Minerals Management Service Lockbox Account
       Agency Location Code 14170001, Lockbox Number 911-4258

Dear Ms. Friedman:

As you know, FMS remains under a continuing court order in Cobell, et al. v. Norton, et al. to preserve, indefinitely, all records relating to Individual Indian Money (IIM) trust funds and trust assets.  Accordingly, please continue to retain all documentation pertaining to the above-referenced lockbox account until further notice.  You have confirmed that the records for this account include:

Standard Form 215
Standard Form 5515
ACH Receiving Remittance/Payment Report
Demand Deposit Account Activity Statements
any forms used to facilitate internal processing, such as the CA$H-LINK II
    Deposit Report Form

You must retain the records for this account IN ALL FORMS AND MEDIA generated for the account.  This includes paper, electronic, microfilm, microfiche, or any other media.  If you create the same record in multiple media, you must retain the record in all media.

Please distribute this letter to appropriate bank personnel, including records management personnel.  If you have any questions regarding these retention instructions, please contact me at (202) 874-6847.  Thank you for your continued cooperation.

Sincerely,

Sheryl R. Morrow, Director
General Revenue Collection Division

**DEPARTMENT OF THE TREASURY**
**FINANCIAL MANAGEMENT SERVICE**
WASHINGTON, D.C. 20227

August 1, 2006

Mr. Stephen C. Herndon
Senior Vice President
Bank of America
Federal Government Banking Division
600 Peachtree Street, NE
Atlanta, GA 30308-2214

Re: Bureau of Indian Affairs - Palm Springs Lockbox Account (closed 11/1/05)
    Agency Location Code 00004844, Lockbox Number 72758

Dear Mr. Herndon:

As you know, FMS remains under a continuing court order in <u>Cobell, et al. v. Norton, et al.</u> to preserve, indefinitely, all records relating to Individual Indian Money (IIM) trust funds and trust assets. Notwithstanding the fact that the above-referenced lockbox account was closed effective November 1, 2005, <u>please continue to retain all documentation pertaining to the account until further notice.</u> You have confirmed that the account records include:

      Standard Form 215
      Standard Form 5515
      Check copies
      Monthly Account Activity Reports (MAAR)
      Monthly Account Analysis Statements (MAAS)
      Standard Listing
      Any forms used to facilitate internal processing, such as the Daily Balance Sheet

Your bank must continue to retain the records for this account IN ALL FORMS AND MEDIA that were generated. Accordingly, notwithstanding that your bank began generating photocopies of the checks associated with this account on October 1, 2001, you must continue retaining any duplicate copies on microfilm, unless and until FMS obtains court approval for your bank to retain only pre-October 2001 microfilm copies and post-September 2001 photocopies.

Page 2 – Mr. Herndon

<u>Please distribute this letter to appropriate bank personnel, including records management personnel.</u>  If you have any questions regarding these retention instructions, please contact me at (202) 874-6847.

Thank you for your continued cooperation.

Sincerely,

Sheryl R. Morrow, Director
General Revenue Collection Division

cc:  Linda S. Corbett, Senior Vice President, Bank of America

[Business Alert Message (BAM) for Current TGAs]

This is a reminder to continue preserving records in accordance with FMS' prior instructions to your financial institution. As stated in our initial letter dated July 9, 1999 and each successive reminder letter, including the most recent Business Alert Message issued on February 16, 2006, due to ongoing litigation [Cobell, et al. v. Norton, et al., Civ. No. 1-96CV01285 (D.D.C.)], your financial institution must retain, until further notice:

> Standard Form 215, Standard Form 5515 and any supporting documentation, IN ALL FORMS AND MEDIA, associated with transactions relating to deposits received from the Department of the Interior for credit to the Treasury's General Account (TGA). This includes paper, electronic, microfilm, microfiche, or any other media.

If you have not already done so, please designate a point of contact at your financial institution to disseminate these record retention instructions to appropriate personnel at your organization (including records management personnel). Please ensure that an appropriate dissemination and compliance process is in place to ensure these instructions are being followed at your financial institution.

If these retention instructions create a problem for your operations, please send your concerns in writing to the Over-the-Counter Revenue Collection Division at 401 14th Street, S.W., Room 307C, Washington, DC 20227.

If you have any questions, contact the Federal Reserve Bank of St. Louis at 1-866-771-1842 or Ava Singleton on (202) 874-9986.

DEPARTMENT OF THE TREASURY
FINANCIAL MANAGEMENT SERVICE
WASHINGTON, D.C. 20227

August 11, 2006

Dear Sir or Madam:

This is a reminder to continue preserving records in accordance with FMS' prior instructions to your financial institution. As stated in our initial letter dated July 9, 1999 and each successive reminder letter, including our most recent reminder letter dated February 24, 2006, due to ongoing litigation [Cobell, et al. v. Norton, et al., Civ. No. 1-96CV01285 (D.D.C.)], your financial institution must retain, until further notice:

> Standard Form 215, Standard Form 5515 and any supporting documentation, IN ALL FORMS AND MEDIA, associated with transactions relating to deposits received from the Department of the Interior for credit to the Treasury's General Account (TGA). This includes any such records formerly maintained by the financial institutions shown on the attached list, now in your possession, custody or control. This includes paper, electronic, microfilm, microfiche, or any other media.

If you have not already done so, please designate a point of contact at your financial institution to disseminate these record retention instructions to appropriate personnel at your organization, including records management personnel. Please ensure that an appropriate dissemination and compliance process is in place to ensure these instructions are being followed at your financial institution.

If these retention instructions create a problem for your operations, please send your concerns in writing to the Over-the-Counter Revenue Collection Division (OTCD) at 401 14th Street, S.W., Room 307C, Washington, DC 20227, as soon as possible.

Thank you for your continuing cooperation in this matter. If you have any questions, the first point of contact is the Federal Reserve Bank of St. Louis at 1-866-771-1842. Should you have further questions, feel free to contact Ava Singleton on (202) 874-9986.

Sincerely,

*Michael G. Ziegler*

for   Corvelli A. McDaniel, Director
Over-the-Counter Revenue Collection Division
A/C Federal Finance

DEPARTMENT OF THE TREASURY
FINANCIAL MANAGEMENT SERVICE
HYATTSVILLE, MD 20782

AUG 11 2006

Brian K. Nagel
Assistant Director,
Office of Investigations
U.S. Secret Service
950 H Street, N.W.
Washington, D.C. 20223

Re: Document Retention Order in <u>Cobell, et al. v. Norton, et al.</u>
     Civ. No. 1-96CV01285 (D.D.C.)

Dear Mr. Nagel:

This is a reminder that Treasury remains subject to a continuing court order in the above-referenced lawsuit, requiring Treasury to retain, indefinitely, "all documents and data relating to Individual Indian Money trust funds and Individual Indian trust assets." Copies of the document retention order entered in the case on August 12, 1999 and Treasury's Stipulation filed with the court on July 6, 1999 were provided with some of our previous reminder letters to Secret Service, including our reminder letter dated August 26, 2003. Please let me know if you need copies of those documents.

As stated in our previous letters to Secret Service (dated January 14, 2000, October 13, 2000, February 28, 2001, August 29, 2001, August 28, 2002, February 12, 2003, August 26, 2003, January 16, 2004, August 2, 2004, February 2, 2005, August 10, 2005, and February 6, 2006), among the types of records that Treasury must preserve to comply with the court order and Stipulation are <u>all Treasury checks and check-related records</u>. Accordingly, please continue to preserve, until further notice, all Treasury checks that FMS forwards to your bureau for investigation and all information and records your bureau maintains relating to those checks. <u>Please continue to take all steps necessary to determine and document that all such records in the possession of Secret Service are being preserved indefinitely.</u>

If you have any questions concerning the <u>Cobell</u> document retention order and Stipulation, please contact Beth Kramer in the FMS Chief Counsel's office, at (202) 874-7036, or me, at (202) 874-7913.

Thank you for your continued cooperation and assistance.

Sincerely,

Ronald G. Cymbor, Director
Financial Processing Division

cc: Thomas Dougherty, Office of Chief Counsel, U.S. Secret Service – Fax #202/406-6544

# DEPARTMENT OF THE TREASURY
## BUREAU OF THE PUBLIC DEBT
### PARKERSBURG, WV 26106-1328

August 14, 2006

National Archives and Records Administration
Life Cycle Management Division
Attention: Stephen Cooper
8601 Adelphi Road
College Park, MD 20740-6601

Re: Suspending Destruction

Dear Mr. Cooper:

As you are aware, the Bureau of the Public Debt (BPD), Department of the Treasury, has been under court order since August 1999 to preserve all documents relating to the pending litigation, Cobell v. Norton, et al., which challenges the government's management of the Individual Indian Monies (IIM).

The purpose of this letter is to remind you that BPD remains under court order to preserve records indefinitely for purposes of the Cobell litigation. Therefore, we request that the Federal Records Centers continue to implement the freeze on **all** records from BPD Record Groups 53 and 82 and preserve all such records until further notice.

Thank you for your cooperation in this matter.

Sincerely,

Vicki Thorpe, Manager,
Graphics, Printing, and Records Branch
Records Officer

**DEPARTMENT OF THE TREASURY**
FINANCIAL MANAGEMENT SERVICE
HYATTSVILLE, MD 20782

August 14 , 2006

Thomas E. Mills
Assistant Archivist for Regional Records Services
National Archives and Records Administration
Office of Regional Records Services
8601 Adelphi Road, Suite 3600
College Park, MD  20740

Dear Mr. Mills:

The purpose of this letter is to remind you that Financial Management Service (FMS), a
bureau of the U.S. Department of the Treasury, remains under court order to preserve
records indefinitely for purposes of the Cobell, et al. v. Norton, et al. litigation.
Therefore, we request that the Federal Records Centers continue to implement the freeze
on **all** records from FMS Record Groups 39, 50 and 425 and preserve all such records
until further notice.

If you have any questions, you may contact Charles Brett at (202) 874-6156.  Thank you
for your cooperation in this matter.

Sincerely,

Sharon M. King, Director
Administrative Programs Division



August 30, 2006

Didlake, Inc.
Attn: Victoria Tanner, Project Manager
3700 East-West Highway, Room B-014
Hyattsville, MD 20782

Re: FMS Contract Number TFMS-HQ-04-K-0001 (formerly FHQ99D51295)

Dear Ms. Tanner:

Please continue to ensure that appropriate personnel at your company who perform work
For FMS under the referenced contract are aware of, and are complying with, FMS's
longstanding instructions to retain, indefinitely, all check claims related records. Such
Records include microfiche copies of closed check claims case files, original documents
Contained in such files (including original TFS 1133 claim forms), and any supporting
Information or documentation associated with same.

Our letter to you dated August 7, 2001 included a copy of the retention order issued
August 12, 1999 in the Cobell, et al. v Norton, et al. litigation. If you need another copy
of the retention order, please let me know.

Please make FMS aware of any concerns you may have regarding these instruction.
You may contact the COTR, Marilyn Haynes, at (202) 874-8883 or Evelyn J. Daval at
(202) 874-6979, if you have any questions.

Thank you for your continued cooperation.

Sincerely,

Evelyn J. Daval
Contracting Officer

Cc: Marilyn Haynes, COTR
     Beth Kramer, Office of Chief Counsel



# Official FMS Business

| | |
|---|---|
| **To:** | Office of the Commissioner Debt Management Services Federal Finance Financial Operations Governmentwide Accounting Information Resources AC Management Regional Operations HQ Austin Birmingham Kansas City Philadelphia San Francisco |
| **Date:** | 08/10/2006 |
| **From:** | William Higgins |
| **Subject:** | Cobell and Tribal Trust Litigation - FMS Retention Requirements |

Date:      August  10, 2006

To:         All FMS Employees

From:      Kenneth R. Papaj
            Commissioner

Subject:   <u>Cobell</u> and Tribal Trust Litigation – FMS Retention Requirements

All FMS employees are again reminded that FMS remains subject to continuing court orders and Treasury directives, requiring us to retain and safeguard all documents, data and tangible things that relate to Individual Indian Money (IIM) and Tribal trust funds and assets, indefinitely.  To ensure that we remain in compliance with the court orders and directives, **please continue to adhere to the following FMS requirements:**

1.  <u>Do not destroy any documents, data or tangible things unless you have received written approval from the Chief Counsel.</u>  This rule applies to <u>all</u> documents, data and tangible things, whether litigation-related or not.  Prepare a disposition request, following the instructions contained in the Chief Counsel's March 7, 2000 memorandum entitled "Process for Obtaining Disposition Approval" (posted on the FMS intranet on the "Cobell/Tribal Litigation" page).  <u>The only exception to this rule is for "obvious non-record materials," as described in the attached "Quick Reference Guide."</u>

2.  <u>Continue copying or forwarding all Cobell-related and Tribal-related e-mail and other electronic documents to their respective dedicated mailboxes</u> ("<u>Cobell Archive@fms</u>" for Cobell-related e-mail/electronic documents and "<u>Tribal Mailbox@fms</u>" for Tribal-related e-mail/electronic documents).  To insert a mailbox address on an e-mail, simply type "Cobell" or "Tribal" and press the "Enter" key.  You may delete your copy of any e-mail or other electronic document sent to these mailboxes.

3.  <u>Promptly forward any voicemail messages that relate to the Jicarilla Apache Nation or The Pueblo of Laguna Tribe to FMS' dedicated "Tribal" voicemail repository.</u>  Step-by-step instructions for forwarding voicemail messages to the repository are provided in my March 26, 2004 memorandum (posted on the FMS intranet on the "Cobell/Tribal Litigation" page).

4.  <u>Do not archive (move) data from any FMS electronic production systems that contain litigation-related data, except pursuant to a written archive plan that has been approved by the Commissioner's Office.</u>  Please refer to the Deputy Commissioner's March 24, 2000 memorandum entitled "Maintenance of Data on FMS Systems" (posted on the FMS intranet on the "Cobell/Tribal Litigation" page) for more information about this requirement.

5.  <u>Do not attempt to give guidance on record retention matters to Federal Reserve Bank personnel.</u>  Please refer all such questions to Terri Dawson at (202) 874-6877 or to Beth Kramer at (202) 874-7036.

I appreciate your continued compliance with these instructions and encourage you to review the pertinent memoranda posted on the FMS intranet.  To locate the memoranda, double click on the icon for Netscape Navigator.  This moves you to FMS' intranet.  Under "News" or "Hot Topics," click on "Cobell/Tribal Litigation."

If you have questions or need assistance regarding any of these retention requirements, please do not hesitate to contact Terri Dawson at (202) 874-6877 or Beth Kramer at (202) 874-7036.

Thank you.


Attachment


## FMS Insider

You are here: **Home** > **News** > **Cobell Litigation** > **-- Commissioner Papaj (August 10, 2006 memo) - Attachment**

# Commissioner Papaj (August 10, 2006 memo) - Attachment

Previous Page | Next Page

# "A Quick Reference Guide"

**REMEMBER: PRESERVE ALL INTERIOR/INDIAN-TRUST-RELATED MATERIAL!!**

| OBVIOUS NONRECORD MATERIALS | |
|---|---|
| These may be destroyed without the approval of the Chief Counsel | |
| **CATEGORIES** | **EXAMPLES** |
| **1. Non-Treasury/FMS Material** | • Office supply catalogs<br>• vendor marketing materials<br>• non-FMS publications/manuals, such as phone books, Federal Register, dictionaries, "Lotus Notes for Dummies," etc. |
| **2. Treasury/FMS Distribution/ Reference Material** | • attendee's copy of handouts received at meetings, training, etc.<br>• employee's copy of work-related organization charts, phone lists, Treasury Correspondence Manual, etc.<br>• employee's copy of FMS publications, such as "Fiscal Scene"<br>• excess stocks of FMS marketing materials, such as Direct Deposit brochures<br>• notices received re: IT security, scheduling of meetings & van rides, training, "acting" managers, voting leave, etc. |
| **3. Personal Papers** | • notices received re: retirements, deaths, TSP, CFC, PTI, Flex Account, etc.<br>• employee's copy of T&A, payroll, personnel, etc. records (except travel records/receipts)<br>• printouts of non-Federal Web pages that were not used for FMS business<br>• non-FMS-related calendars/reminders<br>• recipes, poems, cartoons, etc. |
| **4. Other** | • printer banner pages and printer failure reports<br>• interim drafts created but never circulated to anyone<br>• duplicates of any of the examples in these four categories. |

**Previous Page** | Next Page

Nancy Fleetwood/BPD
08/21/2006 12:44 PM

To  All - BPD (Business use only!)

cc  IIM Mailbox@BPD

bcc

Subject  IMPORTANT REMINDER TO ALL EMPLOYEES

History:      🔁 This message has been forwarded.

I'd like to remind all employees that BPD remains subject to a court order that governs the retention of records relating to the Individual Indian Money (IIM) trust fund and IIM trust assets. To ensure compliance with this court order, you should not destroy any documents or data pertaining to the following subjects without written approval from the Chief Counsel or his designee:

- IIM deposit fund investment records
- IIM accounts and accounts held in trust by the Department of the Interior
- Savings bonds held in trust form of registration by the Department of the Interior
- Correspondence (internal and external) relating to Individual Indian Money
- Electronic communications, such as e-mails and Internet messages, relating to the subjects above, unless those communications have been forwarded to the *Cobell* mailbox.

You should continue to copy or forward all e-mails relating to the IIM trust fund, IIM trust assets, and the *Cobell* litigation to the dedicated IIM Mailbox. To insert the mailbox address on an e-mail, simply type "IIM Mailbox" and press the "Enter" key.

The Federal Reserve Banks have also been instructed not to destroy any fiscal agency records unless they have received specific permission in writing from Treasury authorizing the destruction. Please refer any inquiries from FRB personnel regarding record retention to Jimmy Phillips at (202) 504-3683, fax number (202) 504-3630. Don't attempt to give guidance on record retention matters to any FRB employee.

I appreciate your continued compliance with these instructions and encourage you to occasionally review the pertinent memoranda and e-mails, which are posted on PD Web under the Office of the Chief Counsel's (OCC) website. Just click on the office link "OCC" and then click on " *Cobell v. Norton* ," which appears in the "Litigation" section.

Thanks again for the great support you have shown in helping Public Debt comply with a very challenging court order.

Image: DONet/Portal Image Banner

## Litigation Obligations and Directives

### Office of the General Counsel

**Directive From General Counsel To All Departmental Offices Employees Concerning Cobell Litigation**

By order of the Court in Cobell v. Norton, Departmental Offices employees must preserve all documents and records, whether in paper, electronic, or other form, that are relevant to any aspect of the government's responsibilities with respect to the individual Indian money trust. Such responsibilities include, but are not limited to, management, administration, collection, disbursement, investment, and accounting of trust funds.

To comply with the various court orders to which we are subject in Cobell v. Norton, to make it easier to manage and retrieve electronic mail as needed, and to help ensure that our electronic mail will continue to operate, I am requesting that you do the following things:

**Step One: Search for Previous E-Mails You Have Sent or Received**
Search your e-mail, including "Inbox," "Drafts," "Message Log," and all "Folders" and "Archives," for anything that relates in any way to the Cobell litigation, Individual Indian Monies, or Department of Interior investments on behalf of individual Indians. Forward any e-mails that you find on this subject (including attachments and retaining forwarding history) to "Cobell" or Cobell@do.treas.gov. In an effort to manage electronic mail, we have created this dedicated mailbox for Cobell-related and/or discussions relating to Individual Indian Money account.

**Step Two: E-Mails That You Send in the Future**
Beginning immediately, send a "cc" (not a "bcc") of all e-mails (including attachments) that you initiate, that relate in any way to the Cobell litigation, Individual Indian Monies or Department of Interior investments on behalf of individual Indians, to "Cobell."

**Step Three: E-Mails That You Receive in the Future**
Also beginning immediately, forward all e-mails that

About Us

Contacts
Page Owner

**Home**

you receive (including attachments and retaining forwarding history) that relate in any way to the Cobell litigation, Individual Indian Monies or Department of Interior investments on behalf of individual Indians, to "Cobell," unless you can tell from the message that the e-mail has already been sent to the "Cobell."

If you have questions on this process or the retention of documents, call Thomas McGivern, Counselor to the General Counsel, at 622-2317.

If you need help in formulating e-mail searches or forwarding messages, or have questions on the "Cobell" mailbox, contact the HelpDesk at 622-1111.

Contact Webmaster | Updated: Monday, April 14

 Logo:
Departme
Offices Int

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ELOUISE PEPION COBELL, et al.,     )
                                     )
      Plaintiffs,               )
                                     )
      v.                       )     Case No. 1:96CV01285
                                   )     (Judge Robertson)
DIRK KEMPTHORNE, Secretary of the Interior,  )
     et al.,                      )
                                     )
      Defendants.             )
_____)

## NOTICE OF FILING OF THE TWENTY-NINTH QUARTERLY REPORT FOR THE DEPARTMENT OF THE TREASURY

The Department of the Treasury has prepared its *Twenty-Ninth Quarterly Report on Actions Taken By the Department of the Treasury to Retain IIM-Related Documents Necessary For an Accounting* and submits it to the Court in accordance with this Court's Order of December 21, 1999.

A copy of the report is attached hereto.

Dated: March 1, 2007          Respectfully submitted,
                                PETER D. KEISLER
                                Assistant Attorney General
                                STUART E. SCHIFFER
                                Deputy Assistant Attorney General
                                J. CHRISTOPHER KOHN
                                Director

                                /s/ John J. Siemietkowski
                                ROBERT E. KIRSCHMAN, Jr.
                                (D.C. Bar No. 406635)
                                Deputy Director
                                JOHN J. SIEMIETKOWSKI
                                Trial Attorney
                                Commercial Litigation Branch
                                Civil Division
                                P.O. Box 875
                                Ben Franklin Station

Washington, D.C. 20044-0875
Phone (202) 514-3368
Fax (202)  514-9163

CERTIFICATE OF SERVICE

I hereby certify that, on March 1, 2007 the foregoing *Notice of Filing of the Twenty-Ninth Quarterly Report for the Department of the Treasury* was served by Electronic Case Filing, and on the following who is not registered for Electronic Case Filing, by facsimile:

> Earl Old Person (*Pro se*)
> Blackfeet Tribe
> P.O. Box 850
> Browning, MT 59417
> Fax (406) 338-7530

>    /s/ Kevin P. Kingston
>    Kevin P. Kingston



DEPARTMENT OF THE TREASURY
BUREAU OF THE PUBLIC DEBT
WASHINGTON, DC 20239-0001

March 1, 2007

MEMORANDUM FOR:    PETER D. KEISLER
                   ASSISTANT ATTORNEY GENERAL
                   CIVIL DIVISION
                   U.S. DEPARTMENT OF JUSTICE

FROM:              PAUL G. WOLFTEICH
                   CHIEF COUNSEL
                   BUREAU OF THE PUBLIC DEBT
                   DEPARTMENT OF THE TREASURY

SUBJECT:           TWENTY-NINTH QUARTERLY REPORT
                   *COBELL v. KEMPTHORNE*

Included with this cover memorandum is the "Twenty-Ninth Quarterly Report on Actions
Taken by the Department of the Treasury to Retain IIM-Related Documents Necessary
for an Accounting" (the Report). The Report has been prepared by the Department of the
Treasury pursuant to the Court Order and Opinion in *Cobell v. Babbitt* (D.D.C. CV No.
96-1285), filed December 21, 1999.

The Report includes information concerning the Financial Management Service ("FMS"),
the Bureau of the Public Debt ("BPD"), and certain Departmental Offices ("DO"). The
Report was prepared based on information provided by a number of program offices from
the above-described organizations. The preparation of the Report included circulation of
drafts of the Report to program offices that are responsible for the actions described in
the Report. Comments were received from those offices and incorporated in the Report.
Senior officials of FMS, BPD and DO reviewed the Report before it was submitted to the
Department of Justice.

The Department of the Treasury stands ready to respond to any questions or concerns the
Court may have after reviewing the Report.

**TWENTY-NINTH QUARTERLY REPORT ON ACTIONS TAKEN
BY THE DEPARTMENT OF THE TREASURY TO RETAIN
IIM-RELATED DOCUMENTS NECESSARY FOR AN ACCOUNTING**
*Cobell v. Kempthorne*
March 1, 2007

This is the Twenty-Ninth Quarterly Report filed by the Department of the Treasury ("Treasury") pursuant to the Court's December 21, 1999 Order ("Order") in the above-captioned action. It covers activities occurring over a three-month period from December 1, 2006 through February 28, 2007. The Order requires Treasury to report on the steps it has taken since the last quarterly report to preserve IIM-related documents.

During the past quarter, Treasury again issued reminders to ensure the retention of required records. The reminders Treasury issued include letters reminding Secret Service (see Attachment A), the National Archives and Records Administration (NARA) (see Attachments B and C), banks (see Attachments D and E), and employees of the Financial Management Service (FMS) and Bureau of the Public Debt (BPD) (see Attachments F and G) to continue preserving records related to this litigation. Retention instructions to pertinent Departmental Office (DO) employees continue to be posted on DO's intranet site (see Attachment H).

Effective February 2007, FMS implemented an enhancement to the CA$HLINK II system, to strengthen the effectiveness of the retention reminders that FMS issues via CA$HLINK II, in the form of "Business Alert Messages," to all active CA$HLINK II users (i.e., to all banks that currently act as Treasury's financial agents). The enhancement prevents users from deleting any unopened messages.

As reported in Treasury's Twenty-Seventh Quarterly Report filed September 1, 2006, several boxes of FMS and BPD records were affected by a water sprinkler incident at the Washington National Records Center (WNRC) in July 2006, and NARA sent the boxes to a contractor to be freeze-dried. As of the date of this report, most of the records have been dried and returned to the WNRC (approximately 20 boxes remain to be dried).

As also reported in Treasury's Twenty-Seventh Quarterly Report, a portion of FMS' working copy set of microfilm copies of negotiated Treasury checks was exposed to water when the basement of FMS' Hyattsville, Maryland office flooded on June 25, 2006. The water exposure is believed to have affected the quality of the check images on at least portions of some of the water-exposed microfilm cartridges. FMS sent samples of the water-exposed cartridges to a contractor for assessment. The contractor advised FMS that washing the microfilm would remediate any adhesions (film layers sticking together), thereby preventing further damage to the images on the microfilm and restoring the functioning of the microfilm (i.e., by enabling it to be fed through a microfilm reader). Based on the contractor's advice and the fact that only approximately 2,000 (roughly one-sixth) of the water-exposed cartridges contain copies of checks for which original checks may not be available, FMS decided to procure washing services for those 2,000 water-exposed cartridges only. During the next reporting period, FMS will

begin preparing the water-exposed cartridges that will not be washed, for shipment to the WNRC. During this reporting period, all of the non-water-exposed cartridges were packed into approximately 1,200 boxes, and half of those boxes were shipped to the WNRC. The remaining boxes of non-water-exposed cartridges will be shipped to the WNRC upon completion of necessary paperwork.

Finally, we note that Donald V. Hammond resigned as Treasury's Fiscal Assistant Secretary in January 2007, and accepted a position with the Board of Governors for the Federal Reserve System. Kenneth Carfine now serves as Acting Fiscal Assistant Secretary.

**INDEX TO ATTACHMENTS**
*The Department of the Treasury's Twenty-Ninth Quarterly Report*
*March 1, 2007*

| | |
|---|---|
| **Attachment A** | February 6, 2007 letter issued by FMS, reminding the U.S. Secret Service to continue preserving, until further notice, all Treasury checks that FMS forwards for investigation and related information and records. |
| **Attachment B** | February 7, 2007 letter from FMS to NARA, reminding NARA to continue the "freeze" on FMS records at Federal Records Centers. |
| **Attachment C** | February 15, 2007 letter from BPD to NARA, reminding NARA to continue the "freeze" on BPD records at Federal Records Centers. |
| **Attachment D** | Examples of February 2007 Business Alert Message issued by FMS to all banks that act as Treasury's financial agents and February 28, 2007 letter issued by FMS to all banks that formerly acted as Treasury's financial agents, reminding them to continue to retain, indefinitely, records associated with Interior's deposits to the Treasury General Account. |
| **Attachment E** | February 28, 2007 letters issued by FMS to Mellon Bank and Bank of America, reminding them to continue preserving all records pertinent to two lockbox accounts used to process IIM deposits (the account at Mellon Bank is open; the account at Bank of America is closed). |
| **Attachment F** | Global e-mail issued February 16, 2007 to all FMS employees, and posted on FMS' intranet site, reminding employees to continue retaining records related to this litigation indefinitely and to continue utilizing the "Cobell Archive" mailbox to retain all IIM-related e-mail. |
| **Attachment G** | Global e-mail issued February 23, 2007 to all BPD employees, and posted on BPD's intranet site, reminding employees to continue preserving IIM-related records indefinitely and sending all IIM-related e-mail to BPD's dedicated mailbox. |
| **Attachment H** | Retention instructions to DO employees, posted on DO's intranet site, including steps for sending e-mail documents to DO's dedicated "Cobell" mailbox. |

DEPARTMENT OF THE TREASURY
FINANCIAL MANAGEMENT SERVICE
HYATTSVILLE, MD 20782

**Attachment A**

February 06, 2007

Brian K. Nagel
Assistant Director,
Office of Investigations
U.S. Secret Service
950 H Street, N.W.
Washington, D.C. 20223

Re: Document Retention Order in <u>Cobell, et al. v. Norton, et al.</u>
    Civ. No. 1-96CV01285 (D.D.C.)

Dear Mr. Nagel:

This is a reminder that Treasury remains subject to a continuing court order in the above-referenced lawsuit, requiring Treasury to retain, indefinitely, "all documents and data relating to Individual Indian Money trust funds and Individual Indian trust assets." Copies of the document retention order entered in the case on August 12, 1999 and Treasury's Stipulation filed with the court on July 6, 1999 were provided with some of our previous reminder letters to Secret Service, including our reminder letter dated August 26, 2003. Please let me know if you need copies of those documents.

As stated in our previous letters to Secret Service (dated January 14, 2000, October 13, 2000, February 28, 2001, August 29, 2001, August 28, 2002, February 12, 2003, August 26, 2003, January 16, 2004, August 2, 2004, February 2, 2005, August 10, 2005, February 6, 2006, and August 11, 2006), among the types of records that Treasury must preserve to comply with the court order and Stipulation are <u>all Treasury checks and check-related records</u>. Accordingly, please continue to preserve, until further notice, all Treasury checks that FMS forwards to your bureau for investigation and all information and records your bureau maintains relating to those checks. <u>Please continue to take all steps necessary to determine and document that all such records in the possession of Secret Service are being preserved indefinitely.</u>

If you have any questions concerning the <u>Cobell</u> document retention order and Stipulation, please contact Beth Kramer in the FMS Chief Counsel's office, at (202) 874-7036, or me, at (202) 874-7913.

Thank you for your continued cooperation and assistance.

Sincerely,

Ronald G. Cymber, Director
Financial Processing Division

cc: Thomas Dougherty, Office of Chief Counsel, U.S. Secret Service – Fax #202/406-6544



DEPARTMENT OF THE TREASURY
FINANCIAL MANAGEMENT SERVICE
HYATTSVILLE, MD 20782

**Attachment B**

February 7, 2007

Thomas E. Mills
Assistant Archivist for Regional Records Services
National Archives and Records Administration
Office of Regional Records Services
8601 Adelphi Road, Suite 3600
College Park, MD 20740

Dear Mr. Mills:

The purpose of this letter is to remind you that Financial Management Service (FMS), a bureau of the U.S. Department of the Treasury, remains under court order to preserve records indefinitely for purposes of the <u>Cobell, et al. v. Norton, et al.</u> litigation. Therefore, we request that the Federal Records Centers continue to implement the freeze on **<u>all</u>** records from FMS Record Groups 39, 50 and 425 and preserve all such records until further notice.

If you have any questions, you may contact Charles Brett at (202) 874-6156. Thank you for your cooperation in this matter.

Sincerely,

Sharon M. King, Director
Administrative Programs Division



**DEPARTMENT OF THE TREASURY**
BUREAU OF THE PUBLIC DEBT
PARKERSBURG, WV 26106-1328

**Attachment C**

February 15, 2007

National Archives and Records Administration
Life Cycle Management Division
Attention: Stephen Cooper
8601 Adelphi Road
College Park, MD 20740-6601

Re: Suspending Destruction

Dear Mr. Cooper:

As you are aware, the Bureau of the Public Debt (BPD), Department of the Treasury, has been under court order since August 1999 to preserve all documents relating to the pending litigation, Cobell v. Kempthorne, et al., which challenges the government's management of the Individual Indian Monies (IIM).

The purpose of this letter is to remind you that BPD remains under court order to preserve records indefinitely for purposes of the Cobell litigation. Therefore, we request that the Federal Records Centers continue to implement the freeze on **all** records from BPD Record Groups 53 and 82 and preserve all such records until further notice.

Thank you for your cooperation in this matter.

Sincerely,

Vicki Thorpe, Manager,
Graphics, Printing, and Records Branch
Records Officer

**[Business Alert Message (BAM) for Current TGAs]**

This is a reminder to continue preserving records in accordance with FMS' prior instructions to your financial institution. As stated in our initial letter dated July 9, 1999 and each successive reminder letter, including the most recent Business Alert Message issued August 2006, due to ongoing litigation [Cobell, et al. v. Norton, et al., Civ. No. 1-96CV01285 (D.D.C.)], your financial institution must retain, until further notice:

> Standard Form 215, Standard Form 5515 and any supporting documentation, IN ALL FORMS AND MEDIA, associated with transactions relating to deposits received from the Department of the Interior for credit to the Treasury's General Account (TGA). This includes paper, electronic, microfilm, microfiche, or any other media.

If you have not already done so, please designate a point of contact at your financial institution to disseminate these record retention instructions to appropriate personnel at your organization (including records management personnel). Please ensure that an appropriate dissemination and compliance process is in place to ensure these instructions are being followed at your financial institution.

If these retention instructions create a problem for your operations, please send your concerns in writing to the Over-the-Counter Revenue Collection Division at 401 14th Street, S.W., Room 307C, Washington, D.C. 20227.

If you have any questions, contact the Federal Reserve Bank of St. Louis at 1-866-771-1842 or Ava Singleton on (202) 874-9986.



DEPARTMENT OF THE TREASURY
FINANCIAL MANAGEMENT SERVICE
WASHINGTON, D.C. 20227

**Attachment D**
**(2 of 2)**

February 28, 2007

Dear Sir or Madam:

This is a reminder to continue preserving records in accordance with FMS' prior instructions to your financial institution. As stated in our initial letter dated July 9, 1999 and each successive reminder letter, including our most recent reminder letter dated August 11, 2006, due to ongoing litigation [Cobell; et al. v. Norton, et al., Civ. No. 1-96CV01285 (D.D.C.)], your financial institution must retain, until further notice:

> Standard Form 215, Standard Form 5515 and any supporting documentation, IN ALL FORMS AND MEDIA, associated with transactions relating to deposits received from the Department of the Interior for credit to the Treasury's General Account (TGA). This includes any such records formerly maintained by the financial institutions shown on the attached list, now in your possession, custody or control. This includes paper, electronic, microfilm, microfiche, or any other media.

If you have not already done so, please designate a point of contact at your financial institution to disseminate these record retention instructions to appropriate personnel at your organization, including records management personnel. Please ensure that an appropriate dissemination and compliance process is in place to ensure these instructions are being followed at your financial institution.

If these retention instructions create a problem for your operations, please send your concerns in writing to the Over-the-Counter Revenue Collection Division (OTCD) at 401 14th Street, S.W., Room 307C, Washington, DC 20227, as soon as possible.

Thank you for your continuing cooperation in this matter. If you have any questions, the first point of contact is the Federal Reserve Bank of St. Louis at 1-866-771-1842. Should you have further questions, feel free to contact Ava Singleton on (202) 874-9986.

Sincerely,

Corvelli A. McDaniel, Director
Over-the-Counter Revenue Collection Division (OTCD)
A/C Federal Finance



**DEPARTMENT OF THE TREASURY**
**FINANCIAL MANAGEMENT SERVICE**
WASHINGTON, D.C. 20227

**Attachment E**
**(1 of 2)**

February 28, 2007

Ms. Elaine Friedman, Vice President
Mellon Bank
Mellon Client Service Center
Suite 1260
Pittsburgh, PA  15259-0001

Re:  Minerals Management Service Lockbox Account
     Agency Location Code 14170001, Lockbox Number 911-4258

Dear Ms. Friedman:

As you know, FMS remains under a continuing court order in <u>Cobell, et al. v. Norton, et al.</u> to preserve, indefinitely, all records relating to Individual Indian Money (IIM) trust funds and trust assets.  Accordingly, <u>please continue to retain all documentation pertaining to the above-referenced lockbox account until further notice.</u>  You have confirmed that the records for this account include:

> Standard Form 215
> Standard Form 5515
> ACH Receiving Remittance/Payment Report
> Demand Deposit Account Activity Statements
> any forms used to facilitate internal processing, such as the CA$H-LINK II
>    Deposit Report Form

You must retain the records for this account IN ALL FORMS AND MEDIA generated for the account.  This includes paper, electronic, microfilm, microfiche, or any other media.  If you create the same record in multiple media, you must retain the record in all media.

<u>Please distribute this letter to appropriate bank personnel, including records management personnel.</u>  If you have any questions regarding these retention instructions, please contact John Flesch at (202) 874-6577.  Thank you for your continued cooperation.

Sincerely,

Michael C. Salapka
Acting Director
General Revenue Collection Division



**DEPARTMENT OF THE TREASURY**
**FINANCIAL MANAGEMENT SERVICE**
WASHINGTON, D.C. 20227

**Attachment E**
**(2 of 2)**

February 28, 2007

Mr. Stephen C. Herndon, Senior Vice President
Bank of America
Federal Government Banking Division
600 Peachtree Street, NE
Atlanta, GA  30308-2214

Re:  Bureau of Indian Affairs - Palm Springs Lockbox Account (closed 11/1/05)
    Agency Location Code 00004844, Lockbox Number 72758

Dear Mr. Herndon:

As you know, FMS remains under a continuing court order in <u>Cobell, et al. v. Norton, et al.</u> to preserve, indefinitely, all records relating to Individual Indian Money (IIM) trust funds and trust assets.  Notwithstanding the fact that the above-referenced lockbox account was closed effective November 1, 2005, <u>please continue to retain all documentation pertaining to the account until further notice</u>.  You have confirmed that the account records include:

> Standard Form 215
> Standard Form 5515
> Check copies
> Monthly Account Activity Reports (MAAR)
> Monthly Account Analysis Statements (MAAS)
> Standard Listing
> Any forms used to facilitate internal processing, such as the Daily Balance Sheet

Your bank must continue to retain the records for this account IN ALL FORMS AND MEDIA that were generated.  Accordingly, notwithstanding that your bank began generating photocopies of the checks associated with this account on October 1, 2001, you must continue retaining any duplicate copies on microfilm, unless and until FMS obtains court approval for your bank to retain only pre-October 2001 microfilm copies and post-September 2001 photocopies.

Page 2 – Mr. Herndon

<u>Please distribute this letter to appropriate bank personnel, including records management personnel.</u>  If you have any questions regarding these retention instructions, please contact John Flesch at (202) 874-6577.

Thank you for your continued cooperation.

Sincerely,

Michael C. Salapka
Acting Director
General Revenue Collection Division

cc:  Linda S. Corbett, Senior Vice President, Bank of America

 # Official FMS Business

| | |
|---|---|
| **To:** | Office of the Commissioner Debt Management Services Federal Finance Financial Operations Governmentwide Accounting Information Resources AC Management Regional Operations HQ Austir Birmingham Kansas City Philadelphia San Francisco |
| **Date:** | 02/16/2007 |
| **From:** | William Higgins |
| **Subject:** | Cobell and Tribal Trust Litigation - FMS Retention Requirements |

Date:        February 16, 2007

To:          All FMS Employees

From:        Kenneth R. Papaj
             Commissioner

Subject:     <u>Cobell</u> and Tribal Trust Litigation – FMS Retention Requirements

All FMS employees are again reminded that FMS remains subject to continuing court orders and Treasury directives, requiring us to retain and safeguard all documents, data and tangible things that relate to Individual Indian Money (IIM) and Tribal trust funds and assets, indefinitely. To ensure that we remain in compliance with the court orders and directives, **please continue to adhere to the following FMS requirements:**

   <u>Do not destroy any documents, data or tangible things unless you have received written approval from the Chief Counsel.</u> This rule applies to <u>all</u> documents, data and tangible things, whether litigation-related or not. Prepare a disposition request, following the instructions contained in the Chief Counsel's March 7, 2000 memorandum entitled "Process for Obtaining Disposition Approval" (posted on the FMS intranet on the "Cobell/Tribal Litigation" page). <u>The only exception to this rule is for "obvious non-record materials," as described in the attached "Quick Reference Guide."</u>

   <u>Continue copying or forwarding all Cobell-related and Tribal-related e-mail and other electronic documents to their respective dedicated mailboxes</u> ("Cobell Archive@fms" for Cobell-related e-mail/electronic documents and "Tribal Mailbox@fms" for Tribal-related e-mail/electronic documents). To insert a mailbox address on an e-mail, simply type "Cobell" or "Tribal" and press the "Enter" key. You may delete your copy of any e-mail or other electronic document sent to these mailboxes.

<u>Promptly forward any voicemail messages that relate to the Jicarilla Apache Nation or The Pueblo of Laguna Tribe to FMS' dedicated "Tribal" voicemail repository.</u> Step-by-step instructions for forwarding voicemail messages to the repository are provided in a March 26, 2004 memorandum (posted on the FMS intranet on the "Cobell/Tribal Litigation" page).

<u>Do not archive (move) data from any FMS electronic production systems that contain litigation-related data, except pursuant to a written archive plan that has been approved by the Commissioner's Office.</u> Please refer to the Deputy Commissioner's March 24, 2000 memorandum entitled "Maintenance of Data on FMS Systems" (posted on the FMS intranet on the "Cobell/Tribal Litigation" page) for more information about this requirement.

<u>Do not attempt to give guidance on record retention matters to Federal Reserve Bank personnel.</u> Please refer all such questions to Terri Dawson at (202) 874-6877 or to Beth Kramer at (202) 874-7036.

I appreciate your continued compliance with these instructions and encourage you to review the pertinent memoranda posted on the FMS intranet. To locate the memoranda, double click on the icon for Internet Explorer. This moves you to FMS' intranet. Under "News" or "Hot Topics," click on "Cobell/Tribal Litigation."

If you have questions or need assistance regarding any of these retention requirements, please do not hesitate to contact Terri Dawson at (202) 874-6877 or Beth Kramer at (202) 874-7036.

Thank you.


Attachment

# "A Quick Reference Guide"

| REMEMBER: PRESERVE ALL INTERIOR/INDIAN-TRUST-RELATED MATERIAL!! |
| --- |

## OBVIOUS NONRECORD MATERIALS

These may be destroyed without the approval of the Chief Counsel

| CATEGORIES | EXAMPLES |
| --- | --- |
| **1. Non-Treasury/FMS Material** | • Office supply catalogs<br>• vendor marketing materials<br>• non-FMS publications/manuals, such as phone books, Federal Register, dictionaries, "Lotus Notes for Dummies," etc. |
| **2. Treasury/FMS Distribution/ Reference Material** | • attendee's copy of handouts received at meetings, training, etc.<br>• employee's copy of work-related organization charts, phone lists, Treasury Correspondence Manual, etc.<br>• employee's copy of FMS publications, such as "Fiscal Scene"<br>• excess stocks of FMS marketing materials, such as Direct Deposit brochures<br>• notices received re: IT security, scheduling of meetings & van rides, training, "acting" managers, voting leave, etc. |
| **3. Personal Papers** | • notices received re: retirements, deaths, TSP, CFC, PTI, Flex Account, etc.<br>• employee's copy of T&A, payroll, personnel, etc. records (<u>except</u> travel records/receipts)<br>• printouts of non-Federal Web pages that were not used for FMS business<br>• non-FMS-related calendars/reminders<br>• recipes, poems, cartoons, etc. |
| **4. Other** | • printer banner pages and printer failure reports<br>• interim drafts created but never circulated to anyone<br>• duplicates of any of the examples in these four categories. |

**Nancy Fleetwood/BPD**

02/23/2007 03:09 PM

To All - BPD (Business use only!)

cc

Subject IMPORTANT REMINDER TO ALL EMPLOYEES

I'd like to remind all employees that BPD remains subject to a court order that governs the retention of records relating to the Individual Indian Money (IIM) trust fund and IIM trust assets. To ensure compliance with this court order, you should not destroy any documents or data pertaining to the following subjects without written approval from the Chief Counsel or his designee:

- IIM deposit fund investment records
- IIM accounts and accounts held in trust by the Department of the Interior
- Savings bonds held in trust form of registration by the Department of the Interior
- Correspondence (internal and external) relating to Individual Indian Money
- Electronic communications, such as e-mails and Internet messages, relating to the subjects above, unless those communications have been forwarded to the *Cobell* mailbox.

You should continue to copy or forward all e-mails relating to the IIM trust fund, IIM trust assets, and the *Cobell* litigation to the dedicated IIM Mailbox. To insert the mailbox address on an e-mail, simply type "IIM Mailbox" and press the "Enter" key.

The Federal Reserve Banks have also been instructed not to destroy any fiscal agency records unless they have received specific permission in writing from Treasury authorizing the destruction. Please refer any inquiries from FRB personnel regarding record retention to Jimmy Phillips at (202) 504-3683, fax number (202) 504-3630. Don't attempt to give guidance on record retention matters to any FRB employee.

I appreciate your continued compliance with these instructions and encourage you to occasionally review the pertinent memoranda and e-mails, which are posted on PD Web under the Office of the Chief Counsel's (OCC) website. Just click on the office link "OCC" and then click on " *Cobell v. Kempthorne*," which appears in the "Litigation" section.

Thanks again for the great support you have shown in helping Public Debt comply with a very challenging court order.

Attachment H

☒ Image: DONet/Portal Image Banner

# Litigation Obligations and Directives

### Office of the General Counsel

**Directive From General Counsel To All Departmental Offices Employees Concerning Cobell Litigation**

By order of the Court in Cobell v. Norton, Departmental Offices employees must preserve all documents and records, whether in paper, electronic, or other form, that are relevant to any aspect of the government's responsibilities with respect to the individual Indian money trust. Such responsibilities include, but are not limited to, management, administration, collection, disbursement, investment, and accounting of trust funds.

To comply with the various court orders to which we are subject in Cobell v. Norton, to make it easier to manage and retrieve electronic mail as needed, and to help ensure that our electronic mail will continue to operate, I am requesting that you do the following things:

**Step One: Search for Previous E-Mails You Have Sent or Received**
Search your e-mail, including "Inbox," "Drafts," "Message Log," and all "Folders" and "Archives," for anything that relates in any way to the Cobell litigation, Individual Indian Monies, or Department of Interior investments on behalf of individual Indians. Forward any e-mails that you find on this subject (including attachments and retaining forwarding history) to "Cobell" or Cobell@do.treas.gov. In an effort to manage electronic mail, we have created this dedicated mailbox for Cobell-related and/or discussions relating to Individual Indian Money account.

**Step Two: E-Mails That You Send in the Future**
Beginning immediately, send a "cc" (not a "bcc") of all e-mails (including attachments) that you initiate, that relate in any way to the Cobell litigation, Individual Indian Monies or Department of Interior investments on behalf of individual Indians, to "Cobell."

**Step Three: E-Mails That You Receive in the Future**
Also beginning immediately, forward all e-mails that

**About Us**

Contacts
Page Owner

**Home**

you receive (including attachments and retaining forwarding history) that relate in any way to the Cobell litigation, Individual Indian Monies or Department of Interior investments on behalf of individual Indians, to "Cobell," unless you can tell from the message that the e-mail has already been sent to the "Cobell."

If you have questions on this process or the retention of documents, call Thomas McGivern, Counselor to the General Counsel, at 622-2317.

If you need help in formulating e-mail searches or forwarding messages, or have questions on the "Cobell" mailbox, contact the HelpDesk at 622-1111.

Contact Webmaster | Updated: Monday, April 14


Logo:
Departme
Offices Int

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELOUISE PEPION COBELL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:96CV01285 |
| | ) | (Judge Robertson) |
| DIRK KEMPTHORNE, Secretary of the Interior, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ———————————————————— | ) | |

**NOTICE OF FILING OF THE THIRTIETH QUARTERLY REPORT
FOR THE DEPARTMENT OF THE TREASURY**

The Department of the Treasury has prepared its *Thirtieth Quarterly Report on Actions*

*Taken By the Department of the Treasury to Retain IIM-Related Documents Necessary For an*

*Accounting* and submits it to the Court in accordance with this Court's Order of December 21,

1999.

A copy of the report is attached hereto.

Dated: June 1, 2007                    Respectfully submitted,
                                       PETER D. KEISLER
                                       Assistant Attorney General
                                       MICHAEL F. HERTZ
                                       Deputy Assistant Attorney General
                                       J. CHRISTOPHER KOHN
                                       Director

                                       /s/ John J. Siemietkowski
                                       ROBERT E. KIRSCHMAN, Jr.
                                       (D.C. Bar No. 406635)
                                       Deputy Director
                                       JOHN J. SIEMIETKOWSKI
                                       Trial Attorney
                                       Commercial Litigation Branch
                                       Civil Division
                                       P.O. Box 875
                                       Ben Franklin Station
                                       Washington, D.C. 20044-0875
                                       Phone (202) 514-3368
                                       Fax (202) 514-9163

CERTIFICATE OF SERVICE

I hereby certify that, on June 1, 2007 the foregoing *Notice of Filing of the Thirtieth Quarterly Report for the Department of the Treasury* was served by Electronic Case Filing, and on the following who is not registered for Electronic Case Filing, by facsimile:

Earl Old Person (*Pro se*)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
Fax (406) 338-7530

  /s/ Kevin P. Kingston
Kevin P. Kingston



**DEPARTMENT OF THE TREASURY**
BUREAU OF THE PUBLIC DEBT
WASHINGTON, DC 20239-0001

June 1, 2007

MEMORANDUM FOR:    PETER D. KEISLER
                   ASSISTANT ATTORNEY GENERAL
                   CIVIL DIVISION
                   U.S. DEPARTMENT OF JUSTICE

FROM:              PAUL G. WOLFTEICH
                   CHIEF COUNSEL
                   BUREAU OF THE PUBLIC DEBT
                   DEPARTMENT OF THE TREASURY

SUBJECT:           THIRTIETH QUARTERLY REPORT
                   *COBELL v. KEMPTHORNE*

Included with this cover memorandum is the Thirtieth Quarterly Report on Actions
Taken by the Department of the Treasury to Retain IIM-Related Documents Necessary
for an Accounting (the Report).  The Report has been prepared by the Department of the
Treasury pursuant to the Court Order and Opinion in *Cobell v. Babbitt* (D.D.C. CV No.
96-1285), filed December 21, 1999.

The Report includes information concerning the Financial Management Service ("FMS"),
the Bureau of the Public Debt ("BPD"), and certain Departmental Offices ("DO").  The
Report was prepared based on information provided by a number of program offices from
the above-described organizations.  The preparation of the Report included circulation of
drafts of the Report to program offices that are responsible for the actions described in
the Report.  Comments were received from those offices and incorporated in the Report.
Senior officials of FMS, BPD and DO reviewed the Report before it was submitted to the
Department of Justice.

The Department of the Treasury stands ready to respond to any questions or concerns the
Court may have after reviewing the Report.

**THIRTIETH QUARTERLY REPORT ON ACTIONS TAKEN
BY THE DEPARTMENT OF THE TREASURY TO RETAIN
IIM-RELATED DOCUMENTS NECESSARY FOR AN ACCOUNTING**
*Cobell v. Kempthorne*
June 1, 2007

This is the Thirtieth Quarterly Report filed by the Department of the Treasury ("Treasury") pursuant to the Court's December 21, 1999 Order ("Order") in the above-captioned case.  It covers activities occurring over a three-month period from March 1, 2007 through May 31, 2007.  The Order requires Treasury to report on the steps it has taken since the last quarterly report to preserve IIM-related documents.

As reported in Treasury's Twenty-Seventh Quarterly Report filed September 1, 2006, several boxes of FMS and BPD records were affected by a water sprinkler incident at the Washington National Records Center (WNRC) in July 2006, and NARA sent the boxes to a contractor to be freeze-dried.  As of the date of this report, all of the boxes have been dried and returned to the WNRC.

As also reported in Treasury's Twenty-Seventh Quarterly Report, a portion of FMS' working copy set of microfilm copies of negotiated Treasury checks was exposed to water when the basement of FMS' Hyattsville, Maryland office flooded on June 25, 2006.  The water exposure is believed to have affected the quality of the check images on at least portions of some of the water-exposed microfilm cartridges.  FMS procured the services of a contractor to wash approximately 2,000 (roughly one-sixth) of the water-exposed cartridges, because those cartridges contain check copies for which original checks may not be available.  Washing the microfilm should remediate any adhesions (film layers sticking together), thereby preventing further damage to the images on the microfilm and restoring the functioning of the microfilm (i.e., by enabling it to be fed through a microfilm reader).  The microfilm washing services are expected to be completed by the end of June 2007.

On March 1, 2007, Kenneth E. Carfine was appointed Treasury Fiscal Assistant Secretary, replacing Donald V. Hammond who resigned that position in January 2007.  The Fiscal Assistant Secretary oversees the Financial Management Service and the Bureau of the Public Debt.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELOUISE PEPION COBELL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:96CV01285 |
| | ) | (Judge Lamberth) |
| DIRK KEMPTHORNE, Secretary of the Interior, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**NOTICE OF FILING OF THE TWENTY-EIGHTH QUARTERLY REPORT**
**FOR THE DEPARTMENT OF THE TREASURY**

The Department of the Treasury has prepared its *Twenty-Eighth Quarterly Report on*

*Actions Taken By the Department of the Treasury to Retain IIM-Related Documents Necessary*

*For an Accounting* and submits it to the Court in accordance with this Court's Order of

December 21, 1999.

A copy of the report is attached hereto.

Dated: December 1, 2006

Respectfully submitted,
PETER D. KEISLER
Assistant Attorney General
STUART E. SCHIFFER
Deputy Assistant Attorney General
J. CHRISTOPHER KOHN
Director

/s/ John J. Siemietkowski
ROBERT E. KIRSCHMAN, Jr.
(D.C. Bar No. 406635)
Assistant Director
JOHN J. SIEMIETKOWSKI
Trial Attorney
Commercial Litigation Branch
Civil Division
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875

Phone (202) 514-3368
Fax (202)  514-9163

CERTIFICATE OF SERVICE

I hereby certify that, on December 1, 2006 the foregoing *Notice of Filing of the Twenty-Eighth Quarterly Report for the Department of the Treasury* was served by Electronic Case Filing, and on the following who is not registered for Electronic Case Filing, by facsimile:

Earl Old Person (*Pro se*)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
Fax (406) 338-7530

/s/ Kevin P. Kingston
Kevin P. Kingston



**DEPARTMENT OF THE TREASURY**
BUREAU OF THE PUBLIC DEBT
WASHINGTON, DC 20239-0001

December 1, 2006

MEMORANDUM FOR:    PETER D. KEISLER
ASSISTANT ATTORNEY GENERAL
CIVIL DIVISION
U.S. DEPARTMENT OF JUSTICE

FROM:    PAUL G. WOLFTEICH
CHIEF COUNSEL
BUREAU OF THE PUBLIC DEBT
DEPARTMENT OF THE TREASURY

SUBJECT:    TWENTY-EIGHTH QUARTERLY REPORT
*COBELL v. KEMPTHORNE*

Included with this cover memorandum is the "Twenty-Eighth Quarterly Report on Actions Taken by the Department of the Treasury to Retain IIM-Related Documents Necessary for an Accounting" (the Report). The Report has been prepared by the Department of the Treasury pursuant to the Court Order and Opinion in *Cobell v. Babbitt* (D.D.C. CV No. 96-1285), filed December 21, 1999.

The Report includes information concerning the Financial Management Service ("FMS"), the Bureau of the Public Debt ("BPD"), and certain Departmental Offices ("DO"). The Report was prepared based on information provided by a number of program offices from the above-described organizations. The preparation of the Report included circulation of drafts of the Report to program offices that are responsible for the actions described in the Report. Comments were received from those offices and incorporated in the Report. Senior officials of FMS, BPD and DO reviewed the Report before it was submitted to the Department of Justice.

The Department of the Treasury stands ready to respond to any questions or concerns the Court may have after reviewing the Report.

**TWENTY-EIGHTH QUARTERLY REPORT ON ACTIONS TAKEN
BY THE DEPARTMENT OF THE TREASURY TO RETAIN
IIM-RELATED DOCUMENTS NECESSARY FOR AN ACCOUNTING**
*Cobell, et al. v. Kempthorne*
December 1, 2006

This is the Department of the Treasury's ("Treasury") Twenty-Eighth Quarterly Report, pursuant to the Court's December 21, 1999 Order ("Order") in the above-captioned case. It covers activities occurring over a three-month period from September 1, 2006 through November 30, 2006. The Order requires Treasury to report on the steps it has taken since the last quarterly report to rectify a single breach of its trust responsibilities, namely the destruction of IIM trust materials after their age exceeded six years and seven months. Cobell, et al. v. Babbitt, 91 F.Supp. 2d 1, 50, 59 (D.D.C. 1999).

Treasury continues to preserve IIM-related documentation pursuant to the Court's August 12, 1999 Order, which defines the trust records that Treasury must retain.

The Federal Reserve Bank of St. Louis (FRB) notified Treasury that 37 boxes of records dating from 2003, 2004 and 2005 were not located during an inventory. Thirty-four of these boxes contain only "tracing" information used in sorting and processing Treasury checks, which (if needed) could be recreated from the endorsement stamps on the checks themselves, assuming the endorsements are legible. The remaining three boxes contain "control" information used in balancing Treasury checks and adjusting out-of-balance Treasury checks. Some of the information in the three "control" boxes may not be available from other sources, but the information should no longer be needed for any adjustment purposes because of the passage of time.

As reported in Treasury's Twenty-Seventh Quarterly Report filed September 1, 2006, several boxes of FMS and Bureau of the Public Debt (BPD) records were affected by a water sprinkler incident at the Washington National Records Center (WNRC) in July 2006, and the National Archives and Records Administration (NARA) sent the boxes to a contractor to be freeze-dried. As of the date of this report, some of the records have been dried and returned in good condition to the WNRC. NARA has informed FMS and BPD that it may take several more months for the contractor to dry the remaining records and return them to WNRC.

As also reported in Treasury's Twenty-Seventh Quarterly Report, a portion of FMS' working copy set of microfilm copies of negotiated Treasury checks was exposed to water when the basement of FMS' Hyattsville, Maryland office flooded on June 25, 2006. The water exposure is believed to have affected the quality of the check images on at least portions of some of the water-exposed microfilm cartridges. FMS packed the water-exposed cartridges into boxes (numbering approximately 200 boxes) and moved them to a secure area on the first floor of FMS' Hyattsville, Maryland office. FMS sent sample cartridges to a contractor for assessment, and expects to receive the contractor's written assessment report before the end of this year. Throughout the reporting period, FMS packed all of the non-water-exposed cartridges into boxes at FMS' Ardmore,

Maryland warehouse and began processing those boxes (numbering approximately 1,000 boxes) for shipment to the WNRC for storage. As of the date of this report, one-third of the non-water-exposed microfilm cartridges have been shipped to the WNRC.

As previously reported in Treasury's Twenty-Third Quarterly Report, filed September 1, 2005, all digital check images and associated index data were successfully archived (moved) from the predecessor National Archive System (NAS) library at the Boston FRB to the new Image Services System (ISS) library at the Minneapolis FRB, in August 2005. The FRB has confirmed that the images and data on NAS storage media (consisting of approximately 3,000 tapes) are now merely redundant of the images and data moved to the newer storage media utilized by ISS (disks and magnetic tapes). In particular, the FRB confirmed that, of the 1.97 billion digital check images moved to ISS, 99.99% of the images are retrievable in ISS (i.e., are not defective). Further, the FRB confirmed that any images that are defective in ISS were likewise defective in NAS. The images in ISS are of Treasury checks negotiated in April 1997 or later, for which time period both original negotiated Treasury checks and electronic check data are generally available. FMS will authorize the FRB to destroy the 3,000 NAS tapes at the end of this year.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
ELOUISE PEPION COBELL, et al.,                      )
                                                    )      No. 1:96CV01285 (RCL)
                   Plaintiffs,                      )
          v.                                        )
                                                    )
GALE A. NORTON, Secretary of                        )
the Interior, et al.,                               )
                                                    )
                   Defendants.                      )
_____)

**NOTICE OF FILING OF SEPTEMBER 2005 STATUS REPORT BY
THE DEPARTMENT OF THE INTERIOR OFFICE OF TRUST RECORDS**

The Department of the Interior Office of Trust Records hereby submits its status report

for activity in September 2005.  A copy of the report is attached hereto.

Dated: October 17, 2005                Respectfully submitted,
                                       ROBERT D. McCALLUM, Jr.
                                       Associate Attorney General
                                       PETER D. KEISLER
                                       Assistant Attorney General
                                       STUART E. SCHIFFER
                                       Deputy Assistant Attorney General
                                       J. CHRISTOPHER KOHN
                                       Director

                                       /s/ Timothy E. Curley
                                       ROBERT E. KIRSCHMAN, Jr.
                                       (D.C. Bar No. 406635)
                                       Assistant Director
                                       TIMOTHY E. CURLEY
                                       (D.C. Bar No. 470450)
                                       Trial Attorney
                                       Commercial Litigation Branch
                                       Civil Division
                                       Mailing address:
                                       P.O. Box 875
                                       Ben Franklin Station
                                       Washington, D.C. 20044-0875
                                       Phone (202) 307-3242
                                       Fax (202)  514-9163

CERTIFICATE OF SERVICE

I hereby certify that, on October 17, 2005 the foregoing *Notice of Filing of September 2005 Status Report by the Department of the Interior Office of Trust Records* was served by Electronic Case Filing, and on the following who is not registered for Electronic Case Filing, by facsimile:

> Earl Old Person (*Pro se*)
> Blackfeet Tribe
> P.O. Box 850
> Browning, MT 59417
> Fax (406) 338-7530

<div style="margin-left:40%">

Kevin P. Kingston
Kevin P. Kingston

</div>

**ACTIVITY REPORT**
**OFFICE OF TRUST RECORDS**
September 1 – 30, 2005

As reported in the *Status Report to the Court Number Eleven*, the line authority for supervision and management of the Office of Trust Records (OTR) was vested in the Assistant Deputy Secretary by the Deputy Secretary by memorandum dated September 5, 2002. On September 30, 2005, the memorandum was rescinded by the Associate Deputy Secretary. Accordingly, effective October 1, 2005, OTR reports to the Chief Information Officer, Office of the Special Trustee for American Indians (OST).

**PROGRAMMATIC:**

- Labat-Anderson (Labat Indexing Project)

  Labat reported that 2,519 boxes of inactive Indian records were completed in September 2005. The total number of boxes completed through September 2005 is approximately 124,325.

- Movement of Records

  The Bureau of Indian Affairs (BIA) and OST moved approximately 1,560 boxes of inactive records from various field locations to Lenexa, Kansas for indexing and subsequent storage at the American Indian Records Repository (AIRR) during this reporting period.

  In the OTR Activity Report for August, OTR reported that approximately 2,740 boxes were moved from BIA and OST field locations. The number of boxes moved in August was approximately 2,885 boxes.

- Boxes Requiring Preservation and/or Remediation

  NARA completed the review and cleaning of the contents of the 283 boxes (inadvertently referred to as 285 in the August monthly report). There are approximately 30 boxes which NARA has determined will require further care. These boxes were previously exposed to fire and water. It is anticipated that these boxes will receive further attention in the next reporting period.

- Records Retention Schedules

  The following five BIA electronic records schedules were sent to the National Archives and Records Administration (NARA) for appraisal and approval on September 29, 2005: the Management Accounting and Distribution System, Keyfile System, Great Lakes Agency Database System, Alaska Title Plant Database, and Land Title Mapper.

1

- Site Assessments

  OTRA conducted one follow-up site assessment for the Chippewa-Cree Tribe. In addition, OTRA issued eight final records assessment reports. For BIA agencies they were: Pine Ridge, Colville, Pima, Yakama, Rosebud and Central California, as well as final records reports for Yakama OST field office and Lummi Tribe.

- Records Training

  OTR did not conduct records management training in September.

- Equipment

  No fireproof filing equipment was delivered in September.

- Records Evaluations – Accession #M00-03-8001

  The 31 boxes continue to remain with OTR pursuant to a litigation hold. Once the boxes are released, OST can carry out its plans to verify whether any potential records in the boxes are also filed at the field office. The boxes continue to be stored at the 12th Street warehouse.

- Litigation Support and Research Requests

  OTR continued to provide litigation support in research of records for tribal trust litigation cases including the Shoshone-Bannock Tribes of Ft. Hall. OTR continued to provide significant support to the Office of Historical Trust Accounting and its contractors, and the Department of Justice and its contractors. AIRR staff provided responses to approximately 230 research requests from BIA and OST.

- Records at the National Archives

  The Assistant Deputy Secretary faxed OTR a copy of a letter dated September 28, 2005, from NARA's Director of Litigation, Office of the General Counsel, to Dennis Gingold, Esq. A copy of the September 28th letter is attached.

## ADMINISTRATIVE:

General administrative activities continued.

## GENERAL OBSERVATIONS:

None.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.  I express no opinion on the content of the Site Assessments subsection described above.

Ethel J. Abeita


I declare under penalty of perjury that the contents of the Site Assessments subsection described above is true and correct to the best of my knowledge, information and belief. I express no opinion on the coments of other sections/subsections of the report.

Jeff Lords
Acting Director, Office of Trust
Review and Audit

3



# National Archives and Records Administration

*8601 Adelphi Road*
*College Park, Maryland 20740-6001*

Tel. 301-837-1499
Fax 301-837-0293
Email: jason.baron@nara.gov

September 28, 2005

By Facsimile 202-318-2372
Dennis Gingold, Esq.
607 14th St. N.W.
Box 6
Washington, D.C. 20005

Re: *Cobell v. Norton*

Dear Dennis:

I am writing to provide you with an update about the matters that we discussed in our telephone conversation on Wednesday, September 21, 2005, concerning the recent series of what appear to be several unsuccessful attempts at improper disposal of records at the National Archives. See my letter dated September 13, 2005, to Interior Assistant Deputy Secretary Haspel. I base the following update on specific information that NARA's Office of Inspector General (IG) has provided me and on my own research into the incidents, including viewing the recovered records.

As I told you over the telephone on September 21, NARA's IG is presently conducting an investigation into a series of incidents that have occurred over the past three weeks, involving what appear to be the attempted disposal of various types of permanent records of different federal agencies, including the Departments of Interior and Veterans Affairs, that were stored in the stacks at the Main Archives Building in downtown Washington, D.C. It appears that, in each of the incidents under investigation, an attempt was made to improperly dispose of record and non-record materials in various trash baskets (or in boxes designated as trash) located within restricted areas of the building. In the first incident on September 1, after a NARA staffer noticed the records in a trash basket, NARA staff found and recovered additional records in a dumpster and trash compactor (also located in a restricted area of the Main Archives Building). Since September 1, there appears to have been as many as six additional attempted disposal incidents, all of which are currently under investigation by our IG.

Letter to Dennis Gingold, Esq.
September 28, 2005
Page 2

A point that I made during our September 21 telephone conversation bears re-emphasis: these attempted disposal incidents involve federal agency records that have passed into both the physical *and* legal custody of the National Archives, as the permanent records of the United States.  Neither Secretary Norton nor any other agency head controls the preservation of such records. Accordingly, it is NARA's responsibility to ensure, among other things, that a proper and thorough criminal investigation into the incidents proceeds apace and that all reasonable steps are taken to maintain the continued integrity of NARA's permanent record holdings.

It is important to note that the person or persons responsible for these attempted disposal incidents has not or have not focused solely on the records of the Bureau of Indian Affairs (BIA) or of the Interior Department.  Rather, it appears that the perpetrator(s) of the actions randomly removed records that either were being worked on as part of NARA's "preservation processing," or that were otherwise easily available (*i.e.*, within easy reach) on the stacks of the Main Archives Building. It is also important to note that some of what has been recovered consists of "non-record" materials, such as old, empty file jackets (fronts and backs); old, empty folders; out cards, and empty envelopes.

Based on currently available information, the NARA's IG has recovered the following record and non-record materials in connection with the attempted disposal incidents.  The materials are listed below in descending order of volume.  The listing is not intended to be comprehensive.

*Department of Veterans Affairs*

- Over 3,000 VA Form "40-1330s" (applications for a headstone or marker)

*Department of the Interior*

- One entire file (cover and 105 pages) marked "Blackfeet," dated 1946, consisting of an Annual Credit Report of the Northern Plains Indian Crafts Association
- Various partial files from the Consolidated Chippewa tribe (BIA Record Group 75), circa 1940s and 1950s, including timber sales contracts and correspondence, heirship files, receipts for fee/trust patents, transmittals of patents (approx. 200 pages of record material in different boxes)
- Numerous file covers and other assorted nonrecord file jackets and empty folders associated for the Consolidated Chippewa tribe
- One bound volume of Bureau of Land Management "Letters re Surveyors General," dated March 13-April 16 1883

Letter to Dennis Gingold, Esq.
September 28, 2005
Page 3

- One file consisting of Flathead Agency loans for the purchase of land circa 1950
- Two files consisting of Billings area office correspondence circa 1957

*U.S. Army*

- Bound volume of the U.S. Army Continental Command, 1821-1920, Whipple Barracks Area

*War Department*

- One page of War Department correspondence dated July 13, 1918 (possible duplicate or nonrecord material)

*Navy Department*

- A published engineering report on the electrical equipment on the "Mauretania," from Attache Registers (reports), Record Group 38, Records of the Office of Naval Intelligence.

NARA staff are presently in the process of determining whether there are any "gaps" in NARA's existing holdings at the Main Archives Buildings, which may indicate that other records, in addition to those recovered above, might have been subject to improper disposal.

The Archivist of the United States, Allen Weinstein, has ordered that NARA staff increase security measures at the Main Archives Building immediately to safeguard NARA's permanent record holdings in the building. These measures include increasing security in not only the stack areas but also on the loading dock, and in monitoring trash disposal. As noted above, the stack areas, the loading dock, and the trash disposal areas are among those to which access is restricted to NARA staffers only.

If you deem it necessary, it may be possible to make special arrangements for you to view the documents recovered by the IG, consistent with other demands on our IG's time and resources.

I will provide you with additional updates, as circumstances warrant. Please feel free to

Letter to Dennis Gingold, Esq.
September 28, 2005
Page 4


contact me if you have any questions or concerns.

Sincerely,

JASON R. BARON
Director of Litigation
Office of General Counsel

cc:
Abraham E. Haspel, Ph.D.
Assistant Deputy Secretary
U.S. Department of the Interior

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                            )
ELOUISE PEPION COBELL, et al.,              )
                                            )        No. 1:96CV01285 (RCL)
            Plaintiffs,                     )
       v.                                   )
                                            )
GALE A. NORTON, Secretary of                )
the Interior, et al.,                       )
                                            )
            Defendants.                     )
_____     )

**NOTICE OF FILING OF NOVEMBER 2005 STATUS REPORT BY
THE DEPARTMENT OF THE INTERIOR OFFICE OF TRUST RECORDS**

The Department of the Interior Office of Trust Records hereby submits its status report

for activity in November 2005.  A copy of the report is attached hereto.

Dated: December 15, 2005            Respectfully submitted,
                                    ROBERT D. McCALLUM, Jr.
                                    Associate Attorney General
                                    PETER D. KEISLER
                                    Assistant Attorney General
                                    STUART E. SCHIFFER
                                    Deputy Assistant Attorney General
                                    J. CHRISTOPHER KOHN
                                    Director

                                    /s/ Robert E. Kirschman, Jr.
                                    _____
                                    ROBERT E. KIRSCHMAN, Jr.
                                    (D.C. Bar No. 406635)
                                    Assistant Director
                                    Commercial Litigation Branch
                                    Civil Division
                                    P.O. Box 875
                                    Ben Franklin Station
                                    Washington, D.C. 20044-0875
                                    Phone (202) 307-3242
                                    Fax (202) 514-9163

CERTIFICATE OF SERVICE

I hereby certify that, on December 15, 2005 the foregoing *Notice of Filing of November 2005 Status Report by The Department of the Interior Office of Trust Records* was served by Electronic Case Filing, and on the following who is not registered for Electronic Case Filing, by facsimile:

Earl Old Person (*Pro se*)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
Fax (406) 338-7530

  /s/ Kevin P. Kingston  
Kevin P. Kingston

**ACTIVITY REPORT**
**OFFICE OF TRUST RECORDS**
November 1 - 30, 2005

## PROGRAMMATIC:

- Labat-Anderson (Labat Indexing Project)

  Labat reported that 2,528 boxes of inactive Indian records were completed in November 2005. The total number of boxes completed through November 2005 is approximately 128,825.

- Movement of Records

  The Bureau of Indian Affairs (BIA) and OST moved 1,217 boxes of inactive records from various field locations to Lenexa, Kansas for indexing and subsequent storage at the American Indian Records Repository (AIRR) during this reporting period.

- Boxes Requiring Preservation and/or Remediation

  As reported in the June 2005 OTR Activity Report, a total of 285 boxes were shipped to NARA in Lenexa, Kansas for preservation and/or remediation. NARA reports that all records in the boxes have now been made safe for handling. Of the 285 boxes, 146 boxes were sent to Labat for indexing and subsequent storage in AIRR in November 2005. Of the remaining boxes, approximately 60 boxes require holding maintenance which means file folders within the boxes need to be replaced. Approximately 60 boxes have records that require humidification and flattening of records after humidification. Approximately 20 boxes (down from the 30 boxes reported in October) require further assessment by the conservator. It is anticipated that NARA will be making recommendations on the approximately 20 boxes in January 2006. The total box count of this collection has increased by four (4) to 289 as four boxes would no longer hold the entire contents of the box after holdings maintenance. These are considered "overflow" boxes which will stay with its respective original box. As the file folder/jackets are replaced, this number could increase.

- Records Retention Schedules

  Electronic Records Schedules for the Indian Forestry Database (InfoDat), Continuous Forest Inventory (CFI), and the Real Estate Module System used in the Southern Plains Region were approved by the Archivist of the United States in November 2005. Six electronic records schedules for BIA systems and the record schedule for the Box Index Search System (BISS) are pending review and approval by the Archivist.

- Site Assessment Statement

  During the month of November, OTRA issued final records assessment reports for Sisseton Agency BIA and OST Field Office as well as Fort Apache OST Field Office. OTRA performed site assessments for the Fort Apache and Fort Yuma BIA and OST offices.

- Records Training

  OTR did not conduct records management training in November 2005.

- Equipment

  OTR provided 22 pieces of fireproof filing equipment to BIA and OST offices during this reporting period.

- Records Evaluations – Accession #M00-03-8001

  The 31 boxes continue to remain with OTR pursuant to a litigation hold. Once the boxes are released, OST can carry out its plans to verify whether any potential records in the boxes are also filed at the field office. The boxes continue to be stored at the 12th Street warehouse.

- Litigation Support and Research Requests

  OTR continued to provide litigation support in research of records for tribal trust litigation cases including the Shoshone-Arapaho Tribes of Wind River, the Three Affiliated Tribes of Fort Berthold, Quapaw, Northern Arapaho Tribe, Osage, and Warm Springs. OTR continued to provide significant support to the Office of Historical Trust Accounting and its contractors, and the Department of Justice and its contractors. AIRR staff provided responses to approximately 140 research requests from BIA and OST.

- Records at the National Archives

  OTR received a copy of a letter dated December 9, 2005, addressed to Dennis Gingold, Esq. from Jason R. Baron, Director of Litigation, Office of the General Counsel, National Archives and Records Administration. A copy of the letter is attached.

**ADMINISTRATIVE:** General administrative activities continued.

**GENERAL OBSERVATIONS:** None.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief. I express no opinion on the content of the Site Assessments subsection described above.

Ethel J. Aberta

I declare under penalty of perjury that the content of the Site Assessments Statement described above is true and correct to the best of my knowledge, information and belief. I express no opinion on the contents of other sections/subsections of the report.

Jeff Lords
Acting Director, Office of Trust
Review and Audit

3

 **National Archives and Records Administration**

*8601 Adelphi Road*
*College Park, Maryland  20740-6001*

Tel. 301-837-1499
Fax 301-837-0293
Email: jason.baron@nara.gov

December 9, 2005

By Facsimile 202-318-2372
Dennis Gingold, Esq.
607 14th St. N.W.
Box 6
Washington, D.C. 20005

Re:  *Cobell v. Norton*

Dear Dennis:

In my September 28, 2005 letter to you, I stated that I would provide you with a further update concerning the incidents of attempted records disposal at Main Archives which occurred in September 2005.  This letter serves as that update.

On Friday, December 9, 2005, Archivist Allen Weinstein issued the attached notice to all National Archives and Records Administration (NARA) staff.  As the notice states, and as you are aware from my prior correspondence, a series of seven incidents occurred on and after September 1, 2005, involving the attempted disposal of various types of permanent records amongst our agency's holdings at the Main Archives building in Washington, D.C.  The documents involved included those from the Department of Veterans Affairs, the U.S. Army, Navy Department, and War Department, as well as from the Department of Interior.

As the notice goes on to state, NARA took swift action to investigate and cure the situation that led to those September incidents.  NARA's Inspector General gathered evidence, and based on that evidence, on September 28, 2005, NARA management barred one NARA employee (an archives technician) from having further access to the secured, nonpublic stack areas in the Main Archives building.  NARA also placed that individual on administrative leave.  The employee subsequently resigned from NARA, effective November 18, 2005.  Most importantly, no additional incidents of attempted disposal of records have been reported since the September 2005 incidents referred to above.

In my September 28 letter to you I noted that NARA staff were taking steps to discover whether there were any "gaps" in NARA's existing holdings corresponding to the records

that the former employee was processing for preservation, in addition to the records recovered in the September 2005 incidents. The Archivist's notice reaffirms that NARA staff are continuing to review records holdings in this regard. Based on the review conducted to date, I am in a position to supply you with the following additional facts.

Other than with respect to VA records, the employee in question who has resigned was most recently involved in processing Consolidated Chippewa record holdings (including being tasked to replace old, nonrecord file covers and jackets with new covers). To date, NARA staff have determined that approximately 250 of the actual files that correspond to the approximately 275 Consolidated Chippewa nonrecord file covers and jackets recovered from various trash areas in September are, in fact, intact, in NARA's permanent holdings. As stated above, NARA's review process is ongoing, and NARA staff members are continuing to search for the remaining 25 or so files. In the event these additional records are located, NARA will provide you with a further update.

Please call me if you have further questions or concerns.

Sincerely,

JASON R. BARON
Director of Litigation
Office of General Counsel

Enclosure

cc:
Abraham E. Haspel, Ph.D.
Assistant Deputy Secretary
U.S. Department of the Interior

From:       NOTICE
To:         NOTICE
Date:       12/9/05 2:50PM
Subject:    NARA Notice 2006-054, Incident of Attempted Disposal of Archival Records at Archives
I

This is a NARA notice to all employees.

**Attention supervisors:** If you have employees who do not have access to a computer, please ensure that those employees receive a copy of this notice. This includes employees on LWOP or paid leave.

December 9, 2005

During September, 2005, a series of seven incidents occurred involving the attempted disposal of various types of permanent records amongst our holdings at Archives I. Several staff members and contractors, including archivists, a security guard and an electrician, found the original documents in trash containers and quickly brought them to the attention of their supervisors. The documents were from the Department of Veterans Affairs, the U.S. Army, Navy Department, and War Department, as well as from the Department of Interior.

The incidents were immediately reported to the Inspector General who opened an investigation and gathered evidence. Based on that evidence, on September 28, 2005, a NARA employee was barred from having further access to the secured, nonpublic stack areas at Archives I. NARA also placed that individual on administrative leave. The employee subsequently resigned from NARA. Most importantly, no additional incidents of attempted disposal of records have been reported.

I want to take this opportunity to thank those employees who found the records in the trash containers and the IG for his assistance in this case. The staff in the Office of Records Services, Washington DC, is continuing to review our records holdings to assess whether there are any gaps related to these prior incidents.

I also want to remind all of you of the important work that you do in safeguarding our nation's records. We must continue to work together to find ways to ensure the safety of our documentary heritage, while making these records available to the widest possible audience.

ALLEN WEINSTEIN
Archivist of the United States

For questions on this notice contact:
Susan Cooper, NCON
susan.cooper@nara.gov
Room 102, AI
Phone: 202-501-5526 ext. 236
Fax: 202-208-2046

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
ELOUISE PEPION COBELL, et al.,          )
                                        )
        Plaintiffs,                     )
                                        )
                v.                      )        Case No. 1:96CV01285
                                        )        (Judge Lamberth)
P. LYNN SCARLETT, Acting Secretary )
of the Interior, et al.,                )
                                        )
        Defendants.                     )
_____)

## NOTICE OF FILING OF INTERIOR DEFENDANTS'
## TWENTY-FIFTH STATUS REPORT

Interior Defendants hereby give notice of the filing of their twenty-fifth report due in

accordance with the Order of December 21, 1999.

A copy of the report is attached hereto.

Dated: May 1, 2006                  Respectfully submitted,
                                    ROBERT D. McCALLUM, Jr.
                                    Associate Attorney General
                                    PETER D. KEISLER
                                    Assistant Attorney General
                                    STUART E. SCHIFFER
                                    Deputy Assistant Attorney General
                                    J. CHRISTOPHER KOHN
                                    Director

                                    /s/ John J. Siemietkowski
                                    ROBERT E. KIRSCHMAN, Jr.
                                    (D.C. Bar No. 406635)
                                    Assistant Director
                                    JOHN J. SIEMIETKOWSKI
                                    Trial Attorney
                                    Commercial Litigation Branch
                                    Civil Division
                                    P.O. Box 875
                                    Ben Franklin Station
                                    Washington, D.C. 20044-0875
                                    Phone (202) 514-3368
                                    Fax (202) 514-9163

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on May 1, 2006 the foregoing *Notice of Filing of Interior Defendants' Twenty-fifth Status Report* was served by Electronic Case Filing, and upon the following, who is not registered for Electronic Case Filing, by facsimile:

Earl Old Person (*Pro se*)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
Fax (406) 338-7530

 /s/ Jay St. John
Jay St. John



THE SECRETARY OF THE INTERIOR

WASHINGTON

**MAY 0 1 2006**


J. Christopher Kohn
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875

  Re:   _Cobell v. Norton – Status Report to the Court Number Twenty-Five_

Dear Mr. Kohn:

Enclosed is the Department of the Interior's _Status Report to the Court Number Twenty-Five (For the Period January 1, 2006 through March 31, 2006)_. Please forward a copy to the Court.

This is the 18th report in the revised Report format. My signature on this Report reflects my belief that the information provided to me by others is correct to the best of my knowledge

Thank you for your assistance.

     Sincerely,

     _P. Lynn Scarlett_

     P. Lynn Scarlett
     Acting Secretary


Enclosure

# Status Report to the Court
# Number Twenty-Five

**For the Period**
**January 1, 2006 through March 31, 2006**



**May 1, 2006**

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**

### TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................... 1

  A.  INFORMATION TECHNOLOGY ................................................................... 2

  B.  CADASTRAL SURVEY ................................................................................... 11

  C.  MINERALS MANAGEMENT SERVICE ...................................................... 13

  D.  OFFICE OF HISTORICAL TRUST ACCOUNTING .................................. 14

II.    OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS ................ 17

  A.  TRUST REVIEW AND AUDIT ...................................................................... 19

  B.  OST-OFFICE OF THE CHIEF INFORMATION OFFICER ...................... 21

    1.  RECORDS MANAGEMENT ....................................................................... 21

  C.  TRUST ACCOUNTABILITY .......................................................................... 24

    1.  TRUST BUSINESS PROCESS MODELING ............................................. 24

    2.  TRUST DATA QUALITY AND INTEGRITY ........................................... 26

    3.  INDIAN FIDUCIARY TRUST TRAINING PROGRAM ......................... 28

    4.  RISK MANAGEMENT ................................................................................ 30

    5.  REGULATIONS, POLICIES AND PROCEDURES ................................. 32

  D.  FIELD OPERATIONS ..................................................................................... 34

    1.  APPRAISAL ................................................................................................. 34

  E.  TRUST SERVICES .......................................................................................... 37

    1.  CURRENT ACCOUNTING ACTIVITIES ............................................... 37

III.   BUREAU OF INDIAN AFFAIRS ....................................................................... 41

  A.  TRUST REGULATIONS, POLICIES AND PROCEDURES ...................... 41

  B.  FRACTIONATION .......................................................................................... 43

  C.  PROBATE ......................................................................................................... 45

ACRONYMS AND ABBREVIATIONS ....................................................................... 47

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                                    **Introduction**

## I.      INTRODUCTION

This *Status Report to the Court Number Twenty-Five* (Report) represents the period from January 1, 2006, through March 31, 2006.  The Report is presented for the purpose of informing the Court of actions taken since the issuance of the preceding quarterly report.  In addition, the Report references some matters that might be of interest to the Court, including delays in and obstacles to trust reform activities, and a report on the progress of the historical accounting of individual Indian beneficiary funds managed by Interior.[1]

This Report is prepared in a manner consistent with previous reports to the Court.  Managers from the Office of the Chief Information Officer, Bureau of Indian Affairs, Bureau of Land Management, Minerals Management Service, Office of the Special Trustee for American Indians, and Office of Historical Trust Accounting submit reports on the status of their respective Indian trust activities.

A change in the Report format Interior brings to the Court's attention is that there will not be a Secretary's Observations section in this Report.  The Acting Secretary, P. Lynn Scarlett, will sign the Report as part of the transmittal of the Report to the Court.

A glossary of acronyms and abbreviations is included in this Report.  The glossary is located at the end of the Report.

---

[1]   This Report contains information on the broad trust reform efforts underway at Interior.  Accordingly, it may include information on reform efforts that are not within the scope of the *Cobell* litigation.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                              **Information Technology**

## A.    INFORMATION TECHNOLOGY

### Introduction

This section describes the status of Interior IT systems, particularly the systems that house or provide access to IITD or provide various computing capabilities, including functions critical to the proper administration of the individual Indian trust responsibilities within Interior.  In addition, this section describes various efforts being made to improve IITD security within Interior, pursuant to OMB Circular A-130 Appendix III, and the status of Internet connectivity.

### Accomplishments and Completions

**Computer Security:**
> The primary focus for this reporting period has been remediation of weaknesses, reduction of open POA&M items, and IT security policy.  Interior continued to make progress in enhancing IT security, through continuous monitoring of Internet-accessible systems and implementing corrective actions for weaknesses identified by the Interior penetration tests and audits of financial systems.  The most noteworthy accomplishments, completions and challenges during the reporting period are described below.

> *ESN:*
> - Two Internet gateway routers were replaced with newer and more capable equipment. This upgrade is expected to enhance security and increase availability of Internet services.
>
> - BLM reconfigured Denver and Portland interfaces to the ESN to create a more consistent, layered approach to the perimeter security, including intrusion prevention systems, firewalls, routers, and application firewalls.

> *Prevention and Monitoring:*
> - Interior continued its external perimeter extended vulnerability scan testing of Internet-accessible systems, using capabilities established at ESN.  As of the end of this reporting period, all identified critical or major vulnerabilities in trust systems were either remediated or were identified as false positives.
>
> - Interior continued deployment of the Interior-wide internal scanning tool for BOR, NPS, FWS and OST.  Interior also continued refining the internal scanning process in order to reduce the number of false positives.  Reducing false positives should allow Interior to focus on remediating actual vulnerabilities.
>
> - BLM procured, configured and implemented a security event log consolidation and evaluation program that provides increased security response, including custom coding an automated quarantine tool to deny access to BLM resources to all potentially hostile contacts.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                    **Information Technology**

- There were no successful security incidents detected during this reporting period that resulted in the compromise of trust systems or data.

***Policies and Guidance***
- The Interior CIO issued "Information Resources Management (IRM) Internal Control Review (ICR) Guidance for FY 2006" to the heads of bureaus and offices on January 31, 2006. This directive transmitted Interior's "Guidelines for FY 2006 Internal Control and Audit Follow-up Programs," dated November 4, 2005, that requires performing annual ICR assessments by evaluating the security controls in place for all IT systems contained in Interior's IT system C&A master list.

- The Interior Chief Information Security Officer and OIG agreed to "Rules of Engagement for IT Security Penetration Testing" on February 9, 2006. This document provides a framework of procedures and guidelines to be followed by OIG, its contractor and Interior in performing the independent evaluation of Interior's public-facing network infrastructure and ESN. It establishes the test objective, scope, timeframe, rules, and points of contact.

- The Interior CIO issued "Software Piracy" to the heads of bureaus and offices on February 14, 2006. This directive sets Interior's policy for the prevention of software piracy.

- The Interior CIO issued "Fiscal Year 2006 (FY06) Annual End-user Federal Information Systems Security Awareness Training" on February 17, 2006, and "Fiscal Year 2006 (FY 2006) Annual End-user Federal Information Systems Security Awareness Training" on March 10, 2006, to the assistant secretaries and heads of bureaus and offices. These memoranda require that all personnel, including contractors and other external authorized users, with access to DOI information systems complete training that satisfies the annual FISMA requirement. It also mandates the use of a centralized source to standardize the training across Interior.

- The Interior Deputy Secretary issued "Approval of the Interior's Enterprise Architecture" to the heads of bureaus and offices on February 27, 2006. This memorandum endorses the Interior's IT Investment Review Board approval of the IEA as outlined in Version 2.0 of the ETP. The ETP provides a sequencing plan that describes the business transformation efforts required to move Interior from its current state to the target architecture. The ETP is in alignment with guidance from OMB.

- The Interior CIO issued "Plan of Action and Milestones (POA&M) Process Standard" to the heads of bureaus and offices on February 27, 2006. This revised guidance provides a set of standards and procedures for developing and maintaining

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                    **Information Technology**

bureau and office POA&Ms for identifying weaknesses, managing remediation, and providing quarterly reporting to OMB.

- The Interior CIO issued "Interim Guidance for the Certification and Accreditation of Information Technology Systems" to the heads of bureaus and offices, SOL, OIG, and bureau and office CIOs on March 14, 2006. This directive provides guidance on the C&A process to be used throughout Interior regarding implementation of the NIST Special Publications 800-37, 800-18, 800-30, 800-34, 800-47, 800-53, 800-60, and FIPS Publications 199 and 200.

- The Interior CIO issued "Information Technology (IT) System Inventory Requirements" to the heads of bureaus and offices on March 20, 2006. This directive provides supplemental guidance to OCIO Directive 2004-010 "Population and Maintenance of the Department of the Interior Enterprise Architecture Repository" on system inventory requirements.

- The Interior CIO issued "Instant Messaging, Internet Relay Chat, Web Conferencing, and Peer-to-Peer Usage Policy" to the assistant secretaries, and heads of bureaus and offices on March 20, 2006. This directive establishes usage policy and procedures for various collaborative programs. It also mandates standardization and technical controls to ensure the computing environment and data remain secure.

- MMS issued security requirements for all network users to read and acknowledge the FY2006 MMS IT rules of behavior, which apply to all MMS IT systems.

*Training and Awareness*
- Training was held for users of DEAR's new reporting and C&A self-guided capabilities in DC and Denver, a step-by-step process that allows for standardized and consistent input of data. The new enhancements to DEAR provide for one authoritative data source that links each information system to an overall C&A boundary, thus improving oversight and reporting with respect to FISMA requirements. Training focused on:
    - Assuring roles, processes, and tasks for collecting and maintaining information were clearly defined and reviewed;
    - Performing quality assurance checks on the information contained in DEAR using the new reporting features;
    - Using NIST Special Publication 800-60 guidance to assess the appropriate confidentiality, integrity and availability ratings of an accreditation boundary.

**Plans of Action and Milestones:**
- Interior reduced POA&M weaknesses by 9.6 percent during this reporting period. Interior remediated and closed out 327 weaknesses. Interior continues to address the remaining 1,211 open weaknesses.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                    **Information Technology**

**A-130 Certification and Accreditation:**
- BIA reviewed and updated all trust system security plans to be compliant with NIST Special Publications 800-60 and 800-53 standards. This included following the FIPS Publication 199 guidelines to determine the appropriate security categorization (high, medium, or low) for each system. NIST Special Publication 800-53 requires the selection and employment of appropriate security controls for an information system based upon the security categorization of the system.

- BIA performed tests on a new document scanning module for TAAMS. The test results will be evaluated to assess the impacts, if any, that the introduction of the module will have on the system as a whole.

- BIA completed the ST&E and C&A documentation of the Trust Network Root Enterprise Active Directory system and is reviewing for submission to the DAA.

**E-Authentication and HSPD-12:**
- BLM has transferred existing Smartcard technology to NBC for implementation of HSPD-12 Personal Identification Verification (PIV-II) requirements.

**Staffing:**
- Interior filled several key positions this reporting period, including a Deputy CIO, IT Security Project Manager, IT Enterprise Security Architect, IT Security Trust Officer and an Information Systems Security Officer, OST Deputy CIO, and BIA IT Security and Privacy Deputy Office Director and Security Engineer.

**Current Status**

**A-130 Certification and Accreditation:**
- All trust systems have full ATO status except for one. The one exception is a BIA legacy system called the Land Ownership Tracking System. The system was operating under an IATO valid for 90 days from December 19, 2005. The IATO for this system is expected to be renewed and remain valid until the system is retired, which is expected by the end of CY2006. The risk of continued operation under an IATO has been determined to be necessary since the system is required for BIA to conduct its business.

**ZANTAZ:**
- The contract to restore the ZStage tapes was awarded. All bureaus and offices affected by the ZStage issue from the last reporting period sent their tapes to ZANTAZ.
  - OST sent 112 backup tapes and all were restored without incident.
  - SOL sent 97 backup tapes and restoration is expected to be complete by the end of June 2006.
  - NBC Denver sent 57 backup tapes and restoration is expected to be complete by the end of June 2006.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                    **Information Technology**

- NBC DC sent 409 backup tapes and restoration is expected to be complete by the end of June 2006. Three tapes have not been sent because of national security issues.
- BIA sent 280 backup tapes. Of the 280 tapes sent, 268 of these tapes are blank and 12 tapes have only partial data. BIA sent a technician to ZANTAZ in an attempt to confirm whether the tapes were blank. On March 31, 2006, BIA sent ZANTAZ one tape that it believes may contain some of the data that would have been captured on the 280 tapes.

- The NBC Denver servers were upgraded on January 27, 2006, to correct the ZStage issues reported in the last reporting period.

- BLM shipped a new router to the ZANTAZ Las Vegas data center for the connection to the archive servers. The new router is part of a technology refresh effort and will include implementing a buffer server between the BLM forwarder and the ZANTAZ data center. This will provide up to two weeks of buffer space in the event that connectivity to the datacenter is interrupted for an extended period.

- BIA deployed a ZStage Alert script in late November 2005. During this period, the ZStage Alert script noted problems in three areas have been referred to ZANTAZ for further investigation.
  - A misconfiguration by one user caused that user's messages not to reach ZANTAZ. BIA expects to coordinate with ZANTAZ to deliver whatever messages can be recovered to the digital safe.
  - Notification messages informing the user of e-mail delivery failures were not being captured by ZANTAZ. Messages which the user attempted to send, but which were not actually sent, were captured by ZANTAZ. Therefore, ZANTAZ will show a discrepancy between the senders' and receivers' e-mail collections.
  - A process irregularity occurred whereby an incorrect ZStage value indicated that the e-mail was not captured when it actually has been. This created a false negative in the ZStage value.

**REPORTS:**

These reports were among those issued during this reporting period.

### *FISMA*

- OMB issued "FY 2005 Report to Congress on Implementation of The Federal Information Security Management Act of 2002," on March 1, 2006. This report informs Congress and the public of the Federal government's security performance, and provides OMB's assessment of government-wide information technology security strengths and weaknesses and a plan of action to improve performance. It provides key security performance measures from FY2002 through FY2005 for each agency, based on the report issued by each agency's OIG. While Interior does not believe the FISMA report reflects the current status of Interior's information technology security, Interior

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                    **Information Technology**

acknowledges that the report identified some important areas that need improvement. These areas include, but may not be limited to network security, POA&M, and C&A.

- The House Government Reform Committee issued the "Federal Computer Security Grades - 2001-2005" on March 16, 2006. This document is compiled by the Committee from FISMA reports submitted to Congress by agency CIOs and OIGs. The Committee report, based on the FY2005 report issued by Interior's OIG, indicates Interior's grade moved from "C+" in FY2004 to an "F" in FY2005. Interior is concerned that the FY2005 congressional FISMA report card did not reflect the current status of its information technology security.

- The Interior CIO, in a letter to Congressman Davis, Chairman of the House Government Reform Committee, stated that the FISMA report "did not reflect the current status of [Interior's] information technology security … despite further improvements to [Interior's] IT security." The letter notes the following "accomplishments that strengthened [Interior's] IT security":
  - Provided $1.1 million to OIG for penetration testing in all bureaus;
  - Certified and accredited 98 percent of IT systems, with 100 percent quality assurance reviews;
  - Trained 98.7 percent of the workforce in user security awareness;
  - Ensured that 67 percent of IT security specialists completed role-based training;
  - Increased the number of certified security professionals from 63 to 86;
  - Survived 650 million probes and attacks, with only a couple of web defacements, through sophisticated vulnerability scanning and enhanced intrusion detection and prevention devices;
  - Consolidated 13 networks into one with added security services;
  - Reduced Internet Service Providers from 35 to 5, which created simpler and more effective perimeter security;
  - Developed eight enterprise software and hardware agreements for standardization, cost efficiencies, and increased security;
  - Received OMB's top ranking for Interior's enterprise architecture with an integrated security architecture;
  - Submitted 60 IT investment proposals to OMB: each received passing IT security scores and OMB approval, and security was given special review in each case;
  - Established qualified project managers on major IT projects;
  - Maintained a privacy program recognized as a best practice by the Industry Advisory Council; and,
  - Completed the first departmental IT security assessment through an independent contractor. The nine major program areas received ratings of four good, four satisfactory and one unsatisfactory.

- GAO issued "INFORMATION TECHNOLOGY: Agencies Need to Improve the Accuracy and Reliability of Investment Information (Report No. GAO-06-250)," to Congressional Requesters on January 12, 2006. The report responds to a Congressional

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                    **Information Technology**

request to determine the extent to which selected agencies have underlying support for their FY2006 investment information.  It emphasizes the use of the GAO-developed IT Investment Management framework in implementing capital planning processes and notes Interior to be among those agencies using the IT Investment Management Framework.  Interior was cited as having made significant improvements.

- The Interior IG issued "Security Vulnerabilities at the Information Technology Center Place Sensitive Data at Risk (Report No. NSM-EV-OSS-0004-2006)," on January 17, 2006.  The report details IT security vulnerabilities that would allow unauthorized users access to sensitive data located on the NBC network.  The concern was that the Information Technology Center could be physically entered by anyone with access to the Main Interior Building.  NBC has developed and implemented corrective actions for a majority of the vulnerabilities.  Corrective actions have been developed and prioritized as POA&Ms for the remaining vulnerabilities identified in the report.

- OMB issued "Report to Congress on the Benefits of the President's E-Government Initiatives," on January 20, 2006.  This report provides a status update to Congress on E-Government initiatives which were approved by the President's Management Council.  Initiatives included E-Authentication and the security line of business.

- BIA and ESN issued "NBC Network Security Recommendations Report."  The report, developed in collaboration with NBC, provides recommendations for improving the security of BIA connections to NBC applications and is intended to prevent the possibility of access to sensitive BIA data and systems from users on the NBC network.  This has a low risk of occurrence and a configuration change has been developed and programmed for implementation to correct the weakness.

*MRM Legacy Media*
As previously reported, MRM expected to dispose of 30,000 legacy backup tapes that contain data redundant to data in the new MRMSS.  Due to objections by tribal litigants, MRM has postponed the disposal of these tapes pending resolution of objections.

## Delays and Obstacles

Like other federal agencies, Interior must address many challenges regarding the integration, performance, funding, security, and data integrity of IT systems.  Interior initiated or completed steps to address some of the challenges reported in this and previous reporting periods.  However, delays and obstacles listed below impede progress in achieving Interior's IT management goals.

**Litigation**
- Delays caused by last summer's extensive collection and production of documents and by Court appearances continue to put Interior several months behind in completing many required IT and IT security activities.  These include completing corrective actions from

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                **Information Technology**

audits and on POA&Ms, updating of required security policies and procedures, and implementing initiatives critical to continued improvements in IT security.

- Employee fears about becoming personally implicated in the *Cobell* litigation continue to undermine communication and decision-making, and are contributing factors to low employee morale.

**Staffing**
- Interior is experiencing high staff and management turnover in critical IT positions, particularly IT security. Recruitment challenges to attract qualified candidates continue, particularly in light of litigation impacts. The CISO position remains vacant and the Department's IT security staff is at 70 percent.

**Funding and Resources**
- OCIO, along with Interior bureaus and offices, is responding to an extraordinary level of scrutiny, including OIG evaluations and audits, GAO evaluations and audits, and OMB required reviews. With the significant increase in review, Interior is expending considerable efforts in data collection, document production and related workloads, which diminishes the resources available for IT security-related activities. For example, staff has less time to implement and test security controls.

- Funding availability will continue to dictate the timing of IT-related initiatives. Interior's FY2006 budget will require managing a variety of IT-related requirements and tradeoffs. Interior continues to prioritize its IT security needs in its budget requests within fiscal constraints.

**Denied Internet Access**
- Several Interior bureaus and offices (BIA, OHA, OST and SOL) have not been permitted by the Court to have Internet access since December 5, 2001. Lack of Internet access impedes work processes and the ability to communicate effectively, both internally and externally. For example:

  - Coordination and dissemination of new policies and training is delayed due to the need to deliver material physically. Even after receipt, considerable re-work is required to tailor web-based training programs to run locally.

  - Policy discussion is hampered due to additional time required in coordinating group discussions via teleconferencing when e-mail collaboration would be more appropriate and timely.

  - Ensuring Continuity of Operations and Continuity of Government through the implementation of contingency plans requires rapid notification of an event. The lack of Internet access degrades Interior's capabilities to notify all of its bureaus and offices in a timely and efficient manner.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                    **Information Technology**

- Maintaining security on internal systems is more difficult without access to the Internet for research, reporting, and patch management.

- The concerns over potential future Court-ordered Internet shutdowns or other Court-ordered disruptions create uncertainty over how to proceed with enterprise initiatives and security improvements. Contingency planning for either external or internal disconnections (and all potential permutations) takes resources from planned and daily activities.

**<u>Assurance Statement</u>**

I concur with the content of the information contained in the Information Technology section of the *Status Report to the Court Number Twenty-Five*. The information provided in this section is accurate to the best of my knowledge.

Date:   April 20, 2006

Name:  *Signature on File*
         W. Hord Tipton
         Interior Chief Information Officer

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                    **Cadastral Survey**

## B.     CADASTRAL SURVEY

### Introduction

Cadastral surveys provide assurance that land boundaries for individual Indian and tribal trust lands are identified appropriately.  By federal law, surveys of Indian lands are to be performed under BLM's direction and control.  Official surveys, whether preexisting or new, identify the location of land boundaries of Indian trust assets and determine official acreage.  The official surveys are integral to realty transactions, resource management activities, litigation support and the federal system of patent, allotment and survey records maintained by BLM.  Ownership information, distribution of trust assets, and management of trust accounts may be related to or based upon information recorded in official surveys.

### Accomplishments and Completions

### BLM Indian Lands Surveyors

During this reporting period, the FTM goal to hire and locate 12 BLM Indian lands surveyors for the 12 BIA Regions was accomplished, with the final six surveyors having reported to duty.

The BLM Indian lands surveyors for Eastern, Navajo, Pacific, Rocky Mountain, Southwest and Western Regions reported to their respective duty locations in this reporting period.  All BLM Indian lands surveyors are actively working with BIA staff and others in addressing survey boundary issues.

### Current Status

### Interior Standards for Indian Trust Lands Boundary Evidence

Reviews of the draft Standards for Indian Trust Lands Boundary Evidence (previously referred as Draft Boundary Standards) were received from the Office of the Solicitor, Division of Land and Water Resources, Branch of Public Lands, and the Division of Indian Affairs, Branch of General Indian Legal Affairs. The SOL comments were integrated into the revised draft.  The updated draft will be provided to the Directives Coordinator, Office of Planning and Performance Management, Assistant Secretary - Policy Management and Budget for inclusion in the Departmental Directives system.

### Implementation of the FTM

During this reporting period the FTM goals continued to be implemented.  These goals as they relate to cadastral survey are:  (1) funding for the 12 BLM Indian lands surveyors located in the BIA Regions; (2)  creation of the Certified Federal Surveyor program (where state licensed land surveyors can be certified to perform commercial activities under the direction and control of BLM); (3) improving the maintenance of the Public Land Survey System within Indian Country;

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                          **Cadastral Survey**

and (4) creation of one standardized source of land status information based on cadastral data that delineates the official legal land descriptions.

The main focus of the CFedS program for this reporting period was the development of the training program. The training will be offered through distance learning. Approximately 30 hours of the planned 50 hours of video lecture were developed, and several web-based problems and case studies nearly completed. The draft manual and handbook for the administration and oversight of the CFedS program are in review. It is anticipated that the CFedS program should assure better survey integrity, and should increase the production of surveys.

An inventory of the survey conditions for all exterior boundaries on 325 Indian reservations was prepared during this reporting period as part of the FTM implementation. The inventory consists of information about the condition and era of the survey monumentation (on-the-ground survey markers) along with their extent and location. This inventory will serve as the basis for prioritizing funding allocations and the commitment of resources to meet BLM's fiduciary trust responsibilities.

## Delays and Obstacles

### Disconnection from the Internet

The Court-ordered disconnection from the Internet continues to adversely impact the way communications are handled between BLM, BIA, OST and SOL, including the way CARS is being implemented and the review of the Interior Indian Trust Lands Boundary Standards**.** BLM's productivity has decreased, and the cost associated with dual networks has caused the cost of survey services to increase. This issue continues to impact BLM's ability to provide cadastral services in an effective and cost efficient manner to clients.

### Funding of the FTM

Planning and scheduling of out-year FTM work is dependent on future funding.

### Assurance Statement

I concur with the content of the information contained in the Cadastral Survey section of the *Status Report to the Court Number Twenty-Five*. The information provided in this section is accurate to the best of my knowledge.

Date:   April 19, 2006

Name:   *Signature on File*
          Donald A. Buhler
          Chief Cadastral Surveyor
          Bureau of Land Management

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                    **Minerals Management Service**

### C.    MINERALS MANAGEMENT SERVICE

**Introduction**

Minerals Revenue Management, an MMS program, is responsible for collecting, accounting for, and distributing mineral revenues from both federal and Indian mineral leases, and for evaluating industry compliance with laws, regulations and lease terms.  MRM maintains reported information and distributes revenues at the lease level.  BIA maintains individual Indian ownership records that are used to provide information to OST for disbursement of the lease revenues to individual Indian beneficiaries.

**Current Status**

**Indian Oil Rule**

MMS continued with the rulemaking process for the valuation of oil produced from tribal and allotted Indian lands.  The proposed rule was published in February 2006, and the comment period ended on April 14, 2006.

**Payment Receipt Date Verification**

MMS continues to work with its contractor on system modifications to finalize a listing of prior data errors in the Indian mineral revenue distribution file.  The data listings will be provided to BIA, OST, and any affected tribes.

**MRM Legacy Media**

As previously reported, MRM expected to dispose of 30,000 legacy backup tapes that contain data redundant to data in the new MRMSS.  Due to objections by tribal litigants, MRM has postponed the disposal of these tapes pending resolution of objections.

**Assurance Statement**

I concur with the content of the information contained in the Minerals Management Service section of the *Status Report to the Court Number Twenty-Five*.  The information provided in this section is accurate to the best of my knowledge.

Date:   April 20, 2006

Name:  *Signature on File*
        Cathy J. Hamilton
        Chief of Staff
        Minerals Revenue Management
        Minerals Management Service

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                    **Office of Historical Trust Accounting**

## D.    OFFICE OF HISTORICAL TRUST ACCOUNTING

**Introduction**

OHTA was established by Secretarial Order No. 3231 on July 10, 2001, and is charged with planning, organizing, directing and executing the historical accounting of IIM and tribal trust accounts.  Since its 2001 inception, neither OHTA nor its contractors have stored the IIM transaction data used to perform historical accounting on a system connected to the Internet.

**Current Status**

**Judgment and Per Capita IIM Accounts**

OHTA continues to perform historical accounting procedures on Judgment and Per Capita IIM accounts.  During this reporting period, OHTA reconciled an additional 3,818 Judgment IIM accounts and 2,022 Per Capita IIM accounts.

Results through March 31, 2006, are summarized in the table below.

|  | Judgment Accounts | | Per Capita Accounts | |
|---|---|---|---|---|
|  | **Number of Accounts** | **Percent of Total** | **Number of Accounts** | **Percent of Total** |
| Total at December 31, 2000 (including accounts open at or after October 25, 1994, but closed prior to December 31, 2000) | 80,539 | 100% | 19,033 | 100% |
| Reduction for accounts subsequently determined to be outside of the scope of the population | (835) | (1%) | N/A | N/A |
| Reconciled January 1, 2001, through December 31, 2005 | (50,519) | (63%) | (15,086) | (79%) |
| Reconciled this reporting period | (3,818) | (5%) | (2,022) | (11%) |
| Remaining to be reconciled at March 31, 2006 | 25,367 | 31% | 1,925 | 10% |

**Mailings to Judgment and Per Capita IIM Account Holders**

On March 9, 2006, a fourth submission for permission to mail 20,402 Historical Statements of Account was filed with the U.S. District Court.  The third submission to mail 28,107 Historical Statements of Account was filed on March 24, 2005.  Mailing of these 48,509 Historical Statements of Account awaits approval from the Court.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                    **Office of Historical Trust Accounting**

In its October 22, 2004, Order, the Court permitted OHTA to transmit Historical Statements of Account to 17,096 Judgment IIM account holders; of this number, 4,974 Statements could not be sent because the account holders were classified as WAU. OHTA has been working with OST and contractors to identify addresses for the WAU account holders. During this reporting period, OHTA mailed 826 Historical Statements of Account to account holders for whom addresses had been located, bringing the total number of Statements mailed to 12,948. OHTA will re-mail any of these Statements that are returned as forwarding addresses become available.

**OHTA SDA Distribution Project - Undistributed SDA Balances at December 31, 2002**

During this reporting period, 148 SDA involving $826,508 were resolved and distributed. There remain 11,670 SDA involving $18,530,532 to resolve and distribute. Distributions of SDA balances to rightful owners during the period January 1, 2003, through March 31, 2006, total $39,840,578, including interest of $2,878,375 posted from January 1, 2003, through the date of distribution.

**Imaging/Coding – Individual Indian Trust Documents**

During this reporting period, OHTA completed scanning 456,262 pages, coding 73,041 documents and loading 116,493 documents into ART. All documents are checked for quality and accuracy before they are loaded into ART for reconciliation.

**Accounting Standards Manual**

As previously reported, periodic revisions are routinely made to the *Accounting Standards Manual*. Another revision was issued on March 17, 2006.

**Accounting Plan**

As previously reported, Interior expects to modify the January 6, 2003, accounting plan. Modifications will be based on lessons learned from the work already completed, court decisions, statistical sampling parameters, accounting costs, and the history of congressional funding.

**Delays and Obstacles**

Enacted appropriations for FY2003 through FY2006 have been below the President's requests, thus limiting the historical accounting that could be performed.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                **Office of Historical Trust Accounting**

**Assurance Statement**

I concur with the contents of the information contained in the Office of Historical Trust Accounting section of the *Status Report to the Court Number Twenty-Five*.  The information provided in this section is accurate to the best of my knowledge.

Date:        April 24, 2006

Name:        *Signature on File*
             Bert T. Edwards, Executive Director
             Office of Historical Trust Accounting

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                    **Office of the Special Trustee for American Indians**

## II.    OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS

### Introduction

The Office of the Special Trustee for American Indians was created by the American Indian Trust Fund Management Reform Act of 1994.  The 1994 Act provides direction to the Department of the Interior on accounting for Indian trust funds and reforming the operation of the Indian fiduciary trust.  The Special Trustee's responsibilities under the Act include creating a comprehensive strategic plan for the operation of the trust and providing oversight of the accounting for Indian trust funds and the reform of the trust.

### Special Trustee's Observations

During this reporting period, work continued in the Rocky Mountain and Great Plains BIA region offices toward conversion of IT systems and reengineering business processes.  Meetings were held with officials of these two regions to help develop plans for the conversion process.

The Interior Regulatory Initiative working group held two consultation sessions during this reporting period.  Attendees included Interior officials and tribal representatives, among others.  Publication of proposed regulations in the Federal Register is expected to begin during CY2006.

Continued absence of Internet connectivity continues to cause loss of productivity and requires use of expensive, alternative methods to obtain and transmit information.  Appraisers often travel to access public Internet systems for research of local property values in order to prepare appraisals.  BLM surveyors are often delayed in getting access to information to perform survey work.  Probate specialists are wasting many hours of time attempting to locate prospective heirs while using telephone and fax resources instead of the Internet.  In addition, by accessing Internet databases, OST could locate account holders whose whereabouts are unknown and distribute funds to them.

Internet is a key delivery mechanism for communications and services to individuals and Tribes, and must be available to Indians and Tribes as access becomes available.  With Internet access, many account holders would be able to obtain account and asset information "online" rather than having to use the call center or make personal visits to field offices.  The President of the National Congress of American Indians, Joe Garcia, during the fourth annual State of the Indian Nations address said, "Because of our often-remote location relative to superior professional services, it is crucial for us to join the telecommunications revolution of distance learning, telemedicine, public safety, e-commerce, and electronic government.  Not enough Indians have access."

During this reporting period, one hearing was held by the Senate Indian Affairs Committee and a second hearing was held jointly with Senate Indian Affairs and the House Resources Committee regarding a proposed *Cobell* settlement bill S. 1439.  Congressional leaders have strongly indicated they would like to see an end to the litigation in favor of more direct use of resources in the trust reform area.  Also, during this reporting period, staff from these two committees were

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                    **Office of the Special Trustee for American Indians**

hosted at the Lenexa record center where they saw the approximately 300 million pages of records, including trust records, the indexing project and the record imaging project, followed by a demonstration of the accounting tool that reconciles IIM accounts to the source documents.

During this reporting period, Secretary Norton advised Congress that the proposed FY2007 budget for trust management, including the ongoing trust reform efforts, is $536 million. This budget includes funding for BIA trust asset management responsibilities, accounting and distribution of trust funds by OST, funding for the OHTA historical accounting efforts and tribal litigation work, as well as funding for the Indian land consolidation project. In addition, funding for trust reform activities including the conversion to new technology at all BIA locations, encoding of documents and cleanup of records is included in the budget.

The FY2007 budget includes a requested increase of $25.4 million from this year's budget for the Indian land consolidation program. Fractionation is one of the most challenging problems in Indian country. This money will help direct attention to acquiring the most highly fractionated tracts of land.

The budget also includes an increase of $6.5 million for other trust programs. This money is expected to provide survey work, including adding a cadastral surveyor in each BIA region, continue support of the probate project and to assist Tribes in their development of energy resources on reservations.

## Assurance Statement

The comments and observations are provided by the Special Trustee for American Indians and reflect the opinion of the Special Trustee only.

Date:   April 21, 2006

Name: *Signature on File*
        Ross O. Swimmer
        Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                    **Trust Review and Audit**

### A.    TRUST REVIEW AND AUDIT

**Introduction**

OTRA reports directly to the Special Trustee for American Indians.  OTRA was created by OST as a response to trust initiatives developed during the tribal consultation process of 2002.  OTRA conducts performance audits, examinations and reviews of Interior entities as well as Tribes that manage fiduciary trust activities.  Examinations are routinely conducted at locations that perform trust operations, and are planned to result in a performance rating.  Also, compliance reviews are undertaken in response to information and complaints received from beneficiaries, employees and the public.

**Current Status**

**Indian Trust Examinations**

During this reporting period, OTRA performed seven trust reviews.  Nine draft reports were issued for comment and ten final reports were issued.

OTRA completed four trust record assessments and issued five final reports during this reporting period.

During this reporting period, OTRA started follow-up on the findings in the reports already issued.  Twenty-six letters were sent to regions, agencies and Tribes asking for updates on the findings reported in our reviews.  OTRA received three responses by the end of this reporting period.

**Compliance Reviews**

During this reporting period, nine cases were in inventory.  Three reviews were closed.  Field work or report drafting continued on the remaining cases.

**Delays and Obstacles**

Lack of Internet access impedes OTRA's work processes and its ability to communicate effectively, both internally and externally.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                              **Trust Review and Audit**

**Assurance Statement**

I concur with the content of the information contained in the Trust Review and Audit section of the *Status Report to the Court Number Twenty-Five*.  The information provided in this section is accurate to the best of my knowledge.

Date:   April 28, 2006

Name: *Signature on File*
         D. Jeff Lords
         Director, Office of Trust Review and Audit
         Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                              **Records Management**

<div style="text-align:center;">

**B.     OST-OFFICE OF THE CHIEF INFORMATION OFFICER**

**1.  RECORDS MANAGEMENT**

</div>

<u>**Introduction**</u>

The Office of Trust Records was established in 1999 to develop and implement a program for the economical and efficient management of trust records, consistent with the 1994 Act, the Federal Records Act, and other statutes and implementing regulations.  The OTR records management program has been developed and implemented, and continues to evolve, to ensure that necessary Indian records are maintained, records retention schedules are consistent with retention needs, and records are safeguarded throughout their life-cycles.

<u>**Accomplishments and Completions**</u>

**American Indian Records Repository**

Approximately 136,471 indexed boxes are located in the AIRR as of the end of this reporting period.  As previously reported, OTR has historically reported the number of boxes transferred to AIRR for storage.  However, NARA uses cubic feet as the measure for records stored.  Thus far, NARA reports that they are currently storing 142,433 cubic feet of indexed inactive records at AIRR.  Some boxes are larger than one cubic foot (e.g., map boxes).

**Records Indexing Project**

Indexing of approximately 138,425 boxes has been completed as of the end of this reporting period.  The number of completed boxes (indexed and quality reviewed) differs from the number of boxes stored at AIRR because not all completed boxes were sent to AIRR from the Annex before the end of the reporting period.

Approximately 3,890 boxes of inactive records were moved from BIA/OST field locations to the Lenexa Annex for indexing during this reporting period.  Once indexed, these boxes will be stored in the AIRR.

**Training**

OTR provided records management training for 121 BIA and OST identified records contacts and 51 tribal employees during this reporting period.

**Equipment Purchases**

242 pieces of fireproof filing equipment were delivered to BIA, OST and tribal offices during this reporting period.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                          **Records Management**

---

## Current Status

### Safeguarding Records

As reported, 283 boxes of inactive records that were or may have been damaged or contaminated by mold, mildew, mouse droppings or other adverse elements were shipped to NARA for remediation in June 2005. As reported in the OTR Activity Report for November 2005, the number of boxes increased to 289 as a result of holdings maintenance being performed. Some boxes cannot hold the entire contents of the original box and are placed in an "overflow box" which is kept with the original box.

OTR reported in December 2005 that 145 boxes were released by NARA and sent for indexing and storage in the AIRR. NARA subsequently informed OTR that the number released in December 2005 was actually 146 boxes. Of the 143 boxes (289 – 146) [2] remaining to be treated by NARA, 48 of 60 boxes requiring holding maintenance were completed; 12 of 21 boxes requiring humidification flattening were completed; and 37 of 54 boxes requiring conservation treatment were completed. The completed boxes have been sent to the Annex for indexing. NARA anticipates that the remaining 46 original boxes will be completed by the end of April 2006, except for those materials which are beyond NARA's capabilities to repair.

### Records Retention Schedules

During this reporting period, OTR received approval from the Archivist of the United States for the following five BIA electronic systems records schedules: MADS, Keyfile System, GLADS, Alaska Title Plant Data Base, and Land Title Mapper. The Archivist also approved the Box Index Search System records schedule.

### Records Evaluation

As previously reported, 31 boxes set aside for evaluation remain at OTR in Albuquerque pursuant to a litigation hold. There has been no change during this reporting period.

### Records Management Policies and Procedures

As reported in the OTR Activity Report for February 2006, OTR was notified of allegations of destruction of trust and non-trust records at the BIA Fort Defiance Agency. OTR and OTRA conducted a joint examination of the allegations and concluded that approximately one cubic foot of documents, comprised of original incomplete sand and gravel permits (which were considered to be records) and non-record duplicate copies of archaeological clearances and reports were shredded by Agency staff. As a follow-up to the destruction of records at the BIA Fort Defiance Agency, OTR provided records management briefings specifically targeted to the

---

[2] The OTR Monthly Activity Reports for January and February 2006 inadvertently referenced the original number of 283 boxes.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                              **Records Management**

managers of BIA programs in the BIA Navajo Region.  The purpose of the training was to reinforce the record keeping responsibilities of managers.

Also as reported in the OTR Activity Report for March 2006, OTR received a request from the OST Northwest Regional Fiduciary Trust Administrator to conduct an investigation into possible unauthorized destruction of federal records or non-records material stored at the OST field office in Portland, on or about February 16, 2006.  OTR and OTRA conducted a joint examination March 28 – 30, 2006.  It is anticipated that a report will be prepared in the next reporting period.

## Delays and Obstacles

Lack of Internet access continues to hinder OTR's ability to provide remote access to the record index database for authorized users of the records.  If Internet access were available, authorized researchers could conduct their searches from their respective work sites and only visit AIRR when necessary to inspect specific boxes or request documents from specific boxes.

## Assurance Statement

I concur with the content of the information contained in the Records Management section of the *Status Report to the Court Number Twenty-Five.*  The information provided in this section is accurate to the best of my knowledge.

Date:   April 20, 2006

Name: *Signature on File*
        Ethel J. Abeita
        Director, Office of Trust Records
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**          **Trust Business Process Modeling**

## C.     TRUST ACCOUNTABILITY

### 1.   TRUST BUSINESS PROCESS MODELING

**Introduction**

Interior is working to build a highly effective fiduciary trust services organization by implementing the business objectives contained in the CTM. Those business objectives are being used to guide implementation of the FTM. Implementation of the FTM is a collaborative effort of BIA, OST, BLM, MMS and OHA, and is integrated with Interior's other trust reform initiatives. The FTM is being implemented to transform the current trust business processes into more efficient, consistent, integrated and fiscally responsible business processes that meet the needs and priorities of the beneficiaries.

**Accomplishments and Completions**

Standardized leasing and permitting, rights-of-way, and LTRO handbooks were adopted by BIA. The final standardized handbooks were distributed at the March 2006 National BIA Realty Conference.

Based on the skill sets developed in the previous reporting period, BIA revised its position description for new hires in key trust realty positions.

**Current Status**

As a part of the DOI Regulatory Initiative, reengineering staff participated in the consultation meetings, evaluated comments received and also participated in revising the draft regulations.

The reengineering staff also participated in the initial drafting of new rights-of-way and appraisal regulations with BIA and OAS. It is expected that these regulations will become a part of the Regulatory Initiative.

Validation of managerial skill sets is continuing and is expected to be completed during the next reporting period. Once completed, the skill sets will be used to update the current position descriptions. This will allow supervisors to determine additional training needs for managers to perform their jobs in accordance with FTM requirements.

Reengineering staff conducted follow-up site visits to further assess post-conversion activities and lockbox implementation at pilot agencies. A report on the site visits will be available during the next reporting period. Recommendations are expected to be included as a part of the report.

Initial drafting began of the following handbook chapters: Sales and Exchanges of Tribal Trust or Restricted Land; Negotiated Sales, Gifts and Exchanges of Individually Owned Lands; Tribal Tract Purchases; Consolidation by Sale of Highly Fractionated Tracts; Partitions in Kind; and

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                    **Trust Business Process Modeling**

Mortgages and Deeds of Trust.  The Fluid Minerals handbook and Sand, Gravel and Aggregates handbook have been delivered to BIA.

The reengineering staff began documenting the impact of the lock box process on existing procedures in order to develop DOPs for future use.

Two of three sections of the DOPs for Reporting and Reconciliation have been drafted and are in review.  All three sections are expected to be completed during FY2006.

**Delays and Obstacles**

Lack of Internet access impedes communication with other trust bureaus and offices, and hinders the expansion of reengineered processes that utilize the Internet.  This exacerbates the sheer complexity of reengineering the existing trust business processes.

**Assurance Statement**

I concur with the content of the information contained in the Trust Business Process Modeling section of the *Status Report to the Court Number Twenty-Five*.  The information provided in this section is accurate to the best of my knowledge.

Date:  May 1, 2006

Name: *Signature on File*
       Margaret Williams
       Deputy Special Trustee, Trust Accountability
       Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006** **Trust Data Quality and Integrity**

## 2. TRUST DATA QUALITY AND INTEGRITY

### Introduction

The success of trust reform depends, in part, on the accuracy of data generated from the maintenance of trust assets, ownership of trust assets, distribution of trust income, and management of trust accounts. The DQ&I project focuses on three primary initiatives: (1) assisting BIA with document encoding into the trust systems, (2) validating/correcting CDE to their respective source documents and (3) implementing Post-QA processes.

### Accomplishments and Completions

During this reporting period, TPMC's contractors:

- Conducted DQ&I site assessments for the Ft. Hall Agency, Yakama Agency, EORO-LTRO and the SWRO-LTRO.

- Completed encoding of encumbrance documents into TAAMS Leasing for Horton, Pawnee and Shawnee Agencies.

- Validated beneficiary ownership data for Horton Agency and Pawnee Agency land tracts. Provided these Agencies and LTRO with a tract-level summary of identified variances for further research and corrections, if necessary.

### Current Status

The DQ&I Project expanded to include NWRO-LTRO; Ft. Hall and Yakama Agencies; EORO-LTRO and SWRO-LTRO. Operations continued for: (1) SPRO, (2) GPRO, (3) Pima Agency, (4) PRO-LTRO, (5) RMRO and (6) Miami Agency. Through the project, agencies and regions:

- Continued validation/correction of Shawnee Agency beneficiary ownership data.

- Performed additional global ID changes in TAAMS Title for SPRO, achieving 84% completion.

- Scanned 5,853 active encumbrance documents at RMRO-LTRO to prepare for future validation/correction task.

- Recorded an additional 2,315 for a total of 4,333 documents at RMRO-LTRO.

- Encoded missing required data into TAAMS Title for 4,932 RMRO-LTRO encumbrance documents, allowing the full record to be mapped electronically into TAAMS Leasing.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                          **Trust Data Quality and Integrity**

- Initiated encoding of active encumbrance documents into TAAMS Leasing at Rosebud Agency.

- Scanned encumbrance documents for Crow Creek, Lower Brule, Yankton, Sisseton and Ft. Totten Agencies.  Utilized scanned images to conduct the Post-QA task on BIA encoding into TAAMS Leasing for these locations.

- Analyzed ownership data for 155 Miami Agency tracts and provided assistance with researching and correcting variances identified.

- Continued encoding of active encumbrances into TAAMS Leasing for Miami Agency.

**Delays and Obstacles**

Lack of access to the Internet has resulted in:  (1) communication delays; (2) adverse project coordination issues; (3) increased administrative program costs; and (4) the overall DQ&I project being unable to take full advantage of available information technology.

**Assurance Statement**

I concur with the content of the information contained in this Trust Data Quality and Integrity section of the *Status Report to the Court Number Twenty-Five*.  The information provided in this section is accurate to the best of my knowledge.

Date:   April 21, 2006

Name: *Signature on File*
         John E. White
         Trust Reform Officer
         Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                    **Indian Fiduciary Trust Training Program**

## 3. INDIAN FIDUCIARY TRUST TRAINING PROGRAM

**Introduction**

Interior has a continuing responsibility to provide adequate staffing, supervision and training for trust fund management and accounting activities. Fiduciary trust training is essential to the success of Interior's trust reform efforts and forms an integral part of all training for Interior employees who are involved in the management of Indian trust assets.

**Accomplishments and Completions**

OST offered two sessions of the course, *Fiduciary Overview Program*, presented by Cannon Financial Institute, with 57 OST, BIA and tribal personnel attending during this reporting period. A total of 793 people have attended this course since March 2003. This course compares and contrasts the federal Indian trust administered through Interior with private sector trusts administered through banks and other financial institutions.

During this reporting period, Cannon Financial Institute personnel presented all six of the specialty courses to 100 OST, BIA and tribal personnel. The specialty courses, *Risk Management, Probate*, *Trust Accounting*, *Asset Management*, *Fiduciary Behavior* and *Guardianships* are part of the *Certified Indian Fiduciary Trust Specialist* certification program as described in previous reports.

During this reporting period, OST training staff conducted 10 training sessions in TFAS, CSS, StrataVision and the historical query database for 60 OST, BIA and contractor staff.

OST and BIA staff presented the three-day course, *Trust Fundamentals*, to 21 OST, BIA and tribal staff. This course includes such topics as the history and policy of Indian trust, current trust reform activities, job roles and responsibilities, and organization and working relationships.

**Current Status**

During this reporting period, 11 OST personnel attended the *Certified Indian Fiduciary Trust Specialist* review and exam session, and are expected to receive their certifications during the next reporting period.

Dedication ceremonies for the NIPTC are scheduled for Thursday, April 27, 2006.

**Delays and Obstacles**

The lack of Internet access inhibits electronic communication with other governmental agencies and contractors, hinders the research of training tools and potential contractors, and restricts OST's ability to access online training programs.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                          **Indian Fiduciary Trust Training Program**

<u>**Assurance Statement**</u>

I concur with the content of the information contained in the Indian Fiduciary Trust Training Program section of the *Status Report to the Court Number Twenty-Five.* The information provided in this section is accurate to the best of my knowledge.

Date:   April 19, 2006

Name:  *Signature on File*
         Dianne M. Moran
         Director, Trust Training
         Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                              **Risk Management**

## 4. RISK MANAGEMENT

### Introduction

The objectives of the risk management initiative are to design, deliver, and implement a comprehensive risk management program that includes extensive management controls for monitoring and evaluating Interior's Indian trust asset management program. The risk management program continues to be implemented by TPMC. OTRA monitors and evaluates management corrective action plans to mitigate control deficiencies.

### Accomplishments and Completions

During this reporting period, a revised concept of operations was developed to administer a comprehensive risk management program for Indian trust assets in order to capture the new requirements of OMB Circular A-123. In addition, a Senior Management Council and Senior Assessment Team were established in OST as required by the revisions to A-123.

OST updated and closed out 60 corrective action plans that mitigated identified risks. The remaining corrective action plans are expected to be completed during the next reporting period.

### Current Status

RM-PLUS content for OST trust programs is under review to meet the revised OMB Circular A-123 requirements. These revisions became effective in FY2006 and include strengthening requirements for documentation, monitoring and reporting.

TBCC RM-PLUS content is still under development and is expected to be completed during the next reporting period.

OST continues to work with OSM and BLM on the IT security requirements to allow training to begin on the RM-PLUS tool in order for them to conduct their risk assessments.

During FY2006, OST expects BIA to update and/or close out its open corrective action plans from FY2005.

### Delays and Obstacles

The lack of Internet access complicates the implementation and use of RM-PLUS, since it is designed as a web-based application.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                    **Risk Management**

<u>**Assurance Statement**</u>

I concur with the content of the information contained in the Risk Management section of the *Status Report to the Court Number Twenty-Five*.  The information provided in this section is accurate to the best of my knowledge.


Date:   May 1, 2006

Name:   *Signature on File*
        Margaret Williams
        Deputy Special Trustee, Trust Accountability
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                              **Regulations, Policies and Procedures**

## 5.  REGULATIONS, POLICIES AND PROCEDURES

**Introduction**

OTP in OST was established on April 21, 2003, to assist Interior in establishing "consistent, written policies and procedures for trust fund management and accounting" as stated in the 1994 Act.  OTP oversees and facilitates the development, promulgation and coordination of trust-related regulations, policies, procedures and other materials to guide the proper discharge of Interior's fiduciary responsibilities.  OTP is separate from BIA's PPA, which is responsible for policies, procedures and regulations affecting all BIA activities.  PPA activities thus are reported in the BIA section of the reports to the Court.

**Accomplishment and Completions**

**25 CFR 1200 – American Indian Trust Fund Management Reform Act.**  During this reporting period the technical amendments were submitted in final form and published in the Federal Register.

**Current Status**

The OST Directives System Handbook is awaiting final approval from OST management.  Publication of the handbook is expected during the next reporting period.

Work on the Reporting and Reconciliation DOP, which includes procedures for reconciling financial transactions and preparing financial statements, as well as reporting to Treasury, IRS and beneficiaries, was realigned after priorities were established among various DOP chapters.  Groups of completed processes were circulated for surnaming; drafting and review continues on the remainder.  Approval and issuance of the entire DOP is expected during the next reporting period.

Proposed changes to the Account Maintenance DOP and the Disbursing DOP, specific to the Osage Nation, were reviewed by field staff.  Upon completion of management review, the DOPs will be put into the surname process.  Final issuance is now expected in the next reporting period.

**Delays and Obstacles**

Lack of access to the Internet and its repository of online statutes, the Federal Register and other resources continues to present challenges to this office.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                    **Regulations, Policies and Procedures**

<u>**Assurance Statement**</u>

I concur with the content of the information contained in the Office of Trust Regulations, Policies and Procedures section of the *Status Report to the Court Number Twenty-Five*. The information provided in this section is accurate to the best of my knowledge.


Date:   May 1, 2006


Name:   *Signature on File*
        Philip Viles, Director
        Office of Trust Regulations, Policies and Procedures
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                                 **Appraisal**

### D.   FIELD OPERATIONS

#### 1.   APPRAISAL

**<u>Introduction</u>**

The Office of Appraisal Services, under a management contract with NBC-ASD, is responsible for Indian land valuations.  The contract was established to provide impartial estimates of market value for a variety of real property interests on land owned in trust or restricted status by individual Indians, Alaska Natives, and Indian Tribes.  Various regulations governing Indian trust lands require valuations.  To meet this requirement, an appraisal or other valuation method is used to determine fair market value of Indian lands.

**<u>Accomplishments and Completions</u>**

A Deputy Chief Appraiser for Policy and Compliance and a Deputy Chief Appraiser for OAS Operations were hired and reported for duty during the reporting period.

The position of the director of OME was filled during this reporting period, and the office is expected to be fully staffed during the next reporting period.  The OME will perform mineral evaluation services in support of ILCA.

OAS has contracted to develop an automated Indian Trust Appraisal Request Tracking System (ITARS), conduct a fractionated interest study, and provide appraisal services.

**<u>Current Status</u>**

ASD, in coordination with OST, continues to conduct a comprehensive analysis of OAS staff and training requirements.  Temporary review appraisers continue to be used to reduce the backlog.  The use of contracted appraisal services is expected to provide additional support in Rocky Mountain and Northwest to supplement the existing workforce.

A department-wide appraisal policy handbook, which incorporates the OAS handbook section, was completed in draft form and circulated for comment.  The handbook is expected to be issued in final form before the end of FY2006.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                          **Appraisal**

**Appraisal Backlog**

As of this reporting period, the appraisal backlogs are as follows:

| Region | Appraisal Backlog As of 12/30/05 | Appraisal Backlog * As of 03/31/06 |
|---|---|---|
| Northwest | 285 | 166 |
| Rocky Mountain | 758 | 661 |
| Midwest | 62 | 42 |
| Western | 153 | 69 |
| Southwest | 12 | 15 |
| Eastern Oklahoma | 85 | 75 |
| Navajo | 30 | 80 |
| Pacific | 0 | 4 |
| Alaska | 407 | 399 |
| Eastern | 0 | 0 |
| Southern Plains | 4 | 45 |
| Great Plains | 5 | 0 |
| **TOTAL** | **1,801** | **1,556** |

> * The backlog includes all requests from BIA whether or not they are required for a proposed transaction. The requests are addressed in priority order based on factors such as court-ordered transactions, economic transactions, and rights-of-way transactions. The remaining appraisal requests for which no transaction is pending may appear on the backlog list until appraisal staff has completed priority assignments.

This table does not include appraisal backlog information from the compacted and contracted Tribes. This information is being requested from the tribes and is expected to be included in the next report.

**Delays and Obstacles**

The inability to utilize the Internet as a tool to communicate with outside contacts to research comparable sales and other information is a continuing hardship.

Difficulties continue in recruiting qualified appraisers for permanent, temporary and contract positions, particularly in remote locations.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                    **Appraisal**

---

**<u>Assurance Statement</u>**

I concur with the content of the information contained in the Appraisal section of the *Status Report to the Court Number Twenty-Five.*  The information provided in this section is accurate to the best of my knowledge.

Date:   May 1, 2006

Name:  *Signature on File*
           Brian M. Holly, MAI
           Appraisal Services Directorate
           National Business Center

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                   **Current Accounting Activities**

<div align="center">

### E.     TRUST SERVICES

### 1.   CURRENT ACCOUNTING ACTIVITIES

</div>

**<u>Introduction</u>**

Current accounting activities focus on: (a) whereabouts unknown accounts; (b) trust funds accounting system; (c) special deposit accounts; (d) small balance accounts; and (e) accounting discrepancies.

WAU are classified as such for various reasons, including (1) new accounts established without an address, (2) mail returned for invalid address and (3) account holder refused or did not claim mail. A variety of methods and means are used to locate WAU account holders.

TFAS is a generic term for a COTS trust fund accounting system that provides the basic receipt, accounting, investment, disbursing and reporting functions common to commercial trust funds management operations.

SDA are temporary accounts for the deposit of trust funds that cannot immediately be credited to the proper account holders. As explained in the BIA/OST Interagency Procedures Handbook, this type of account is to be used only as an exception to the rule that trust funds immediately be deposited to the credit of, and then distributed as soon as practicable to, the individual and tribal beneficiaries. The SDA project has two sub-projects: the retrospective (pre-January 1, 2003, receipts) and the prospective (post-December 31, 2002, receipts) phases. OHTA has responsibility for "resolution" (i.e., research and distribution of funds) of the retrospective phase, while BIA has comparable responsibility for the prospective phase. This section of the report to the Court thus addresses only the prospective phase.

Small balance accounts are defined as those with balances of $.01 - $1.00 and no activity in the preceding eighteen months. Management expenses for these accounts are considerable, in part because (as directed by Congress) annual statements must be sent to these account holders.

Various accounting discrepancies that existed prior to the conversion to TFAS still need research and resolution. Some may impact individual accounts. At present, OST has a daily and monthly reconciliation process in place to ensure that transactional reporting to Treasury is accurate and that any discrepancies are researched and reconciled during the next accounting period. While this process ensures resolution of current discrepancies in timely fashion, separate research and reconciliation efforts are needed to address the pre-TFAS discrepancies.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                              **Current Accounting Activities**

a.      **Whereabouts Unknown Accounts**

**Current Status**

During this reporting period, 5,421 accounts with a combined balance of $3 million were added to the WAU list, and 3,663 account holders with a combined balance of $7.5 million were located.

Priority continues to be placed on securing current addresses for account holders of the rolling top 100 highest dollar balance WAU accounts. During this reporting period, 21 of the top 100 WAU accounts, with combined account balances in excess of $2.9 million, were updated with current addresses.

As of March 31, 2006, there were 46,450 WAU accounts with a combined balance of $61,372,720. The following table illustrates the number of accounts stratified by account balance and WAU category.

| Account Balance | Correspondence/ Check Returned | Account Setup No Address | Awaiting Address Confirmation | Refused/ Unclaimed Mail | Total |
|---|---|---|---|---|---|
| Equal to or over $100,000 | 16 | 9 | 0 | 0 | 25 |
| Under $100,000 and equal to or over $50,000 | 37 | 10 | 0 | 0 | 47 |
| Under $50,000 and equal to or over $5,000 | 1,905 | 808 | 0 | 1 | 2,714 |
| Under $5,000 and equal to or over $1,000 | 5,850 | 1,530 | 3 | 7 | 7,390 |
| Under $1,000 and equal to or over $100 | 7,939 | 3,040 | 12 | 2 | 10,993 |
| Under $100 and equal to or over $1 | 11,301 | 4,748 | 19 | 3 | 16,071 |
| Under $1 | 3,139 | 6,048 | 20 | 3 | 9,210 |
| **Total** | 30,187 | 16,193 | 54 | 16 | 46,450 |

**Delays and Obstacles**

The influx of WAU accounts categorized as "Account Setup No Address" causes the total number of WAU accounts to remain relatively constant. These accounts primarily result from a lack of current addresses for individual heirs named in probate orders or recipients of per capita distributions. Also, accounts are being created in TFAS for non-financial asset owners in order

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                              **Current Accounting Activities**

to generate asset statements.  Many of these owners do not have current addresses.  As a result, the total number of WAU is expected to increase significantly.

There presently are 16,422 supervised IIM account holders (minors, emancipated minors, adults in need of assistance, and non-compos mentis) coded as WAU.  Updating supervised account addresses coded as WAU presents a challenge, since BIA Social Services must verify and update the address changes to these accounts.

The lack of Internet access limits communication effectiveness.  OST and its contractor must rely primarily on mail and telephone communication with IIM account holders.

### b.    Trust Funds Accounting System

<u>Accomplishments and Completions</u>

During this reporting period, the remaining agencies in the Southern Plains Region and the Miami Agency from the Eastern Oklahoma Region were converted to the TAAMS Leasing module.  The interface between TAAMS and TFAS allows for quarterly account statements of performance to be produced for beneficiaries, including ownership and encumbrance information of trust assets located in Southern Plains Regional LTRO.

### c.    Special Deposit Account Activity

<u>Current Status</u>

BIA has the responsibility for distribution of SDA funds received since January 1, 2003 (prospective receipts).  It is the policy of BIA to distribute funds within 30 days of receipt into SDA.  During this reporting period, there were 13,623 receipt transactions posted to SDA.  Of these, 2,074 were undistributed and aged more than 30 days as of March 31, 2006.

During this reporting period, aged funds were held in 16 fewer SDA than in the previous reporting period.  Undistributed aged receipts decreased by 5,176 and the combined dollar amount decreased by $1,779,963.51.  As of March 31, 2006, funds were held in SDA with a combined dollar amount of $1,984,760.47, which represented 4,109 undistributed receipts aged over 30 days from January 1, 2003, through March 31, 2006.  As of March 31, 2006, there were 695 receipts in 188 SDA aged more than one year for a combined dollar amount of $441,021.35.

During this reporting period, OST contractors continued to assist the Fort Belknap Agency to reduce its backlogs by encoding probate orders into BIA's IRMS.  Reducing backlogs assists agencies with their SDA distribution efforts.  OST staff and contractors also assisted BIA staff in performing work necessary to distribute aged receipts at the Pima, Eastern Navajo, Fort Hall, Northern Idaho and Coeur d'Alene Agencies.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                    **Current Accounting Activities**

<u>**Delays and Obstacles**</u>

Lack of use of the Internet continues to delay access to information useful to resolving SDA.

### d.    Small Balance Accounts

As of March 31, 2006, there were 15,842 accounts that have a $.01 - $1.00 balance with no activity for the previous 18 months. The total sum included in those accounts is $2,548.19. Statements are sent to account holders for these accounts on an annual basis pursuant to direction from Congress.

### e.    Accounting Discrepancies

As previously reported, Interior submitted to Congress a legislative proposal to resolve the approximate $6 million difference between the subsidiary account ledger (liabilities) and the investment pool (assets). Additional and detailed information regarding the proposal was submitted to congressional staff during this reporting period.

<u>**Assurance Statements**</u>

I concur with the content of the information contained in the Accounting Discrepancies subsection of the Current Accounting Activities section of the *Status Report to the Court Number Twenty-Five.* The information provided in this subsection is accurate to the best of my knowledge.

Date:   April 27, 2006

Name:   *Signature on File*
        Charlene Toledo
        Deputy Special Trustee, Trust Services
        Office of the Special Trustee for American Indians


I express no opinion on the content of the Accounting Discrepancies subsection, above. I concur with the content of the information contained in the balance of the Current Accounting Activities section of the *Status Report to the Court Number Twenty-Five*, and this information is accurate to the best of my knowledge.

Date:   May 1, 2006

Name:   *Signature on File*
        Margaret Williams
        Deputy Special Trustee, Trust Accountability
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                       **Trust Regulations, Policies and Procedures**

### III. BUREAU OF INDIAN AFFAIRS

### A. TRUST REGULATIONS, POLICIES AND PROCEDURES

<u>Introduction</u>

The Office of Planning and Policy Analysis (PPA) in the Office of the Assistant Secretary – Indian Affairs was established on April 21, 2003. PPA is responsible for developing and promulgating Indian Affairs directives. PPA is separate from OST's Office of Trust Regulations, Policies and Procedures, whose activities are reported in the OST section of the status reports to the Court.

<u>Accomplishments and Completions</u>

**Grants of Easement for Right-of-Way on Indian Lands –** The handbook was completed and issued to all Regions during this reporting period.

**Land Titles and Records** – The handbook was completed and issued to all Regions during this reporting period.

**Leasing and Permitting** – The handbook was completed and issued to all Regions during this reporting period.

**Indian Probate** – The draft handbook was issued to all Regions during this reporting period.

<u>Current Status</u>

**Regulatory Initiative –** Preliminary draft regulations have been distributed to Indian Affairs staff and Tribes as part of the consultation effort prior to publication in the Federal Register. During this reporting period, two consultation sessions were held. Publication of the regulations is expected to begin during CY2006.

**25 CFR 216 – Surface Exploration, Mining, and Reclamation of Lands –** The project is on schedule, with publication of the proposed revisions expected during the third quarter of CY2006.

**25 CFR 162 – Leases and Permits, Subparts C and D – Residential Leases and Business Leases –**Publication of this rule is expected during FY2006.

**25 CFR 224 – Tribal Energy Resource Agreements –**This rulemaking is required by the Energy Policy Act of 2005, which mandates the Secretary to establish and implement an Indian energy resource development program. This rule is expected to establish a cohesive and comprehensive means of development of energy resources on tribal trust lands. Tribal consultations were held during the last reporting period. The proposed rule is expected to be published in the second quarter of CY2006.

41

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                    **Trust Regulations, Policies and Procedures**

**25 CFR 292 – Gaming on Trust Lands Acquired After October 17, 1998 –**The proposed rule establishes the criteria that the Department will consider when determining whether a parcel of land acquired in trust after October 17, 1988, qualifies under any of the exceptions listed in 25 U.S.C. 2719. During this reporting period, draft regulations were distributed to tribal leaders. The proposed rule is expected to be published during the second quarter of CY2006.

**Delays and Obstacles**

Lack of access to the Internet has hindered PPA's ability to research statutes and departmental manuals and makes distribution of documents for review by Tribes more difficult and costly.

**Assurance Statement**

I concur with the content of the information contained in the Trust Regulations, Policies and Procedures – BIA section of the *Status Report to the Court Number Twenty-Five*. The information provided in this section is accurate to the best of my knowledge.

Date:   April 20, 2006

Name:  *Signature on File*
         Debbie L. Clark
         Deputy Assistant Secretary – Indian Affairs (Management)
         Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                                 **Fractionation**

### B.    FRACTIONATION

**Introduction**

Fractionation of Indian trust and restricted land stems from the federal Indian policy of the 19th Century.  Fractionation occurs as land passes from one generation to the next and more and more heirs or devisees acquire an undivided interest in the land.  This is a complex and potentially emotionally-charged issue, due primarily to cultural differences, historical legacy and family associations of the present owners with the original Indian owners of those lands.  Efforts to address this complex issue are coordinated primarily through the BIA Indian Land Consolidation Office, which seeks to help Tribes make use of the opportunities offered by the Indian Land Consolidation Act, as amended in 2004.  ILCO is operating several acquisition projects and, from there, a nationwide plan is being implemented to promote consolidation of the ownership of Indian land.

**Accomplishments and Completions**

- Acquired 10,941 fractional interests during this reporting period, for a cumulative total of 213,716 interests for ILCP in the Midwest, Northwest, Western, Eastern Oklahoma, Navajo, Rocky Mountain and Great Plains Regions.
- Of the total interests acquired, 86% were interests of less than 2% ownership in the respective tracts of land.
- Acquired a cumulative total equivalent of 245,122.18 acres for the project reservations.

**Current Status**

ILCO proposed a new strategy during this reporting period, including refocusing its acquisition activities on reservations with the most highly fractionated tracts.  The proposal is under review by the TESC, and a decision is expected during the next reporting period.  "Highly fractionated" is defined as tracts having 200 or more interests.

ILCO is discontinuing acquisition activities for three reservations that contain fewer highly fractionated tracts.  During this reporting period, three reservations with more highly fractionated tracts were added to the program.  Acquisition on these reservations is expected to begin during FY2006 and FY2007.

Other ILCP activities include:

- Coordinating with OAS and LTRO to prepare for acquisitions at reservations added to the program.
- Continuing to target and acquire additional *Youpee* interests.
- Continuing implementation of LCTS.  The LCTS project is expected to be completed during FY2006.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                    **Fractionation**

### Delays and Obstacles

- Probate and LTRO backlogs and *Youpee* issues continue to impede acquisitions.
- Lack of Internet access results in slower processing of applications from potential sellers and hinders searches for WAU account holders.
- Delay in obtaining land and mineral values impedes acquisitions.

### Assurance Statement

I concur with the content of the information contained in the Fractionation section of the *Status Report to the Court Number Twenty-Five.* The information provided in this section is accurate to the best of my knowledge.

Date:   April 13, 2006

Name: *Signature on File*
          Brenda Walhovd
          Program Specialist, Indian Land Consolidation Office
          Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                    **Probate**

### C.    PROBATE

**Introduction**

Federal law permits Indian owners to pass title to their trust assets by testamentary devise or by intestate succession, and imposes upon Interior the duty of determining the legal heirs.  BIA, OHA and OST must coordinate their work to complete the probates of Indian estates. Information on the status of probates is contained within the ProTrac system.  Each BIA regional office and corresponding agency is responsible for encoding new cases, examining "initial load" cases and making corrections.  Data-cleanup continues in an effort to make ProTrac a more complete source of probate data.

**Current Status**

**Case Preparation**

According to ProTrac, 8,308 probate cases are in the case preparation stage.

**Case Adjudication**

According to ProTrac, 5,022 probate cases are in the case adjudication stage.  As reported by OHA, deciding officials received 1,622 cases and issued decisions in 1,114 cases.  OHA reported 3,942 cases pending.

**Case Closure**

According to ProTrac, there are 3,620 cases in the closing stage.  Cases in the closing stage are ones that have been adjudicated but not distributed in TFAS, LTRO, or in the Lease Distribution System.  According to ProTrac, 2,702 cases have been closed during this reporting period.

**Financial Case Closure**

OST reported that it distributed funds and closed 1,868 accounts in TFAS, representing 1,786 estates.  As of the end of March 2006, TFAS contained 30,580 open estate accounts, which is an increase of 212 from the 30,368 estate accounts at the end of the last reporting period.

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                    **Probate**

**Probate Handbook**

Publication was delayed and is expected to be completed during the next reporting period.

### Delays and Obstacles

The following obstacles have been identified as having an impact on the progress of the probate program:

- Lack of access to the Internet, which includes the inability to use electronic mail communication between OHA and BIA/OST;
- Continued fractionation of ownership of Indian lands;
- Numerous initiatives competing for resources (e.g., *Youpee* revestitures, *Cobell* requirements);
- Cultural diversities regarding the subject of death;
- BIA probate reorganization has not been completed.

### Assurance Statement

I concur with the content of the information contained in the Probate section of the *Status Report to the Court Number Twenty-Five*. The information provided in this section is accurate to the best of my knowledge.

Date:   May 1, 2006

Name: *Signature on File*
        William Titchywy
        Acting Special Projects Director
        Western Region
        Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                  **Acronyms and Abbreviations**

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| 1994 Act (or Act) | American Indian Trust Fund Management Reform Act of 1994 |
| A-130 | Office of Management and Budget Circular A-130 Appendix III |
| ADM | Attorney Decision Makers |
| AFMSS | Automated Fluid Mineral Support System |
| AIMS | ActivCard Identity Management System |
| AIPRA | American Indian Probate Reform Act |
| AIRR | American Indian Records Repository |
| ALIS | Alaska Land Information System |
| ALJ | Administrative Law Judges |
| ARO | Alaska Region office |
| ARRTS | Appraisal Request and Review Tracking System |
| ART | Accounting Reconciliation Tool |
| AS-IA | Assistant Secretary-Indian Affairs |
| ASD | Appraisal Services Directorate |
| ATO | authority to operate |
| BIA | Bureau of Indian Affairs |
| BIAM | Bureau of Indian Affairs Manual |
| BISS | Box Index Search System |
| BLM | Bureau of Land Management |
| BOR | Bureau of Reclamation |
| BPA | Blanket Purchase Agreement |
| BRM | Business Reference Model |
| C&A | Certification and Accreditation |
| CARS | Cadastral Automated Request System |
| CDE | Critical Data Elements |
| CFedS | Certified Federal Surveyor |
| CFI | Continuous Forest Inventory |
| CGI | Software vendor successor to TAAMS vendor |
| CGIS | Cadastral Geographic Information Systems |
| CIFTA | Certified Indian Fiduciary Trust Analyst |
| CIFTS | Certified Indian Fiduciary Trust Specialist |
| CIO | Chief Information Officer |
| CIRC | Computer Incidents Response Center |
| CISSP | Certified Information System Security Professional |
| CMS | Credential Management System |
| COTS | Commercial off-the-shelf |
| CPIC | Capital Planning and Investment Control |
| CSIRC | Computer Security Incident Response Capability |
| CSIRT | Computer Security Incident Response Team |
| CSS | Customer StrataStation |
| CTM | Comprehensive Trust Management Plan |
| DAA | Designated Approving Authority |
| DEAR | DOI Enterprise Architecture Repository |

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                    **Acronyms and Abbreviations**

| | |
|---|---|
| DDoS | Distributed Denial of Service |
| DLRM | DOI Land and Resource Management |
| DM | Departmental Manual |
| DMZ | De-Militarized Zone |
| DNS | Domain Name Server |
| DOI | Department of the Interior |
| DOP | Desk Operating Procedure |
| DoS | Denial of Service |
| DQ&I | Data Quality and Integrity |
| DRM | Data Reference Model |
| EA | Enterprise Architecture |
| ENA | Eastern Navajo Agency |
| EORO | Eastern Oklahoma Region office |
| ERO | Eastern Region office |
| ESN | Enterprise Services Network |
| ETP | Enterprise Transition Plan |
| FAMS | Facilities Asset Management System |
| FAR | Federal Acquisition Regulation |
| FFMIA | Federal Financial Management Improvement Act |
| FIMO | Farmington Indian Minerals Office |
| FIPS | Federal Information Processing Standards |
| FISMA | Federal Information Security Management Act |
| FMFIA | Federal Managers' Financial Integrity Act |
| FRC | Federal Records Center |
| FRD | Functional Requirements Document |
| FTM | Fiduciary Trust Model |
| FTO | Fiduciary Trust Officer |
| GAO | Government Accountability Office |
| GCDB | Geographic Coordinate Data Base |
| GIS | Geographic Information System |
| GLO | General Land Office |
| GLADS | Great Lakes Agency Database System |
| GPRO | Great Plains Region office |
| GPS | Global Positioning System |
| GSA | General Services Administration |
| GSS | General Support Systems |
| HSPD-12 | Homeland Security Presidential Directive 12 |
| IAM | Indian Affairs Manual |
| IATO | Interim Approval to Operate |
| ICR | Internal Control Review |
| IEA | Interior Enterprise Architecture |
| IFTR | Indian Fiduciary Trust Records |
| IG | Inspector General |
| IIM | Individual Indian Money |
| IITD | Individual Indian Trust Data |

48

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                                   **Acronyms and Abbreviations**

| | |
|---|---|
| ILCA | Indian Land Consolidation Act |
| ILCO | Indian Land Consolidation Office |
| ILCP | Indian Land Consolidation Project |
| IM | Instruction Memorandum |
| InfoDat | Indian Forestry Database |
| Interior | Department of the Interior |
| IP | Internet Protocol |
| IPJ | Indian Probate Judges |
| IPv6 | Internet Protocol Version 6 |
| IQCS | Incidence Qualification and Certification System |
| IRM | Information Resources Management |
| IRMS | Integrated Records Management System |
| IRS | Internal Revenue Service |
| ISA | Information Security Assessment |
| IT | Information Technology |
| ITARS | Indian Trust Appraisal Request Tracking System |
| IV&V | independent verification and validation |
| LAN | Local area network |
| LCTS | Land Consolidation Tracking System |
| LMS | Learning Management System |
| LR2000 | Legacy Rehost 2000 System |
| LRIS | Land Records Information System |
| LTIC | Land Tenure in Indian Country |
| LTRO | Land Titles and Records Office |
| MA | Major Applications |
| MAD/LCP | Management Accounting Distribution/Land Consolidation Program |
| MADS | Management Accounting Distribution System |
| MMD | Missing Mandatory Documents for Unrestricted Accounts |
| MMS | Minerals Management Service |
| MOU | Memorandum or Memoranda of Understanding |
| MRM | Minerals Revenue Management |
| MRMSS | Minerals Revenue Management Support System |
| MWRO | Midwest Region office |
| NARA | National Archives and Records Administration |
| NBC | National Business Center |
| NILS | National Integrated Lands System |
| NIPTC | National Indian Programs Training Center |
| NIST | National Institute of Standards and Technology |
| NPS | National Park Service |
| NRO | Navajo Region office |
| NWRO | Northwest Region office |
| O&G | Oil and Gas |
| OAS | Office of Appraisal Services |
| OCIO | Office of the Chief Information Officer |
| OHA | Office of Hearings and Appeals |

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                      **Acronyms and Abbreviations**

| | |
|---|---|
| OHTA | Office of Historical Trust Accounting |
| OIG | Office of the Inspector General |
| OME | Office of Minerals Evaluation |
| OMB | Office of Management and Budget |
| OSM | Office of Surface Mining |
| OST | Office of the Special Trustee for American Indians |
| OTFM | Office of Trust Funds Management |
| OTP | Office of Trust Regulations, Policies and Procedures |
| OTR | Office of Trust Records |
| OTRA | Office of Trust Review and Audit |
| PAR | Performance and Accountability Report |
| PIV | Personal Identity Verification |
| PLSS | Public Land Survey System |
| PMSO | Project Management Support Office |
| POA&M | Plans of Actions and Milestones |
| Post-QA | Post Quality Assurance |
| PPA | Office of Planning and Policy Analysis |
| PRIS | Production and Response Information System |
| PRO | Pacific Region office |
| ProTrac | Probate Case Management and Tracking System |
| QA | Quality Assurance |
| QC | Quality Control |
| RAF | Recommended Action Forms |
| RAS | Rangeland Administration System |
| RDRS | Royalty Distribution and Reporting System |
| REM | Real Estate Module |
| RFP | Request for Proposal |
| RM-PLUS | Risk Management Assessment/Evaluation tool |
| RMRO | Rocky Mountain Region office |
| ROW | Rights-of-Way |
| SANS | SysAdmin, Audit, Network, Security |
| SCADA | Supervisory Control and Data Acquisition |
| SDA | Special Deposit Accounts |
| SDLC | System Development Life Cycle |
| SMEs | Subject Matter Experts |
| SMS | System Management Servers |
| SOL | Office of the Solicitor |
| SPRO | Southern Plains Region office |
| SSA | Social Security Administration |
| SSM | System Security Manager |
| SSP | System Security Plan |
| ST&E | Security Test and Evaluation |
| STIGs | Security Technical Implementation Guides |
| SUS | System Update Servers |
| SWRO | Southwest Region office |

*STATUS REPORT TO THE COURT NUMBER TWENTY-FIVE*

**May 1, 2006**                                         **Acronyms and Abbreviations**

| | |
|---|---|
| TAAMS | Trust Asset and Accounting Management System |
| TAP | Technical Architecture Profile |
| TBCC | Trust Beneficiary Call Center |
| TESC | Trust Executive Steering Committee |
| TFAS | Trust Fund Accounting System |
| TPMC | Trust Program Management Center |
| TRAC | Trust Tracking and Coordination |
| Treasury | Department of the Treasury |
| TRM | Technical Reference Model |
| TRO | Temporary Restraining Order |
| UAT | User Acceptance Testing |
| USGS | United States Geological Survey |
| USPAP | Uniform Standards of Professional Appraisal Practice |
| VBNS | Very High Performance Backbone Network Service |
| VPN | Virtual Private Network |
| WAN | Wide area network |
| WAU | Whereabouts Unknown |
| WRO | Western Region office |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ELOUISE PEPION COBELL, <u>et al.</u>, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:96CV01285 |
| | ) | (Judge Lamberth) |
| GALE A. NORTON, Secretary of the Interior, | ) | |
| <u>et</u> <u>al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**NOTICE OF FILING OF INTERIOR'S TWENTY-THIRD STATUS REPORT**

Interior Defendants hereby give notice of the filing of their twenty-third status report due in

accordance with the Order of December 21, 1999.

A copy of the report is attach hereto.

Dated: November 1, 2005                Respectfully submitted,

ROBERT McCALLUM, JR.
Associate Attorney General
PETER D. KEISLER
Assistant Attorney General
STUART E. SCHIFFER
Deputy Assistant Attorney General
J. CHRISTOPHER KOHN
Director
ROBERT E. KIRSCHMAN, Jr.
(D.C. Bar No. 406635)
Assistant Director


  /s/ John T. Stemplewicz
JOHN T. STEMPLEWICZ
Senior Trial Attorney
Commercial Litigation Branch
Civil Division
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875
Telephone:  (202) 307-1104
Facsimile:  (202) 514-7162

CERTIFICATE OF SERVICE

I hereby certify that, on November 1, 2005 the foregoing *Notice of Filing of Interior's Twenty-third Status Report* was served by Electronic Case Filing, and on the following who is not registered for Electronic Case Filing, by facsimile:

Earl Old Person (*Pro se*)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
Fax (406) 338-7530

/s/ Kevin P. Kingston
Kevin P. Kingston



THE SECRETARY OF THE INTERIOR

WASHINGTON

NOV − 1 2005

Christopher Kohn
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875

Re:    *Cobell v. Norton* – *Status Report to the Court Number Twenty-Three*

Dear Mr. Kohn:

Enclosed is the Department of the Interior's *Status Report to the Court Number Twenty-Three (For the Period July 1, 2005 through September 30, 2005).* Please forward a copy to the Court.

This is the 16th report in the revised Report format. My signature on this Report reflects my belief that my personal observations are true and correct, and that the information provided to me by others for inclusion in my observations, as well as accompanying sections of the Report are correct to the best of my knowledge.

Thank you for your assistance.

Sincerely,

Gale A. Norton

Enclosure

# Status Report to the Court
# Number Twenty-Three

**For the Period**
**July 1, 2005 through September 30, 2005**



**November 1, 2005**

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**

# TABLE OF CONTENTS

I.     **INTRODUCTION**.................................................................................... 1

II.    **SECRETARY GALE NORTON'S OBSERVATIONS**................................. 2

  A.   **INFORMATION TECHNOLOGY**............................................... 4

  B.   **CADASTRAL SURVEY**.............................................. 13

  C.   **MINERALS MANAGEMENT SERVICE**.............................. 15

  D.   **OFFICE OF HISTORICAL TRUST ACCOUNTING**............. 16

III.   **OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS**................. 19

  A.   **TRUST REVIEW AND AUDIT**......................................... 21

  B.   **OST-OFFICE OF THE CHIEF INFORMATION OFFICER**................. 23

    1.   **RECORDS MANAGEMENT**................................. 23

  C.   **TRUST ACCOUNTABILITY**......................................... 26

    1.   **TRUST BUSINESS PROCESS MODELING**................. 26

    2.   **TRUST DATA QUALITY AND INTEGRITY**................. 28

    3.   **INDIAN FIDUCIARY TRUST TRAINING PROGRAM**................. 30

    4.   **RISK MANAGEMENT**......................................... 32

    5.   **REGULATIONS, POLICIES AND PROCEDURES**................. 33

  D.   **FIELD OPERATIONS**......................................... 35

    1.   **APPRAISAL**......................................... 35

  E.   **TRUST SERVICES**......................................... 38

    1.   **CURRENT ACCOUNTING ACTIVITIES**................. 38

IV.   **BUREAU OF INDIAN AFFAIRS**......................................... 43

  A.   **TRUST REGULATIONS, POLICIES AND PROCEDURES**................. 43

  B.   **FRACTIONATION**......................................... 45

  C.   **PROBATE**......................................... 47

**ACRONYMS AND ABBREVIATIONS**......................................... 49

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005** **Introduction**

## I.    INTRODUCTION

This *Status Report to the Court Number Twenty-Three* (Report) represents the period from July 1, 2005, through September 30, 2005.  The Report is presented for the purpose of informing the Court on the progress of trust reform activities occurring during this reporting period, and progress of the historical accounting of individual Indian beneficiary funds managed by Interior.[1]

This Report is prepared in a manner consistent with previous reports to the Court.  Each manager in charge of an area of trust administration and the director of the historical accounting project are submitting reports on the progress of their respective activities.

The Court's attention is directed to the revised format of the OHTA report.  The report is significantly reduced in size from previous reports, largely as a result of eliminating several tables.  These tables have been used in the past to distinguish between types of accounts being reconciled.  The report continues to present in text form the progress of the accounting and related activities during this quarter.

A glossary of acronyms and abbreviations is included in this Report.  The glossary is located at the end of the Report.

---

[1]   This report contains information on the broad trust reform efforts underway at Interior.  Accordingly, it may include information on reform efforts that are not within the scope of the *Cobell* litigation.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                    **Secretary Gale Norton's Observations**

## II.    SECRETARY GALE NORTON'S OBSERVATIONS

As this quarterly report details, trust management improvements continue to be made at local and regional offices of the Bureau of Indian Affairs.  Conversion of systems and business process improvements required in the Fiduciary Trust Model are reportedly now in progress at several more BIA agencies in addition to the pilot agencies.  FTM initiatives such as the lockbox for collection of funds due beneficiaries, the call center offering  beneficiaries access to information about their accounts and land status, the placement of trust officers at BIA agencies and many other innovations provide greatly enhanced services and accountability for beneficiaries.

Implementation of the FTM includes conversion of many stand-alone trust systems to new interactive systems at all BIA agencies and regions.  This requires BIA agency superintendents to rely on new BIA and Interior computer systems to accomplish work that was formerly done through the use of independent local operating systems.  The new systems and business processes are designed to have information encoded on a "real-time" basis.  Bringing data current in legacy systems in order to convert to new systems requires thousands of hours of contractor support and rigorous quality control.  As the FTM is installed throughout the agencies, we are certain to encounter new challenges.  The Special Trustee has estimated this work will consume most of the next two years to accomplish.  However, our goal of operating in a modern IT environment with consistent practices across all agencies and regions will ultimately improve the overall management of the trust.

As previously reported, Interior is engaged in a significant regulatory initiative to bring our trust and trust-related regulations into compliance with changes in the law and update those regulations that are part of the implementation of trust improvements.  This is a significant project that we expect to be completed after consultation is conducted with tribes and the regulations are adopted.

During this reporting period, appropriations for FY2006 were passed by Congress.  We did not receive the full amount we requested for historical accounting.  Congress appropriated only $58 million, and indicated that the difference between our request and the appropriated amount was allocated to other Indian affairs and Indian health programs.  The remaining requests for funding trust programs in Interior were left intact.  However, as a result of the limited funding for the second year in a row, the historical accounting project will necessarily be extended beyond the initially projected completion date.

On July 26, 2005, the Senate Indian Affairs Committee held a hearing on S. 1439, proposed legislation (sponsored by Senators McCain and Dorgan) to legislatively resolve issues regarding the individual Indian trust.  Special Trustee Ross Swimmer and Associate Deputy Secretary Jim Cason testified for the Department.  They noted that "the introduction of S. 1439 is the first serious Congressional effort we have seen to comprehensively resolve the issues involved in the Cobell lawsuit.  While many details remain to be negotiated and clarified, the bill represents an important step towards bringing the parties together for a meaningful effort to seek closure on this matter."  Other witnesses represented tribes and the Cobell v. Norton plaintiffs.  There has not been any formal action on this bill.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                    **Secretary Gale Norton's Observations**

I have been informed that, as of September 30, 2005, the Office of Historical Trust Accounting had fully reconciled an additional 6,538 judgment and per capita accounts (including some with no current balance). As I mentioned in the last quarterly report, OHTA is awaiting permission from the Court to send the results to 28,107 account holders. A submission to the Court for authorization to mail the results of these account reconciliations was filed on March 24, 2005.

During this reporting period, Interior prepared *Historical Accounting for Individual Indian Monies: A Progress Report,* highlighting Interior's historical accounting progress in several areas. The *Progress Report* notes that Interior has consolidated, indexed, and stored over 120,000 boxes of records at the state-of-the-art American Indian Records Repository in Lenexa, Kansas, preserving the records effectively while keeping them accessible and searchable. OHTA reported that it has reconciled over 17,000 transactions in land-based IIM accounts, including over 99% of transactions sampled in the Litigation Support Accounting project. Based on a report dated September 30, 2005, from NORC, the statistical consultant, these numbers should be sufficient to allow statistically valid conclusions to be drawn; namely, about 1% of all deposit and disbursement transactions from 1985 through 2000 are different from the expected amount, and posting errors constitute less than 1% of the dollars reconciled. The *Progress Report* also noted that Interior has reconciled over 53,000 Judgment and per capita IIM accounts, has mailed more than 12,000 historical statements of account to judgment IIM account holders, and has distributed over $36 million in residual balances from special deposit accounts.

I am told by our security experts that every Internet based system is vulnerable to threats of hackers as well as other malicious activity. Certainly, one of my goals has been to reduce the threat to our systems. As part of that commitment, Interior bureaus and offices continue to have their computer systems examined and challenged for security by the Office of the Inspector General, outside contractors and their own internal security analysts. From this testing, I hope our vulnerabilities can be identified and corrected. While I am encouraged by the improvements during the past four years, I recognize that risks remain, not only to Indian trust data, but to Interior systems generally. However, in spite of these risks, we also have to conduct day-to-day operations. While risks are being eliminated, these risks can also be mitigated in order to allow systems to operate. Our challenge is to adequately protect systems within limits of our budget and other constraints.

During this reporting period, NARA disclosed to Interior that certain records under the legal and physical custody of NARA as the permanent records of the United States, including some Indian related records, were found in trash containers at the National Archives building in Washington, D.C. NARA officials have advised us that this matter has been referred to their Inspector General for investigation. While these records are under neither my control nor the control of anyone else at Interior, I am concerned about the potential loss of such records and will be monitoring the situation as information from NARA becomes available.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                                    **Information Technology**

## A.    INFORMATION TECHNOLOGY

### Introduction

This section describes the status of Interior IT systems, particularly the systems that house or provide access to IITD or provide various computing capabilities, including functions critical to the proper administration of the individual Indian trust responsibilities within Interior.  In addition, this section describes various efforts being made to improve IITD security within Interior, pursuant to OMB Circular A-130 Appendix III, and the status of Internet connectivity.

### Accomplishments and Completions

**Computer Security:**

Interior continues to make progress in ensuring IT security.  A primary focus for this reporting period has been implementing corrective actions for weaknesses identified by the Interior penetration tests and audit of financial systems.  Additional efforts were focused on:

- Performing continuous monitoring of Internet-accessible systems;
- Preparing submission of the annual FISMA report;
- Conducting annual IT security awareness and role-based training;
- Submission of annual assurance statements required to complete the annual PAR; and,
- Continuing to validate and improve the C&A packages completed previously.

The most noteworthy accomplishments and completions during the reporting period are described below.

### *Prevention and Monitoring*

- Interior continued its extended vulnerability scan testing of Internet-accessible systems.  The extended testing checks for approximately 7,400 different types of vulnerabilities, in addition to the SANS Top 20 vulnerabilities of previous testing.  Since the last reporting period, Interior tested over 5,000 Internet-accessible network devices (for example, servers, routers, switches.)  Initial results from January to April 2005 indicated over 5,000 potential vulnerabilities, but included many false positives and duplications.  By the end of this reporting period, potential vulnerabilities were substantially reduced.  This reduction results from routinely scanning network devices for potential vulnerabilities and working toward correcting or mitigating identified weaknesses.  121 vulnerabilities remained and continued to be mitigated as of the end of the reporting period.

- Potential incidents that were reported to DOI-CIRC during this reporting period include 22 successful incidents.  None appears to have resulted in any known compromise of IITD.  Successful incidents are those that were not prevented or blocked by Interior at the time of their occurrence.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                                          **Information Technology**

- OIG completed a FISMA documentation review for OST, with no deficiencies noted during the review. The draft or final report has not been received.

- BLM conducted two significant, separate table-top contingency exercises of MAs and the enclave GSS. BLM conducted an exercise of the ALIS contingency plan on August 9, 2005. Multiple other MAs participated in a contingency plan exercise on September 14, 2005.

- As reported to the court on September 2, 2005, a limited amount of IITD was discovered in BLM's LR2000 database on August 18, 2005. Internal access to LR2000 was immediately blocked. A data quality review was conducted by BLM. All IITD was removed from LR2000. The security module was modified to include access disclaimers requiring users to refrain from using LR2000 for any Indian trust-related work. Additional scans were completed on August 24, 2005. BLM's DAA approved access restoration on an internal basis as of August 26, 2005.

- MMS conducted monthly network vulnerability scans on internal servers and network devices. Due to the hurricane impacts to the Gulf of Mexico, including severe damage to MMS facilities, limited remediation occurred for the August and September scan results. The tracking system in New Orleans was not restored until after the end of the reporting period.

- As reported to the Court on August 25, 2005, MMS detected an unauthorized change of an administrator password on the MRMSS externally-hosted portal in August 2005. The incident is still under investigation with the OIG and FBI. Based upon the investigation to date, there is no reason to believe the integrity of any data was compromised. Changes have been made to increase event monitoring at both the perimeter firewalls and application. Security scans of the application have been conducted, additional scans are scheduled. Final security scans and a security review are expected to be conducted by an independent third party contractor.

- NBC initiated remediation activities to address vulnerabilities identified in the second OIG penetration testing conducted on NBC systems in July. Personnel data was accessed, in the course of testing NPS systems. Immediate action was taken on critical vulnerabilities and NBC continues to track progress of remaining tasks from both penetration testing exercises.

### Policies and Guidance

- The Interior CIO issued OCIO Directive 2005-012, "Wireless Network Security," to the bureau and office chief information officers on July 29, 2005. This directive outlines the security requirements for wireless networking devices within Interior and requires adherence to "Wireless Security Technical Implementation Guide," Version 2.0, July 21, 2005. The CIO also approved the "DOI Wireless Data Communications Strategy" on August 3, 2005.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                                    **Information Technology**

- The Interior CIO issued a memorandum, "Implementing OCIO Directive 2005-007 for 4th Quarter Plans of Action and Milestones (POA&M) and 4th Quarter Federal Information Security Management Act (FISMA) Performance Measures," to the heads of bureaus and offices on August 18, 2005. This memorandum provides guidance in completing POA&Ms and FISMA performance measures in accordance with OMB requirements and Interior OCIO Directive 2005-007.

- The Interior CIO issued a memorandum, "External Vulnerability Scans – MCI Service," to the Deputy Secretary, assistant secretaries and heads of bureaus and offices on September 12, 2005. This memorandum outlines the vulnerability scanning program conducted by MCI. It requires bureaus to address systems with critical vulnerabilities first, and to isolate from the Internet vulnerable systems or services until the issue can be resolved, if the vulnerabilities can not be immediately remediated or identified as false positives.

- The Interior CIO issued a memorandum, "Temporary Approval of Wireless Technologies Waiver Requests to Support Emergency Efforts," to the assistant secretaries and heads of bureaus and offices on September 23, 2005. This memorandum provides specific criteria and conditions regarding the use of wireless technologies or access to non-Interior provided wireless networks to enable efficient implementation of the Federal National Response Plan.

- The Interior CIO issued OCIO Directive 2005-015, "Information Technology (IT) Audit Findings and Corrective Actions," to the heads of bureaus and offices on September 26, 2005. This directive supplements existing policies and guidance to improve the overall quality of IT audit findings and responses.

*Training and Awareness*

- Overall, 98% of Interior employees and contractors who use or access Interior computer systems completed the Interior FY2005 required annual end user Federal information systems security awareness training. 66% of employees with significant IT security responsibilities received specialized training, as described in NIST Special Publication 800-16 *Information Technology Security Training Requirements: A Role- and Performance-Based Model*.

  - All required BLM, MMS, SOL, OHA, Office of the Secretary and Office of the Assistant Secretary – Indian Affairs employees and contractors completed the end user training. 98% of the required OST employees and contractors completed the Interior FY2005 annual training. 97% of BIA staff completed the training. The remaining BIA staff who did not receive training (289 Indian Education employees) do not require computer access, or left BIA employment prior to the reporting deadline.

  - The BLM, MMS and OHA employees and contractors with significant IT security responsibilities received specialized training. 97% of Office of the Secretary, 66% of

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005** **Information Technology**

SOL and 58% of OST employees with significant IT security responsibilities received specialized training

- In September 2005, the Deputy Assistant Secretary – Indian Affairs/CIO sponsored three workshops on recent and evolving NIST security requirements, specifically covering FIPS 199 and NIST SP 800-53 guidance for system characterization and for selecting appropriate security controls. A total of 50 BIA and other Interior bureau staff (including both Federal employees and contractors) attended the three sessions offered.

- The quarterly Fall 2005 MMS Information Security Awareness Newsletter was distributed to MMS employees and contractors on September 23, 2005, to keep users abreast of IT security issues.

**Plans of Action and Milestones:**

Interior tracked 1,730 POA&M recorded weaknesses, of which 529 weaknesses were identified this quarter and 1,201 (reported incorrectly in the previous status report as 1,206 due to a data transposition error) weaknesses were carried over from the third quarter. Interior remediated and closed out 416 weaknesses this quarter. Interior is currently tracking 1,314 open weaknesses. All bureaus and offices with trust systems certified the completion of POA&M corrective actions.

**A-130 Certification and Accreditation:**

Ninety-eight percent of Interior systems have full authority to operate (ATO) status. The C&A packages for all of those systems have been reviewed by a qualified third party for compliance with A-130 standards and requirements. 74% of the reviewed packages received passing scores. C&A packages that had not met minimum compliance review scores on initial reviews continue to be improved.

OST completed an update of its IT contingency plan, its disaster recovery plans for 5 minor applications running within OSTNet, and its SSP for OSTNet. OST updated its ST&E Guide for OSTNet to incorporate FIPS 199 and NIST SP 800-53 requirements. OST evaluated OSTNet using the updated ST&E, which resulted in an update to the OSTNet risk assessment. OST conducted a table-top disaster recovery and continuity of operations exercise.

Due to the recent implementation of Active Directory and new security controls, OHA initiated a re-certification and accreditation of OHANet. As part of this process, OHA validated the information types, information security categorization, and corresponding system characterization.

SOL completed its first C&A and received full authority to operate SOLNet.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                                    **Information Technology**

**IT Systems Architecture:**

Interior completed a Departmental Solution Development Life Cycle document, which more tightly couples EA, CPIC, and security requirements during development or acquisition of IT systems.

EA is dynamic. As systems are deployed and others are decommissioned, the architecture changes. Therefore, the updating, population and maintenance of the DEAR is a continual process that occurs every quarterly reporting period. Bureaus are required to keep the repository accurate and current.

***DOI Land and Resource Management System (DLRM)***

As previously reported, the DLRM system is expected to provide a long-term solution for the legacy functionality of the CGI leasing software module, formerly a part of the TAAMS project. A pre-solicitation notice for DLRM was published on August 21, 2005, but the solicitation was subsequently cancelled. In order to go forward with the project, functional requirements for all Interior land and resource management mission areas need to be validated to define a comprehensive enterprise capability and funding strategy.

**ESN:**

- MMS completed the connection to the ESN Internet gateway for the Herndon, VA, and Denver offices this reporting period. The New Orleans Regional Office was connected to ESN in mid-October, having been delayed due to the recent hurricanes in the Gulf.

- NBC, NPS and OSM were connected to the ESN Internet gateway this reporting period.

**Current Status**

**ZANTAZ**

- ZStage refers to a ZANTAZ software indicator which shows whether an e-mail message has been properly processed. Interior addressed the ZStage issue in a September 11, 2005, filing and at a September 15, 2005, status conference.

- During this reporting period, OST discovered a limited processing problem identified by reviewing ZStage data and took steps to mitigate it. OST is expecting to send 160 tapes to ZANTAZ to recover missing data from February 19, 2005, to September 8, 2005. OST engaged an independent third party contractor to conduct a complete review of the OST electronic mail environment, identify any ZANTAZ issues or problems, and develop corrective actions. Receipt of analysis reports and corrective actions plans is pending.

- NBC determined that the incident discovered on June 21, 2005, noted in the previous reporting period, will require 419 back-up tapes to be sent from DC to ZANTAZ for

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                                           **Information Technology**

processing. The incident covered the period of August 28, 2004, through August 13, 2005, when a fix was implemented. NBC Denver has not yet resolved the incident, but estimates 46 back-up tapes will need to be sent for processing.

- On October 7, 2005, SOL's configuration was corrected by ZANTAZ. All messages are now going to the Digital Safe. SOL expects to send 96 tapes to ZANTAZ to recover missing data from February 22, 2005 to October 7, 2005.

- BIA expects to send 280 backup tapes to ZANTAZ to recover missing data from October 25, 2003 through January 27, 2005. Tapes covering earlier periods were previously sent to ZANTAZ (the last tape processed by ZANTAZ was on October 24, 2003, which included the Juneau server.)

- Tape delivery and subsequent restoration cannot proceed until Interior has completed its contract negotiations with ZANTAZ. Accordingly, the OCIO cannot at this time estimate a date for the delivery of the tapes to ZANTAZ.

**Reports:**

These reports are likely to be of interest to the Court, including several that were issued following the end of this reporting period.

- Interior anticipates filing the FISMA report and the OIG annual evaluation with the Court in the near future.

- OIG issued *The Department of the Interior's Process to Manage Information Technology Security Weaknesses*, Report No. A-EV-MOA-0001-2005, on September 23, 2005. OIG recommended that Interior declare a material weakness with respect to the POA&M process based on its review of POA&Ms from September and November 2004. OIG sampled 133 corrective actions that were reported as having been completed, and opined that 48% of those actions had not been implemented to his satisfaction.

  As noted in this OIG report, the CIO concluded that Interior's existing POA&M process is adequate, and that the OIG assessment of POA&Ms was based on reviews conducted early in FY2005 and did not reflect subsequent improvements implemented to correct noted issues. These improvements included requiring additional verification and validation of completed corrective actions. For each quarterly POA&M submission, bureau and office CIOs review the completed POA&M corrective actions, and attest to their implementation prior to noting the action as closed on the POA&M.

- OIG, through its contractor, was unsuccessful in its efforts to penetrate the MMS systems. OIG Report *NSM-EV-MMS-0021-2005 MMS Penetration Testing* noted that no significant vulnerabilities were discovered that would allow penetration into MMS networks or

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                                    **Information Technology**

unauthorized access to information.  MMS is reviewing the final report for inclusion of identified weaknesses on the POA&M.

- As reported to the Court on September 28, 2005, OIG issued the results of its Phase 3 penetration testing on September 6, 2005.  Phase 3, conducted between May and mid-August 2005, included penetration testing on FWS, NPS and OSM.  The report also included the completion of BOR National Critical Infrastructure Information Systems reviews.  Phase 3 test results show that OIG was not able to penetrate FWS and OSM, but that a penetration of NPS allowed testers to traverse to NBC's systems without detection. OIG also found that "the SCADA systems are operating in relative safety from potentially catastrophic cyber-security threats."

- GAO issued "Information Security: Weaknesses Persist at Federal Agencies Despite Progress Made in Implementing Related Statutory Requirements" (GAO-05-552).  This report is based on agency reports of FY2003 and FY2004 and related GAO reports from FY2003 through FY2005.  Although it notes that the government is making progress in implementing FISMA, it finds pervasive weaknesses in information security policies and practices across all major agencies.  As this report assesses the challenges in implementing IT security programs government-wide, it may or may not be of interest to the Court.

## Delays and Obstacles

There are many challenges that must be addressed regarding the integration, performance, funding, security, and data integrity of IT systems generally.  Like other federal agencies, Interior must address these challenges for its IT systems.  Interior initiated or completed steps to address some of the challenges reported in this and previous reporting periods.  However, delays and obstacles listed here impede progress in achieving Interior's IT management goals:

**Hurricane Katrina**

- Hurricane Katrina has had severe impacts on resources.  Key staff members for MMS IT security are based out of the New Orleans office, and were unable to work or only able to work sporadically since the event.  MMS temporarily shut down its computing facility in New Orleans.  This facility will be restored to service as soon as conditions warrant and resources are available.  Essential systems have been relocated and/or restored at other MMS sites and are available.  A temporary office was established in Houston that may operate for up to one year. The results of these efforts demonstrated the workability of the MMS business continuity plan.

**Litigation**

- Collection and production of documents and court appearances continued to place significant strain on available staff and contractor resources throughout much of this reporting period, resulting in substantial delays in accomplishing planned and required work.  The extent of the effort required for this document production resulted in significant backlogs and

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                                                    **Information Technology**

rescheduling that will hamper Interior's efforts for months to come.  Production of documents has exceeded 4.5 million pages.  This litigation continued to impact:

- o  FISMA compliance actions
- o  Interior's financial audit
- o  OMB and Congressional reporting requirements
- o  Migration to a single e-mail messaging system
- o  Migration to a single Active Directory system
- o  Complying with HSPD-12 for implementing E-Authentication in Interior
- o  Delay in moving Interior bureaus and offices to a single WAN
- o  Updating Interior policies to fully comply with issued guidance and regulations

- Employee fears about becoming personally implicated in the *Cobell* litigation continued to be heightened as individuals from varying levels in Interior were required to testify at the evidentiary hearing.  These fears continue to undermine communication and decision-making, and along with burn-out from demands for volumes of document production, are contributing factors to low employee morale.

**Staffing**

Interior is experiencing high staff and management turnover in critical IT positions, particularly IT security.  For example, the Department's Chief Information Security Officer resigned on October 11, 2005.  Resulting impacts to communication, efficiency, and oversight are impeding IT security service area functions.

**Funding and Resources**

- Considerable expense was incurred as a result of collecting and producing over 4.5 million pages of material for the litigation.  This expense diminished the funding available for security improvement and program evaluation.

- With the significant increase in FISMA reporting required by OIG, the resources (time, personnel, and funding) provided for IT security-related activities were diminished.  Interior continues to prioritize its FISMA needs in its budget requests within fiscal constraints.

- Funding availability will continue to dictate the timing of IT-related initiatives.  Interior's FY2006 budget will require managing a variety of IT-related requirements and tradeoffs.

**Denied Internet Access**

- Several Interior bureaus and offices (BIA, OHA, OST and SOL) have not been permitted by the Court to have Internet access since December 5, 2001.  Lack of Internet access impedes work processes and the ability to communicate effectively, both internally and externally.  For example, lack of connectivity hampers internal communication among bureaus providing customer service to individual Indians at FIMO located in the BLM Farmington Field Office.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                                    **Information Technology**

- Maintaining security on internal systems is more difficult without access to the Internet for research, reporting, and patch management. Similarly, promulgation of policy and training is substantially hampered by the lack of interconnectivity and Internet access.

**<u>Assurance Statement</u>**

I concur with the content of the information contained in the Information Technology section of the *Status Report to the Court Number Twenty-Three*. The information provided in this section is accurate to the best of my knowledge.

Date:   October 31, 2005

Name: *Signature on File*
        W. Hord Tipton
        Interior Chief Information Officer

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                                                    **Cadastral Survey**

### B.    CADASTRAL SURVEY

**Introduction**

Cadastral surveys provide assurance that land boundaries for individual Indian and tribal trust lands are identified appropriately.  By federal law, surveys of Indian lands are to be performed under BLM's direction and control.  Official surveys, whether preexisting or new, identify the location of land boundaries of Indian trust assets and determine official acreage.  The official surveys are integral to realty transactions, resource management activities, litigation support and the federal system of patent, allotment and survey records maintained by BLM.  Ownership information, distribution of trust assets, and management of trust accounts may be related to or based upon information recorded in official surveys.

**Accomplishments and Completions**

**Educational Opportunity and Outreach**

During this reporting period, BLM and the Oregon Institute of Technology began an outreach effort with the private sector to support the existing cooperative partnership.  The objective of this partnership is to emphasize the public land surveying curriculum and to partner with American Indian Tribes and organizations to promote and encourage survey education for individual Indians.

**Current Status**

**Interior Indian Trust Lands Boundary Standards (Draft)**

The Draft Boundary Standards continue to be reviewed and revised based upon comments received by SOL.  Upon completion of SOL review, an updated draft will be provided to Interior bureaus, offices and other affected parties.

**Funding of the Recommendations Outlined in the FTM**

During this reporting period, information was developed to justify funding of the FTM goals as they relate to the four cadastral survey initiatives.  These four initiatives include:  (1) funding for the 12 BLM Indian lands surveyors located in the BIA Regions; (2) creation of the CFedS program (where state licensed land surveyors can be certified to perform commercial activities under the direction and control of BLM); (3) improving the maintenance of the PLSS within Indian Country; and (4) creation of one standardized source of land status information based on cadastral data that delineates the official legal land descriptions.  BLM has funding in FY2006 for the regional surveyors and the CFedS program.

The BLM Indian lands surveyors for the Eastern Oklahoma and Great Plains Regions are hired and have reported to their respective duty locations.  The BLM Indian lands surveyors for the Midwest and Northwest Regions are actively working with BIA staff and others in addressing

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                                      **Cadastral Survey**

survey boundary issues. The Southern Plains lands surveyor is scheduled to report during the next reporting period. The remaining seven BLM Indian lands surveyor positions were advertised at the end of this reporting period and it is anticipated that these individuals will be selected during the next reporting period.

During this reporting period, the CFedS project manager position was filled at the BLM National Training Center. Briefings on the CFedS project were presented to Interior bureaus and offices.

## Delays and Obstacles

**Disconnection from the Internet**

The Court-ordered disconnection from the Internet continues to adversely impact the way communications are handled between BLM, BIA, OST and SOL, including the way CARS is being implemented and the review of the Interior Indian Trust Lands Boundary Standards. BLM's productivity has decreased, and the cost associated with dual networks has caused the cost of survey services to increase. This issue continues to impact BLM's ability to provide cadastral services in an effective and cost efficient manner to clients.

**Funding of the FTM**

Planning and scheduling of out-year FTM work is dependent on future funding.

## Assurance Statement

I concur with the content of the information contained in the Cadastral Survey section of the *Status Report to the Court Number Twenty-Three*. The information provided in this section is accurate to the best of my knowledge.

Date:   October 27, 2005

Name:  *Signature on File*
         Donald A. Buhler
         Chief Cadastral Surveyor
         Bureau of Land Management

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                                    **Minerals Management Service**

### C.    MINERALS MANAGEMENT SERVICE

**Introduction**

Minerals Revenue Management, an MMS program, is responsible for collecting, accounting for, and distributing mineral revenues from both federal and Indian mineral leases, and for evaluating industry compliance with laws, regulations and lease terms.  MRM maintains reported information and distributes revenues at the lease level.  BIA maintains individual Indian ownership records that are used to provide information to OST for disbursement of the lease revenues to individual Indian beneficiaries.

**Current Status**

**Indian Oil Rule**

MMS continued with the rulemaking process for the valuation of oil produced from tribal and allotted Indian lands.  The proposed rule for valuing crude oil produced from Indian leases now is expected to be published in January 2006.

**Payment Receipt Date Verification**

As previously reported, MMS completed the PeopleSoft upgrade in January 2005; and as of July 31, 2005, all software changes were successfully tested and incorporated into MRM's financial system.  With the implementation of the changes, future errors should be prevented.  MMS is working with its contractor to determine when system modifications can be made that should allow MMS to identify any prior errors in the Indian mineral revenue distribution file.  Any potential additional interest that may be due to recipients would be identified upon review and analysis of the data produced from the system modifications.

**Assurance Statement**

I concur with the content of the information contained in the Minerals Management Service section of the *Status Report to the Court Number Twenty-Three*.  The information provided in this section is accurate to the best of my knowledge.

Date:   October 19, 2005

Name: *Signature on File*
           Cathy J. Hamilton
           Chief of Staff
           Minerals Revenue Management
           Minerals Management Service

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                                        **Office of Historical Trust Accounting**

## D.    OFFICE OF HISTORICAL TRUST ACCOUNTING

**Introduction**

OHTA was established by Secretarial Order No. 3231 on July 10, 2001, and is charged with planning, organizing, directing and executing the historical accounting of IIM and tribal trust accounts.

**Current Status**

**Judgment and Per Capita IIM Accounts**

OHTA continues to perform historical accounting procedures on Judgment and Per Capita IIM accounts. OHTA received the electronic IIM transaction data files it uses for the Judgment and Per Capita IIM account historical accounting in 2003 from one of its contractors, which had received the data files directly from OST in 1999; the data files were received by OHTA from a system that was not connected to the Internet. Since its 2001 inception, neither OHTA nor its contractors have stored the data on a system connected to the Internet.

During this reporting period, OHTA completely reconciled an additional 3,852 Judgment IIM accounts and 3,521 Per Capita IIM accounts.

**Mailings to Judgment and Per Capita IIM Account Holders**

A submission to mail 28,107 additional Historical Statements of Account, filed with the Court on March 24, 2005, is still pending approval. Consequently, OHTA has not mailed these Historical Statements of Account during this reporting period.

**Land-Based IIM Accounts**

A Litigation Support Accounting Project for the Electronic Records Era (1985 – 2000) for the land-based IIM accounts was begun in 2004. This Project involved reconciliation work on High-Dollar transactions (those equal to or in excess of $100,000) and on a National Sample of transactions (statistically selected from those under $100,000) in Land-Based IIM accounts. A report on this work was delivered to OHTA on September 30, 2005. Over 99% of the random sample of transactions have been reconciled to the supporting documentation for all 12 BIA Regions.

The report highlights include:

**Debits (principally, cash disbursements)**

- Reconciliation results show the debit difference rate to be 0.4%. With an assurance level of 99%, the difference rate for all debits is no more than 1.3%. The estimated rate of

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                                      **Office of Historical Trust Accounting**

differences disadvantageous to the IIM account holders with an assurance level of 99% is 0.7%. This disadvantageous difference rate at a 95% assurance level is 0.6%.

- With an assurance level of 99%, the estimated dollar exposure for debit differences disadvantageous to IIM account holders is no more than $4 million. At a 95% assurance level, the dollar exposure is slightly over $2 million.

**Credits (principally, cash receipts)**

- Reconciliation results show the credit difference rate to be 1.3%. With an assurance level of 99%, the difference rate for all credits less than $100,000 is no more than 7.0%. The estimated rate of differences disadvantageous to the IIM account holders with an assurance level of 99% is under 4.0%. This disadvantageous difference rate at a 95% assurance level is 3.0%.

- With an assurance level of 99%, the estimated dollar exposure for credit differences disadvantageous to the IIM account holders is no more than $86 million. At a 95% assurance level, the dollar exposure is $42 million.

Statistically, no evidence was found to suggest that under- and over-payments were different. That is, the under- and over-payments occur at about the same rate and the distribution of the difference amount is statistically equivalent (whether the differences were under or over the recorded amount).

**OHTA SDA Distribution Project**

In previous reports to the Court, the SDA balances remaining to be distributed included net principal and interest activity that occurred subsequent to December 31, 2002. The SDA balance reported in *Status Report to the Court Number Twenty-Two* has been reduced by the principal receipts (net of disbursements thereof) and interest activity posted to the OHTA SDA population since January 1, 2003, a total reduction of $5,540,163. This change in the basis of reporting will more accurately reflect the balances remaining to be distributed in the OHTA SDA Distribution Project.

During this reporting period, 258 SDAs involving $1,345,082 were resolved. There remain 11,963 SDAs involving $20,574,115 to distribute.

**Interest Recalculation**

Interior plans to recalculate expected interest payments for each IIM account. During this reporting period, OHTA completed an interest recalculation effort for Alaska Region Land-Based IIM accounts for transactions occurring during the Electronic Records Era (1985 – 2000). Completion of the interest recalculation effort for all Regions will account for approximately 40% of the total number of transactions in Land-Based IIM accounts and will help facilitate the identification and resolution of data gaps in the electronic records.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                    **Office of Historical Trust Accounting**

**Imaging/Coding – Individual Indian Trust Documents**

During this reporting period, OHTA completed scanning 928,680 pages, coding 48,349 documents and loading 50,176 documents into the Accounting Reconciliation Tool.

**Delays and Obstacles**

Enacted appropriations for FY2003 through FY2005 have been below the President's requests. This has prevented OHTA from making the progress it projected in the January 6, 2003, Plan filed with the Court.

**Assurance Statement**

I concur with the contents of the information contained in the Office of Historical Trust Accounting section of the *Status Report to the Court Number Twenty-Three*. The information provided in this section is accurate to the best of my knowledge.

Date:        October 31, 2005

Name:        *Signature on File*
             Bert T. Edwards, Executive Director
             Office of Historical Trust Accounting

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                    **Office of the Special Trustee for American Indians**

## III.    OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS

### Introduction

The Office of the Special Trustee for American Indians was created by the American Indian Trust Fund Management Reform Act of 1994. The 1994 Act provides direction to the Department of the Interior on accounting for Indian trust funds and reforming the operation of the Indian fiduciary trust. The Special Trustee's responsibilities under the Act include creating a comprehensive strategic plan for the operation of the trust and providing oversight of the accounting for Indian trust funds and the reform of the trust. In addition to other trust reform-related duties assigned by the Secretary, the Special Trustee accepted the transfer of the Office of Appraisal Services from BIA to OST.

### Special Trustee's Observations

### Trust Initiatives for the 21st Century

Work was completed at the pilot agencies to enable the first mailings to beneficiaries of comprehensive account statements as required by the 1994 Act. In addition, a schedule was agreed upon to incorporate the new systems, to perform quality reviews of information contained in data files, making corrections where necessary, and to record backlogged information into the appropriate systems at the remaining BIA agencies, field offices and LTROs. This effort is expected to be approximately 85% complete by the end of CY2006, with all agencies fully converted by the end of CY2007.

Interior Regulatory Initiative working groups continue to draft language to further the implementation of the FTM, comply with requirements of AIPRA and streamline business processes. The draft language will be the subject of various consultation sessions with Tribes and other stakeholders. This consultation process is expected to begin by the end of the first quarter of CY2006.

Implementation of the FTM is a massive project. It requires conversion of systems, upgrading BIA processes and coordinating this work with other Interior bureaus and offices. When completed, this effort should result in a much more efficient, accurate and timely processing of information and in enhanced accountability to trust beneficiaries.

### American Indian Probate Reform Act

During this reporting period, BIA awarded a grant to a non-profit organization to develop training courses for attorneys engaged in writing wills for Indian people with trust assets. This grant also includes community outreach on estate planning and helping Indian trust beneficiaries understand AIPRA.

19

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                    **Office of the Special Trustee for American Indians**

### Conclusion

Implementation of the FTM continues on a track to be completed by the end of CY2007. Promulgating new regulations, recording backlogged information, and developing new lease forms and business processes (such as desk operating procedures) are challenging. Nevertheless, it is now possible to see, almost daily, the improvements to the management of the trust and interaction with beneficiaries. However, fractionation will be a continuing problem, requiring expenditures far beyond the revenue generated from trust assets each year. It is imperative that further legislative solutions come from Congress to solve the fractionation problem.

### Assurance Statement

The comments and observations are provided by the Special Trustee for American Indians and reflect the opinion of the Special Trustee only.

Date:   October 20, 2005

Name:   *Signature on File*
        Ross O. Swimmer
        Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                                        **Trust Review and Audit**

### A.    TRUST REVIEW AND AUDIT

**Introduction**

OTRA reports directly to the Special Trustee for American Indians.  OTRA was created by OST as a response to trust initiatives developed during the tribal consultation process of 2002.  OTRA conducts performance audits, examinations and reviews of Interior entities as well as Tribes that manage fiduciary trust activities.  Examinations are routinely conducted at locations that perform trust operations, and are planned to result in a performance rating.

**Current Status**

**Indian Trust Examinations**

During this reporting period, OTRA performed 22 trust reviews.  Twenty-four draft reports were issued for comment and seven final reports were issued.

OTRA completed 11 trust record assessments and issued 22 final reports during this reporting period.

**Annual Interior Indian Trust Funds Financial Statement Audit**

The Indian trust funds financial statement audit, required by the American Indian Trust Fund Management Reform Act of 1994, is conducted by an independent auditor under OIG management.  The independent auditor continued work on the FY2005 audit during this reporting period and is expected to complete work during the first quarter of FY2006.

OTRA completed the contracting process for the FY2006 Indian trust funds financial statement audit.  The independent auditors will begin work early in CY2006.

**Compliance Reviews**

Compliance reviews are generated by information received from beneficiaries, employees and the public.  The reviews usually concern the adequacy or status of fiduciary activities of Interior.  During this reporting period, eight cases were in inventory.  Two cases were added to the inventory and two cases were closed.  Field work or report drafting continued on the remaining eight.

**Delays and Obstacles**

Lack of Internet access impedes OTRA's work processes and its ability to communicate effectively, both internally and externally.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                                      **Trust Review and Audit**

---

**Assurance Statement**

I concur with the content of the information contained in the Trust Review and Audit section of the *Status Report to the Court Number Twenty-Three*.  The information provided in this section is accurate to the best of my knowledge.

Date:   October 21, 2005

Name: *Signature on File*
        D. Jeff Lords
        Acting Director, Office of Trust Review and Audit
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                                              **Records Management**

### B.    OST-OFFICE OF THE CHIEF INFORMATION OFFICER

### 1.    RECORDS MANAGEMENT

**<u>Introduction</u>**

The Office of Trust Records was established in 1999 to develop and implement a program for the economical and efficient management of trust records, consistent with the 1994 Act, the Federal Records Act and other statutes and implementing regulations. The OTR records management program has been developed and implemented, and continues to evolve, to ensure that necessary Indian records are maintained, records retention schedules are consistent with retention needs, and records are safeguarded throughout their life-cycles.

As reported in the *Status Report to the Court Number Eleven*, the line authority for supervision and management of OTR was vested in the Assistant Deputy Secretary by the Deputy Secretary by memorandum dated September 5, 2002. On September 30, 2005, the memorandum was rescinded by the Associate Deputy Secretary. Accordingly, effective October 1, 2005, OTR reports to the Chief Information Officer, OST, in accordance with the pertinent provision of the Departmental Manual.

**<u>Accomplishments and Completions</u>**

**American Indian Records Repository**

Approximately 122,420 indexed boxes are located in the AIRR as of the end of this reporting period. As previously reported, OTR has historically reported the number of boxes transferred to AIRR for storage. However, NARA uses cubic feet as the measure for records stored. Thus far, NARA reports that they are currently storing 128,790 cubic feet of indexed inactive records at AIRR. Some boxes are larger than one cubic foot (e.g., map boxes).

**Records Indexing Project**

Indexing of approximately 124,325 boxes has been completed as of the end of this reporting period. The number of completed boxes (indexed and quality reviewed) differs from the number of boxes stored at AIRR because not all completed boxes were sent to AIRR from the Annex before the end of the reporting period.

Approximately 6,745 boxes of inactive records were moved from BIA/OST field locations to the Lenexa Annex for indexing during this reporting period. Once indexed, these boxes will be stored in the AIRR.

As previously reported, the electronic BISS was classified as a Privacy Act system of records by Interior. The Privacy Act notice for this system was published in the Federal Register on

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                                    **Records Management**

July 29, 2005. The notice provided that the classification would be effective as proposed, unless comments requiring a contrary determination were received within the 40-day comment period. No comments were received by the end of the 40-day comment period.

**Training**

OTR provided records management training for 261 BIA and OST identified records contacts and 13 tribal employees during this reporting period.

**Equipment Purchases**

91 pieces of fireproof filing equipment were delivered to BIA and OST offices during this reporting period. Additional requests will be responded to as received.

**Current Status**

**Safeguarding Records**

As reported, 283 boxes of inactive records that were or may have been damaged or contaminated by mold, mildew, mouse droppings or other adverse elements were shipped to NARA for remediation in the previous reporting period. All boxes have been reviewed and cleaned. There are approximately 30 boxes which NARA has determined require further care. These records were previously exposed to fire and water. It is anticipated that these records will receive further attention in the next reporting period.

**Record Keeping Requirements**

The "Final Decision Regarding Self-Determination and Self-Governance Funding Agreement Language on Fiduciary Trust Records Management" was published in the Federal Register on August 29, 2005. The Final Decision states that "the Department decided not to institute the proposed policy on fiduciary trust records management for Title I and Title IV Tribes/Consortia; rather, the Department will negotiate with each Tribe/Consortium a specific section in the funding agreement that addresses the Tribe's/Consortium's and the Secretary's respective responsibilities regarding the management of fiduciary trust records." The notice did provide specific language for fiduciary trust records management which was to be negotiated into the agreements for FY2006.

**National Archives Records**

As reported in the OTR Activity Report for August 2005 (filed on September 19, 2005), OTR received a copy of a letter dated September 13, 2005, from NARA to the Assistant Deputy Secretary of the Interior regarding an incident involving records at the Main Archives in Washington, DC. OTR also received a copy from the Assistant Deputy Secretary of a letter dated September 28, 2005, from NARA to Dennis Gingold, Esq.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                                    **Records Management**

**Records Retention Schedules**

OTR has not yet received approval from the Archivist of the United States of the following electronic systems records schedules that were submitted in the previous reporting period: Anadarko REM, InfoDat and CFI.  OTR is working with BIA to provide NARA with additional technical analysis related to the GIS schedule.  The BISS records schedule was submitted to NARA during the previous reporting period and was inadvertently not included in the previous report.   NARA requested that certain changes be made to the BISS records schedule and it was resubmitted on September 29, 2005 after the changes were made.

The following five BIA electronic systems records schedules were submitted to NARA for appraisal and approval on September 29, 2005: MADS, Keyfile System, GLADS, Alaska Title Plant Database, and Land Title Mapper.

**Records Evaluation**

As previously reported, 31 boxes set aside for evaluation remain at OTR in Albuquerque pursuant to a litigation hold.  There has been no change during this reporting period.

**<u>Delays and Obstacles</u>**

Lack of Internet access continues to hinder OTR's ability to provide remote access to the record index database for authorized users of the records.  If Internet access were available, authorized researchers could conduct their searches from their respective work sites and only visit AIRR when necessary to inspect specific boxes.

**<u>Assurance Statement</u>**

I concur with the content of the information contained in the Records Management section of the *Status Report to the Court Number Twenty-Three*.  The information provided in this section is accurate to the best of my knowledge.

Date:   October 17, 2005

Name: *Signature on File*
        Ethel J. Abeita
        Director, Office of Trust Records
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                                              **Trust Business Process Modeling**

### C.    TRUST ACCOUNTABILITY

### 1.    TRUST BUSINESS PROCESS MODELING

**<u>Introduction</u>**

Interior is working to build a highly effective fiduciary trust services organization by implementing the business objectives contained in the CTM. Those business objectives are being used to guide implementation of the FTM. Implementation of the FTM is a collaborative effort of BIA, OST, BLM, MMS and OHA, and is integrated with Interior's other trust reform initiatives. The FTM is being implemented to transform the current trust business processes into more efficient, consistent, integrated and fiscally responsible business processes that meet the needs and priorities of the beneficiaries.

**<u>Current Status</u>**

**FTM - General**

Work is continuing toward implementation of the FTM at the pilot agencies now that the conversion of software systems is complete. The availability of the new data systems supports streamlining of business processes, such as leasing, collections, title, probates, and expanded beneficiary services.

As previously reported, an FTM training task deliverable is being developed. During this reporting period, an additional site visit was performed to obtain input regarding training preferences and methodologies.

Reengineering staff continued to participate in the Regulatory Initiative effort during this reporting period. Preliminary language supporting the initiative has been prepared and is being circulated within the work groups to solicit comments and identify cross-cutting issues.

During this reporting period, draft handbooks for LTRO, probate, rights-of-way, and leasing and permitting were submitted for review to BIA.

**Universal Support Function**

A process to automate processing of CSS work tickets was presented to senior management. Site visits to the pilot agencies to assess opportunities for improving financial transaction work flow are expected to occur during the next reporting period. The process will then be revised, as needed, to reflect how business will be conducted in the future.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

| November 1, 2005 | **Trust Business Process Modeling** |
| --- | --- |

### Delays and Obstacles

Lack of Internet access impedes communication with other trust bureaus and offices, and hinders the expansion of reengineered processes that utilize the Internet.  This exacerbates the sheer complexity of reengineering the existing trust business processes.

### Assurance Statement

I concur with the content of the information contained in the Trust Business Process Modeling section of the *Status Report to the Court Number Twenty-Three.*  The information provided in this section is accurate to the best of my knowledge.

Date:   October 27, 2005

Name: *Signature on File*
        John Bennett
        Acting Deputy Special Trustee, Trust Accountability
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                                    **Trust Data Quality and Integrity**

## 2.     TRUST DATA QUALITY AND INTEGRITY

**Introduction**

The success of trust reform depends, in part, on the accuracy of data generated from the maintenance of trust assets, ownership of trust assets, distribution of trust income, and management of trust accounts.  The DQ&I project focuses on three primary initiatives:  (1) assisting BIA with document encoding into the trust systems, (2) validating/correcting CDE to their respective source documents and (3) implementing Post-QA processes.

**Accomplishments and Completions**

During this reporting period, TPMC's contractors:

* Scanned trust conveyance documents necessary to perform CDE validation/correction for the Standing Rock Agency.

* Assisted PRO-LTRO with land title system conversion cleanup.  172 trust patent documents were updated during the quarter, completing all of 272.

* Scanned trust encumbrance files at the Horton, Shawnee and Pawnee Agencies necessary to perform CDE validation/correction, TAAMS lease encoding and performance bond inventory tasks.

* Scanned trust right-of-way files at the SPRO-LTRO that are necessary to perform CDE validation/correction and TAAMS lease encoding for the Horton, Shawnee and Pawnee Agencies.

* Performed Post-QA on correcting entries for the remaining 12 Concho and 42 Anadarko CDE title variances outstanding from the CDE validation/correction task.

**Current Status**

The DQ&I project continued for:  (1) SPRO-LTRO, (2) GPRO-LTRO, (3) Pima Agency and (4) PRO-LTRO.

During this reporting period, TPMC:

* Assisted Concho Agency to reduce RDRS data entry backlogs by encoding 16 probate orders, 2 oil and gas leases, and 23 landowner ID changes.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                                      **Trust Data Quality and Integrity**

- Initiated the CDE validation/correction task for Shawnee Agency.

- Analyzed variances in tract ownership between the land title system and legacy realty system.  Provided results and recommendations for 166 of 261 Concho and 323 of 342 Anadarko tracts.

- Researched and updated landowner ID numbers in the land title system at the PRO-LTRO.  194 BIA-certified ID numbers were completed during the quarter, for a cumulative total of 209 of a second phase total of 1,043 BIA-certified ID numbers.

- Performed global ID changes in the SPRO land title system.  Scanned owner ID documentation for 404 individual owners, completed research for 207 owners and performed encoding for 123 owners.

- Verified beneficiary ID numbers to support SPRO-LTRO encoding of backlogged probates and modifications for Shawnee, Pawnee and Horton Agencies.  Researched ID numbers associated with 89 probates and performed initial encoding in the land title system.

**Delays and Obstacles**

- Securing timely BIA trust system logon IDs.

- Lack of access to the Internet has resulted in:  (1) communication delays; (2) adverse project coordination issues; (3) increased administrative program costs; and (4) the overall DQ&I project being unable to take full advantage of available information technology.

**Assurance Statement**

I concur with the content of the information contained in the Trust Data Quality and Integrity section of the *Status Report to the Court Number Twenty-Three*.  The information provided in this section is accurate to the best of my knowledge.

Date:   October 28, 2005

Name:  *Signature on File*
        John E. White
        Trust Reform Officer
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                          **Indian Fiduciary Trust Training Program**

## 3.    INDIAN FIDUCIARY TRUST TRAINING PROGRAM

### Introduction

Interior has a continuing responsibility to provide adequate staffing, supervision and training for trust fund management and accounting activities. Fiduciary trust training is essential to the success of Interior's trust reform efforts and forms an integral part of all training for Interior employees who are involved in the management of Indian trust assets.

### Accomplishments and Completions

OST offered one session of the course, *Fiduciary Overview Program*, presented by Cannon Financial Institute, with 14 OST, BIA and tribal personnel attending during this reporting period. A total of 684 people have attended this course since March 2003. This course compares and contrasts the federal Indian trust administered through Interior with private sector trusts administered through banks and other financial institutions.

During this reporting period, Cannon Financial Institute personnel also presented the *Risk Management, Guardianship, Fiduciary Behavior* and *Asset Management* specialty courses to 145 OST, BIA and tribal personnel. These four courses are part of the previously reported certification program. Additional sessions of *Risk Management, Wills & Probate, Accounting and Asset* Management are expected to be presented during the next reporting period.

During this reporting period, OST training staff conducted 4 sessions to provide training in TFAS, CSS, StrataVision and the historical query database to 41 OST, BIA and contractor staff.

OST and BIA staff presented the three-day course, *Trust Fundamentals,* to 30 OST, BIA and tribal staff. This course includes such topics as the history and policy of Indian trust, current trust reform activities, job roles and responsibilities, and organization and working relationships. This course is expected to be presented again during the next reporting period.

During this reporting period, OST training staff conducted 9 sessions to provide Lockbox process training to 250 OST, BIA and contractor staff.

### Current Status

Construction continues on the NIPTC in Albuquerque and is expected to be completed by the end of CY2005. The first NIPTC governance board meeting was held this reporting period. The governance board consists of employees from OST, BIA, MMS, BLM, the U.S. Fish and Wildlife Service National Conservation Training Center and DOI University. At this meeting, the board discussed its roles, responsibilities and objectives. It plans to meet on a quarterly basis.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                    **Indian Fiduciary Trust Training Program**

## Delays and Obstacles

The lack of Internet access inhibits electronic communication with other governmental agencies and contractors, hinders the research of training tools and potential contractors, and restricts OST's ability to access online training programs.

## Assurance Statement

I concur with the content of the information contained in the Indian Fiduciary Trust Training Program section of the *Status Report to the Court Number Twenty-Three.*  The information provided in this section is accurate to the best of my knowledge.

Date:   October 20, 2005

Name: *Signature on File*
        Dianne M. Moran
        Director, Trust Training
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                                           **Risk Management**

## 4.    RISK MANAGEMENT

### Introduction

The objectives of the risk management initiative are to design, deliver, and implement a comprehensive risk management program that includes extensive management controls for monitoring and evaluating Interior's Indian trust asset management program. The risk management program continues to be implemented by TPMC. OTRA monitors and evaluates management corrective action plans to mitigate control deficiencies.

### Accomplishments and Completions

During this reporting period:

- Training was provided to staff with responsibilities for conducting risk self-assessments at OST, MMS and the BIA pilot agencies.
- OST (with the exception of the Trust Beneficiary Call Center) completed risk self-assessments utilizing RM-PLUS.
- The new BIA processes were incorporated into the RM-PLUS tool and both Concho and Anadarko agencies completed their risk self-assessments utilizing RM-PLUS.
- MMS completed manual risk self-assessment.

### Current Status

OST continues to work with OSM and BLM on the use of the RM-PLUS tool.

### Delays and Obstacles

The lack of Internet access complicates the implementation and use of RM-PLUS, since it is designed as a web-based application.

### Assurance Statement

I concur with the content of the information contained in the Risk Management section of the *Status Report to the Court Number Twenty-Three.* The information provided in this section is accurate to the best of my knowledge.

Date:   October 27, 2005

Name: *Signature on File*
         John Bennett
         Acting Deputy Special Trustee, Trust Accountability
         Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                                    Regulations, Policies and Procedures

## 5.    REGULATIONS, POLICIES AND PROCEDURES

### Introduction

OTP in OST was established on April 21, 2003, to assist Interior in establishing "consistent, written policies and procedures for trust fund management and accounting" as stated in the 1994 Act.  OTP oversees and facilitates the development, promulgation and coordination of trust-related regulations, policies, procedures and other materials to guide the proper discharge of Interior's fiduciary responsibilities.  OTP is separate from BIA's PPA, which is responsible for policies, procedures and regulations affecting all BIA activities.  PPA activities thus are reported in the BIA section of the reports to the Court.

### Accomplishments and Completions

**25 CFR 124 – Deposits of Proceeds of Lands Withdrawn for Native Selection under the Alaska Native Claims Settlement Act.**  The final rule was published in the Federal Register early in this reporting period.

The Disbursing DOP was completed and issued.

### Current Status

OTP continues to develop the draft OST Directives System Handbook.  Publication of the handbook now is expected by the end of the second quarter of FY2006.

Work continues on the Reporting and Reconciliation DOP.  Completion and issuance now is expected during the next reporting period.  Work, including a site visit to the Osage Nation, continued on an Osage DOP for account maintenance and disbursement because of statutes and regulations unique to the Osage Tribe.  Completion is expected by the end of CY2005.

**25 CFR 1200 – American Indian Trust Fund Management Reform Act.**  Technical amendments to this rule have been prepared and are awaiting final internal approval.  Publication is expected by the end of CY2005.

### Delays and Obstacles

Lack of access to the Internet and its repository of online statutes, the Federal Register and other resources continues to present challenges to this office.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                    **Regulations, Policies and Procedures**

**Assurance Statement**

I concur with the content of the information contained in the Office of Trust Regulations, Policies and Procedures section of the *Status Report to the Court Number Twenty-Three*.  The information provided in this section is accurate to the best of my knowledge.


Date:   October 19, 2005

Name: *Signature on File*
        Philip Viles, Director
        Office of Trust Regulations, Policies and Procedures
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                                                    **Appraisal**

### D.    FIELD OPERATIONS

### 1.    APPRAISAL

__Introduction__

The Office of Appraisal Services, under a management contract with NBC-ASD, is responsible for Indian land valuations.  The contract was established to provide impartial estimates of market value for a variety of real property interests on land owned in trust or restricted status by individual Indians, Alaska Natives, and Indian Tribes.  Various regulations governing Indian trust lands require valuations.  To meet this requirement, an appraisal or other valuation method is used to determine fair market value of Indian lands.

__Accomplishments and Completions__

The position of Regional Supervisory Appraiser for the Eastern Region was filled during this reporting period.  OAS filled three permanent review appraiser positions in the Great Plains and Northwest Regions.  Selection is pending for a permanent review appraiser position in the Rocky Mountain Region.

The Chief Appraiser has received approval to proceed with the creation of the Office of Minerals Evaluation within ASD (previously reported as the Indian Minerals Valuation Unit).  OME will establish the line of authority for mineral appraisals and will perform mineral evaluation services for clients in support of ILCA.

A national appraisal conference for all OAS appraisers and staff was held in August 2005.  This conference included continuing appraisal education concerning the Uniform Appraisal Standards for Federal Land Acquisitions as well as presentations concerning valuations of rights-of-way, minerals evaluations and records management.

__Current Status__

The Deputy Chief Appraiser position was re-advertised during this reporting period and a selection is expected during the next reporting period.

ASD, in coordination with OST, continues to conduct a comprehensive analysis of OAS staff and training requirements.  Temporary review appraiser positions are being added in the Alaska, Rocky Mountain and Western Regions, to help reduce the backlog in those areas.  In addition, budgetary and workload analysis is being conducted to determine the appropriate number of permanent review appraisers.

An updated department-wide appraisal handbook, which incorporates the OAS handbook section, was completed in draft form and is now being circulated for comment within Interior.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                                                    **Appraisal**

Work continued on the cooperative effort between OAS and NBC to establish regional contracts with independent contractors to perform appraisals and alleviate backlogs. Efforts continue to streamline the requisition and outsourcing process. The scope of work for the previously-reported blanket purchase order for the Northwest Region was completed, and is being expanded into a multi-region approach.

**Appraisal Backlog**

As of this reporting period, the appraisal backlogs are as follows:

|  | Appraisal Backlog As of 6/30/05 | Appraisal Backlog * As of 9/30/05 |
|---|---|---|
| Northwest | 402 | 470 |
| Rocky Mountain | 592 | 811 |
| Midwest | 38 | 43 |
| Western | 42 | 37 |
| Southwest | 27 | 13 |
| Eastern Oklahoma | 51 | 68 |
| Navajo | 21 | 15 |
| Pacific | 2 | 0 |
| Alaska | 293 | 325 |
| Eastern | 0 | 0 |
| Southern Plains | 11 | 4 |
| Great Plains | 10 | 10 |
| **TOTAL** | **1,489** | **1,796** |

> \* The backlog includes all appraisal requests from BIA whether or not they are required for a proposed transaction. The requests are addressed in priority order based on factors such as court-ordered transactions, economic transactions, and rights-of-way transactions. The remaining requests for which no transaction is pending may appear on the backlog list until appraisal staff has completed priority assignments.

This table does not include appraisal backlog information from the compacted and contracted Tribes. The MOUs that are currently being negotiated with Tribes require quarterly reporting of backlog information. This information is expected to be incorporated into future reports to the Court.

**Delays and Obstacles**

The inability to utilize the Internet as a tool to communicate with outside contacts to research comparable sales and other information is a continuing hardship.

Difficulties continue in recruiting qualified appraisers for permanent, temporary and contract positions, particularly in remote locations.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                                                **Appraisal**

### Assurance Statement

I concur with the content of the information contained in the Appraisal section of the *Status Report to the Court Number Twenty-Three.* The information provided in this section is accurate to the best of my knowledge.

Date:   October 20, 2005

Name:   *Signature on File*
            Brian M. Holly, MAI
            Appraisal Services Directorate
            National Business Center

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                                          **Current Accounting Activities**

E.    **TRUST SERVICES**

1.    **CURRENT ACCOUNTING ACTIVITIES**

<u>Introduction</u>

Current accounting activities focus on:  a) whereabouts unknown accounts; b) trust funds accounting system; c) special deposit accounts; d) small balance accounts; and e) accounting discrepancies.

WAU are classified as such for various reasons, including (a) new accounts established without an address, (b) mail returned for invalid address and (c) account holder refused or did not claim mail.  A variety of methods and means are used to locate WAU account holders.

TFAS is a generic term for a COTS trust fund accounting system that provides the basic receipt, accounting, investment, disbursing and reporting functions common to commercial trust funds management operations.

SDA are temporary accounts for the deposit of trust funds that cannot immediately be credited to the proper account holders.  As explained in the BIA/OST Interagency Procedures Handbook, this type of account is to be used only as an exception to the rule that trust funds immediately be deposited to the credit of, and then distributed as soon as practicable to, the individual and tribal beneficiaries.  The SDA project has two sub-projects: the retrospective (pre-January 1, 2003 receipts) and the prospective (post-December 31, 2002 receipts) phases.  OHTA has responsibility for "resolution" (i.e., research and distribution of funds) of the retrospective phase, while BIA has comparable responsibility for the prospective phase.  This section of the report to the Court thus addresses only the prospective phase.

Small balance accounts are defined as those with balances of $.01 - $1.00 and no activity in the preceding eighteen months.  Management expenses for these accounts are considerable, in part because (as directed by Congress) annual statements must be sent to these account holders.

Various accounting discrepancies that existed prior to the conversion to TFAS still need research and resolution.  Some may impact individual accounts.  At present, OST has a daily and monthly reconciliation process in place to ensure that transactional reporting to Treasury is accurate and that any discrepancies are researched and reconciled during the next accounting period.  While this process ensures resolution of current discrepancies in timely fashion, separate research and reconciliation efforts are needed to address the pre-TFAS discrepancies.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                                    **Current Accounting Activities**

### a.    Whereabouts Unknown Accounts

**Accomplishments and Completions**

During this reporting period, TPMC staff conducted one WAU beneficiary outreach at the Daybreak Pow Wow in Seattle, WA.  As a result of this outreach effort, TPMC received current addresses for 36 WAU account holders.

OST hired a contractor during the last reporting period to focus on securing current addresses for, or determining the status of, WAU accounts with the large account balances.

**Current Status**

Priority continues to be placed on securing current addresses for account holders of the rolling top 100 highest dollar balance WAU accounts.  During this reporting period, 16 of the top 100 WAU accounts, with combined account balances in excess of $1.5 million, were updated with current addresses.

During this reporting period, 2,040 accounts with a combined balance of $1 million were added to the WAU list, and 4,601 account holders with a combined balance of $6 million were located. As of September 30, 2005, there were 46,630 WAU accounts with a combined balance of $65,247,914.  The following table illustrates the number of accounts stratified by account balance and WAU category:

| Account balance | Correspondence/ Check Returned | Account Setup No Address | Awaiting Address Confirmation | Refused/ Unclaimed Mail | Total |
|---|---|---|---|---|---|
| Equal to or over $100,000 | 18 | 9 | 0 | 0 | 27 |
| Under $100,000 and equal to or over $50,000 | 34 | 13 | 0 | 0 | 47 |
| Under $50,000 and equal to or over $5,000 | 2,072 | 805 | 0 | 1 | 2,878 |
| Under $5,000 and equal to or over $1,000 | 6,568 | 1,579 | 2 | 8 | 8,157 |
| Under $1,000 and equal to or over $100 | 8,222 | 3,279 | 3 | 2 | 11,506 |
| Under $100 and equal to or over $1 | 11,842 | 4,767 | 9 | 5 | 16,623 |
| Under $1 | 3,373 | 4,005 | 10 | 4 | 7,392 |
| **Total** | 32,129 | 14,457 | 24 | 20 | 46,630 |

**Delays and Obstacles**

The influx of WAU accounts categorized as "Account Setup No Address" causes the total number of WAU accounts to remain relatively constant.  These accounts primarily result from a

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                                 **Current Accounting Activities**

lack of current addresses for individual heirs named in probate orders or recipients of per capita distributions.  Also, accounts are being created in TFAS for non-financial asset owners in order to generate asset statements.  Many of these owners do not have current addresses.  As a result, the total number of WAUs is expected to increase significantly.

There presently are 17,836 supervised IIM account holders (minors, emancipated minors, adults in need of assistance, and non-compos mentis) coded as WAU.  Updating supervised account addresses coded as WAU presents a challenge, since BIA Social Services must verify and update the address changes to these accounts.

The lack of Internet access limits communication effectiveness.  OST and its contractor must rely primarily on mail and telephone communication with IIM account holders.

### b.        Trust Funds Accounting System

**Accomplishments and Completions**

On June 30, 2005, a conversion of the real property asset information for the Concho and Anadarko pilot agencies was completed.  During this reporting period, asset statements for those individuals who have real property held in trust at Concho and Anadarko were produced and mailed in conjunction with the quarterly IIM account statements to the accountholders who have a valid address on TFAS.

**Current Status**

Testing commenced using TFAS to do the real property income allocation based upon the beneficial title interest recorded in TAAMS.  It is anticipated that this process will be put into production during the next reporting period.

### c.        Special Deposit Account Activity

**Current Status**

BIA has the responsibility for distribution of SDA funds received since January 1, 2003 (prospective receipts).  It is the policy of BIA to distribute funds within 30 days of receipt into SDA.  During this reporting period, there were 4,587 receipt transactions posted to SDA.  Of these, 177 were undistributed and aged more than 30 days as of September 30, 2005.

During this reporting period, aged funds were held in 278 fewer SDA than in the previous reporting period.  Undistributed aged receipts decreased by 3,011 and the combined dollar amount decreased by $1,589,630.45.  As of September 30, 2005, funds were held in SDA with a combined dollar amount of $1,542,462.69, which represented 1,398 undistributed receipts aged over 30 days from January 1, 2003, through September 30, 2005.  As of September 30, 2005, there were 556 receipts in 170 SDA aged more than one year for a combined dollar amount of $586,362.89.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                                    **Current Accounting Activities**

During this reporting period, OST concentrated on assisting BIA staff in performing work necessary to distribute aged receipts (over 30 days) at the Fort Belknap, Pima, Yakama, Fort Hall and Eastern Navajo agencies.  OST staff and contractors spent a combined eight weeks at these agencies.  Through these efforts, in coordination with the efforts of BIA, aged receipts totaling $622,000 were distributed from SDA during the reporting period.

During this reporting period, OST contractors also continued to assist the Fort Belknap Agency to reduce its backlogs by encoding probate orders into BIA's IRMS.  Reducing backlogs assists agencies with their SDA distribution efforts.

**Delays and Obstacles**

Some BIA agencies still are not utilizing StrataVision to obtain current aging reports to assist in the monitoring and management of their SDA receipt activity.  OST continues to make training available to encourage the use of StrataVision.

### d.        Small Balance Accounts

As of September 30, 2005, there were 14,995 accounts that have a $.01 - $1.00 balance with no activity for the previous 18 months.  The total sum included in those accounts is $2,043.58.  Statements are sent to account holders for these accounts on an annual basis pursuant to direction from Congress.

### e.        Accounting Discrepancies

Interior has submitted an OMB approved legislative proposal to resolve the difference between the subsidiary account ledger (liabilities) and the IIM investment pool (assets), of approximately $6 million.  However, the proposal has not been acted upon by Congress.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                    **Current Accounting Activities**

**Assurance Statements**

I concur with the content of the information contained in the Accounting Discrepancies subsection of the Current Accounting Activities section of the *Status Report to the Court Number Twenty-Three*. The information provided in this subsection is accurate to the best of my knowledge.

Date:  October 27, 2005

Name: *Signature on File*
       Margaret Williams
       Deputy Special Trustee, Trust Services
       Office of the Special Trustee for American Indians

I express no opinion on the content of the Accounting Discrepancies subsection, above. I concur with the content of the information contained in the balance of the Current Accounting Activities section of the *Status Report to the Court Number Twenty-Three*, and this information is accurate to the best of my knowledge.

Date:  October 27, 2005

Name: *Signature on File*
       John Bennett
       Acting Deputy Special Trustee, Trust Accountability
       Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                    **Trust Regulations, Policies and Procedures**

IV.    **BUREAU OF INDIAN AFFAIRS**

A.    **TRUST REGULATIONS, POLICIES AND PROCEDURES**

**Introduction**

The Office of Planning and Policy Analysis (PPA) in the Office of the Assistant Secretary – Indian Affairs was established on April 21, 2003.  PPA is responsible for developing and promulgating Indian Affairs directives.  PPA is separate from OST's Office of Trust Regulations, Policies and Procedures, whose activities are reported in the OST section of the status reports to the Court.

**Accomplishments and Completions**

**Indian Forest Management Handbook, Volume 4 (Permit Sales of Forest Products) –** The handbook supporting 53 IAM was published during the reporting period and is referenced at 53 IAM 4-H, Permit Sales of Forest Products.

**Current Status**

The following previously-reported regulations are included in the Regulatory Initiative:

- **25 CFR 151 – Land Acquisitions –** The proposed revisions are expected to be published during CY2006.

- **25 CFR 162 – Leases and Permits, Subparts B, G, and H –** The proposed revision of Subpart B and addition of Subparts G and H are expected to be published during CY2006.

- **25 CFR 166 – Grazing Permits –** The proposed revisions are expected to be published during CY2006.

- **25 CFR 216 – Surface Exploration, Mining, and Reclamation of Lands –** A draft of the proposed revisions is expected during CY2006.

**25 CFR 161 – Navajo Partitioned Lands Grazing Permits –** The final rule was published in the Federal Register on October 7, 2005.  This rule is effective January 5, 2006.

**25 CFR 162 – Leases and Permits, Subparts C and D – Residential Leases and Business Leases –** The final rule is expected to be published during the first quarter of CY2006.

**25 CFR 169 – Rights-of-Way Over Indian Lands –** The handbook is expected to be published by the end of CY2005.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                     **Trust Regulations, Policies and Procedures**

**25 CFR 243 – Reindeer in Alaska –** The final rule is expected to be published by the end of CY2005.

**35 BIAM Information Resources Management –** Revisions have been incorporated into a new 60 IAM.  Publication has been delayed due to internal review, which resulted in additional revisions.  Assistant Secretary – Indian Affairs approval is expected by the end of CY2005.  The handbook supporting 60 IAM is now expected to be published during CY2006.

## Delays and Obstacles

Lack of access to the Internet has hindered PPA's ability to research statutes and departmental manuals and makes distribution of documents for review by Tribes more difficult and costly.

## Assurance Statement

I concur with the content of the information contained in the Trust Regulations, Policies and Procedures – BIA section of the *Status Report to the Court Number Twenty-Three*.  The information provided in this section is accurate to the best of my knowledge.

Date:   October 24, 2005

Name:  *Signature on File*
        Bruce Blanchard
        Director, Office of Planning and Policy Analysis
        Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                                                    **Fractionation**

## B.    FRACTIONATION

### Introduction

Fractionation of Indian trust and restricted land stems from the federal Indian policy of the 19th Century.  Fractionation occurs as land passes from one generation to the next and more and more heirs or devisees acquire an undivided interest in the land.  This is a complex and potentially emotionally-charged issue, due primarily to cultural differences, historical legacy and family associations of the present owners with the original Indian owners of those lands.  Efforts to address this complex issue are coordinated primarily through the BIA Indian Land Consolidation Office, which seeks to help Tribes make use of the opportunities offered by the Indian Land Consolidation Act, as amended in 2004.  ILCO is operating several acquisition projects and, from there, a nationwide plan is being implemented to promote consolidation of the ownership of Indian land.

### Accomplishments and Completions

- Acquired 21,403 fractional interests during this reporting period, for a cumulative total of 183,992 interests for ILCP in the Midwest, Northwest, Western, Eastern Oklahoma, Navajo, Rocky Mountain and Great Plains Regions.
- Of the total interests acquired, 87% were interests of less than 2% ownership in the respective tracts of land.
- Acquired a cumulative total equivalent of 191,603.67 acres for the project reservations.

### Current Status

ILCO continued to manage active acquisition programs for 18 reservations within seven BIA regions until the end of the fiscal year.  ILCO had expended all funding available to acquire fractionated interests by June 1, 2005.  ILCO received $10.22 million from OST to continue acquisition activities.  Presently, all acquisition sites are wrapping up activities for FY2005 and preparing for acquisitions during the next fiscal year, subject to available funding.

Due to the volume of beneficiary requests to sell their land interests, the annual appropriations for purchases are expected to be exhausted before the end of the FY2006.  If funds are exhausted, ILCO expects to seek additional funding and use its program staff to prepare for acquisitions during FY2007.

Current ILCP activities include:

- Preparing to implement ILCO's national expansion strategy in FY2006;
- Preparing to target and acquire additional *Youpee* interests in FY2006;
- Field testing of LCTS was completed on October 4, 2005.  ILCO is working with AS-IA CIO to finalize acceptance and resolve any remaining developmental issues.  ILCO has scheduled staff training to begin the last week of October 2005.  Full implementation is expected by the

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                                           **Fractionation**

end of the first quarter of FY2006.
- Testing of the MAD/LCP has been completed for all twelve reservations in the Great Plains Region.

## Delays and Obstacles

- Required support from ILCO to the GPRO and SWRO LTROs to assist with recording ILCP deeds, re-vesting *Youpee* interests, researching ownership files and recording to ownership records reduces the availability of ILCP funds for acquisitions of land interests.
- Probate backlog and *Youpee* issues continue to impede the land-purchase transaction process.
- Lack of Internet access results in slower processing of applications from potential sellers and hinders searches for WAU account holders.

## Assurance Statement

I concur with the content of the information contained in the Fractionation section of the *Status Report to the Court Number Twenty-Three*. The information provided in this section is accurate to the best of my knowledge.

Date:  October 17, 2005

Name: *Signature on File*
        Robert R. Jaeger
        Director, Indian Land Consolidation Office
        Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                                                    Probate

### C.    PROBATE

**Introduction**

Federal law permits Indian owners to pass title to their trust assets by testamentary devise or by intestate succession, and imposes upon Interior the duty of determining the legal heirs.  In order to perform this duty, BIA, OHA and OST must coordinate their work to accomplish the probate process.

**Accomplishments and Completions**

**Case Preparation**

As of the end of this reporting period, 8,300 probate cases were in the case preparation stage.

**Case Adjudication**

In this reporting period, deciding officials received 1,873 cases and issued decisions in 1,573 cases.

**Case Closure**

At the end of this reporting period, 5,221 cases were in the closing stage.  Cases in the closing stage are ones that have been adjudicated but not distributed either in TFAS or LTRO.

**Financial Case Closure**

In this reporting period, OST distributed funds, and closed 1,528 accounts in TFAS representing 1,496 estates.  As of the end of September 2005, TFAS contained 30,236 open estate accounts, which is an increase of 93 from the 30,143 estate accounts at the end of the last reporting period.

**Current Status**

**Probate Case Management and Tracking System**

Each BIA regional office and corresponding agency continued the process of encoding new cases, examining "initial load" cases and making corrections.  Data-cleanup continued for this period, with ProTrac now the source of probate data.

**Probate Handbook**

During this reporting period, a Regulatory Initiative working group drafted language implementing the probate provisions of AIPRA.  Until this initiative is completed, publication of the probate handbook is expected to be deferred.

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                                                                                    **Probate**

### Delays and Obstacles

The following obstacles have been identified as having an impact on the progress of the probate program:

- Lack of access to the Internet, which includes the inability to use electronic mail communication between OHA and BIA/OST;
- Continued fractionation of ownership of Indian lands;
- Numerous initiatives competing for resources (e.g., *Youpee* revestitures, *Cobell* requirements);
- Cultural diversities regarding the subject of death;
- Completion of implementation of the probate reorganization.

### Assurance Statement

I concur with the content of the information contained in the Probate section of the *Status Report to the Court Number Twenty-Three*.  The information provided in this section is accurate to the best of my knowledge.

Date:   October 26, 2005

Name: *Signature on File*
William Titchywy
Acting Special Projects Director
Western Region
Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

November 1, 2005                                    **Acronyms and Abbreviations**

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| 1994 Act (or Act) | American Indian Trust Fund Management Reform Act of 1994 |
| A-130 | Office of Management and Budget Circular A-130 Appendix III |
| ADM | Attorney Decision Makers |
| AFMSS | Automated Fluid Mineral Support System |
| AIPRA | American Indian Probate Reform Act |
| AIRR | American Indian Records Repository |
| ALIS | Alaska Land Information System |
| ALJ | Administrative Law Judges |
| ARO | Alaska Region office |
| ART | Accounting Reconciliation Tool |
| AS-IA | Assistant Secretary-Indian Affairs |
| ASD | Appraisal Services Directorate |
| ATO | authority to operate |
| BIA | Bureau of Indian Affairs |
| BIAM | Bureau of Indian Affairs Manual |
| BISS | Box Index Search System |
| BLM | Bureau of Land Management |
| BOR | Bureau of Reclamation |
| BPA | Blanket Purchase Agreement |
| BRM | Business Reference Model |
| C&A | Certification and Accreditation |
| CARS | Cadastral Automated Request System |
| CDE | Critical Data Elements |
| CFedS | Certified Federal Surveyor |
| CFI | Continuous Forest Inventory |
| CGI | Software vendor successor to TAAMS vendor |
| CGIS | Cadastral Geographic Information Systems |
| CIFTA | Certified Indian Fiduciary Trust Analyst |
| CIFTS | Certified Indian Fiduciary Trust Specialist |
| CIO | Chief Information Officer |
| CIRC | Computer Incidents Response Center |
| CISSP | Certified Information System Security Professional |
| CMS | Credential Management System |
| COTS | Commercial off-the-shelf |
| CPIC | Capital Planning and Investment Control |
| CSIRC | Computer Security Incident Response Capability |
| CSIRT | Computer Security Incident Response Team |
| CSS | Customer StrataStation |
| CTM | Comprehensive Trust Management Plan |
| DAA | Designated Approving Authority |
| DEAR | DOI Enterprise Architecture Repository |
| DDoS | Distributed Denial of Service |
| DLRM | DOI Land and Resource Management |

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                                    **Acronyms and Abbreviations**

| | |
|---|---|
| DM | Departmental Manual |
| DNS | Domain Name Server |
| DOI | Department of the Interior |
| DOP | Desk Operating Procedure |
| DoS | Denial of Service |
| DQ&I | Data Quality and Integrity |
| DRM | Data Reference Model |
| EA | Enterprise Architecture |
| ENA | Eastern Navajo Agency |
| EORO | Eastern Oklahoma Region office |
| ERO | Eastern Region office |
| ESN | Enterprise Services Network |
| FAMS | Facilities Asset Management System |
| FAR | Federal Acquisition Regulation |
| FIMO | Farmington Indian Minerals Office |
| FIPS | Federal Information Processing Standards |
| FISMA | Federal Information Security Management Act |
| FRC | Federal Records Center |
| FRD | Functional Requirements Document |
| FTM | Fiduciary Trust Model |
| FTO | Fiduciary Trust Officer |
| GAO | Government Accountability Office |
| GCDB | Geographic Coordinate Data Base |
| GIS | Geographic Information System |
| GLADS | Great Lakes Agency Database System |
| GPRO | Great Plains Region office |
| GPS | Global Positioning System |
| GSA | General Services Administration |
| GSS | General Support Systems |
| HSPD-12 | Homeland Security Presidential Directive 12 |
| IAM | Indian Affairs Manual |
| IATO | Interim Approval to Operate |
| IEA | Interior Enterprise Architecture |
| IFTR | Indian Fiduciary Trust Records |
| IG | Inspector General |
| IIM | Individual Indian Money |
| IITD | Individual Indian Trust Data |
| ILCA | Indian Land Consolidation Act |
| ILCO | Indian Land Consolidation Office |
| ILCP | Indian Land Consolidation Project |
| InfoDat | Indian Forestry Database |
| Interior | Department of the Interior |
| IP | Internet Protocol |
| IPJ | Indian Probate Judges |
| IPv6 | Internet Protocol Version 6 |

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                    **Acronyms and Abbreviations**

| | |
|---|---|
| IQCS | Incidence Qualification and Certification System |
| IRM | Information Resources Management |
| IRMS | Integrated Records Management System |
| IRS | Internal Revenue Service |
| ISA | Information Security Assessment |
| IT | Information Technology |
| IV&V | independent verification and validation |
| LAN | Local area network |
| LCTS | Land Consolidation Tracking System |
| LR2000 | Legacy Rehost 2000 System |
| LRIS | Land Records Information System |
| LTIC | Land Tenure in Indian Country |
| LTRO | Land Titles and Records Office |
| MA | Major Applications |
| MAD/LCP | Management Accounting Distribution/Land Consolidation Program |
| MADS | Management Accounting Distribution System |
| MMD | Missing Mandatory Documents for Unrestricted Accounts |
| MMS | Minerals Management Service |
| MOU | Memorandum or Memoranda of Understanding |
| MRM | Minerals Revenue Management |
| MRMSS | Minerals Revenue Management Support System |
| MWRO | Midwest Region office |
| NARA | National Archives and Records Administration |
| NBC | National Business Center |
| NILS | National Integrated Lands System |
| NIPTC | National Indian Programs Training Center |
| NIST | National Institute of Standards and Technology |
| NPS | National Park Service |
| NRO | Navajo Region office |
| NWRO | Northwest Region office |
| O&G | Oil and Gas |
| OAS | Office of Appraisal Services |
| OCIO | Office of the Chief Information Officer |
| OHA | Office of Hearings and Appeals |
| OHTA | Office of Historical Trust Accounting |
| OIG | Office of the Inspector General |
| OME | Office of Minerals Evaluation |
| OMB | Office of Management and Budget |
| OSM | Office of Surface Mining |
| OST | Office of the Special Trustee for American Indians |
| OTFM | Office of Trust Funds Management |
| OTP | Office of Trust Regulations, Policies and Procedures |
| OTR | Office of Trust Records |
| OTRA | Office of Trust Review and Audit |
| PAR | Performance Accountability Report |

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                                    **Acronyms and Abbreviations**

| | |
|---|---|
| PLSS | Public Land Survey System |
| PMSO | Project Management Support Office |
| POA&M | Plans of Actions and Milestones |
| Post-QA | Post Quality Assurance |
| PPA | Office of Planning and Policy Analysis |
| PRIS | Production and Response Information System |
| PRO | Pacific Region office |
| ProTrac | Probate Case Management and Tracking System |
| QA | Quality Assurance |
| QC | Quality Control |
| RAF | Recommended Action Forms |
| RAS | Rangeland Administration System |
| RDRS | Royalty Distribution and Reporting System |
| REM | Real Estate Module |
| RFP | Request for Proposal |
| RM-PLUS | Risk Management Assessment/Evaluation tool |
| RMRO | Rocky Mountain Region office |
| ROW | Rights-of-Way |
| SANS | SysAdmin, Audit, Network, Security |
| SCADA | Supervisory Control and Data Acquisition |
| SDA | Special Deposit Accounts |
| SDLC | System Development Life Cycle |
| SMEs | Subject Matter Experts |
| SMS | System Management Servers |
| SOL | Office of the Solicitor |
| SPRO | Southern Plains Region office |
| SSA | Social Security Administration |
| SSM | System Security Manager |
| SSP | System Security Plan |
| ST&E | Security Test and Evaluation |
| STIGs | Security Technical Implementation Guides |
| SUS | System Update Servers |
| SWRO | Southwest Region office |
| TAAMS | Trust Asset and Accounting Management System |
| TAP | Technical Architecture Profile |
| TBCC | Trust Beneficiary Call Center |
| TESC | Trust Executive Steering Committee |
| TFAS | Trust Fund Accounting System |
| TPMC | Trust Program Management Center |
| TRAC | Trust Tracking and Coordination |
| Treasury | Department of the Treasury |
| TRM | Technical Reference Model |
| TRO | Temporary Restraining Order |
| UAT | User Acceptance Testing |
| USGS | United States Geological Survey |

*STATUS REPORT TO THE COURT NUMBER TWENTY-THREE*

**November 1, 2005**                                        **Acronyms and Abbreviations**

| | |
|---|---|
| USPAP | Uniform Standards of Professional Appraisal Practice |
| VBNS | Very High Performance Backbone Network Service |
| VPN | Virtual Private Network |
| WAN | Wide area network |
| WAU | Whereabouts Unknown |
| WRO | Western Region office |

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | | |
|---|---|---|
| ELOUISE PEPION COBELL, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:96CV01285 |
| | ) | (Judge Robertson) |
| DIRK KEMPTHORNE, Secretary of the | ) | |
| Interior, et al., | ) | |
| | ) | |
| Defendants. | ) | |

_____)

**NOTICE OF FILING OF INTERIOR DEFENDANTS'
TWENTY-EIGHTH STATUS REPORT**

Interior Defendants hereby give notice of the filing of their twenty-eighth report due in

accordance with the Order of December 21, 1999.

A copy of the report is attached hereto.

Dated: February 1, 2007          Respectfully submitted,
                                 PETER D. KEISLER
                                 Assistant Attorney General
                                 STUART E. SCHIFFER
                                 Deputy Assistant Attorney General
                                 J. CHRISTOPHER KOHN
                                 Director

                                 /s/ John J. Siemietkowski
                                 ROBERT E. KIRSCHMAN, Jr.
                                 (D.C. Bar No. 406635)
                                 Assistant Director
                                 JOHN J. SIEMIETKOWSKI
                                 Trial Attorney
                                 Commercial Litigation Branch
                                 Civil Division
                                 P.O. Box 875
                                 Ben Franklin Station
                                 Washington, D.C. 20044-0875
                                 Phone (202) 514-3368
                                 Fax (202) 514-9163

## CERTIFICATE OF SERVICE

I hereby certify that, on February 1, 2007 the foregoing *Notice of Filing of Interior Defendants' Twenty-eighth Status Report* was served by Electronic Case Filing, and on the following who is not registered for Electronic Case Filing, by facsimile:

Earl Old Person (*Pro se*)
Blackfeet Tribe
P.O. Box 850
Browning, MT 59417
Fax (406) 338-7530

/s/ Kevin P. Kingston
Kevin P. Kingston



THE SECRETARY OF THE INTERIOR

WASHINGTON

FEB 21 2007

J. Christopher Kohn
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 875
Ben Franklin Station
Washington, D.C. 20044-0875

    Re:    <u>*Cobell v. Kempthorne*</u> *– Status Report to the Court Number Twenty-Eight*

Dear Mr. Kohn:

Enclosed is the Department of the Interior's *Status Report to the Court Number Twenty-Eight (For the Period October 1, 2006 through December 31, 2006).* Please forward a copy to the Court.

My signature on this report reflects my reliance on the assurances of those who have compiled the report that the information contained herein is accurate.

Thank you for your assistance.

                        Sincerely,

                        DIRK KEMPTHORNE

Enclosure

# Status Report to the Court
# Number Twenty-Eight

**For the Period**
**October 1, 2006 through December 31, 2006**



**February 1, 2007**

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                                    **Table of Contents**

<div align="center">

### TABLE OF CONTENTS

</div>

INTRODUCTION ........................................................................................................ 1

I.      OFFICE OF HISTORICAL TRUST ACCOUNTING ................................................ 3

II.     OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS ..................... 9

  A.    TRUST SERVICES – CURRENT ACCOUNTING .................................... 11

  B.    OFFICE OF TRUST RECORDS ................................................................. 15

  C.    TRUST ACCOUNTABILITY ...................................................................... 19

    1.    TRUST BUSINESS PROCESS MODELING .......................................... 19

    2.    TRUST DATA QUALITY AND INTEGRITY ....................................... 21

    3.    INDIAN FIDUCIARY TRUST TRAINING PROGRAM ....................... 25

    4.    RISK MANAGEMENT ........................................................................... 27

    5.    TRUST REGULATIONS, POLICIES AND PROCEDURES ............... 29

  D.    TRUST REVIEW AND AUDIT ................................................................. 31

  E.    OFFICE OF APPRAISAL SERVICES ....................................................... 33

III.    INDIAN AFFAIRS ....................................................................................................... 37

  A.    TRUST REGULATIONS, POLICIES AND PROCEDURES .................... 37

IV.    BUREAU OF INDIAN AFFAIRS ............................................................................... 39

  A.    FRACTIONATION .................................................................................... 39

  B.    PROBATE .................................................................................................... 41

V.    OTHER TOPICS ........................................................................................................... 43

  A.    INFORMATION TECHNOLOGY ............................................................. 43

  B.    CADASTRAL SURVEY ............................................................................ 51

  C.    MINERALS MANAGEMENT SERVICE ................................................. 55

ACRONYMS AND ABBREVIATIONS .......................................................................... 57

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                    **Table of Contents**

*THIS PAGE INTENTIONALLY BLANK*

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                                                 **Introduction**

## INTRODUCTION

This *Status Report to the Court Number Twenty-Eight* (Report) represents the period from October 1, 2006, through December 31, 2006.  The Report is presented for the purpose of informing the Court of actions taken since the issuance of the preceding quarterly report.  The Report includes delays in and obstacles to trust reform activities.  A report on the progress of the historical accounting of individual Indian beneficiary funds managed by Interior is a primary part of the Report.[1]

This Report is prepared in a manner consistent with previous reports to the Court.  Managers from the Office of Historical Trust Accounting, Office of the Special Trustee for American Indians, Office of the Chief Information Officer, Bureau of Indian Affairs, Bureau of Land Management, and Minerals Management Service submit reports on the status of their respective Indian trust activities.

A glossary of acronyms and abbreviations is included in this Report.  The glossary is located at the end of the Report.

---

[1]  This Report contains information on the broad trust reform efforts underway at Interior.  Accordingly, it may include information on reform efforts that are not within the scope of the *Cobell* litigation.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                                    **Introduction**

*THIS PAGE INTENTIONALLY BLANK*

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                    **Office of Historical Trust Accounting**

## I.    OFFICE OF HISTORICAL TRUST ACCOUNTING

### Introduction

OHTA was established by Secretarial Order No. 3231 on July 10, 2001, and is charged with planning, organizing, directing and executing the historical accounting of IIM and tribal trust accounts. OHTA's historical accounting includes all transactions in IIM accounts open on or after October 25, 1994 (the enactment date of the American Indian Trust Fund Management Reform Act), through December 31, 2000. OST has issued quarterly account statements since the end of 2000.

### Current Status

**Land-Based IIM Transactions**

On December 31, 2006, NORC, a statistical contractor to OHTA, issued a Memorandum to supplement its September 30, 2005, report, *Reconciliation of the High Dollar and National Sample Transactions from Land-Based IIM Accounts (All Regions)*, to include the additional reconciliation results for 277 High Dollar transactions, reconciled since September 30, 2005. NORC's update reported no change to the statistical conclusions in its 2005 Report. The Report highlights were reported in *Status Report to the Court Number Twenty-Three*. Under- and over-payments are both small in dollars and number, occur at about the same rate, and the distribution of the differences is statistically equivalent (whether the differences were under or over the recorded amount).

As previously reported, land-to-dollars pilot tests were commenced at the BIA Horton and Colville agencies. These tests are designed to detect whether all surface or subsurface revenues were recorded in the IIM Trust Fund systems. The Horton test has been completed and the statistical analysis and accompanying report is expected to be completed during the next reporting period. The Colville pilot continues and is expected to be completed by the end of FY2007.

**Treasury and GAO Settlement Process**

OHTA continues to research and examine Indian trust records from the pre-1985 Paper Records Era in order to determine the accuracy and reliability of transactions that may be included in Historical Statements of Account. In addition to historical audit and reconciliation studies previously reported, Treasury regularly examined, settled, and certified Indian Service Special Disbursing Agents' accounts containing IIM transactions from the early 1890s through 1920, and GAO performed the same work from 1921 through 1950. Over 20,000 Treasury and 31,000 GAO account settlement packages have been located at the NARA Archives II facility in College Park, Maryland. These packages represent a new opportunity to understand earlier accounting periods.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                    **Office of Historical Trust Accounting**

A stratified random sample of 90 settlement packages was selected from each of the Treasury and GAO periods and reviewed by a professional independent public accounting firm under contract to OHTA. These packages include Certificates of Settlement stating that Treasury and GAO examined the ISSDAs' transactions for the period, including IIM and Tribal Trust Funds, as well as other government-appropriated monies handled by ISSDAs at BIA agencies.

The accounting firm found that the Treasury and GAO auditors checked the collection schedules against leases and other source documents, and checked disbursements against cancelled checks. On the basis of OHTA's examination of documents in the account settlement packages, the accounting firm also found that all errors discovered in the examination, settlement and certification process were resolved consistent with standard accounting practices of the time.

NORC completed its statistical analysis of the sampled ISSDA account settlement packages. Based on its analysis, NORC's findings indicate that Treasury and GAO systematically examined, settled, and certified the balance of ISSDA accounts containing IIM transactions regularly and continually between 1890 and 1950. OHTA expects that NORC will complete its report during the next reporting period.

**Judgment and Per Capita IIM Accounts**

In accordance with the 2003 Plan, Interior has reconciled all transactions in more than 83,000 Judgment and Per Capita IIM accounts. These accounts generally consist of a single credit transaction and periodic interest postings. Because numerous accounts are usually associated with each Judgment or Per Capita distribution, by reconciling a payment in one account, Interior can also reconcile all the related accounts. Because most Judgment and Per Capita IIM accounts have one credit posting and many interest postings, as part of the reconciliation process, Interior recalculated the interest posted to each account.

OHTA continues to perform historical accounting procedures on Judgment and Per Capita IIM accounts. During this reporting period, OHTA reconciled an additional 2,682 Judgment IIM accounts and 216 Per Capita accounts.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                    **Office of Historical Trust Accounting**

Results through December 31, 2006, are summarized in the table below.

| | Judgment Accounts | | Per Capita Accounts | |
|---|---|---|---|---|
| | **Number of Accounts** | **Percent of Total** | **Number of Accounts** | **Percent of Total** |
| Total at December 31, 2000 (including accounts open at or after October 25, 1994, but closed prior to December 31, 2000) | 80,539 | -- | 19,033 | -- |
| Reduction for accounts coded incorrectly as Judgment or Per Capita accounts - | | | | |
|   - Reduction through September 30, 2006 | (901) | -- | (28) | -- |
|   - Reduction identified in this reporting period | (1,820) | -- | -- | -- |
| Total after reductions | 77,818 | 100% | 19,005 | 100% |
| Reconciled January 1, 2001, through September 30, 2006 | (63,012) | (81%) | (17,316) | (91%) |
| Reconciled this reporting period | (2,682) | (3%) | (216) | (1%) |
| Remaining to be reconciled at December 31, 2006 | 12,124 | 16% | 1,473 | 8% |

**Mailings to Judgment and Per Capita IIM Account Holders**

As previously reported, on March 9, 2006, a fourth submission for permission to mail 20,402 Historical Statements of Account was filed with U.S. District Court. The third submission to mail 28,107 Historical Statements of Account was filed on March 24, 2005. Mailing of these 48,509 Historical Statements of Account still awaits approval from the Court.

**System Tests - Confirming Accuracy of Electronic Records Era Accounting**

Data completeness validation is a process consisting of three tests (Transaction Mapping, Balance Comparison, and Account Number Tests), which are designed to detect accounts and transactions missing from the electronic data set, as well as potential posting errors. During FY2006 and continuing in this reporting period, this activity has provided assurance for the accuracy of transactions and accounts in the Electronic Records Era (1985-2000).

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                    **Office of Historical Trust Accounting**

**Interest Recalculation**

To date, interest recalculation (the verification of interest accruals to IIM accounts) has been performed on all reconciled Judgment and Per Capita IIM accounts, as well as Land-Based accounts in the Alaska Region. All semi-annual and monthly interest accruals will be recalculated and compared to actual interest postings in the IIM Trust Fund for each Land-Based IIM account receiving a Historical Statement of Account. An interest factor was determined for each time period by OTFM, may vary by period and is based upon the IIM Trust Fund investment pool earnings.

**OHTA SDA Distribution Project - Undistributed SDA Balances
at December 31, 2002**

SDA are temporary accounts for the deposit of trust monies that could not immediately be credited to the proper owners. The SDA project has two phases: the retrospective (pre-January 1, 2003, receipts) and the prospective (post-December 31, 2002, receipts). OHTA has responsibility for "resolution" (i.e., research and distribution of funds) of the retrospective phase, while BIA has comparable responsibility for the prospective phase. This section of the report to the Court addresses only the retrospective phase.

During this reporting period, 53 SDA involving $206,653 were resolved and distributed. There remain 11,414 SDA involving $16,790,541 to resolve and distribute. Distributions of SDA balances to the owners during the period January 1, 2003, through December 31, 2006, total $42,398,061, including interest of $3,319,329 posted from January 1, 2003, through the date of distribution. Of the SDA remaining at December 31, 2006, 7,965 accounts have balances less than $500 (70% of SDA) involving $661,710 (2.5% of SDA dollar balances). This *Status Report to the Court Number Twenty-Eight* incorporates the addition of 32 SDA to the OHTA SDA population with December 31, 2002, aggregate balances of $377,482.

**Imaging/Coding - Individual Indian Trust Documents**

OHTA and its contractors continue to collect and image IIM transaction documents and encode the data to be used to perform the historical accounting. The imaging process converts the original paper records into electronic images. The coding process captures specific identifying information, such as an IIM account number, from an imaged document so that the imaged document can be retrieved at a later time. A document may consist of several related records (images) that can be grouped together for further analysis. All coded documents are quality-control checked for accuracy before they are loaded into the Accounting Reconciliation Tool for analysis.

In December 2006, OHTA provided revisions to the OHTA draft *Coding and Imaging Manual* (*Manual*), dated November 1, 2004, with proposed changes to OHTA's staff and contractor personnel for comment. These changes reflect necessary updates to coding IIM records and incorporate new coding requirements for tribal records. The *Manual* formalizes the imaging and

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                    **Office of Historical Trust Accounting**

coding process for various Indian trust records. OHTA expects to issue an updated *Manual* during the next reporting period.

During this reporting period, OHTA completed imaging 158,224 IIM pages and loading 41,300 IIM documents into the ART. As of December 31, 2006, ART contained 8.9 million coded IIM images and 6.3 million coded tribal images (15.2 million total coded IIM and tribal images). In addition, 160,625 tribal documents were loaded into ART during this reporting period. These images constitute 2.1 million IIM and tribal documents.

**OHTA's Federal Records Management**

OHTA is currently working with NARA staff on the transfer of the ART data and documentation to NARA's Electronic and Special Media Records Services Division in College Park, MD. Transfer of the system data and system documentation is expected to occur during the next reporting period.

Additionally, during this reporting period, OHTA prepared 75 cubic feet of inactive records to be transferred to AIRR for indexing, and permanent storage and preservation.

**Historical Accounting Plan for Individual Indian Money Accounts**

Interior expects to issue a revised Historical Accounting Plan for IIM accounts during the next reporting period. The 2003 Plan will be revised based on lessons learned from work already completed, court decisions, statistical sampling parameters, accounting costs and congressional funding.

**<u>Delays and Obstacles</u>**

The 109th Congress did not pass an Interior appropriations bill for FY2007, and OHTA is operating under a continuing resolution of $21,353,000 versus the FY2006 appropriation of $56,353,000. If this funding level remains in place, this reduction is a substantial obstacle to historical accounting progress and will extend project completion dates.

**<u>Assurance Statement</u>**

I concur with the contents of the information contained in the Office of Historical Trust Accounting section of the *Status Report to the Court Number Twenty-Eight*. The information provided in this section is accurate to the best of my knowledge.

Date:          January 31, 2007

Name:          *Signature on File*
               Bert T. Edwards, Executive Director
               Office of Historical Trust Accounting

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                    **Office of Historical Trust Accounting**

*THIS PAGE INTENTIONALLY BLANK*

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

February 1, 2007                    **Office of the Special Trustee for American Indians**

## II.    OFFICE OF THE SPECIAL TRUSTEE FOR AMERICAN INDIANS

**Introduction**

The Office of the Special Trustee for American Indians was created by the American Indian Trust Fund Management Reform Act of 1994.  The 1994 Act provides direction to the Department of the Interior on accounting for Indian trust funds and reforming the operation of the Indian fiduciary trust.  The Special Trustee's responsibilities under the Act include creating a comprehensive strategic plan for the operation of the trust and providing oversight of the accounting for Indian trust funds and the reform of the trust.

**Special Trustee's Observations**

**GAO Report**

In December 2006, the United States Government Accountability Office issued a report on the activities of the Office of the Special Trustee for American Indians.  In its report, GAO stated:

> OST has implemented several key trust fund management reforms, but has not prepared a timetable for completing its remaining trust reform activities and a date for OST's termination, as required by the 1994 Act.  OST estimates that almost all key reforms needed to develop an integrated trust management system and to provide improved trust services will be completed by November 2007.

The report goes on to list the critical trust reforms that have been implemented, including the trust funds accounting system, trust asset management system, trust land title system, and OST's ongoing work to validate all BIA systems back to source documents to ensure the integrity of all integrated systems.  Although the report states that almost all reforms will be in place by November of 2007, it is expected that final validation of land titles for non-income producing land interests will not be completed until the end of FY2009.

The primary criticism of OST is that the Comprehensive Trust Management Plan developed in January 2003 did not contain a date by which all the reforms were expected to be completed.  However, as explained in the CTM, it was impossible to know the degree of difficulty or kinds of obstacles that OST might experience in implementing the CTM until more information was known about the local BIA agencies and regional offices.  As a result of the work that has been completed, OST expects to "provide the Congress with a timetable for completing the trust reforms and a plan for future trust fund operations once reforms are completed," as recommended by GAO.  OST expects to have this information available by the end of FY2007 and will so advise the Congress.

GAO also recommended that OST develop a workforce plan that would be implemented following completion of the reform effort.  OST expects to have a workforce plan developed by the end of FY2007.  While the plan will anticipate what an appropriate staffing level should be

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                    **Office of the Special Trustee for American Indians**

following reforms, it must be understood that the plan may be modified in the future to accommodate changes Congress or the Administration might make in the Indian fiduciary trust laws and regulations.

**Trust Reform Initiatives**

During this reporting period, validation and verification of information contained in various BIA systems continued. Conversion of those systems to new software, business processes and procedures to conform to the FTM continued and is expected to be complete for all income producing accounts at BIA agencies by the end of FY2007. Following these conversions, validation and verification activities, primarily at the BIA title plants, is expected to continue through FY2008 for those interests in land that currently are not producing income.

**Congressional Action**

Although Congress has extended the continuing resolution through February 15, 2007, it appears that Congress will continue funding for FY2007 at the same level as FY2006, after the expiration of the continuing resolution. This level of funding would be sufficient to continue the work of OST as planned, including OHTA and ILCP.

**<u>Assurance Statement</u>**

The comments and observations are provided by the Special Trustee for American Indians and reflect the opinion of the Special Trustee only.

Date:   January 29, 2007

Name: *Signature on File*
       Ross O. Swimmer
       Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                    **Trust Services – Current Accounting**

### A.  TRUST SERVICES – CURRENT ACCOUNTING

**<u>Introduction</u>**

Current accounting activities focus on:  (a) the trust funds accounting system; (b) special deposit accounts; (c) whereabouts unknown accounts; and (d) small balance accounts.

One of the mandates implicit in the 1994 Act is to provide adequate systems for tracking and managing trust assets.  Interior converted to a new trust funds accounting system, TFAS, in April 2000.  The system is used by seven of the ten largest commercial trust departments in the United States.  TFAS allows Interior to reconcile with Treasury and value financial assets on a daily basis, invest with Treasury and meet the statement of performance requirements outlined in the 1994 Act.

Interior next converted its title records to an updated, automated title system, TAAMS Title, which was completed in CY2005.  Currently, Interior is in the process of converting the legacy leasing systems to the TAAMS lease management module.  Once locations are converted to the TAAMS lease management module, encumbrance and ownership information is reflected in TFAS.  Then, using the information reflected in TFAS, funds received at the lockbox[2] can be distributed and statements of performance can be generated.

SDA are temporary accounts for the deposit of trust funds that cannot immediately be credited to the proper account holders.  As explained in the BIA/OST Interagency Procedures Handbook, this type of account is to be used only as an exception to the rule that trust funds immediately be deposited to the credit of, and then distributed as soon as practicable to, the individual and tribal beneficiaries.  The SDA project has two sub-projects: the retrospective (pre-January 1, 2003, receipts) and the prospective (post-December 31, 2002, receipts) phases.  OHTA has responsibility for "resolution" (i.e., research and distribution of funds) of the retrospective phase, while BIA has comparable responsibility for the prospective phase.  This section of the report to the Court thus addresses only the prospective phase.

Accounts are classified as WAU for many reasons.  New accounts (for financial and nonfinancial assets) are sometimes established without an address, often as a result of probate.  Sometimes account holder statements are returned due to an invalid address, or an account holder refuses or does not claim mail.  A variety of methods and means are used to locate WAU account holders.

Small balance accounts are defined as those with balances of $.01 - $1.00 and no activity in the preceding eighteen months.  Management expenses for these accounts are considerable, in part because (as directed by Congress) annual statements must be sent to these account holders.

---

[2] "Lockbox" represents the process of using a post office box that the contractor or bank maintains to receive proceeds for the sale or use of trust lands, which are then deposited for distribution to the beneficiaries.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

February 1, 2007                                   **Trust Services – Current Accounting**

### a.    Trust Funds Accounting System

<u>**Current Status**</u>

During this reporting period no additional regions or agencies were converted.  The next scheduled conversion is expected to occur in March 2007.  All regions and agencies are scheduled for conversion by September 30, 2007.  The interface between TAAMS and TFAS allows for quarterly account statements of performance, which include ownership and encumbrance information of trust assets managed at the converted agencies.

### b.    Special Deposit Account Activity

<u>**Current Status**</u>

BIA has the responsibility for distribution of SDA funds received since January 1, 2003 (prospective receipts).  It is the policy of BIA to distribute funds within 30 days of receipt into SDA.  During this reporting period, there were 6,011 receipt transactions posted to SDA.

During this reporting period, aged funds (those held in SDA longer than 30 days) were held in 132 fewer SDA than in the previous reporting period.  Undistributed aged receipts increased by 129.  However, the combined dollar amount decreased by $153,226.47.  As of December 31, 2006, aged SDA totaled $1,076,367.96, which represented 3,374 undistributed receipts.  As of December 31, 2006, there were 726 receipts in 130 SDA aged more than one year totaling $459,335.86.

During this reporting period, OST staff and contractors assisted BIA staff in performing work necessary to distribute aged and current receipts at the Fort Hall, Fort Belknap, Northern Idaho, Eastern Navajo and Wind River Agencies, as well as the Navajo Region and the Federal Indian Minerals Office.

<u>**Delays and Obstacles**</u>

Resolution of SDA totaling over $267,000 is delayed by ongoing activities, including adjudication of range rates, need for cadastral surveys, need for SOL opinions, and other litigation-related matters.

Inability to use the Internet also continues to delay access to information useful to resolving SDA.

### c.    Whereabouts Unknown Accounts

<u>**Current Status**</u>

Priority continues to be placed on securing current addresses for account holders of the rolling

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                        **Trust Services – Current Accounting**

top 100 highest dollar balance WAU accounts. During this reporting period, 9 of the top 100 WAU accounts, with combined account balances in excess of $582,000 were updated with current addresses.

During this reporting period, 4,159 accounts with a combined balance of $1.9 million were added to the WAU list, and 3,200 account holders with a combined balance of $3.8 million were located.

As of December 31, 2006, there were 54,858 WAU accounts with a combined balance of $63,281,709.91. The following table illustrates the number of accounts stratified by account balance and WAU category.

| Account Balance | Correspondence/ Check Returned | Account Setup No Address | Awaiting Address Confirmation | Refused/ Unclaimed Mail | Total |
|---|---|---|---|---|---|
| Equal to or over $100,000 | 12 | 8 | 0 | 0 | 20 |
| Under $100,000 and equal to or over $50,000 | 34 | 12 | 0 | 0 | 46 |
| Under $50,000 and equal to or over $5,000 | 2,163 | 724 | 0 | 1 | 2,888 |
| Under $5,000 and equal to or over $1,000 | 5,717 | 1,422 | 0 | 3 | 7,142 |
| Under $1,000 and equal to or over $100 | 8,288 | 3,015 | 7 | 0 | 11,310 |
| Under $100 and equal to or over $1 | 12,517 | 5,106 | 13 | 2 | 17,638 |
| Under $1 | 4,366 | 11,424 | 23 | 1 | 15,814 |
| **Total** | 33,097 | 21,711 | 43 | 7 | 54,858 |

**<u>Delays and Obstacles</u>**

Due to implementation of the FTM, accounts continue to be created in TFAS for non-financial asset owners in order to generate asset statements. Many of these owners do not have current addresses. As a result, the total number of WAU has increased. After the FTM conversion is completed, however, the rate of increase of WAU is expected to stabilize. The accounts categorized as WAU will then mainly consist of accountholders that cannot be located, accountholders that have moved without a forwarding address, and accounts that are established without an address for heirs of a probate or recipients of per capita distributions.

The lack of Internet access limits communication effectiveness. OST and its contractor must rely primarily on mail and telephone communication with IIM account holders.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

February 1, 2007                                    **Trust Services – Current Accounting**

---

### d.    Small Balance Accounts

**Current Status**

As of December 31, 2006, there were 24,454 accounts that have a $.01 - $1.00 balance with no activity for the previous 18 months.  The total sum included in those accounts is $7,305.34. Statements are sent to account holders for these accounts on an annual basis pursuant to direction from Congress.

**Assurance Statements**

I concur with the content of the information contained in the Whereabouts Unknown Accounts subsection of the Current Accounting Activities section of the *Status Report to the Court Number Twenty-Eight*.  The information provided in this subsection is accurate to the best of my knowledge.

Date:   January 23, 2007

Name:  *Signature on File*
        Bryan Marozas
        Program Manager, Beneficiary Call Center
        Office of the Special Trustee for American Indians


I express no opinion on the content of the Whereabouts Unknown Accounts subsection, above.  I concur with the content of the information contained in the balance of the Current Accounting Activities section of the *Status Report to the Court Number Twenty-Eight*, and this information is accurate to the best of my knowledge.

Date:   January 24, 2007

Name:  *Signature on File*
        Margaret Williams
        Deputy Special Trustee, Trust Accountability
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                    **Office of Trust Records**

### B.  OFFICE OF TRUST RECORDS

## Introduction

The Office of Trust Records was established in 1999 to develop and implement a program for the economical and efficient management of trust records, consistent with the 1994 Act, the Federal Records Act and other statutes and implementing regulations.  The OTR records management program has been developed and implemented, and continues to evolve, to ensure that necessary Indian records are maintained, records retention schedules are consistent with retention needs, and records are safeguarded throughout their life-cycles.

## Accomplishments and Completions

### American Indian Records Repository

The American Indian Records Repository was built by Interior in collaboration with NARA for the purpose of consolidating and preserving Indian records at one NARA regional records center. The facility, located in Lenexa, Kansas, opened in May 2004.  Prior to the opening of AIRR, Indian records were stored in various NARA regional records centers, BIA, and other government facilities across the United States.  All Indian records from the NARA centers have been shipped to AIRR, while records continue to be collected from the other locations for shipment to AIRR.  Indian records are indexed at the AIRR Annex before being transferred to AIRR for storage.  A file level index of the contents of each box is stored in an electronic data base called the Box Index Search System.

Approximately 4,030 boxes of inactive records were moved from BIA/OST field locations to the Lenexa Annex for indexing during this reporting period.  Indexing of approximately 151,675 boxes has been completed as of the end of this reporting period.  Approximately 150,745 indexed boxes have been sent to AIRR for permanent storage.

### Training

OTR provided records management training for 107 BIA and OST records contacts and 51 tribal employees during this reporting period.  OTR provided records management training to Tribes as they requested training.

## Current Status

### Safeguarding Records

As previously reported, since June 2005, NARA has completed remediation of all but six of the previously-reported 283 boxes of inactive records that were damaged or contaminated by mold, mildew, mouse droppings or other adverse elements.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

---

February 1, 2007                                      **Office of Trust Records**

---

The materials NARA could not repair consisted of one box that has about 25% of its contents covered with a tar-like substance; one entire box that had mold and the files are stuck together; and one box of green bar printouts from 1989 oil and gas royalty disbursements that have holes in the printout caused by insects.  Three boxes have extensive water damage and the contents are stuck together.  Although NARA recommended that the documents should not be separated, an independent conservator indicated that it would be possible to salvage some of the information through physical stabilization or recovery of the information through reproduction techniques.

In November 2006, OTR's conservation contractor conducted an in depth review of the box contents and drafted a remediation plan.  OTR has determined that there are two boxes that may contain trust records and should undergo repair/conservation.  The other boxes do not contain trust records and will be stored at the AIRR without remediation treatment.  Based on the contractor's estimate, the remediation and conservation work, which will be labor intensive, is expected to be completed by the end of February 2007.

Also, as previously reported, NARA recommended copying for preservation purposes of maps from eight oversized boxes.  However, several of the large maps are too big for NARA's copiers.  Remediation of these maps by the contractor is expected to be completed by February 2007.  OTR will review the maps once they have been treated and make a determination whether the maps should be copied using other methods.

**Records Retention Schedules**

Records retention schedules for the following BIA electronic records systems were completed in the previous reporting period and were forwarded to NARA in November 2006:  National Irrigation Information Management System, PC Lease, San Carlos Irrigation Project, Document Management Program, and Integrated Transportation Information Management System.  The BIA Geographic Information System records retention schedule continues to await approval by the Archivist of the United States.

Records retention schedules for the following BIA electronic records systems were developed and forwarded to NARA during the last week of December 2006:  Social Services Assistance System, Progeny, Facilities Management Information System, Fee-to-Trust, Identity Information System, National Integrated Oil and Gas Electronic Management System, Timber Sales Accounting and Report Program/Operations Inventory and Colorado River Electrical Utility Management System.

Records retention schedules for the following OST electronic records systems were developed and forwarded to NARA during the last week of December 2006:  Risk Management Plus, Trust Beneficiary Call Center, and Lockbox/Trust Funds Receivable Application.

Paper records retention schedules for the following OST offices were completed during the previous reporting period and were circulated for review by OST managers during this reporting period:  Office of the Principal Deputy Special Trustee; Office of External Affairs; Office of the Chief Information Officer; Office of Budget, Finance and Administration; Office of the Deputy

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                  **Office of Trust Records**

Special Trustee, Trust Accountability; Office of the Deputy Special Trustee, Field Operations; and Office of the Deputy Special Trustee, Trust Services. It now is anticipated that the schedules will be forwarded to NARA in the next reporting period.

### Delays and Obstacles

Lack of Internet access continues to hinder OTR's ability to provide remote access to the record index database for authorized users of the records. If Internet access were available, authorized researchers could conduct their searches from their respective work sites and only visit AIRR when necessary to inspect specific boxes or request documents from specific boxes.

### Assurance Statement

I concur with the content of the information contained in the Office of Trust Records section of the *Status Report to the Court Number Twenty-Eight*. The information provided in this section is accurate to the best of my knowledge.

Date:  January 12, 2007

Name: *Signature on File*
      Ethel J. Abeita
      Director, Office of Trust Records
      Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                    **Office of Trust Records**

*THIS PAGE INTENTIONALLY BLANK*

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                          **Trust Business Process Modeling**

### C.  TRUST ACCOUNTABILITY

### 1.    TRUST BUSINESS PROCESS MODELING

**Introduction**

Interior is working to build a highly effective fiduciary trust services organization by implementing the business objectives contained in the Comprehensive Trust Management Plan. The CTM laid the groundwork for the development of the Fiduciary Trust Model.  The FTM is being implemented to transform the current trust business processes into more efficient, consistent, integrated and fiscally responsible business processes that meet the needs and priorities of the beneficiaries.  Implementation of the FTM is a collaborative effort of BIA, OST, BLM, MMS and OHA, and is integrated with Interior's other trust reform initiatives.

**Accomplishments and Completions**

The draft BIA Procedural Handbook for Minerals has been completed and delivered to BIA for review.  This draft includes procedures and workflows for Fluid and Solid Minerals; Coal; and Sand, Gravel & Aggregates.

During this reporting period, OST reengineering staff provided conversion support for the lockbox receipting process to personnel at 19 BIA locations.  This support includes an overview of the lockbox receipting process, related support systems and reporting tools.

**Current Status**

During this reporting period, drafting began on regulations related to minerals, 25 CFR Parts 200-207.

During the next reporting period, drafting is expected to be completed for BIA review of the following handbooks/chapters related to Land Conveyances (25 CFR 152):  Sales and Exchanges of Tribal Trust or Restricted Land; Negotiated Sales, Gifts and Exchanges of Individually Owned Land; Tribal Tract Purchases; and Consolidation by Sale of Highly Fractionated Tracts.

**Delays and Obstacles**

Lack of Internet access impedes communication with other trust bureaus and offices, and hinders the expansion of reengineered processes that utilize the Internet.  This exacerbates the complexity of reengineering the existing trust business processes.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                              **Trust Business Process Modeling**

**Assurance Statement**

I concur with the content of the information contained in the Trust Business Process Modeling section of the *Status Report to the Court Number Twenty-Eight.*  The information provided in this section is accurate to the best of my knowledge.

Date:   January 23, 2007

Name:  *Signature on File*
           Margaret Williams
           Deputy Special Trustee, Trust Accountability
           Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

February 1, 2007                              **Trust Data Quality and Integrity**

## 2.    TRUST DATA QUALITY AND INTEGRITY

**Introduction**

The success of trust reform depends, in part, on the accuracy of data generated from the maintenance of trust assets, ownership of trust assets, distribution of trust income, and management of trust accounts. The DQ&I project focuses on three primary initiatives. The first initiative is assisting BIA with document encoding into TAAMS Title and TAAMS Leasing. Currently, BIA is converting to TAAMS Leasing, which tracks the use of Indian trust land. BIA completed its conversion to TAAMS Title, used to record Indian trust land title activity.

The second initiative involves the validation and correction of critical data elements (CDE) to their respective source documents. CDE are defined as those trust data elements that are needed to provide: (1) timely and accurate payments to beneficiaries; (2) timely and accurate transaction listings and asset inventories to beneficiaries, and (3) effective management of the assets. Examples of CDE are beneficiary name, account number, tract identification number, and land ownership interests.

The third initiative is implementation of a Post-QA process. The Post-QA process compares the encoded CDE in TAAMS to the CDE in the respective source document(s). The purpose of performing Post-QA is to help ensure the ongoing accuracy of CDE encoded into TAAMS.

**Accomplishments and Completions**

During this reporting period, TPMC's contractors completed:

**Research**

- Research of land ownership interest variances for Yakama (3,284), Uintah and Ouray (11,157) and Pima Agencies (36,981). Land ownership interest variance research compares the landowners' name, ID number and fractional land ownership interest as shown in TAAMS for a particular land tract and like information in a BIA legacy realty system, such as IRMS. Typically, variances were the result of: one system being more current than the other; the same individual having different landowner ID numbers in each system, or the same individual having different fractional land ownership interests in each system. Research was then conducted to identify the cause of the variance and a recommendation was made to the BIA for correction. BIA then is responsible for making any corrections to TAAMS.

- Research of non-enrolled ID number variances for Colorado River (1,401), Fort Yuma (537), Papago (507) and San Carlos Agencies (273).

- Verifying the accuracy of landowner ID numbers associated with 78 probate orders for the SPRO LTRO. The remainder of this task was assumed by BIA.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                    **Trust Data Quality and Integrity**

**Encoding**

- Encoding of surface leases for GPRO LTRO (793) and Fort Yuma Agency (348). Encoding involves entering data into TAAMS. Required information is entered into TAAMS by referring to the original surface lease document and any subsequent modifications.

- Encoding of ROW documents for Uintah and Ouray Agency (235). This task was assumed by BIA.

- Encoding of Global ID updates for SPRO LTRO (730). Historically, some beneficiaries have been assigned multiple landowner ID numbers. Where applicable, current requirements call for one unique landowner ID number to be used in TAAMS. For this task, research was conducted to identify all multiple landowner ID numbers assigned to a beneficiary. BIA then designated one landowner ID number for future use. Then all TAAMS land ownership interests and transactions were linked to the designated landowner ID number.

**CDE Validation & Corrections**

- Performing CDE validation and corrections on 496, for a total of 1,066, Shawnee Agency trust land tracts and corrected 2,666, for a total of 4,615 CDE variances. Completed 163, for a total of 429, Horton Agency land tracts and corrected 423, for a total of 1,036 CDE variances. Finished 723, for a total of 815, Pawnee Agency land tracts and corrected 1,860, for a total of 2,021 CDE variances.

**Post-QA Review**

- Post-QA review implementation at the Alaska LTRO.

**Current Status**

The DQ&I Project staff continue to assist BIA with TAAMS Leasing conversion efforts by:

- Encoding ROW documents for RMRO LTRO (1,919), GPRO LTRO (826), Fort Yuma Agency (111), Papago Agency (71) and Palm Springs Agency (357).

- Encoding 139 surface leases for Papago Agency and 215 oil and gas leases for FIMO.

- Encoding 104 probate orders into RDRS for Concho Agency.

- Applying payment schedules in TAAMS for 227 surface leases at Fort Hall Agency.

- Conducting Post-QA review of land title and realty transactions encoded into the trust

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                     **Trust Data Quality and Integrity**

systems for the following locations:  Anadarko Agency, Concho Agency, Pima Agency, San Carlos Agency, GPRO LTRO, NWRO LTRO, PRO LTRO, RMRO LTRO, SPRO LTRO and SWRO LTRO.  The contractor reviewed 17,639 transactions during the quarter bringing the cumulative total to 100,412 transactions.

**Delays and Obstacles**

Lack of access to the Internet has resulted in:  (1) communication delays; (2) adverse project coordination issues; (3) increased administrative program costs; and (4) the overall DQ&I project being unable to take full advantage of available information technology.

**Assurance Statement**

I concur with the content of the information contained in the Trust Data Quality and Integrity section of the *Status Report to the Court Number Twenty-Eight.*  The information provided in this section is accurate to the best of my knowledge.

Date:  January 23, 2007

Name: *Signature on File*
          John E. White
          Trust Reform Officer, Trust Accountability
          Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                    **Trust Data Quality and Integrity**

*THIS PAGE INTENTIONALLY BLANK*

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

February 1, 2007                    **Indian Fiduciary Trust Training Program**

### 3.    INDIAN FIDUCIARY TRUST TRAINING PROGRAM

**Introduction**

Interior has a continuing responsibility to provide adequate staffing, supervision and training for trust fund management and accounting activities. Fiduciary trust training is essential to the success of Interior's trust reform efforts and forms an integral part of all training for Interior employees who are involved in the management of Indian trust assets.

**Accomplishments and Completions**

The Cannon Financial Institute presented two Certification Review & Tests courses for the *Certified Indian Fiduciary Trust Specialist* certification program to 29 OST, two BIA and one tribal personnel. All 32 passed the exams and were awarded their certifications.

**Current Status**

During this reporting period, Cannon Financial Institute personnel presented:

- One *Indian Fiduciary Trust Principles* course to 23 OST, BIA and tribal personnel. Completion of this course, passing an exam and reviewing a DVD entitled *Fiduciary Concepts* are requirements of the *Certified Indian Fiduciary Trust Analyst* certification.

- Eight specialty courses to 133 OST, BIA and tribal personnel. The specialty courses, *Risk Management, Probate, Trust Accounting, Asset Management*, *Fiduciary Behavior* and *Guardianships* are part of the *Certified Indian Fiduciary Trust Specialist* certification program.

During this reporting period, OST training staff conducted four training sessions for 69 OST, BIA, and contractor staff on the use of TFAS and related systems and reporting programs that include:

- CSS – used to enter, approve and post cash transactions;

- Stratavision – contains daily, weekly and monthly reports from OST systems for viewing by OST and BIA staff;

- Historical Query Database – contains account transaction history going back to 1985; and

- TFR – Trust Funds Receivable – used for tracking lockbox receipts.

OST and BIA staff presented three *Trust Fundamentals* courses to 70 OST, BIA, MMS, BLM, USGS, and tribal staff. This course includes such topics as the history and policy of Indian trust,

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                          **Indian Fiduciary Trust Training Program**

current trust reform activities, job roles and responsibilities, and organization and working relationships.

### Delays and Obstacles

The lack of Internet access inhibits electronic communication with other governmental agencies and contractors, hinders the research of training tools and potential contractors, and restricts OST's ability to access online training programs.

### Assurance Statement

I concur with the content of the information contained in the Indian Fiduciary Trust Training Program section of the *Status Report to the Court Number Twenty-Eight*. The information provided in this section is accurate to the best of my knowledge.

Date:   January 11, 1007

Name:  *Signature on File*
         Dianne M. Moran
         Director, Office of Trust Training
         Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                           **Risk Management**

## 4.    RISK MANAGEMENT

### Introduction

The Deputy Special Trustee, Trust Accountability is responsible for overseeing OST's risk management program, which is implemented by the Trust Program Management Center.

TPMC risk management staff identify and document bureau and office programs, policies, procedures and processes, both trust and non-trust.  TPMC staff also develop, operate and maintain risk-based management tools to support and monitor the risk levels and implementation of corrective actions.  In addition, TPMC staff facilitate regular reviews of programs for OST to provide interim and annual statements of assurance for all trust-related activities.

### Accomplishments and Completions

During this reporting period, statements of assurance for OST-OCIO and the Special Trustee for American Indians were finalized and accepted by PMB.

Statements of work for support of the (1) content and (2) operation and maintenance contracts for the RM-PLUS tool have been developed.  NBC has solicited RFQs for the statements of work.

OST submitted its FY2007 priorities plan to PMB.  The priorities plan identifies the several key steps that must be completed for OST's three-year risk management plan, which is coordinated with Interior's risk management effort for Indian trust.

### Current Status

OST continues to review its RM-PLUS content for compliance with revised OMB Circular A-123 Appendix A requirements.  These revisions became effective in FY2006 and include expanded requirements for documentation, monitoring and reporting.

- During this reporting period, OST submitted draft guidance to PMB for Indian trust bureaus and offices to meet the A-123 requirements.  OST expects that PMB will finalize or update the guidance by the end of the next reporting period.
- RM-PLUS now contains, for management review, all OST corrective action plans as they relate to the findings from internal risk assessments, OIG, GAO, and OST's annual audit.
- As of October 1, 2006, OST had 45 open corrective action plans.  During this reporting period, two plans were closed, 15 were updated, and 10 new plans were opened.
- OST continues to work with BIA's internal controls and planning group, which is responsible for BIA risk management, to enhance BIA's use of RM-PLUS.
- OST expects to continue to work throughout FY2007 with bureaus and offices that have trust content in RM-PLUS.  OST expects to meet with those bureaus and offices during January.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                      **Risk Management**

### Delays and Obstacles

The lack of Internet access complicates coordination among bureaus and offices, and hampers implementation and use of RM-PLUS, since it is designed as a web-based application.

### Assurance Statement

I concur with the content of the information contained in the Risk Management section of the *Status Report to the Court Number Twenty-Eight.* The information provided in this section is accurate to the best of my knowledge.

Date:   January 23, 2007

Name: *Signature on File*
         Margaret Williams
         Deputy Special Trustee, Trust Accountability
         Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

February 1, 2007                    Trust Regulations, Policies and Procedures

## 5.    TRUST REGULATIONS, POLICIES AND PROCEDURES

**Introduction**

The Office of Trust Regulations, Policies and Procedures was established on April 21, 2003, to assist Interior in establishing "consistent, written policies and procedures for trust fund management and accounting," as stated in the 1994 Act. OTP oversees and facilitates the development, promulgation and coordination of trust-related regulations, policies, procedures and other materials to guide the proper discharge of Interior's fiduciary responsibilities. OTP is separate from BIA's Office of Planning and Policy Analysis, which is responsible for policies, procedures and regulations affecting all BIA activities. PPA activities thus are reported in the BIA section of the reports to the Court.

**Accomplishment and Completions**

During this reporting period the Reporting and Reconciliation DOP was approved and issued.

**Current Status**

Final issuance of the Osage Nation Account Maintenance DOP and the Osage Nation Disbursing DOP continued to be delayed due to pre-conversion activities and their impact on DOPs. These DOPs are now scheduled to be completed in the first quarter of CY2007.

OTP staff continues to: work with program offices to become more familiar with program processes; assess the current regulatory climate; and identify those directives which need changes, rescission, and/or reformatting to comply with the OST Directives System Handbook.

**Delays and Obstacles**

Lack of access to the Internet and its repository of online statutes, the Federal Register and other resources continues to present challenges to this office.

**Assurance Statement**

I concur with the content of the information contained in the Office of Trust Regulations, Policies and Procedures section of the *Status Report to the Court Number Twenty-Eight*. The information provided in this section is accurate to the best of my knowledge.

Date:   January 16, 2007

Name:  *Signature on File*
        Philip Viles
        Director, Office of Trust Regulations, Policies and Procedures
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                    **Trust Regulations, Policies and Procedures**

*THIS PAGE INTENTIONALLY BLANK*

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                        **Trust Review and Audit**

### D.  TRUST REVIEW AND AUDIT

**<u>Introduction</u>**

OTRA reports directly to the Special Trustee for American Indians.  OTRA was created by OST as a response to trust initiatives developed during the tribal consultation process of 2002.  OTRA conducts performance audits, examinations and reviews of Interior entities as well as Tribes that manage fiduciary trust activities.  Examinations are routinely conducted at locations that perform trust operations, and are planned to result in a performance rating.  Also, compliance reviews are undertaken in response to information and complaints received from beneficiaries, employees and the public.

**<u>Current Status</u>**

**Indian Trust Examinations**

The Indian trust examination process includes conducting on-site visits to evaluate operations and compliance, performing sufficient testing to verify the integrity of trust operations, and analyzing the effectiveness of management and management controls.  Based upon the results of an examination, OTRA assigns an overall rating reflecting the quality of the administration of fiduciary trust functions.  OTRA follows up on findings in its reports with regions, agencies, and Tribes.

During this reporting period, OTRA performed trust reviews at four sites, issued 16 trust review draft reports for comment and issued 13 final reports.

**Records Assessments**

The record assessment is a focused evaluation of records maintenance and security.  OTRA completed four trust record assessments and issued 13 final reports.

**Compliance Reviews**

OTRA issued a final report on the results of one investigation of allegations received.  Two reviews are pending with fieldwork and/or report drafting continuing on these cases.

**<u>Delays and Obstacles</u>**

Lack of Internet access impedes OTRA's work processes and its ability to communicate effectively, both internally and externally.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                    **Trust Review and Audit**

**Assurance Statement**

I concur with the content of the information contained in the Trust Review and Audit section of the *Status Report to the Court Number Twenty-Eight.*  The information provided in this section is accurate to the best of my knowledge.


Date:   January 11, 2007


Name:  *Signature on File*
        D. Jeff Lords
        Director, Office of Trust Review and Audit
        Office of the Special Trustee for American Indians

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                    **Office of Appraisal Services**

### E.  OFFICE OF APPRAISAL SERVICES

**Introduction**

The Office of Appraisal Services, under a management contract with NBC-ASD, is responsible for Indian Land valuations.  The contract was established to provide impartial estimates of market value for a variety of real property interests on land owned in trust or restricted status by individual Indians, Alaska Natives, and Indian Tribes.  Various regulations governing Indian trust lands require valuations.  To meet these requirements, an appraisal or other valuation method is used to determine fair market value of Indian lands.

**Accomplishments and Completions**

The Office of Minerals Evaluation within ASD is now fully staffed and delivered approximately 700 valuations of mineral interests for ILCP during the reporting period.

OAS has contracted for development of an automated Indian Trust Appraisal Request Tracking System.  The pilot was successful in the test region, and nationwide roll-out of ITARS is scheduled during the next reporting period.

The final department-wide appraisal policy handbook, which incorporates the OAS handbook section, was distributed during the reporting period.

**Current Status**

The Deputy Chief Appraiser for Policy and Compliance and the Deputy Chief Appraiser for OST continued to implement and enforce consistent standards and practices for OAS operations during the reporting period.  Audits of the workload as well as internal procedural changes have improved OAS's ability to meet deadlines and reduced the backlogs.

OAS has begun working closely with BIA realty staff to improve lines of communication between the two offices and clarify policies for staff to ensure understanding of their respective roles and responsibilities with regard to appraisal requests.

ASD, in coordination with OST, continues to examine OAS operations, make improvements in OAS and monitor OAS staff compliance with training requirements.  The Deputy Chief Appraiser for Policy and Compliance, in consultation with the Appraisal Institute, has designed a training curriculum for appraisal review, which will be offered to all OAS and ASD appraiser staff during the next reporting period.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                    **Office of Appraisal Services**

**Appraisal Backlog**

As of this reporting period, the appraisal backlogs are as follows:

| Region | Appraisal Backlog As of 09/30/06 | Appraisal Backlog * As of 12/31/06 |
|---|---|---|
| Northwest | 0 | 0 |
| Rocky Mountain | 100 | 55 |
| Midwest | 6 | 85 |
| Western | 24 | 0 |
| Southwest | 0 | 0 |
| Eastern Oklahoma | 80 | 91 |
| Navajo | 20 | 16 |
| Pacific | 0 | 0 |
| Alaska | 267 | 277 |
| Eastern | 0 | 8 |
| Southern Plains | 0 | 9 |
| Great Plains | 0 | 10 |
| **TOTAL** | **497** | **551** |

      * The backlog often includes all requests from BIA, even when the property to be appraised has yet to be defined and whether or not an appraisal is required for a proposed transaction. The requests are addressed in priority order based on factors such as court-ordered transactions, economic transactions, and rights-of-way transactions.

This table does not include appraisal backlog information from the compacted and contracted Tribes.  The MOUs that are currently being negotiated with Tribes require quarterly reporting of backlog information.  This information is expected to be incorporated into future reports to the Court.

**<u>Delays and Obstacles</u>**

The inability to utilize the Internet as a tool to communicate with outside contacts to research comparable sales and other information is a continuing hardship.

Difficulties continue in recruiting qualified appraisers for contract positions, particularly in remote locations.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                    **Office of Appraisal Services**

**Assurance Statement**

I concur with the content of the information contained in the Appraisal section of the *Status Report to the Court Number Twenty-Eight.*  The information provided in this section is accurate to the best of my knowledge.

Date:   January 23, 2007

Name: *Signature on File*
        Kathryn J. Gearheard, MAI
        Deputy Chief Appraiser for OST
        Appraisal Services Directorate, National Business Center

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                   **Office of Appraisal Services**

*THIS PAGE INTENTIONALLY BLANK*

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

February 1, 2007                     **Trust Regulations, Policies and Procedures**

III.   **INDIAN AFFAIRS**

A.  **TRUST REGULATIONS, POLICIES AND PROCEDURES**

<u>Introduction</u>

The Office of Planning and Policy Analysis in the Office of the Assistant Secretary – Indian Affairs was established on April 21, 2003.  PPA is responsible for developing and promulgating Indian Affairs directives.  PPA is separate from OST's Office of Trust Regulations, Policies and Procedures, whose activities are reported in the OST section of the status reports to the Court.

<u>Current Status</u>

**Regulatory Initiative –** On August 8, 2006, BIA and the Office of the Secretary proposed to amend several regulations related to Indian trust management (71 FR 45173).  The proposed rule addresses Indian trust management issues in the areas of probate, probate hearings and appeals, tribal probate codes, life estates and future interests in Indian land, Indian land titles of record, and conveyances of trust or restricted land.  On November 1, 2006, BIA and the Office of the Secretary reopened the comment period for an additional 60 days to January 2, 2007, to ensure that all interested parties, including Tribes and individual Indians, have the opportunity to review the proposed rule and prepare their comments (71 FR 64181).

Phase II of the Regulatory Initiative includes tribal consultation and publication of the draft Tribal Trust Fund Accounting and Appeals regulation.  At the close of the initial comment period, the work group began considering and incorporating comments on the draft regulation.

In CY2007, Interior expects to begin Phase III of the Regulatory Initiative.  This phase includes tribal consultation and proposal of the regulations affecting leasing, grazing, land acquisitions and rights-of-way.

**25 CFR 216 – Surface Exploration, Mining, and Reclamation of Lands –** This regulation is undergoing additional program review and revisions by the Indian Affairs Division of Energy and Minerals with SOL assistance.  The regulation now is expected to be proposed and published during the second quarter of CY2007.

**25 CFR 224 – Tribal Energy Resource Agreements –** The Division completed its review of comments on the proposed rule during this reporting period.  A draft of the final rule is expected to be submitted to SOL for review in early February.  The final rule is still expected to be published during the first quarter of CY2007.

**25 CFR 292 – Gaming on Trust Lands Acquired After October 17, 1998 –** The public comment period on the proposed rule was extended to February 1, 2007, in order to receive additional comments.  Because of the extension of the comment period, the final rule now is expected to be published during the second quarter of CY2007.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                    **Trust Regulations, Policies and Procedures**

## Delays and Obstacles

Lack of access to the Internet has hindered PPA's ability to research statutes and departmental manuals and makes distribution of documents for review by Tribes more difficult and costly.

## Assurance Statement

I concur with the content of the information contained in the Trust Regulations, Policies and Procedures – BIA section of the *Status Report to the Court Number Twenty-Eight*.  The information provided in this section is accurate to the best of my knowledge.

Date:   January 19, 2007

Name:  *Signature on File*
        Debbie L. Clark
        Deputy Assistant Secretary – Indian Affairs (Management)
        Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                                          **Fractionation**

### IV.    BUREAU OF INDIAN AFFAIRS

### A.  FRACTIONATION

**Introduction**

Fractionation of Indian trust and restricted land stems from the federal Indian policy of the 19th Century.  Fractionation occurs as land passes from one generation to the next and more and more heirs or devisees acquire an undivided interest in the land.  This is a complex and potentially emotionally-charged issue, due primarily to cultural differences, historical legacy and family associations of the present owners with the original Indian owners of those lands.  Efforts to address this complex issue are coordinated primarily through the BIA Indian Land Consolidation Office, which seeks to help Tribes make use of the opportunities offered by the Indian Land Consolidation Act, as amended in 2004.  ILCO is operating several acquisition projects and, from there, a nationwide plan is being implemented to promote consolidation of the ownership of Indian land.

**Accomplishments and Completions**

- Indian Land Consolidation Program acquired 20,424 fractional interests during this reporting period.
- Of the total interests acquired during this reporting period, 77% were interests of less than 2% ownership in the respective tracts of land.
- ILCP acquired the equivalent of 45,536.09 acres during this reporting period.
- As a result of ILCP purchases, Tribes now have 100% ownership of 223 tracts. (Reconciliation resulted in a correction from 227, as previously reported, to 223 tracts.)

**Current Status**

- ILCP continued to purchase small fractionated interests on highly fractionated tracts.
- ILCP continued to support the Great Plains Region LTRO by assisting with recording ILCP deeds, re-vesting *Youpee*[3] interests, researching ownership files, and recording to ownership records.

---

[3] In 1983, Congress passed the Indian Consolidation Act, 25 U.S.C. §2201, *et seq.* (ILCA) to address the problem of fractionation through inheritance of trust and restricted lands.  ILCA provided that very small, undivided interests could not pass by will or intestacy, but rather would escheat to the tribe with jurisdiction over the interest.  These provisions were held unconstitutional in *Hodel v. Irving*, 481 U.S. 704 (1987).  Congress amended the escheat provision in 1984, but it was again struck down by the United States Supreme Court.  *Babbitt v. Youpee*, 519 U.S. 234 (1997).  The 1984 ILCA amendments allowed landowners to devise fractionated interests in trust property to co-owners.  When challenged in *Youpee*, the Court held the amendments unconstitutional because the limitation on devise and descent "shrinks drastically the universe of possible successors" and most probably excludes lineal descendents.  519 U.S. at 244.  The small fractionated interests that escheated to the tribes under ILCA are often called "*Youpee* interests."  Since 1997, BIA has been working to divest the Tribes of the escheated interests and return the interests to the proper owner.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                                         **Fractionation**

- A total of 16 reservations located in five BIA Regions are participating in ILCP. (Reconciliation resulted in correction from 17, as previously reported, to 16 reservations.)

**Delays and Obstacles**

- Probate and LTRO backlogs and *Youpee* issues continue to impede acquisitions.
- Lack of Internet access results in slower processing of applications from potential sellers and hinders searches for WAU account holders.

**Assurance Statement**

I concur with the content of the information contained in the Fractionation section of the *Status Report to the Court Number Twenty-Eight*.  The information provided in this section is accurate to the best of my knowledge.

Date:   January 19, 2007

Name:  *Signature on File*
          Robert R. Jaeger
          Director, Indian Land Consolidation Office
          Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007** **Probate**

### B. PROBATE

**Introduction**

Federal law permits Indian owners to pass title to their trust assets by testamentary devise or by intestate succession, and imposes upon Interior the duty of determining the legal heirs. BIA, OHA and OST must coordinate their work to complete the probates of Indian estates. Information on the status of probates is contained within the ProTrac system. Each BIA regional office and corresponding agency is responsible for encoding new cases, examining "initial load" cases and making corrections. The majority of the data-cleanup for ProTrac has been completed, which should make ProTrac a more complete source of probate data.

**Current Status**

**Case Preparation**

Case preparation is the initial stage of the probate process. During this stage information is researched and gathered regarding the identity and whereabouts of potential heirs, and an inventory of the trust assets of an estate is prepared. According to ProTrac, 7,658 probate cases are in the case preparation stage.

**Case Adjudication**

Depending on the complexity of the case, probates are adjudicated by OHA Administrative Law Judges, Indian Probate Judges, or Attorney Decision Makers. According to ProTrac, 6,607 probate cases are in the case adjudication stage. As reported by OHA, deciding officials received 1,734 cases and issued decisions in 1,736 cases. OHA reported 4,754 cases pending.

**Case Closure**

Cases in the closing stage are ones that have been adjudicated but not updated in TFAS, LTRO, or the Lease Distribution System. According to ProTrac, there are 3,520 cases in the closing stage and 3,316 cases were closed during this reporting period.

**Financial Case Closure**

Financial case closure is the posting and recording of ownership and distribution of assets after the case has been adjudicated. OST reported that it distributed funds and closed 1,576 accounts in TFAS, representing 1,543 estates. As of the end of December 2006, TFAS contained 31,194 open estate accounts, which is a decrease of 115 from the 31,309 estate accounts at the end of the last reporting period.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                                                 **Probate**

### Delays and Obstacles

The following obstacles have been identified as having an impact on the progress of the probate program:

- Lack of access to the Internet, which includes the inability to use electronic mail communication between OHA and BIA/OST;
- Continued fractionation of ownership of Indian lands;
- Numerous initiatives competing for resources (e.g., *Youpee* revestitures, *Cobell* requirements);
- Cultural diversities regarding the subject of death; and
- Incomplete reorganization of BIA probate program.

### Assurance Statement

I concur with the content of the information contained in the Probate section of the *Status Report to the Court Number Twenty-Eight*.  The information provided in this section is accurate to the best of my knowledge.

Date:   January 25, 2007

Name: *Signature on File*
           William Titchywy
           Director, Probate Division
           Office of Trust Services
           Bureau of Indian Affairs

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

February 1, 2007                                          **Information Technology**

### V.    OTHER TOPICS

### A.  INFORMATION TECHNOLOGY

__Introduction__

This section describes the status of Interior IT systems, particularly the systems that house or provide access to IITD or provide various computing capabilities, including functions critical to the proper administration of the individual Indian trust responsibilities within Interior.  In addition, this section describes various efforts being made to improve IITD security within Interior, pursuant to OMB Circular A-130 Appendix III, and challenges due to no Internet connectivity at four bureaus.

__Accomplishments and Completions__

**Computer Security:**
Interior continues to make progress in enhancing IT security through improvements to the vulnerability scanning process and the re-Certification & Accreditation of systems.  The most noteworthy accomplishments, completions and challenges during the reporting period are described below.

*Prevention and Monitoring*
- An ESN contractor selected a new product to continue the on-going external vulnerability scanning service for Interior.  Interior took the opportunity at this time to make the service available to bureaus for their internal vulnerability scanning solution.

*Policies and Guidance*
- The Interior CIO issued "Fiscal Year (FY) 2006 Assurance Statement for Information Technology (IT) Security" to the Assistant Secretary for Policy, Management and Budget on October 13, 2006.  This report presented the summary assessment of the adequacy of bureau, office, and departmental (common) controls related to information systems and information technology programs.  The CIO noted many "significant" accomplishments, including increased security through centralizing Internet gateways at ESN and enhancements in IT security training.

- The Interior CIO issued "Additional Guidance for the Protection of Personally Identifiable Information (PII) and Department Sensitive Information" to the heads of bureaus and offices and to bureau and office Chief Information Officers on December 15, 2006.  This memorandum directed the bureaus to implement encryption for mobile devices (e.g., laptops and remote workstations/servers) as an interim solution until an Interior-wide encryption product can be procured.

- The Interior CIO issued "Internal Control Review (ICR) Guidance for Fiscal Year (FY) 2007" to the heads of bureaus and offices and to bureau and office Chief Information Officers on December 20, 2006.  This directive provides specific guidance for IT system

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                                **Information Technology**

owners and Bureau Information Technology Security Manager (BITSMs) for conducting annual assessments of the security controls in place for all IT systems contained in DEAR.

- The Interior CIO issued "Trust Asset and Accounting Management System (TAAMS)" to the Deputy Director, Office of Trust Services on December 27, 2006. This memorandum informed the Deputy Director that the TAAMS project would be subject to a project management review performed by OCIO.

- BLM issued two policies during this reporting period that provided system owners and project managers with the upcoming schedule for system C&A, and reminded all system owners of the requirement to apply funding towards sustaining and maintaining security certifications.

*Training and Awareness*
- BLM hosted an OST "Trust Fundamentals" class at its New Mexico State Office as part of its plan to elevate awareness of trust responsibilities and accountability.

**Plan of Action and Milestones[4]:**
- As reported to OMB, Interior has continued to remediate and close out a significant number of weaknesses, eliminating 266 during this reporting period. However, 444 new weaknesses were identified and added; many resulted from self-assessments, independent financial audits and findings based on OIG reports. Interior continues to proactively address the remaining 1,880 open weaknesses.

**IT Systems Architecture:**
- Interior revised the draft Trust Modernization Blueprint to include a more detailed analysis of the data managed by current information systems and how well those systems support the streamlined business processes in the Fiduciary Trust Model.

- The MMS EA Team completed the alignment of five major systems (four MAs and one GSS) with the five DOI/OMB reference models (Business, Performance, Data, Services and Technical).

---

[4] A Plan of Action and Milestones (POA&M), also referred to as a corrective action plan, is a management tool that outlines identified IT security program and system weaknesses, along with the tasks necessary to correct or mitigate them. To facilitate the remediation of weaknesses, the POA&M process provides a means of planning and monitoring corrective actions; identifies those responsible for solving problems; assists in identifying security funding requirements; tracks and prioritizes resources; and informs senior management of the security status of programs and systems.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                                    **Information Technology**

### E-Authentication[5] and HSPD-12[6]:

- The HSPD-12 contract was awarded during this reporting period. Upon awarding the contract, NBC began issuance of smart cards before an OMB-mandated deadline.

### Staffing:

- The following positions were filled during this reporting period:
  - Interior's Security Program Manager, Security POA&M Lead and ZANTAZ Liaison,
  - NBC's CIO,
  - BLM's Deputy CIO, and
  - MMS's IT Security Manager.

### Current Status

### A-130 Certification and Accreditation:

- Of the 36 trust systems that are currently tracked in DEAR, all have full ATO status except the FWS Isolated Realty Network. The ST&E results and documentation for IRN are currently being reviewed. The system is expected to be fully accredited during the next reporting period.

- BIA completed the Trust Active Directory root services C&A package in August 2006. This system provides authentication services for TrustNet, which is the network supporting the disconnected bureaus. A meeting held in December 2006 resolved a majority of the issues without the need to develop an MOU. The remaining issues involve deployment of the system across the trust bureaus. Full accreditation is expected upon resolution of these issues.

- The re-C&A of MMSNet is in the ST&E phase and an MMS contractor completed testing of the system. MMS is awaiting results of the testing.

### ZANTAZ[7]:

- The 25 BLM tapes that were shipped to ZANTAZ, as reported in the previous report, have been received. ZANTAZ informed Interior that they will process the tapes by the end of the next reporting period.

---

[5] E-Authentication is designed to provide a trusted and secure standards-based authentication architecture. This approach would provide a uniform process for establishing electronic identity and eliminate the need to develop redundant solutions for the verification of identity and electronic signatures. E-Authentication's distributed architecture would also allow citizens and businesses to use non-government-issued credentials to conduct transactions with the government.

[6] HSPD-12 would establish a common identification standard for all federal government employees and contractors for physical and computerized systems and data access while providing a roadmap for other applications. The HSPD-12 policy establishes sound criteria for verifying an employee's identity designed to be strongly resistant to identity fraud, tampering, counterfeiting and terrorist exploitation. The standard includes graduated criteria, from least secure to most secure, to ensure flexibility in selecting the appropriate level of security for each application.

[7] ZANTAZ is a contractor that archives emails sent to and from certain bureaus and offices.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                    **Information Technology**

- The contract was awarded in December 2006 for the forensic analysis of the 268 blank BIA tapes documented in the *Status Report to the Court Number Twenty-Five*. The analysis is expected to be completed in the next reporting period.

- The testing of the software to correct the NBC/BLM ZStage[8] irregularity reported in the *Status Report to the Court Number Twenty-Six* has been completed. BLM and ZANTAZ have determined that the upgrade will not correct the irregularity and they continue to work on identifying an alternative solution.

- SOL experienced a ZANTAZ outage from November 18–22, 2006. The outage was the result of a mis-configuration of a ZANTAZ device. No emails were lost since the SOL buffer server captured and re-transmitted all emails that were awaiting transmission to ZANTAZ.

**Training and Awareness:**
- A large number of NBC and MMS systems are due for re-C&A this fiscal year. Therefore, NBC and MMS are providing focused C&A training to management and staff.

**Incidents:**
- On December 28, 2006, four tribal computers, four tribal flash drives and an unknown number of tribal CDs were stolen from a 638[9] tribal office located on Yakama Nation property. This incident was reported to local police and remains under investigation. An OCIO task force continues to evaluate the types and sensitivity of the data involved and determine appropriate response actions.

- OHA reported potential misuse of a laptop computer in December 2006. The incident remains under investigation.

**Reports:**
These reports were among those issued during this reporting period.
- The Interior IG issued "Vulnerability Assessment Report of MMS Third Party Service Provider USinternetworking (USi) (NSM-EV-MMS-0009-2006)" on September 27, 2006. This report presents the results of an evaluation of a contractor system involved in hosting MRM data. In this report, the OIG indicates that the site is "reasonably secure, with security countermeasures commensurate with the data it is hosting."

---

[8] ZStage refers to a mechanism that verifies delivery of emails to the ZANTAZ digital safe. Each message is assigned a value indicating success or failure of delivery.

[9] A "638 Tribe" provides services to tribal members under the Indian Self-Determination and Education Assistance Act, Public Law 93-638 (as amended). This act authorizes Tribes to contract and compact with the federal government to perform certain federal programs.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                              **Information Technology**

- The Interior IG issued "FY2006 FISMA Report (NSM-EV-OIG-0002-2006)" on September 29, 2006.  This report presents the results of the IG's annual evaluation of Interior's IT security program, as required by FISMA.  It noted many "significant" accomplishments, including increased security through centralizing Internet gateways at ESN and enhancements in IT security training.  However, the IG found that challenges still remain in the quality of C&A practices and the implementation of security configuration standards.

- The GAO issued "Agencies Need to Develop and Implement Adequate Policies for Periodic Testing (GAO-07-65)" on October 20, 2006.  This report presented the results of a survey of 24 major federal agencies and their Inspectors General, as well as analysis of their information security policies and procedures.  The GAO determined that agencies have not adequately designed or effectively implemented policies for performing periodic testing and evaluation of information security controls.

## Delays and Obstacles

Like other federal agencies, Interior must address many challenges regarding the integration, performance, funding, security, and data integrity of IT systems.  Interior initiated or completed steps to address some of the challenges reported in this and previous reporting periods.  However, delays and obstacles listed below impede progress in achieving Interior's IT management goals.

### Staffing

- Interior is experiencing high staff and management turnover in critical IT positions, particularly IT security.  Recruitment challenges to attract qualified candidates continue, particularly in light of past litigation impacts.

- During this reporting period, the Interior CIO announced his retirement from federal service and that his last official day would be January 3, 2007.  The Interior Deputy Secretary named the CIO for the Fish and Wildlife Service as the acting Interior CIO effective on January 4, 2007.

- The following positions remain vacant at the end of this reporting period:
  o Interior's Deputy CISO and Security Policy Lead,
  o NBC's Deputy CIO and IT Security Manager,
  o MMS's MRM IT Security Manager,
  o BLM's IT Security Manager, and
  o BIA's CIO and C&A Project Manager.

### Funding and Resources

- Interior continues to operate under a continuing resolution, impacting the ability of Interior to fill personnel vacancies, complete projects and meet deadlines.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                    **Information Technology**

**Denied Internet Access**

Four Interior bureaus and offices (BIA, OHA, OST and SOL) have not been permitted by the Court to have Internet access since December 5, 2001.  Lack of Internet access impedes work processes and the ability to communicate effectively, both internally and externally.  For example:

- Currently the BIA Transportation Division utilizes an application system titled the Integrated Transportation Information Management System to manage and report on the maintenance of roads, bridges and the core transportation infrastructure within Indian country.  ITIMS does not contain any IITD.  However, being offline significantly inhibits BIA's ability to interface with the Tribes, share information and effectively manage millions of dollars in BIA and Federal Highway funds.  The BIA Transportation Office would like to implement a replicated version of ITIMS, which would be totally isolated from TrustNet, but be accessible via the Tribes through a direct connection to the Internet.  Data would be synchronized between the two networks using physical/removable media.  This synchronization and replication would not be necessary but for the Court order.

- On October 16, 2006, the Trust Executive Steering Committee authorized a pilot project to permit additional Tribes to access TrustNet in compliance with federal security requirements.  The Morongo Band of Mission Indians is the first Tribe that Interior is working with under this pilot project.  Under a Memorandum of Understanding and Tribal Use Agreement, tribal employees would have access to an Interior computer and would be treated similarly to federal employees and contractors with access to TrustNet.  All appropriate IT security directives will be extended to the Tribe and its users.  The Morongo Band has agreed to the terms of the Memorandum of Understanding and Tribal Use Agreement as well as unannounced IT security visits, and made all the recommended changes to support physical security requirements requested.  Without the Court order, trust connectivity, such as that sought here, would be less complex, less costly, and could be accomplished more quickly.

- Maintaining security on internal systems is more difficult without access to the Internet for research, reporting, and patch management.

- Policy discussion is hampered due to additional time required in coordinating group discussions via teleconferencing when e-mail collaboration would be more appropriate and timely.

- OMB's e-Government initiative requires agencies to web-enable as many of their applications as possible.  Without internet access, Interior cannot comply with this and other OMB initiatives, like consolidation of agencies' network infrastructures.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                    **Information Technology**

- The concerns over potential future Court-ordered Internet shutdowns or other Court-ordered disruptions has created uncertainty over how to proceed with enterprise initiatives and security improvements. Without connectivity between the disconnected and online bureaus and offices, implementation of true enterprise-wide applications has been difficult. Plans and funding call for only a single instance of an application to service all bureaus and offices. Many of these applications rely upon the internet to service external as well as internal customers. Providing access to the disconnected bureaus and offices would eliminate duplicate systems, networks, and data. Duplicate systems require a significant increase in resources to manually transfer data between the two systems. The possibility of future disruptions also raised concern about Interior's ability to provide services to its non-Interior customers.

- Coordination and dissemination of new policies and training is delayed due to the need to deliver material physically. Even after receipt, considerable re-work is required to tailor web-based training programs to run locally. Courses normally are completed on-line through DOI LEARN, but also must be duplicated in stand-alone CD-ROM and paper forms for the off-line bureaus.

- Ensuring continuity of operations and continuity of government through the implementation of contingency plans requires rapid notification of an event. The lack of Internet access degrades Interior's capabilities to notify all of its bureaus and offices in a timely and efficient manner. Additionally, without remote access, disconnected bureaus and offices will be unable to provide services to their customers in the event of extended contingency periods that may result from pandemics or major natural events.

## Assurance Statement

I concur with the content of the information contained in the Information Technology section of the *Status Report to the Court Number Twenty-Eight*. The information provided in this section is accurate to the best of my knowledge.

Date:   January 25, 2007

Name: *Signature on File*
        Michael J. Howell, Jr.
        Interior Acting Chief Information Officer

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                    **Information Technology**

# THIS PAGE INTENTIONALLY BLANK

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                                            **Cadastral Survey**

### B.  CADASTRAL SURVEY

**Introduction**

Cadastral surveys provide assurance that land boundaries for individual Indian and tribal trust and restricted lands are identified appropriately.  By federal law, surveys of Indian lands are to be performed under BLM's direction and control.  Official surveys, whether preexisting or new, identify the location of land boundaries of Indian trust assets and determine official acreage.  The official surveys are integral to realty transactions, resource management activities, litigation support and the federal system of patent, allotment and land tenure records maintained by BLM and BIA.  Ownership information, distribution of land based trust assets, and management of land-based trust accounts may be related to or based upon information recorded in official surveys.

**Accomplishments and Completions**

**Survey Backlog**

Of the 198 backlogged surveys (pre-FY2005), 164 were completed during FY2006.  The majority of the remaining 34 backlogged surveys are anticipated to be completed by the end of the next reporting period.  Surveys are considered work in progress using a two-year cycle and are not considered backlogged during that time.  Backlogs may occur as a result of litigation, water boundary issues, weather, budget, project scope, etc.  In addition to the 34 backlogged surveys, there are currently 55 surveys in progress for FY2005 and 111 for FY2006.  If the program is funded at 100% of the BIA's 2007 budget justification, 165 surveys have been scheduled to start in FY2007.

**Current Status**

**Certified Federal Surveyor Program (CFedS)**

The BLM Cadastral Program developed CFedS, a certification program for private surveyors.  The certification of state licensed land surveyors is expected to enhance cadastral services under the direction and control of BLM on Indian lands.  It is anticipated that the CFedS program will assure boundary integrity, and should increase the production of marked and documented trust lands and their boundaries.  During this reporting period:

- The beta-test group candidates, selected during the last reporting period, began and completed 70% of their training with the CFedS distance learning modules.  The first examination of the certification process is scheduled for February 2007.

- The CFedS training materials are being enhanced and modified to provide a better product.  Any changes to the program are based upon the input and experiences from the beta-test group.  These changes are reflected in course development and improvements in handout materials.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                              **Cadastral Survey**

**Interior Standards for Indian Trust Lands Boundary Evidence**

The Standards for Indian Trust Lands Boundary Evidence are expected to increase efficiencies in land transactions and boundary issues by establishing standard processes and formal procedures for consulting between title and realty specialists, resource managers and cadastral surveyors on land tenure and boundary issues. The standards should also save money, improve record systems and standardize existing processes. The standards are in final draft format.

BLM submitted the final draft standards through the Assistant Secretary, Lands and Mineral Management, to the Assistant Secretary, PMB for inclusion in the Departmental Directives system. After these standards are incorporated as directives, Interior bureaus and offices will use these standards to improve boundary evidence within Indian Country. During this reporting period, BLM continued the process of incorporating the standards into draft regulations. BLM has also developed a performance tracking system to monitor the use of the standards.

**Implementation of the FTM**

During this reporting period, BLM continued to implement FTM goals. These goals as they relate to cadastral services are: (1) funding and support for the 12 BLM Indian Lands Surveyors located in the BIA Regions; (2) implementation and continued development of the CFedS program; (3) improving and extending the PLSS within Indian Country; and (4) creation of a CGIS to be used as a foundation layer of BIA and tribal GIS, which should include legal land descriptions, ownership status, uses and encumbrances.

A team from BIA, OST, AS-IA and BLM completed an evaluation of the feasibility of providing a geographic interface to the data in TAAMS. This interface should enable users to graphically portray tract boundaries and other land characteristics related to survey records. The team recommends a pilot project that would identify obstacles, validate costs, determine workloads and isolate technical issues associated with the development of the proposed interface.

Elements have been added to the BLM management tracking systems to measure progress and quantify results. These elements account for the number of interactions the BLM entertained with trust clients and the number of boundary evidence certificates issued.

<u>**Delays and Obstacles**</u>

**Disconnection from the Internet**

The Court-ordered disconnection from the Internet continues to hamper communications and service delivery between BLM, BIA, OST and SOL. This includes the way CARS is being implemented and the review of the Interior Standards for Indian Trust Lands Boundary Evidence. BLM's productivity has decreased, and the cost associated with dual networks has caused the cost of survey services to increase. This issue continues to impact BLM's ability to provide cadastral services in an effective and cost efficient manner to its trust clients.

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                    **Cadastral Survey**

**Funding of the FTM**

Proper planning, scheduling and implementation of future FTM work are dependent on funding. The reduced levels of funding provided by the Continuing Resolution for Interior's Fiscal Year 2007 budget is negatively impacting the designed implementation of the FTM initiatives. The BILS program, a key component of the FTM, is currently not funded under the Continuing Resolution. The consultation and expertise provided by the 12 BILS to the 12 BIA Regions in matters of lands, realty and other trust issues is substantial and increasing.

**Assurance Statement**

I concur with the content of the information contained in the Cadastral Survey section of the *Status Report to the Court Number Twenty-Eight*. The information provided in this section is accurate to the best of my knowledge.

Date:  January 25, 2007

Name: *Signature on File*
       Donald A. Buhler
       Chief Cadastral Surveyor
       Bureau of Land Management

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                              **Cadastral Survey**

*THIS PAGE INTENTIONALLY BLANK*

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

February 1, 2007                                    **Minerals Management Service**

## C.  MINERALS MANAGEMENT SERVICE

### Introduction

Minerals Revenue Management, an MMS program, is responsible for collecting, accounting for, and distributing mineral revenues from both federal and Indian mineral leases, and for evaluating industry compliance with laws, regulations and lease terms.  MRM maintains reported information and distributes revenues at the lease level.  BIA maintains individual Indian ownership records that are used to provide information to OST for disbursement of the lease revenues to individual Indian beneficiaries.

### Current Status

**Indian Oil Valuation Rule**

MMS continued with the rulemaking process for the valuation of oil produced from tribal and allotted Indian lands.  The proposed rule was published in February 2006, and the comment period ended in April 2006.  MMS received and reviewed comments from Tribes, industry trade associations, industry producers, and an individual.  MMS decided not to issue the rule as proposed in 2006.  MMS instead is taking separate actions by publishing a final rule containing technical corrections to the existing 1988 Indian Oil Valuation Rule, and by establishing a negotiated rulemaking committee to address issues regarding the "major portion" calculation for oil produced from Indian leases.  In addition, MMS is currently reviewing this final rule to determine if any new information collection requirements exist resulting from the technical corrections.  After publishing any new Information Collection Requests, MMS anticipates publishing the final rule before the end of CY2007.

### Assurance Statement

I concur with the content of the information contained in the Minerals Management Service section of the *Status Report to the Court Number Twenty-Eight*.  The information provided in this section is accurate to the best of my knowledge.

Date:  January 12, 2007

Name: *Signature on File*
       Richard J. Adamski
       Chief of Staff
       Minerals Revenue Management
       Minerals Management Service

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                    **Minerals Management Service**

*THIS PAGE INTENTIONALLY BLANK*

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                    **Acronyms and Abbreviations**

## ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| 1994 Act (or Act) | American Indian Trust Fund Management Reform Act of 1994 |
| A-123 | Office of Management and Budget Circular A-123, Management's Responsibility for Internal Control |
| A-130 | Office of Management and Budget Circular A-130 Appendix III |
| ADM | Attorney Decision Makers |
| AFMSS | Automated Fluid Mineral Support System |
| AIMS | ActivCard Identity Management System |
| AIPRA | American Indian Probate Reform Act |
| AIRR | American Indian Records Repository |
| ALIS | Alaska Land Information System |
| ALJ | Administrative Law Judges |
| ARO | Alaska Region office |
| ARRTS | Appraisal Request and Review Tracking System |
| ART | Accounting Reconciliation Tool |
| AS-IA | Assistant Secretary-Indian Affairs |
| ASD | Appraisal Services Directorate |
| ATO | authority to operate |
| BIA | Bureau of Indian Affairs |
| BIAM | Bureau of Indian Affairs Manual |
| BILS | BLM Indian Lands Surveyors |
| BISS | Box Index Search System |
| BITSM | Bureau Information Technology Security Manager |
| BLM | Bureau of Land Management |
| BOR | Bureau of Reclamation |
| BPA | Blanket Purchase Agreement |
| BRM | Business Reference Model |
| C&A | Certification and Accreditation |
| CARS | Cadastral Automated Request System |
| CDE | Critical Data Elements |
| CFedS | Certified Federal Surveyor |
| CFI | Continuous Forest Inventory |
| CGI | Software vendor successor to TAAMS vendor |
| CGIS | Cadastral Geographic Information Systems |
| CIFTA | Certified Indian Fiduciary Trust Analyst |
| CIFTS | Certified Indian Fiduciary Trust Specialist |
| CIO | Chief Information Officer |
| CIRC | Computer Incidents Response Center |
| CISO | Chief Information Security Officer |
| CISSP | Certified Information System Security Professional |
| CMS | Credential Management System |
| COTS | Commercial off-the-shelf |
| CP&R | Check Payment and Reconciliation |
| CPIC | Capital Planning and Investment Control |

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                    **Acronyms and Abbreviations**

| | |
|---|---|
| CSIRC | Computer Security Incident Response Capability |
| CSIRT | Computer Security Incident Response Team |
| CSS | Customer StrataStation |
| CTM | Comprehensive Trust Management Plan |
| DAA | Designated Approving Authority |
| DEAR | DOI Enterprise Architecture Repository |
| DDoS | Distributed Denial of Service |
| DLRM | DOI Land and Resource Management |
| DM | Departmental Manual |
| DMZ | De-Militarized Zone |
| DNS | Domain Name Server |
| DOI | Department of the Interior |
| DOP | Desk Operating Procedure |
| DoS | Denial of Service |
| DQ&I | Data Quality and Integrity |
| DRM | Data Reference Model |
| EA | Enterprise Architecture |
| ENA | Eastern Navajo Agency |
| EORO | Eastern Oklahoma Region office |
| ERO | Eastern Region office |
| ESN | Enterprise Services Network |
| ETP | Enterprise Transition Plan |
| FAMS | Facilities Asset Management System |
| FAR | Federal Acquisition Regulation |
| FBMS | Financial Business Management System |
| FFMIA | Federal Financial Management Improvement Act |
| FIMO | Farmington Indian Minerals Office |
| FIPS | Federal Information Processing Standards |
| FISMA | Federal Information Security Management Act |
| FMFIA | Federal Managers' Financial Integrity Act |
| FOIA | Freedom of Information Act |
| FRC | Federal Records Center |
| FRD | Functional Requirements Document |
| FTM | Fiduciary Trust Model |
| FTO | Fiduciary Trust Officer |
| FWS | U.S. Fish and Wildlife Service |
| GAO | Government Accountability Office |
| GCDB | Geographic Coordinate Data Base |
| GIS | Geographic Information System |
| GLO | General Land Office |
| GLADS | Great Lakes Agency Database System |
| GPRO | Great Plains Region office |
| GPS | Global Positioning System |
| GSA | General Services Administration |
| GSS | General Support Systems |

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                **Acronyms and Abbreviations**

| | |
|---|---|
| HSPD-12 | Homeland Security Presidential Directive 12 |
| IAM | Indian Affairs Manual |
| IATO | Interim Approval to Operate |
| ICR | Internal Control Review |
| ICRs | Information Collection Requests |
| IEA | Interior Enterprise Architecture |
| IFTR | Indian Fiduciary Trust Records |
| IG | Inspector General |
| IIM | Individual Indian Money |
| IITD | Individual Indian Trust Data |
| ILCA | Indian Land Consolidation Act |
| ILCO | Indian Land Consolidation Office |
| ILCP | Indian Land Consolidation Project |
| IM | Instruction Memorandum |
| InfoDat | Indian Forestry Database |
| Interior | Department of the Interior |
| IP | Internet Protocol |
| IPJ | Indian Probate Judges |
| IPv6 | Internet Protocol Version 6 |
| IQCS | Incidence Qualification and Certification System |
| IRM | Information Resources Management |
| IRMS | Integrated Records Management System |
| IRN | Isolated Realty Network |
| IRS | Internal Revenue Service |
| ISA | Information Security Assessment |
| IT | Information Technology |
| ITARS | Indian Trust Appraisal Request Tracking System |
| ITIMS | Integrated Transportation Information Management System |
| ITRS | Indian Trust Rating System |
| IV&V | independent verification and validation |
| LAN | Local area network |
| LCTS | Land Consolidation Tracking System |
| LMS | Learning Management System |
| LR2000 | Legacy Rehost 2000 System |
| LRIS | Land Records Information System |
| LTIC | Land Tenure in Indian Country |
| LTRO | Land Titles and Records Office |
| MA | Major Application |
| MAD/LCP | Management Accounting Distribution/Land Consolidation Program |
| MADS | Management Accounting Distribution System |
| MMD | Missing Mandatory Documents for Unrestricted Accounts |
| MMS | Minerals Management Service |
| MOU | Memorandum or Memoranda of Understanding |
| MRM | Minerals Revenue Management |
| MRMSS | Minerals Revenue Management Support System |

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                  **Acronyms and Abbreviations**

| | |
|---|---|
| MWRO | Midwest Region office |
| NARA | National Archives and Records Administration |
| NBC | National Business Center |
| NILS | National Integrated Lands System |
| NIPTC | National Indian Programs Training Center |
| NIST | National Institute of Standards and Technology |
| NORC | National Opinion Research Center |
| NPS | National Park Service |
| NRO | Navajo Region office |
| NWRO | Northwest Region office |
| O&G | Oil and Gas |
| OAS | Office of Appraisal Services |
| OCIO | Office of the Chief Information Officer |
| OHA | Office of Hearings and Appeals |
| OHTA | Office of Historical Trust Accounting |
| OIG | Office of the Inspector General |
| OME | Office of Minerals Evaluation |
| OMB | Office of Management and Budget |
| OSM | Office of Surface Mining |
| OST | Office of the Special Trustee for American Indians |
| OTFM | Office of Trust Funds Management |
| OTP | Office of Trust Regulations, Policies and Procedures |
| OTR | Office of Trust Records |
| OTRA | Office of Trust Review and Audit |
| PAR | Performance and Accountability Report |
| PFM | Policy and Financial Management |
| PII | Personally Identifiable Information |
| PIV | Personal Identity Verification |
| PLSS | Public Land Survey System |
| PMB | Policy, Management and Budget |
| PMSO | Project Management Support Office |
| POA&M | Plans of Actions and Milestones |
| Post-QA | Post Quality Assurance |
| PPA | Office of Planning and Policy Analysis |
| PRIS | Production and Response Information System |
| PRO | Pacific Region office |
| ProTrac | Probate Case Management and Tracking System |
| QA | Quality Assurance |
| QC | Quality Control |
| RAF | Recommended Action Forms |
| RAS | Rangeland Administration System |
| RDRS | Royalty Distribution and Reporting System |
| REM | Real Estate Module |
| RFP | Request for Proposal |
| RM-PLUS | Risk Management Assessment/Evaluation tool |

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007**                                    **Acronyms and Abbreviations**

| | |
|---|---|
| RMRO | Rocky Mountain Region office |
| ROW | Rights-of-Way |
| SANS | SysAdmin, Audit, Network, Security |
| SCADA | Supervisory Control and Data Acquisition |
| SDA | Special Deposit Accounts |
| SDLC | System Development Life Cycle |
| SMEs | Subject Matter Experts |
| SMS | System Management Servers |
| SOL | Office of the Solicitor |
| SPRO | Southern Plains Region office |
| SSA | Social Security Administration |
| SSM | System Security Manager |
| SSP | System Security Plan |
| ST&E | Security Test and Evaluation |
| Statements | Historical Statements of Account |
| STIGs | Security Technical Implementation Guides |
| SUS | System Update Servers |
| SWRO | Southwest Region office |
| TAAMS | Trust Asset and Accounting Management System |
| TAP | Technical Architecture Profile |
| TBCC | Trust Beneficiary Call Center |
| TESC | Trust Executive Steering Committee |
| TFAS | Trust Fund Accounting System |
| TPMC | Trust Program Management Center |
| TRAC | Trust Tracking and Coordination |
| Treasury | Department of the Treasury |
| TRM | Technical Reference Model |
| TRO | Temporary Restraining Order |
| UAT | User Acceptance Testing |
| USGS | United States Geological Survey |
| USPAP | Uniform Standards of Professional Appraisal Practice |
| VBNS | Very High Performance Backbone Network Service |
| VPN | Virtual Private Network |
| WAN | Wide area network |
| WAU | Whereabouts Unknown |
| WRO | Western Region office |

*STATUS REPORT TO THE COURT NUMBER TWENTY-EIGHT*

**February 1, 2007** **Acronyms and Abbreviations**

*THIS PAGE INTENTIONALLY BLANK*

**UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| PUEBLO OF LAGUNA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) )  No. 02-24L |
| | )  Judge Francis M. Allegra |
| UNITED STATES OF AMERICA, | ) |
| Defendant. | ) ) ) |

**DEFENDANT'S NOTICE OF FILING OF REPORT CONCERNING INADVERTENT DOCUMENT DESTRUCTION**

Pursuant to Section 4 of the Record Retention Order dated March 19, 2004, Defendant United States hereby submits a report from the Office of the Chief Counsel, Financial Management Service, United States Department of the Treasury (Treasury), which describes the recent, inadvertent destruction of 15 boxes of government records by a records storage contractor to a Treasury contractor. See Defendant's Exhibit ("Def. Exh.") 1. The 15 boxes of government records include documents relating to financial transactions of the United States Department of the Interior and the Bureau of Indian Affairs. Among other things, the report describes the efforts that have been undertaken by the Treasury contractor "to identify the information in the [15] boxes and to reconstruct the documents to the maximum extent possible" and the degree of success, to date, of those efforts. Id. at 1-2.

Respectfully submitted this 9th day of July, 2007,

RONALD J. TENPAS
Acting Assistant Attorney General

s/Robert W. Rodrigues
ROBERT W. RODRIGUES
Trial Attorney

LAURA MAROLDY
Trial Attorney
E. KENNETH STEGEBY
Trial Attorney
MARTIN LALONDE
Trail Attorney
United States Department of Justice
Environment and Natural Resources
Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Telephone:    202.353.8839
Facsimile:    202.305.0506
Email: robert.rodrigues@usdoj.gov

Of Counsel:
Rachel Howard
Office of the Chief Counsel
Financial Management Service
United States Department of the Treasury

Gladys Orr Cojocari
Tom Kearns
Candace Beck
Office of the Solicitor
United States Department of the Interior
1849 C Street, NW
Washington, DC 20240

Jason R. Baron
Director of Litigation
Office of the General Counsel
National Archives and Records
Administration
8601 Adelphi Road, Suite 3110
College Park, MD 20740

# DEFENDANT'S

# EXHIBIT 1



**DEPARTMENT OF THE TREASURY**
FINANCIAL MANAGEMENT SERVICE
WASHINGTON, D.C. 20227
July 9, 2007

MEMORANDUM FOR ANTHONY P. HOANG
                      ROBERT RODRIGUES
                      ENVIRONMENT AND NATURAL RESOURCES DIVISION
                      UNITED STATES DEPARTMENT OF JUSTICE

FROM:               RACHEL HOWARD    *m marquette*
                        OFFICE OF CHIEF COUNSEL  *for*

SUBJECT:       Bank of America Incident

This memorandum is to inform the Department of Justice about an incident involving the erroneous destruction of documents by the contractor of one of its financial agents.

The Department of the Treasury ("Treasury") has a financial agency agreement with Bank of America ("the Bank") under which the Bank processes certain financial transactions involving the Treasury General Account, including deposits and debits for the Department of the Interior ("Interior") and the Bureau of Indian Affairs ("BIA"). One of the Bank's responsibilities as financial agent is to follow Treasury's document retention directives in this case. The Bank has a contractual arrangement with Iron Mountain, a records storage company, whereby the latter stores records associated with the Bank's financial agency agreement with Treasury.

In June 2007, the Bank advised Treasury that Iron Mountain had mistakenly destroyed 15 boxes of government records and 8 boxes of Bank records. According to the Bank, the destruction, which took place in April 2007, resulted from an inadvertent error in coding the proper retention status for the boxes. The Bank advised Treasury that, of the 15 boxes of government records, 14 boxes contained SF 215's (deposit tickets) and SF 5515's (debit vouchers), and one box contained adjustment backup documentation which may or may not have related to Interior transactions. Based on information provided by the Bank and consistent with Treasury Financial Manual requirements that financial agents return copies of transaction-related documents to the respective government agency, Treasury believes that all of the information in these 15 boxes may exist in other government records.

After its initial notice to Treasury, the Bank reported to Treasury that it had been working to identify the information in the boxes and to reconstruct the documents to the maximum extent possible. The Bank has informed Treasury that it has reconstructed the

Page 2 - Bank of America Incident

inadvertently destroyed SF 215's and SF 5515's in the 14 boxes using information in
Treasury's Ca$hLink II system, with the exception of information that may have been in
the agency use field and with the exception of some SF 215's and SF 5515's from some
date ranges which have not yet been reconstructed due to technical issues which Treasury
expects to be resolved. According to the Bank, the documents in the one box containing
adjustment backup information cannot be reconstructed but copies relating to any Interior
transactions should have been returned to Interior. Treasury has asked Interior to check
its files for copies of documents which reflect transactions initiated by BIA.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| JICARILLA APACHE NATION,<br>f.k.a. JICARILLA APACHE TRIBE,<br><br>    Plaintiff,<br><br>    v.<br><br>UNITED STATES OF AMERICA,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. 02-25L
Judge Francis M. Allegra

## DEFENDANT'S NOTICE OF FILING OF REPORT CONCERNING
## INADVERTENT DOCUMENT DESTRUCTION

Pursuant to Section 4 of the Record Retention Order dated March 19, 2004, Defendant United States hereby submits a report from the Office of the Chief Counsel, Financial Management Service, United States Department of the Treasury (Treasury), which describes the recent, inadvertent destruction of 15 boxes of government records by a records storage contractor to a Treasury contractor. See Defendant's Exhibit ("Def. Exh.") 1. The 15 boxes of government records include documents relating to financial transactions of the United States Department of the Interior and the Bureau of Indian Affairs. Among other things, the report describes the efforts that have been undertaken by the Treasury contractor "to identify the information in the [15] boxes and to reconstruct the documents to the maximum extent possible" and the degree of success, to date, of those efforts. Id. at 1-2.

Respectfully submitted this 9th day of July, 2007,

RONALD J. TENPAS
Acting Assistant Attorney General

*s/Robert W. Rodrigues*
ROBERT W. RODRIGUES
United States Department of Justice

Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Telephone:      202.353.8839
Facsimile:      202.305.0506
Email: robert.rodrigues@usdoj.gov

Attorney of Record for Defendant

OF COUNSEL:

LAURA MAROLDY
E. KENNETH STEGEBY
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663

MARGARET MARQUETTE
Chief Counsel
RACHEL HOWARD
Office of the Chief Counsel
Financial Management Service
United States Department of the Treasury
Washington, D.C. 20217

ELISABETH BRANDON
GLADYS ORR COJOCARI
TOM KEARNS
CANDACE N. BECK
Office of the Solicitor
United States Department of the Interior
Washington, D.C. 20240

- 2 -



**DEPARTMENT OF THE TREASURY**
FINANCIAL MANAGEMENT SERVICE
WASHINGTON, D.C. 20227
July 9, 2007

MEMORANDUM FOR ANTHONY P. HOANG
　　　　　　　　　　　ROBERT RODRIGUES
　　　　　　　　　　　ENVIRONMENT AND NATURAL RESOURCES DIVISION
　　　　　　　　　　　UNITED STATES DEPARTMENT OF JUSTICE

FROM:　　　　　　　RACHEL HOWARD　　*m marguette*
　　　　　　　　　　　OFFICE OF CHIEF COUNSEL

SUBJECT:　　　　　　Bank of America Incident


This memorandum is to inform the Department of Justice about an incident involving the erroneous destruction of documents by the contractor of one of its financial agents.

The Department of the Treasury ("Treasury") has a financial agency agreement with Bank of America ("the Bank") under which the Bank processes certain financial transactions involving the Treasury General Account, including deposits and debits for the Department of the Interior ("Interior") and the Bureau of Indian Affairs ("BIA"). One of the Bank's responsibilities as financial agent is to follow Treasury's document retention directives in this case. The Bank has a contractual arrangement with Iron Mountain, a records storage company, whereby the latter stores records associated with the Bank's financial agency agreement with Treasury.

In June 2007, the Bank advised Treasury that Iron Mountain had mistakenly destroyed 15 boxes of government records and 8 boxes of Bank records. According to the Bank, the destruction, which took place in April 2007, resulted from an inadvertent error in coding the proper retention status for the boxes. The Bank advised Treasury that, of the 15 boxes of government records, 14 boxes contained SF 215's (deposit tickets) and SF 5515's (debit vouchers), and one box contained adjustment backup documentation which may or may not have related to Interior transactions. Based on information provided by the Bank and consistent with Treasury Financial Manual requirements that financial agents return copies of transaction-related documents to the respective government agency, Treasury believes that all of the information in these 15 boxes may exist in other government records.

After its initial notice to Treasury, the Bank reported to Treasury that it had been working to identify the information in the boxes and to reconstruct the documents to the maximum extent possible. The Bank has informed Treasury that it has reconstructed the

Page 2 - Bank of America Incident

inadvertently destroyed SF 215's and SF 5515's in the 14 boxes using information in Treasury's Ca$hLink II system, with the exception of information that may have been in the agency use field and with the exception of some SF 215's and SF 5515's from some date ranges which have not yet been reconstructed due to technical issues which Treasury expects to be resolved. According to the Bank, the documents in the one box containing adjustment backup information cannot be reconstructed but copies relating to any Interior transactions should have been returned to Interior. Treasury has asked Interior to check its files for copies of documents which reflect transactions initiated by BIA.

UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| NAVAJO NATION, | ) | |
| f.k.a. NAVAJO TRIBE OF INDIANS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.   06-945 L |
| | ) | Judge Francis M. Allegra |
| UNITED STATES OF AMERICA, | ) | **Electronically filed June 21, 2007** |
| | ) | |
| Defendant. | ) | |

### Defendant's Opposition to Plaintiff's Motion for Entry of Record Retention Order

RONALD J. TENPAS
Acting Assistant Attorney General

ROBERT W. RODRIGUES
Trial Attorney
LAURA MAROLDY
Trial Attorney
E. KENNETH STEGEBY
Trial Attorney
JOHN H. MARTIN
Trail Attorney
United States Department of Justice
Environment and Natural Resources
        Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044 - 0663

# TABLE OF CONTENTS

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I.   Plaintiff Has Failed To Meet The Laguna Test For Entry Of A Record
     Retention Order . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     A.   Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

     B.   Plaintiff has Failed to Meet the Test Established in Laguna . . . . . . . . . . . . . . . . . . . 4

II.  Interior's Actions Since Entry of the Jicarilla and Laguna RROs Eliminate
     the Bases for an Order in Navajo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

     A.   Interior has issued numerous Directives to ensure Preservation of
          Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

          1.   The Acting Deputy Solicitor's March 12, 2007 Departmental
               Memorandum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          2.   Interior Policy Memoranda Regarding the Movement of
               Inactive Records . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

     B.   Opening of the AIRR and the Box Inventory Search System "BISS" . . . . . . . . . . . 10

     C.   Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III. Treasury's Actions Since Entry of the Jicarilla and Laguna RROs Eliminate
     the Bases for an Order in Navajo . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV.  The Material Offered by Plaintiff in its Motion Does Not Justify An RRO . . . . . . . . . . . 14

     Plaintiffs Arguments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

          1.   Hard-Copy Records are Protected and Preserved Under
               Current Regulations, Guidelines, Directives, and Practices . . . . . . . . . . . 16

          2.   The NARA Office of the Inspector General Promptly
               Investigated the NARA Episode to Which Plaintiff Refers;
               and the Lone Individual Responsible Has Resigned . . . . . . . . . . . . . . . . . 17

          3.   The Steven Griles Plea and the March 1, 2007 letter from

Secretary Kempthorne and Attorney General Gonzales to the
U.S. Senate Committee On Indian Affairs, Have No Relevance
To Whether Plaintiff is Entitled to an RRO in this Case . . . . . . . . . . . . .  18

4.    The Ft. Defiance Agency Incident . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

5.    The Reported Thefts from Yakama Tribal Offices Do Not
Demonstrate Any Risk to Navajo Trust Records . . . . . . . . . . . . . . . . . . .  20

6.    The Department of the Treasury Took Prompt and Appropriate
Steps to Mitigate the Effects of the Two Incidents Plaintiff
Identifies; and There is No Indication Navajo-Related Documents
Were Involved . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

7.    Electronic Records  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

V.    Plaintiff's Proposed Retention Order is Burdensome and Misdirected . . . . . . . . . . . . . . . .  27

A.    Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

B.    Plaintiff's Proposed RRO is Ineffective and Overbroad under the
Test of Laguna  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

1.    The PPRO Extends the Review of Inactive Records to Agencies
in Addition To the Department of the Interior . . . . . . . . . . . . . . . . . . . . . .  29

2.    The PPRO Unacceptably Extends to Active Records  . . . . . . . . . . . . . . . .  30

3.    The Time Frames for Completion of Designation and
Review are Substantially Extended, Including No Time
Limits for Designation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

4.    Further Provisions Delaying the Record Review Process  . . . . . . . . . . . .  32

5.    Extraneous Advocacy Provisions  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

C.    The Burdensome Impact of the PPRO on Agencies' Missions  . . . . . . . . . . . . . . .  33

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  40

# TABLE OF AUTHORITIES

**FEDERAL CASES**

Capricorn Power Co., v. Siemens Westinghouse Power Corp.,
    220 F.R.D. 429 (W.D. Pa. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Chambers v. NASCO, Inc.,
    501 U.S. 32 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 40

Cobell v. Kempthorne,
    455 F.3d 301 (D.C. Cir. 2006) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Coleman v. Am. Red Cross,
    23 F.3d 1091 (6th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Herbert v. Lando,
    441 U.S. 153 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

In re Potash,
    1994 WL 1108312 (D. Minn. Dec. 5, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

In re Prudential Ins. Co. Of America Sales Practices Litigation,
    169 F.R.D. 598 (D. N.J. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

Kanemoto v. Reno,
    41 F.3d. 641 (Fed. Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Leyh v. Modicon, Inc.,
    881 F.Supp. 420 (S.D. Ind. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

Mack v. Great Atl. & Pac. Tea Co.,
    871 F.2d 179 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Pueblo of Laguna v. United States,
    60 Fed. Cl. 133 (Fed. Cl. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Quality Aero Tech., Inc. v. Telemetrie Elektronik GmbH,
    212 F.R.D. 313 (E.D.N.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Rincon Band v. United States,
    No. 80-A, 1980 U.S. Ct. Cl. LEXIS 1029 (Ct. Cl. February 29, 1980) . . . . . . . . . . . . . . . 29

Roadway Express, Inc., v. Piper,
    447 U.S. 752 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

iv

Treppel v. Biovail Corp.,
    233 F.R.D. 363 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Williams v. Mass. Mut. Life Ins. Co.,
    226 F.R.D. 144 (D. Mass. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Zubulake v. UBS Warburg LLC,
    217 F.R.D. 309 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

**FEDERAL STATUTES**

44 U.S.C. § 3541 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
Public Law 93 - 638 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

**FEDERAL RULES**

Fed. R. Civ.P. 26 (b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
Fed. R. Civ.P. 26 (b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# Exhibit List

1.      Memorandum of Steven Griles, Deputy Secretary of the Interior, April 6, 2004

1a.     Department Memorandum, March 20, 2002

2.      Memorandum of Steven Griles regarding preservation obligations, July 9, 2004

3.      Memorandum of Steven Griles regarding preservation obligations, July 13, 2004

4.      Memorandum of Steven Griles regarding preservation obligations, October 26, 2006

5.      Memorandum of Lawrence Jensen, Deputy Solicitor, March 12, 2007

6.      Memorandum of James E. Cason, Associate Deputy Secretary, May 5, 2005

7.      Memorandum of Ethel J. Abeita, Director, Office of Trust Records, March 22, 2006

7a.     Memorandum of Chief Information Officer, Office of the Special Trustee for American Indians, February 1, 2007

8.      Declaration by Ethel J. Abeita, June 21, 2007

8a.     Memorandum of Understanding Between the Department of the Interior and the National Archives and Records Administration, September 12, 2003

9.      Declaration from Omar Bradley Regional Director, Navajo Region, June 21, 2007

10.     Memorandum from Ann Meister,  April 1, 2004

11.     FMS Insider

12.     PD Webb

13.     Memorandum of Nancy Fleetwood, February 23, 2007

14.     Memorandum of Richard L. Gregg, February 14, 2006

15.     Memorandum of Kenneth R. Papaj, August 10, 2006

16.     Memorandum of Kenneth R. Papaj, February 16, 2007

17.     Federal Register 43899 regarding BISS, July  29, 2005

18.     FISMA Report FY2006

19.     19th Interior Report, November 1, 2004

20.     20th Interior Report, February 1, 2004 [sic] actual date is 2005

21.     21st Interior Report, May 2, 2005

22.     22nd Interior Report, August 1, 2005

23.     26th Interior Report, July 27, 2006

24.     28th Interior Report, February 1, 2007

25.     29th Interior Report, May 1, 2007

26.     Letter from Jason Baron to Dennis Gingold, September 28, 2005

26 a.   Letter from Jason Baron to Abraham Haspel, September 13, 2005

27.     Letter from Jason Baron to Dennis Gingold, December 9, 2005

28.     25th Interior Report, May 1, 2006

29.     30th Treasury Report

30.     27th Treasury Report

31.     Declaration of Lawrence K. Ruffin, June 21, 2007

32.     Declaration of Rita Bratcher, June 21, 2007

33.     Declaration of Steven Tilley, June 21, 2007

34.     Declaration of Gregory Pomicter, June 21, 2007

35.     DOI Email Policies

36.     Proposed Form of Order

37.     28th Treasury Report

38.     23rd Interior Report, November 1, 2005

39.     Memorandum of Wallace K. Fung, July 2, 1999.

40.     Memorandum of Richard L. Gregg, August 30, 1999

41.     Memorandum of Donald V. Hammond, April 1, 2002

42.     Memorandum of Richard L. Gregg, April 2, 2002

43.     Financial Management Service & Bureau of Public Debt. (Dept. Of Treasury) Periodic
        Reminders regarding record retention, 2004-2007

**Preliminary Statement**

It is Plaintiff's burden to show that the record retention order sought here is necessary, and that it would not be unduly burdensome. Plaintiff has not met its burden. First, Plaintiff has not established, and cannot establish, that the order is necessary. In its attempt to show necessity, Plaintiff describes incidents in which documents allegedly were damaged or lost, but in doing so, Plaintiff relies on material that it presents incompletely or out of context. When put in their proper context, these incidents either are irrelevant or confirm that Defendant responds promptly and adequately to situations in which it identifies documents or other material that is or may be at risk. In light of the fact that Defendant has implemented rigorous document retention practices and has taken other actions to protect relevant documents and to remove or mitigate any significant risks that such documents will be damaged or destroyed, Plaintiff has failed to satisfy its heavy burden to show that a record retention order is necessary.

Plaintiff has also failed to satisfy the second part of its burden because it has not established that the proposed order is effective and not overbroad. To the contrary, the preservation – or more accurately – the discovery order Plaintiff requests is overly broad and places severe burdens on the agencies involved. For example, to comply with the proposed order would be so time consuming and labor intensive that it would be virtually impossible for the National Archives and Records Administration ("NARA") to do so, and it would severely curtail NARA's ability to work for other members of the public. Similarly, the demands placed on the Bureau of Indian Affairs ("BIA") by the proposed order would detract from BIA's ongoing work for Plaintiff and its members, as well as for all other tribes which it serves. Moreover, the search for records by the Treasury would involve high dollar costs, excessive time requirements, and a great drain on its resources. Finally, it should be stressed that most of the substance of the proposed record retention order is directed towards entry

of a records access and comprehensive discovery order providing Plaintiff immediate authority to proceed with burdensome discovery that exceeds the scope permitted by the Rules of the Court of Federal Claims ("RCFC"), or as conducted in most of the active tribal trust cases. Plaintiff's proposed order covers both active and inactive documents and, if implemented, would prevent the Bureau of Indian Affairs ("BIA") from moving inactive documents to the American Indian Records Repository ("AIRR"), which is BIA's new, central archives facility in Lenexa, Kansas, for indexing, archiving and safe and proper storage.

At the outset, the Government, in part through its various departments, including the Departments of the Interior and Treasury (hereinafter "Interior" and "Treasury"), represents that it has in other tribal trust cases demonstrated a commitment to the preservation of tribal trust documents. See, e.g., Memorandum of Lawrence Jensen, Deputy Solicitor, March 12, 2007 Ex. 5. This commitment and demonstrated performance outweighs Plaintiff's attempts to show a separate retention and preservation order is necessary, independent of the preservation commitment required by the RCFC. Further, the vast majority of the provisions in Plaintiff's proposed retention order ("PPRO") do not address preservation at all. Rather, the PPRO is overly burdensome in that it sets forth a schedule requiring that the Government simultaneously make available potentially relevant documents, both active and inactive, in a massive number of records sites involving many different federal agencies, on and off the Navajo Reservation. Indeed, it essentially holds those documents captive until all of the PPRO's conditions regarding the timing, nature and extent of Plaintiff's document review have been exacted, in complete disregard of the carefully considered and developed policies and practices of the federal agency responsible for the records, and beyond the scope of traditional rules of discovery.

Plaintiff simply has not demonstrated that any document collections are exposed to real

danger of destruction.  Nor can it do so, based on any facts of which Defendant is aware.  In addition,

Plaintiff's PPRO is a cumbersome discovery order, utilizing a sledgehammer to gain access to

agency documents when good faith negotiations could potentially resolve issues between the parties.

Defendant is willing to consider negotiation of a discovery stipulation executed by the parties

covering relevant document collections or documents which may lead to relevant evidence.[1/]

Defendant is equally willing to reiterate its commitment, and the commitment of its agencies, to the

preservation of Navajo Nation documents.  However, Defendant does not believe that a wholesale

substitution of the draconian discovery provisions of the proposed order for the discovery tools

provided under the RCFC (particularly in a document identified as a Record Retention Order) is

either appropriate or equitable.  Also inappropriate is any attempt by Plaintiff to substitute its own

judgment for the judgment of the agencies involved here, with respect to the proper document

management processes.

### Argument

I.    **Plaintiff Has Failed To Meet The Laguna Test For Entry Of A Record Retention Order**

A.    **Background**

As in the present case, Plaintiffs in Jicarilla Apache Nation v. United States, No. 02-25L, and

Pueblo of Laguna v. United States, No. 02-24L, filed motions seeking entry of a record retention

order ("RRO").  Defendant opposed Plaintiffs' motions based, in part, on two specific grounds: (1)

---

[1/] Prior to May 31, 2007, Defendant attempted to negotiate a stipulation with Plaintiff concerning a preservation commitment and document discovery procedures, executed by the Parties and the Court.  Plaintiff rejected Defendant's proposal and filed their present motion without prior notice to the Government.

that the Court lacked jurisdiction to enter the proposed order because it was in large part a disguised injunctive order; and (2) that Plaintiff failed to establish it was entitled to the entry of the requested injunctive relief.  See e.g., Defendant's Opposition to Plaintiff's Motion for Entry of Record Retention Order ("Def.'s Opp."), filed November 5, 2003; Pueblo of Laguna v. United States, supra.[2]

On March 19, 2004, the Court granted Plaintiffs' motions and found that it had jurisdiction to issue an RRO.  In doing so, the Court relied in large part on the inherent powers of the Court to preserve material evidence and to take appropriate action to control and schedule discovery under the RCFC 16.  See Pueblo of Laguna v. United States, 60 Fed. Cl. 133, 136-138 (Fed. Cl. 2004). However, the Court also recognized that its inherent authority should be used only with the utmost restraint because such authority is indeed powerful.  See id. at 137 (citing Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991)).

**B.    Plaintiff has Failed to Meet the Test Established in Laguna**

In Laguna, this Court set out a two prong test which the proponent of an RRO must satisfy. In that case, the Court explained that "one seeking a preservation order [must] demonstrate that it is necessary and not unduly burdensome."  Id. at 138.  To satisfy this two prong test, the Court said that a proponent first must show that "absent a court order, there is significant risk that relevant evidence

---

[2] In Jicarilla and Laguna, Defendant pointed out that the agencies potentially affected by the proposed RRO already had devised and implemented sound procedures for maintaining the integrity and accessibility of records that were moved, whether electronically or physically, and that the proposed RRO would go far beyond those measures by involving the Court and Plaintiff even in the most minor and routine agency operations. See Def.'s Opp., at 16-19.  Moreover, because the RRO was in essence a disguised request for injunctive relief, the Government, citing Kanemoto v. Reno, 41 F.3d. 641, 644-45 (Fed. Cir. 1994), argued that the Court lacked jurisdiction to grant such relief.  See Def.'s Opp., at 16-19.  Defendant also argued that Plaintiff had failed to meet the traditional four-factor test for entry of an injunction.  While Defendant recognizes the Court's decision in Laguna, Defendant respectfully reasserts the foregoing arguments in the current Navajo PPRO proceeding.

will be lost or destroyed . . . ." Id. (emphasis added). Second, to show that a preservation order is not unduly burdensome, "the proponent must show that the particular steps to be adopted will be effective, but not overbroad . . . ." Id.[3]

The Laguna decision is instructive for other reasons as well. Specifically, the Court recognized that Plaintiff was asking for more than a preservation order:

> [Plaintiff] . . . would have this Court prohibit generally the destruction of records relevant to this case absent its prior written concurrence. . . . It would also have this Court impose significant restrictions on the inter and intra agency transfer of such records, including the transfer of records from the Department of the Interior to the National Archives and Records Administration, by essentially requiring that plaintiff be offered an opportunity to examine such records prior to their movement.

Laguna, 60 Fed. Cl. at 140.

Ultimately, this Court declined to order the broad transfer restrictions proposed by Plaintiff. See id. at 140. In doing so, the Court concluded that such provisions would unduly burden the operations of various agencies in two ways:

(1)    By impacting the daily and routine movement of records; and

(2)    By injecting Plaintiff into agency processes that are designed to avoid the loss or destruction of records by allowing Plaintiff to interfere with agency decision making and discretion with respect to retention of records.

See id.

---

[3] The Laguna two prong test has been followed by other courts with some variations. See, e.g., Treppel v. Biovail Corp., 233 F.R.D. 363, 370 - 71 (S.D.N.Y. 2006); Williams v. Mass. Mut. Life Ins. Co., 226 F.R.D. 144, 147 (D. Mass. 2005). Another case, Capricorn Power Co., v. Siemens Westinghouse Power Corp., 220 F.R.D. 429 (W.D. Pa. 2004) presents a three factor analysis for entry of a record retention order. These factors include: (1) level of concern the court has for continuing existence and maintenance of integrity of evidence absent court order; (2) irreparable harm likely to result to the party seeking preservation of evidence; and (3) capability of a party to maintain evidence sought to be preserved, and the physical, spatial and financial burdens created by ordering preservation. See id. at 433-34.

Plaintiff fails to meet the <u>Laguna</u> test. First, Plaintiff's attempts to show that there is a "significant risk" to relevant documents fail. It is simply not enough for Plaintiff to rely on incomplete and out of context quotes from the quarterly reports filed by the Departments of the Interior and Treasury in <u>Cobell v. Kempthorne</u>, No. 96-1285 (D.D.C.) (hereinafter "<u>Cobell</u>"). <u>See supra</u>, Section I. Plaintiff also fails to satisfy its burden because it has not shown, and cannot show that there is a "significant risk" that documents will be damaged or lost by virtue of the Government's showing of the preservation activities it has undertaken since <u>Jicarilla</u>, as set forth in Section II.

Plaintiff likewise fails to demonstrate that the PPRO will be effective but not overbroad, the second element of the <u>Laguna</u> test. The majority of the provisions of Plaintiff's proposed order do not address preservation at all but rather seek to ensure Plaintiff's access to documents, data, and tangible things on terms and conditions which go far beyond anything contemplated by the discovery rules of the Court of Federal Claims. The burdensome nature of Plaintiff's order is described and analyzed at Section IV as well as in the attached declarations of agency representatives who would be required to shoulder Plaintiff's extraordinary demands.

## II.    Interior's Actions Since Entry of the Jicarilla and Laguna RROs Eliminate Any Basis for an Order in Navajo

The key provisions of the March 19, 2004 <u>Jicarilla</u> and <u>Laguna</u> orders essentially mirror each other in that they require the United States and its agencies and employees to take reasonable steps to preserve information that is relevant or may lead to the discovery of information relevant to the litigation. In addition, the parties are directed to meet and confer regarding the indexation of "documents, data, and tangible things" anticipated to be subject to discovery in those cases. Also included in those orders are scheduling provisions for the movement of inactive records of the

6

Department of the Interior.  Both orders remain in effect through the present day.  Plaintiffs in those cases have never commenced any proceedings in this Court claiming any violation of those orders by the Government.

Since the entry of the aforenoted RRO's by this Court, the federal agencies having the vast preponderance of relevant documents, namely Interior and Treasury, have undertaken a number of steps to ensure compliance.  These steps include: (1) sending preservation directives to agency personnel; (2) training agency personnel; (3) development of records movement protocols; (4) the opening of the AIRR and the creation of the Box Inventory Search System ("BISS"); and (5) a policy emphasis on movement of inactive records to the AIRR to protect trust records.

Most importantly, when this Court entered its orders in Jicarilla and Laguna, Interior was in the process of developing a comprehensive records management program to address the specific weaknesses.  Abeita Dec., ¶¶ 3-6.  In the three years since then, Interior has adopted an institutional records program with three main components: (1) the centralization of all inactive records in an archival - quality records facility, the AIRR, for preservation and indexation Abeita Dec., ¶¶ 5-9; (2) the adoption of NARA-approved records retention schedules requiring the indefinite retention of Indian fiduciary trust records; Abeita Dec., ¶ 16; and (3) extensive training of Interior and Tribal personnel in records management and safeguarding trust records has been underscored by the issuance of periodic directives to all Interior employees and contractors, as discussed below.

A.    **Interior has Issued Numerous Directives to Ensure Preservation of Evidence**

Both Interior and Treasury officials have sent a number of preservation directives and periodic reminders to agency management and staff since March of 2004.  Specifically, on April 6, 2004, the Deputy Secretary of the Interior issued a memorandum to the heads of various components

and subagencies of the Interior Department about the document preservation orders issued in the

Jicarilla and Laguna cases.[4]  Exhibit 1.[5]  That memorandum reaffirmed the existing duties,

responsibilities, and obligations of  Interior officials and employees to preserve Indian trust

documents as set forth in the Departmental Memorandum dated March 20, 2002.  See Ex. 1a & Ex. 1

at 2.  The April 2004 memorandum also imposed preservation and retention obligations pertaining to

relevant or potentially relevant data and information on the telephone and voice-mail systems of the

Interior Department.  See id.

Since the issuance of those memoranda by the Deputy Secretary, Interior has published

periodic reminders containing instructions regarding certain preservation obligations.  Some of the

publications have occurred on July 9, 2004, July 13, 2004, and October 26, 2006.  See Exs. 2, 3, 4.

     1.    The Acting Deputy Solicitor's March 12, 2007 Departmental Memorandum

On March 12, 2007, Lawrence J. Jensen, the Deputy Solicitor of the Department of the

Interior, issued a Departmental Memorandum to the heads of various components and sub-agencies

of the Interior Department[6] reiterating Interior's policy regarding the preservation and retention of

Indian trust-related documents and data.  See Ex. 5.  Among other things, the memorandum

---

[4] The recipients of the memorandum were the Secretary; Acting Solicitor; Assistant Secretary - Fish and Wildlife and Parks; Assistant Secretary - Indians Affairs; Assistant Secretary - Land and Minerals Management; Assistant Secretary - Policy; Inspector General; Direct, U.S. Geological Survey; Director, Bureau of Land Management; Director, Minerals Management Service; Commissioner, Bureau of Reclamation; Active Director, Bureau of Indian Affairs; Special Trustee for American Indians; Director, Office of Trust Records; Director, Office of Historical Trust Accounting; Associate Director, Minerals Revenue Management, MMS; Regional Director, Southwest Region, BIA; Superintendent, Jicarilla Agency, BIA; Superintendent, Laguna Agency, BIA; Superintendent, Southern Pueblos Agency, BIA.

[5] "Exhibit" is hereinafter abbreviated as "Ex." and the plural "Exs."

[6]    The recipients of the memorandum were essentially the same as those identified in footnote 4.

8

identified, by name, the Tribes (including Plaintiff herein) or groups that had filed trust accounting

and trust mismanagement cases against Defendant.  See id.  Using the broad language set forth by the

Court in the document preservation order in Laguna, and Jicarilla, supra, the memorandum mandated

the preservation of "all documents, data, and tangible things in the possession, custody or control" of

Interior employees, bureaus, and offices that may be relevant to the subject matter of the Tribal Trust

cases.[7] Id. at 2.  The memorandum applied to all paper documents, electronically stored information,

and other materials, such as maps, videos, calendars, and charts, and it also applied to materials

stored at off-site storage facilities and Federal Records Centers (FRCs).  See id.  As noted, that

memorandum specified that Navajo trust-related records were among those required to be preserved

in compliance with the memorandum.  Further, the memorandum instructed Interior employees about

the obligations imposed by the recent amendments to the Federal Rules of Civil Procedure to

preserve electronically stored information and directed them to comply with those obligations.  See

id. at 3.

      2.     <u>Interior Policy Memoranda Regarding the Movement of Inactive Records</u>

The Department of the Interior recognizes the critical importance of preserving inactive

Indian trust records and, in pursuit of this important task, has partnered with NARA to move those

documents to the AIRR.  See, Ex. 8a.  As part of the process of transferring those inactive documents

---

[7] The Office of the Solicitor defined "relevant information" as

    reflecting, referring or relating to (1) any asset, such as funds, land, minerals, forestry,
    sand and gravel, or other resources, that is, or at any time has been, held in trust by the
    United States or its agents for the Plaintiff; (2) policies, procedures, guidelines, or
    correspondence relating to any aspect of the management or administration of trust
    assets; (3) proceeds, interest, or income from trust assets; or disbursement, distribution,
    disposition or transfer of any trust assets; (4) reports, appraisals, reconciliations or
    evaluations of any trust assets; and (5) information that serves to identify, locate, or link
    any relevant information, such as file inventories, file folders and indices.

to the AIRR, the documents are carefully indexed and filed in an archive where the entrances and exits of researchers and employees alike are carefully monitored and controlled. Thus, any suggestion by Plaintiff that inactive BIA documents should be retained for Plaintiff's convenience on the Navajo Reservation is contradictory to Plaintiff's stated objective of document preservation because the documents would in fact be more secure at the AIRR as well as be better protected from potential environmental harms such as natural catastrophe or changes in temperature and humidity. See Part B., infra, describing the AIRR.

Interior's policy to move inactive records to the AIRR as soon as possible is manifest in several Interior records, three of which are included with this brief: (1) Memorandum of James E. Cason, Associate Deputy Secretary, May 5, 2005 ("Cason Decl.") Ex. 6; (2) Memorandum of Ethel J. Abeita, Director, Office of Trust Records, March 22, 2006. ("Abeita Memo") Ex. 7; and (3) Memorandum of Chief Information Officer, Office of the Special Trustee for American Indians, February 1, 2007, Ex. 7a. These memoranda underscore the importance of delivery of inactive records to the AIRR and set out the procedures for expeditiously accomplishing the objective. In keeping with this policy and, as noted by Ms. Abeita, Interior plans to send any inactive records from the Navajo reservation on a priority basis in the upcoming summer months. See Declaration of Omar Bradley, Ex. 9 (hereinafter "Bradley Decl."); and Declaration of Ethel Abeita, Ex. 8 at ¶ 14 (hereinafter "Abeita Decl.").

**B.      Opening of the AIRR and the Box Inventory Search System "BISS"**

In collaboration with NARA, Interior has built a state-of-the-art underground document storage facility to consolidate in a single location all inactive federal Indian records. See Memorandum of Understanding Between the Department of the Interior and the National Archives

and Records Administration, September 12, 2003.  Ex. 8a.  The facility was built in Lenexa, Kansas,

and completed in 2004.  See Abeita Decl., Ex. 8, ¶ 5.  It is co-administered by the Office of Trust

Records ("OTR") and NARA.  The AIRR is a state of the art facility built to archive standards and is

equipped with controls to regulate humidity, temperature, particulate matter and ultraviolet light.  See

id. ¶¶ 5- 6.  The AIRR provides secure access for research by individual Indians, tribes, and

historians, with permission from Interior, and for Interior staff conducting historical accounting work.

The AIRR has sufficient future capacity to hold all of the Interior's American Indian records.  Id. at ¶

6.  Currently, the AIRR contains in excess of 150,000 boxes of inactive records of which

approximately 15,000 boxes are BIA Navajo records.  See id.  ¶ 9.

Records movement plans for delivery of Indian trust documents are described in the June 21,

2007 Abeita Decl., Ex. 8, ¶¶ 9-14.  See also Bradley Decl., Ex. 9, ¶¶ 11-18. As noted in detail in the

Chain of Custody plan, pickup, delivery, and verification of contents of boxes shipped are all

carefully confirmed, both at the point of origin and at the point of delivery.  See Abeita Decl., Ex. 8,

¶¶ 9-14.  Ultimately, upon arrival of inactive boxes to the AIRR, the contents are indexed using the

BISS, as described below.  The indexed contents are then archived at the AIRR.

Inactive Indian trust records stored at the AIRR are electronically indexed to the document

level in the BISS.  See Abeita Decl., Ex. 8, ¶ 11.  If there are no file folders and the box is identified

as coming from a trust program, a document level index is compiled for the entire box contents.

Information as to where the records originated is printed on the outside of each box, and this

information is also entered into the BISS.  For example, this identifier could be an agency location

code, a regional office location code or a Federal Records Center code.  Typically, BISS entries will

include a file title and the category of the document (such as a bill for collections or financial data

reports) and will also capture date ranges of information contained in a file folder.  See id. ¶¶ 11-12.

### C.    Training

The BIA also provides training to its personnel and to tribal records personnel with respect to the proper management of Indian trust records.  The Office of Trust Records trains new employees as they are hired and provides advanced training to longer-term employees.  Abeita Decl., Ex. 8 at ¶ 18 and Ex. 2 to Abeita Decl.  In the previous year, OTR held over 100 training events.  In the last two and a half years, over 2,000 people have received records training, including 156 from the BIA Navajo Region.  Abeita Decl., ¶ 18.  In addition to training by OTR, courses are also offered by the Office of Trust Training of the Office of the Special Trustee for American Indians.  See e.g., 29th Interior Report, Ex. 25 at 23; 23rd Interior Report, Ex. 38 at 7; 28th Interior Report, Ex. 24 at 44.[8] Courses offered under the Indian Fiduciary Trust Training Program include specialty courses ranging from "Trust Fundamentals" to "Trust Accounting."  Additionally, there is a curriculum leading to a Certified Indian Fiduciary Trust Specialist certification.[9]  See id.

---

[8] Hereinafter, reference to the Cobell Quarterly Reports will be abbreviated as follows: "___ Interior/ Treasury Report at ___."

[9] Data concerning the number of attendees for the various courses are also reported in the Quarterly Cobell Reports filed by the Department of the Interior under the "Office of Trust Records" and "Indian Fiduciary Trust Training Program" sections.

**III.**    **Treasury's Actions Since Entry of the Jicarilla and Laguna RROs Eliminate Any Basis for an Order in Navajo**

Treasury has implemented retention policies and procedures for documents relating to Tribal trust funds.[10]  Treasury's retention policy relies in part on a successful structure that it developed to comply with a retention order issued in connection with Cobell, supra.  See generally Exs. 11 and 39-40.  Shortly after the filing of Tribal trust accounting and trust mismanagement cases in the Spring of 2002, Treasury instructed its employees to take steps to "preserve any potentially relevant documents and to perform an initial identification of what documents we have."[11]  Ex. 41 (with attachments).  Treasury stressed that its employees have to "retain and maintain those records associated with the tribal trust fund accounts, regardless of NARA approved disposition schedules."  Id.  This directive remains in full force and effect today.  Id.; see also Exs. 10-12 and 42.

In addition to the foregoing Treasury Department directive, the Treasury bureaus that have program responsibilities relating to Tribal trust funds, i.e., the Financial Management Service (FMS) and the Bureau of Public Debt (BPD), have implemented their own document retention policies and procedures specifically for the Tribal trust cases, as well as the Cobell litigation.  See, e.g., Exs. 42,

---

[10]    To the extent that this case involves Treasury, that involvement pertains to Treasury's asserted role as a co-trustee for funds held in trust for Plaintiff.

[11]    Treasury applies its retention policies, described at Exhibits 10-16 and 39-43, to records in a wide variety of media.  Treasury defines "record" to include:

> any handwritten, typed or printed documents (such as memoranda, correspondence, telephone logs, calendars, notes, books, brochures, studies, writings, drafts, transcripts, and minutes).  The term "record" also includes documentary material in other forms (such as electronic documents or presentations, electronic mail, magnetic tapes, computer disks, audio or video records, slides, microfilm and motion pictures).

Ex. 41.

10.  These policies and procedures are not only widely available to employees on the Departmental components' Intranet, but are also included in periodic reminders and discussed within the bureaus. Exs. 11, 12, 43.  In addition to existing procedures for the retention of documents in paper format, both FMS and BPD have procedures in place to assure retention of electronic documents potentially relevant to Indian tribal trust funds.  See Exs.12, 43.

**IV.    The Material Offered by Plaintiff in its Motion Does Not Justify An RRO**

**Plaintiff's Arguments**

In the absence of hard evidence to support its request for an overly broad document retention and discovery order, Plaintiff presents at pages 9 - 21 of its brief a selection of incomplete or out-of-context quotes from the Interior and Treasury quarterly reports filed with the court in Cobell v. Kempthorne, No. 96 - 1285 (D.D.C).

In addition, Plaintiff quotes from the RROs entered by this Court in Laguna v. United States, 60 Fed. Cl. 133 (2004), and Jicarilla Apache Nation v. United States, No. 02-25L, (March 19, 2004 Order) (CFC). Specifically, Plaintiff sets forth the Court's recitation of the general types of perceived mishandling of records by the government on which those orders were based.  See Laguna, 60 Fed. Cl. at 138.

However, examples from more than three years ago do not reflect the current status of the agencies' record retention and record remediation processes, however. In reality, many of the circumstances that formed the basis for the Jicarilla and Laguna orders have been mitigated by actions undertaken by Interior since then.  Specifically, the previously-claimed scattering of historical Indian documents in less than adequate facilities has been effectively countered by the opening of the AIRR, which, as noted above, is a centralized, state of the art archival facility where historical Native

14

American documents and records are housed, indexed and, if necessary, remediated for use by individual Native Americans, tribes, academics, researchers, and other interested persons under comprehensive archival protocols.  See Defendant's Opposition at 11-12.  Any shortcomings in the indexing of inactive tribal records have been significantly improved by implementation of the BISS.

In addition, since 2004, Interior and Treasury, the primary record-keeping agencies for purposes of this case, have implemented regulations, guidelines and directives regarding Indian trust record retention as well as the movement of the trust records between records centers or between their current location and the AIRR for final archiving.  See Defendant's Opposition at 8-11.  This implementation has included comprehensive and redundant verification procedures for the movement of trust records, including inventorying and shrink-wrap packaging of records boxes to ensure that trust records verifiably reach their destination, usually the AIRR, without damage, loss or harm.  See id.

Under Interior's and Treasury's current practices for retention and preservation of Indian trust records, the agencies' assessment of any reports of damage, and actions in response thereto, potentially  involving trust records has been prompt.  In addition, Interior's and Treasury's documented remediation has mitigated or cured any harm to the records involved, as explained further below.

Plaintiff divides its discussion of alleged incidents of document mishandling purportedly relevant to Navajo between hard-copy records and electronic records.  For its examples, Plaintiff relies almost exclusively on information produced by Interior and Treasury in Quarterly Reports filed in Cobell, supra.  As Defendant explains below, Plaintiff's method of presentation causes confusion and may give an incorrect impression regarding the number, nature, or outcome of the incidents to

which Plaintiff refers. Also as discussed below, Plaintiff's description of the incidents are frequently

incomplete and fail to mention the prompt remediation completed by Interior and Treasury.

 1. <u>Hard-Copy Records are Protected and Preserved Under Current Regulations,</u>
<u>Guidelines, Directives, and Practices</u>

 Under various headings and in several sections in its brief, Plaintiff refers to a collection of

269 boxes of records "that were or may have been damaged or contaminated by mold, mildew,

mouse droppings, or other adverse elements." 19th Interior Report, Ex. 19 at 31. While Plaintiff's

scattered references to the same incident might give the impression that there are several incidents

involving several hundred moldy or contaminated boxes, such is not the case. <u>See</u>, <u>e.g.</u>, Plaintiff's

Brief in support of Plaintiff's Motion for record Retention Order, May 21, 2007 at 11, 12, and 14

(hereinafter "Plaintiff's Brief."). Moreover, as noted below, not all the boxes contained trust records.

 As of November 1, 2004, Interior proactively identified 269 boxes that had potentially been

damaged. As Interior's investigation continued, this increased to 283 boxes as of February 1, 2005.

These boxes were immediately turned over to a remediation contractor for review and assessment.

<u>See</u> 20th Interior Report, Ex. 20 at 32. By May 2, 2005, the remediation contractor concluded that

less than half, or 140 boxes, required further attention to address partial legibility of some records.

Moreover, the contractor estimated that less than 1% of the total pages assessed appeared completely

illegible. <u>See</u> 21st Interior Report, Ex. 21 at 30.

 The contractor's report was provided to NARA which commenced remediation activities on

or about August 1, 2005. <u>See</u> 22nd Interior Report, Ex. 22 at 35. By April 2006, NARA completed

remediation of all the original 283 boxes with the exception of six boxes. <u>See</u> 26th Interior Report,

Ex. 23 at 23. In November, 2006, the Conservation Contractor of the Office of Trust Records

determined that two of the six boxes could contain trust records and should therefore undergo further

<div align="center">16</div>

remediation. <u>See</u> 28th Interior Report, Ex. 24 at 16.

In summary, what began as a report of claimed mold and mildew damage to approximately 300 boxes ultimately was reduced by Interior's prompt and careful assessment and various degrees of cleaning and remediation to two boxes of documents that were likely to contain trust-related records and which would require labor-intensive remediation. That remediation was projected to be completed in the second or third quarter of 2007. <u>See</u> <u>id.</u>

2.  <u>The Office of the Inspector General at NARA Promptly Investigated the NARA Episode to Which Plaintiff Refers; and the Lone Individual Responsible Has Resigned</u>

Plaintiff also references an occurrence at the headquarters building of NARA. The matter is described in a September 28, 2005 letter from Jason R. Baron, Director of Litigation for NARA, to Dennis Gingold, attorney of record for Plaintiff in <u>Cobell</u>. <u>See</u> Ex. 26; <u>see</u> <u>also</u> Ex. 26a. In essence, the situation involved the attempted discarding by a single NARA employee of hard-copy folders and records from the Department of Veteran's Affairs, the Department of the Interior, the United States Army, the War Department, and the Navy Department. Documents were found in various unauthorized locations at NARA, including a waste basket, dumpster and trash compactor at the Main Archives building at 9th Street and Constitution Avenue. The initial identification of these discarded records began on September 1, 2005. NARA's Office of the Inspector General conducted an investigation in September and October of that year. As noted in Mr. Baron's September 28, 2005 correspondence, the NARA staff determined that approximately 250 of the actual files that corresponded to the approximately 275 Consolidated Chippewa non-record file covers and jackets recovered in various trash areas in September 2005 were intact and in NARA's permanent holdings. NARA staff thereafter conducted a search for the remaining 25 files. <u>See</u> December 9, 2005 letter

from Jason R. Baron to Dennis Gingold, Ex. 27.

It is difficult to imagine how the foregoing events support or are even relevant to entry of an RRO in the <u>Navajo</u> case, especially when the facts indicate the actions involved were attributable to a single disgruntled employee, who has since resigned.  Indeed, the <u>Jicarilla</u> and <u>Laguna</u> RROs were in effect at the time of the incidents but clearly were not effective in preventing these incidents.  These facts establish that the incidents are not probative of the necessity for an RRO in this case and so should be disregarded or recognized simply as the actions of one individual who no longer has access to the documents at issue.

       3.     <u>The Steven Griles Plea and the March 1, 2007 letter from Secretary Kempthorne and Attorney General Gonzales to the U.S. Senate Committee On Indian Affairs Have No Relevance To Whether Plaintiff is Entitled to an RRO in this Case</u>

The directives given by high-level decision-makers such as Mr. Jensen and others to retain hard-copy and electronic data relevant to the issues presented by Plaintiffs' complaints, whether in <u>Jicarilla</u>, <u>Laguna</u>, or <u>Navajo</u> or any other Tribal accounting cases, and the concrete actions taken, such as construction of the AIRR and training programs, are dispositive measures already undertaken in good faith by the Agency. They show that a record retention order is not necessary here.

This Court should not be distracted from that fact by Plaintiff's rhetoric concerning the Steven Griles plea or executive branch recommendations regarding legislative solutions to Indian trust litigation. <u>See</u> Plaintiff's Brief at 18 - 19.  The March 2007 plea by Steven Griles, former Deputy Secretary of the Interior, concerned a charge of obstruction of proceedings before the United States Senate.  It was based on Mr. Griles' statement and testimony provided to the Senate Indian Affairs Committee ("SIAC") in an October 2005 Senate interview and a November 2005 Senate hearing.  It had nothing whatsoever to do with the retention or preservation of Indian trust

18

documents.

Plaintiff suggests, without any attempt at explanation, that the plea has relevance to its motion, in light of certain directives provided by Mr. Griles and relied on by the United States in support of its opposition to entry of the RRO in the Jicarilla and Laguna litigation. Yet there is no evidence that the Griles memoranda were not genuinely directed to achieving compliance with court orders requiring document retention, nor that they were ineffective in doing so. Thus, the outcome of Mr. Griles' appearance before the SIAC does not in any way undermine the legitimacy of his orders for Departmental compliance with the Jicarilla and Laguna RROs. In the absence of facts to present to this Court, Plaintiff's speculation as to the relationship between Mr. Griles' legal problems and the effectiveness of the Griles' memorandum is pure speculation. See Plaintiff's Brief pp. 18 - 19. This Court should disregard Plaintiff's attempt to cloud the issue with references to situations that lack any relevance to the alleged need for an RRO in this case.

Similarly, correspondence by the Secretary of the Interior and the Attorney General to a United States Senator proposing legislation to modify the Government's federal trust obligations to Indian tribes is plainly irrelevant to whether there is any significant risk of damage to relevant historic or current operating records of the Navajo Nation. See Plaintiff's Brief, page 19. The proposed legislation may never pass. In addition, it says nothing about trust records relevant to Plaintiff's case. Moreover, the legislation would in no way modify any trust obligations at issue in the Navajo litigation. The Court should not be distracted by this irrelevant material, which has no bearing on whether it is appropriate to enter any RRO in this case.

4.     The Ft. Defiance Agency Incident

Plaintiff identified one episode of alleged destruction of trust and non-trust documents on the

19

Navajo Reservation, at the BIA Fort Defiance Agency.  Following an immediate investigation by the

BIA, the agency determined that a single box (i.e., one cubic foot) of original, incomplete sand and

gravel permits and duplicate copies of archeological clearances had been discarded in error by

agency staff.  There is no evidence that the documents in that box, including the archeological

clearances, have any impact on the Plaintiff's claims in this lawsuit.  However, as part of the

remediation plan for this incident, the Office of Trust Records (OTR) provided management

briefings targeted to the managers of BIA programs in the BIA Navajo agencies.  As  noted in the

25th Interior Report, Ex. 28 at 22-23. "[T]he purpose of the training was to reinforce the record

keeping responsibilities of managers." Id. at 23.

      5.      The Reported Thefts from Yakama Tribal Offices Do Not Demonstrate Any Risk to
                  Navajo Trust Records

In a threadbare attempt to bolster its motion, Plaintiff relies on the reported theft of certain

Yakama Nation property, including four tribal computers, four tribal flash drives and an unknown

number of tribal CDs from the Yakama Reservation.  See 29th Interior Report, Ex. 25 at 43.   In light

of the fact that the Yakama Nation has contracted with Interior pursuant to Public Law 93 - 638 to

assume contractual responsibility for various tribal functions in Tribal Offices, it makes no sense to

ascribe to the Department of the Interior responsibility for the theft from a Yakama Tribal facility of

Yakama equipment used to perform contractual obligations undertaken by the Tribe.  Even more

difficult to understand is how an incident of theft of tribal equipment located in a tribal office in the

State of Washington supports entry of a record retention order in the Navajo case.  Indeed, thieves

are not likely to concern themselves with any judicial orders.  The Yakama incident does not

demonstrate any significant risk of records loss affecting the Navajo Nation and should be

disregarded by the Court in this proceeding.[12]

      6.     The Department of the Treasury Took Prompt and Appropriate Steps to Mitigate the Effects of the Two Incidents Plaintiff Identifies; and There is No Indication Navajo-Related Documents Were Involved

Plaintiff identifies two incidents involving Treasury documents being exposed to water, as supposed support for entry of an RRO in this case. (Plaintiff's Brief, at 15-16). Again, Plaintiff's reliance is misplaced. Those incidents, like several others on which Plaintiffs relies, have no relevance to the question of whether an RRO should be entered. First, there is no indication that any of the documents involved included Navajo-related documents. In addition, Plaintiff's incomplete descriptions of the events and subsequent remediation failed to report the follow-up developments by the Department of Treasury, as reported in the 30th Treasury Report, Ex. 29, which are presented here, and which are necessary to an accurate understanding of the events in question and whether they support Plaintiff's motion.

Plaintiff, quoting from the 27th Treasury Report, Ex. 30 at 1, reported that microfilm working copies of negotiated Treasury checks were water damaged when the basement of the Financial Management Service Office in Hyattsville, Maryland, flooded with rains, exposing the bottom drawers of certain file cabinets to water. See Plaintiff's Brief, pp. 15 - 16. The 30th Treasury Report,

---

[12] Plaintiff also reported that in January 2007, "someone tried to break into the BLM computer room containing servers for the Legacy Rehost 2000 system." See Plaintiff Brief, p. 18 citing 29th Interior Report, at 44, Ex. 25. Plaintiff failed to report remediation efforts by BLM, despite the fact that those remediation measures were described in the same Interior Report quoted by Plaintiff. Specifically, "although the lock was not compromised, BLM coordinated with GSA (the building owner) to install an additional metal plate over the lock mechanism to prevent similar break-in attempts in the future." Id. As with the Yakama Public Law 93-638 contract situation, incidents such as this one cannot be used to establish a significant risk of loss of Navajo documents. If anything, these incidents have relevance only in that they demonstrate the speed of remediation responses by the agency. Again, it seems unlikely that thieves would be influenced by a judicial order.

21

Ex. 29 at 1, describes the successful remediation activities as follows:

> FMS procured the services of a contractor to wash approximately 2000 (roughly one sixth) of the water-exposed cartridges, because those cartridges contain check copies for which original checks may not be available. Washing the microfilm should remediate any adhesions (film layers sticking together), thereby preventing further damage to the images on the microfilm and restoring the functioning of the microfilm (i.e., by enabling it to be fed through a microfilm reader). The microfilm washing services are expected to be completed by the end of June 2007.

Plaintiff also raises a July, 2006 incident, where a water sprinkler burst at the Washington National Records Center in Suitland, Maryland, affecting several boxes of FMS and BPD records. See Plaintiff's Brief, p. 16. However, Plaintiff failed to point out that the 30th Treasury Report, dated June 1, 2007, stated that all of the boxes had been remediated by a contractor and all documents dried and returned to the Washington National Records[13]. See Ex. 29, p.1, ¶ 2.

In sum, the incidents on which Plaintiff relies to support its request for an extraordinarily broad RRO lack substance as well as relevance. As Defendant explains, infra, Plaintiff's claims with respect to electronic records likewise fail to support the relief it seeks.

7.    Electronic Records

With respect to electronic records, Plaintiff continues to rely upon irrelevant matter in support of its request for an RRO. The first example provided by Plaintiff involving electronic records

---

[13] One final Treasury - related incident cited by Plaintiff in support of its motion concerns 37 boxes of records at a federal reserve bank which were not located during a recent inventory. See Plaintiff's Brief, p. 17. Plaintiff states that "[s]ome of the boxes contained 'control' information that was used in balancing Treasury checks and out-of-balance Treasury checks and which might not be available from other sources." [sic.] 28th Treasury Report at 1, Ex. 37. Had Plaintiff read the next sentence in the Report, it would have learned the following more specific information: "Some of the information in the three 'control boxes' may not be available from other sources, but the information should no longer be needed for any adjustment purposes because of the passage of time." Id. Finally, given that the dates of material in these boxes date from 2003 - 2005, their significance to the Navajo action is likely marginal at best.

appears at page 11 of the Plaintiff's Brief.  There, Plaintiff selectively quotes from the 20th Interior

Report at 8, Ex. 20, noting that between July and December 2004, two BIA servers failed to send

emails to ZANTAZ.  However, Plaintiff neglected to review the next few sentences of the Report:

> The configuration was <u>immediately corrected</u> with the installation of a new version
> of ZANTAZ software.  BIA captured e-mail between and within the two servers
> during the time in question on backup tapes.  During the next reporting period, BIA
> expects to transfer the content on back-up tapes to ZANTAZ to ensure the digital safe
> has a copy of the e-mails that were not captured live.

20th Interior Report, at 8 Ex. 20.[14] (emphasis supplied)

Plaintiff also reports on an additional claimed email-related problem at page 13, where

Plaintiff refers to "wide-spread email backup problems."  Plaintiff's characterization of the problem

is erroneous.  Specifically, had Plaintiff performed even a cursory review of the 23rd Interior Report

at 8-9,  Ex. 38, it would have noted reference to the particular problem as a ZStage issue.

Specifically, the Report explains as follows:

> ZStage refers to a ZANTAZ software indicator which shows whether an email
> message has been properly processed . . . (i.e., sent to the Zantaz email receptacle for
> processing.). During this reporting period, OST discovered a limited processing
> problem identified by reviewing ZStage data and took steps to mitigate it.

<u>Id.</u>  As the 23rd Report explains, affected agencies such as the Office of the Special Trustee (OST),

the National Business Center (NBC), the Solicitor's Office (SOL), and BIA forwarded backup tapes

to Zantaz in order to retrieve undelivered email messages. That process is discussed in detail in the

Report.  <u>See id.</u> at 8-9.  In addition, the 25th Interior Report, Ex. 28 at 5-6, details the upgrading of

servers at the aforenoted agencies to correct the ZStage problems which had caused a failure to

---

[14] In addition, it is DOI policy to require employees to print and save hard copies of any
substantive email.  Thus between the backup tapes and the "print and save" policy, chances of
lost email seem extremely remote.  <u>See</u> Ex. 35 regarding Interior Email Policies.

process email to Zantaz. The e-mail problems of OST, SOL, and NBC were resolved by July 27, 2006, and all emails were properly re-processed. See 26th Interior Report, Ex. 23 at 5-6.

Without any substantive explanation, Plaintiff also includes other IT-related matters in support of its motion. For example, at page 21, Plaintiff simply notes that in May of 2007, there were a total of 2,041 "IT weaknesses" outstanding with approximately 85% of the total number in the low or medium risk level.[15] Plaintiff fails to explain how the alleged "weaknesses" support Plaintiff's position that there is a significant risk that evidence relevant to the claims and defenses in the Navajo lawsuit will be lost or stolen. Indeed, Plaintiff fails to connect, in any way, the purported weaknesses to any identified risk to relevant evidence. Simply put, there is no showing whatsoever that these supposed weaknesses have anything to do with Navajo Nation trust information.

In response to Plaintiff's unexplained data, Defendant submits the Declaration of Lawrence K. Ruffin, Chief Information Security Officer in the Office of Interior's Chief Information Officer, June 21, 2007, Ex. 31. ("Ruffin Decl."). Mr. Ruffin's testimony is that, based on his extensive experience in information technology ("IT") security matters, the volume and types of weaknesses concerning Interior's networks are similar to other organizations with comparable users, systems, and work stations. See Ruffin Decl., Ex. 31, ¶11. Mr. Ruffin also testifies as to the process by which Interior and its contractors identify and prioritize remediation of weaknesses. See id. at ¶¶ 13 and 14. He also provides examples, to put them in an appropriate context. See id. at ¶ 11.

Moreover, Mr. Ruffin also describes the results of the FY 2006 Interior survey prepared pursuant to the Federal Information Security Management Act (FISMA), 44 U.S.C. § 3541 et seq.

---

[15] Plaintiff makes additional references to raw numbers of security weaknesses also without explanation as to their general significance or any purported connection between the security risks and relevant evidence. E.g., Plaintiff's Brief at 12.

See Ruffin Decl., Ex. 31, ¶5.[16]  That report, prepared by Interior's Office of Inspector General, concluded that Interior had made good progress in its system inventory, Plans of Actions and Milestones, and incident responses over the year 2005.  The significant improvement in incident response recognizes Interior's accomplishments in the remediation context.  See id. at ¶¶ 15 and 16; see also Ex. 18.  This subject area in particular was regarded by the Court as significant in its deliberation over entry of an RRO in Laguna.  See Pueblo of Laguna, supra, 60 Fed. Cl. at 138.

Finally, Mr. Ruffin describes the substantial efforts undertaken by Interior in dealing with unauthorized system penetration.  See Ruffin Decl., Ex. 31, ¶18.  Specifically, he explains that, in addition to securing systems through the enterprise risk management processes and C & A process, Interior employs several other technologies as follows:

> Interior deploys a variety of incident detection and prevention technologies as part of a defense-in-depth strategy to monitor, detect, protect, and respond to potential incidents resulting from intruder attempts.  These Intrusion Detection Systems and Intrusion Prevention Systems (IDS/IPS) are strategically positioned in various locations by bureaus and offices within their network infrastructures.  Interior has also positioned a robust IDS/IPS architecture at the perimeter of Interiors's ESN that provides a Wide-Area Network (WAN) that connects some of Interior's bureaus/offices to the Internet.  IDS and IPS sensors are configured to monitor network traffic in real-time to detect know attack signatures and alert security personnel as part of Interior's incident monitoring, detection, and response processes.  IPS sensors are also capable of proactively blocking and preventing potentially malicious network traffic without manual intervention.  Interior's application and database servers and other networking devices are configured to automatically log security events.  Other security devices automatically monitor those security event logs and alert security administrators about potential attacks, system compromises, system misuse, and other types of related incidents.

Id. at ¶18.

On page 16 of Plaintiff's brief, there is yet another example of Plaintiff's quoting a source

---

[16] The FY 2006 survey is the latest FISMA Survey for Interior available.

wholly out of context.  Here, Plaintiff cites to an opinion by the U.S. Court of Appeals for the

District of Columbia in an attempt to show that Interior's IT security is flawed and that hackers could

gain access to Interior's computer systems and alter trust-related data.  However, Plaintiff simply

misconstrues the opinion of the appellate court by not presenting the immediately-following

paragraphs of the opinion, in which the appellate court found that the lower court had abused its

discretion in granting injunctive relief against the Interior.  See Cobell v. Kempthorne, 455 F.3d 301,

315 (D.C. Cir. 2006) (en banc).  Rather than supporting the entry of the PPRO, that decision

undercuts Plaintiff's argument.  The appellate court there found, as is equally true here, that plaintiffs

had presented no evidence that anyone had altered any trust data, that any such actions were

imminent or that the effects of any such alterations would prevent plaintiffs from obtaining the relief

sought.  To the contrary, the court determined that:

> [A]s the district court acknowledged, "it is generally considered impossible to create
> a perfectly secure IT environment."  The inherently imperfect nature of IT security
> means that if we granted injunctive relief here, based only on Interior's security
> vulnerabilities and not on a showing of some imminent threat or specific reason to
> be concerned that IITD [Individual Indian Trust Data] is a target, we would
> essentially be justifying perpetual judicial oversight of Interior's computer systems.
> In order to return to normal operations, Interior would be faced with the nearly
> impossible task of ensuring that its systems have no exploitable weaknesses
> whatsoever, rather than addressing a more specific danger to IITD.  Moreover, nearly
> any system administrator who maintains data for private trusts could be in danger of
> facing similar claims for relief, as only the unreachable goal of perfect security would
> be sufficient to counter general fears of data tampering by internal threats or external
> hackers.  At the very least, something more than a list of vulnerabilities is required
> to show that the class members may be harmed, as the next consideration – the harm
> faced by Interior – weighs so heavily against granting injunctive relief.

Id. at 315-16 (citation omitted) (emphasis added).

Not only does Plaintiff's quote misconstrue the opinion of the appellate court, but the matters

raised in that case bears little or no relationship to this case or the potentially relevant Navajo records.

Accordingly, the language quoted by Plaintiff has no application here.

**V.      Plaintiff's Proposed Retention Order is Burdensome and Misdirected**

      **A.      Introduction**

As noted above, Plaintiff has failed to show that the PPRO is necessary because it has not met the "significant risk" test set out by this Court in Laguna.  Most of the examples of incidents specified by Plaintiff at pages 9-21 of its brief confirm –  rather than question – Defendant's commitment to and execution of expeditious remediation of any records identified as subject to a mishap of some type, and ultimately, return of the records to their collection whether at a federal records center, the AIRR, or some other agency location.

In many ways, "PPRO" is a misnomer since the vast bulk of the Order's proposed text is directed to ensuring Plaintiff's convenience, rather than the safety and security of the documents. There is indeed an obvious contradiction between Plaintiff's desire to review Navajo documents and data in its backyard over several months or longer versus reviewing them in the AIRR archival facility, indexed and secured from potential mishaps at busy Navajo agencies, storage, and headquarters facilities.  As noted above, approximately 15,000 boxes of Navajo documents currently await Plaintiff's review at the AIRR, whereas approximately 1,000 boxes of inactive trust records are located in various Navajo BIA facilities and are awaiting transfer to the AIRR, with the bulk located at the Window Rock Regional Headquarters.  See Bradley Decl., Ex. 9 ¶ 11; cf. Abeita Decl., Ex 8 ¶ 14.[17] Should this Court reject Defendant's assertion that documents would be safer and better preserved if transferred to the AIRR, Defendant respectfully suggests that the access which Plaintiff

---

[17] Note that Bradley's reference to 1,000 boxes refers only to trust records while Abeita's reference to 2,000 boxes includes both trust and non-trust records.

seeks should be discussed and negotiated between the Parties and put in the form of a stipulation

instead of a burdensome, expedited discovery order captioned as a record retention order.[18]

_____

[18]Rule 26(b)(2) provides that the Court "shall" limit discovery under certain conditions. One such circumstance is where the Court "determines that . . . (iii) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." RCFC 26(b)(2)

As a matter of logic, what constitutes reasonable discovery in light of this Rule should inform what the Court can order a party to preserve. The caselaw applying RCFC 26(b)(2) (and its counterpart in the Federal Rules) therefore casts light on the question whether Plaintiff's proposed Order is reasonable and appropriate for this lawsuit. As Defendant explains, infra, that proposed Order is not reasonable and this Court should reject it because it forces Defendant to preserve (and produce) an unreasonably broad range and large volume of documents from numerous locations, at high, and even potentially crippling, expense to the agencies involved, with no showing that those documents have relevance to the claims and defenses in this case.

"[T]he discovery provisions, like all of the Federal Rules of Civil Procedure, are subject to the injunction of Rule 1 that they 'be construed to secure the just, *speedy*, and *inexpensive* determination of every action.' (Emphasis added.) To this end, the requirement of Rule 26(b)(1) that the material sought in discovery be 'relevant' should be firmly applied, and the district courts should not neglect their power to restrict discovery where 'justice requires [protection for] a party or person from annoyance, embarrassment, oppression, or undue burden or expense . . . .' Rule 26(c). With this authority at hand, judges should not hesitate to exercise appropriate control over the discovery process." Herbert v. Lando, 441 U.S. 153, 177 (1979).

Similarly, "[a]lthough judicial discretion is not unrestrained -courts must apply a set of general principles, *see, e.g.,* Fed. R. Civ.P. 26 – parties have a correlative obligation to tailor [discovery requests] to suit the particular exigencies of the litigation. They ought not to be permitted to use broadswords where scalpels will suffice, nor to undertake wholly exploratory operations in the vague hope that something helpful will turn up." Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 187 (1st Cir. 1989)(upholding the trial court's decision that certain interrogatories requiring defendant to produce certain information regarding defendant's job vacancies and how they were filled were "'overbroad and the burden on the defendant ... would outweigh significantly any [corresponding] benefit to plaintiff's case.'" 871 F.2d at 186.)

As the court noted in Zubulake v. UBS Warburg LLC, 217 F.R.D. 309 (S.D.N.Y. 2003), "whether production of documents is unduly burdensome or expensive turns primarily on whether it [sic] is kept in an *accessible or inaccessible* format (a distinction that corresponds closely to the expense of production). In the world of paper documents, for example, a document is accessible if it is readily available in a usable format and reasonably indexed. Examples of inaccessible paper documents could include (a) documents in storage in a difficult to reach place; (b) documents converted to microfiche and not easily readable; or (c) documents kept haphazardly, with no indexing system, in quantities that make page-by-page searches impracticable." 217 F.R.D. at 318. Similarly, the court noted that the answer to whether a

28

B.    **Plaintiff's Proposed RRO is Ineffective and Overbroad under the Test of Laguna**

Beyond the foregoing threshold objections, Defendant hereby identifies several more specific problems with the PPRO.

1.    The PPRO Extends the Review of Inactive Records to Agencies in Addition To the Department of the Interior

The Jicarilla and Laguna RROs limited review by Plaintiff exclusively to Department of the Interior inactive records.[19]  Other agencies, including Treasury, the Forest Service (FS), the NARA, the Department of Energy (DOE), and the Nuclear Regulatory Commission (NRC), while subject to the preservation requirements of the RROs, were not included in the "Document Inspection" sections.  See §§ 2(a) - (d), Laguna and Jicarilla RROs.  In the instant case, Defendant has failed to

---

request imposed 'undue burden or expense,' boiled down to "'how important is the sought-after evidence in comparison to the cost of production?'" 217 F.R.D. at 322-23.

Other courts have likewise imposed restrictions on discovery requests deemed overly broad when compared to the importance of the materials sought or the cost of locating or producing them.  See, e.g., Coleman v. Am. Red Cross, 23 F.3d 1091, 1098 (6th Cir. 1994) (plaintiff's request that would have required the defendant to search every file that exists at its national headquarters for any documents that may be of any relevance to any matter in the case, held overly burdensome); and Quality Aero Tech., Inc. v. Telemetrie Elektronik GmbH, 212 F.R.D. 313, 318 (E.D.N.C. 2002)(request seeking potentially voluminous materials –  "all documents" relating to an international project –  held unduly burdensome).

Likewise, in Rincon Band v. United States, No. 80-A, 1980 U.S. Ct. Cl. LEXIS 1029, *3 (Ct. Cl. February 29, 1980), which involved claims brought by an Indian band, the U.S. Court of Claims refused to order the United States to produce its collection of publicly-available documents potentially relevant to those claims, where "the original documents or evidence have been equally accessible to both parties if they are willing to exert the necessary effort to sort them out."  This has particular application to the burdens Plaintiff seeks to impose on NARA here.

In short, other federal courts set appropriate limits on the burdens litigants may impose on each other in their search for documents and information, and this Court should do so here.

---

[19] Just as with the PPRO here, Plaintiffs' proposed orders in Jicarilla and Laguna also sought to control movement of active records going so far as to require the federal agencies involved to seek permission from Plaintiff prior to records movement.  The Court rejected Plaintiffs' request in those cases, and should do so here, as well.

show why these agencies should be subject to immediate document production obligations according to the schedule set out in the PPRO at § 2(e), particularly in the absence of any well-articulated claims offering some guidance as to relevant evidence for these non-Interior agencies and organizations. Thus, any document access and production provision in any RRO which might be entered in this case should not extend to Treasury, FS, NARA, DOE, or NRC.

2.    The PPRO Unacceptably Extends to Active Records

Contrary to the Jicarilla and Laguna RROs, the PPRO contemplates review of both inactive and active records. While Section 2 of Plaintiff's PPRO is entitled "Document Inspection and Production," and it specifically refers to review of inactive Navajo Trust Records, § 2(e) requires a "meet and confer" which in part is directed to scheduling review of active records.[20] This includes active records at BIA offices at the Chinle Agency, the Fort Defiance Agency, the Western Navajo Agency, the Eastern Navajo Agency, the Shiprock Agency, the AIRR, the Federal Records Centers, the Office of Trust Records (OTR), the Office of Special Trustee (OST), and any other federal agencies with Navajo records ranging from NARA to Department of Energy. An RRO here should also be limited to inactive records.

3.    The Time Frames for Completion of Designation and Review are Substantially Extended, Including No Time Limits for Designation.

Plaintiff has increased the time frames for it to complete the various activities for which the PPRO provides compared to the Jicarilla and Laguna RRO's. For example, Plaintiff has increased its allowed inspection period by one third to 90 days from the date records are made available. PPRO § 2(c). This is to be contrasted with the 63 days allowed under the Laguna and Jicarilla RROs § 2 (c).

_____

[20]The "meet and confer" is also meant to cover additional inactive records at agencies and offices other than the BIA Navajo offices, the AIRR, OTR, and OST.

More notable in the context of records found in Plaintiff's designation is PPRO § 2(b)ii, which

provides as follows:

> (ii) Plaintiff shall designate boxes or records listed in the provided indices that
> Plaintiff wishes to review for Navajo Trust Records at *any time*.

PPRO § 2(b)(ii) (emphasis supplied). Putting the burden on the government, § 2(b)(ii) goes on to
provide that:

> [I]f Defendant has informed Plaintiff in writing that it intends to move certain records
> to another location, then Plaintiff should make designations for those records within
> 90 days after receiving such notice.[2]/

Id. The terms proposed by Plaintiff are problematic for several reasons.  First, under the PPRO,

Plaintiff is permitted to designate boxes or records "at any time" for review absent Defendant

notifying Plaintiff in writing that it intends to move records to "another location."  Indeed, the

language is so broad that it contemplates control of document movement within the territorial borders

of the reservation itself.  This is made clear as well by the language in § 2(b)(iii) of the PPRO which

contemplates that documents should remain at the reservation facilities in which they are found for

Plaintiff's review.  In a reservation such as the Navajo, where inactive records are located in several

of the six geographically scattered agencies as well as the two regional headquarters locations in

Window Rock, Arizona, and Gallup, New Mexico, this provision would likely lead to simultaneous

document reviews in different parts of the reservation.  Put another way, § 2(b)(iii) denies the agency

discretion to move inactive documents to a single site in order to make the review process more

economical for both parties and less disruptive for the agencies.  Other notable increases in timing

requirements between the PPRO and the Jicarilla and Laguna RROs include an increase from 90 to

_____

[2]/Again, in the PPRO, 90 days (instead of 60 days) has become the default period within which
Plaintiff has to designate documents for scanning.

120 days as the amount of time that must expire between the date a box is presented for review and

when a box can be moved absent commencement of review by Plaintiff. See PPRO § 2(d). Only

after inaction by Plaintiff for the 120 days could Defendant move the boxes at issue. See id.

The effects of these provisions are to delay the transfer of inactive records to the security of

the AIRR, to hamper agency operations and any attempt to consolidate the records for review or

transfer, by restricting movement of the documents within the reservation, and to permit or even

require (as a practical matter) the simultaneous review of documents at scattered sites on the

reservation. Such restrictions decrease, rather than enhance, the security of documents while

increasing the burdens on the agencies involved.

4.    Further Provisions Delaying the Record Review Process

Under the terms of the Jicarilla and Laguna RRO § 2(d), Defendant is permitted to

remove inactive records "in accordance with its normal procedures and protocols" once designated

records had been copied or imaged. Under the PPRO, Defendant is precluded from moving

designated records until copies of the records are actually produced to the Plaintiff. The actual

production of copied or imaged records can reasonably add several weeks or, potentially, months to

the amount of time required to move the inactive records to the AIRR archive in Lenexa. That has

the compound effect of delaying the indexing and secure storage of these records at the AIRR.

5.    Extraneous Advocacy Provisions

At Section 3(a) of the PPRO, there is a provision which constitutes Plaintiff's gloss on the

trustee's purported record-keeping duties. The provision states as follows:

> Pursuant to Defendants' duties as a trustee to create, maintain in a
> businesslike manner, and make available to Plaintiff trust records related to
> Plaintiff's trust assets, Defendants could be expected to have maintained and
> to provide document-level indices and inventories for each location that may

32

contain Plaintiff's trust records. PPRO § 3(a).

The language appears without citation to any case law, statute or regulation. Certainly, Defendant is not aware of any such document-level indexation requirement in the law. Indeed, in the <u>Jicarilla</u> and <u>Laguna</u> RROs, there is no such language. Rather, this Court directs the parties to "develop a plan for indexing documents, data, and tangible things reasonably anticipated to be subject to discovery in this case." <u>Jicarilla</u> and <u>Laguna</u> RROs § 3(a).

Plaintiff excised the Court's language quoted immediately above and instead substituted language purporting to make "document-level indices" the standard unit for purposes of indexation. Particularly as Plaintiff failed to cite any statute or regulation imposing a requirement for "document-level indices," Defendant urges that the language not be included in any Order or other requirement imposed by the Court in response to Plaintiff's proposed RRO.

## C.    The Burdensome Impact of the PPRO on Agencies' Missions

As this court held in <u>Laguna</u>, "one seeking a preservation order [must] demonstrate that it is necessary and not unduly burdensome." <u>Laguna</u>, 60 Fed. Cl. at 138. Accordingly, in addition to making the required showing of necessity, "the proponent must show that the particular steps to be adopted will be effective *but not overbroad* – the court will neither lightly exercise its inherent power to protect evidence nor indulge in an exercise in futility." <u>Laguna</u>, 60 Fed. Cl. at 138 (emphasis supplied) (citing <u>In re Potash</u>, 1994 WL 1108312, at *8 (D. Minn. Dec. 5, 1994); and <u>Prudential Ins. Co. Of America Sales Practices Litigation</u>, 169 F.R.D. 598, 616-17 (D. N.J. 1997)).

As Defendant has explained elsewhere in this memorandum, Plaintiff failed to discharge its obligation to show that the order it seeks is necessary. In addition, Plaintiff failed to show that the order is not unduly burdensome or that the "particular steps to be adopted will be effective but not

overbroad," as it must do to meet the requirements this Court enunciated in <u>Laguna</u>, 60 Fed. Cl. at 138.  In contrast, the attached declarations from the United States government agencies whose records and operations would be most directly and severely affected by PPRO (namely, NARA, Interior, and Treasury) show that the order would impose undue burdens, and that the measures to be adopted are overly broad as well as unnecessary.

NARA's mission involves preserving and making available to the public for research those records of the United States determined to be "permanently valuable."   Declaration of Steven D. Tilley ("Tilley Decl."), Ex. 33, ¶¶ 4, 9, 16, and 17; Declaration of Gregory Pomicter ("Pomicter Decl."), Ex. 34, ¶¶ 4, 5, 10, 18, and 19[22].  As the attached NARA declarations establish, to locate all Navajo-related records amongst NARA's holdings would be a massive and severely burdensome undertaking.  Tilley Decl., Ex. 33, ¶¶ 6-8 and 10-13 ; Pomicter Decl., Ex. 34, ¶¶ 7-9 and 12-13.  NARA's vast archival holdings are organized or classified in over 500 record group designations.  Tilley Decl., Ex. 33, ¶ 6.   In general, federal records are arranged by the name of the government agency with which they are associated and each such agency has its own filing system, none of which are known to have been designed to enable a search of records by the name of an Indian tribe.  <u>Id.</u>  Rather, the records of each agency are arranged and filed by the agency's own bookkeeping and filing system, in accordance with existing file plans and records series set out in each agency's records schedules.  <u>Id.</u>  Consequently, NARA archivists are not generally able to search records of all government agencies under the search term "Navajo" to locate all records relating to this tribe.  <u>Id.</u>

---

[22]    Steven D. Tilley is the Director of the Textual Archives Services Division in the Access Programs unit of NARA's Office of Records Services, Washington DC.  Tilley Decl., Ex. 33, ¶ 1.   Gregory Pomicter is the Assistant for Operations in the Office of Regional Records Services of NARA.  Pomicter Decl., Ex. 34, ¶ 1.

Moreover, although many records relating to the Navajo would be expected to be found within Interior's record groups, NARA archivists are also aware of many record groups outside of DOI that also might conceivably contain Navajo-related records.  Id.  See also, Pomicter Decl., Ex. 34, ¶¶ 7-9 and 12 (discussing NARA's regional archival holdings, as well as the fact that a general search under the name "Navajo" is not possible, and that universe of record collections potentially containing Navajo-related records encompasses the records of many agencies, not just the BIA) .

In short, millions of unindexed pages of records amongst the NARA holdings might contain Navajo-related records of some type. Tilley Decl., Ex. 33,  ¶¶ 6 and 13; Pomicter Decl., Ex. 34, ¶¶ 7 and 13.  There are 25,777 cubic feet of BIA records held at Main Archives, alone.   Tilley Decl., Ex. 33, ¶ 14.  An additional 43,345 cubic feet of BIA records are held in NARA's regional archival facilities.  Pomicter Decl., Ex. 34, ¶¶ 8 and 14.  In addition, Navajo-related records may be located amongst the NARA holdings of records originating from various other government agencies.  Tilley Decl., Ex. 33, ¶ 6; Pomicter Decl. Ex. 34, ¶ 7.   Just the subset of "likely places" to find Navajo-related records itself amounts to an estimated 34,383 cubic feet of records.  Tilley Decl., Ex. 33, ¶ 12.

Furthermore, to attempt to identify and segregate "Navajo Trust Records" from other Navajo-related records, once the latter are identified, would be a project so labor-intensive and consuming it is virtually impossible for NARA to perform. Tilley Decl., Ex. 33, ¶¶ 8-9; Pomicter Decl., Ex. 34, ¶ 11.  In addition, as the Tilley and Pomicter Declarations also establish, the broad requirements of the proposed order concerning indexing Navajo-related records would impose a crippling burden on NARA.  For example, to index just the 25,777 cubic feet of BIA records located at the Main Archives of NARA would require 386,655 hours of labor, or 193.33 person/years of labor.  Tilley Decl., Ex. 33, ¶ 14.  In other words, it would require the equivalent of 20 archivists spending 9.7

35

years of their time indexing, or 100 archivists spending a full 2 years of their time, to index just the subset of BIA records located at NARA's Main Archives. Tilley Decl., Ex. 33, ¶ 14. Likewise, to review and index the additional 43,345 cubic feet of BIA records held in NARA's regional archival facilities, would take an additional 650,175 hours, or 325 person-years, of work. Pomicter Decl., Ex. 34, ¶ 14. As Gregory Pomicter's Declaration also establishes, that equates to 20 archivists spending 16 1/4 years each, just to identify and index Navajo-related records from one agency (BIA) held in the regional archives. Id.

      To pull the required numbers of NARA archivists away from all of the other functions they perform, to index Navajo-related records, would cripple NARA. Tilley Decl., Ex. 33, ¶ 18; Pomicter Decl., Ex. 34, ¶ 14. Furthermore, it would interfere with all of the other competing priority work performed on a daily basis by NARA staff, including handling reference requests; processing a backlog of more than a million cubic feet of records awaiting being made available to the public; accessioning approximately 35,000 cubic feet of new records per year; performing preservation work on existing archival record collections; and screening records for privacy-related information and to ensure that only unclassified records are opened. Tilley Decl., Ex. 33, ¶¶ 9 and 14; Pomicter Decl., Ex. 34, ¶¶ 10, 14, and 20. NARA fields, and follows-up on, over 1,000,000 reference requests per year from around the United States and around the world. Tilley Decl., Ex. 33, ¶ 9; Pomicter Decl. Ex. 24, ¶ 10. If its limited staff and budget must be allocated instead to the measures set forth in the PPRO, handling reference requests, and the other work NARA performs for members of the public will be severely curtailed. Tilley Decl. Ex. 33, ¶¶ 13, 14, and 20; Pomicter Decl., ¶¶ 13, 14, and 22. Plaintiff is not entitled to document retention and discovery measures that would cripple a

government agency's ability to serve the public.[23]  In short, there can be no question that, as to

NARA, the proposed order is not only unnecessary, but unduly burdensome.

Likewise, the proposed order would unduly burden the Regional Office and the program and

agency offices of BIA that serve the Navajo Tribe and its members.  The attached Declaration of

Omar Bradley, the Regional Director of the Navajo Regional Office, shows that a mandate that

inactive Navajo trust records be kept on-site at those offices, and produced there for Plaintiff's

inspection and review, contravenes Plaintiff's stated desire to preserve the records in a safe

environment.  Bradley Decl., Ex. 9, ¶¶ 8, 17, and 18.  In addition, the offices involved are not

designed or staffed to serve as record repositories or inspection venues.  Id. at ¶¶ 17 and 22.  The

financial and other burdens of forcing those offices and staffs to take on such responsibilities are

heavy, and would divert resources from already-strained budgets.  Id. at ¶¶ 23-25 and 28.   In

addition to personnel costs, the potential need for purchase of additional copiers, scanners, paper, ink,

file folders, boxes, equipment maintenance and additional space for storage and inspections could

exceed $100,000.  Id. at ¶ 28.

Moreover, inspection of trust records on site at the offices where they currently reside would

result in diversion of BIA staff to document production activities, to the detriment of important

ongoing work for the Tribe and its members.  Id. at ¶¶ 25-29.   The regional program office in

Window Rock, Arizona, serves as just one example of the hardships and undue burdens posed by

---

[23]    See, e.g.,  Leyh v. Modicon, Inc., 881 F.Supp. 420 (S.D. Ind. 1995)(A plaintiff who
brought a discrimination action was not allowed to depose the EEOC investigator because the
possibility that relevant admissions might be uncovered was outweighed by the burden of
subjecting EEOC to depositions of its investigators as a matter of course, since EEOC's principal
responsibility was to serve public as a whole, not individual litigants).

Plaintiff's requested order.  Id. at ¶ 32.  The bulk of the inactive records, awaiting shipment to the security of the AIRR, presently are located there.  Id. at ¶¶ 10 and 15-17.  The Window Rock office handles all of the realty functions for the Navajo Tribe, including maintenance and oversight of the Tribe's and individuals' Rights of Way, leases, permits, unresolved rights, trespass matters, and minerals.  Id. at ¶ 11.  The office is located in an historic building.  Id.  It has 15 employees, carrying out the functions of the office.  Id.  It has no conference room or any room that would accommodate the production or inspection of documents.  Id.  It is at capacity now, in terms of accommodating people and documents.  Id. at 33.  To force the BIA to produce records for inspection there (or at other program and agency offices) would not only divert staff and other resources to document production and inspection activities, it would also hamper the day-to-day performance of the realty functions carried out there.  Id. at ¶¶ 13-14, 20, 21-24, and 33.  Likewise, there is a danger that the work needed to comply with the proposed order would displace trust reform initiatives, which currently are priorities for the affected offices.  Id. at ¶ 26.

Even if personnel could be hired to assist in the tasks contemplated or required by the proposed order, budget constraints would force the offices concerned to borrow funds from other BIA programs to pay for the costs incurred.  Id. at ¶ 26.  Furthermore, experienced employees with the best knowledge of the contents of the active and inactive records within their areas of responsibility would have to devote time and attention to supervising any new staffers that could be hired, all to the detriment of their day-to-day mission.  Id. at ¶ 27.

Such circumstances of course arise whether inactive or active records are at issue. Production and inspection of active Navajo records at the Navajo Regional office and program and field offices serving the Navajo would place additional undue burdens not only on the BIA, but on

the persons it serves, by disrupting the day-to-day activities of the offices concerned.  Id. at ¶¶ 29-33.

 BIA staff members need access to active Navajo records throughout their work-day to perform their

jobs.  Id. at ¶ 31.  If they are required to make those records available for inspection and production

as set forth in the PPRO, services to the Tribe and others will be hampered and delayed.  Id. at ¶¶ 23-

24, 26, 27, and 30-31.

    For all of the reasons noted above, and as further set forth in the attached Bradley

Declaration, this Court should reject the PPRO because it saddles the Interior and BIA with undue

burdens and requires measures that are not only overly broad but unnecessary.  Moreover, those

measures cut against Plaintiff's stated desire to preserve trust records.

    The attached Declaration of Rita Bratcher of the Department of the Treasury (hereinafter

"Bratcher Decl.", Ex. 32), also makes clear that the proposed measures are unduly burdensome and

overly broad as applied to Treasury's records.  To conduct a search for Navajo-related trust records

held by Treasury, pursuant to the PPRO, would entail a search similar in scope to the one Treasury

undertook in connection with the Cobell litigation.  Bratcher Decl., Ex. 32,  ¶¶ 3-4.  Accordingly, the

search conducted in Cobell provides an apt analogy for the search Plaintiff's PRRO contemplates in

this case, and indicates the financial and other burdens the PPRO would impose on Treasury.  The

Cobell search took 14 months, required research at 37 facilities in 24 cities, and involved the work of

2,200 people.  Id. at ¶¶ 5 and 7.  It considered over 6 billion records and cost over $3.9 million, yet

yielded relatively few records relating to the individuals whose records were sought.  Id.  Such high

dollar costs, time requirements, and drains on human resources epitomize the phrases "unduly

burdensome" and "overly broad" in the context of a discovery order; they do so even more in the

context of a purported preservation and retention order.

In summary, Plaintiff's proposed RRO fails to meet the standards this court enunciated in Laguna. As this Court made clear, those requirements are informed by the United States Supreme Court's admonition that "'[b]ecause of their very potency,' . . . 'inherent powers [such as those this court relied on in holding that entry of a retention order lay within its "inherent power"] must be exercised with restraint and discretion.'" Laguna, 60 Fed. Cl. at 137 (citing Chambers, 501 U.S. at 44; and Roadway Express, Inc., v. Piper, 447 U.S. 752, 764 (1980)). Accordingly, should this Court decide a preservation order is necessary (which Defendant does not concede), the burdens imposed by such an order should not exceed those described in the Conclusion, infra.

Furthermore, as Defendant notes elsewhere in this memorandum, the provisions of the PPRO, i.e., the "particular steps to be taken," are aimed at compelling production and inspection of documents, rather than preserving them. In other words, the proposed order is a discovery order more than a document preservation order. This, too, shows the overbreadth of the measures plaintiff seeks in the name of "preservation" of records. It forms an additional and independent reason the proposed order is not appropriate in this case and should be rejected.

## CONCLUSION

In light of Plaintiff's failure to meet the Laguna test devised by this Court for entry of an RRO, the Government respectfully urges that no RRO be entered in this case. In the event the Court finds an RRO is required, the Government urges that the Court enter Sections 1, 4, 5, 6, and 8 of the Laguna RRO, which are preservation-directed and allow the parties to negotiate an appropriate stipulation to address any records access issues, i.e., discovery provisions, whether in the context of an ADR proceeding or otherwise.

40

Dated: June 21ˢᵗ, 2007.

Respectfully submitted,

RONALD J. TENPAS
Acting Assistant Attorney General

s/Robert W. Rodrigues
ROBERT W. RODRIGUES
Trial Attorney
LAURA MAROLDY
Trial Attorney
E. KENNETH STEGEBY
Trial Attorney
JOHN H. MARTIN
Trail Attorney
United States Department of Justice
Environment and Natural Resources
Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Telephone:     202.353.8839
Facsimile:      202.305.0506
Email: robert.rodrigues@usdoj.gov

Of Counsel:
Rachel Howard
Office of the Chief Counsel
Financial Management Service
United States Department of the Treasury

Gladys Orr Cojocari
Tom Kearns
Candace Beck
Office of the Solicitor
United States Department of the Interior
1849 C Street, NW
Washington, DC 20240

Jason R. Baron
Director of Litigation
Office of the General Counsel
National Archives and Records
Administration
8601 Adelphi Road, Suite 3110
College Park, MD 20740

41

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

WINNEBAGO TRIBE OF NEBRASKA,   )
                                            )

        Plaintiff,                   )

                                            )

        v.                       )      Case No. 06-cv-00913L

                                            )      Judge Margaret M. Sweeney

THE UNITED STATES OF AMERICA,   )

                                            )

        Defendant.          )

_____)

**PARTIES' JOINT STATUS REPORT PURSUANT TO
COURT ORDER DATED MARCH 8, 2007**

Pursuant to this Court's Orders dated March 8, 2007,[1] Plaintiff Winnebago Tribe of Nebraska and Defendant United States of America (the parties) hereby submit the following joint status report about (1) whether a document preservation order similar to the one issued on March 19, 2004, in Pueblo of Laguna v. United States (Laguna), 60 Fed. Cl. 133 (2004),[2] is necessary in this case; and (2) whether the jurisdictional limitations set forth in 28 U.S.C. § 1500 apply to this case.

**I.    Need for Document Preservation Order in this Case**

The parties have discussed and agreed that there is no need in this case for a document preservation order similar to the one issued on March 19, 2004, in Laguna, supra. As explained by Defendant in greater detail below, the United States Departments of the Interior (Interior) and of the Treasury (Treasury), i.e., the federal agencies that are involved in the Tribal trust accounting and trust mismanagement issues and claims asserted by Plaintiff in this case, have already implemented

---

[1]    By orders dated April 13 and April 23, 2007, the Court granted Defendant's unopposed request to extend the filing deadline of this Joint Status Report to April 30, 2007.

[2]    See also Jicarilla Apache Nation v. United States (Jicarilla), 60 Fed. Cl. 413 (2004).

policies and procedures that are fully adequate to preserve and retain the documents and data at the agencies that are relevant or potentially relevant to Plaintiff's issues and claims herein.

A.    **Department of the Interior**

The Interior Department established the Office of Trust Records (OTR) in 1999. See Exhibit A (attached).  OTR's mission is to develop and implement a program for the economical and efficient management of trust records, consistent with the American Indian Trust Fund Management Reform Act of 1994, Pub.L. No. 103-412 (1994); the Federal Records Act, Pub.L. 81 Pub. L. No 754; and a host of other statutes and implementing regulations.  Id.  Since 1999, OTR has been involved actively in Interior's efforts to manage and safeguard Indian Tribal trust records.[3] Id.  To that end, OTR has promulgated policies and procedures that instruct its employees, inter alia, about the identification of Indian trust records and the requirements for their retention and preservation. Part 303 of Interior's Departmental Manual (DM) sets forth the policies and procedures for

---

[3]    OTR has defined "Tribal trust records" as

all documents, data, and records upon which the Government must rely to fulfill its trust duties to recognized Indian Tribes pursuant to the American Indian Trust Fund Management Reform Act of 1994 (P.L. No. 103-412), and other applicable statutes; for example, those which evidence the existence of Tribal trust assets (e.g., ownership data, trust patents, plot descriptions, surveys, jacket files, statements of accounts, etc.), the collection of income from Tribal trust assets (e.g., deposit tickets, journal vouchers, schedule of collections, etc.), the use of Tribal trust assets (e.g., leases, sales, rights-of-way, investment reports, production reports, sales contracts, etc.), the management of Tribal trust assets (e.g., daily ledgers, investment reports, production verification reports, trespass enforcement, timber stumpage reports, royalty production reports, etc.), or the disbursement of Tribal trust assets (e.g., transaction ledgers, check registers, transaction registers, or lists of cancelled or undelivered checks, etc.).  Tribal trust assets are lands, natural resources, money or other assets that are or were held by the Federal government in trust, or that are were restricted against alienation for Indian tribes.

See Exh. C.

identifying, managing, protecting, and controlling Indian trust records. Exh. B. OTR officials frequently train both Interior and tribal employees to ensure their familiarity with Indian trust records and to assure compliance with the Department's established records retention schedules and management procedures. See generally Exhs. A and B. Interior's records retention schedules, specifically the ones pertaining to Indian Fiduciary Financial trust records that are contained in the Bureau of Indian Affairs Manual (BIAM), have been approved by the National Archives and Records Administration (NARA) and provide for the permanent retention of such records. See generally Exh. A; see also BIAM Series 4400, 4500, 4600, 4800.

In March 2002, the Deputy Secretary of the Interior issued a Departmental Memorandum imposing a freeze on the destruction of all Indian trust records. Exh. C. This memorandum instructed "all Interior employees to immediately preserve all documents, e-mail, and other records relating to Indian Tribal trust funds and Tribal trust assets, even if record retention schedules or other rules, manuals, or handbooks would allow their destruction." Id. The memorandum charged supervisors with assuring that subordinate employees in the possession, custody and control of Tribal trust documents understand the importance of preserving them, and, further, it held employees accountable for failure to do so. Id.

In April 2002, the Deputy Secretary sent to the Special Trustee for American Indians and the Assistant Secretary for Indian Affairs a memorandum about the management of Indian trust records. Exh. D. Among other things, this memorandum reiterated the mandate set forth in the March 2002 memorandum banning the destruction of Indian trust records. Id. This Department-wide prohibition on the disposition of Tribal Trust Records remains in effect to this day. See id.; see also 16 BIAM Series 4400, 4500, 4600, 4800.

On April 6, 2004, the Deputy Secretary issued a memorandum to the heads of various components and sub-agencies of the Interior Department[4] about the document preservation orders that had been issued in <u>Laguna</u>, <u>supra</u>, and <u>Jicarilla</u>, <u>supra</u>.  Exh. E.  This memorandum re-affirmed the existing duties, responsibilities, and obligations of Interior Department officials and employees to preserve Indian trust documents and data as set forth in the Departmental Memorandum dated March 20, 2002.  <u>Id.</u> at 2.  The memorandum also imposed preservation and retention obligations pertaining to relevant or potentially relevant data and information on the telephone and voice-mail systems of the Interior Department.  <u>Id.</u>

Since the issuance of these memoranda by the Deputy Secretary, Interior has published periodic reminders containing instructions regarding certain document preservation obligations.  The publications have occurred on July 9, 2004, July 13, 2004, and October 26, 2006.  Exhs. F, G, H.

On March 12, 2007, the Acting Deputy Solicitor issued a Departmental Memorandum to the heads of various components and sub-agencies of the Interior Department,[5] reiterating Interior's

---

[4]     The recipients of this memorandum were the Secretary; Acting Solicitor; Assistant Secretary-Fish and Wildlife and Parks; Assistant Secretary-Indians Affairs; Assistant Secretary-Land and Minerals Management; Assistant Secretary-Policy, Management and Budget; Assistant Secretary-Water and Science; Deputy Assistant Secretary-Policy; Inspector General; Director, U.S. Geological Survey; Director, Bureau of Land Management; Director, Minerals Management Service; Commissioner, Bureau of Reclamation; Acting Director, Bureau of Indian Affairs; Special Trustee for American Indians; Director, Office of Trust Records; Director, Office of Historical Trust Accounting; Associate Director, Minerals Revenue Management, MMS; Regional Director, Southwest Region, BIA; Superintendent, Jicarilla Agency, BIA; Superintendent, Laguna Agency, BIA; Superintendent, Southern Pueblos Agency, BIA.  Exh. E.

[5]     Once again, the recipients of the memorandum were the Office of the Secretary; Office of the Solicitor; Office of the Special Trustee; Office of Historical Trust Accounting; Office of the Inspector General; Office of the Assistant Secretary-Indian Affairs; Bureau of Indian Affairs; Office of the Assistant Secretary-Policy, Management and Budget; Office of Hearings and Appeals; Office of the Assistant Secretary-Land and Minerals; Minerals Management Service; Office of Surface

(continued...)

policy regarding the preservation and retention of Indian trust-related documents and data. Exh. I. Among other things, the memorandum identified, by name, the Tribes (including Plaintiff herein) or groups that had filed trust accounting and trust mismanagement cases against Defendant. Id. Using the broad language set forth in the document preservation order in Laguna, supra, and Jicarilla, supra, the memorandum mandated the preservation of "all documents, data, and tangible things in the possession, custody or control" of Interior employees, bureaus, and offices that may be relevant to the subject matter of the Tribal trust cases.[6] Id. at 2. The memorandum applied to all paper documents, electronically stored information, and other materials, such as maps, videos, calendars, and charts, and it included those materials stored at off-site storage facilities and Federal Records Centers (FRCs). Id. Further, the memorandum instructed Interior employees about the obligations imposed by the recent amendments to the Federal Rules of Civil Procedure to preserve electronically stored information and directed them to comply with those obligations. Id. at 3.

---

[5]/(...continued)
Mining; Bureau of Land Management; Office of the Assistant Secretary-Fish, Wildlife and Parks, Fish and Wildlife Service; Office of the Assistant Secretary-Water and Science; Bureau of Reclamation; United States Geological Survey. Exh. I.

[6]       The Office of the Solicitor defined "relevant information" as

reflecting, referring or relating to (1) any asset, such as funds, land, minerals, forestry, sand and gravel, or that resources, that is, or at any time has been held in trust by the United States or its agents for the Plaintiff; (2) policies, procedures, guidelines, or correspondence relating to any aspect of the management or administration of trust assets; (3) proceeds, interest, or income from trust assets; or disbursement, distribution, disposition or transfer of any trust assets; (4) reports, appraisals, reconciliations, or evaluations of any trust assets; and (5) information that serves to identify, locate, or link any relevant information, such as file inventories, file folders and indices.

Exh. I at 2.

Additionally, the memorandum required Interior employees to retain and preserve Indian trust documents and data retroactively and prospectively. Id.

### B. Department of the Treasury

Treasury has implemented retention policies and procedures for documents relating to Tribal trust funds.[7] Treasury's retention policy relies in part on a successful structure that it developed to comply with a retention order issued in connection with Cobell, supra. See generally Exhs. J, K, L. Shortly after the filing of Tribal trust accounting and trust mismanagement cases in the Spring of 2002, Treasury instructed its employees to take steps to "preserve any potentially relevant documents and to perform an initial identification of what documents we have."[8] Exh. M (with attachments). Treasury stressed that its employees have to "retain and maintain those records associated with the tribal trust fund accounts, regardless of NARA approved disposition schedules." Id. This directive remains in full force and effect today. Id.; see also Exhs. N-Q.

In addition to the foregoing Treasury Department directive, the Treasury bureaus that have program responsibilities relating to Tribal trust funds, i.e., the Financial Management Service (FMS) and the Bureau of Public Debt (BPD), have implemented their own document retention policies and

---

[7]    To the extent that this case involves Treasury, that involvement pertains to Treasury's asserted role as a co-trustee for funds held in trust for Plaintiff.

[8]    Treasury applies its retention policies, described at Exhibits M-Q, to records in a wide variety of media. Treasury defines "record" to include:

> any handwritten, typed or printed documents (such as memoranda, correspondence, telephone logs, calendars, notes, books, brochures, studies, writings, drafts, transcripts, and minutes). The term "record" also includes documentary material in other forms (such as electronic documents or presentations, electronic mail, magnetic tapes, computer disks, audio or video records, slides, microfilm and motion pictures).

Exh. M.

procedures specifically for the Tribal trust cases, as well as the <u>Cobell</u> litigation.  <u>See</u>, <u>e.g.</u>, Exhs. N, O.  These policies and procedures are not only widely available to employees on the Departmental components' Intranet, but also included in periodic reminders and discussed within the bureaus.  Exhs. P, Q, R.  In addition to existing procedures for the retention of documents in paper format, both FMS and BPD have procedures in place to assure retention of electronic documents potentially relevant to Indian tribal trust funds.  Exhs. Q, R.

The parties believe that the document retention policies pertaining to Tribal trust funds that are presently in effect at Treasury obviate the need for additional preservation orders similar to those issued in <u>Cobell</u>, <u>supra</u>; <u>Laguna</u>, <u>supra</u>; and <u>Jicarilla</u>, <u>supra</u>.  <u>Cf.</u> Exh. K (Order in <u>Cobell</u> dated August 11, 1999); Exh. S (Order in <u>Laguna</u> dated March 19, 2004); and Exh. T (Order in <u>Jicarilla</u> dated March 19, 2004), with Exhs. N, O.

## II.    Parties' Positions Regarding 28 U.S.C. § 1500

Plaintiff does not believe that the Complaint in this case, as presently pled, implicates the jurisdictional limitations contained in 28 U.S.C. § 1500.  While Plaintiff has filed and is maintaining this case and a companion case in the United States District Court for the District of Columbia, <u>Winnebago Tribe of Nebraska v. Kempthorne</u>, Civ. No. 1:05cv02493-JR (D.D.C.), and, while the issues and claims presented by Plaintiff in both cases relate generally to the trust accounting and trust management duties and responsibilities allegedly owed by Defendant to Plaintiff, Plaintiff takes the position that the Complaint in this case seeks relief that is distinct from the relief requested in the Complaint in the District Court companion case.  Specifically, Plaintiff demands monetary relief or damages in this case, while it seeks declaratory and injunctive relief in the District Court.

Defendant is still investigating the applicability of 28 U.S.C. § 1500 to this case, but, at this

time, it has not determined that 28 U.S.C. § 1500 is implicated herein.

Notwithstanding the foregoing, the parties reserve their right to amend their positions as to the applicability of 28 U.S.C. § 1500 as this case and the companion case in the District Court evolve and relevant facts become more fully developed.

Respectfully submitted this 30th day of April, 2007,

MATTHEW McKEOWN
Acting Assistant Attorney General

s/ Brian J. Leinbach
BRIAN J. LEINBACH
Engstrom, Lipscomb & Lack
10100 Santa Monica Blvd., 16th Floor
Los Angeles, CA  90067-4107
Tel:  (310) 552-3800
Fax: (310) 552-9434

Attorney of Record for Plaintiff

OF COUNSEL:

PATRICIA A. MARKS
15992 A.E. Mullinix Road
Woodbine, MD  21797-8440
Tel:  (410) 489-4553
Fax: (301) 854-5117

WALTER J. LACK
Engstrom, Lipscomb & Lack
10100 Santa Monica Blvd., 16th Floor
Los Angeles, CA  90067-4107
Tel:  (310) 552-3800
Fax: (310) 552-9434

GREGORY A. YATES
16830 Ventura Blvd, Suite 250
Encino, CA 91436
Tel:  (310) 858-6944
Fax: (818) 905-7038

s/ Kevin J. Larsen
KEVIN J. LARSEN
United States Department of Justice
Environment and Natural Resources Division
P.O. Box 663
Washington, D.C.  20044-0663
Tel: (202) 305-0258
Fax: (202) 353-2021

Attorney of Record for Defendant

OF COUNSEL:

ANTHONY P. HOANG
MARTIN J. LALONDE
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C.  20044-0663
Tel: (202) 305-0241
Tel: (202) 305-0247
Fax: (202) 353-2021

GLADYS ORR COJOCARI
Office of the Solicitor
United States Department of the Interior
Washington, D.C.  20240

RACHEL HOWARD
Office of the Chief Counsel

- 8 -

Financial Management Service
United States Department of the Treasury
Washington, D.C.  20227

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

PUEBLO OF LAGUNA                    )
    Plaintiff,                 )
                       )
    v.                         )     No. 02-24 L
                       )     Judge Francis M. Allegra
UNITED STATES OF AMERICA,           )
                       )
    Defendant.                 )
_____)

## DEFENDANT'S NOTICE OF FILING OF UPDATE
## CONCERNING INADVERTENT DOCUMENT DESTRUCTION

Pursuant to Section 4 of the Record Retention Order dated March 19, 2004, Defendant United States hereby submits a report from the Office of the Chief Counsel, Financial Management Service, United States Department of the Treasury (Treasury), which provides updated information that Treasury has obtained, since July 9, 2007, about the inadvertent destruction of certain documents by a subcontractor of Treasury's agent, the Bank of America. See Defendant's Exhibit ("Def. Exh.") 1.

As detailed in the attached report, Treasury has learned, among other things, that the data from all 15 of the inadvertently destroyed boxes of government records were recorded in Treasury's CA$HLINK II system, so that it should be possible to recreate the data from CA$HLINK II; that the CA$HLINK II electronic data provided sufficient information to enable any depositing agency (e.g., the Department of the Interior) to retrieve its own paper copy of any deposit ticket or debit voucher that was in the inadvertently destroyed boxes; that the boxes contained materials relating to government-wide deposit ticket and debit voucher activity, so that not every record in the 15 boxes related to Indian trust-related transactions; that the Bank of America has recreated entirely the deposit and debit voucher activity for 11 of the 15 inadvertently destroyed boxes and determined that

more than 98 percent of the materials in those 11 boxes did not relate to Indian trust transactions;

and that the Bank of America has acted promptly and implemented certain security measures so as

to ensure a similar incident does not occur in the future. Id., ¶¶ 1-4, at 1-2.

Respectfully submitted this 24th day of September, 2007,

RONALD J. TENPAS
Acting Assistant Attorney General

*s/Robert W. Rodrigues*
ROBERT W. RODRIGUES
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 353-8839
Fax: (202) 353-2021
Email: robert.rodrigues@usdoj.gov

Attorney of Record for Defendant

OF COUNSEL:

LAURA MAROLDY
E. KENNETH STEGEBY
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Tel: (202) 514-4565
Tel: (202) 616-8119
Fax: (202) 353-2021
E-mail: laura.maroldy@usdoj.gov
E-mail: kenneth.stegeby@usdoj.gov

TERESA E. DAWSON
Office of the Chief Counsel
Financial Management Service
United States Department of the Treasury

- 2 -

Washington, D.C.  20217

ELISABETH BRANDON
GLADYS ORR COJOCARI
Office of the Solicitor
United States Department of the Interior
Washington, D.C.   20240



**DEPARTMENT OF THE TREASURY**
FINANCIAL MANAGEMENT SERVICE
WASHINGTON, D.C. 20227

Date:        September 11, 2007

To:          Anthony P. Hoang
             Robert Rodrigues
             Environmental and Natural Resources Division
             United States Department of Justice

From:        Teresa E. Dawson
             Office of Chief Counsel
             Financial Management Service
             United States Department of the Treasury

Subject:     Update Concerning Bank of America Incident Reported on July 9, 2007

          This memorandum provides additional information that we have learned about the above-referenced incident since our initial memorandum of July 9, 2007.

1.        We previously informed you that, in April 2007, an employee at Iron Mountain (a records storage company) mistakenly destroyed 24 boxes of documents being stored by Iron Mountain for Bank of America, a depository bank and one of Treasury's financial agents. Some of these boxes contained government records and some contained Bank records. In particular, 14 boxes were identified as containing government records, and a 15th box was identified as containing "adjustment backup documentation" which could have been either government or Bank records. We have further reviewed the type of material that would have been in the box of "adjustment backup documentation" material, and have concluded that this material does comprise government records. However, contrary to our initial understanding, data from these materials would have also been captured in Treasury's CA$HLINK II system. Therefore, data from all 15 of the 15 inadvertently destroyed boxes of government records were recorded in, and should be able to be recreated from, CA$HLINK II. Paragraph 3 below provides further information concerning recreated data.

2.        Bank of America acted promptly to ensure that a similar incident would not occur in the future. Specifically, an investigation into the cause of this incident revealed that an Iron Mountain employee was able to, and did, override the "Hold" placed on these Bank records in Iron Mountain's system. Iron Mountain's system has since been modified so that only one Iron Mountain employee – namely, Iron Mountain's account manager for the Bank of America account – has permission within Iron Mountain's system(s) to override any "Hold" condition placed on Bank of America records. Moreover, Iron Mountain issued a broadcast reminder to all employees with any responsibility for Bank of America records that these materials are subject to a "Hold" condition that may not be overridden.

3.    Although it may not have been clear in our earlier memo, not every government record in these 15 boxes pertained to Indian trust-related transactions. Rather, the materials in these boxes encompassed government-wide deposit ticket and debit voucher activity. As explained previously, depositary banks enter data from all deposit tickers (SF 215s) and debit vouchers (SF 5515s) into the CA$HLINK II system.[1] Using data from CA$HLINK II, the Bank was able to reconstruct entirely the deposit and debit voucher activity for 11 of the 15 inadvertently destroyed boxes. This reconstruction revealed that more than 98% of the 119,838 items in those 11 boxes did _not_ relate to Indian trust transactions. Only 1,444 items in the 11 boxes (less than 2% of the total) represented Bureau of Indian Affairs (BIA) transactions that might have been Indian trust-related, and those are likely to include a mixture of IIM, tribal trust, and non-trust items. Moreover, there is no indication that the percentage of non-trust items would be any different for the four boxes of deposit tickets and debit vouchers for which the data is more complicated to recreate (due to the transfer of deposit-related activity among different bank locations) and which therefore have not yet been analyzed.

4.    Finally, the electronic data in CA$HLINK II provide sufficient information to enable any depositing agency to retrieve its own paper copy of any deposit ticket or debit voucher that was in the boxes inadvertently destroyed. Not only is there an "agency copy" in each of these multi-part forms, but, in accordance with Treasury instructions, depositary banks provide other copies of these items to depositing agencies at the time of the transactions.[2]

We believe it may be helpful to the courts now entertaining record retention orders to receive copies of this memorandum so that they are fully aware of the circumstances surrounding this incident. While regrettable, this incident did serve to demonstrate that the systems in place at Bank of America and Treasury allow us to identify such errors in a timely fashion, which was a concern expressed by Judge Allegra at the hearing concerning the record retention order to be issued in _Jicarilla_.[3] It also serves to

---

[1] The only piece of information on SF 215s and 5515s that is not recorded in CA$HLINK II is the contents of the "agency use" field. This field is an optional field agencies use at their discretion – some agencies use it, some do not. Even those who do may not use it on a consistent basis. Because it is not an element of data required for Treasury's processing of these records, it is not captured in CA$HLINK II.

[2] Volume V of the Treasury Financial Manual contains Treasury's instructions to its depositaries. Part 1, Chapter 2000 of Volume V instructs depositaries to distribute the multiple copies of the SF 215 "according to the instructions printed on each copy" and to deliver "the memorandum and confirmed copies of the SF 5515" to the depositing agency. _See_ V TFM §§ 2040.10(c), 2040.20(a) (copies attached). As can be seen on the exemplars provided, the depositary is to return the "Confirmed Copy" of the SF 215 to the depositor, and to return the "Memorandum Copy" and the "Confirmed Copy" of the SF 5515 to the depositing agency. An "Agency Copy" is also provided in each form, which the depositor may "retain ... for internal use." (Indeed, if the agency were not provided its own copy of the form, the "agency use" field would be of no use whatsoever.)

[3] As Judge Allegra stated, "So how does one then in the agency determine whether or not that [agency] order [freezing destruction of Indian records] is being complied with? ... _Would we know if something got destroyed ..._?" Hearing on Plaintiff's Proposed Record Retention Order, _Jicarilla v. United States, Laguna v. United States_, February 13, 2004 (emphasis added). The need of the Financial Management

2

demonstrate that Bank of America and Treasury are committed to addressing any such errors promptly. Because human error is inevitable regardless of the number of safeguards in place, we do not believe that this incident provides any basis whatsoever to impose further restrictions on Treasury's ability to manage its burgeoning records population.

---

Service's Chief Counsel to know about any such incidents has been a point of emphasis at all training sessions given by FMS's Chief Counsel's office since the *Jicarilla* and *Laguna* orders were entered.

3

# United States Court of Federal Claims

NAVAJO NATION                                  )
f.k.a. NAVAJO TRIBE OF INDIANS,                )
                                               )
              Plaintiff,                        )
                                               )        No. 06-945L
       v.                                      )        Judge Francis M. Allegra
                                               )
UNITED STATES,                                 )
                                               )
              Defendant.                        )

## DEFENDANT'S NOTIFICATION OF DISCOVERY OF DOCUMENT DAMAGE

       Pursuant to Section 4 of the Navajo Record Retention Order dated September 10, 2007, Defendant hereby notifies the Court of the discovery of damage to records potentially relevant to this case. The relevant information is as follows:

1.     On April 8, 2008, Solicitor's Office attorneys advised the Department of Justice ("Justice") attorneys of record in this case that, in the course of privilege reviews taking place at the Gallup, New Mexico Federal Building, Solicitor's Office attorneys had discovered certain records and file folders which displayed some water damage and/or mold. The records had been included in a collection of boxes originally stored at the Bureau of Indian Affairs Regional Office in Window Rock, Arizona.

2.     The initial discovery of some of these damaged records occurred in the afternoon of April 3, 2008, and additional documents were discovered thereafter. At the present time 9 boxes have been discovered containing some documents with mold and/or water damage.

3.     On April 8, 2008, Justice attorneys contacted opposing counsel and advised them

of the information set out above.

4.     The Department of the Interior intends on obtaining further information as soon
as possible concerning the damaged documents and will provide that information
to the Court and opposing counsel as it becomes available.

Respectfully submitted this 15th day of April, 2008.

RONALD J. TENPAS
Assistant Attorney General

s/Robert W. Rodrigues
Robert W. Rodrigues
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 663
Washington, D.C. 20044-0663
Telephone: 202-353-8839
Facsimile: 202-353-2021

Attorney of Record for Defendant

# In The United States Court of Federal Claims

No. 06-945L

(Filed:  April 16, 2008)

_____

NAVAJO NATION
f.k.a. NAVAJO TRIBE OF INDIANS,

          Plaintiff,

   v.

THE UNITED STATES,

          Defendant.

_____

**ORDER**

_____

On April 15, 2008, defendant filed a notification of discovery of document damage, apprising the court that the Solicitor's Office had, in the course of privilege reviews, discovered certain records and file folders that displayed water damage and/or mold in a collection of boxes stored at the Bureau of Indian Affairs Regional Office in Window Rock, Arizona.

Accordingly, it is hereby ordered that, on or before Wednesday, April 30, 2008, defendant shall file a detailed status report explaining the following:

1.     The nature of the destruction and/or damage to documents;

2.     The best estimate of when the destruction and/or damage to the documents occurred;

3.     The circumstances regarding the destruction and/or damage to the documents and the discovery of the damage; and

4.     The steps the agency has taken or will take to ensure that there is no further damage to documents.

**IT IS SO ORDERED.**

s/ Francis M. Allegra
Francis M. Allegra
Judge

TESTIMONY OF THE HONORABLE EARL E. DEVANEY
INSPECTOR GENERAL FOR THE DEPARTMENT OF THE INTERIOR
BEFORE SUBCOMMITTEE ON ENERGY AND RESOURCES
UNITED STATES HOUSE OF REPRESENTATIVES
SEPTEMBER 13, 2006

Mr. Chairman and members of the Subcommittee, I want to thank you for the

opportunity to address the Subcommittee this morning concerning the status of the

investigation being conducted by Office of Inspector General (OIG) for the Department

of the Interior (DOI) into the circumstances surrounding the failure of Minerals

Management Service to include price thresholds in deepwater leases entered into during

1998 and 1999. You have also requested that I address "the institutional culture of

managerial irresponsibility and lack of accountability" that lies beneath some of the most

significant failures within the Department.

Let me begin with a brief description of the process we undertake when

conducting an investigation. OIG investigations spring from numerous sources: requests

from Congress; requests from the Secretary or other senior DOI officials and credible

allegations by DOI employees, public citizens, or anonymous sources. Regardless of the

source, our investigations are conducted prudently, thoroughly and completely. We

always proceed at a deliberate pace, but speed never supersedes accuracy. Although

often pressured to do so, we will not rush an investigation to meet the specific needs of

any source.

The subject matter underlying most of our high-profile investigations is often

fraught with fervent emotions, strong opinions and competing interests. The issues

pertaining to the deepwater leases are no exception. Armed with the protections afforded

by the IG Act, however, we undertake investigations with no preconceived notions and

1

no preordained outcomes.  With the very integrity of the OIG at stake each time we conduct an investigation, we must demonstrate professionalism, independence and objectivity at all times.  As the content of our previous reports demonstrates, we will condemn the Department for wrongdoing and we will exonerate the Department when allegations prove unfounded.

We generally conduct our investigations from the lowest level to the highest; from the least culpable to the most.  Our investigators travel throughout the country, as necessary, to interview witnesses and secure documentary and physical evidence.  When highly technical or specialized issues arise, we may secure the assistance of independent subject-matter experts, or partner with other law enforcement entities that possess a required expertise.

We report the results of our investigations in a variety of formats, choosing the most appropriate format for the purpose at hand.  If we are referring a case for criminal prosecution, we do so by way of a formal Report of Investigation, a document which contains all witness interviews, evidentiary documents and investigative activity reports. If we are referring a matter for administrative action by the Department, we may tailor Reports of Investigation to address the conduct of individual employees, when such information can be reasonably segregated.  If we are preparing a report for release to the public, it will typically be written in narrative form, but with confidential, personal privacy, and other privileged information redacted.

Whether an investigation results in the prosecution and conviction of a criminal defendant or disciplinary action against an employee engaged in misconduct, I am most pleased when the results of an investigation also give the Department insight and

incentive to improve the way in which it conducts itself, and in doing so, prevents the problem from recurring.

I would like to give this Subcommittee my assurance that OIG investigators are working diligently to finalize our report of investigation concerning the terms of the deepwater leases issued in 1998 and 1999. In summary, we conducted our investigation with two primary questions in mind: How and why were price thresholds omitted from the deepwater leases of 1998 and 1999; and what happened once the omission was discovered. What we know is that MMS told us that they intended to include price thresholds in leases issued pursuant to the Deepwater Royalty Relief Act, as evidenced in the first leases issued in 1996 and 1997. As MMS was developing new regulations relating to the Deepwater Royalty Relief Act, confusion arose among MMS components as to whether or not the regulations would address price thresholds. In the end, the regulations did not.

The person responsible for directing the preparation of the leases said he was told by those in MMS' Economics and Leasing Divisions to take the price threshold language out of the leases. This individual submitted to a polygraph, and passed.

Those in the Economics and Leasing Divisions denied doing so. One of these individuals provided a sworn statement, submitted to a polygraph, and passed. Another individual refused to provide a sworn statement, so was not asked to take a polygraph. The third individual provided a sworn statement, but refused to take a polygraph.

The attorney involved in both processes conceded to an MMS official that he should have spotted the omission, but did not. The official who signed the leases on behalf of MMS told us he relied on counsel and his staff.

When the omission was discovered by MMS staff in 2000, it was not conveyed to the MMS Directorate. We interviewed the former MMS Directors who were in place at the time of the omission and the time of its discovery. Each told us that they only became aware of the omission when the *New York Times* article came out this year.

So far we have interviewed 29 witnesses, including present and former DOI employees. We have obtained approximately 11,000 MMS e-mails through a storage system unique to the Department, necessitated by the Indian Trust litigation, and, using software developed by OIG forensics specialists, we searched this universe to extract e-mails potentially relevant to this issue. We then conducted further investigative analysis, and determined that less than twenty e-mails were specifically on-point.

We found a brief flurry of e-mail discussion in 2000 about the discovery of the omission of price thresholds, and the e-mails document the decision not to advise the Director. Unfortunately, the official who made this particular decision is deceased. We did not find any e-mail prior to 2000 that touched on this issue.

Mr. Chairman, in the end, unless we come across something entirely unexpected, this appears to be an example of bureaucratic bungling, of the stove-piping of various responsibilities involved in a complex undertaking, reliance on a surname-process which dilutes responsibility and accountability by including virtually every official involved, having no one person ultimately responsible for the quality assurance of the final product. Although we have found massive finger-pointing and blame enough to go around, we do not have a "smoking gun;" we do, however, have a very costly mistake which might never have been aired publicly absent the *New York Times*, the interest of this Committee,

the Senate Committee on Energy and Natural Resources and that of several other interested members of Congress.

This brings me to the second matter of concern to the Committee – the culture at the Department of the Interior that sustains managerial irresponsibility and a lack of accountability. I would like to speak about this culture in very general terms, if I may. In fairness, I cannot speak about it in terms of the 1998-1999 deepwater royalty relief issue, since the Secretary has not yet had the benefit of our report on the matter. In fact, while Secretary Kempthorne has essentially inherited the culture at Interior, he has already signaled, both in terms of his early messages to Interior employees and in discussions with me, his intentions to create and sustain a culture of ethics and accountability during his tenure as Secretary of the Interior. Therefore, I am hopeful at this juncture that the culture that I describe in my testimony today will soon become a thing of the past.

I recently marked my seventh anniversary as Inspector General for the Department of the Interior. Over the course of this seven year tenure, I have observed one instance after another when the good work of my office has been dynamically disregarded by the Department. Simply stated, short of a crime, anything goes at the highest levels of the Department of the Interior. Ethics failures on the part of senior Department officials – taking the form of appearances of impropriety, favoritism, and bias – have been routinely dismissed with a promise "not to do it again." Numerous OIG reports, which have chronicled such things as complex efforts to hide the true nature of agreements with outside parties; intricate deviations from statutory, regulatory and policy requirements to reach a predetermined end; palpable procurement irregularities; massive project collapses; bonuses awarded to the very people whose programs fail; and

indefensible failures to correct deplorable conditions in Indian Country, have been met with vehement challenges to the quality of our audits, evaluations and investigations. Typically, the Department has disputed a number of negligible details contained in our reports, losing sight of – or, perhaps intentionally eclipsing – the greater issues, tainting the whole of any given report with trifling details.

In one particularly contentious investigation of a high-level official that we conducted over the course of several years, and which cost my office well over $1 million, we were met with just such an assault from two different fronts – both the Department and the Office of Government Ethics (OGE). At the conclusion of our investigation, we sought the opinion of OGE on myriad issues. We were astonished to learn that, following a lengthy and time-consuming analysis, OGE would only opine when they believed that no ethics violation had occurred; they would not opine that an ethics violation had occurred, deferring to the Secretary and her ethics office for such a determination. In this particular case, we had also sharply criticized the Department's ethics office, which is why we referred the matter to OGE. The Catch-22 we found ourselves in was disheartening.

When I transmitted this particular Report of Investigation to former Secretary Norton, I commented that:

> ….the American public is not equipped to conduct the kind of tortured analysis necessary to come to a sound legal conclusion in matters like this. Whether a violation occurred or not may ultimately be irrelevant. Mere appearances, however, will erode the public trust. Once eroded, that trust is difficult – if not impossible – to win back. This is only one in a series of cases in which we have observed an institutional failure to consider the appearance of a particular course of conduct on the part of Departmental employees and officials. It is my hope, however, that this may be the case that changes the ethical culture in the Department.

6

Clearly, Mr. Chairman, my hope was not realized. In fact, former Secretary Norton met with me at length and indicated that she accepted this official's admission that he exercised bad judgment, but given his promise not to do so again, she was unwilling to take any action against him.

I have watched a number of high-level Interior officials leave the Department under the cloud of OIG investigations into bad judgment and misconduct. Absent criminal charges, however, they are sent off in usual fashion, with a party paying tribute to their good service; wishing them well, to spend more time with their family or seek new opportunities in the private sector. This charade does not go unnoticed by the career public servants, many of whom have been witnesses in our investigations. What are these civil servants to think? If those at the top are not held accountable, why should those at lower levels not feel empowered to challenge the call for accountability?

In June 2004, my office issued an evaluation report on *Conduct and Discipline* at the Department which chronicled an unfortunate culture of inequity and ineffectiveness. This report included an employee survey which revealed widespread skepticism regarding the fairness of the Department's discipline policies. For instance, over one-third of the respondents believed that discipline for misconduct depended on who committed the offense, rather than the offense itself. A startling forty-six percent of respondents stated that discipline was administered fairly only "sometimes," if ever. During this evaluation, we also conducted a number of "town meetings." At over half of these meetings, employees reported that supervisors were either not disciplined at all or disciplined more leniently. This failure to hold the leadership of the Department accountable sets the stage for the remainder of the workforce. If one subscribes to the

7

concept of "leading by example," it is no wonder that a "culture of managerial

irresponsibility and lack of accountability" thrives at Interior.

This culture also drives much of the work that my office does. Shortly after I

arrived at the Office of Inspector General, I created the Program Integrity Unit. Initially,

it was a small, dedicated unit to promptly investigate allegations against senior-level

officials. Over the years, however, I have reluctantly dedicated more and more resources

to this "specialized" entity, which now constitutes the largest investigative unit in the

OIG, and which is unparalleled in federal OIG counterparts. This unit operates under

extraordinary pressure, both internal and external. The Program Integrity Unit "enjoys" a

boundless source of complaints, allegations and requests for investigation. Before one

priority case can be completed, two or three or more are in the queue. This is simply not

the mark of good government.

Mr. Chairman, I do not have a simple solution. I am hopeful that somehow the

Congress, Secretary Kempthorne and I can work together constructively to disassemble

this troubling culture at Interior and replace it with a strong, sustainable culture of ethics,

responsibility and accountability. I am in the process of collecting my thoughts about

this issue, and memorializing them in a white paper, which may serve as a roadmap as we

undertake this daunting task.

This concludes my formal testimony. Thank you for the opportunity to appear

here before the Subcommittee today. I will be happy to answer any questions you may

have.



# United States Department of the Interior

## OFFICE OF THE SOLICITOR

MAR 1 2 2007

### MEMORANDUM

To:      Office of the Secretary
         Office of the Solicitor
         Office of the Special Trustee
               Office of Historical Trust Accounting
         Office of the Inspector General
         Office of Assistant Secretary - Indian Affairs
               Bureau of Indian Affairs
         Office of Assistant Secretary - Policy, Management, and Budget
               Office of Hearings and Appeals
         Office of Assistant Secretary - Land and Minerals
               Minerals Management Service
               Office of Surface Mining
               Bureau of Land Management
         Office of Assistant Secretary - Fish, Wildlife, and Parks
               Fish and Wildlife Service
         Office of Assistant Secretary - Water and Science
               Bureau of Reclamation
               U.S. Geological Survey

From:    Lawrence J. Jensen
         Deputy Solicitor

Subject:     Litigation Hold: Preservation of Information in Tribal Trust Cases

As you may know, eighty Tribal plaintiffs, including some Indian groups that are not federally recognized, recently filed actions against the Department of the Interior ("Department") asserting claims of breach of trust and/or asset mismanagement (collectively, "Tribal Trust cases"). This gives rise to an extremely important obligation under Federal law to preserve material that is or may be relevant to the Tribal Trust cases.

The purpose of this Litigation Hold is to inform you of the scope of this obligation and what actions are required to comply with it. The preservation of information will primarily be carried out by individual employees and contractors (any reference herein to "employees" includes contractor employees). Therefore, it is imperative that a copy of this Litigation Hold reaches every employee who may possess relevant information in your bureau or office.

### Information To Be Preserved:

The information that must be preserved consists of all "documents, data, and tangible things" in the possession, custody, or control of your bureau or office that are or may be relevant to the subject matter of the Tribal Trust cases. "Documents, data, and tangible things" encompass paper documents, electronically stored information (discussed below), and other materials, such as maps, videos, calendars, charts, and similar items.

Attached is a list identifying the individual Tribal plaintiffs whose information must be preserved. Additionally, the Native American Rights Fund has filed an action purporting to be on behalf of all other Tribes that received materials as part of the Tribal Reconciliation Project. Therefore, this Litigation Hold covers information concerning any Tribe or group of Indians for which the Department administers or has administered assets in trust.

The Tribal Trust cases concern the management and accounting of tribal resources and funds held in trust by the Department. Accordingly, information that is or may be relevant to these cases includes, without limitation, anything reflecting, referring or relating to:

1. any asset, such as funds, land, minerals, forestry, sand and gravel, or other resources, that is, or at any time has been, held in trust by the United States or its agents for Tribes or Indian groups ("trust asset");
2. policies, procedures, guidelines, or correspondence relating to any aspect of the management or administration of trust assets;
3. proceeds, interest, or income from trust assets; or disbursement, distribution, disposition or transfer of any trust assets;
4. reports, appraisals, reconciliations, or evaluations of any trust assets; and
5. information that serves to identify, locate, or link any relevant information, such as file inventories, file folders, and indices.

The timeframe of information that must be preserved is from a yet-to-be-determined beginning date through the present, which means that information created in the future must also be preserved.

### General Preservation Requirements:

Employees are required to take "reasonable steps" to preserve the information described above. Reasonable steps, at a minimum, include ensuring that information is not purged pursuant to a records disposition schedule or otherwise inadvertently destroyed. This obligation also extends to records maintained in off-site storage facilities, which may include, in some instances, Federal Records Centers. At the present time, this obligation is only to identify and preserve the information. You will be notified if anything additional is required as the Tribal Trust cases proceed.

2

03/23/2007 16:56 FAX 2022190559         DOI                              ☑007

## Preservation of Electronically Stored Information ("ESI"):

Under new amendments to the Federal Rules of Civil Procedure, the preservation requirement explicitly relates to electronically stored information. ESI can include, but is not limited to:

- E-mail (including attachments);
- Instant messages;
- Electronic calendars, task lists, and other organizational aids;
- Word processing documents;
- Spreadsheets;
- Databases;
- Audio and video recordings; and
- Voicemail.

ESI may be located on network systems and servers; local hard drives, laptops, storage media, (including flash drives, diskettes, and CD-ROMs), as well as on PDAs (such as Blackberries) and cell phones. · Note that home computers, cell phones, and other devices used for work may also contain relevant or potentially relevant information that must be identified and preserved. Further, the hard drive and network files of departing employees must be identified and preserved.

Your IT personnel will be responsible for taking steps to preserve ESI from a technical standpoint. Employees should seek assistance from the IT personnel as necessary to preserve their ESI, and in no case should they delete any relevant information.

### Conclusion:

Immediate compliance with this Litigation Hold is essential to protect the Department from lengthy—and avoidable—discovery disputes that consume bureau time and resources and other negative consequences, such as monetary sanctions and evidentiary inferences that would limit the Department's ability to defend against the claims in the cases. This Litigation Hold also protects individual managers and employees by providing them basic guidance on how to comply with their legal requirements.

Thank you for your prompt attention to this matter. Please direct any questions about this memorandum to Paul Smyth, Counselor to the Solicitor, (202-208-4307).

Attachment

3

**Tribes and Indian Groups with Pending Tribal Trust Cases (As of 3/06/2007)**

Ak-Chin Indian Community

Alabama Quassarte Tribal Town

Assiniboine & Sioux

Gros Ventre Tribe and Assiniboine Tribe

Blackfeet Tribe of the Blackfeet Indian Reservation

Cheyenne River Sioux Tribe

The Chickasaw Nation and Choctaw Nation

Chippewa Cree ("Pembina")

Chippewa Cree Tribe of the Rocky Boy's Reservation

Coeur d'Alene Tribe

Colorado River Indian Tribes

The Confederated Tribes of the Colville Reservation

Confederated Tribes of the Goshute Reservation

Confederated Tribes of the Warm Springs Reservation of Oregon

Crow Creek Sioux Tribe

Delaware Tribe of Indians and The Delaware Trust Board

Delawares of Idaho, Inc.

Eastern Shawnee Tribe of Oklahoma

Gila River Indian Community

Haudenosaunee, Onondaga Nation

Hoopa Valley Tribe

Hopi Tribe

Iowa Tribe of Kansas and Nebraska

1

03/23/2007 16:58 FAX 2022190559          DOI                                          @009

Jicarilla Apache Nation

Kaw Nation of Oklahoma

Makah Indian Tribe of the Makah Indian Reservation

Miami Tribe of Oklahoma

Muscogee (Creek) Nation of Oklahoma

Navajo Nation

Nez Perce, et al (Class Action)
    Mescalero Apache Tribe
    Tule River Indian Tribe
    Hualapai Tribe
    Yakama Nation
    Klamath Tribes
    Yurok Tribes
    Cheyenne-Arapaho Tribe
    Sac and Fox Nation
    Santee Sioux Tribe of Nebraska
Nez Perce Tribe

Northern Cheyenne Tribe of Indians

Northwestern Band of Shoshone Indians

Oglala Sioux Tribe

Omaha Tribe of Nebraska

Osage Nation and/or Tribe of Indians of Oklahoma

2

Otoe-Missouria Tribe of Indians of Oklahoma

Paiute-Shoshone Indians of the Bishop Community of the Bishop Colony, California

Passamaquoddy Tribe of Maine

Pawnee Nation of Oklahoma

Pechanga Band of Luiseno Mission Indians of California

Ponca Tribe of Indians of Oklahoma

Prairie Band of Potawatomi Nation

Pueblo of Laguna

Pueblo of Santa Ana

Quechan Tribe of the Fort Yuma Indian Reservation

Red Cliff Band of Lake Superior Chippewa Indians

Rosebud Sioux Tribe

Round Valley Indian Tribes

Salt River Pima-Maricopa Indian Community

San Manuel Band of Serrano Missions Indians

Seminole Nation of Oklahoma

Shoshone-Bannock Tribes of the Fort Hall Reservation

The Shoshone Indian Tribe and Northern Arapaho Tribe of the Wind River
Reservation, Wyoming

Eastern Shoshone Tribe and Northern Arapaho Tribe

Soboba Band of Luiseno Indians

Sokaogon Chippewa Community (aka Mole Lake Band of Lake Superior
Chippewa Indians)

Standing Rock Sioux

Stillaguamish Tribe of Indians

Swinomish Indian Tribal Community

Te-Moak Tribe of Western Shoshone Indians (Class Action)

Three Affiliated Tribes of the Fort Berthold Reservation

Tohono O'odham Nation

Tonkawa Tribe of Indians of Oklahoma

United Keetoowah Band of Cherokee Indians in Oklahoma.

Ute Indian Tribe of the Uintah and Ouray Reservation

Winnebago Tribe of Nebraska

3

03/23/2007 16:57 FAX 2022190559    DOI    ☑011

Wyandot Nation of Kansas

Yankton Sioux

Yomba Shoshone Tribe

4

# In the United States Court of Federal Claims

No. 06-932 L

(E-Filed: July 19, 2007)

|  |  |
|---|---|
| AK-CHIN INDIAN COMMUNITY, | ) |
|  | ) |
| Plaintiff, | ) |
|  | ) |
| v. | ) |
|  | ) |
| THE UNITED STATES, | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

## PROTECTIVE ORDER

The parties requested the court to enter a protective order and provided a proposed form of order on July 13, 2007. Based on the parties' proposed form of the order and further to discussions held telephonically on July 18, 2007, the court GRANTS the parties' motion to the extent consistent with the following and ORDERS as follows:

1.    All materials and information provided by defendant to plaintiff or its representatives in response to pre-trial discovery, the court's production orders or the initial disclosures required by Rules of the Court of Federal Claims (RCFC) 26(a)(1) in this action (Produced Material) shall be subject to the terms of this Protective Order.

2.    Any Produced Material which contains Confidential Information, as described in the second and third sentences of this paragraph 2, shall be marked by defendant with the endorsement "CONFIDENTIAL MATERIALS--DO NOT DISCLOSE." Produced Material will be so designated if it contains trade secret, confidential, proprietary or commercially sensitive information within the scope of RCFC 26(c)(7). Confidential Information entitled to protection under this Protective Order shall include, but is not limited to, information protected by the Privacy Act, 5 U.S.C. § 552a; "privileged proprietary information" as defined by 25 U.S.C. § 2103(c) enacted as part of the Indian Mineral Development Act of 1982; information concerning the nature and location of archeological resources within

the meaning of 16 U.S.C. § 470hh of the Archeological Resources Protection Act of 1979; information about the location, character or ownership of historical sites within the meaning of 16 U.S.C. § 470w-3(a) of the Natural Historic Preservation Act of 1966; information which concerns or relates to trade secrets or confidential statistical or financial data within the meaning of 18 U.S.C. § 1905; and other confidential, proprietary or commercially sensitive information, including but not limited to financial information of Individual Indians or other Tribes, within the scope of RCFC 26(c)(7). The same endorsement shall be placed on any document or other record prepared on behalf of plaintiff that incorporates Confidential Information derived from any Produced Material designated by defendant as "CONFIDENTIAL MATERIALS--DO NOT DISCLOSE." Produced Material that contains solely plaintiff's trade secrets, confidential statistical or financial information, or other confidential information will not be designated by defendant as Confidential Information and, except as provided in paragraph 4 below, is not subject to this Protective Order.

3.    Any documents, data or other materials that defendant identifies as potentially containing Confidential Information and that defendant makes available to plaintiff or its representatives for inspection shall be treated as if it were Confidential Information and no copies of any such material shall be made during inspection. If images or copies of such inspected materials are thereafter requested by and provided to plaintiff, only those images or copies containing Confidential Information shall be marked by defendant as "CONFIDENTIAL MATERIALS-- DO NOT DISCLOSE" and be subject to the provisions of this Protective Order.

4.    Plaintiff and defendant may agree to forego defendant's review to determine the confidentiality of the Produced Material, in which case defendant shall endorse "CONFIDENTIAL MATERIALS—DO NOT DISCLOSE" on all of the documents, data, and other materials before providing them to plaintiff. The documents, data, and other materials endorsed in this manner shall be deemed Confidential Information and protected as such under this Protective Order. If plaintiff intends to file documents, data, or other materials that have been endorsed as Confidential Materials with the court as evidence or for any other purpose, it shall follow the procedures set forth in this Protective Order. Alternatively, plaintiff may request that defendant review the endorsed documents, data, or other materials to determine if they contain Confidential Information, redact the Confidential Information, and produce a version of the documents, data, or other materials, after the necessary redactions, for filing with the court without the "CONFIDENTIAL MATERIALS—DO NOT DISCLOSE" endorsement. If

2

plaintiff wishes to use for any other purposes documents, data, or other materials that have been endorsed as Confidential Materials, plaintiff may request that defendant review those documents and produce a version of the documents, data or other materials without the Confidential Materials endorsement. Such documents, data, or other materials, after either being redacted or determined not to contain Confidential Information, shall no longer be considered Confidential Materials and subject to this Protective Order.

5.  Confidential Materials shall be used by plaintiff's counsel and its consultants and experts (including but not limited to accountants) only for purposes of this litigation, or as otherwise hereafter may be agreed to by the parties (provided that no such agreement shall permit disclosure in violation of law or the rights of third parties) or approved by the court. Plaintiff, plaintiff's counsel, consultants and experts may disclose or make available Confidential Materials only to their employees who are currently engaged in work specifically related to this litigation and only to the extent that those employees need such Confidential Materials in order to carry out that work. Before any Confidential Materials shall be disclosed by or on behalf of plaintiff to any person, plaintiff's counsel shall advise the person of the terms of this Protective Order, the person shall be provided with a copy of this Protective Order, the person shall personally review the terms of this Protective Order and shall execute a document containing the following acknowledgment:

> I understand that I am being given access to Confidential Materials containing Confidential Information within the terms of a Protective Order, in Ak-Chin Indian Community v. United States, No. 06-932L, (Fed. Cl. July 19, 2007), a copy of which has been provided to me. I have read the Protective Order and agree to be bound by its terms.

The executed acknowledgments shall be maintained by plaintiff's attorney of record. Counsel for the parties shall be deemed to have executed the foregoing acknowledgment. The court, court personnel and court reporters shall have access to Confidential Materials without further action. Counsel for the parties shall advise court reporters at depositions of the applicable terms of this Protective Order.

6.  If plaintiff disputes defendant's assertion and designation that Produced Material contains Confidential Information, plaintiff shall notify defendant in writing and state the grounds for disputing defendant's assertion and designation of

Confidential Materials. Within 21 days of defendant's receipt of plaintiff's written notification, the parties shall discuss and attempt to resolve the dispute. If the parties do not resolve the dispute within 21 days (unless extended by agreement), the parties, by turns, beginning with plaintiff, shall promptly (that is, within seven days unless otherwise agreed or ordered by the court), file a motion to seek a ruling from the court regarding defendant's assertion and designation of Confidential Materials.

7.   Confidential Materials shall be filed under seal by the Clerk of the Court if such materials are filed into the court record as evidence or exhibits or for any other purpose. The parties shall not file with the court at any time any pretrial motion, brief, pleading, or other filing in this case, quoting or paraphrasing Confidential Materials or containing Confidential Information obtained from Confidential Materials, unless the portion of the motion, brief, pleading, or other filing is filed under seal with the Clerk of the Court. All materials filed under seal shall be filed in accordance with General Order No. 42A of the Court of Federal Claims, Nov. 4, 2004, and other court rules, policies, and orders applicable at the time of filing. If Confidential Materials or Confidential Information shall be discussed at any deposition, defendant shall, upon receipt of the transcript of such deposition, promptly designate the pages containing that information and those pages shall be marked with the "CONFIDENTIAL MATERIALS – DO NOT DISCLOSE" endorsement .

8.   All individuals to whom Confidential Materials are disclosed shall return to counsel for defendant or destroy all Confidential Materials in their possession immediately upon the termination of this litigation (including the resolution of any applicable appeals) or the termination of any related administrative proceedings before the Department of the Interior, whichever occurs later. In furtherance of the foregoing, plaintiff's counsel shall provide defendant's counsel with copies of the acknowledgments executed pursuant to paragraph 5. If an individual or entity to whom Confidential Materials are disclosed ceases to serve as plaintiff's legal representative, the individual or entity shall immediately return to counsel for plaintiff all Confidential Materials then in his or her or its possession. Individuals or entities returning or destroying Confidential Materials shall provide to defendant's counsel certification in writing that the Confidential Materials have been returned or destroyed. Compliance with the terms of this paragraph 8 is not intended to result in plaintiff being unable to retain copies of documents to the extent that such documents contain information about plaintiff or plaintiff's assets or information about the performance by defendant of its trust responsibilities to

4

plaintiff (collectively plaintiff's documents). The parties shall cooperate, using the procedures for redaction described in paragraph 4 or other procedures agreed to by the parties or ordered by the court, so that plaintiff may, at the termination of this litigation, retain copies of plaintiff's documents.

9.    This Protective Order shall remain in full force and effect after the termination of this litigation.

     IT IS SO ORDERED.

                              s/ Emily C. Hewitt
                              EMILY C. HEWITT
                              Judge

5

# In the United States Court of Federal Claims

No. 06-889 L

(Filed December 12, 2007)

```
* * * * * * * * * * * * * * * * * * * *
MAKAH INDIAN TRIBE OF THE        *
MAKAH INDIAN RESERVATION,        *
                                 *
            Plaintiff,           *
                                 *
      v.                         *
                                 *
THE UNITED STATES,               *
                                 *
            Defendant.           *
* * * * * * * * * * * * * * * * * * * *
```

## PROTECTIVE ORDER

This matter is before the court on the parties' Joint Stipulation, filed December 7, 2007, regarding the confidentiality of certain documents, data, and other materials to be provided by defendant to plaintiff in this case. The joint stipulation states that defendant has documents, data, and other materials in its possession, custody or control that may contain information that is subject to protection from disclosure under various statutory or regulatory provisions and policies, and that defendant proposes to provide access to this material to plaintiff's attorney(s) of record and others as stipulated. Court approval is sought. After full consideration of the joint stipulation and for good cause shown, it is hereby **ORDERED** that:

(1) The Joint Stipulation, filed November 15, 2007, is **APPROVED** and incorporated into this protective order as follows:

(2) This order and the associated joint stipulation govern the provision of confidential materials and confidential information by defendant to plaintiff during

this litigation, regardless of the context (*i.e.*, in litigation, ADR, or informal settlement discussions) in which the provision occurs.

(3)  Plaintiff shall not use the confidential materials, or their contents, for any purpose, other than this litigation (including any ADR process, informal settlement discussions, and appeals therein) or any related administrative proceedings before the Interior Department.  Any confidential information contained in the confidential materials shall be kept strictly confidential by plaintiff's attorney(s) and designee(s), and such confidential information shall not be disclosed, made public, or made available to anyone, except as specifically provided in this order and the associated joint stipulation or in any further order that this court may enter.

(4)  Any documents, data, or other materials made available by defendant to plaintiff's attorney(s) or plaintiff's designee(s) for inspection in this case shall be deemed confidential only for purposes of the inspection.  Any images or copies of confidential materials that are provided to plaintiff shall include the endorsement "CONFIDENTIAL MATERIALS—DO NOT DISCLOSE."  Plaintiff and defendant may agree to forego defendant's review to determine the confidentiality of certain documents, data, and other materials to be provided to plaintiff, in which case defendant shall include on those documents, data, and other materials the endorsement "CONFIDENTIAL MATERIALS—DO NOT DISCLOSE," before providing the documents, data, and other materials to plaintiff.  All documents, data, and other materials so endorsed shall be deemed confidential materials and protected as such under this order and the associated joint stipulation.

(5)  If plaintiff intends to file documents, data, or other materials that have been endorsed as confidential materials with the court as evidence or for any other purpose, it shall follow the procedures set forth in this order and the associated joint stipulation.  Alternatively, plaintiff may request that defendant, within a specified period of time agreed to by the parties, review certain endorsed documents, data, or other materials to determine if they contain confidential information; redact any confidential information; and produce a version of the documents, data, or other materials, after the necessary redactions, for filing with the court without the confidential information endorsement.  After the documents, data, or other materials have been redacted or otherwise determined not to contain confidential materials, the documents, data, or other materials shall no longer be

2

considered confidential and subject to this order and the associated joint stipulation.

(6) Documents, data, or other materials relating exclusively to individuals, other tribes, or entities, or to funds, lands, and resources to which plaintiff does not claim a legal interest shall not be produced to plaintiff, unless plaintiff and defendant agree that such production would be appropriate and necessary for the purposes of this case. In the event that the parties agree that such documents, data, or other materials should be produced to plaintiff, defendant shall include on the documents, data, or other materials the endorsement "CONFIDENTIAL MATERIALS—DO NOT DISCLOSE," before providing the documents, data, or other materials to plaintiff.

(7) Any notes, dictation tapes, or media containing electronically stored information that are made as part of a review of the confidential materials and that contain information regarding the confidential materials shall include the endorsement "CONFIDENTIAL MATERIALS—DO NOT DISCLOSE" and shall be subject to the same provisions as copies or images of the confidential materials.

(8) Confidential materials may be disclosed without further court approval only to the following: (1) the court or any settlement judge or mediator appointed, designated, or selected to work with the parties in this case; (2) the attorney(s) of record in this case, as well as the attorney(s), paralegal(s), and support staff in his/her/their office(s) who are involved or may be necessary in the ordinary course to representing a party herein; and (3) plaintiff's designees in this case. Plaintiff's designees may include attorneys representing other tribes in other tribal trust fund mismanagement cases, if plaintiff and its counsel determine that such designations are needed for the litigation, settlement, or other alternative resolution of this case. Plaintiff assumes all liability for the disclosure of any confidential information and/or materials to its designees, including any liability that may arise from any claims brought by individuals or tribes (other than plaintiff) that may be based on or stem from the disclosure of confidential information and/or materials related to those individuals or those other tribes. Defendant (including the Departments of the Interior and of the Treasury) and DOJ shall be held harmless for any disclosures of any confidential materials and/or information by plaintiff to its designees. Plaintiff's attorney(s) of record in this case; the attorney(s), paralegal(s), and support staff in the office(s) of plaintiff's attorney(s) of record;

3

and plaintiff's designees may have access to the confidential materials, provided, however, that, before receiving access to the confidential materials, each person receiving such access shall execute an "Affidavit of Confidentiality," in the form attached hereto as Exhibit 1, and provide the Affidavit to plaintiff's attorney(s) of record. (No Affidavit of Confidentiality needs to be executed by support staffers who simply handle or file the confidential materials but do not review their contents.) The executed Affidavits of Confidentiality shall be maintained by plaintiff's attorney(s) of record.

(9) Confidential materials shall be filed under seal by the Clerk of the Court in the event that such materials are filed into the court record as evidence or exhibits or for any other purpose. The parties herein shall not file with the court at any time any pretrial motion, brief, pleading, or other filing in this case, quoting, or paraphrasing confidential information, unless the confidential portion of any such motion, brief, pleading, or other filing is filed under seal with the Clerk of the Court. Materials or pleadings filed under seal shall be filed in accordance with Appendix E of the Rules of the United States Court of Federal Claims and other applicable court rules, policies, and orders; provided that, pursuant to this order, the parties shall not be required to file motions for leave to file documents under seal. Materials or pleadings filed under seal shall be filed in a sealed envelope or other appropriate sealed container on which shall be endorsed the title of the action, an indication of the nature of the contents of such sealed container or other container, the phrase "CONFIDENTIAL MATERIALS—FILED UNDER SEAL," and a statement substantially in the following form:

> This envelope or container is sealed and contains confidential information filed in this case by [name of party] and is not to be opened or the contents thereof displayed or revealed, except by order of the court or pursuant to written stipulation of the parties to this action. This envelope or container shall not be opened without order of the court, except by officers of the court or attorney of record, who, after reviewing the contents, shall return them to the Clerk in a sealed envelope or container.

(10) It shall be the responsibility of plaintiff's attorney(s) of record herein,

4

as well as the attorney(s) working with plaintiff's attorney(s) of record on this case, of plaintiff's designees, and of any other person possessing confidential materials, to employ reasonable measures, consistent with this order and the associated joint stipulation, to control duplication of, access to, and distribution of the confidential materials.

(11) All confidential materials, copies or images thereof, or extracts that constitute confidential materials under this order and the associated joint stipulation shall be returned to counsel for defendant or be destroyed, immediately upon the termination of this litigation (including the resolution of any applicable appeals) or upon the termination of any related administrative proceedings, if any, before the Interior Department, whichever occurs later. At that time, all individuals who have executed an Affidavit of Confidentiality pursuant to paragraph 8 of this order and paragraph 7 of the associated joint stipulation who still have access to such confidential materials shall certify in writing that all such confidential materials, copies or images thereof, or extracts that constitute confidential materials have been returned or destroyed. Plaintiff's attorney(s) of record shall maintain these certifications and shall provide a copy thereof to defendant's counsel upon request. In the event that an individual or entity to whom confidential materials are disclosed is no longer plaintiff's attorney(s) or designee(s), the individual or entity shall immediately return to counsel for plaintiff or destroy all confidential materials in his or her possession as set forth in the Affidavit of Confidentiality, Exhibit 1, hereto. In the event that the individual or entity returns the confidential materials to plaintiff's counsel, plaintiff's counsel shall handle the materials in accordance with the requirements of this paragraph and the rest of this order and the associated joint stipulation.

(12) If plaintiff disputes defendant's assertion and designation that a document, data, or information is/are subject to confidentiality protection under federal law or regulations, plaintiff shall notify defendant in writing and state therein the grounds for disputing the assertion and designation of confidentiality. Within 20 days of the other party's receipt of such written notification (or a longer period of time, if the parties so agree), the parties herein shall discuss and attempt to resolve the dispute. If the parties do not resolve the dispute within 20 days or an extension thereof, plaintiff may file a motion to seek a ruling from the court regarding defendant's assertion and designation regarding confidentiality. Plaintiff may request a shorter period of time for good cause.

5

(13)  Until further order of this court, this order and the associated joint stipulation shall remain in full force and effect after the dismissal of the case and regardless of whether the parties reach settlement.

**It is so ORDERED**.

/s/Lynn J. Bush

LYNN J. BUSH

Judge

6

# In the United States Court of Federal Claims

No. 06-888L

Filed March 25, 2008

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| QUECHAN TRIBE OF THE FORT YUMA INDIAN RESERVATION, | * * * * |
| Plaintiff, | * * |
| v. | * * |
| THE UNITED STATES, | * * |
| Defendant. | * * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ORDER

On March 24, 2008, the Parties filed a Joint Motion for Approval of Stipulation Regarding Confidentiality of Certain Documents, Data, and Other Materials to be Provided by Defendant to Plaintiff. The Joint Motion states that defendant has documents, data, and other materials in its possession, custody or control that may contain information that is subject to protection from disclosure under various statutory or regulatory provisions and policies, and that Defendant proposes to provide access to this material to Plaintiff's attorney(s) of record and other as stipulated. The Joint Motion is granted, and the court enters the following Order:

(1) This Order and the associated Joint Stipulation govern the provision of confidential materials and confidential information by Defendant to Plaintiff during this litigation, regardless of the context (i.e., in litigation, ADR, or informal settlement discussions) in which the provision occurs.

(2) Plaintiff shall not use the Confidential Materials, or their contents, for any purpose, other than this litigation (including any ADR process, informal settlement discussions, and appeals therein) or any related administrative proceedings before the Department of the Interior. Any Confidential Information contained in the Confidential Materials shall be kept strictly confidential by Plaintiff's attorney(s) and designee(s), and such Confidential Information shall not be disclosed, made public, or made available to anyone, except as specifically provided in this Order and the associated Joint Stipulation or in any further Order that this court may enter.

(3) Any documents, data, or other materials made available by Defendant to Plaintiff's attorney(s) or Plaintiff's designee(s) for inspection in this case shall be deemed Confidential only for purposes of the inspection. Any images or copies of Confidential Materials that are provided to Plaintiff shall include the endorsement "CONFIDENTIAL MATERIALS-DO NOT DISCLOSE." Plaintiff and Defendant may agree to forego Defendant's review to determine the confidentiality of certain documents, data, and other materials to be provided to Plaintiff, in which case Defendant shall include on those documents, data, and other materials the endorsement "CONFIDENTIAL MATERIALS-DO NOT DISCLOSE," before providing the documents, data, and other materials to Plaintiff. All documents, data, and other materials so endorsed shall be deemed Confidential Materials and protected as such under this Order and the associated Joint Stipulation.

(4) If Plaintiff intends to file documents, data, or other materials that have been endorsed as Confidential Materials with the court as evidence or for any other purpose, it shall follow the procedures set forth in this Order and the associated Joint Stipulation. Alternatively, Plaintiff may request that Defendant, within a specified period of time agreed to by the parties, review certain endorsed documents, data, or other materials to determine if they contain Confidential Information; redact any Confidential Information; and produce a version of the documents, data, or other materials, after the necessary redactions, for filing with the court without the Confidential Information endorsement. After the documents, data, or other materials have been redacted or otherwise determined not to contain Confidential Materials, the documents, data, or other materials shall no longer be considered confidential and subject to this Order and associated Joint Stipulation.

(5) Documents, data, or other materials relating exclusively to individuals, other Tribes, or entities, or to funds, lands, and resources to which Plaintiff does not claim a legal interest shall not be produced to Plaintiff, unless Plaintiff and Defendant agree that such production would be appropriate and necessary for the purposes of this case. In the event that the parties agree that such documents, data, or other materials should be produced to Plaintiff, Defendant shall include on the documents, data, or other materials the endorsement "CONFIDENTIAL MATERIALS-DO NOT DISCLOSE," before providing the documents, data, or other materials to Plaintiff.

(6) Any notes, dictation tapes, or media containing electronically stored information that are made as part of a review of the Confidential Materials and that contain information regarding the Confidential Materials shall include the endorsement "CONFIDENTIAL MATERIALS-DO NOT DISCLOSE and shall be subject to the same provisions as copies or images of the Confidential Materials.

(7) Confidential Materials may be disclosed without further court approval only to the following: (1) the court or any settlement judge or mediator appointed, designated, or selected to work with the parties in this case; (2) the attorney(s) of record in this case, as well as the attorney(s), paralegal(s), and support staff in his/her/their office(s) who are involved or may be necessary in the ordinary course to representing a party herein; and (3) Plaintiff's designees in this case. Plaintiff's designees may include attorneys representing other Tribes in other Tribal trust fund mismanagement cases, if Plaintiff and its counsel determine that such designations are needed for the litigation,

2

settlement, or other alternative resolution of this case. Plaintiff assumes all liability for the disclosure of any Confidential Information and/or Materials to its designees, including any liability that may arise from any claims brought by individuals or tribes (other than Plaintiff) that may be based on or stem from the disclosure of Confidential Information and/or Materials related to those individuals or those other tribes. Defendant (including the Departments of the Interior and of the Treasury) and DOJ shall be held harmless for any disclosures of any Confidential Materials and/or Information by Plaintiff to its designees. Plaintiff's attorney(s) of record in this case; the attorney(s), paralegal(s), and support staff in the office(s) of Plaintiff s attorney(s) of record; and Plaintiff s designees may have access to the Confidential Materials, provided, however, that, before receiving access to the Confidential Materials, each person receiving such access shall execute an "Affidavit of Confidentiality," in the form attached to the Joint Motion as Exhibit 1, and provide the Affidavit to Plaintiffs attorney(s) of record. (No Affidavit of Confidentiality needs to be executed by support staffers who simply handle or file the Confidential Materials but do not review their contents.) The executed Affidavits of Confidentiality shall be maintained by Plaintiff s attorney(s) of record.

(8) Confidential Materials shall be filed under seal by the Clerk of the United States Court of Federal Claims in the event that such materials are filed into the court record as evidence or exhibits or for any other purpose. The parties herein shall not file with the court at any time any pretrial motion, brief, pleading, or other filing in this case, quoting, or paraphrasing Confidential Information, unless the confidential portion of any such motion, brief, pleading, or other filing is filed under seal with the Clerk of the court. Materials or pleadings filed under seal shall be filed in accordance with the Rules of the Court of Federal Claims and other applicable court rules, policies, and Orders; provided that, pursuant to this Order, the parties shall not be required to file motions for leave to file documents under seal. Materials or pleadings filed under seal shall be filed in a sealed envelope or other appropriate sealed container on which shall be endorsed the title of the action, an indication of the nature of the contents of such sealed container or other container, the phrase "Confidential Materials - Filed Under Seal," and a statement substantially in the following form:

> This envelope or container is sealed and contains confidential information filed in this case by [name of party] and is not to be opened or the contents thereof displayed or revealed, except by order of the court or pursuant to written stipulation of the parties to this action. This envelope or container shall not be opened without order of the court, except by officers of the court or attorney of record, who, after reviewing the contents, shall return them to the Clerk in a sealed envelope or container.

(9) It shall be the responsibility of Plaintiff's attorney(s) of record herein, as well as the attorney(s) working with Plaintiffss attorney(s) of record on this case, of Plaintiff's designees, and of any other person possessing Confidential Materials, to employ reasonable measures, consistent with this Order and the associated Joint Stipulation, to control duplication of, access to, and distribution of the Confidential Materials.

(10) All Confidential Materials, copies or images thereof, or extracts that constitute Confidential Materials under this Order and the associated Joint Stipulation shall be returned to

3

counsel for Defendant or be destroyed, immediately upon the termination of this litigation (including the resolution of any applicable appeals) or upon the termination of any related administrative proceedings, if any, before the Interior Department, whichever occurs later. At that time, all individuals who have executed an Affidavit of Confidentiality pursuant to Paragraph 5 of this Order and the associated Joint Stipulation who still have access to such Confidential Materials shall certify in writing that all such Confidential Materials, copies or images thereof, or extracts that constitute Confidential Materials have been returned or destroyed. Plaintiff's attorney(s) of record shall maintain these certifications and shall provide a copy thereof to Defendant's counsel upon request. In the event that an individual or entity to whom Confidential Materials are disclosed is no longer Plaintiff's attorney(s) or designee(s), the individual or entity shall immediately return to Counsel for Plaintiff or destroy all Confidential Materials in his or her possession as set forth in the Affidavit of Confidentiality. In the event that the individual or entity returns the Confidential Materials to Plaintiff's counsel, Plaintiff's counsel shall handle the materials in accordance with the requirements of this paragraph and the rest of this Order and the associated Joint Stipulation.

(11) If Plaintiff disputes Defendant's assertion and designation that a document, data, or information is/are subject to confidentiality protection under federal law or regulations, Plaintiff shall notify Defendant in writing and state therein the grounds for disputing the assertion and designation of confidentiality. Within 20 days of the other party's receipt of such written notification (or a longer period of time, if the parties so agree), the parties herein shall discuss and attempt to resolve the dispute. If the parties do not resolve the dispute within 20 days or an extension thereof, Plaintiff may file a motion to seek a ruling from the court regarding Defendant's assertion and designation regarding confidentiality. Plaintiff may request a shorter period of time for good cause.

(12) Until further order of this court, this Order and the associated Joint Stipulation shall remain in full force and effect after the dismissal of the case and regardless of whether the parties reach settlement. The court, however, reserves the right, after reviewing the record and other information submitted by the parties, to modify this Order in the event such information is not confidential, privileged, proprietary, or would adversely affect national defense and/or national security upon public disclosure.

**IT IS SO ORDERED.**

<div style="margin-left:40%">

s/Susan G. Braden
**SUSAN G. BRADEN**
**Judge**

</div>